IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| SOUTHERN NUCLEAR OPERATING, COMPANY; ALABAMA POWER COMPANY; and GEORGIA POWER COMPANY, | ) | |
| Plaintiffs, | ) | |
| v. | ) | No. 98-614C |
| | ) | (Senior Judge Merow) |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

DEFENDANT'S RESPONSE TO PLAINTIFFS' MOTION FOR AN ORDER REGARDING SUBSEQUENT DAMAGES ACTIONS AND REQUEST FOR EXPEDITED CONSIDERATION AND CROSS-MOTION FOR SUMMARY JUDGMENT REGARDING PRE-BREACH AND FUTURE DAMAGES

Defendant, the United States, respectfully files this response to the motion for an order regarding subsequent damages actions and request for expedited consideration filed by plaintiffs, Southern Nuclear Operating Company, Alabama Power Company and Georgia Power Company (collectively, "Southern Nuclear"). Defendant also respectfully requests that the Court grant the Government summary judgment regarding Southern Nuclear's ability to recover costs incurred prior to January 31, 1998 ("pre-breach damages") and to recover costs that may be incurred after the date of the complaint or, at the latest, after the date of trial arising from post-complaint and future breaches of the Standard Contract ("future damages") in this case. Because of the nature of the contract breach that Southern Nuclear has asserted in its complaint – a partial breach, rather than a total breach – Southern Nuclear can recover neither pre-breach nor future or prospective damages in this case. Instead, the scope of damages to be properly litigated at the trial commencing in August 2005 are those that Southern Nuclear can establish it has incurred between January 31, 1998 and the date of the filing of its complaint as a result of the failure of

the Department of Energy ("DOE") to begin acceptance of spent nuclear fuel ("SNF") in accordance with the requirements of the Standard Contract, 10 C.F. R. § 961.11 (1983).

## SUMMARY OF THE ARGUMENT

In its motion on damages, Southern Nuclear appears to request an order from the Court that establishes the following: one, that the parties are to litigate damages that Southern Nuclear may have incurred since 1995, and might in the future incur through 2020, all allegedly arising from a partial breach through 2010, during the trial scheduled to begin in August 2005; and, two, that Southern Nuclear may file a new lawsuit in 2020 or after 2020 seeking payment for damages that may be incurred both before and after 2020. Southern Nuclear, however, has chosen to plead a partial breach of contract, a choice which necessarily limits its damages to those costs incurred between the date of breach and the date of upon which it filed its complaint, or potentially, an amended complaint. Southern Nuclear also misapprehends the continuing nature of the Government's partial breach. The Government's breach is not from 1998 to 2010, the date that DOE currently anticipates that it will be able to begin performance. Instead, the Government partially breaches the contract every time that it does not perform in accordance with the Government's agreements with individual utilities to accept a specific amount of their SNF.

Based upon the nature of the breach to be litigated and damages assessed, the Court should limit the consideration of damages to those incurred from January 31, 1998, the date of the breach of contract, through the date upon which Southern Nuclear filed its complaint. If Southern Nuclear decides to file a new or amended complaint encompassing all partial breaches that have occurred to the date of the filing of that new or amended complaint, which could then

be consolidated with this case, Southern Nuclear's damages recovery could include those damages incurred through the date of that new or amended complaint. Such an order would preclude the need for an order from the Court to allow Southern Nuclear to split its claims or, as Southern Nuclear requests, for the Court to retain jurisdiction over claims that may be litigated more than 15 years from now. Instead, Southern Nuclear can seek to recover future damages arising from future partial breaches when they are incurred in future claims brought to this Court within the applicable statute of limitations.

## ARGUMENT

### I. SOUTHERN NUCLEAR SEEKS TO RECOVER DAMAGES FOR A PARTIAL, RATHER THAN TOTAL, BREACH OF CONTRACT

Southern Nuclear has made a careful decision in identifying the type of contractual breach upon which it relies in this litigation. In its amended complaint, Southern Nuclear alleges that DOE's failure to begin acceptance of the nuclear utilities' SNF by January 31, 1998, constitutes a partial breach of the Standard Contract at issue in this litigation. First Amended Complaint, dated October 4, 2002, Count I. Moreover, this Court already found that the Government "partially breached the Standard Contracts executed by [Alabama Power Company and Georgia Power Company]. . . [when it] failed to meet the contractual requirement to begin disposition of the nuclear waste covered by the Standard Contract no later than January 31, 1998." Order, dated April 7, 2004, at 5. Southern Nuclear's reliance upon a partial breach of contract theory, as opposed to a total breach of contract theory, affects the scope of damages that Southern Nuclear may recover in this case and the parties' continuing obligations under the Standard Contract.

The distinction between a total and a partial breach of contract is extremely important here. If Southern Nuclear wanted to pursue a claim for a total breach of contract, it certainly could have attempted to have done so. However, as explained below, had Southern Nuclear pursued and prevailed upon such a theory, DOE would have had no further obligation to perform under the Standard Contract or to accept Southern Nuclear's SNF. Instead, DOE only would have been liable to Southern Nuclear for damages resulting from the total breach. We presume that, because Southern Nuclear wants DOE to continue to perform the Standard Contract and want to ensure that DOE will accept its SNF to preclude it from having to find an alternative means of long-term storage for that waste, Southern Nuclear consciously elected not to pursue claims for total breach and limited its claims to partial breach claims. Having elected to pursue a claim for partial breach, Southern Nuclear's damages must be confined to those properly allowed for a partial breach.

## II. SOUTHERN NUCLEAR CAN RECOVER ONLY FOR PARTIAL BREACHES THAT HAVE OCCURRED AS OF THE FILING OF ITS COMPLAINT

### A. DOE's Continuing Breaches Are Tied To The Failure To Accept SNF In Accordance With The Approved DCSs With Individual Utilities

Southern Nuclear seeks an order from the Court that, in part, mandates that the damages to be litigated at trial are those it has incurred to date and may incur until 2020 arising from DOE's assumed failure to perform until 2010. This request is based upon the Department of Energy's announced current expectation that it will commence acceptance from the nuclear utility industry in 2010. However, Southern Nuclear incorrectly views DOE's failure to perform to date as a single partial breach that extends from 1998 to 2010. Instead, DOE's failure to perform is properly viewed as a series of partial breaches tied to DOE's failure to perform in accordance

with the delivery commitment schedules that DOE approved relating to individual utilities and specific amounts of SNF. Given the uncertainty that exists with regard to future events, the Court can not decide with certainty that breaches will occur in the future. Further, the Court only possesses jurisdiction to entertain suits based upon breaches that had occurred as of the date upon which the complaint was filed.

The Standard Contract identifies a general framework for determining the order, or priority, of SNF acceptance from the various contract holders. It provides that "acceptance priority [for contract holder SNF and/or high-level waste ("HLW")] shall be based upon the age of the SNF and/or HLW as calculated from the date of discharge of such material from the civilian nuclear power reactor." 10 C.F.R. § 961.11, Art. VI.B.1. It further provides that "DOE will first accept from Purchaser the oldest SNF and/or HLW for disposal in the DOE facility, except as otherwise provided for in paragraphs B and D of Article V" and in paragraph B.1.b of Article VI. Id. Therefore, the Standard Contract generally requires that the "order" of DOE's acceptance of contract holders' SNF be based upon an "oldest fuel first" scenario, subject, among other things, to definitization of an allocation commitment to accept SNF through the contract holder's submission of, and DOE's approval of, a delivery commitment schedule.

Pursuant to the terms of the Standard Contract, and beginning not later than July 1, 1987, DOE was to "issue an annual capacity report for planning purposes," which would "set forth the projected annual receiving capacity for the DOE facility(ies) and the annual acceptance ranking relating to DOE contracts for the disposal of SNF and/or HLW including, to the extent available, capacity information for ten (10) years following the projected commencement of operation of the initial DOE facility." 10 C.F.R. § 961.11, Art. IV.B.5.b. The Standard Contract provided

DOE with the authority to identify and publish for planning purposes the rates of SNF acceptance that it anticipated, at any given time, might be utilized by DOE once SNF acceptance began. See id. Further, beginning on April 1, 1991, DOE was to "issue an annual acceptance priority ranking for receipt of SNF and/or HLW at the DOE repository," based upon "the age of SNF and/or HLW as calculated from the date of discharge of such material from the civilian nuclear power reactor" and with "[t]he oldest fuel or waste . . . hav[ing] the highest priority for acceptance," except as provided in Articles V.B, V.D, and VI.B.3. Id., Art. IV.B.5.a.

