Page 3450

A Yes, they do.
Q And what do those reports represent?
A They represent the views and positions of the M&O contractor on those issues.
Q Are these reports deliverables under their contract?
A Yes, they are.
Q Does DOE accept these reports as deliverables?
A Yes, we accept them as deliverables if they – if we believe that they appropriately addressed the statement of work and the intention of the report, yes.
Q Are those reports the statements of DOE?
A No, they are not.
Q By accepting the report, does DOE accept the conclusions stated in the report?
A No.
Q When would these reports become the reports or statements of DOE?
A When DOE either issued a document under its own letterhead, it would have an RW number, radioactive waste number on it. Or if there was some policy statement made by the Department in some mechanism either through correspondence or other

Page 3451

areas.
Q Thank you. Mr. Kouts, are you familiar with the term receipt rate?
A Yes, I am.
Q What is the receipt rate?
A The receipt rate, as we use it in the program, is the technical capability of our facilities to receive materials and process them through the system.
Q Are you familiar with the term acceptance rate?
A Yes, I am.
Q What is the acceptance rate?
A The acceptance rate is the contractual rate at which the Department has committed to receive materials from the contract holders.
Q Where is the acceptance rate set forth?
A The acceptance rate is set forth in the acceptance priority ranking and the Annual Capacity Report.
Q Could the receipt rate and the acceptance rate be different?
A Yes, they could.
Q Why?
A Essentially, the Department can determine

Page 3452

from a business standpoint as a business judgment that it does not want to commit to accept materials at the amount of the maximum capability, if you will, of our ability to receive those materials.
So, depending on how the Department views how it wants to operate the program from a business perspective, if you will, it could be different than what the total receipt rate and the total capability of the receipt rate would be of our facilities.
Q Could there be other constraints on the acceptance rate?
A Potentially there could be issues associated with how we want to deploy facilities and how we want to essentially process the fuel.
Q Are you familiar with the term ramp-up rate?
A Yes, I am.
Q What is ramp-up rate?
A It's standard practice, when you're going to start up any kind of facility, including nuclear facility, and I would say especially a nuclear facility, that you don't want to start out at a maximum rate. You don't want to tax your facilities to their maximum rate until you had a learning curve, if you will.
So the ramp-up rate that we typically had in

Page 3453

our technical baseline documents is a step-by-step approach to try to work us up to our maximum rate that would allow us the ability to learn as we go and to bring on capability – additional capability in a measured fashion as opposed to trying to do a maximum amount on day one.
Q Thank you. Mr. Kouts, are you familiar with the MRS that DOE was designing to be able to accept waste in 1998?
A I'm familiar with the various designs that were being considered for that, yes.
Q What type of facility did DOE plan to build?
A That was a bare fuel handling storage only facility that could receive materials from transportation casks, if you will, from utilities and from utility sites, and store it on site by removing materials out of those casks, out of those transportation casks and putting them into various storage devices.
Q And do you know what the estimated cost for that facility was?
A Depending on the type of storage technology to be used, the life cycle cost we looked at somewhere between 1.7 and $2.7 billion.
Q Thank you. Can we have Plaintiffs' Exhibit

11

Page 3454

254?
MS. SULLIVAN: May I approach, Your Honor?
THE COURT: Sure. Yes.
MS. SULLIVAN: Your Honor, would you like a copy?
THE COURT: I can use this.
MS. SULLIVAN: Okay.
BY MS. SULLIVAN:
Q Mr. Kouts, what's been put up on the screen and I provided you a paper copy of has been marked as Plaintiffs' Exhibit 254. Do you recognize this document?
A Yes, I do.
Q Would you explain to the Court what this document is.
A This is a, I believe, revision 5 of our parent or our main technical requirements document. It's typically a document that the director of the program owns, and it lays out the technical requirements for the program to implement.
Q And does this document contain information with regard to the design requirements of the repository?
A Yes, it does.
Q Okay. How is this document used by your

Page 3455

office in its waste acceptance function?
A Essentially, it gives us guidance to -- in terms of what the receipt rate of the system would be. It also gives various policy guidance to the program as a whole.
Q Is your office responsible for the preparation of this document?
A I -- yes. I manage changes to this. And I basically do that for the director of the program.
Q Could we go to page 15 of this document, please. Mr. Kouts, are you familiar with the centralized interim storage facility mentioned on this page?
A Yes, I am.
Q How are you familiar with that facility?
A As I mentioned, when I went through my history within the program, I was responsible for developing the design of a centralized interim storage facility that essentially met these requirements.
Q What type of facility did DOE plan to build as the centralized interim storage facility?
A It was a, essentially a canister handling facility that could meet the ramp-up rates identified in -- in table 3 here.
Q Okay. And the rates in table 3, do you have

