# APPENDIX

**PLAINTIFFS' REPLY TO
DEFENDANT'S RESPONSE TO PLAINTIFFS' MOTION FOR AN ORDER
REGARDING SUBSEQUENT DAMAGES ACTIONS
AND PLAINTIFFS' RESPONSE TO DEFENDANT'S CROSS-MOTION
FOR PARTIAL SUMMARY JUDGMENT REGARDING
PRE-BREACH AND FUTURE DAMAGES**

# INDEX TO THE APPENDIX

**Document**


Office of Civilian Radioactive Waste Management Plan Amendment (June 1987) (selected pages) ........ A - 01

Report to Congress on Reassessment of the Civilian Radioactive Waste Management Program (Nov. 1989) (selected pages) ........ A - 04

1991 Annual Capacity Report, DOE (selected pages) ........ A - 06

Acceptance Priority Ranking and Annual Capacity Report (DOE 2004) (selected pages) ... A - 08

Government's Responses to Southern's Interrogatories (selected pages) ........ A - 10

Affidavit of Bruce Hunt ........ A - 17

DOE/RW-0128

DOE/RW--0128

DE87 012899

# OCRWM Mission Plan Amendment

## With Comments on the Draft Amendment and Responses to the Comments

June 1987

U.S. Department of Energy
Office of Civilian Radioactive Waste Management
Washington, DC 20585

AMENDMENT
TO THE MISSION PLAN
FOR THE CIVILIAN RADIOACTIVE WASTE MANAGEMENT PROGRAM

at both sites as the DOE receives evidence that quality-assurance requirements are satisfied.

EXTENSION OF THE SCHEDULE FOR THE FIRST REPOSITORY

Beginning with the comments on the proposed DOE siting guidelines,[14] which were issued on February 7, 1983, shortly after the Act was signed by the President, and continuing through the comments on the 1984 draft Mission Plan[11] and the Project Decision Schedule,[4] many parties have insisted that, given the controversial nature of the program, the schedule specified by the Act was not realistic and not achievable.* They pointed out that the schedule was not reconcilable with the siting process mandated by the Act--to achieve one it was necessary to sacrifice the other--and suggested that the DOE ask the Congress for schedule relief.

The DOE attempted to meet both objectives and developed an aggressive schedule that would allow the first repository to start accepting waste in January 1998. This schedule, first reported in the 1984 draft of the Mission Plan[11] and later revised in the 1985 Mission Plan,[2] resulted from a careful evaluation of the feasible options for each phase of the program and was based on innovative approaches to the development of the repository, such as the integration into the construction of the repository of the exploratory shafts used for site characterization and the construction of the repository in two phases. At the same time, the DOE insisted that the schedule would not be allowed to prevail over the need for technical excellence and public participation.

As already mentioned, several important milestones have been achieved. However, the experience gained in achieving these milestones and advances in the technical planning of the program, coupled with a decrease in the budget for fiscal year 1987** and uncertainty about fiscal year 1988, have led the DOE to reassess and rebaseline the program for the first repository and to revise its schedule (see Table 1). The new schedule shows a 5-year extension of the date for waste acceptance at the first repository, from 1998 to 2003. (As explained later, the DOE could nonetheless start accepting waste in 1998 at an MRS facility.)

The schedule remains aggressive and success oriented. As explained more fully in Appendix B, most of the extension occurs in the near term, during the site-characterization and site-selection phases. The activities scheduled for these phases include the preparation and public review of the site characterization plans, the construction of the exploratory shafts, the underground

---

*Summaries of these comments and the DOE's responses can be found in Volume II of the 1985 Mission Plan.[2]

**In the budget appropriation for fiscal year 1987, the Congress provided $499 million of the $710 million requested by the DOE and withheld $79 million of the $499 million pending the certification of good-faith efforts in consultation and cooperation with States and affected Indian Tribes.

JOE DAILY

# Nuclear Waste: Is There A Need For Federal Interim Storage?

Report of the Monitored Retrievable Storage Review Commission

November 1, 1989

# Executive Summary

About 20,000 metric tons of spent, or used, nuclear fuel have accumulated since the beginning of commercial nuclear power production in the United States. At the end of the currently licensed period of all existing nuclear power plants and those under construction, the amount of spent nuclear fuel is expected to total 87,000 metric tons.

