No. 98-614C
(Senior Judge Merow)

---

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**SOUTHERN NUCLEAR OPERATING COMPANY,**
**ALABAMA POWER COMPANY AND GEORGIA POWER COMPANY,**

**Plaintiffs,**

**v.**

**THE UNITED STATES,**

**Defendant.**

---

# PLAINTIFFS' MEMORANDUM OF CONTENTIONS OF FACT AND LAW

---

M. Stanford Blanton
BALCH & BINGHAM LLP
1710 Sixth Avenue North
Birmingham, AL 35203-2015
Phone: (205) 226-3417
Fax: (205) 226-8798

Ronald A. Schechter
Jeffrey L. Handwerker
ARNOLD & PORTER LLP
555 Twelfth Street, N.W.
Washington, D.C. 20004-1202
Phone: (202) 942-5000
Fax: (202) 942-5999

Of Counsel:

Ed R. Haden
K. C. Hairston
BALCH & BINGHAM LLP
1710 Sixth Avenue North
Birmingham, AL 35203-2015
Phone: (205) 251-8100
Fax: (205) 226-8798

September 2, 2005

# TABLE OF CONTENTS


TABLE OF CONTENTS .................... i

TABLE OF AUTHORITIES .................... iii

INTRODUCTION AND STATEMENT OF ISSUES OF FACT AND LAW .................... 1

A. Resolved Issues of Fact and Law .................... 3

B. Unresolved Issues of Fact and Law .................... 7

1. This Court's Questions on the Acceptance Rate .................... 7

2. Quantum of Damages .................... 9

STATEMENT OF FACTS .................... 16

CONTENTIONS OF FACT AND LAW .................... 23

I. THE 3,000 MTU RATE OF ACCEPTANCE WOULD HAVE ELIMINATED THE NEED FOR ON-SITE DRY STORAGE AT EACH OF SOUTHERN'S PLANTS, WAS CONTEMPLATED BY THE PARTIES, WAS PAID FOR BY SOUTHERN, AND IS REASONABLE .................... 23

A. "Would excess capacity at other utilities also be utilized to avoid additional on-site storage?" .................... 23

B. "What rate of acceptance by DOE would have been necessary to avoid additional on-site storage at APC or GPC given the age of their stored fuel, their SNF pool capacity, and the production of waste at the specified plants in this litigation?" .................... 23

C. "Would such a rate be within the range contemplated by the parties?" .................... 24

1. A 3,000 MTU Acceptance Rate Was Within the Contemplation of the Parties. .................... 25

2. The Government has Charged Southern Fees Based on the 3,000 MTU Rate. .................... 27

3. The 3,000 MTU Rate is Reasonable. .................... 28

4. The Government's Suggested Rates Are Neither Reasonable Nor Within the Contemplation of the Parties. .................... 29

D. "When would disposition have to commence in order to avoid additional on-site storage at APC or GPC?" .................... 33

II. SOUTHERN'S DAMAGES WERE REASONABLY FORESEEABLE, WERE CAUSED BY THE GOVERNMENT'S PARTIAL BREACH, AND HAVE BEEN PROVEN WITH REASONABLE CERTAINTY ........ 34

A. The Applicable Legal Standards for Breach of Contract Damages. ........ 34

B. The Seven Principal Damages Issues. ........ 39

1. Southern's Loading Schedule, Including the Number of Casks Purchased and Loaded, and Related Infrastructure Costs Reflect the Court's Damages Order, the Correct Measure of Damages, and the Reasonable Judgment Not to Use a Second Rack in the Hatch Pool. ........ 40

2. Southern's Decision to Purchase Three HI-STAR Casks was Reasonable ........ 50

3. Southern Will Be Forced to Purchase and Construct Additional Storage Facilities at Plant Vogtle ........ 53

4. Southern's Cost of Capital is Recoverable. ........ 55

5. The Costs of Internal Labor, Overhead, and Engineering Supervision Are Recoverable. ........ 58

6. The Private Fuel Storage Costs Were Reasonable Expenditures ........ 63

7. The Williams Services' and Southern Company Services' Costs Are Fully Supported by the Evidence Presented to the Government ........ 65

CONCLUSION ........ 67

CERTIFICATE OF SERVICE ........ 68

# TABLE OF AUTHORITIES

## Cases

*Alaska Pulp Corp. v. United States*, 59 Fed. Cl. 400 (2004) ..................... 33

*Bluebonnet Sav. Bank, F.S.B. v. United States*, 266 F.3d 1348 (Fed Cir. 2001) ..................... 54

*Bluebonnet Sav. Bank, F.S.B. v. United States*, 339 F.3d 1341 (Fed Cir. 2003) ..................... 54

*Centex Corp. v. United States*, 55 Fed. Cl. 381 (2003), *aff'd*, 395 F.3d 1283 (Fed. Cir. 2005) ..................... 54

*Chain Belt Co. v. United States*, 127 Ct. Cl. 38 (1953) ..................... 33, 58, 59

*Cienega Gardens v. United States*, 38 Fed. Cl. 64, 79 (1997), *rev'd on other grounds*, 194 F.3d 1231 (Fed. Cir. 1998) ..................... 35

*Citizens Federal Bank v. United States,* 66 Fed. Cl. 179 (Fed. Cl. 2005) ..................... 35, 39, 50

*Clements Auto Supply Co. v. Service Bureau Corp.,* 298 F. Supp. 115, 134 (D. Minn. 1969), *aff'd in relevant part*, 444 F.2d 169 (8th Cir. 1971) ..................... 56

*Commercial Federal Bank, F.S.B. v. United States,* 59 Fed. Cl. 338, 355 (2004), *aff'd*, 125 Fed. Appx. 1013 (Fed. Cir. 2005) ..................... 36

*Commonwealth Edison Co. v. United States*, 56 Fed. Cl. 652 (2003) ..................... passim

*Convoy Co. v. Sperry Rand Corp.*, 672 F.2d 781 (9th Cir. 1982) ..................... 56

*Department of Water & Power v. United States*, 131 F. Supp. 329 (S.D. Cal. 1955) ...... 55, 59, 60

*Dunn Appraisal Co. v. Honeywell Information Systems, Inc.*, 687 F.2d 877 (6th Cir. 1982) ..................... 57

*England v. Contel Advanced Systems, Inc.*, 384 F.3d 1372 (Fed. Cir. 2004) ..................... 55

*F.S.B. v. United States*, 317 F.3d 1363 (Fed. Cir. 2003) ..................... 54, 60

*First Nationwide Bank v. United States*, 56 Fed. Cl. 438 (Fed. Cl. 2003) ..................... 34, 36, 50

*Fisher v. First Stamford Bank & Trust Co.,* 751 F.2d 519 (2d. Cir. 1984) ..................... 35

*Franconia Assocs. v. United States*, 536 U.S. 129 (2002) ..................... 32

*Freeport Sulphur Co. v S/S Hermosa*, 526 F.2d 300 (5th Cir. 1976) ..................... 57

*Howell v. United States*, 51 Fed. Cl. 516 (2002) ..................... 24

*In re Kellett Aircraft Corp.,* 186 F.2d 197 (3rd Cir. 1950) ..................... 36, 47, 50

*Indiana Michigan Power Co. v. Department of Energy*, 88 F.3d 1272 (D.C. Cir. 1996)............. 2

*Indiana Michigan Power Co. v. United States*, 57 Fed. Cl. 88 (2003)............................ 4, 29, 31

*KMS Fusion, Inc. v. United States*, 36 Fed. Cl. 68 (1996), *aff'd mem.*, 108 F.3d 1393 (Fed. Cir. 1997)........................................................................................................ 24

*Locke v. United States*, 283 F.2d 521 (Ct. Cl. 1960) ......................................................... 34

*Maine Yankee Atomic Power Co. v. United States*, 225 F.3d 1336 (Fed. Cir. 2000) .................... 3

*Massachusetts Bay Transp. Auth. v. United States*, 129 F.3d 1226 (Fed. Cir. 1997)....... 32, 43, 56

*Minpeco, S.A. v. Hunt,* 686 F. Supp. 420 (S.D.N.Y. 1988) ...................................................... 54