Beginning January 1, 1992, following DOE's issuance of the 1991 Annual Capacity Report and Acceptance Priority Ranking, the contract holders were required to submit delivery commitment schedules to DOE, "in the form set forth in Appendix C" to the Standard Contract, in which they would "identify all SNF and/or HLW the Purchaser wishes to deliver to DOE beginning sixty-three (63) months thereafter." 10 C.F.R. § 961.11, Art. V.B.1 (emphasis added). Accordingly, if the 1991 ACR identified a 1998 allocation for SNF acceptance from a particular contract holder, and if the contract holder wanted to use that 1998 allocation, the contract holder would have to submit a DCS for 1998 acceptance no later than September 30, 1992. See id.; A. 1 ("Instructions For Completing The Appendix C Delivery Commitment Schedule").[1]

DOE was to "approve or disapprove such schedules within three (3) months after receipt." 10 C.F.R. § 961.11, Art. V.B.1. "In the event of disapproval, DOE [was to] advise the Purchaser in writing of the reasons for disapproval and request a revised schedule from the Purchaser, to be submitted to DOE within thirty (30) days after receipt of DOE's notice of disapproval." Id. DOE had 60 days to approve or disapprove any revised DCS submission. Id., Art. V.B.2. "In the

[1] "A. __" refers to the appendix attached to this brief.

event of disapproval [of the revised DCS submission], DOE [was to] advise the Purchaser in writing of the reasons for such disapproval and [to] submit [DOE's] proposed schedule." Id. If the contract holder disagreed with DOE's proposed schedule, the parties were required "promptly [to] seek to negotiate mutually acceptable schedule(s)." Id.

Upon approval by DOE, the delivery commitment schedule defined, among other things, the first year in which DOE was obligated to begin acceptance of a contract holder's SNF, and the amount of SNF that DOE was to take from a particular contract holder in a given year. 10 C.F.R. § 961.11, Appendix C. As the Standard Contract expressly provided, the SNF that DOE was to accept for any particular year "shall be specified in a delivery commitment schedule as provided in Article V below." Id., Art. II. Absent a delivery commitment schedule, DOE had no basis for identifying any SNF that a contract holder intended to deliver to DOE within a given year. Further, the "oldest fuel first" acceptance priority ranking in Article VI.B.1 of the Standard Contract was made expressly contingent upon the DCS provisions in Article V.B, indicating that, absent a submitted and approved DCS for a given year, a contract holder would lose its priority, or right to SNF acceptance, for that year. Thus, a contract holders' submission of a DCS, and DOE's approval thereof, determined the first year in which DOE was obligated to begin acceptance of the contract holder's SNF and HLW.

Indeed, a contract holder's failure to submit a delivery commitment schedule at least 63 months before its acceptance allocation waives its position in the acceptance queue for that particular allocation period. The Standard Contract requires that, beginning January 1, 1992, the contract holder "shall submit to DOE the [delivery commitment schedules] which shall identify all SNF and/or HLW the Purchaser wishes to deliver to DOE beginning sixty-three (63) months

thereafter." 10 C.F.R. § 961.11, Art. V.B.1 (emphasis added). Further, the Standard Contract defines the scope of the Standard Contract as relating to the acceptance by DOE of SNF "specified in a delivery commitment schedule as provided in Article V below." Id. § 961.11, Art. II. Until a contract holder submits a DCS for a particular year, DOE cannot approve a specific delivery commitment to that contract holder for that year. See id. § 961.11, Art. V.B.1. Accordingly, absent an approved DCS through which a contract holder commits to delivering a specific amount of SNF to DOE in a given year, there is no basis in the Standard Contract upon which DOE could, or would, be able to accept any SNF from a contract holder in that year. If a contract holder elects not to submit a DCS for a particular year in which DOE had provided it an allocation, the contract holder has waived its rights to acceptance for that allocation period.

The delivery commitment schedule thus defined the amount of SNF and/or HLW that DOE would accept from a contract holder in a given year, and established the first year in which DOE was obligated to begin that acceptance. Further definitization of the timing for SNF and/or HLW acceptance came through the submission, review, and approval of final delivery schedules. Specifically, not less than 12 months before the delivery date "for delivery of SNF and/or HLW covered by an approved [DCS], the contract holder holding that DCS was required to "submit to DOE final delivery schedules . . . ," which DOE would review and either approve or disapprove. 10 C.F.R. § 961.11, Art. V.C. The final delivery schedule required identification of the proposed "delivery first estimate" to further define the specific dates for SNF and HLW acceptance during the assigned year. As with the DCS submittal and approval process, if the parties could not agree upon the final delivery schedule, the parties were required "promptly [to] seek to negotiate

mutually acceptable schedule(s)."[2] Id. It is DOE's failure to perform in accordance with these approved DCSs that gives rise to the partial breach of contract for which Southern Nuclear and the other nuclear utilities seek damages.[3]

B. Performance In 2010 Has Not Been Established As An Independent Contractual Commitment Pursuant To The Standard Contract

Southern Nuclear incorrectly views DOE's announced plans regarding the start of acceptance in 2010 as an "admission" regarding the nature and the scope of the breach at issue. Pl. Mtn. at 2. However, the Standard Contract has not been modified to create a new performance obligation that runs from 2010. Indiana Michigan Power Co. v. United States, 60 Fed. Cl. 639, 648 n.19 (2004). DOE's obligation to perform continues to run from 1998. Moreover, uncertainty as to the future actions that Congress, DOE, or the Nuclear Regulatory Commission may take which could affect DOE's ability to commence operations at Yucca

[2] If the parties could not agree upon a disapproved delivery commitment schedule or a final delivery schedule after negotiation, the Standard Contract's "Disputes" clause would apply. 10 C.F.R. § 961.11, Art. XVI.A. Pursuant to that clause, "any dispute concerning a question of fact arising under this contract which is not disposed of by agreement shall be decided by the Contracting Officer, who shall reduce his decision to writing and mail or otherwise furnish a copy to the Purchaser." Id. The contracting officer's decision is final and conclusive unless, within 90 days from the purchaser's date of receipt of the decision, the purchaser appeals in writing to the Department of Energy Board of Contract Appeals. Id.

[3] Pursuant to the Court's April 7, 2004 order, the Court has determined that the issue regarding the rate of acceptance and the role of the approved DCSs in the determination of that rate would be resolved in further proceedings. Order at 6-7 ("What is required are schedules of the specific damages claimed by plaintiffs [Alabama Power Company and Georgia Power Company] so that any rate determination(s), if any, that may be required in order to resolve issues of liability for the damages items sought can be reached in the context of the actual circumstances involved.") Accordingly, the actual extent of the Government's breach in any given year since 1998 will be developed in future proceedings, presumably at trial.

Mountain by 2010 or at another facility prior to that time preclude the Court from knowing that the time period 1998 to 2010 defines the specific extent of DOE's partial breaches.