Page 3456

an understanding as to what the source of those rates was?
A Yes.
MR. STOUCK: Your Honor, can I interpose an objection for the record here. I don't mean to interrupt unduly. But Mr. Kouts was disclosed in the government's witness list to testify about two topics. And I just want to make a record on that. And we can deal with the consequences later. The first one, DOE's plans to begin waste acceptance in 2010. The second was the fact that the Yucca Mountain repository is not being designed to accept GTCC waste. So I just wanted to have that on the record. And, again, we can deal with questions about whether this is beyond that once we see if it ties up.
MS. SULLIVAN: Would you like me to address that, Your Honor?
THE COURT: If you wish.
MS. SULLIVAN: Or shall I just continue? Your Honor, the tables specifically in this chart are the ones that Dr. Graves or Mr. Graves relied upon. Mr. Kouts has some testimony we believe is important. So I believe it was raised in Plaintiffs' case. And also, further questions will make clear it's tied in part to the 2010 date.

Page 3457

THE COURT: Okay. Go forward.
MS. SULLIVAN: Thank you, Your Honor.
BY MS. SULLIVAN:
Q Mr. Kouts, what was -- do you have an understanding what the source of the rates were for the facilities that were set forth in this document?
A Yes.
Q And what was your understanding?
A There were several bills that were winding their way through Congress that would have directed the Department, should they have been passed, to deploy a facility to essentially begin to take materials from utilities for storage purposes. These ramp-up rates were basically rates that were contained in those bills.
Q I'm sorry. Let me just clarify. You say bills were pending in the Department. Did you mean bills pending in Congress?
A Bills pending in Congress.
Q And did you have an understanding as to what the legislation called for, generally?
A The -- the legislation went through a variety of mutations. The initial form of the legislation was for the Department to build a -- an interim storage facility or centralized interim

Page 3458

storage facility at, potentially in Nevada, next to where the Yucca Mountain site is right now. And there were also other options in terms of where that facility could be deployed.
Q How was the centralized interim storage facility different from the MRS designed by DOE in the early '80s – in the 1980s and early '90s?
A In the mid-'80s, we were looking at a facility that had a great deal more capability. It was one that basically had packaging capability that would essentially do some of the packaging that a repository typically would have done. It also had rod consolidation. It also had the flexibility to develop disposal-ready canisters for any of the three sites that we were considering at that time, which were the basalt site in Hanford, Washington, the tuff site, t-u-f-f, volcanic tuff site in Nevada, and also the Deaf Smith bedded salt site in Texas.
Q Was the facility, the centralized interim storage facility set forth on this page ever constructed?
A No, it was not.
Q Why not?
A The legislation was never passed and the

Page 3459

Department never received any authorizations to proceed on it.
Q Could there be a similar congressional initiative today that would allow or mandate acceptance of spent nuclear fuel prior to 2010?
A If Congress passed that legislation, then the Department would be authorized to implement it, yes.
Q Are you aware of the spent nuclear fuel storage issue that arose in connection with the NRC's budget last year?
A Yes, I am.
Q And what was the initiative discussed in that budget submission?
A I believe there was a set amount of funds that was supposed to be distributed from the Nuclear Regulatory Commission budget to the National Academy of Sciences, where they were to undertake a study to look at the – the safety, if you will, of fuel that's currently stored in spent fuel pools, at reactors, and also that's in dry storage at reactor sites, and to provide the Academy's views on the safety of both types of storage mechanisms.
Q Do you have an understanding as to what initiatives could result from this study?

Page 3460

A There have been various considerations on Capitol Hill as to initiatives that would use Homeland Security funds to essentially fund the reactors to put their – the pool – the materials that they're now managing in the pools, the high-level waste materials, the spent fuel into dry storage casks, and undertake that initiative.
Q Mr. Kouts, are you familiar with the material known as Greater Than Class C radioactive waste?
A Yes.
Q Do you understand that GTCC radioactive waste is generated by commercial nuclear utilities?
A Yes.
Q Is GTCC radioactive waste one of the waste materials that DOE will accept pursuant to the standard contract?
A No.
Q Is DOE designing the repository to accept GTCC radioactive waste generated by commercial nuclear facilities?
A No, it is not.
Q Could DOE accept GTCC radioactive waste at the repository?
A Theoretically it could. It would require, I