Thus far, practically all of the spent nuclear fuel is stored in water-filled pools at reactor sites. However, space does not exist in the pools to store all the spent fuel expected to accumulate over the lifetime of the reactors. Therefore, other storage must be made available.

U.S. policy is to dispose of spent fuel from nuclear power plants in a permanent underground geologic repository. The objective of permanent disposal is to limit to safe quantities the amount of nuclear waste that might reach the biosphere during the next 10,000 years and beyond.

To achieve that objective, Congress, in the Nuclear Waste Policy Amendments Act of 1987 (NWPAA), designated Yucca Mountain, Nevada, as the candidate site for a repository. Final selection of the Yucca Mountain site was made subject to extensive studies of the suitability of this site and other conditions.

The objective of Congress in adopting the NWPAA was to have a repository available for accepting spent fuel in 1998. However, the U.S. Department of Energy (DOE), which has responsibility for characterizing the Yucca Mountain site, has announced that the opening of the repository will be delayed until 2003, and it is likely that there will be additional delays.

To store spent fuel until the permanent repository is available, a monitored retrievable storage (MRS) facility has been proposed by DOE. The MRS would serve as a means of collecting spent fuel, in excess of that in reactor pools, in a central location, where it would be stored until the fuel can be accepted at the repository. It has also been proposed that the MRS could serve other purposes, such as consolidating the fuel and packaging it for ultimate disposal in the repository.

Facilities similar to an MRS have been proposed since 1972 and have always been the subject of considerable controversy. As recently as 1987, DOE proposed to build an MRS at the Clinch River site near Oak Ridge, Tennessee. In adopting the NWPAA later that year, however, Congress "annulled and revoked" the DOE proposal to locate an MRS in Tennessee.

In the same law, Congress authorized the construction of an MRS but created the Monitored Retrievable Storage Review Commission to study and report to Congress on whether an MRS should be a part of the Nation's nuclear waste disposal system. Essentially, Congress directed the MRS Review Commission to compare the options of a waste disposal system that included an MRS with one that did not include an MRS. The latter, which is known as the No-MRS alternative, would require continued storage of spent nuclear fuel at the more than 70 existing sites of nuclear power plants until the repository is operational.

In the NWPAA, DOE was directed to begin site surveys for an MRS only after the MRS Review Commission had submitted its report to Congress. The NWPAA also limited the capacity of the MRS and linked its construction and operation to the repository schedule.

This report represents the results of almost 18 months of study and deliberations by the MRS Review Commission in response to its mandate from Congress. In addition to its own studies and evaluations, the Commission contracted a number of studies by independent consultants; held extensive public hearings in four locations in the United States; reviewed detailed studies by DOE, the State of Tennessee, and others; received numerous written statements; and visited nuclear waste storage sites in the United States and in four European countries.

As a result of its extensive studies and deliberations, the Commission reached the following conclusions:

**Conclusion No. 1.** From a technical perspective, both the No-MRS and MRS options are safe.

Although neither option is completely without risk, the Commission determined that the risks are expected to be small and within regulatory limits, and the degree of difference in risks is so small that the magnitude of difference should not affect the decision as to whether there should be an MRS.

**Conclusion No. 2.** The net cost of a waste management system that includes an MRS would be lower than previously estimated because of delays that have already occurred in the expected date of repository operation, and the likelihood of further slippages of that date.

DOE RW 0331P

Office of Civilian Radioactive
Waste Management

# Annual Capacity Report

December 1991

U.S. Department of Energy
Office of Civilian Radioactive Waste Management

EXHIBIT
Bronstein 30
4/10/02

HQ0002356

1373

## 2.0 WASTE ACCEPTANCE PROJECTIONS

The waste acceptance projections used in this ACR are representative of a FWMS configuration authorized by the NWPA, which includes a Monitored Retrievable Storage (MRS) facility. Article II of the Standard Contract specifies that "The services to be provided by DOE under this contract shall begin, after the commencement of facility operations, not later than January 31, 1998...." DOE recognizes that, under current conditions, waste acceptance at a DOE facility can begin in 1998 only if the Federal Government is able to consummate a timely agreement, which is enacted into Federal law, with a host State or Indian Tribe for the siting of an MRS facility. The Office of Nuclear Waste Negotiator, the head of which is a representative of the Federal Government appointed by the President, is actively seeking a State or Indian Tribe willing to host an MRS facility or a geological repository.