*Northern States Power Co. v. United States Dep't of Energy*, 128 F.3d 754 (D.C. Cir. 1997), *cert. denied,* 525 U.S. 1016 (1998)........................................................ 2, 3

*Northern States Power Co. v. United States*, 224 F.3d 1361 (Fed. Cir. 2000) .............................. 3

*Pacific Gas & Elec. Co. v. Howard P. Foley Co., Civ. No. 85-2922 SW, 1993* WL 299219 (N.D. Cal. July 27, 1993).......................................................................................... 54

*Rumsfeld v. Applied Cos.*, 325 F.3d 1328, 1344 (Fed. Cir.), *cert. denied,* 540 U.S. 981 (2003)............................................................................................................................ 33

*S. J. Groves & Sons Co. v. Warner Co.,* 576 F.2d 524 (3d Cir. 1978) ....................................... 35

*Sacramento Mun. Util. Dist. v. United States*, 63 Fed. Cl. 495 (2005) ........................................ 5

*Salles v. United States*, 156 F.3d 1383 (Fed. Cir. 1998)......................................................... 24

*Systems Fuels, Inc. v. United States*, 66 Fed. Cl. 722 (2005) ...................................................... 5

*United Power Ass'n v. L.K. Comstock & Co.,* 1992 U.S. Dist. LEXIS 18874, Civ. No. 3-89 766, 1992 WL 402906 (D. Minn., Oct. 27, 1992) .......................................... 54

*United States v. New England S.S. Co.*, 297 F. 651 (S.D. N.Y. 1923) ........................................ 58

*United States v. The John R. Williams*, 144 F.2d 451 (2d Cir.), *cert. denied,* 323 U.S. 782 (1944)...................................................................... 57, 58

*Veranda Beach Club Ltd P'ship v. Estern Sur. Co.*, 936 F.2d 1364 (1st Cir. 1991).................... 36

*Westfed Holdings, Inc. v. United States, aff'd in relevant part & rev'd in part on other grounds*, 407 F.3d 1352 (Fed. Cir. 2005), 52 Fed. Cl. 135 (2002)........................................ 54

**Statutes**

28 U.S.C. § 2516 .......... 53, 54

42 U.S.C. § 10165 .......... 30

42 U.S.C. § 10168 .......... 30

Nuclear Waste Policy Act of 1982, as amended, Pub. L. 97-425, 96 Stat. 2201 (codified at 42 U.S.C. §§ 10101-10270 (1982)) .......... 1

Ala. Code § 37-1-49 .......... 44

O.C.G.A. § 46-2-20 .......... 45

**Other Authorities**

11 *Corbin on Contracts* § 1039 (2002) .......... 34

3 Dan B. Dobbs, *Law of Remedies* § 12.6(1)(6) (2d ed. 1993) .......... 35

*Restatement (Second) of Contracts* § 204 .......... 24

*Restatement (Second) of Contracts* § 344 .......... 32

*Restatement (Second) of Contracts* § 347 .......... 35, 63

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| **SOUTHERN NUCLEAR OPERATING CO., INC., ALABAMA POWER COMPANY, AND GEORGIA POWER COMPANY,** | ) | |
| **Plaintiffs,** | ) | |
| **v.** | ) | **No. 98-614C (Senior Judge Merow)** |
| **THE UNITED STATES,** | ) | |
| **Defendant.** | ) | |

**PLAINTIFFS' MEMORANDUM OF CONTENTIONS OF FACT AND LAW**

Pursuant to this Court's April 5, 2005 Pretrial Order, Plaintiffs Southern Nuclear Operating Company ("SNC"), Alabama Power Company ("APC"), and Georgia Power Company ("GPC") (collectively, "Southern") submit this Memorandum of Contentions of Fact and Law in support of their initial pretrial submissions.

**INTRODUCTION AND STATEMENT OF ISSUES OF FACT AND LAW**

Southern and the Government are parties to contracts (the "Contracts") executed in accordance with the Nuclear Waste Policy Act of 1982, as amended ("NWPA"), Pub. L. 97-425, 96 Stat. 2201 (codified at 42 U.S.C. §§ 10101-10270 (1982)). Southern has paid approximately $850,000,000 in fees to the Department of Energy ("DOE" or the "Government"), and continues to pay tens of millions of dollars each year, under the Contracts in exchange for the Government's promise to remove spent nuclear fuel ("SNF") from Southern's plant sites, which the Government has failed to do. Southern filed suit on July 29, 1998, to recover damages for partial breach of contract, for breach of the duty of good faith, for a taking without just

compensation, and for illegal exaction, all arising from the Government's failure to begin and continue acceptance of SNF from Southern's nuclear plants on or after January 31, 1998.

Prior to this case being filed, the United States Court of Appeals for the District of Columbia Circuit held in two separate opinions that the Government had an unconditional obligation under the Contracts to commence removal of SNF on January 31, 1998, and that the Government cannot rely on its failure to construct a repository in accordance with the NWPA as an excuse for its non-performance. *See Northern States Power Co. v. United States Dep't of Energy*, 128 F.3d 754, 760 (D.C. Cir. 1997), *cert. denied,* 525 U.S. 1016 (1998); *Indiana Michigan Power Co. v. Department of Energy*, 88 F.3d 1272, 1276-77 (D.C. Cir. 1996). In the seven years between Southern's filing of this lawsuit and its culmination in a damages trial, the Court of Appeals for the Federal Circuit and the Judges of this Court have resolved many of the issues relevant to this case. All that remains to be resolved are Southern's damages claims, which involve straightforward principles of contract damages law. Under the acceptance rate that Southern believes the Court will conclude the Contracts require,[1] the Government's experts acknowledge that Southern is entitled to over $48 million in damages.[2]

**A. Resolved Issues of Fact and Law**

Among the issues that have been resolved are the following:

---

[1] Indeed, the Government's experts acknowledge that, even under the reduced acceptance rate that the judges of this Court have uniformly rejected, Southern is entitled to recover over $28 million.

[2] This is not to suggest that Southern accepts the Government's measure of damages. Southern will demonstrate that the Government's expert has improperly reduced its damages, and that Southern is entitled to judgment in the amount of approximately $153 million.

First, the United States Court of Appeals for the Federal Circuit held that the Court of Federal Claims has jurisdiction to consider suits for partial breach of contract brought by nuclear utilities that entered into contracts with the Government. *Maine Yankee Atomic Power Co. v. United States*, 225 F.3d 1336, 1341-42 (Fed. Cir. 2000); *Northern States Power Co. v. United States*, 224 F.3d 1361, 1367 (Fed. Cir. 2000). In *Maine Yankee*, 225 F.3d at 1342, the Federal Circuit concluded as a matter of law that the Government's failure to begin acceptance of SNF by January 31, 1998, was a partial breach of contract that extended to *all nuclear utilities*: "The breach involved all the utilities that had signed the contract—the entire nuclear electric industry." The Federal Circuit also held that the unavoidable delays clause of the contracts applied only to the types of delays that "routinely" arise after performance under the contract had begun and not to the delay of "a critical and central obligation of the contract" — to begin acceptance of SNF by January 31, 1998. *Id.* at 1341.