While DOE has clearly stated that it currently anticipates that it will begin performance at a repository at Yucca Mountain in 2010, it is not at all certain that no action will be taken with regard to utility SNF prior to that date, given national security and other cost considerations. The Court, during the trial in Yankee Atomic, heard evidence regarding this uncertainty. As Mr. Kouts, director of the office responsible for the waste acceptance function within the Office of Civilian Radioactive Waste Management, testified, circumstances could change that would allow or require DOE to perform prior to 2010. Specifically, Congress could enact legislation requiring DOE to construct and accept waste at a centralized interim storage facility in advance of the completion of Yucca Mountain. Congress has considered legislation that provided for these actions in the past. A. 12; A. 17. Alternatively, Congress or the Nuclear Regulatory Commission could mandate that Federal funds be expended to purchase casks for utilities to store all of their spent fuel for national security reasons. A. 13. Either of these actions could alleviate the burden imposed upon contract holders by DOE's continuing breach. Congress clearly continues to monitor issues related to the storage of SNF at nuclear utilities for reasons of national security, urging DOE to "move aggressively to get the Yucca Mountain repository licensed, built, and operating at the earliest possible date." A. 19. Moreover, several nuclear utilities, including Indiana Michigan, have argued that DOE is not likely to perform at Yucca Mountain in 2010, but rather will be delayed by the licensing process. Indiana Michigan, 60 Fed. Cl. at 643. A determination by the Court that the partial breach of the Standard Contract

runs from 1998 to 2010 may leave utility plaintiffs without a remedy, if DOE is unable to perform until 2011 or later.

If DOE were required to perform before 2010 by Congress, utility plaintiffs that have recovered damages based upon DOE's non-performance until 2010 may receive a windfall in the form of payment for costs that will not be incurred because of delays in DOE's performance. Alternatively, if DOE does not perform until 2011 or later, utility plaintiffs that have recovered damages based upon DOE's non-performance may be foreclosed from recovering damages arising from the initial partial breach running from 1998. Instead, the Court should find that DOE's failure to perform to date pursuant to the approved DCSs has given rise to a series of partial breaches. If the Court only adjudicates possible damages tied to these partial breaches, the Court preserves the ability to award damages arising from the failure of DOE to perform pursuant to the Standard Contract that are properly tied to the extent of DOE's breaches.

## III. BECAUSE SOUTHERN NUCLEAR SEEKS CONTINUED PERFORMANCE OF THE STANDARD CONTRACT, SOUTHERN NUCLEAR CANNOT RECOVER DAMAGES FOR COSTS THAT WERE INCURRED PRIOR TO DOE'S PARTIAL BREACHES OF CONTRACT OR AFTER THE DATE THAT ITS COMPLAINT WAS FILED

### A. The Measure Of Damages For A Partial Breach Of Contract Differs From That For A Total Breach Of Contract

"When one party to a contract materially breaches his duties under the contract, the other party may proceed in one of two ways." S&R Corp. v. Jiffy Lube Int'l, Inc., 968 F.2d 371, 376 (3d Cir. 1992). "He can either consider the contract terminated and sue for total breach, or he can continue his performance and sue for partial breach." Id. That is, a claim for partial breach is one for damages based upon "only part of the injured party's remaining rights to performance,"

while a claim for damages for total breach is "one for damages based on all of the injured party's remaining rights to performance." San Carlos Irrigation & Drainage Dist. v. United States, 23 Cl. Ct. 276, 279 (1991) (citations omitted), aff'd, 111 F.3d 1557 (Fed. Cir. 1997). Consequently, the damages recoverable for a partial breach of contract are necessarily less than those recoverable for a total breach. See Roboserve, Inc. v. Kato Kagaku Co., 78 F.3d 266, 279 (7th Cir. 1996) (concluding that the jury's determination that damages for partial breach of contract exceeded those for total breach was "obviously irrational"). In awarding damages for breach of contract, a fact-finder therefore has to "differentiate between a total or material breach on the one hand and a partial breach on the other, and to measure damages, if any, according to the nature of the breach." Lovink v. Guilford Mills, Inc., 878 F.2d 584, 587 (2d Cir. 1989). The distinction between partial and total breach "is particularly important in executory contracts." Id. at 586.

"The terms total breach and partial breach are frequently used by the courts in determining the remedies available to the injured party." 9 A. Corbin, Corbin on Contracts § 946, at 717-18 (interim ed. 1979). "A total breach of contract is a non-performance of duty that is so material and important as to justify the injured party in regarding the whole transaction as at an end." 9 A. Corbin, supra, § 946, at 718; see Restatement (Second) of Contracts § 236(1), at 214 (1981) ("[a] claim for damages for total breach is one for damages based on all of the injured party's remaining rights to performance").[4] "[I]t is clear that, wherever the court will hold that

---

[4] The United States Court of Appeals for the Federal Circuit recently held that "[t]he Restatement of Contracts is recognized as an appropriate source of authority in contract cases." Hansen Bancorp, Inc. v. United States, 367 F.3d 1297, 1308 n.9 (Fed. Cir. 2004) (citing Mobil Oil Exploration v. United States, 530 U.S. 604, 608 (2000)). Similarly, the Federal Circuit has repeatedly relied upon the Restatement (Second) of Judgments (to which we will cite in this motion) as authority. See, e.g., Christopher Village, L.P. v. United States, 360 F.3d 1319 (Fed. Cir. 2004) (citing repeatedly to Restatement (Second) of Judgments); Ammex, Inc. v. United

A's breach is a total breach, B can regard A's performance as at an end and at once maintain action for damages for all of his injury, past, present, and future." 9 A. Corbin, supra, § 946, at 718.

"While in the case of a total breach the injured party can at once get judgment for his entire injury, it is not always necessary for him to elect this remedy." 9 A. Corbin, supra, § 946, at 720. "In some cases he may elect to regard the breach as partial, proceed with his own performance, sue for the partial injury, and maintain a second suit in case a further breach occurs." Id., quoted in Indiana Michigan, 60 Fed. Cl. at 664; see Coughlin v. Blair, 41 Cal. 2d 587, 598, 262 P.2d 305, 311 (1953) ("even if a breach is total, the injured party may treat it as partial, unless the wrongdoer has repudiated the contract").[5] "If the injured party elects to or is required to await the balance of the other party's performance under the contract, his claim is said instead to be one for damages for partial breach. For example, an injured party who claims damages in addition to specific performance claims damages for partial breach." Restatement (Second) of Contracts § 236 cmt. b, at 214 (1981).

The concept of "partial" breach is particularly applicable to contracts that involve a requirement for a series of performances, or installments, over an extended period of time. Professor Corbin has described the election that the non-breaching party to an installment

---

States, 334 F.3d 1052, 1056 (Fed. Cir. 2003) (recognizing that court is broadly guided by the Restatement (Second) of Judgments); Young Engineers, Inc. v. United States Int'l Trade Comm'n, 721 F.2d 1305, 1314 (Fed. Cir. 1983) ("[i]n our analysis we will be guided by the Restatement (Second) of Judgments (1982) . . . .").

[5] "A partial breach of contract is a breach where remedial rights provided by law can be substituted by the injured party for only part of the existing contractual rights." Restatement (First) of Contracts § 313(2) (1932).

contract can make when the other party fails to satisfy the requirements of an installment of the contract:

> If the seller of goods delivers an instalment of nonconforming goods, in breach of some warranty, even though the breach may be such as to operate as a total breach the buyer is not required to treat it so. He may keep the defective instalment, retaining his right to damages or recoupment, and demand delivery of the remaining instalments required by the contract. When sued for the price of the instalments received by him, he may recoup for breach of warranty and claim damages for the seller's failure to deliver the subsequent instalments. The seller has committed one breach, treated by the buyer as partial, and a second breach that is total.

9 A. Corbin, supra, § 946, at 720. Professor Corbin considers a contract that requires continuing performance similar to an installment contract and potentially capable of a series of partial breaches:

> There are contracts, however, that have been said to require continuing (or continuous) performance for some specified period of time, a period that may be definite or indefinite when the contract is made. These contracts too are capable of a series of "partial" breaches, as well as of a single total breach by repudiation or by such a material failure of performance when due as to go "to the essence" and to frustrate substantially the purpose for which the contract was agreed to by the injured party. For each "partial" breach a separate action is maintainable, just as in the case of an "instalment" contract: and for a series of "partial" breaches occurring before any action is brought only one action is maintainable.

Id. § 956, at 746.[6]

---

[6] Professor Corbin concluded that there is "no essential difference between a 'continuing' contract and an 'instalment' contract." 9 A. Corbin, Corbin on Contracts § 956, at 748.