Page 3461

believe, a change in legislation to allow less than high-level waste materials to go into the repository. In addition to that, we would have to perform a variety of technical analyses and supplement our analyses that we are currently planning for the Nuclear Regulatory Commission as to how we would dispose of those materials within Yucca Mountain. In addition to that, we would have to develop some kind of fee structure to pay for the additional costs associated with those materials.
Q Are there space limitation issues that DOE would have to analyze if GTCC were to go to the repository?
A Yes. Potentially there are.
Q And are there issues concerning the current design of the surface facilities at Yucca Mountain that would have to be analyzed?
A Yes. Right now, our facilities are designed to deal with high-level waste materials, spent fuel, bare spent fuel, if you will. If we were going to handle Greater Than Class C waste, we would have to figure out how it would be packaged, where it would be packaged, and probably require separate service facilities over and above what we have now, since our current facilities are designed only to handle the

13

Page 3462

materials, the high-level waste materials.
And as such, we would not want to reduce the capacities of those facilities in order to deal with other waste materials.

Q Could DOE place GTCC in the backfill spaces of the repository?

MR. STOUCK: Can we watch the leading questions here on this, Your Honor? There have been a series of leading questions about this GTCC issue, and I object on that basis.

THE COURT: Well, you could rephrase.

MS. SULLIVAN: Okay.

BY MS. SULLIVAN:

Q Mr. Kouts, when I use the term backfill spaces, do you know what I'm talking about?

A Yes.

Q Could those backfill spaces –

MS. SULLIVAN: I don't understand quite how this is leading. This is a direct question, whether or not they could place GTCC in the backfill spaces. Would you like me to try to rephrase, Your Honor?

MR. STOUCK: I can explain why it's leading, Your Honor. She asked if they could put GTCC in the repository. And he said no. That would have been the place to mention why not, rather than have counsel

Page 3463

lead him to the explanation.

MS. SULLIVAN: He's provided some reasons. I think there are some other reasons, and I'm helping him –

THE COURT: The record reflects that – you may answer the question. I'll overrule the objection.

MS. SULLIVAN: Thank you, Your Honor.

THE WITNESS: Okay. As simplistically – my sense is, from my understanding of what's in Greater Than Class C low-level waste, I don't think we could just simply put these materials in backfill or in various spaces in the drifts, if you will, the underground tunnels, if you will, in the repository, without some kind of packaging and assurance that these materials would not get out so that it would affect our ability to meet the very stringent EPA standards.
So what I alluded to earlier was the fact that we do have to do a variety of analytical work to determine how best these materials would have to – would be placed in the repository, what they would be placed in, what kind of canisters, what type of waste packages they would be in. And without that additional detail work, it's difficult at this time to say whether or not they could go in backfill, if you

Page 3464

will, of the repository.
Let me also add we're in the planning on backfilling the repository. Essentially what we're doing is placing the waste packages. We're not filling up the repository with any kind of materials. It's been theorized in the past we would take pulverized tuff or volcanic materials and backfill it. We're not planning on doing that. That's not part of the current plan to demonstrate to the Nuclear Regulatory Commission that this site can isolate material.
So there isn't a lot of space in the drifts to add additional materials. So my sense is what would have to happen is there would be additional drifts or tunnels that would have to be drilled out where these materials would be placed.

THE COURT: What if you would package the GTCC in exactly the same type of container that the fuel assemblies are put in?

THE WITNESS: We could do that. I would also indicate that each of the waste packages costs roughly about half a million dollars. That's a very expensive package for low-level waste materials. There might be more efficient, more effective ways to do that. But I think when we analyze this in our

Page 3465

environmental impact statements, as we had to look at reasonably foreseeable alternatives, what we did analyze and essentially take these materials and put them in these packages and evaluate them as part of the EIS process.
That was the option we took because it was expedient, and we didn't want to expend any additional analytical work. It was kind of an outer bound of what we might do.

THE COURT: Would that solve the fee problem too, because you could charge the same fee as SNF?

THE WITNESS: That might help with the fee. We would have to look at, you know, what amount of new drifts, if you will, new tunnels would be caused by this. There were – in the EIS, as I remember, there were roughly 2,000 cubic meters of these materials that were identified in the EIS. You translate that to cubic yards. That's roughly about 2600 cubic yards. So that's going to be quite a few waste packages and quite a few drifts that you would have to develop, if you will, in order to put these materials in there.

THE COURT: Okay. Ms. Sullivan.

MS. SULLIVAN: Thank you, Your Honor.