The acceptance rates in Table 2.1 do not reflect the MRS facility' schedule linkages with the repository development that were imposed by the NWPA, but are consistent with the 10,000 MTU storage capacity limit contained in the NWPA for an MRS facility before a repository starts operation. These acceptance rates assume commencement of facility operations in 1998. If the current linkages between MRS facility construction and repository construction authorization are maintained, it is estimated that commencement of facility operations and initial acceptance of SNF by DOE could not start until at least 2007.

Operation of the FWMS with the waste acceptance rates presented in Table 2.1 would result in the receipt of 8,200 MTU of SNF at the MRS facility during the first ten years of operations. This table provides only an approximation of the system throughput rates and is subject to change depending on the system design and configuration and Congressional action regarding the conditions for the siting of an MRS facility. DOE will further define and specify the system operating and waste acceptance parameters as the program progresses and inform the Purchasers accordingly at the earliest feasible time. Under current conditions, the owners and generators of SNF will

DOE/RW-0567

# Acceptance Priority Ranking & Annual Capacity Report



**U.S. Department of Energy**
Office of Civilian Radioactive Waste Management

**July 2004**

Future discharges will be added to the priority ranking based on their date of permanent discharge. If SNF currently designated as temporarily discharged is redesignated as permanently discharged (without subsequent irradiation), the date of redesignation will become the ranking date, instead of the date of actual discharge. Reinserted assemblies, previously designated as permanently discharged, will be removed from the priority ranking.

## 1.2 BASIS FOR THE ANNUAL CAPACITY REPORT

The ACR (see Appendix B) applies a 10-year projected nominal waste acceptance rate to the APR, resulting in individual capacity allocations. The projected nominal acceptance rate is based on the assumption of SNF acceptance beginning in 2010 at the Yucca Mountain Geologic Repository. These projected nominal waste acceptance rates are presented in Table 1.

**Table 1. Projected Nominal Waste Acceptance Rates for Spent Nuclear Fuel**

| Year | SNF (MTU) |
|---|---|
| 2010 | 400 |
| 2011 | 600 |
| 2012 | 1,200 |
| 2013 | 2,000 |
| 2014 | 3,000 |
| 2015 | 3,000 |
| 2016 | 3,000 |
| 2017 | 3,000 |
| 2018 | 3,000 |
| 2019 | 3,000 |

The Department will further define and specify the system operating and waste acceptance parameters as the Program progresses, and inform the Purchasers accordingly. Until the SNF is accepted by the Department, Section 111 (a)(5) of the Act assigns the waste owners and generators the primary responsibility to provide for, and pay the costs of, interim storage.

The Tables in Appendix B list the Purchasers' annual allocations for each of the first 10 years[***] of projected CRWMS operation. Table 2 presents a summary of all Purchasers' annual allocations based on the nominal waste acceptance rates for the 10-year period covered by this report.

[***] The term "year," when used in reference to capacity allocation in this report, means the calendar year, beginning January 1 and ending December 31.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| SOUTHERN NUCLEAR OPERATING, COMPANY; ALABAMA POWER COMPANY; and GEORGIA POWER COMPANY, Plaintiffs, | |
| v. | No. 98-614C (Senior Judge Merow) |
| UNITED STATES, Defendant. | |

DEFENDANT'S RESPONSES TO PLAINTIFFS' FIRST SET OF INTERROGATORIES

Pursuant to Rule 33 of the Rules of the Court of Federal Claims ("RCFC"), defendant, the United States, provides the following responses to the first set of interrogatories served by plaintiffs, Southern Nuclear Operating Company, Alabama Power Company and Georgia Power Company (collectively "Southern Nuclear"). Defendant has already responded to two previous sets of discovery requests served by Southern Nuclear and the other utility plaintiffs during the coordinated discovery proceedings.

GENERAL OBJECTIONS

1. Defendant objects to each and every interrogatory to the extent that it calls for the disclosure of material or information that is subject to any claim of privilege or protection, including without limitation, the attorney-client privilege, the work-product doctrine, or any Government privilege. Defendant will not produce privileged or protected documents, materials or information in response to the document requests. The inadvertent production by defendant of documents protected by the attorney-client privilege, or any other privilege, shall not constitute a waiver of the applicable privilege or protection as to any document so produced, or as to any other document.