Second, in light of the Federal Circuit's rulings in *Maine Yankee*, 225 F.3d at 1342, and *Northern States*, 224 F.3d at 1367, this Court granted Southern's motion for summary judgment on the issue of the Government's contract liability. Apr. 7, 2004 Order, Docket No. 234, at 5. This Court found that the Government partially breached the Standard Contracts it had entered into with Southern, which obligated the Government to begin and continue disposal of SNF by no later than January 31, 1998. *Id.*

Third, Judge Hewitt, Judge Hodges, and Your Honor have denied the Government's partial summary judgment motions that the 900 Metric Tons of Uranium ("MTU") per year acceptance rate contained in the 1991, 1992, and 1995 Annual Capacity Reports ("ACRs") is the reasonable and appropriate acceptance rate on which to base the utilities' damages. *See Commonwealth Edison Co. v. United States*, 56 Fed. Cl. 652, 666-67 (2003) (Hewitt, J.); *Indiana*

*Michigan Power Co. v. United States*, 57 Fed. Cl. 88, 97-100 (2003) (Hodges, J.); *Yankee Atomic Electric Co. v. United States*, No. 98-126C (Fed. Cl. June 26, 2003) [hereinafter "*Yankee Atomic*"] (order adopting Judge Hewitt's opinion in *Commonwealth Edison* to extent applicable). The Government's 900 MTU per year acceptance rate is based on limits that the 1987 Amendments to the NWPA imposed on a Monitored Retrievable Storage ("MRS") facility. *See Indiana Michigan*, 57 Fed. Cl. at 100; *Commonwealth Edison*, 56 Fed. Cl. at 666. Because DOE was never authorized to build an MRS facility and because it was illegal under the 1987 Amendments to the NWPA to store SNF at an MRS before a permanent repository was licensed, the *Indiana Michigan* and *Commonwealth Edison* courts rejected the Government's position that its damages should be limited based on an acceptance rate derived from the operation of an MRS facility. *See Indiana Michigan*, 57 Fed. Cl. at 100; *Commonwealth Edison*, 56 Fed. Cl. at 666. Judge Hewitt concluded:

> The court does not agree with defendant that it is entitled to limit its damages based upon an optional disposal method of which it did not avail itself. The 10,000 MTU limitation applied only to a MRS until a permanent repository began accepting SNF; the 1987 Amendments did not apply this limitation to DOE's obligation to dispose of SNF under the Standard Contract beginning January 31, 1998.

*Commonwealth Edison*, 56 Fed. Cl. at 666.

Fourth, Judge Hewitt in *Commonwealth Edison* rejected another Government argument, that the Delivery Commitment Schedule ("DCS") process described in the Standard Contract, which the DOE contracting officer acknowledged was suspended in 1997 in a purported effort to limit the Government's damages, should define the amount of SNF that the Government was required to accept in the non-breach scenario. Judge Hewitt properly held that the DCS process was a planning tool and that it did not create any binding obligation on either the Government or the utilities. *See Commonwealth Edison*, 56 Fed. Cl. at 663, 665-66. Judge Hewitt stated, "In

these circumstances, plaintiff's submission and defendant's acceptance of the proposed DCSs did not create a contractually binding obligation for either party." *Id.* at 666 (citations omitted).

Other Judges on this Court have agreed with Judge Hewitt that the DCS process did not create any obligation between the Government and the utilities nor did it alter the Government's obligations under the Standard Contract. *See Systems Fuels, Inc. v. United States*, 66 Fed. Cl. 722, 732 (2005) (Braden, J.) (finding that "[t]here is absolutely no evidence in the record that the ACR and DCSs were binding on either party" and that "as a matter of law, the ACR and DCSs did not amend the Standard Contract"); *Sacramento Mun. Util. Dist. v. United States*, 63 Fed. Cl. 495, 505 (2005) (finding that "the DCSs imposed no legal obligation on either party to the DOE Standard Contract" and that "[t]he record contains no evidence that separate consideration was offered by the Government to support an independent contract modifying the DOE Standard Contract.") (Braden, J.); *Indiana Michigan*, 57 Fed Cl. at 97-98 (Hodges, J.) ("The Contract does not use [ACRs] and [DCSs] to determine an Acceptance Rate. The [DOE] did not consider these forms to be binding. . . . The Contract contemplated that DOE would use these reports for planning purposes only. The [ACRs] disclaimed any other purpose, specifically stating that they were not binding on either party." (footnotes and citations omitted)).

Fifth, because an acceptance rate term is missing from the Standard Contracts, it has been established that the Court must supply a reasonable acceptance rate term. *See Commonwealth Edison*, 56 Fed. Cl. at 662, 667. In its April 7, 2004 Order, this Court adopted Judge Hewitt's reasoning in *Commonwealth Edison*, but left final resolution of the acceptance rate issue for trial.

April 7, 2004 Order, at 6. The April 7 Order granted Southern's motion for partial summary judgment on liability, leaving for trial the proof of Southern's damages.[3] *Id.* at 4-5.

Finally, in its December 20, 2004 Order, this Court established the parameters for Southern's proof of past and future damages. The Court held that damages incurred prior to January 31, 1998, are not to be excluded solely on the basis that they were incurred prior to the date of the Government's partial breach of contract. Dec. 20, 2004 Order, Docket No. 262, at 2. In addition, Southern can present evidence of past and future damages resulting from the Government's partial breach from January 31, 1998 through December 31, 2009, "including cost or monetary ramifications thereof extending to 2020." *Id.* at 2-3. Southern also can maintain a separate action for any damages resulting from any Government breaches beyond January 1, 2010.[4] *Id.*

**B. Unresolved Issues of Fact and Law**

Still unresolved are: (1) the numeric rate of acceptance to which the Government is bound and by which Southern's damages will be measured; and (2) the proof of damages for the amounts that Southern has and will expend through 2020 resulting from the Government's

---

[3] This Court dismissed the takings claim as duplicative of the contract claim, but denied the Government's motion to dismiss the illegal exaction claim. April 7, 2004 Order at 4-5, 7-8. This Court also denied the Government's motion to dismiss any claim for damages arising from Greater than Class C radioactive waste. *Id.* at 5-6.

[4] Prior to December, 2004, the Government repeatedly made representations that it would begin acceptance of SNF in 2010. Dec. 20, 2004 Order, at 2. However, in recent months DOE officials have acknowledged that the Government will not begin performance in 2010. *See, e.g.*, (Kouts Dep. at 62-63); Steve Tetreault, *Energy Officials Turn Shy in Talk about Yucca Schedule*, Las Vegas Review-Journal, Mar. 11, 2005, at 1B ("Although saying 2012 can be achieved if everything goes their way, Yucca managers in recent public comments have mentioned 2015 as another possibility.").

partial breach through the end of 2009. With respect to the rate, this Court posed four questions to the parties in its April 7, 2004 Order that Southern answers as follows:

**1. This Court's Questions on the Acceptance Rate**

**(a) "Would excess capacity at other utilities also be utilized to avoid additional at-reactor storage?" (April 7, 2004 Order at 6.)**

Southern does not rely on excess capacity at other utilities to avoid additional on-site storage in the non-breach scenario in this case. Both Southern and the Government agree that there need be no "swaps" or exchanges of SNF acceptance rights for Southern to have avoided dry storage if the Government had performed beginning in 1998 at the annual rate of 3,000 MTUs, with the five-year ramp-up period.

**(b) "What rate of acceptance by DOE would have been necessary to avoid additional on-site storage at APC or GPC given the age of their stored fuel, their SNF pool capacity, and the production of waste at the specified plants involved in this litigation?" (April 7, 2004 Order at 7.)**

Both Southern's and the Government's experts agree that 3,000 MTUs per year of industry-wide acceptance of SNF, with a five-year ramp-up period, would have avoided the need for additional storage capacity at Southern's plants given the age of their SNF, their pool capacity, and their on-going production of SNF. *See* Jonathan Neuberger, Expert Witness Report at 17 (June 10, 2005) [hereinafter "Neuberger Report"] (Government's expert stating: "As with the Kenrich simulation, no casks are required at any of the four facilities in the but-for [*i.e.*, non-breach] scenario."); Kenneth P. Metcalf & Richard J. Seracki, Assessment of Damages 24 (Jan. 31, 2005) [hereinafter "Kenrich Report"] (Southern's expert stating: "Had DOE begun picking up spent fuel from the nuclear industry in 1998, Southern would not have needed to store fuel at

a [dry storage facility] at Hatch or Farley, and would not have incurred any costs related to dry storage.").

**(c) "Would such a rate be within the range contemplated by the parties?" (April 7, 2004 Order at 7.)**

It is clear from the evidence that both parties to the Contracts understood that the purpose of the NWPA and the requirement of the Contracts was to eliminate the need for additions to storage capacity at nuclear plants after 1998 and to eliminate the backlog in SNF inventories over time, in exchange for the payments of fees by Southern and other utilities. The 3,000 MTU annual rate, with a five-year ramp-up period, was the rate that the Government believed would accomplish that objective and was also within the range contemplated by the parties as demonstrated by repeated reference to that rate by DOE officials and program documents, including DOE's assessments of the adequacy of fees charged to Southern. This is the rate at which the Contracts required the Government to perform and should be the basis for the calculation of Southern's damages.