Aside from the different measure of damages applicable to a partial and total breach, these claims can also be distinguished based upon the remedies they provide to an injured party. Indeed, a plaintiff's decision to continue a contract after a material breach and initiate an action for damages for partial breach is not "without consequences." PVI, Inc. v. Ratiopharm, 253 F.3d 320, 325 (8th Cir. 2001). This is because a "total breach justifies termination of the contract and damages for complete failure of performance," whereas a "partial breach does not." Lovink, 878 F.2d at 587; see Pinewood Realty Ltd. P'ship v. United States, 223 Ct. Cl. 98, 104, 617 F.2d 211, 215 (1980) ("[i]f the injured party ignores the breach, and continues to perform, it has waived its right to terminate the contract, and has only retained its claim for damages for partial breach"); Hansen Bancorp, Inc. v. United States, 53 Fed. Cl. 92, 100 (2002) ("[a] breach by non-performance gives rise to a claim for damages for total breach only if it discharges the injured party's remaining duties to render such performance"), vacated and remanded on other grounds, 367 F.3d 1297 (Fed. Cir. 2004). As the Court held in Cities Service Helex, Inc. v. United States, 211 Ct. Cl. 222, 543 F.2d 1306 (1976), a contractor must make an election in response to an anticipatory breach either to view the contract as concluded or to continue contract performance:

> A material breach does not automatically and *ipso facto* end a contract. It merely gives the injured party the right to end the agreement; the injured party can choose between canceling the contract and continuing it. If he decides to close the contract and so conducts himself, both parties are relieved of their further obligations and the injured party is entitled to damages to the end of the contract term (to put him in the position he would have occupied if the contract had been completed). If he elects instead to continue the contract, the obligations of both parties remain in force and the injured party may retain only a claim for damages for partial breach.

Id. at 234, 543 F.2d at 1313; accord Barron Bancshares, Inc. v. United States, 366 F.3d 1360, 1382 (Fed. Cir. 2004) (finding that the Government waived plaintiff's prior material breach by continuing to make contract assistance payments).

Here, Southern Nuclear's decision to continue the contract after the Government's breach and insist upon the Government's performance of its obligations has at least two consequences. First, because the Government's contractual obligations were not discharged as a result of Southern Nuclear's suit for partial breach, it did not discharge the Government's obligation to accept and dispose of Southern Nuclear's SNF. Second, it limited Southern Nuclear's recovery of damages to those for partial breach. The significance of the second consequence of Southern Nuclear's election to pursue a partial rather than total breach theory is material here because damages recoverable for partial breach begin to accrue later than, and are necessarily less than, those for total breach.

B. Because Southern Nuclear Has Elected To Pursue Damages For A Partial Breach Of Contract, Rather Than A Total Breach, It Cannot Recover Damages That Pre-Date The Actual Partial Breach

1. Under A Partial Breach Claim, A Plaintiff Cannot Rely Upon An Anticipatory Partial Repudiation Theory To Recover Damages That Precede The Actual Partial Breach

Although damages for breach of contract are generally measured from the date of the actual breach, see Reynolds v. United States, 141 Ct. Cl. 211, 220, 158 F. Supp. 719, 725 (1958), Southern Nuclear seeks damages that precede the actual partial breach of contract in this case. Although not set forth in its amended complaint, Southern Nuclear claims in its damages motion that it has been incurring costs as effort to mitigate damages as a result of DOE's breach "[s]ince 1995," at least three years before the date upon which the Court found DOE to have partially

breached the Standard Contract. Pl. Mtn. at 3. Southern Nuclear claims that these mitigation efforts were undertaken based upon the assertion that "[b]eginning in the early 1990s, it became apparent that DOE likely would not be able to begin SNF disposal by the January 31, 1998, deadline." Id. With these allegations, Southern Nuclear apparently intends to establish that there was some type of "anticipatory" breach by DOE. Id.

An anticipatory repudiation is a "renunciation of a contractual duty *before* the time fixed in the contract for performance." Franconia Assocs. v. United States, 536 U.S. 129, 143 (2002) (emphasis in original). It "entails a statement or voluntary affirmative act indicating that the promisor will commit a breach when performance becomes due." Id.; see Danzig v. AEC Corp., 224 F.3d 1333, 1337 (Fed. Cir. 2000) ("[a]t common law, anticipatory repudiation of a contract required an unambiguous and unequivocal statement that the obligor would not or could not perform the contract"); Tretchick v. Department of Transportation, 109 F.3d 749, 752 (Fed. Cir. 1997) (anticipatory repudiation "must be a distinct unequivocal absolute refusal to perform the promise, and must be treated and acted upon as such by the party to whom the promise was made").

An anticipatory repudiation of a contract is, in and of itself, a breach of contract that "generally gives rise to a claim for damages for total breach even though it is not accompanied or preceded by a breach by non-performance." Restatement (Second) of Contracts § 253(1) cmt. a; see Wisconsin Power & Light Co. v. Century Indem. Co., 130 F.3d 787, 793 (7th Cir.1997) ("[t]he disclaimer of a contractual duty is a breach of contract even if the time specified in the contract for performing the duty has not yet arrived"). However, an anticipatory repudiation of a contract constitutes a total breach "only if the promisee 'elects to treat it as such.'" Franconia

Assocs., 536 U.S. at 143 (emphasis added) (citing Roehm v. Horst, 178 U.S. 13 (1900)). Repudiation "gives the promisee the right of electing either to treat the declaration as *brutum fulmen*, and, holding fast to the contract, to wait till the time for [the promisor's] performance has arrived, or to act upon [the renunciation] and treat it as a final assertion by the promisor that he is no longer bound by the contract." Roehm, 178 U.S. at 13. Therefore, to recover damages for an anticipatory repudiation, the injured party must "elect to treat" the repudiation as a total breach. Franconia Assocs., 536 U.S. at 143; see United States v. Dekonty Corp., 109 F.3d 749, 752 (Fed. Cir. 1991) (injured party who elects to sue for anticipatory breach of contract must "treat th[e] refusal [to perform] as a breach and commence an action at once therefor").

Unfortunately for Southern Nuclear, "a breach by repudiation alone can only give rise to a claim for total breach . . .," effectively ending any further performance obligations by the contracting parties. Restatement (Second) of Contracts § 253 cmt. b (emphasis added). A party cannot seek damages for a total breach based upon anticipatory repudiation and, at the same time, seek continued performance of the contract. Restatement (Second) of Contracts § 236 cmt. b (1981). Further, "an anticipatory breach cannot be predicated on a partial breach of the contract . . . ." City of Fairfax, Va. v. Washington Metro. Area Transit Auth., 582 F.2d 1321, 1331 (4th Cir. 1978) (emphasis added), cert. denied, 440 U.S. 914 (1979); see 4 A. Corbin, Corbin on Contracts § 972, at 901 (1951) ("there seems to be no authority for saying that, for such a partial anticipatory repudiation, an action for damages can be at once maintained"). To the contrary, an anticipatory repudiation gives rise only to a claim for total breach that concludes the parties' further performance obligations.

The Court of Appeals for the Second Circuit's decision in Lucente v. IBM Corp., 310 F.3d 243 (2d Cir. 2002), is instructive on the effect of a partial breach theory on damages. In Lucente, a former executive of IBM had entered into a "letter agreement" with IBM that prohibited him from working for a competitor and provided for cancellation of his stock options in the event of his violation of the agreement. Id. at 249. Two years later, in 1993, Lucente became an executive of Digital Equipment Corporation ("Digital"), a competitor of IBM, and IBM sent a cancellation letter to Lucente informing him that his restricted stock and stock options at IBM were now cancelled as a result of his employment with Digital. Id. at 250. From 1993 to 1999, the value of IBM stock significantly rose. In 1999, Lucente filed a suit against IBM, arguing that IBM's 1993 cancellation letter was an anticipatory repudiation that he elected to ignore while awaiting IBM's future performance. Id. at 251. In 2001, Lucente attempted to exercise his options by tendering $1.89 million to IBM. IBM rejected Lucente's purported exercise of his options and returned Lucente's check. Subsequently, the district court granted Lucente leave to amend his complaint to treat IBM's cancellation letter as an anticipatory repudiation with respect to his stock options. Id. at 252. Lucente's amended complaint also alleged that IBM's cancellation letter was a breach for the purposes of Lucente's restricted stock. Id. The district court awarded Lucente $4.8 million, concluding that Lucente had properly exercised his stock options.