14

HQ0.19990112.0001 QA: L

DOE/RW-0406

*Office of Civilian Radioactive Waste Management*

# *Civilian Radioactive Waste Management System Requirements Document*

## *Revision 05*

*(A00000000-00811-1708-00003)*

*January 1999*

*U. S. Department of Energy*
*Office of Civilian Radioactive Waste Management*



HQO.19990112.0001.0001

PLAINTIFF'S EXHIBIT
P0254
Yankee Atomic Elec. Co. et al

I. Waste Acceptance and Transportation Element shall accomplish planning and scheduling according to the provisions of the Standard Contract (10 CFR Part 961) and the EM/RW and NNPP/RW MOAs.

J. Integrated plans for CRWMS activities shall be developed and updated as needed to respond to changed data and operating conditions. Planning involves allocating system capacity, evaluating schedule requests, and establishing the CRWMS operations schedule.

K. Records validation shall be initiated upon receipt of Purchaser/Producer/Custodian forms describing the SNF/HLW to be delivered.

L. Waste Acceptance and Transportation shall validate title and/or transfer of responsibility and custody documentation from the Purchasers/Producers/Custodians.

## 3.4 MGR ELEMENT REQUIREMENTS

This section contains the requirements allocated to the MGR Element.

A. The MGR shall be designed to be capable of accommodating the total inventory of SNF and HLW (as documented in Planning Consideration 2.4.C) consistent with current disposal concepts (e.g., HLW/DOE SNF co-disposal). However, until the second repository is approved the MGR operational capacity shall be limited to 70,000 MTHM or equivalent of SNF and HLW.

B. The waste packages shall be designed such that substantially complete containment of the waste can be demonstrated for at least 1,000 years.

C. The monitored geologic repository concept shall allow the repository to be closed as early as 10 years after emplacement of the last waste package or to be kept open for at least 100 years from initiation of waste emplacement. The design shall not preclude the ability to keep the repository open, with appropriate maintenance and monitoring, for 300 years after initiation of waste emplacement. Future generations will make the ultimate decision on whether it is appropriate to continue to maintain the repository in an open, monitored condition or to close the repository, based on development of their own criteria and level of certainty regarding ultimate repository performance.

## 3.5 CISF ELEMENT REQUIREMENTS

If a CISF is approved, the following allocated requirements shall be met.

A. The CISF shall be designed to expedite operations by using a phased approach with Phase 1 having the capability to receive and store licensed dual purpose and multi-purpose systems only and Phase 2 having the capability to receive and store SNF in licensed dual purpose and multi-purpose systems and as individual assemblies at the rates indicated in Table 3.

Table 3. CISF Receipt Rates[7] (In MTHM or Equivalent/Year)

| Phase | Year of Operation | Commercial SNF[8] | Government Managed Nuclear Materials |
|---|---|---|---|
| I | 1 | 1200 | TBD 3 |
| I | 2 | 1200 | TBD 3 |
| II | 3 and 4 | 2000 | TBD 4 |
| II | 5 | 2700 | TBD 4 |
| II | 6 and subsequent | 3000 | TBD 4 |
| II | TBD 2 | 3000 | TBD 4 |

B. The CISF shall have a minimum storage capacity of 10,000 MTHM of SNF.

C. The CISF shall have a HLW storage capacity of (TBD 6).

D. The CISF shall be capable of preparing SNF and HLW for off-site transport.

## 3.6 INTERFACE REQUIREMENTS

This section identifies the interface requirements between CRWMS system elements. Acceptance criteria for nuclear materials are documented in the Waste Acceptance System Requirements Document (WA-SRD) (DOE/RW-0351P).

### 3.6.1 Waste Acceptance and Transportation - Government Agency Interface Requirements

Waste Acceptance and Transportation shall interface with appropriate federal, state, tribal, and local government agencies to meet legal, regulatory and operational requirements for acceptance and transportation of SNF and HLW, such as route selection, approval, scheduling and notification, emergency planning and response, and security.

[7] Receipt rates in this table are only applicable if a CISF is approved.

[8] This could include MOX SNF in Phase II.

108TH CONGRESS
*1st Session* | HOUSE OF REPRESENTATIVES | REPORT
108–212

# ENERGY AND WATER DEVELOPMENT APPROPRIATIONS BILL, 2004

JULY 16, 2003.—Committed to the Committee of the Whole House on the State of the Union and ordered to be printed

Mr. HOBSON, from the Committee on Appropriations, submitted the following

## REPORT

[To accompany H.R. 2754]

The Committee on Appropriations submits the following report in explanation of the accompanying bill making appropriations for energy and water development for the fiscal year ending September 30, 2004, and for other purposes.