2. Defendant objects to the instructions and definitions accompanying plaintiffs' interrogatories to the extent that such instructions and definitions attempt to impose obligations on defendant other than those imposed by Rules 26, 33, and 34 of the Rules of the United States Court of Federal Claims, ("RCFC") and the Court's prior orders, including but not limited to:

a. Pursuant to the Court's November 8, 2001 order, limitations upon the parties' obligations to preserve and search for electronic mail, to the extent that it has not been stored or has been retained only in an electronic form, were established.

b. The instructions contained in paragraph 2 to the extent that they seek to impose requirements beyond those contained in Rule 26(e)(1) - (3), RCFC. Defendant will seasonably supplement its responses only to the extent required by Rule 26(e), RCFC.

c. The instructions contained in paragraph 3 are objectionable regarding the information to be provided regarding the Government's claims of privilege. The Government will provide a privilege log that contains sufficient information to support the Government's assertion of privilege over the documents identified as responsive to plaintiffs' discovery requests.

d. The instructions contained in paragraph 7 to the extent that they seek to impose requirements beyond those contained in the Rules of the Court of Federal Claims. Defendant will produce copies of any responsive documents electronically upon the secure website that has been established for the production of the documents. Counsel for plaintiff may retrieve the bates numbered electronic images from the website.

3. Defendant objects to each and every interrogatory that requests that the Government "identify all evidence" and "explain how" that evidence supports the Government's response to a particular interrogatory as overly broad, unduly burdensome and beyond the requirements imposed by RCFC 33. Moreover, the requests that defendant identify such evidence are vague as to which parts or subparts of the interrogatory they relate.

4. Defendant objects to each and every interrogatory that requests that the Government "identify all persons with knowledge" and "explain the nature of such knowledge" regarding the Government's response to a particular interrogatory as overly broad, unduly burdensome and beyond the scope of the requirements imposed by RCFC 33. Moreover, the

requests that defendant identify all knowledgeable persons are vague as to which parts or subparts of the interrogatory they relate.

5. Defendant objects to these interrogatories to the extent that they require the Government to search for documents available on the Record Information System database ("RIS-web") maintained by the Office of Civilian Radioactive Waste Management ("OCRWM") and to produce any documents found there. The Government continues to make this database available to plaintiffs, and the burden to search for and request documents is the same for plaintiffs as it is for defendant. Accordingly, the Government will not undertake any searches of the RIS-web in response to these production requests.

6. Defendant objects to these interrogatories to the extent that they require the Government to produce documents that are publicly available to plaintiffs. Publicly available documents would include documents available through websites maintained by either the Department of Energy ("DOE") or the Nuclear Regulatory Commission ("NRC") or available from the public document room maintained by the NRC. To the extent that documents are available from these sources, the Government will not undertake the effort to produce them.

7. Defendant objects to the plaintiffs' interrogatories upon the grounds and to the extent that, by them, plaintiffs seek to have defendant make certain legal conclusions and/or conclusions as to the legal significance of certain documents and/or events which it is not required to make.

8. Defendant objects to the plaintiffs' interrogatories upon the grounds and to the extent that, by them, plaintiffs seek from defendant information prepared and/or developed in anticipation of litigation and/or for trial.

9. Defendant objects to the plaintiffs' interrogatories upon the grounds and to the extent that, by them, plaintiffs seek the discovery of information which is irrelevant and immaterial and not reasonably calculated to lead to the discovery of admissible evidence.

10. Defendant objects to the plaintiffs' interrogatories upon the grounds that the manner in which they are worded, when read with their definitions and general instructions, are so vague, broad, general, and all inclusive that they do not permit a proper or reasonable response and are, therefore, unduly burdensome and oppressive.

11. Defendant objects to the plaintiffs' interrogatories upon the grounds that, by them, plaintiffs seek to require defendant to make legal conclusions and/or conclusions concerning the legal significance of certain documents and/or events which must be determined by the United States Court of Federal Claims in this action and upon the grounds that, to respond to them, defendant would be required to make an extensive investigation, research, compilation, and evaluation of data and records in its possession, which would constitute annoyance, harassment, oppression, undue burden, and undue expense to defendant.

12. Defendant objects to any inference that can be drawn from any portion of plaintiffs' interrogatories or the responses to them that the documents requested or events referred in the requests actually exist or occurred. The failure to object to each such inference in no way constitutes an admission by defendant that such information exists or that such events actually occurred.