**(d) "When would disposition have to commence in order to avoid additional on-site storage at APC or GPC?" (April 7, 2004 Order at 7.)**

If the Government had commenced industry-wide performance in 1998 at the 3,000 MTU annual rate, with a five-year ramp-up period, it would have begun removing SNF from Plant Hatch no later than 2001, from Plant Farley no later than 2002, and from Plant Vogtle no later than 2006. Both parties' experts agree that under this schedule, Southern would not have had to construct dry storage facilities at any of its plants.

**2. Quantum of Damages**

Once the rate is determined, this will be a straight-forward proof-of-damages case. Southern's damages do not depend on possible swaps of storage capacity, potential non-renewal of plant operating licenses, changing priorities of SNF acceptance for shut down plants, whether Greater Than Class C radioactive waste ("GTCC") is covered by the Contracts, or any novel theories of causation. Instead, Southern has already built and paid for SNF storage facilities at two of its three nuclear plants, and will be forced by the Government's delay to construct dry storage facilities at its third plant.

Because of the Government's partial breach of the Standard Contracts, Southern has incurred substantial costs related to the design, engineering, licensing, construction, installation, operation, and maintenance of additional at-reactor storage. At Plant Hatch, Southern has constructed a licensed Independent Fuel Storage Installation ("ISFSI"), which currently consists of four concrete pads, each with a capacity of twelve dry SNF storage casks. As of December 2004,[5] Southern had purchased twenty-two dry casks, loaded SNF into these casks, and placed the loaded casks onto Plant Hatch's ISFSI. By 2012, Plant Hatch will need to construct two additional twelve-cask ISFSI pads and purchase, load, and place thirty additional dry casks because of the Government's delay through 2009. In 2005, Plant Hatch will load and place four additional dry casks in the ISFSI.

Construction of an ISFSI at Plant Farley began in 2000. As of December 2004, Southern had purchased three dry storage casks for Plant Farley. Through 2013, Plant Farley will be required to purchase, load, and place twenty-two dry casks on an ISFSI because of the

---

[5] By agreement of the parties, for purposes of the damages trial, past damages include those costs incurred through December 31, 2004.

Government's delay through 2009. In 2005, construction on Plant Farley's ISFSI was completed and Plant Farley has loaded three dry casks with SNF and placed these casks into its ISFSI.

Because of the Government's breach, Plant Vogtle procured and installed additional SNF pool racks during the period of 1998 to 2000. By 2015, Plant Vogtle will be required to design, license, engineer, and construct an ISFSI because of DOE's delay through 2009. By 2017, Plant Vogtle will also be required to purchase, load, and place eleven dry casks in the ISFSI because of that delay.

Costs associated with dry storage also include the licensing, design, and engineering of the ISFSIs, fuel characterization, the purchase and maintenance of dry cask handling equipment, the development of procedures and training for loading and other operations, and the continued operation and maintenance of the ISFSIs.

The damages incurred at Plant Hatch, Plant Farley, and Plant Vogtle total $153,288,216 at a 3,000 MTU per year acceptance rate. At this acceptance rate, the Government does not dispute $48,611,522 in damages.[6] Expert Report of R. Larry Johnson at 37 (June 10, 2005) [hereinafter "L. Johnson Report"]. The difference between the damages numbers derives from the parties' divergent views on the reasonableness of how Southern has operated its nuclear plants in the face of the Government's partial breach of its Contracts to remove SNF.

---

[6] At an acceptance rate of 900 MTUs per year, which as discussed supra has been previously rejected, the Government calculates Southern's damages to be $28,789,228. (L. Johnson Rep. at 37.)

**(a) Whether Southern's Loading Schedule, including the Number of Casks and Associated Infrastructure, is Reasonable.**

First, the Government argues that the number of dry casks that Southern will be forced to buy should be substantially reduced. This argument is based on three contentions: (1) that Southern is not entitled to recover any costs incurred after 2009; (2) that Southern's damages calculations using its actual SNF cask loading schedule exceed the hypothetical number of casks derived from a cask-loading "model" because Southern is maintaining more operating and maintenance reserve space in its pools than provided in the "model"; and (3) that Southern made an unreasonable management decision in not installing a second rack in the rectangular inset in the side of the Hatch pool known as the "bathtub" area, which the Government contends would have eliminated the need for three casks that Southern has already purchased and loaded.

The evidence in this case will rebut each of the Government's allegations. With respect to post-2009 damages, this Court's December 20, 2004 Order expressly allows Southern to present evidence of all damages that will be incurred through 2020 resulting from the Government's partial breach ending in 2009. As to the number of casks to be loaded, the law is clear that Southern is entitled to be placed in the same position that it would have been in had the Government performed beginning in 1998. Had the Government performed at the 3,000 MTU annual rate, with a five-year ramp-up period, there would have been more usable reserve space in Southern's spent fuel pools than has been maintained using Southern's *actual* cask loading schedule. Southern is basing its claim for damages on the more conservative measure of its actual loading schedule, which is somewhat slower than the loading schedule that would place Southern in the same position (*i.e.*, provide that same amount of usable pool space) as if the Government had performed.

With respect to the installation of a second rack in the "bathtub" area of the Hatch pool, such an installation would have deprived Southern of usable space needed for non-SNF activities in the "bathtub" area of the Hatch pool (*e.g.*, storage of contaminated tools) and needlessly exposed Southern's workers to an extra dose of radiation.

**(b) Whether Southern's Purchase of Three HI-STAR Casks was Reasonable.**

Second, the Government asserts that it was unreasonable for Southern to purchase three multi-purpose HI-STAR casks instead of the lower-cost HI-STORM casks that Southern subsequently purchased. At the time Southern purchased the HI-STAR casks, however, the Nuclear Regulatory Commission ("NRC") had only licensed HI-STAR, and not HI-STORM, casks for use. Further, it was reasonable to purchase the HI-STAR casks because Southern could utilize such casks to transport SNF to a site at which a privately funded SNF repository was to be built (*i.e.*, Private Fuel Storage) in Utah and the Government could use such casks to transport the SNF to its proposed repository at Yucca Mountain or to an MRS. Indeed, the Government encouraged the use of transportable SNF canisters by utilities in the 1990s and such canisters could be used in conjunction with transportable casks, such as the HI-STAR cask. (4/26/2002 Barrett Dep. at 653-655; OCRWM, Systems Requirements Document, Rev. 6, vii (Sept. 2004).) Moreover, when the NRC licensed the less expensive HI-STORM casks, Southern purchased them.

**(c) Whether Southern's Dry Cask Storage Damages for Plant Vogtle are Reasonably Certain.**

Third, the Government assumes that none of the costs for dry storage at Plant Vogtle are reasonably certain because "Southern does not have a definitive plan to construct an ISFSI . . . ."

(L. Johnson Rep. at 32.) The SNC Board of Directors, however, has adopted a plan for a dry storage project at Plant Vogtle that calls for the construction of dry storage facilities, and will construct an ISFSI at least by 2015, if not earlier. Furthermore, even if the Government were to commence industry-wide performance in 2010, that performance would be inadequate to prevent Southern from having to build dry storage facilities at Plant Vogtle. The Government has admitted, however, that it will not meet the 2010 date to begin performance.

**(d) Whether Southern's Cost of Capital is a Reasonable Cost Incurred that is Not Pre-Judgment Interest.**

Fourth, the Government asserts that Southern's cost of capital on past damages constitutes pre-judgment interest on a claim and therefore is not recoverable. Southern's cost of capital, however, represents the cost of funds used to pay for dry storage facilities – another cost incurred to store SNF – and thus is part of the claim amount that is recoverable under this Court's precedent.