The Court of Appeals for the Second Circuit reversed, finding that Lucente could not treat IBM's 1993 cancellation letter as both a breach and an anticipatory repudiation that he chose to ignore. The court stated that, "[a]part from allowing Lucente to have his cake and eat it too, such a result is antithetical to the common law percepts of anticipatory repudiation and the election of

remedies doctrine." Id. at 258. The court explained that, when confronted with a anticipatory repudiation, the non-breaching party must make a choice:

> When confronted with an anticipatory repudiation, the non-repudiating party has two mutually exclusive options. He may (a) elect to treat the repudiation as an anticipatory breach and seek damages for breach of contract, thereby terminating the contractual relation between the parties, or (b) he may continue to treat the contract as valid and await the designated time for performance before bringing suit.

Id. (citations omitted). "The non-repudiating party must, however, make an affirmative election" and "'cannot at the same time treat the contract as broken and subsisting,' for '[o]ne course of action excludes the other.'" Id. (citations omitted). Indeed, "[t]he law simply does not . . . permit a party to exercise two alternative or inconsistent . . . remedies." Id. (quoting Apex Pool Equip. Corp. v. Lee, 419 F.2d 556, 562 (2d Cir. 1969)). "Once a party has elected a remedy for a particular breach, his choice is binding with respect to that breach and cannot be changed." Id. at 258-59.

The court further recognized that, under an anticipatory repudiation theory, a contract holder who elects to treat a repudiated contract as binding and valid waives any action against the repudiating party until an actual breach occurs and can recover damages only for the actual breach:

> Under an anticipatory repudiation theory, a plaintiff who elects to treat a repudiated contract as valid does not have an action against the repudiating party until an actual breach occurs. Since it is undisputed that Lucente failed to take action to exercise any of his stock options before filing this suit, Lucente had no claim for breach against IBM under the theory of anticipatory repudiation. Therefore, the only claim that Lucente could possibly have asserted in 1999 was that IBM breached its contractual obligations by cancelling his restricted stock and stock options in April 1993.

Id. at 259. The court further held that "damages for breach of contract are to be measured *from the date of the breach*." Id. at 262 (emphasis added).

Here, Southern Nuclear's decision to proceed under a partial breach theory following DOE's breach on January 31, 1998, and not to declare the Standard Contract at an end following some earlier alleged anticipatory repudiation clearly indicates that Southern Nuclear elected to waive any anticipatory repudiation theory. Had Southern Nuclear elected to proceed based upon anticipatory repudiation prior to January 31, 1998, and sought to recover damages accruing from the date of the repudiation, Southern Nuclear would have had to file its suit at that time and, further, would have to have elected to consider the Standard Contract at an end, eliminating both parties' further performance obligations. However, Southern Nuclear waited until the time for DOE's performance under the Standard Contract had passed and then sued for partial breach because it did not want to discharge DOE's obligation to accept Southern Nuclear's SNF. Having made this election, Southern Nuclear cannot now attempt to claim damages both for a partial breach of contract on January 31, 1998, and for an anticipatory total breach of contract at some point earlier than January 31, 1998, while at the same time seeking to enforce DOE's continuing performance obligations under the Standard Contract.

Because Southern Nuclear elected to pursue a partial breach theory in its 1998 suit, Southern Nuclear cannot recover damages for costs it incurred prior to DOE's breach on January 31, 1998. See Franconia Associates, 536 U.S. at 143 (party treats an anticipatory repudiation as a present breach "by filing suit prior to the date indicated for performance," but, otherwise, "breach would occur when . . . [the repudiating party's] responsive performance become[s] due"); Cities Service Helex, 211 Ct. Cl. 222, 543 F.2d at 1313 & n.16 (once party elects to continue repudiated

contract, he retains "only a claim for damages for partial breach"); Dunkin Donuts of Am., Inc. v. Minerva, Inc., 956 F.2d 1566, 1571 (11th Cir. 1992) (franchisee who continued performance after learning of material breach could not seek damages for total breach, and his damages were limited to those for partial breach); Pinewood Realty Ltd. P'ship, 223 Ct. Cl. at 104, 617 F.2d at 215 ("[i]f the injured party ignores the breach, and continues to perform, it has . . . only retained its claim for damages for partial breach").

2. Southern Nuclear Cannot Circumvent The Legal Bar To Recovery Of Its Pre-Breach Damages By Formulating Them As Costs Incurred In The Exercise Of Its Duty Of Mitigation

Southern Nuclear, in its motion, asserts that it undertook efforts to mitigate the possible damages arising from the Government's breach and incurred costs arising from this mitigation effort beginning in 1995. Pl. Mtn. at 3. Despite Southern Nuclear's attempt to cast these efforts as mitigation, Southern Nuclear's election to pursue a partial breach claim limits its possible damages to those incurred after the date of the actual breach.

"As a general rule, a party cannot recover damages for loss that he could have avoided by *reasonable efforts*." Robinson v. United States, 305 F.3d 1330, 1333 (Fed. Cir. 2002) (emphasis original, citation omitted). The duty of mitigation reflects the policy of encouraging an injured party to attempt to avoid loss when it can do so without undue risk or burden. In this way, the amount of damages that the injured party could have avoided by taking reasonable steps to reduce its damages are subtracted from the amount that would otherwise have been recoverable as damages. See Restatement (Second) of Contracts § 350 cmt. b (1981); Dittmore-Freimuth Corp. v. United States, 390 F.2d 664, 679 (Ct. Cl. 1968).

Nevertheless, although costs incurred in the exercise of the duty of mitigation may possibly be recoverable in a breach of contract action, costs preceding the date of a breach are not recoverable. Indeed, Southern Nuclear cannot circumvent the bar to recovery of its pre-breach damages by formulating them as costs reasonably incurred in the exercise of its duty of mitigation. Costs incurred prior to an actual breach are not incurred solely as a consequence of the breach. At best, such "mitigation" costs might be incurred in anticipation of the possibility that the other party might breach the contract. Given that Southern Nuclear cannot rely upon an anticipatory repudiation as a basis for supporting any pre-breach damages for a partial breach, it cannot circumvent that rule by arguing that it is entitled to rely on pre-breach "repudiations" to incur pre-breach costs.

In Middleton v. United States, 175 Ct. Cl. 786 (1966), the Court of Claims rejected the argument that a non-breaching party can recover the costs of "mitigation" efforts that occurred prior to the breach:

> [N]either of the parties here may insist upon an expansion of this concept so as to encompass items which relate to a period *antedating* defendant's breach. Both the defendant's right to a setoff and the plaintiff's duty to mitigate are defined in terms of the same fixed time period; like opposites of the same coin, they are inextricably bound together. Thus, plaintiff could no more seek to reduce defendant's setoff by alleging expenses incurred prior to his discharge, than defendant could enlarge his setoff by seeking the inclusion of income which plaintiff earned prior to his erroneous dismissal. . . . It follows, therefore, that all expenses which arose prior to plaintiff's discharge that he seeks to include, may not be considered within the framework of the setoff question.

Id. at 792 (italics in original; underlining added). To the extent that Southern Nuclear claims that costs incurred prior to DOE's partial breach are recoverable under principles of mitigation,

Southern Nuclear's arguments are meritless and cannot resurrect its claims for pre-breach damages. Accordingly, the Court should bar limit the possible damages to be pursued through discovery and considered at trial to those costs that Southern Nuclear incurred or committed itself to incur after January 31, 1998.