INDEX TO BILL AND REPORT


| | Page Number Bill | Report |
|---|---|---|
| Introduction | ........ | 4 |
| I. Department of Defense—Civil: | | |
| Corps of Engineers—Civil: | | |
| Introduction | ........ | 7 |
| General investigations | 2 | 9 |
| Construction, general | 3 | 36 |
| Flood control, Mississippi River and Tributaries | 4 | 55 |
| Operation and maintenance, general | 5 | 59 |
| Regulatory program | 6 | 80 |
| Formerly Utilized Sites Remedial Action Program | 6 | 81 |
| Flood control and coastal emergencies | 6 | 81 |
| General expenses | 6 | 82 |
| Administrative provisions | 7 | .......... |
| General provisions | 7 | 82 |
| II. Department of the Interior: | | |
| Central Utah Project completion account | 9 | 85 |
| Bureau of Reclamation: | | |
| Water and related resources | 9 | 87 |
| Bureau of Reclamation loan program account | 11 | 104 |
| California Bay-Delta ecosystem restoration | ........ | 105 |
| Central Valley Project restoration fund | 11 | 105 |


★88–380

PLAINTIFF'S EXHIBIT
P1889
~~Yankee Atomic Elec. Co. et al.~~
v. US, 98-126C, 98-154C, 98-474C

DOE headquarters, $7,774,000 for Technical Information Management; and $1,020,000 for Energy Research Analyses. The request for program direction for field offices was reduced by $3,720,000 and the amount transferred to the Safeguards and Security line. The control level for fiscal year 2004 is at the program account level of Science Program Direction.

FUNDING ADJUSTMENTS

The Committee recommendation includes an offset of $4,383,000 for the safeguards and security charge for reimbursable work, as proposed in the budget request. A general reduction of $1,000,000 has been applied to the Science account.

NUCLEAR WASTE DISPOSAL

| | |
|---|---|
| Appropriation, 2003 | $144,058,000 |
| Budget Estimate, 2004 | 161,000,000 |
| Recommended, 2004 | 335,000,000 |
| Comparison: | |
| Appropriation, 2003 | +190,942,000 |
| Budget Estimate, 2004 | +174,000,000 |

The Federal government has a clear statutory responsibility, assigned by Congress in the Nuclear Waste Policy Act of 1982, as amended, to provide for the permanent disposal of spent nuclear fuel and high-level radioactive waste. The Department of Energy was required by statute to accept commercial spent nuclear fuel for disposal beginning on January 31, 1998, and entered into legally enforceable contracts with utilities to execute that obligation. Unfortunately, the Department has been unable to meet that deadline, resulting in a number of lawsuits over the Department's failure to meet its statutory and contractual obligation and a growing financial liability over that failure. The Court of Federal Claims has found the Department to be in breach of its contractual obligations and is proceeding to determine the extent of damages.

The primary consequence of the Department's failure to begin accepting spent nuclear fuel is not, however, the existence of lawsuits and damage claims; it is that vast quantities of commercial spent nuclear fuel remain in temporary storage at reactor sites scattered around the country, many located near major population centers. The Committee is not questioning the current safety and security of spent nuclear fuel stored at commercial sites in accordance with Nuclear Regulatory Commission criteria. The Committee does, however, believe that the safety and security of these materials will be enhanced the sooner they are placed in the underground repository at Yucca Mountain. After the events of September 11, 2001, the Committee believes it is more essential than ever to move aggressively to get the Yucca Mountain repository licensed, built, and operating at the earliest possible date.

Chronic funding shortfalls, however, have starved the program of the resources necessary to keep the repository program on schedule. The Department's latest schedule calls for opening the repository and beginning to accept spent fuel in 2010 at the earliest, over 12 years behind schedule. Most recently, the Department requested a total of $591,000,000 for the nuclear waste disposal program in fiscal year 2003, yet received only $457,000,000, a funding shortfall

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
No. 01-249-C

(Filed: August 12, 2004)

| | |
|---|---|
| TENNESSEE VALLEY AUTHORITY, | ) |
| Plaintiff, | ) |
| v. | ) |
| UNITED STATES, | ) |
| Defendant. | ) |

ORDER

The government's motion for reconsideration, filed on August 10, 2004, respecting this Court's decision reported at 60 Fed. Cl. 665 (2004), proceeds on erroneous premises. First, contrary to the government's motion, the Court made *no* "finding that TVA could receive damages beginning in 1995." Def.'s Mot. at 12. Rather, the Court explicitly found that "DOE breached its obligation to act on TVA's DCSs in good faith," 60 Fed. Cl. at 674, and that initially occurred in 1997. Second, causation is an element of proof regarding damages, and the Court specifically denied TVA's motion for summary judgment respecting damages. *See* 60 Fed. Cl. at 675-76. Defendant's motion for reconsideration is denied.

It is so ORDERED.

s/ Charles F. Lettow
Charles F. Lettow
Judge