13. Defendant objects to these interrogatories to the extent that they seek information that was sought and/or made available in the coordinated discovery proceedings. To the extent that plaintiffs seek this information in relation to schedule issues, plaintiffs, by order of the Court, were required to take all of their discovery regarding schedule issues in the coordinated discovery proceedings, and plaintiffs cannot use new discovery requests to evade that requirement or to require the Government to revisit any agreements or limitations upon search or production obligations upon which the parties may have agreed in those proceedings.

14. The objections set forth above apply to each of the numbered paragraphs of the plaintiffs' interrogatories.

15. Without waiving the above objections, defendant will provide only relevant, non-privileged information and documents currently available to it, subject only to the requirements for supplementation of responses contained in the Rules of the United States Court of Federal Claims.

DEFENDANT'S RESPONSE TO PLAINTIFFS' FIRST SET OF INTERROGATORIES

INTERROGATORY NO. 1:

On what specific date do you contend that DOE will actually begin the acceptance and removal of SNF from nuclear plant sites industry wide? State all factual and legal grounds upon which you base this contention.

(a) How, if at all, do you contend that the District of Columbia Circuit's decision in *Nuclear Energy Institute, Inc. v. EPA*, 373 F.3d 1251 (D.C. Cir. 2004), affects this answer?

(b) What level of appropriations do you contend will be required on an annual basis to begin acceptance on this date?

(c) Identify all evidence that supports this contention and explain how those documents support this contention.

(d) Identify all persons with knowledge relevant to this answer and explain the nature of such knowledge.

(e) Produce copies of all documents that support your answer.

RESPONSE:

The Government objects to this interrogatory as overly broad and unduly burdensome to the extent that it requires the Government to identify all documents responsive to the interrogatory and all individuals knowledgeable about the Government's response. The Government further objects to this interrogatory upon the grounds that it is irrelevant to plaintiffs' damages claim, served upon the Government on August 31, 2004, pursuant to the Court's June 21, 2004 order. Although plaintiffs have informed the Court that they intend to seek damages in this litigation through 2020, plaintiffs' current damages claim only identifies costs to be incurred through December 31, 2009. The Government also objects to this interrogatory to the extent that it seeks a legal conclusion. Finally, the Government objects to this interrogatory upon the grounds that it is premature and that, pursuant to RCFC 33(c), the answer(s) may be obtained from the database of documents previously made available, or to be made available, to

plaintiffs, and the burden of ascertaining the answer(s) is substantially the same for the plaintiffs as it is for the Government. The Government will make the database of documents available to plaintiffs on the Government's production website to allow plaintiffs to download such records as plaintiffs deem appropriate.

Without waiving these objections, the Government responds as follows:

The Department of Energy ("DOE") plans to begin the acceptance of spent nuclear fuel ("SNF") from commercial nuclear utilities in 2010. DOE has not identified the specific day upon which the acceptance will begin. This date will be identified as DOE's planning process proceeds in accordance with the requirements of the Standard Contract. DOE's plans have been announced publicly and have been the subject of testimony before Congress and in both depositions and trials before the Court of Federal Claims.

a. The possible effect of the decision in Nuclear Energy Institute, Inc. v. EPA, 373 F.3d 1251 (D.C. Cir. 2004), upon the commencement of SNF acceptance is unknown.

b. Recent budget requests submitted to Congress identify the annual appropriations amounts that DOE believes are needed to enable the Office of Civilian Radioactive Waste Management ("OCRWM") to conduct and complete activities necessary prior to beginning the acceptance of SNF from commercial nuclear utilities in 2010.

d. Persons knowledgeable about DOE's plans to begin accepting SNF from commercial nuclear utilities in 2010 include, but are not necessarily limited to, the following: Christopher Kouts, Thomas Pollog, and David Zabransky.

c. and e. As previously mentioned, documents responsive to this interrogatory may be obtained from the documents previously made available, or to be made available, to plaintiffs, and the burden of ascertaining the answer(s) is substantially the same for the plaintiffs as it is for the Government. Although plaintiffs' request for production of documents should have been made pursuant to RCFC 34, rather than in interrogatories pursuant to RCFC 33, the Government

# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| SOUTHERN NUCLEAR OPERATING COMPANY; ALABAMA POWER COMPANY; and GEORGIA POWER COMPANY,<br><br>Plaintiffs,<br><br>v.<br><br>THE UNITED STATES OF AMERICA,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. 98-614C<br>Senior Judge Merow |

## DECLARATION OF BRUCE E. HUNT

STATE OF ALABAMA )
)
SHELBY COUNTY )

Pursuant to 28 U.S.C. § 1746, Bruce E. Hunt, deposes and states as follows:

1. "My name is Bruce E. Hunt. I reside at 440 Fern Cove Circle, Birmingham, Alabama, am over the age of eighteen (18) and am in all respects competent to make this Declaration. I have personal knowledge of the statements made in this declaration. I am the Manager, Nuclear Fuel, for Southern Nuclear Operating Company, Inc. My responsibilities include management of nuclear fuel for all nuclear plants operated by Southern Nuclear, including the administration of the contracts by and between Alabama Power Company and Georgia Power Company, respectively, and the United States for the disposal of spent nuclear fuel and high-level radioactive waste ("SNF"). Prior to the incorporation of Southern Nuclear Operating Company, I was employed by Southern Company Services, Inc., with similar responsibilities. At all times since 1982, I have been employed either by Southern Nuclear or Southern Company Services and have had responsibility for the administration of Contracts between APC and/or GPC and the United States for the disposal of SNF.

2. Southern Nuclear Operating Company ("SNC") is a Delaware corporation, having its principal place of business at 40 Inverness Center Parkway, Birmingham, Alabama 35242.

3. Alabama Power Company ("APC") is an Alabama corporation located at 600 North Eighteenth Street, Birmingham, Alabama 35291. APC is the owner of the Joseph M. Farley Nuclear Plant, Units 1 and 2 ("Farley"), located in Houston County, Alabama.

4. Georgia Power Company ("GPC") is a Georgia corporation located at 333 Piedmont Avenue, N.E., Atlanta, Georgia 30308. GPC is the co-owner of both the Edwin I. Hatch Nuclear Plant, Units 1 and 2 ("Hatch"), located in Appling County, Georgia, and the Vogtle Electric Generating Plant, Units 1 and 2 ("Vogtle"), located in Burke County, Georgia.

5. Pursuant to Nuclear Operating Agreements, executed in 1991, by and between SNC and APC, and in 1993 by and between SNC and GPC, respectively, SNC is the operator of Plants Farley, Hatch and Vogtle, and acts as agent for APC and GPC, respectively, in the operation and management of the plants, including the administration and enforcement of agreements between APC and GPC, respectively, and third parties. Prior to the incorporation of Southern Nuclear, my former employer, Southern Company Services, performed similar contract administration functions.

6. Nuclear power plants operate using assemblies of enriched uranium for fuel. On a periodic basis, the reactors must be refueled. During refueling, used fuel assemblies, commonly referred to as "spent nuclear fuel," are removed from the reactor core to make room for new assemblies. Spent nuclear fuel ("SNF") is placed in a water-filled basin located at the reactor site. If there is insufficient storage space in the SNF basin to allow discharged SNF assemblies to be removed from the reactor, alternate storage systems must be added or the reactor must cease operation.

7. On or about February 4, 1983, the United States Department of Energy published for notice and comment a proposed rulemaking which set forth the terms and conditions of a proposed Standard Contract under the Nuclear Waste Policy Act of 1982. Authorized executives of APC and GPC commented on the proposed contract. True and correct copies of the comment letters from APC and GPC are contained in pages 567-584 of Plaintiffs' Appendix ("PA") to its Memorandum in Opposition to Defendant's Motion for Summary Judgment Regarding

the Spent Nuclear Fuel Acceptance Rate And In Support Of Plaintiff's Motion For Partial Summary Judgment Regarding The Rate Of Spent Nuclear Fuel Receipt. Exhibits 1 and 2, respectively.

8. On or about June 13, 1983, in accordance with the directives of the Nuclear Waste Policy Act of 1982, APC entered into a Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste (the "Standard Contracts"), with the Defendant, the United States of America (the "Government"), acting through the United States Department of Energy ("DOE"), for the disposal of SNF from Plant Farley. See PA 293-355.

9. On or about June 10, 1983, in accordance with the directives of the Nuclear Waste Policy Act of 1982, GPC entered into two Standard Contracts with the Government, acting through the DOE, for the disposal of SNF from Plants Hatch and one Standard Contract for the disposal of SNF from Plant Vogtle. See PA 357-544.