**(e) Whether Southern's Internal Labor, Overhead, and Engineering Supervision Damages are Incremental.**

Fifth, the Government contends that the costs of Southern's own labor, overhead, and engineering supervision relating to SNF storage facilities are not recoverable because Southern would have incurred expenses regardless of the Government's partial breach. The courts, however, have allowed the government and private plaintiffs to recover the costs of their own labor, overhead, and supervision incurred to mitigate damages. Such recovery is especially appropriate where the internal labor, overhead, and supervision could have been used for other productive activities on behalf of the plaintiff employer instead of to mitigate the harm caused by the defendant's wrongful actions and was less expensive than hiring outside contractors.

**(f) Whether Southern's Payments to the Private Fuel Storage program were Reasonable.**

Sixth, the Government assumes that the amounts Southern spent on the Private Fuel Storage program are not recoverable because Southern viewed it, in part, as an "insurance policy." Given the Government's default on its contractual obligation to remove SNF and the real effect SNF storage capacity has on a reactor's ability to operate, expending a small amount on an alternative private storage facility was reasonable and is recoverable.

**(g) Whether Southern's Payments to Williams Power Company and Southern Company Services were Adequately Supported.**

Finally, the Government assumes that the costs of two contractors, Southern Company Services and Williams Power Company and related entities ("Williams"), are not adequately supported because its own expert has not yet reviewed the submitted documentation. A review of the extensive supporting documentation and financial records produced to the Government will demonstrate to this Court that all of those costs were paid with regard to SNF storage facilities at Plants Hatch and Farley and are recoverable.[7]

---

[7] At the time this Memorandum was filed, Southern still has not heard whether the Government's auditors have finished their review of the documents provided for these costs.

## STATEMENT OF FACTS

### Southern's Nuclear Plants

Southern operates three nuclear plants – Plant Farley in Alabama and Plants Hatch and Vogtle in Georgia. Each plant has two nuclear reactors. Hatch Unit 1 began operation in 1975, and Hatch Unit 2 began operation in 1979. Farley Units 1 and 2 began operations in 1977 and 1981, respectively. Vogtle Units 1 and 2 began operations in 1987 and 1989, respectively.

Each of the six reactors uses enriched uranium to produce electricity sold to APC's and GPC's customers. The uranium fuel used in the reactors is in the form of processed pellets that are stacked into long metal tubes called "fuel rods." The fuel rods are placed into an array called an "assembly." The assembly is then placed in the reactor for operation.

After three to six years, the usable energy in the uranium pellets in an assembly becomes depleted and the old assembly must be replaced with an assembly with new uranium. In order to unload the exhausted uranium pellets – SNF – and reload new uranium pellets, space in the reactor pools is required.

### The Discharge, Storage, and Management of SNF

The SNF is discharged from the reactor into a connected pool to make room for new uranium fuel to be placed in the reactor. Because the SNF is highly radioactive, it must be stored in the pool in racks to protect Southern's workers and the environment. The SNF must remain in the pool several years to cool. Only after the SNF is discharged from the reactor into the pool can new fuel be loaded into the reactor.

The effective operating capacity of a reactor pool for a nuclear plant depends on the total number of nuclear fuel assemblies that are licensed to be stored in the pool, the cumulative number of assemblies that have actually been discharged into the pool, the number of assemblies

in each discharge per cycle, and the amount of reserve storage capacity that should be maintained in the pool. Reasonable operating practice requires that a nuclear plant operator maintain at a minimum sufficient space in the pool: (1) to accommodate the discharge of a complete reactor core into the pool in the event the core must be completely unloaded in order to inspect, maintain, or repair the reactor; (2) to accommodate any new fuel that must be loaded into the reactor through the pool at the next refueling; and (3) to maneuver tools, racks, new fuel and SNF for operating and maintenance purposes.[8] The space in the pool needed to unload all of the fuel out of a reactor is referred to as a "full core reserve" ("FCR"). (Kenrich Rep. at 9-10.)

The regularly scheduled discharge of SNF for storage into racks gradually fills the limited space in the pool. Unless SNF is removed from the pool – the objective of the NWPA – the regular discharges eventually impinge on the needed amount of space for the discharge of SNF and the maintenance of one FCR per reactor. Accordingly, to maintain usable pool space, SNF must be taken out of the pool and stored.

**<u>SNF Management at Southern's Nuclear Plants</u>**

The specific amount of reserve space that is reasonable for a nuclear utility to maintain depends on the design and operating characteristics of a particular reactor and its pool. At Plant Hatch, both reactors share a single pool. Although the absolute minimum amount of reserve capacity for operation of Plant Hatch is one FCR total for such a shared pool, it is reasonable long-term operating practice to maintain one FCR per reactor – two FCRs total for the shared

---

[8] In addition, where feasible, adequate space to accommodate the storage of tools and parts that are used in the pool and are regularly exposed to radiation (*e.g.*, pool vacuum, control rod blade sections, fuel inspection brushes, metal plate sections) is considered reasonable nuclear operating practice.

pool at Plant Hatch – from the standpoint of maintaining the reliability of plant operations. While the reserve capacity in a shared pool could dip below one FCR per reactor for a short period of time, the maintenance of one FCR per reactor reduces the risk to the utility of premature and/or extended shutdowns which could have catastrophic economic consequences for the plant operator. (E.R. Johnson Rep. at 5; E.R. Johnson Dep. at 100-111.)

At Plant Farley, each reactor has its own pool. However, the reactor design requires that the entire core for each reactor be placed in that reactor's pool during each refueling, which means that sufficient space to discharge the entire core plus enough space for the new fuel must be maintained in each pool. Thus, the reasonable amount of reserve space in each pool at Plant Farley is at least one FCR plus adequate space to load new fuel. (E.R. Johnson Dep. at 111-114; Kenrich Rep. at 10.)

At Plant Vogtle, each reactor discharges into its own pool, but the pools are connected so that, if necessary, SNF can be moved from one pool to another. Movement of SNF in this manner is a complex and expensive process that may expose nuclear plant workers to higher doses of radiation than normal, however, so the movement of SNF in this manner should be avoided where practicable. As a result, it is reasonable operating practice for Plant Vogtle to maintain at least one FCR in each of its pools – one FCR per reactor. (E.R. Johnson Rep. at 5; E. R. Johnson Dep. at 100-111.)

Plant Hatch has been operating the longest of Southern's plants and, as a result, its SNF pools began to reach full capacity in the late 1990s. At its lowest point – during 2000-2003, the remaining capacity of the Plant Hatch shared pool fell to between one and .5 FCR per reactor. (Kenrich Rep., Appendix F, Chart II-A; Neuberger Rep., Exh. 3, Actual Scenario, Hatch Unit 1 & 2.) Similarly, without out-of-pool storage, Farley Unit 1 would have lost one FCR capacity in

2006, and Farley Unit 2 will lose one FCR capacity in 2009. (Kenrich Rep., Appendix F, Charts II-B and II-C; Neuberger Rep., Exh. 3, Actual Scenario, Hatch Unit 1 & 2.) Without out-of-pool storage, Plant Vogtle will lose effectively one FCR per reactor 2015. (Kenrich Rep., Appendix F, Chart II-D.)

**Southern's Contracts with the Government**

Pursuant to the NWPA, Southern signed one SNF removal Contract for Plant Farley, two Contracts for Plant Hatch (a separate contract was executed for the first four reloads of fuel for the Unit 1 reactor at Plant Hatch), and one Contract for Plant Vogtle. Thus, all of the SNF produced by all six of Southern's nuclear reactors is covered by these Contracts.

To date, Southern has paid over $850,000,000 to the Government pursuant to the Contracts, while the Government has not begun to pick up *any* SNF from any nuclear utility and has acknowledged that it will not do so prior to 2010. (Kouts Dep. at 62-62.) Southern continues to pay tens of millions of dollars each year. Moreover, the Government recently acknowledged that it currently has no schedule whatsoever to pick up SNF from any commercial nuclear power plants. (Kouts Dep. at 72; 4/12/05 Zabransky Dep. at 30.)