In response to the Government's motion in limine regarding the presentation of evidence at trial concerning pre-breach damages filed in Yankee Atomic Electric Company v. United States, No. 98-126C (Fed. Cl.), the Court held that plaintiffs would not be precluded from the presentation of evidence regarding costs incurred prior to the date of DOE's breach of the Standard Contract. Yankee Atomic Electric Co. v. United States, No. 98-126C, 2004 WL 1535688, at *6 (Fed. Cl. June 28, 2004). In reaching the decision regarding the scope of evidence that could be presented, the Court questioned whether the plaintiffs in these cases were required to wait for DOE's actual breach prior to deciding how to address the harm arising from that breach. Id. However, with all due respect, the consideration of this evidence of costs incurred before the actual breach eliminates the plaintiff's obligation to make an election to declare the contract in total breach in response to an anticipatory repudiation or to waive the anticipatory repudiation and pursue damages for only a partial rather than a total breach of contract. We have found no case support for such a proposition.[7] Further, we understood the

[7] The Court cited to its decision in Tennessee Valley Authority v. United States, 60 Fed. Cl. 665 (2004), as support for the concept that pre-breach damages potentially could be recoverable. See Yankee Atomic, 2004 WL 1535688, at *6. However, in response to the Government's motion for reconsideration, in which the Government demonstrated that pre-breach damages were not recoverable in a partial breach case, and should not be permitted as a matter of law, the TVA Court indicated that its decision should not be interpreted as permitting TVA to recover damages prior to the date that the TVA court defined as the first partial breach. A. 20 (Order in Tennessee Valley Authority v. United States, No. 01-249C (Fed. Cl. Aug. 12, 2004)).

Court's order in Yankee as deciding whether the plaintiffs there would be permitted to present evidence regarding pre-breach damages, rather than finally deciding that pre-breach damages would be recoverable.

Further, in deciding the motion in limine in Yankee Atomic, the Court also found that the Court's reasoning in Indiana Michigan Power Co. v. United States, 60 Fed. Cl. 639 (2004), regarding the availability of pre-breach damages was "dicta." Instead, the Court determined that the Court's decision in Indiana Michigan was predicated upon a finding that Indiana Michigan had failed to establish a causal link between DOE's breach and the incurred costs. Yankee Atomic, 2004 WL 1535688, at *7. Again, with all due respect, the Court's reading of the decision in Indiana Michigan is incorrect. The Court in Indiana Michigan explicitly found that Indiana Michigan's "claim of partial breach of contract does not permit the recovery of damages incurred before January 1998 and after March 2004 (the date of trial)." 60 Fed. Cl. at 641. The Court also made factual findings, in the alternative, regarding the failure of plaintiff to establish the causal link or the speculative nature of all of Indiana Michigan's future costs, but these findings were not predicated upon a determination that Indiana Michigan could possibly recover these costs. Id.

### C. Southern Nuclear Also Cannot Recover As Damages Costs Incurred After The Date That Its Complaint Was Filed

As explained above, the damages that a plaintiff can seek in a suit for a partial breach differ substantially from those that are recoverable in a suit for a total breach. Generally, "[i]f the initial breach is accompanied or followed by a 'repudiation' (see Restatement, Second, Contracts § 250)" – that is, if the breach is total – "and the plaintiff thereafter commences an action for

damages, he is obliged in order to avoid 'splitting,' to claim all his damages with respect to the contract, prospective as well as past, and judgment in the action precludes any further action by the plaintiff for damages arising from the contract." Restatement (Second) of Judgments § 26 cmt. g, at 240 (1982) (emphasis added). "In the event of a 'material' breach (see Restatement, Second, Contracts § 241) that is not accompanied or followed by a repudiation, the plaintiff is entitled to treat the contract as at an end and to recover damages for performances not yet due as well as those already due on the theory that there has been a total breach of contract." Restatement (Second) of Judgments § 26 cmt. g, at 240-41 (1982). "If a plaintiff does this, a judgment extinguishing the claim under the rules of merger or bar precludes another action by him for further recovery on the contract." Id. at 241. Accordingly, if a plaintiff seeks damages for a total breach of contract, he must seek to recover all damages that he has or will incur as a result of the total breach, given that the parties' obligations to continue contract performance are terminated and a judgment for the non-breaching party will conclude all obligations under the breached contract.

"On the other hand, although the breach is material, the plaintiff may elect to treat it as being merely a partial breach." Id. "A claim for damages for partial breach is one for damages based on only part of the injured party's remaining rights to performance." Restatement (Second) of Contracts § 236(2), at 214 (1981) (emphasis added). As previously discussed, a partial breach of contract does not conclude the parties' continuing contract obligations, but instead requires continued contract performance. When a plaintiff elects to treat a breach of contract only as a partial breach, "[i]t has been thought that where there has been no repudiation, the plaintiff can recover damages for his injury only to the date of the writ – that he must treat the breach as only

'partial.'" 9 A. Corbin, supra, § 956, at 747 (emphasis added). Specifically, if the non-breaching party elects to treat a breach as a partial breach, "he is entitled to maintain an action for damages sustained from breaches up to the time of the institution of the action, and the judgment does not preclude a further action by him for a breach occurring after that date." Restatement (Second) of Judgments § 26 cmt. g, at 241 (1982) (emphasis added); see Kaiser v. Northwest Shopping Ctr., Inc., 587 S.W.2d 454, 457 (Tex. Civ. Ct. 1979) (suggesting that, under Texas state law, plaintiffs seeking damages for partial breach may recover damages incurred through date of filing the pleading).

The fact that Southern Nuclear cannot seek future damages for future partial breaches of the Standard Contract is supported by the absence of a legal remedy for an anticipatory partial breach discussed above. Indeed, "an anticipatory breach cannot be predicated on a partial breach of the contract." City of Fairfax, Va., 582 F.2d at 1331 (emphasis added); see 9 A. Corbin, supra, § 972, at 798 ("there seems to be no authority for saying that, for such a partial anticipatory repudiation, an action for damages can be at once maintained"). To the contrary, an anticipatory repudiation gives rise only to a claim for total breach that concludes the parties' further performance obligations. See Restatement (Second) of Contracts § 253 cmt. b, at 287 (1981) ("a breach by repudiation alone can only give rise to a claim for total breach . . .," effectively ending any further performance obligations by the contracting parties). This Court has recently recognized that "[a]nticipatory repudiation does not apply in a partial breach situation." Indiana Michigan Power, 60 Fed. Cl. at 648. Accordingly, Southern Nuclear, having elected not to seek damages for a total breach of contract and to continue to seek performance under the Standard Contract, cannot anticipate partial breaches of the Standard Contract that may occur in the future

or seek damages at this time for partial breaches of the Standard Contract that may occur in the future. As a result, this Court need not investigate and make decisions about the speculative events that may, or may not, occur in the future.

Support for the premise that Southern Nuclear may only recover for breaches that have occurred as of the filing of its complaint is found in cases analyzing the Court's jurisdiction to consider partial breach claims. In San Carlos Irrigation & Drainage District. v. United States, 23 Cl. Ct. 276 (1991), this Court considered a contract that it concluded was a "continuing contract" subject to a series of partial breaches. In that case, the United States was required to operate and maintain the "Project Works" (Coolidge Dam, San Carlos Reservoir, including spillways and an electrical generating system) for the irrigation district in the best possible manner, pursuant to a "Repayment Contract" entered in 1931. Apparently, the spillways became inoperable no later than 1966, and possibly as early as the 1940s, and the irrigation district stopped receiving its share of water or power in 1980. However, in 1983, a storm caused the dam to be shut down and evacuated, leaving the district no way to generate electrical power or store water. In response to the Government's argument that the irrigation district's claims had accrued for statute of limitations purposes no later than 1980, and possibly in 1966 or the early 1940s, the Court held that the Repayment Contract was a "continuing contract" potentially subject to a series of partial breaches, that the alleged 1983 breach was not time-barred by the applicable six-year limitations period because each "partial" breach created a new claim, and that the "fact that other partial breach claims, not raised in this litigation, are now time-barred is of no consequence." Id. at