10. The Standard Contracts executed by APC and GPC contained language relative to the rate of receipt of SNF consistent with the suggestions in the comment letters from APC and GPC executives.

11. Southern Nuclear has been designated as agent for APC and GPC with respect to such Standard Contracts. Prior to the incorporation of Southern Nuclear, my former employer, Southern Company Services, acted as agent for APC and GPC with respect to the Standard Contracts.

12. To date APC has paid over 250 million dollars ($250, 000,000) and GPC has paid over 486 million dollars ($486,000,000) in quarterly fees under the Standard Contract. APC continues to pay fees in the aggregate of approximately 12.5 million dollars ($12,500,000) per year, and GPC continues to pay fees in the aggregate of approximately 30.2 million dollars ($30,200,000) per year.

13. APC, GPC and SNC understood from the DOE officials' statements and published

documents that the DOE interpreted both the Act and the Standard Contract to require DOE to perform SNF disposal services at a rate sufficient to avoid the need for additional at-reactor storage after January 31, 1998, and would reduce the backlog of fuel accumulated prior to that date so that APC and GPC could decommission their reactors in a timely manner.

14. On or about September 23, 1988, I corresponded with the United States Department of Energy concerning a proposed schedule for the removal of spent nuclear fuel from the reactor sites set forth in a draft amendment to the DOE "Mission Plan." See PA at 1239. My letter sets forth my understanding of the United States' responsibilities under the Standard Contract and the Nuclear Waste Policy Act. DOE responded to my letter on November 23, 1988 but did not address my principal concerns that receipt rates in the draft amendment were inadequate and that DOE's draft amendment assumed that APC and GPC would be responsible for adding storage capacity until SNF was removed by DOE. *See* PA at 1246A.

15. On or about September 30,1996 and October 21,1996, Ronald Cocherell, who is employed by Southern Nuclear as Manager of Nuclear Fuel Services, corresponded with DOE concerning the submission of Delivery Commitment Schedules for Plant Hatch. See PA at 1633, 1635.

16. DOE's instructions for submission of Delivery Commitment Schedules provided that they be submitted no later than 63 months prior to the delivery date of spent nuclear fuel to DOE as reflected in the most recent Annual Capacity Report from DOE. See Government Appendix at 150. The 1995 Annual Capacity Report omitted the year of delivery from the Waste Acceptance Schedule included in the Report. See PA at 1514. Therefore, there was no way to determine when a Delivery Commitment Schedule was due.

17. On or about March 13, 1997, Southern Nuclear Operating Company received a response from Beth Tomasoni, Contracting Officer for DOE, to Mr. Cocherell's letters of September 30, 1996 and October 21, 1996. See PA at 1641.

18. Based on Ms. Tomasoni's letter of March 13, 1997, and on repeated acknowledgements by DOE for several years preceding that time that it would not begin removal of SNF in January of 1998 in accordance with the Standard Contracts, it was apparent that continued submission of Delivery Commitment Schedules served no purpose and was futile. Consequently, SNC has not submitted additional Delivery Commitment Schedules on behalf of GPC or APC.

19. DOE has never responded to the objection set forth in Mr. Cocherell's letters to the rate of SNF receipt included in the 1995 Annual Capacity Report.

20. The DOE, through the Contracting Officer, David Zabransky, has informed SNC that it will not make acceptance allocations for 2008 and 2009 and will not process delivery commitment schedules for those years. See PA at 1926.

21. DOE has refused and failed to remove the Companies' SNF beginning January 31, 1998 and the Government has stated, in the form of written correspondence, that it will not begin accepting SNF from the plant sites before the year 2010.

22. Without additions to SNF storage capacity, Plant Hatch Units 1 and 2 would not have been able to operate beyond 2003. In 1998 Plant Hatch began construction of on-site dry-cask storage facilities to accommodate DOE's failure to remove SNF from Plant Hatch in accordance with the Standard Contracts.

23. Without additions to SNF storage capacity, Plant Farley Unit 1 would not have been able to operate beyond 2009, Plant Farley Unit 2 to operate beyond 2013, or Plant Vogtle Units 1 and 2 to operate beyond 2008.

I declare under penalty of perjury on this 12 day of December, 2002 that the foregoing is true and correct.

[signature]
Bruce E. Hunt