**The Government's Breach and Southern's Mitigation**

When it became clear in the early 1990s that the Government would breach the Contracts by not removing the SNF from Southern's plant sites starting January 31, 1998, Southern had two options: allow its reactor pools to fill up and its plants to shut down or mitigate its damages by providing for its own additional SNF storage facilities. Given the Government's history of non-performance and Government's lack of clarity as to when and at what rate it will perform in the future, Southern's management concluded that long-term dry cask storage, first at Plant

Hatch, then at Plant Farley, and in the future at Plant Vogtle, presented the best options for storing SNF outside of the reactor pools.

In a dry cask system, SNF is taken from racks in the pool and loaded into a metal canister that is welded shut, dried, and filled with helium. The canister is then placed inside a concrete housing, or cask (*i.e.*, a HI-STAR or HI-STORM), that is then transferred outside the reactor building and placed on an ISFSI – consisting of a reinforced concrete pad and a monitoring system. At the time Southern began its dry cask storage efforts at Plant Hatch, this technology was relatively new and was not fully licensed, and the industry had limited experience in the construction and operation of dry storage facilities.

In order to give itself adequate time to construct and implement a dry cask storage system, Southern purchased two additional storage racks for the Hatch pool. One set of racks was installed in an area of the Hatch pool referred to as the "bathtub" area. The "bathtub" area is a rectangular inset in the side of the Hatch shared pool that normally is used for non-SNF activities, such as the storage of contaminated equipment, and other plant activities which require the shielding properties of the pool. The second set of racks was never installed in the Hatch pool, because Southern was able to begin operation of its dry cask storage system before the additional set of racks was needed. The determination not to use the second set of racks was based on the need to maintain some capability to use the "bathtub" region of the Hatch pool for purposes other than SNF storage and to avoid contaminating the second set of racks, thereby reducing the total amount of radioactive waste generated by Plant Hatch.

In addition to on-site dry cask storage, Southern also joined with several other nuclear utilities and invested in a Private Fuel Storage ("PFS") project in Utah. The purpose of the PFS project was to construct a privately operated interim storage facility for SNF. SNF would be

shipped from reactor sites to the PFS facility in Utah. Much like the Government's proposed MRS facility, the proposed PFS facility would allow participating utilities to store SNF until the Yucca Mountain repository becomes operational.

**Southern's Existing SNF Storage Facilities**

The Government has not provided Southern with any realistic basis upon which to plan for the Government's commencement of performance at any of its sites. Indeed, DOE officials have recently announced that DOE has no schedule for removing SNF from Southern's reactor sites. (Kouts Dep. at 72; 4/12/05 Zabransky Dep. at 30.) As a result, in order to protect the operating capability of its most valuable generating assets, Southern has and must continue to plan conservatively to ensure that each nuclear plant is able to continue to operate assuming a continuing indefinite delay on the part of the Government.

Plant Hatch – Southern completed construction of the ISFSI for Plant Hatch in 2000. By the end of 2005, Southern will have purchased twenty-six dry casks for Plant Hatch, loaded them with SNF, and placed the loaded casks onto the ISFSI. Because of the constant discharge of SNF, the Government's failure to remove SNF will force Southern to construct two additional ISFSI pads and purchase, load, and place thirty more casks by 2012.

Southern has removed SNF assemblies from Plant Hatch's reactor pool and is loading them into dry casks on a schedule designed to gradually recover the ability to discharge the cores from both of its reactors into the pool. That capability should be achieved by 2008. Had the Government performed at its published acceptance rate of 3,000 MTUs per year, with a five-year ramp-up period, the Plant Hatch pool would have temporarily fallen below one FCR per reactor, but would have recovered the ability to discharge one FCR per reactor by 2004.

Plant Farley – Because of the Government's impending breach, Southern began to plan in the late 1990s to increase its storage capacity for Plant Farley by adding dry storage facilities. Construction of an ISFSI at Plant Farley began in 2000. In 2005, construction on Plant Farley's ISFSI was completed. To date, Southern has loaded three casks and placed them onto the ISFSI at Plant Farley. Through 2013, Plant Farley will be required to purchase, load, and place twenty-two dry casks because of the Government's delay through 2009.

Southern has adopted a schedule to load SNF storage casks at a rate sufficient to maintain at least one FCR plus space for an adequate amount of new fuel in each of its Farley pools. Again, had the Government removed SNF from the industry at the rate contemplated by both parties to the Contract, it would have removed more than double the amount SNF from the Plant Farley pools through 2009 than is called for by Southern's actual loading schedule.

Plant Vogtle – Because of the Government's partial breach, Plant Vogtle procured and installed additional SNF pool racks during the period of 1998 to 2000. Because of the Government's delay through 2009, Southern has adopted a plan to begin expending funds for dry storage at least by 2010, and to complete the design, license, engineering, and construction of a dry storage facility at Plant Vogtle to be operational by 2015. By at least 2015, and possibly by 2013, Plant Vogtle will have purchased, loaded, and placed eleven dry casks in the ISFSI because of that delay. Based on the rate of SNF discharged from its reactors, Plant Vogtle would lose the one FCR per reactor in its combined, connected pools in 2015 if it does not add storage capacity.

The evidence will establish that the decisions to add SNF storage capacity at each of the nuclear plants were reasonable based on the facts and circumstances that confronted Southern's experienced team of nuclear plant managers and engineers at the time they made these decisions.

## CONTENTIONS OF FACT AND LAW

### I. THE 3,000 MTU RATE OF ACCEPTANCE WOULD HAVE ELIMINATED THE NEED FOR ON-SITE DRY STORAGE AT EACH OF SOUTHERN'S PLANTS, WAS CONTEMPLATED BY THE PARTIES, WAS PAID FOR BY SOUTHERN, AND IS REASONABLE.

The Court's Order of April 7, 2004 posed four questions relative to the SNF acceptance rate applicable to the Contracts. The answers to those questions compel the conclusion that Southern is entitled to recover the costs associated with dry cask storage facilities constructed and planned at its nuclear plants.

#### A. "Would excess capacity at other utilities also be utilized to avoid additional on-site storage?"

**Answer:** No. Had the Government performed at the 3,000 MTU annual rate advocated by Southern, Southern would not have needed to rely on assumed exchanges of acceptance allocations or storage capacity with other utilities in order to have avoided the addition of dry storage facilities at its plant sites – the Government's performance would have been sufficient. (Kenrich Rep. at 24.) The Government does not dispute this fact. (Neuberger Rep. at 17.)

#### B. "What rate of acceptance by DOE would have been necessary to avoid additional on-site storage at APC or GPC given the age of their stored fuel, their SNF pool capacity, and the production of waste at the specified plants in this litigation?"

**Answer:** A rate of 3,000 MTUs per year, with a five-year ramp-up, would have eliminated any requirement for dry cask storage at Southern's plants.[9] The Government's and

---

[9] Had the Government's performance at the 3,000 MTU annual rate after a five-year ramp-up period been imminent in 1998, Southern would have avoided building dry cask storage by installing a second SNF rack in the spent fuel pool at Plant Hatch. A slightly faster ramp-up schedule would have been required to avoid the installation of the second rack. The Government

Southern's experts agree that at an annual rate of 3,000 MTUs per year industry-wide (with ramp-up rates of 400, 600, 1,200, and 2,000), Southern would have avoided the construction of any dry storage facilities at any of Southern's nuclear plants and the latest Vogtle pool capacity expansion. (Neuberger Rep. at 17) ("As with the Kenrich simulation, no casks are required at any of the four facilities in the but-for [*i.e.*, non-breach] scenario."); (Kenrich Rep. at 14) ("Had DOE begun disposing of spent fuel from the commercial nuclear industry in 1998, there would have been no need for dry storage at Hatch, Farley, or Vogtle.").

### C. "Would such a rate be within the range contemplated by the parties?"

**Answer:** Yes. DOE and Southern documents from the timeframe in which the Contracts were executed (*i.e.*, the early and mid-1980s), the testimony of DOE officials involved with the SNF program at the time the Contracts were executed, and the Government's calculation of the amount it charged Southern in exchange for the Government's promised acceptance of SNF, all confirm that the 3,000 MTU annual rate was within the range contemplated of the parties, and was, in fact, specifically contemplated as the requirement of the Contracts.