279-80;[8] see Tennessee Valley Authority, 60 Fed. Cl. at 678 ("TVA's future claims for its future damages should, therefore, be considered to accrue for purposes of the statute of limitations at the time such damages are incurred.");[9] see Keefe Co. v. Americable Int'l, Inc., 755 A.2d 469, 472-75 (D.C. Ct. App. 2000) (discussing installment contracts); Kaiser, 587 S.W.2d at 457-58 (discussing continuing contracts); Restatement (First) of Contracts § 313 cmt. c (1932) (for partial breach, "the promisor may perform the remainder of the contract and be subject merely to a remedial duty to give compensation in damages" for the partial breach, but not for future anticipated partial breaches). Given that this Court's jurisdiction is determined by the circumstances existing upon the date that the complaint is filed, see Lujan v. Defenders of Wildlife, 504 U.S. 555, 571 n.4 (1992) (post-filing conduct cannot create jurisdiction that did not exist at outset of litigation); Newman-Green, Inc. v. Alfonzo-Larrain, 490 U.S. 826, 830 (1989) ("[t]he existence of federal jurisdiction ordinarily depends on the facts as they exist when the complaint is filed"), and given the problems that will always arise in identifying and verifying

---

[8] The Court distinguished the situation before it from the "continuing claim" doctrine, in which "a continuing course of action by the United States constitutes a continuing breach of a duty." San Carlos Irrig., 23 Cl. Ct. at 280. It recognized that, as with Southern Nuclear's claims, "[t]he District is not claiming a continuing breach of the Repayment Contract, but rather that there were partial breaches of a continuing contract." Id.

[9] The Court's ruling in Yankee Atomic did not disagree with this legal reasoning regarding the scope of damages that could be considered for future breaches. Yankee Atomic, 2004 WL 1535688 at *2-3. Instead, the Court reached a different result based upon the finding of a single partial breach that extended from 1998 to 2010. Id. ("Damages caused by any failure to commence pick-up after 2010 (as well as any related issued concerning the adequacy of that future performance) would be future damages for future breaches.") As explained above, DOE's failure to perform is more properly viewed as a continuing series of partial breaches, the extent of which can only be measured with certainty as of the date of the filing of Southern Nuclear's complaint or the date of trial, at the latest, rather than a single partial breach that runs from 1998 to 2010.

claimed damages incurred between the conclusion of fact discovery and the commencement of trial, the rules identified in the Restatement (Second) of Contracts and Restatement (Second) of Judgments, establishing an end date for damages for a partial breach at the filing of a complaint, appear correct.

Alternatively, other courts, including this one, have found that damages may be recovered under a partial breach to the extent that they were incurred by the time of trial. In Coughlin v. Blair, 41 Cal. 2d 587, 262 P.2d 305 (1953), the California court held that, "[i]f the breach is partial only, the injured party may recover damages for non-performance only to the time of trial and may not recover damages for anticipated future non-performance." Id. at 598, 262 P.2d at 311, quoted in May v. Morganelli-Heumann & Assocs., 618 F.2d 1363, 1367 n.2 (9th Cir. 1980); see Quick v. American Steel & Pump Corp., 397 F.2d 561, 564 (2d Cir. 1968) ("we see no reason not to apply the usual rule that contracts to pay money in instalments are breached one instalment at a time"). This Court recently adopted the holding in the Coughlin decision in Indiana Michigan, finding that "[d]amages for partial breach of contract are measured by costs incurred between the breach and the date of trial." 60 Fed. Cl. at 648 (citing Coughlin, 41 Cal. 2d at 598, 262 P.2d at 311). If Southern Nuclear were allowed to seek damages incurred up to the date of trial, the Government's ability to conduct discovery into those damages may be hampered by the need to prepare for trial while at the same time seeking to audit and verify Southern Nuclear's incurred costs. Accordingly, the better result would be to require Southern Nuclear to identify its costs incurred to a date certain in advance of trial, through a new complaint in a new case that could be consolidated with this case (to eliminate any jurisdictional issues), and to allow Southern Nuclear to bring a future claim for any additional costs incurred after that date. See

Tennessee Valley Authority, 60 Fed. Cl. at 678 n.16 (directing that the damages to be considered at trial encompass those incurred through the end of plaintiff's most recent fiscal year to "make the presentation and analysis of evidence more convenient and efficient for the parties and the Court without inflicting prejudice on either party.")

Here, Southern Nuclear has elected to treat DOE's failure to meet the January 31, 1998 date for beginning SNF acceptance as a partial, rather than total, breach. Accordingly, its damages are limited to those for the partial breach, or partial breaches, that occurred by the time that Southern Nuclear filed its complaint or, at the outside, that has occurred to date. See 9 A. Corbin, supra, § 950, at 728 ("[o]ne judgment bars any further action for breaches that existed at the time suit was brought and that might then have been included in a single action"). To the extent that additional partial breaches occur in the future, Southern Nuclear may attempt to seek appropriate relief at that time. See Indiana Michigan, 60 Fed. Cl. at 664 ("[w]hen [plaintiff] can show that it has incurred costs related to defendant's breach, plaintiff may have causes of action that are not speculative" and may elect to "maintain a second suit in case a further breach occurs" (quoting 9 A. Corbin, supra, § 946, at 720)); Tennessee Valley, 60 Fed. Cl. at 678; Yankee Atomic, 2004 WL 1535688, at *3. Currently, Southern Nuclear's damages should be limited to damages, if any, specifically caused by the delay in beginning SNF and/or HLW acceptance upon which its complaint is based, and should not be extended to other possible future delays in continuing SNF and/or HLW acceptance or future damages that have not yet occurred. In any event, the existence of future delays in continuing SNF and/or HLW acceptance is speculative in light of the possible effects of future events, precluding an award of future damages.

## IV. BY REQUESTING THE ABILITY TO RETURN TO THE COURT WITH FUTURE CLAIMS, SOUTHERN NUCLEAR RECOGNIZES THE LIMITATIONS UPON ITS ABILITY TO RECOVER FUTURE OR PROSPECTIVE DAMAGES

### A. Southern Nuclear, In Seeking To "Split" Its Claims, Recognizes That It Cannot Now Litigate The Damages Arising From Future Partial Breaches

In addition to requesting that the Court adjudicate all possible damages incurred or to be incurred between 1995 and 2020, Southern Nuclear appears to request that it be allowed to preserve any claims for damages that it may incur arising from DOE's failure to perform during this time period and bring any claims arising after 2020 before this Court as well. To allow these actions, Southern Nuclear proposes that it be allowed to split its claims and that the Court retain jurisdiction over its claims. Both actions are unnecessary. Because of the nature of the breach – DOE's failure to perform constituting a series of partial breaches – Southern Nuclear has the ability to bring future claims for any future breaches for which it can establish damages.

Claim splitting is properly invoked when different claims are based upon different legal theories. Alyeska Pipeline Service Co. v. United States, 688 F.2d 765, 769 (1982). "A single nondivisible contract . . . normally gives rise to only one claim." Id. (citing Nager Electric Co. v. United States, 177 Ct. Cl. 234, 254, 368 F.2d 847, 861 (1966)). "A separate action founded upon a single nondivisible contract may be maintained if the later claim is severable from the earlier one, and, if at the time of commencement of the earlier suit, the later claim was not then capable of being asserted." Everett Plywood Corp. v. United States, 206 Ct. Cl. 244, 251, 512 F.2d 1082, 1087 (1975) (citations omitted). "However, if the claimant, before filing its first suit is in possession of all the facts on which its second suit is based, the splitting of claims into multiple

suits is fatal to maintenance of the later-filed action." Id. (citing Container Transportation Int'l, Inc. v. United States, 468 F.2d 926, 199 Ct. Cl. 713 (1972)).

When a plaintiff makes a partial breach claim, the rules regarding "claim splitting" apply differently. As the Restatement (Second) of Judgments explains, if the plaintiff elects to treat a contract breach as partial, "he is entitled to maintain an action for breaches up to the time of the institution of the action, and the judgment does not preclude a further action by him for a breach occurring after that date. Id. § 26 cmt. g. In that instance, the plaintiff may "sue from time to time for damages incurred to the date of suit." Id. § 26(1)(e).