As set forth in Southern's Cross-Motion for Partial Summary Judgment Regarding the Rate of Spent Nuclear Fuel Receipt (Docket No. 191, Dec. 18, 2002), which Southern adopts by reference for purposes of this Memorandum, the Contracts do not contain a term for the rate of

---

initially projected an 1,800 MTU ramp-up rate in the original fee adequacy assessment and in the 1983 draft of the mission plan. (DOE, Report on Financing the Disposal of Commercial Spent Nuclear Fuel and Processed High-Level Radioactive Waste, at 11 (July 1983), PA-625; Civilian Radioactive Waste Management Program Mission Plan, Vol. 1, Overview and Current Program Pans, at 2-3 (Dec. 20, 1983), PA-664.) Because it was clear in 1998 that the Government's performance would not occur for several years, if at all, Southern would have had to build an ISFSI and purchase dry casks even if it did install a second rack in the Plant Hatch pool. Accordingly, Southern did not install the second rack and is claiming no damages therefor.

acceptance of SNF. (Pls.' Cross Mot. at pp. 24-25.)[10] "When a written document does not state the complete understanding memorialized therein, the missing terms may be proven." *Salles v. United States*, 156 F.3d 1383, 1384 (Fed. Cir. 1998). To determine the intent of the parties to a contract, the Court can look to "all the relevant circumstances surrounding the transaction," including the "conduct of the parties before the advent of controversy, oral statement, writings, the recitals to a contract, prior negotiations, and other conduct by which the parties manifest their assent." *KMS Fusion, Inc. v. United States*, 36 Fed. Cl. 68, 76 (1996), *aff'd mem.*, 108 F.3d 1393 (Fed. Cir. 1997). Further, "[w]hen the parties to a . . . contract have not agreed with respect to a term which is essential to a determination of their rights and duties, a term which is reasonable in the circumstances is supplied by the court." *Howell v. United States*, 51 Fed. Cl. 516, 521 (2002) (quoting *Restatement (Second) of Contracts* § 204 (1981)).

### 1. A 3,000 MTU Acceptance Rate Was Within the Contemplation of the Parties.

Former Southern Vice Presidents Tom Beckam and Fred Clayton wrote letters to DOE in 1982 regarding the initial draft of the Contracts, in which they expressed Southern's view that the Contracts should commit the Government to remove SNF at a rate that eliminated the need to expand SNF storage at Southern's plants after 1998. (Letter from J.T. Beckham, Jr., GPC, to Robert Morgan, DOE (March 4, 1983), PA at 575; Letter from F.L. Clayton, Jr., APC, to Robert Morgan, DOE (March 4, 1983), PA at 583.) In response to those letters, the Government included language requested by Southern that the Government was obligated to remove SNF "as

---

[10] Southern also adopts its Proposed Findings of Uncontroverted Facts (Docket No. 189, Dec. 18, 2002) regarding the rate of Spent Nuclear Fuel Receipt.

expeditiously as practicable" from Southern's plant sites. (3/22/02 Morgan Dep. at 105-106, PA at 2200(A)).

Numerous statements by DOE officials and in DOE publications demonstrate that Southern's view regarding the intent of the Contracts was shared by DOE, culminating in the development of an aggregate industry steady state acceptance rate of 3,000 MTUs per year as the vehicle for accomplishing that intent. For example:

- **Statement of Robert Morgan, Statement at the Proceedings of the 1983 Radioactive Waste Management Program (Dec. 1983)**: "[B]eginning in 1998, utilities will not have to provide any additional storage facilities on site. During the first year of operation of the repository in 1998, we should be receiving fuel at a rate so that no utility would have to add any further storage facilities either on site or at another location." (PA at 665.)

- **DOE's OCRWM 1983 Draft Mission Plan (Dec. 20, 1983)**: Used a annual acceptance rate of 3,000 MTUs after a ramp-up period of five years at 1,800 MTUs and stated "waste materials will be accepted in accordance with a Waste Acceptance Schedule designed to provide an acceptance rate in the first five years such that no utility will have to provide . . . additional storage capacity after January 31, 1998." (p. 2-4, PA at 664; p. 2-1, PA at 662.)

- **DOE's 1984 Draft Mission Plan (April 1984):** Showed a 3,000 MTU annual acceptance rate after a ramp-up period. (p. 2-2, PA at 733.)

- **DOE's 1985 Final Mission Plan (June 1985):** Showed a 3,000 MTU annual acceptance rate after a ramp-up period. (p. 27, PA at 875.)

- **Lake Barrett Deposition Testimony** – Lake Barrett, Deputy Director of DOE's radioactive waste program, testified that the 3,000 MTU rate was necessary to achieve the goals of the NWPA: "Q So based on your prior testimony, Mr. Barrett, the 3,000 rate would be consistent with your understanding of the intent of the act to reduce over a reasonable period of time the backlog of spent nuclear fuel throughout the nation, correct? . . . A Yes." (**Barrett Dep. at 59.**??)

- **Tom Pollog Deposition Testimony:** Tom Pollog, the Government's 30(b)(6) representative on the rate of acceptance used by DOE in estimates from 1982 to 1987, testified that the 3,000 MTU rate was necessary from a functional standpoint in order to collect all SNF during the 25-year period that the Government expects to operate the repository. (4/11/02 Pollog Dep. at 96-97, PA at 2230; *id.* at 12, PA at 223.)

### 2. The Government has Charged Southern Fees Based on the 3,000 MTU Rate.

Moreover, the Government has consistently used the 3,000 MTU acceptance rate to compute the fees that it charges Southern for removing the SNF. The contemplation of the parties as to the rate of SNF removal required by the Contract is illustrated by the fact that the **fee studies that the Government utilized to evaluate the amount that it charged Southern and the other nuclear utilities for SNF removal, used 3,000 MTUs per year**. For example:

- **DOE's Report on Financing the Disposal of Commercial SNF and Processed HLRW (July 1983):** Used a 3,000 MTU annual acceptance rate after a ramp-up period to compute the cost to finance an SNF repository. (p. 11, PA at 625.)

- **OCRWM, Preliminary Analysis of Total System Life Cycle Cost of the Commercial High-Level Radioactive Waste Disposal Program (April 1984):** was based on a phased-in 3,000 MTU annual acceptance rate. (p. 2-11, PA at 764.)

- **OCRWM, Analysis of Total System Life Cycle Cost of the Commercial High-Level Radioactive Waste Disposal Program (Dec. 1998):** was based on a phased-in 3,000 MTU annual acceptance rate. (p. 15, PA at 1735.)

- **OCRWM, Analysis of Total System Life Cycle Cost of the Commercial High-Level Radioactive Waste Disposal Program (May 2001):** was based on a phased-in 3,000 MTU annual acceptance rate. (p.4-14, PA at 1800.)

- **OCRWM, Nuclear Waste Fund Fee Adequacy**: An Assessment (May 2001): Based the 1 mill fee on the 2001 TSLCC, *supra* – the 3,000 MTU rate. (p.1, PA at 1818.)

### 3. The 3,000 MTU Rate is Reasonable.

Southern's removal rate expert, Eileen Supko, will testify that a 3,000 MTU rate is necessary to avoid additional SNF storage, to allow reduction of the backlog, to allow timely decommissioning, and to ensure that the SNF system was not overbuilt and underutilized. Eileen M. Supko, Expert Report Regarding Determination of the U.S. Department of Energy's Overall

Spent Nuclear Fuel Acceptance Rate and Spent Fuel Acceptance Rights for Southern Nuclear Operating Company, at 20 (Jan. 31, 2005) [hereinafter "Supko Report"].

In addition to being contemplated by the parties, the 3,000 MTU annual rate is also reasonable as DOE itself recently published its plan to use that rate:

Table 1. Projected Nominal Waste Acceptance Rates for Spent Nuclear Fuel

| Year | SNF (MTU) |
|---|---|
| 2010 | 400 |
| 2011 | 600 |
| 2012 | 1,200 |
| 2013 | 2,000 |
| 2014 | 3,000 |
| 2015 | 3,000 |
| 2016 | 3,000 |
| 2017 | 3,000 |
| 2018 | 3,000 |
| 2019 | 3,000 |

DOE, Acceptance Priority Ranking and Annual Capacity Report 2 (July 2004).