In its motion, Southern Nuclear asks to be allowed to split breach of contract claims arising from the Standard Contract with DOE, referring to the guidelines set forth in section 26 of the Restatement (Second) of Judgments. Pl. Mtn. at 6. Southern Nuclear wants to limit current consideration of its damages to those allegedly accruing by 2020, but seeks to preserve its rights, under a partial breach theory, to petition this Court at some point after 2010 for damages arising for possible breaches of the Standard Contract after that date in addition to preserving its rights to bring claims for damages that it cannot now determine. Pl. Mtn. at 4. In making this request, Southern Nuclear recognizes that it does not now know all of the circumstances that will give rise to its future partial breach claim. However, the Court should not distinguish between "near" future damages and "far" future damages. The rules applicable to bringing and maintaining claims based upon partial breach are well-established in the Restatement. Based upon Southern Nuclear's partial breach claims, all future or prospective damages – whether accruing in 2006, 2007, or 2011 – should be brought at later dates, after they have been incurred.

B. The Court Need Not Retain Jurisdiction Or Toll The Statute Of Limitations

Southern Nuclear asks, in a footnote, that the Court retain jurisdiction over and toll the statute of limitations on any claims that Southern Nuclear may be allowed to reserve for the future or that Southern Nuclear may bring if DOE fails to begin performance in 2010. Pl. Mtn. at 7. Southern Nuclear fails to provide any support for the proposition that the Court can or should undertake these actions.

The only authority of which we are aware that would allow the Court to adjudicate Southern Nuclear's current claims and issue a final judgment on those claims, yet retain jurisdiction, would be RCFC 54(b). Pursuant to RCFC 54(b), the Court "may direct the entry of a final judgment as to one or more but fewer than all the claims or parties only upon an express determination that there is no just reason for delay." RCFC 54(b) is intended to "avoid the possible injustice of a delay in judgment of a distinctly separate claim to await adjudication of the entire case." Brown v. United States, 3 Cl. Ct. 409, 412 (1983) (quoting Fed. R. Civ. P. 54(b) note (1946)). "[T]he court may not invoke Rule 54(b) liberally, but must find 'some danger of hardship or injustice through delay which would be alleviated by immediate appeal.'" Cherokee Nation of Oklahoma v. United States, 23 Cl. Ct. 735, 738 (1991) (quoting, in part, Brunswick Corp. v. Sheridan, 582 F.2d 175, 183 (2d Cir. 1978) (denying request for invocation of RCFC 54(b) because plaintiff had not shown that "hardship or injustice" would result from delay)).

Southern Nuclear is not asking the Court to adjudicate claims now to avoid the possible hardship of delay. Instead, Southern Nuclear is asking the Court to retain jurisdiction over claims that have not and, apparently, cannot yet be defined based upon partial breaches that have

not yet occurred. The rule does not appear to contemplate partial adjudication by the Court to allow for the presentation of new claims at a future date. Further, this Court does not possess jurisdiction to entertain claims in this case based upon partial breaches that have not yet occurred or that occurred after Southern Nuclear's complaint was filed. As explained above, Southern Nuclear may pursue damages for future partial breaches in separate proceedings before this Court. See Tennessee Valley Authority, 60 Fed. Cl. at 678. Southern Nuclear's claims do not fit within the narrow confines in which RCFC 54(b) was intended to be invoked. Moreover, to the extent that Southern Nuclear is requesting that the Court enter a partial judgment and simply keep the case open on its docket, that effort seems unnecessary and a waste of the Court's resources. Given Southern Nuclear's inability to know precisely the scope of its future claims, it is better that Southern Nuclear start with a fresh claim before the Court. See Indiana Michigan, 60 Fed. Cl. at 664.

Similarly, Southern Nuclear's request that the Court "toll the statute of limitations" is without explanation or the benefit of citation to authority. Any plaintiff that alleges that the United States has breached a contract must bring any claim for the alleged breach within the Tucker Act's six-year statute of limitations. 28 U.S.C. § 2501. Although no court has ever held that 28 U.S.C. § 2501 can be equitably tolled, see Frazer v. United States, 288 F.3d 1347,1352-53 (Fed. Cir. 2002), the Court need not decide that issue here. Even when equitable tolling is potentially available, it is clear that equitable tolling is available against the Government only if "the Government tricked [the plaintiff] into missing the deadline" and if the plaintiff was "diligen[t]" in pursuing its claims. Juice Farms Inc. v. United States, 68 F.3d 1344, 1346 (Fed.

Cir. 1995); see Irwin v. Dep't of Veterans Affairs, 498 U.S. 89, 96 (1990) ("Federal courts have typically extended equitable [tolling] relief only sparingly.").

Further, given that Southern Nuclear is seeking to bring future claims for costs that are yet to be accrued, it is unclear why it is necessary for the Court to toll the six-year statute of limitations that applies to all claims brought before the Court. Southern Nuclear retains the ability to bring claims within this time period in the future. The six-year statute of limitations for a partial breach begins to run from the date of each individual partial breach. Tennessee Valley Auth., 60 Fed. Cl. at 678. With regard to future partial breaches that have not yet occurred, the statute of limitations has obviously not begun to run. Without an explanation as to exactly how or why the tolling of this statute of limitations is necessary or appropriate, the Government is unable to respond further to Southern Nuclear's request that the Court toll the statute of limitations for such future claims.

Finally, Southern Nuclear seeks expedited review of its motion, arguing that granting the motion will define the scope of discovery required in the case. Pl. Mtn. at 7-8. Southern Nuclear fails to explain how discovery into claims that it itself has not or cannot identify will be defined by the Court's ruling, but it appears that discovery will be expanded and delayed if the Court considers as possible damages all costs that Southern Nuclear may incur through 2020. In the claim documents that Southern Nuclear provided to the Government on August 31, 2004, pursuant to the Court's June 21, 2004 order, Southern Nuclear has only provided cost information for costs to be possibly incurred through December 31, 2009. Pl. Mtn. at 4. If the Court were to grant Southern Nuclear's motion, Southern Nuclear would first have to provide the Government with the cost estimates and the supporting documentation for an additional 10 years of potential

costs and then the Government would have to conduct discovery regarding these potential costs.

In contrast, by granting the Government's motion to limit the scope of potential damages to the costs incurred between 1998 and the date of Southern Nuclear complaint, the Court will will properly limit the scope of discovery by foreclosing the need to conduct discovery into what DOE, NRC or Southern Nuclear may do as many as five years into the future. Discovery will be properly focused upon the decisions that Southern Nuclear has already made and the costs it has incurred as a result of DOE's continuing breaches and its storage decisions. Discovery into what "may" happen in the future will be unnecessary.

## CONCLUSION

For the foregoing reasons, the Government respectfully requests that the Court deny Southern Nuclear's motion in its entirety and grant the Government's cross-motion limiting the consideration of damages to those incurred between January 31, 1998 and the date that Southern Nuclear filed its complaint.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/ Harold D. Lester, Jr.
HAROLD D. LESTER, JR.
Assistant Director

s/ Marian E. Sullivan
MARIAN E. SULLIVAN
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 307-0365
Fax: (202) 307-2503

Attorneys for Defendant

OF COUNSEL:

JANE K. TAYLOR
Office of the General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

JOHN C. EKMAN
HEIDE L. HERRMANN
Trial Attorneys
Commercial Litigation Branch
Civil Division
Department of Justice
Washington, D.C. 20530

October 1, 2004

CERTIFICATE OF FILING

I hereby certify that on this 1st day of October 2004, a copy of foregoing "DEFENDANT'S RESPONSE TO PLAINTIFFS' MOTION FOR AN ORDER REGARDING SUBSEQUENT DAMAGES ACTIONS AND REQUEST FOR EXPEDITED CONSIDERATION AND CROSS-MOTION FOR SUMMARY JUDGMENT REGARDING PRE-BREACH AND FUTURE DAMAGES" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Marian E. Sullivan