Moreover, both Lake Barrett, the former Deputy Director of the DOE radioactive waste program and David Zabransky, formerly the DOE official responsible for the administration of the Standard Contract and currently the Contracting Officer responsible for the Standard Contract, have testified that the phased-in 3,000 MTU rate in the 2004 APR/ACR is "reasonable."[11] According to Mr. Barrett's deposition testimony:

---

[11] When cross-examined in *Yankee Atomic*, No. 98-126, Mr. Zabransky responded to questions regarding the reasonableness of the phased-in 3,000 MTU rate reflected in DOE's 2004 Acceptance Priority Ranking and Annual Capacity Report as follows:

Q. . . . You believe that **acceptance rate is reasonable**, don't you?

A. That's the rate that's in our requirements documents, the facilities are being designed for, and **that's the rate the Department has put forth as its willing to commit to in the new ACR, yes**.

Q. And I'll take it a step further. Do you believe that the 3,000 annual steady-state rate is a reasonable rate for DOE to plan to use in terms of taking spent nuclear fuel from utilities?

A. I think it's a reasonable rate. There may be better rates that if we -- if the nation gets a little clearer that we're going to really perform I think we will refine that number and we may, based on events of September 11th, maybe it will be raised.

Q. And would you agree that the 3,000 annual steady-state rate is a rate that is consistent with achieving the objectives that you enumerated earlier?

A. Generally so, yes.

(5/10/02 Barrett Dep. at 1370-71; PA at 2002.)

#### 4. The Government's Suggested Rates Are Neither Reasonable Nor Within the Contemplation of the Parties.

Notwithstanding overwhelming evidence supporting the 3,000 MTU rate, the Government has argued in various cases for four alternate annual rates of acceptance: 0, 1, 900, and 2,100 MTUs. First, the Government argued that absent a completed and approved DCS, it had no contractual obligation to pick up any SNF. (Def.'s Mot. for Partial Summ. J. Regarding the Rate of Spent Nuclear Fuel Acceptance, at 10-22.) However, DOE has stated that the DCSs were non-binding, has suspended the DCS process for several periods including currently, and never finalized any DCSs. Accordingly, Judge Hewitt, in *Commonwealth Edison,* 56 Fed. Cl. at 666, rejected the Government's argument, reasoning:

---

Q. **So you believe that the acceptance rate in** the -- in **the 2004 ACR is reasonable**?

A. I believe that **the rate in the ACR** which presumes we'll have Yucca Mountain up and running **is reasonable, yes.**

(*Yankee Atomic* Tr. at 4168) (emphases added).

> The 1991 ACR itself states that "[a]s specified in the Standard Contract, the ACR is for planning purposes only and thus is **not contractually binding** on either DOE or [plaintiff.]" ... Defendant eventually conceded at oral argument that the ACRs were for planning purposes .... DOE's position that it would reject plaintiff's DCS submission if it "exceed[ed] the allocation in the [1991] ACR," . . ., is inconsistent with plaintiff's justified expectation that the ACRs were negotiable and to be used for "planning purposes." ... The parties could not have expected that planning documents would create binding contractual obligations.
>
> In these circumstances, plaintiff's submission and defendant's acceptance of the proposed DCSs did not create a contractually binding obligation for either party. Even if the process defined in Article V of the Standard Contract could, if followed and completed in good faith, create a contractual obligation, the third step in the process was not completed because plaintiff did not submit and defendant did not approve a FDS [Final Delivery Schedule] for any year.

(Emphasis added) (citations to record omitted).

Second, absent an agreement on the rate of acceptance between the parties, the Government argues that it was only required to commence acceptance of SNF in 1998 and that it had the unfettered discretion to choose any rate, regardless of how slow. (Reply to Pls.' Opposition to Def.'s Mot. for Partial Summ. J. and Resp. to Pls.' Cross-Mot. for Partial Summ. J. Regarding the Rate of Spent Nuclear Fuel Acceptance, at 26-31.) Judge Hewitt and Judge Hodges both rejected this argument as advocating an illusory contract. *See Commonwealth Edison*, 56 Fed. Cl. at 665; *Indiana Michigan*, 57 Fed. Cl. at 97.

Third, the Government argued in this case that it could accept SNF at an annual rate of only 900 MTUs. (Def.'s Reply at 25-29). The Government based its 900 MTU rate on the acceptance limits of its temporary plans for a 10,000 MTU interim storage facility – Monitored Retrievable Storage ("MRS"), and currently projects the 900 MTU rate for 10 years. (PPF, ¶ 110; PA at 1381) ("The acceptance rates in Table 2.1 . . . are consistent with the 10,000 MTU storage capacity limit contained in the NWPA for an MRS facility before a repository starts operation.")

The Government's arguments fail not only because they are fundamentally inconsistent with the intentions of the parties,[12] but also because the 900 MTU rate is inconsistent with the requirements in the NWPA for MRS construction. The 1987 Amendments to the NWPA provided: (1) DOE could not select a site for an MRS until DOE recommended approval of a repository site, 42 U.S.C. § 10165(b); and (2) construction of an MRS could not begin until the NRC had granted DOE authorization to begin construction of the repository, 42 U.S.C. § 10168(d)(1). The construction schedules for the repository and the MRS facility were such that the MRS would not have operated for ten years before the repository opened. DOE officials have conceded that the 900 MTU rate would have required amendments to the NWPA to de-link the MRS construction from repository construction that were never enacted. (5/02/2002 Milner Dep. at 247-248.)

Moreover, when asked what purpose remained for the 900 MTU rate, Mr. Zabransky admitted in his deposition that the Government continued to use that rate to attempt to limit its obligations to the utilities.[13] Accordingly, Judge Hewitt, Judge Hodges, and Your Honor all have

---

[12] Lake Barrett, testified:

> Q. And what would your opinion be if an annualsteady-state rate was chosen that was around 1,000 MTUs per year?
>
> MS. HERRMANN: Objection. Speculation.
>
> A. For performance aspect it would be better, you know, better than none, but not as good as 2,000and not as good as 3,000.

(5/10/2002 Barrett Dep. at 1371, PA at 2002.)

[13] Mr. Zabransky stated in his deposition:

> Q: Why did the Department of Energy publish a document to be used as the basis for delivery commitment schedules [the 1995 APR/ACR] using rates which it was not using itself for the purpose of planning the system?

rejected the Government's asserted 900 MTU rate. *See Commonwealth Edison*, 56 Fed. Cl. at 666; *Indiana Michigan*, 57 Fed. Cl. at 100; *Yankee Atomic*, No. 98-126C, at *2.

Finally, in the *Yankee Atomic* trial, the Government invented a 2,100 MTU annual acceptance rate, apparently on the theory that it was 100 MTUs greater than the annual rate at which the nuclear industry discharges SNF. (Defendant's Initial Post-Trial Br. at 12, *Yankee*, No. 98-126.) The 2,100 MTU rate has never appeared in DOE planning documents, and indeed conflicts with those documents, and is contradicted by DOE officials' statements regarding what would constituted a reasonable acceptance rate For example, Lake Barrett testified:

> Q. In your opinion would a steady-state rate of 2,000 MTUs on an annual basis be consistent with achieving those same objectives?
>
> A. I would think that's low.
>
> Q. Why?
>
> A. Because that's about what the generation rate is, and if we start with that, matching the generation rate at 2010 -- if we steady state at 2010, all the fuel that's in dry storage and a lot of the shut-down reactors, it will be difficult to avoid new storages or prolong decommissionings

(5/10/02 Barrett Dep. at 1371, PA at 1999.)

Indeed, none of the acceptance rates suggested by the Government would allow timely decommissioning or efficient utilitization of a repository. *Cf.* Supko Rep. at 20.

---

> A. The Department carried over the rates it had used in the previous ACR and did not change them.
>
> Q. Was the Department trying to minimize the commitments it had to utilities who were parties to the standard contracts in using this document, in using Exhibit 5.
>
> A. I believe that was a consideration.
>
> (4/18/02 Zabransky Dep. at 364-65, PA at 2328.)