### D. "When would disposition have to commence in order to avoid additional on-site storage at APC or GPC?"

**Answer:** Had DOE commenced performance in 1998 at the 3,000 MTU rate, with the ramp-up period, it would have commenced removal of SNF at Plant Hatch in 2001, at Plant Farley in 2002, and at Plant Vogtle in 2006. (Kenrich Rep. at pp. 35-37.) Commencement of performance on that schedule would have been sufficient to eliminate the need for dry cask storage at those plants.

## II. SOUTHERN'S DAMAGES WERE REASONABLY FORESEEABLE, WERE CAUSED BY THE GOVERNMENT'S PARTIAL BREACH, AND HAVE BEEN PROVEN WITH REASONABLE CERTAINTY.

### A. The Applicable Legal Standards for Breach of Contract Damages.

After the rate of SNF acceptance is determined, this case will consist of a straight-forward examination of Southern's and the Government's evidence regarding damages according to general principles of contract law. "When the United States enters into contract relations, its rights and duties therein are governed generally by the law applicable to contracts between private individuals." *Franconia Assocs. v. United States*, 536 U.S. 129, 141 (2002) (internal quotation marks omitted). "The general rule is that damages for breach of contract shall place the wronged party in as good a position as it would have been in, had the breaching party fully performed its obligation." *Massachusetts Bay Transp. Auth. v. United States*, 129 F.3d 1226, 1232 (Fed. Cir. 1997). The non-breaching party is entitled to recover his "expectation interest [--] the 'interest in having the benefit of his bargain by being put in as good a position as he would have been in had the contract been performed.' *Restatement (Second) of Contracts* § 344(a) (1981). Expectation damages are recoverable provided they are actually foreseen, or reasonably

foreseeable, are caused by the breach of the promisor, and are proved with reasonable certainty." *Rumsfeld v. Applied Cos.*, 325 F.3d 1328, 1344 (Fed. Cir.), *cert. denied,* 540 U.S. 981 (2003). In general, Southern has the burden to prove its damages "by a preponderance of the evidence." *Alaska Pulp Corp. v. United States*, 59 Fed. Cl. 400, 413-14 (2004).

As the non-breaching party, Southern had a duty to mitigate its damages – "to avoid by reasonable effort any damages which it should have foreseen and, having done so, it may recover as damages the expense incurred in such reasonable effort to avoid harm." *Chain Belt Co. v. United States*, 127 Ct. Cl. 38, 57, 115 F. Supp. 701, 714 (1953). When faced with the Government's impending partial breach of the Contracts, Southern did not stand idle, let its reactor pools fill with SNF, and shut down its nuclear plants. Instead, Southern mitigated such damages by expending funds to provide the means of storing SNF out of the pools and thus reclaiming needed usable pool space. These mitigation costs were foreseeable, were caused by the Government's breach, and are reasonably certain in amount.

Southern will prove the foreseeability of its damages – mitigation costs – by showing numerous DOE documents and statements by DOE officials that the purpose of the Standard Contract was to avoid the need for utilities to add additional SNF storage capacity after January 31, 1998, and to reduce the SNF backlog at a reasonable rate. Southern will prove that the Government's breach caused its damages by showing that both of Southern's damages expert witnesses, Messrs. Metcalf and Seracki of the Kenrich Group, and the Government's expert, Dr. Neuberger, agree that had the Government performed its contractual obligation to accept SNF at a 3,000 MTU annual rate, Southern would not have had to build dry storage facilities and would not have had to add the latest rack additions at Plant Vogtle. Southern will prove the reasonable

certainty of its damages by showing actual amounts spent on existing facilities and budgets for future facilities based on actual amounts expended by Southern for similar facilities in the past.

Southern will prove its damages for amounts already expended for additional storage capacity with its summaries of accounting books, records, and general ledgers, testimony of its employees who were involved in the work, its accounting personnel, its expert witnesses, pictures of the dry cask storage facilities that already have been built and are in operation, and other evidence. Southern will prove with reasonable certainty its future damages that result from the Government's partial breach through December 31, 2009 and that will be incurred through 2020 by producing engineering analyses, expert reports, and budgets based on the amounts it already has actually spent for prior construction of similar dry storage facilities at its own plants. *See Locke v. United States*, 283 F.2d 521, 524 (Ct. Cl. 1960) (stating that where "a reasonable probability of damages can be clearly established, uncertainty as to the amount will not preclude recovery" . . . [and] [t]he amount may be approximated if a reasonable basis of computation is afforded.")

While Southern bears the initial burden of proving causation, foreseeability, and reasonable certainty of amount, "the breaching party [*i.e.*, the Government] has the burden of proof on a failure to mitigate [properly] defense." *First Nationwide Bank v. United States*, 56 Fed. Cl. 438, 444 (Fed. Cl. 2003). 11 *Corbin on Contracts* § 1039, p. 216 (2002) ("The burden of proving that losses could have been avoided by reasonable effort and expense must always be borne by the party who has broken the contract."). Southern mitigated its damages by adding dry storage capacity to its plants and contributing to the PFS project instead of shutting the plants down. The Government cannot bear its burden to show that Southern's mitigation decisions were unreasonable. Southern will show through the testimony of its managers, engineers, and

experts and through DOE's documents that Southern acted reasonably when faced with the prospect of the Government's partial breach. Indeed, the Government's expert, Mr. Ed Johnson, has estimated temporary storage costs that exceed the amount of damages that Southern is claiming.

The Government may argue that in hindsight Southern could have incurred fewer mitigation costs in the short-term by pursuing different mitigation options. However, this Court's precedent provides that such "Monday-morning quarterbacking is irrelevant to an award of mitigation costs" and that "a party that takes steps that seemed reasonable at the time will not be judged by hindsight." *Citizens Federal Bank v. United States,* 66 Fed. Cl. 179, 185 (Fed. Cl. 2005) (quoting E. Allan Farnsworth, *Contracts* § 12.12 (3d ed. 1999)). As this Court explained in its Order of August 19, 2005 regarding discovery from Holtec:

> Furthermore, **mitigation does not require clairvoyance.** Reasonable expenses are recoverable regardless of whether the economics were realized. *See* 3 Dan B. Dobbs, *Law of Remedies* § 12.6(1)(6), at 127 (2d ed. 1993) ("[T]he plaintiff's damages are adjusted upwards to reflect all the reasonable costs he incurs in attempting to avoid losses, whether or not he was successful in doing so."); *Restatement (Second) of Contracts* § 347, cmt. c. (costs incurred in reasonable efforts to avoid loss are recoverable "whether successful or not*");* *Cienega Gardens v. United States*, 38 Fed. Cl. 64, 79 (1997) ("[w]hether or not an attempt to mitigate damages is successful, the non-breaching party may recovery for injury incurred during such mitigation as long as the attempt was reasonable*"), rev'd on other grounds*, 194 F.3d 1231 (Fed. Cir. 1998).

*Southern Nuclear Operating Co. v. United States*, No. 98-614C, Docket No. 297, Order, at 5-6 (Aug. 19, 2005) (emphasis added).[14]

---

[14] In *Citizens Federal Bank*, 66 Fed. Cl. at 185 n.1, this Court cited the following supporting authorities:

> *Fisher v. First Stamford Bank & Trust Co.,* 751 F.2d 519, 524 (2d. Cir. 1984) ("**Hindsight may not serve as a basis to decrease damages** plaintiff is otherwise entitled to recover."); *S. J. Groves & Sons Co. v. Warner Co.,* 576 F.2d 524, 528 (3d Cir. 1978) ("'it is **immaterial that hindsight may later prove** that the

This Court has further explained:

> Consistent with this fundamental principle of mitigation damages, this court has repeatedly rejected attempts by the Government to come in years after the fact and claim that the nonbreaching parties failed to mitigate properly. In *Commercial Federal Bank, F.S.B. v. United States,* the Government opposed lost profits damages on the ground that the plaintiff made no effort to mitigate the purported harm. 59 Fed. Cl. 338, 355 (2004)[, *aff'd*, 125 Fed. Appx. 1013 (Fed. Cir. 2005)]. Defendant argued that plaintiff should have converted to a stock chartered institution as a means of mitigation. *Id.* Rejecting that argument, the court recognized, "[i]n fact, the shrink strategy employed by plaintiff was a form of mitigation. Management chose to shrink the institution in order to safeguard the thrift against new risks of failure created by the FIRREA-induced loss of capital." *Id.* Critically, the court explained, "[i]t is not the task of the court to second guess the judgment of a skilled team of managers with a history of successful institutional management." *Id.* As Judge Bruggink held in *First Nationwide Bank v. United States,* "'[t]he rule of mitigation of damages may not be invoked by a contract breaker ... merely for showing that the injured person *might have* taken steps which ... would have been more advantageous to the defaulter.'" 56 Fed. Cl. 438, 444 (2003) (quoting *In re Kellett Aircraft Corp.,* 186 F.2d [197,] 198-99 [(3rd Cir. 1950)]) (alterations in original). This general rule applies with particular force in the instant case where the breaching party had the ability to refuse to allow the injured party to deviate from its preferred course of mitigation.

*Citizens Federal Bank*, 66 Fed. Cl. at 185 (emphasis added).

The following sections of this Memorandum demonstrate that Southern's mitigation decisions were reasonable and that its mitigation costs were reasonably foreseeable, were caused by the Government's partial breach, and that its damages have been proven with reasonable certainty.

---

**method** of cover used was **not the cheapest or most effective'"**) (citation omitted); . . . *Veranda Beach Club Ltd P'ship v. Estern Sur. Co.*, 936 F.2d 1364, 1386 (1st Cir. 1991) ("A party charged with mitigating damages is **not obliged to play the seer**, choosing the course of action that would, in hindsight, have turned out best."). *Restatement (Second) of Contracts* § 350, cmt. h (1981) . . . at illus. 21 ("A contracts to sell B a used machine to be delivered at A's factory by June 1 for $10,000. A breaks the contract by repudiating it on May 1. B makes a reasonable purchase of a similar machine for $12,000 in time to be delivered at his factory by June 1. It later appears that, unknown to B, a similar machine could have been found for only $11,000. Nevertheless, B can recover $2,000 from A.")

**B. The Seven Principal Damages Issues.**

Pursuant to this Court's Order dated December 20, 2004, Southern's expert report calculates the costs resulting from the Government's partial breach of contract through 2009, including costs resulting from that partial breach through 2020. These costs are $153,288,216 at the 3,000 MTU annual acceptance rate. (Kenrich Rep. at 6.) The Government's expert report acknowledges that, at the 3,000 MTU annual rate of acceptance, Southern's damages are $48,611,522.[15] (L. Johnson Rep. at 37.) The differences between the two amounts are shown on the following chart:

[15] The Government's expert report also calculates Southern's damages to be $28,789,228 at the 900 MTU rate. (L. Johnson Rep. at 37.)

**<u>Government's Proposed Reductions to Southern's Damages in (000s)</u>**

| Item | Hatch | Farley | Vogtle | Totals |
|---|---|---|---|---|
| Southern's Claim for Damages | $97,976,677 | $36,917,871 | $18,393,668 | $153,288,216 |
| Cask Loading Schedule (including No. of Casks and associated infrastructure) | (24,212,946) | (10,665,195) | -0- | (34,878,141) |
| HI-STARS Casks | (6,341,543) | -0- | -0- | (6,341,543) |
| Vogtle Future Costs | -0- | -0- | (15,720,610) | (15,720,610) |
| Cost of Capital | (7,058,614) | (1,245,617) | (1,369,584) | (9,673,815) |
| Internal Labor, Overhead | (6,076,365) | (1,571,656) | 5,148,352 | (2,499,669) |
| Private Fuel Storage | (4,322,092) | (4,809,779) | (4,274,734) | (13,406,605) |
| Unreviewed/Unsupported | (18,514,552) | (680,492) | (860,604) | (20,055,648) |
| Other Adjustments | (1,923,161) | 13,391 | (190,893) | (2,100,663) |
| Government's Computation of Damages in 2005 Dollars | $29,527,404 | $17,958,523 | $1,125,595 | $48,611,522 |

Note: L.R. Johnson's Report classifies damages (in nominal dollars) in broad categories of not reasonable, not incremental, not reasonably certain, and unreviewed/unsupported. The above chart (in 2005 dollars) categorizes Johnson's adjustments based on the purported reason for the adjustment (*i.e.*, loading schedule, etc.).

**1. Southern's Loading Schedule, Including the Number of Casks Purchased and Loaded, and Related Infrastructure Costs Reflect the Court's Damages Order, the Correct Measure of Damages, and the Reasonable Judgment Not to Use a Second Rack in the Hatch Pool.**

The report of the Government's economist, Dr. Neuberger, proposes to decrease Southern's damages by eliminating the cost to purchase and load a number of dry storage casks based on three contentions. First, at the direction of counsel for the Government, Dr.

Neuberger's analysis proposes to eliminate casks to be purchased after 2009, regardless of whether Southern's need for these casks was caused by the Government's partial breach through the end of 2009. (Neuberger Rep. at 16-17.) Second, Dr. Neuberger proposes to eliminate casks needed to maintain more than .5 FCR per reactor in the Plant Hatch shared pool and in Plant Vogtle's combined, connected pools, without any technical or operational basis for doing so. (*Id.*) Finally, Dr. Neuberger proposes to eliminate casks that he asserts could have been avoided if the second rack for the "bathtub" region of the Hatch pool had been installed. (*Id.*) Each of these positions is erroneous. Indeed, Dr. Neuberger, who has never worked in the nuclear industry, has admitted that he is not qualified to render an opinion on the appropriateness of Southern's SNF cask loading schedule or the technical or operational considerations involved in the decision to add additional racks to the Hatch and Vogtle pools. (Neuberger Dep. at 74, 114-115, 172.)

**(a) This Court's Damages Order Allows Evidence of Damages Through 2020 Attributable to DOE's Partial Breach Through 2009.**

Southern's damages claim includes the cost of facilities and casks that will have to be constructed and purchased, in order to remove the number of SNF assemblies at each of its three plants between 2009 and 2020, that would have been loaded into dry cask storage even if the Government had commenced industry-wide performance at the 3,000 MTU rate (with a five-year ramp-up period) in 2010. Based solely on direction from counsel for the Government, as opposed to any expert opinion, the Dr. Neuberger proposes to truncate damages for casks to be purchased or loaded after 2009. (Neuberger Rep. at 9; Neuberger Dep. at 54.) The Government's instruction, however, misinterprets this Court's December 20, 2004 Order on Damages.

This Court's December 20, 2004 Order, at 3, provided in pertinent part: "evidence shall be received in this litigation addressed to the monetary damages plaintiffs claim to be appropriately tied to the period of DOE's current performance delay until 2010, **including cost or monetary ramifications thereof extending to 2020**. . . ." (Emphasis added.) The December 20, 2004 Order established a procedural construct that limited the partial breach to the period through the end of 2009 for purposes of simplifying the damages trial. That procedural construct, however, does not change the reality of operating Southern's nuclear plants.

The discharge of SNF from Southern's reactors into the reactor pools up until December 31, 2009, will substantially reduce the amount of usable pool space. Because only a limited amount of usable pool space will remain as of December 31, 2009, the continued discharge of SNF after that date will threaten to impinge on the one FCR per reactor margin that Southern uses to operate its reactors, even if the Government begins Contract performance in 2010. To preserve this margin, Southern will have to purchase and construct additional dry storage facilities.

If the Government's removal of SNF begins, the Government will eventually catch up with and surpass the rate of SNF discharge at Southern's plants. Even if the Government begins picking up SNF industry-wide in 2010 at the 3,000 MTU rate with the five-year ramp-up period, however, Southern will be forced to take SNF out of its pools and store it in dry casks between 2009 and 2020. The "cost or monetary ramifications thereof extending to 2020" clearly include the costs of loading SNF assemblies that will be discharged after 2009 and are recoverable damages.

**(b) The Government's .5 FCR Per Reactor Limitation Would Not Place Southern in as Good a Position as it Would Have Been Absent DOE's Breach.**

Southern formulated its cask loading schedule to maintain one FCR per reactor at each plant – one FCR in each of the separate pools at Plant Farley and two FCRs total for the shared pool at Plant Hatch and the combined, connected pools at Plant Vogtle. Farley Unit 1 will be required to load three casks in 2005 to clear sufficient pool space for the 2006 refueling. Farley Unit 2 will be required to load two casks in 2008 to clear sufficient space for the 2009 refueling. Southern's loading schedule allows the reserve in the Hatch shared pool to temporarily dip below one FCR per reactor for a short period of time, but recovers the one FCR per reactor by 2008. (Kenrich Rep., Appendix F, Chart II-A; Neuberger Rep. Exh. 3, Actual Scenario, Hatch Unit 1 & 2.) The Government argues that Southern's actual loading schedule, which includes casks already loaded by Southern, should not be the basis for damages. Instead, the Government's economist, Dr. Neuberger, argues that a computer model not utilized by Southern, that limits each SNF pool to the capability to discharge a maximum of one full core of SNF, and less than that for significant periods each year, regardless of the number of reactors that the pool serves, should be used to limit the number of casks for with Southern can recover.

The Neuberger Report proposes to reduce the reserve at the Farley pools to eliminate the space for new fuel. (Neuberger Rep. at 16.) This approach ignores that the Farley reactors require space not only to discharge the reactor core during refueling, but also to load new fuel through the reactor pools. Not only Southern Nuclear's Tom McCallum, who managed the dry storage project at Plant Farley, but also the Government's expert witness Ed Johnson agrees that the maintenance of space for new fuel is reasonable. (4/29/05 Tom McCallum Dep. at 94-98; 7/27/05 E. R. Johnson Dep. at 112-113.)

The Neuberger Report also proposes to reduce the number of casks to the amount required to maintain only one FCR of usable space in the Hatch pool even though two reactors share that pool (*i.e.*, .5 FCR per reactor). (Neuberger Rep. at 16.) Similarly, Dr. Neuberger would limit Plant Vogtle's combined, connected pools to a total of one FCR for both reactors (*i.e.*, .5 FCR per reactor). Dr. Neuberger's proposal, uninformed by any nuclear operating experience, fails because the policy of downgrading the reserve in a shared pool from one FCR per reactor to .5 FCR per reactor is not consistent with good nuclear operating practice and has even been contradicted by the Government's own nuclear industry expert. Moreover, it misstates the legal measure of contract damages. While Dr. Neuberger, an economist, is presented as an expert on the appropriate use of damages models, he has no nuclear industry education or experience and disclaimed any opinion on the appropriate reserve amount. (7/13/05 Neuberger Dep. at 14, 74-76.)

The Government's only nuclear industry expert, Mr. Ed Johnson, states that while a reactor with a shared pool might "get by" with .5 FCR per reactor in a shared pool, it is reasonable for a plant operator to maintain one FCR "for each reactor unit" – two FCRs total for a shared pool serving two reactors. (E.R. Johnson Rep. at 5; 7/27/05 E.R. Johnson Dep. at 109-112.) Mr. Johnson agrees that a plant operator might reasonably seek to maintain one FCR per reactor in a shared pool because of the lower risk of premature shutdown. (7/27/05 E.R. Johnson Dep. at 109-112.) Indeed, if Plant Hatch were to load casks on the schedule suggested by the Neuberger Report, the routine discharges of SNF by the two reactors into the shared pool would eliminate even .5 FCR per reactor (one FCR total) for the period between refueling and cask loading – a period of several months each year, and could result in the inability to refuel the

reactor at all if only two successive cask loadings were missed due to unanticipated operating issues, unavailability of casks etc. (Neuberger Rep., Exh. 7, Actual Scenario, Hatch Unit 1 & 2.)

The Government's position is apparently that Southern should have spent the minimum necessary to keep its reactors in operation by slowing its cask loading schedule to provide only .5 FCR per reactor in shared and connected pools. The Government cannot limit its liability by assuming a degraded operating standard that is not a reasonable industry practice, prudent under state law, or consistent with its performance obligation.

First of all, degrading the reserve to just .5 FCR per reactor misstates the fundamental measure of contract damages – to place the party in "as good a position as it would have been in, had the breaching party fully performed its obligation." *Massachusetts Bay Transp. Auth.*, 129 F.3d at 1232. Both the Government's and Southern's experts agree that, had the Government performed its contractual obligation, Southern would have had usable space in its reactor pools of much more than one FCR per reactor from 1998 to 2009, with the exception of a limited period at Plant Hatch prior to 2003. (Neuberger Rep. Ex. 4 and 5a.)[16] This is because Southern's SNF acceptance allocations under the Government's 3,000 MTU rate, and hence the number of fuel assemblies that would have been removed by the Government from Southern's pools, exceed the number of assemblies Southern plans to load into its dry storage facility.

Indeed, had the Government performed at the 3,000 MTU rate (with the five-year ramp-up period), Southern would have much more usable pool space than it currently has or will have under Southern's loading schedule. Applying the Government's 3,000 MTU rate to Southern's

---

[16] During the pre-2003 period, however, Southern would have allowed the reserve to fall between one FCR per reactor and .5 FCR per reactor had the Government been removing SNF on schedule. This is because it could have simply added the second rack to the "bathtub" region of Plant Hatch's pool for a temporary period and thus avoid building dry storage facilities altogether that would have been necessary for only a limited period of time.

place in the Government's queue (based on the age of Southern's SNF) results in Southern's pools emptying faster than Southern's actual loading schedule. Every witness with any technical knowledge who has testified agrees that the recovery of one FCR per reactor limits Southern's risk. Because empty space in Southern's pools has economic value in the form of lower risk of premature shutdown and/or extended decommissioning, Southern is entitled, at the least, to recover damages based on its actual loading schedule. Southern would not be in as good a position under the Government's .5 FCR theory as it would had the Government performed its obligations. As a result, the Government's position regarding the number of casks to be loaded should be rejected.

Moreover, APC and GPC have a duty under the laws of their respective States to serve their customers adequately. The responsibility to ensure that their nuclear facilities are available to produce electricity for their customers is part of that duty. Southern is required under Alabama law "to render adequate service to the public" and to maintain their equipment in "good operating condition." Ala. Code § 37-1-49 (1992).[17] Further, the Alabama Public Service Commission ("Alabama PSC") requires that "the entire plant of each utility shall be constructed and installed in accordance with accepted good practice." Rule 3, Ala. PSC Rules. Similarly, the Georgia Public Service Commission ("Georgia PSC") recognizes that an electricity provider is under an "obligation to provide adequate and dependable service . . . ." Ga. PSC Dkt. No.

---

[17] Section 37-1-49 of the Alabama Code provides:

> Every utility shall maintain its plant, facilities and equipment in good operating condition and shall set up and maintain proper reserves for renewals, replacements and reasonable contingencies. Every utility shall render adequate service to the public and shall make such reasonable improvements, extensions and enlargements of its plants, facilities and equipment as may be necessary to meet the growth and demand of the territory which it is under the duty to serve.

13714-U: Shaw Industries, Inc.'s Request to Change the Electrical Supplier of its Fitzgerald Facility From the Fitzgerald Water, Light and Bond Commission to a Company of its Choosing, 2001 Ga. PUC LEXIS 72, at *6 (Ga. PUC 2001). If GPC fails to do so, the Georgia PSC may order GPC to "maintain such public services and facilities as may be reasonable and just." O.C.G.A. § 46-2-20 (2004). Southern's experienced managers and engineers have determined that recovery of one FCR for each of its reactors is consistent with that duty and the Government should not avoid the consequences of its breach by forcing a lower standard of reliability on those facilities.

**(c) Southern Reasonably Concluded that it Would Not Install the Second Rack in the Hatch Pool if it Was Going to Build an ISFSI.**

The Plant Hatch pool has a rectangular inset referred to as the "bathtub" region of the pool that is used in part to store SNF in a rack and in part to store contaminated tools and reactor parts. Although Southern purchased a second rack that it could have installed in the "bathtub" region, its nuclear plant managers and engineers concluded that given the commencement of operation of its dry cask storage facility, they would forgo the installation of the second rack, preserving a portion of the "bathtub" region of the pool for operating and maintenance purposes. This decision resulted in the loading of three additional casks.

The Government's experts contend that Southern's damages should be reduced by the costs associated with these three casks, because Southern should have installed that second rack in the "bathtub" region of the Plant Hatch pool. (Neuberger Rep. at 13-14); Expert R. Report of Larry Johnson, at 14 (June 10, 2005) [hereinafter "L. Johnson Report"]. Southern will show that its managers' and engineers' decision not to place a second SNF rack in the "bathtub" region of

the shared pool at Plant Hatch was reasonable based on technical and operating issues that the Government's experts failed to take into account in developing their opinions.

Because of the lack of usable pool space and the rate of discharge of SNF from the reactors, a dry storage facility had to be built at Plant Hatch regardless of whether the second rack was installed. The second rack was purchased as a contingency in the event Southern's dry storage facility did not commence operation on schedule. Upon the commencement of operation of the dry storage facility, there was no need to place the second rack in the "bathtub" region of the pool.

David Bland, the former manager of the Plant Hatch dry cask storage project, will testify that placement of a second rack in the bathtub region of the Plant Hatch reactor pool would have been an unsound decision.[18] The "bathtub" region of the pool serves several important functions, including storing contaminated tools and equipment, and allowing the inspection and repair of damaged fuel assemblies. As a result, had the second "bathtub" rack been installed, it would have been unloaded, removed, and properly disposed of upon the commencement of the operation of the dry storage facility, to reclaim that usable space in the pool for operation and maintenance purposes. In addition, the installation and use of the second rack would have contaminated the rack and would have increased the amount of radioactive waste to be disposed at the decommissioning of the reactor. Dr. Neuberger had not been informed of any of these considerations prior to stating his opinion.

---

[18] Southern purchased two "bathtub" racks in 1998. Because Southern was going to install one in any event, it reasonably decided to expend the minimal marginal cost for the design and NRC licensing of a second, identical rack. (1/13/05 Bland Dep. at 227-228.) Had the Government commenced performance and had Southern been able to avoid dry storage by installing the rack, it is undisputed that Southern would have done so.

Based on their history of successful nuclear plant management, Southern's skilled managers and engineers assessed the facts and circumstances at the time the decision had to be made and decided to load a cask instead of installing a second rack in the "bathtub" region of the Hatch reactor pool. On the one hand, Southern's managers and nuclear engineers have decades of hands-on experience in successfully operating nuclear plants. On the other hand, none of the Government's expert witnesses who have questioned, in hindsight, the decision to refrain from adding the second rack have ever even worked in a nuclear plant and are in no position to "Monday-morning quarterback" on this issue. *See Commercial Fed. Bank, F.S.B.*, 59 Fed. Cl. at 355 (**"It is not the task of the court to second guess the judgment of a skilled team of managers with a history of successful institutional management.**") (Emphasis added); *Citizens Federal Bank,* 66 Fed. Cl. at 185 ("**[R]easonable conduct is to be determined from all the facts and circumstances** of each case, and **must be judged in the light of one viewing the situation <u>at the time the problem was presented</u>.")** (Quoting *In re Kellett Aircraft Corp.*, 186 F.2d at 198 (footnotes omitted) (emphases added). It was the Government's wrongful conduct – the breach of its contractual duty to remove the SNF – at the time Southern had to make the decision on the second rack that made the decision not to install that rack inevitable. *See id.* ("Where a choice has been required between two reasonable courses, the person whose wrong forced the choice can not complain that one rather than the other was chosen.") The cost of purchasing and loading the three casks is recoverable.

### 2. Southern's Decision to Purchase Three HI-STAR Casks was Reasonable

The first three SNF casks that Southern purchased for Plant Hatch were HI-STAR casks. HI-STAR casks can be used for both SNF storage and transportation. They are also more

expensive than the remainder of casks that Southern purchased – HI-STORM casks – that can be used only for storage of SNF.[19]

In another example of after-the-fact criticism, the Government's experts contend that Southern should not have purchased the three dual-purpose HI-STAR casks, which are NRC-certified for storage and transportation, but only the less-expensive, storage only HI-STORM casks. E.R. Johnson, Analysis of Technical Issues Related to Cost Analysis at Hatch, Farley, and Vogtle Nuclear Power Plants of Southern Nuclear Operating Company, at 8-9 (June 10, 2005) [hereinafter "E.R. Johnson Report"]; (L. Johnson Rep. at 15.) Beginning with this assumption, the Government's expert further opines that Southern should not recover the costs to demonstrate the loading of the HI-STAR cask to the NRC, the cost of a railroad spur used in the HI-STAR loading operation, the cost of leasing cranes and railcars, the cost of a "strong back support

---

[19] In a dry cask system, a sufficiently cooled SNF assembly is loaded into a metal canister in the pool. A HI-STAR cask is then lowered into the pool and the canister is placed inside of the cask. The HI-STAR cask is then taken out of the pool, and the canister is welded shut, dried, and filled with helium. The HI-STAR cask is then sealed and transferred outside the reactor building to an ISFSI.

The loading of a HI-STORM cask requires an additional step because the HI-STORM cask is not lowered into the pool. Instead, a transfer cask, known as a HI-TRAC cask, is submerged in the pool and a loaded canister is placed inside it. The HI-TRAC transfer cask is then removed from the pool, and the canister is welded, dried, and filled with helium. The HI-TRAC transfer cask is then placed on top of a HI-STORM cask, the bottom of the HI-TRAC is opened and the canister is lowered into the HI-STORM cask below. The HI-STORM cask is then transferred to an ISFSI.

When Southern's canisters are to be shipped offsite (*i.e.*, to the Government's repository, an MRS, or a PFS facility), the canisters will be transferred from HI-STORM to HI-STAR casks for shipment. (E.R. Johnson Dep. at 48-49.) The HI-TRAC will be used to facilitate this transfer. The HI-TRAC will be placed on top of the HI-STORM, and the canister will be transferred to the HI-TRAC. The HI-TRAC will then placed on top of an empty HI-STAR cask and the canister will be transferred to the HI-STAR. After sealing the HI-STAR cask, the canister can then be shipped offsite.

beam," the cost of a HI-STAR Cask Cradle, engineering costs, and other costs relating to the three HI-STAR casks. (L. Johnson Rep., Exh. 1 at 39; *id.* at Exh. 6, at 52 - 55.)

At the time its managers and engineers signed off on the purchase of the three HI-STAR casks, that cask design was the only Holtec (the manufacturer) design licensed by the NRC for use. In addition, the HI-STAR casks had the extra function of transportability that would allow the Government to transport the casks away from the reactor site to, for example, Yucca Mountain or an MRS, or would allow Southern to transport SNF to the PFS facility in Utah. At the time the decision was made to purchase the HI-STARs, the Government had not announced that it would not accept transportable casks. To the contrary, the Government was encouraging the use of multi-purpose canisters (*i.e.*, canisters that could be used to store and transport SNF) that would have been housed in the HI-STAR casks. (4/26/2002 Barrett Dep. at 653-655.) Moreover, the Government's expert witness, Mr. Ed Johnson, has testified that the Government will likely use the HI-STAR casks to transport Southern's SNF to the Government's facility whenever that occurs. (E. R. Johnson Dep. at 48-49.) Similarly, the HI-STAR casks could be used to ship SNF to PFS, if that became necessary or desirable.

Finally, the Government has taken position that it will not accept Southern's SNF in canisters. (4/12/2005 Zabransky Dep. at 60-61.) As a result, the SNF stored in canisters on Southern's plant sites will have to be removed from the canister in order to deliver it to the Government. Unless the Government removes a significant amount of Southern's SNF prior to the decommissioning of the plant, a prospect that appears most unlikely given the Government's acknowledgement that it currently has "no plan" to pick up Southern's SNF, Southern's SNF pools would likely be shut down and unavailable for the removal operation. In that event, Southern would be forced to ship SNF offsite to be removed from its canisters in order to deliver

the SNF to the Government.[20] The HI-STAR casks could be used for that purpose and for that reason alone their purchase was reasonable.

Subsequently, when the less expensive, storage-only HI-STORM casks became available and were licensed by the NRC for use, Southern began purchasing the HI-STORM casks. As with the decision not to install the second rack in the bathtub region of the Hatch pool, Southern's decision to purchase the HI-STAR casks was reasonable. The Government's house-of-cards argument that the HI-STAR casks and all costs dependant thereon should be disallowed totally collapses when one considers the facts and circumstances that confronted Southern's managers and engineers at the time they made the decision to mitigate damages by purchasing the HI-STAR casks. *See Citizens Federal Bank*, 66 Fed. Cl. at 185 (quoting E. Allan Farnsworth, *Contracts* § 12.12) ("[A] party that takes steps that seemed reasonable at the time will not be judged by hindsight.").

Again, it is not appropriate for the Government's economists and auditors to "second guess the judgment of a skilled team of managers with a history of successful [nuclear plant] management." *See Commercial Fed. Bank, F.S.B.*, 59 Fed. Cl. at 355. *See Citizens Federal Bank*, 66 Fed. Cl. at 185 ("As Judge Bruggink held in *First Nationwide Bank v. United States*, '"[t]he rule of mitigation of damages may not be invoked by a contract breaker ... merely for showing that the injured person *might have* taken steps which ... would have been more advantageous to the defaulter."' 56 Fed. Cl. 438, 444 (2003) (quoting *In re Kellett Aircraft*

---

[20] Of course, the cost of removing the SNF from the canisters, disposing of the canisters, and loading it into containers provided by the Government would be recoverable because placement of the SNF in the canisters in the first place was the proximate result of the Government's breach. Such casks would be the subject of a future action under this Court's Order of December 20, 2004.

*Corp.*, 186 F.2d at 198-99) (alterations in original)."). The cost of the three HI-STAR casks and the related expenses are recoverable mitigation expenses.

### 3. Southern Will Be Forced to Purchase and Construct Additional Storage Facilities at Plant Vogtle.

The Government's expert assumes that none of the costs for dry storage at Plant Vogtle are reasonably certain because "Southern does not have a definitive plan to construct an ISFSI . . . ." (L. Johnson Rep. at 32.) Southern does, however, have a plan for a dry storage project at Plant Vogtle and such plan has been approved by the SNC Board of Directors. The May 2004 "Alvin W. Vogtle Electric Generating Plant Strategic Plan," at page 8, provides:

> Vogtle plans to continue operating with a high capacity factor and refueling every 18 months. As a result, Vogtle will be unable to offload and store a full core from both units by 2014. In addition, Vogtle's spent fuel pools are projected to be full by 2017. Both of these conditions may be relieved once the federal government starts storing spent fuel. However, in light of the ongoing Yucca Mountain debate, Vogtle must plan on utilizing dry storage casks to store spent fuel. The planning will start in 2008 and be ready by 2013.
>
> . . . .
>
> Total project cost is estimated to be $22,000,000 ($20M Capital, $2M O&M). total project includes $21.6M for years beyond 2009.

The Vogtle Strategic Plan was not a document created for this litigation, as are the Government's expert witness reports. Instead, it embodies the actual plan, based on the business judgment of Southern's management, for the long-term operation of one of GPC's most valuable assets. Southern management has chosen to implement dry cask storage at Plant Vogtle, rather than attempt to forestall the construction of such dry storage by installing additional racks in the Plant Vogtle pools. This decision was made because of the limited amount of storage space that could be added by installing such racks compared to the complexity, the risk to workers, the

expense of the additional racks, and the fact that dry cask storage will be required at Plant Vogtle in any event.

The installation of additional racks in the Plant Vogtle pools – the only alternative to the construction of dry cask storage even were the Government to have begun performance in 2010 – is neither inexpensive nor simple. Although Southern has not commissioned the technical reviews necessary to determine the feasibility of the installation of such additional racks, at a minimum it would involve the movement of SNF already stored in the pool and expose Southern's workers to radiation, without any assurance that the expense would be less than the cost of dry casks for an equivalent number of stored assemblies. Given the relative certainty of the need for dry cask storage in the long term, Southern's management has concluded that it is a reasonable use of its own resources to pursue dry storage as the first option.[21]

The estimates of the cost of the facility are based Southern's real life experience in constructing and operating similar facilities at Plants Hatch and Farley. The Government's partial breach of the Contract through 2009 has caused and will continue to cause SNF to

---

[21] Although pursuant to the Court's order of December 20, 2004, the parties have assumed that the Government's delay will end in 2010 for the purpose of calculating the number of SNF assemblies that must be stored, that assumption cannot be treated as a hard fact in determining the reasonableness of the technology decisions Southern has made, which must instead be based on considerations of when the Government will actually perform. The testimony of Christopher Kouts, the Government's 30(b)(6) designee, confirms that the Government has no current schedule for performance and that utilities should not rely on expectations of Government performance in making SNF management decisions. (4/11/2005 Kouts Dep. at 72). It therefore was more than reasonable for Southern to plan for dry storage at Plant Vogtle without assuming the Government would begin performance in 2010.

accumulate in the Vogtle pool through 2020.[22] Southern has no choice but to build another ISFSI and purchase more casks to store the SNF that the Government contracted to remove.

#### 4. Southern's Cost of Capital is Recoverable.

Southern has included in its damages claim the cost of capital for the investment in dry storage facilities necessitated by the Government's breach of contract. This claim represents the cost of financing actually incurred by Southern in connection with these facilities. The Government asserts that Southern's cost of capital for this investment is the equivalent of pre-judgment interest and is thus not recoverable as a matter of law. The Government's expert, Mr. Neuberger, however, has admitted that the cost of capital is a real cost:

> Q: . . . All I'm doing is asking you as an economist whether the cost of capital is a real cost that a company that's pursuing a capital project has to pay?
>
> A: And my answer to that is yes, it is.

(Neuberger Dep. at 191.)

The legal question before the Court is whether the cost of capital represents an element of damages arising out of the Government's breach of contract or prejudgment interest on Southern's claim for damages which is not recoverable against the Government under 28 U.S.C. § 2516(a).[23] Because neither the Contract nor the NWPA address the allowance of prejudgment

---

[22] Mr. Kouts, DOE's Director of the Office of Systems Analysis and Strategy Development, has admitted that the Government probably will not begin performance in 2010. (Kouts Dep. at 62-63.)

[23] 28 U.S.C. § 2516(a) provides:

> (a) Interest on a claim against the United States shall be allowed in a judgment of the United States Court of Federal Claims only under a contract or Act of Congress expressly providing for payment thereof.

interest on "claims," the determinative issue is whether Southern's cost of capital is distinguishable from prejudgment interest.

This Court has distinguished between interest "on a claim" (*i.e.*, prejudgment interest which begins accruing when a claim arises and continues to accrue during the entire pendency of the claim on the entire amount of the claim) and interest as a component of a claim – financing costs that represent a claim in themselves. *Centex Corp. v. United States*, 55 Fed. Cl. 381, 390 (2003), *aff'd*, 395 F.3d 1283 (Fed. Cir. 2005). The Federal Circuit has held that such financing costs are recoverable so long as they are foreseeable. *Bluebonnet Sav. Bank, F.S.B. v. United States*, 266 F.3d 1348, 1354-58 (Fed Cir. 2001); *Bluebonnet Sav. Bank, F.S.B. v. United States*, 339 F.3d 1341, 1344 (Fed Cir. 2003); *LaSalle Talman Bank, F.S.B. v. United States*, 317 F.3d 1363 (Fed. Cir. 2003). As the Court stated in *Westfed Holdings, Inc. v. United States*, 52 Fed. Cl. 135, 163 (2002), :

> Interest on a claim against the United States is precluded under 28 U.S.C. § 2516(a) (1994) unless permitted under a contract or Act of Congress. Plaintiff contends that the **"interest"** it seeks is not the "interest on a claim" barred under *28 U.S.C. § 2516*(a), **but is a "claim for interest incurred as the consequence of a breach."** Westfed Damages Opp. at 30. Plaintiff argues by analogy to areas of law such as antitrust and RICO where **a distinction 'between interest as an element of damages and 'interest on a claim'" is well-recognized.** *Id.* at 31. In these areas, plaintiff finds support for its argument that its bond debt and incurrence of bond debt are compensable reliance damages. *See, e.g., Pacific Gas & Elec. Co. v. Howard P. Foley Co., Civ. No. 85-2922 SW, 1993* WL 299219, at *4 (N.D. Cal. July 27, 1993) (**"The mere fact that []damage can be computed in terms of 'interest' does not make it impermissible prejudgment interest.**"); *United Power Ass'n v. L.K. Comstock & Co.*, 1992 U.S. Dist. LEXIS 18874, Civ. No. 3-89 766, 1992 WL 402906, at *8 (D. Minn., Oct. 27, 1992) ("The court finds that the cost of borrowed funds is a separate and compensable element of actual damage."); *Minpeco, S.A. v. Hunt*, 686 F. Supp. 420, 425-27 (S.D.N.Y. 1988) ("[Interest on a loan] is an actual expense, a claim for actual damages which should be treated like any other damage claim.").
>
> **The court agrees that the 'interest' Westfed seeks to recover is not prejudgment interest.** Westfed seeks to recover a cost expended in reliance on the contract in the form of interest. Such a characterization has been accepted by recent case law in this court.

(Emphases added), *aff'd in relevant part & rev'd in part on other grounds,* 407 F.3d 1352 (Fed. Cir. 2005). *Cf. England v. Contel Advanced Sys., Inc.*, 384 F.3d 1372 (Fed. Cir. 2004) (disallowing claim for interest where contract provided for a certain amount of interest – which was paid – and no more and where incurrence of interest was not caused by the Government's breach of a performance obligation).

Southern's claim for the cost of capital incurred represents an actual expense incurred during the construction of additional storage facilities as a result of the Government's partial breach. The cost of capital was accounted for in accordance with traditional, widely accepted utility accounting principles consistent with the Federal Energy Regulatory Commission ("FERC"), Alabama PSC, and Georgia PSC accounting requirements. *See Department of Water & Power v. United States*, 131 F. Supp. 329, 331 (S.D. Cal. 1955) (allowing electric utility to recover damages from the government where allocations of costs were made in accordance with "the accounting procedure recommended by the Federal Power Commission [FERC's predecessor] and the California Public Utilities Commission"). Because Southern had to expend capital to purchase, construct, and operate the SNF storage facilities, it could not use this capital to pay dividends or liquidate outstanding indebtedness. Southern's cost of capital was more than it would have been had the Government performed its contractual obligations and obviated the need for Southern to expend its own capital to store SNF.

In contrast, pre-judgment interest would equate with application of a statutory interest rate to the cost of capital and other damages incurred in a year to obtain interest on top of the cost of capital actually incurred and reflected on the claimant's books. Southern seeks damages for its cost of capital incurred in building the dry storage facilities, not for interest on top of that cost of capital.

### 5. The Costs of Internal Labor, Overhead, and Engineering Supervision Are Recoverable.

In adding SNF storage capacity, Southern, in part, used its own workforce and supervisors and allocated overhead to the SNF projects in accordance with its standard accounting practices. The Government's experts contend that the cost of labor, overhead, and engineering supervision for Southern's employees who worked on SNF storage facilities are not incremental because Southern would have paid such costs even without the Government's breach. (E.R. Johnson Rep. at 3; L. Johnson Rep. at 9-11, 12, 21.)

The Government's argument runs afoul of basic contract law. "The general rule is that damages for breach of contract shall place the wronged party in as good a position as it would have been in, had the breaching party fully performed its obligation." *Massachusetts Bay Transp. Auth.*, 129 F.3d at 1232. The courts have recognized that to place a non-breaching party "in as good a position" as it would have enjoyed in a non-breach scenario requires the award of damages for the reasonable cost of internal labor and supervision to mitigate the breach. Had the breaching party performed, the non-breaching party's employees could have performed other tasks. For example, in *Convoy Co. v. Sperry Rand Corp.*, 672 F.2d 781, 785-86 (9th Cir. 1982), the court of appeals affirmed an award of breach of contract damages for a defective computer system, stating:

> Univac argues that as a matter of law supervisory staff costs cannot be recovered because the plaintiff would have paid the staff's salary in any event. . . .
>
> **The issue is not whether Convoy would have paid the supervisors' salaries if the defendant had not breached the contract, but whether the breach deprived Convoy of the services it paid for. . . .**
>
> In *Clements Auto Supply* [*Co. v. Service Bureau Corp.,* 298 F. Supp. 115, 134 (D. Minn. 1969), *aff'd in relevant part*, 444 F.2d 169 (8th Cir. 1971)], the court found that the supervisors' services were effectively lost to the plaintiff

> during the time they supervised a system which was of little benefit to the company. In relying on *Clements Auto Supply*, the district court implicitly found that Convoy had lost the benefit of its supervisors' services for the time they spent supervising the computer system.

(Emphasis added.)[24] *See Dunn Appraisal Co. v. Honeywell Information Systems, Inc.*, 687 F.2d 877, 883-84 (6th Cir. 1982) (upholding award of damages for labor of plaintiffs' employees and supervisor in fraudulent-inducement-of-contract case resulting from purchase of inadequate computer system).

Indeed, the government has sued and recovered for the cost of its own employees and facilities needed to repair damage caused by private parties. For example, in *United States v. The John R. Williams*, 144 F.2d 451 (2d Cir.), *cert. denied*, 323 U.S. 782 (1944), a private tugboat damaged a submarine cable, and the government repaired the cable using its own boat

---

[24] Similarly, in a negligence case, the Fifth Circuit affirmed an award of damages to place a dock owner in as good a position as it enjoyed prior to the injury to its dock by awarding the cost of internal labor as damages, stating:

> Freeport has arranged with an independent engineering concern to be furnished supplemental personnel when its own salaried engineering staff is overworked. Because Freeport found it unnecessary to tap this outside [firm] during the period of the engineering work on the dock, Pansuiza contends that, were it not for the dock work, Freeport's engineers would have been idle or engaged in essentially nonproductive work. Pansuiza argues, therefore, that the engineering work was performed without any additional expense or overhead. We reject this argument as being wholly based on speculation. It is at least as plausible that there were other Freeport projects that would have been worked on by Freeport's internal engineers, but were not of such an emergency nature that they required the immediate employment of the outside firm.
>
> . . . .
>
> The cost of repairs performed internally by the injured party, including overhead, are recoverable in a negligence action. . . . The district court properly concluded that Freeport was entitled to recover its in-house engineering costs.

*Freeport Sulphur Co. v S/S Hermosa*, 526 F.2d 300, 303-04 (5th Cir. 1976).

and crew. While the private party argued that the repair work "did not prevent the use of the [government's] vessel for other repair work and, therefore, added nothing to the [government's] necessary outlay," the Second Circuit upheld that award of damages for the Government's repair boat and crew. *Id.* at 453. Similarly, in *United States v. New England S.S. Co.*, 297 F. 651 (S.D. N.Y. 1923), the Government sued for the costs of repairing damage to a Navy ship caused by a private ship. While the private party argued that "[t]he government had five dry docks at the yard; except for the use in question [*i.e.*, repairing the Navy's damages ship], all were idle during the repairs," the court awarded damages for the cost of the Navy crewmen and the Navy's dock facilities used to take the ship to the dockyard and repair it. *Id.* at 654-55.

Similarly, Southern used its own labor force and equipment to add SNF storage capacity. During the time period in which Southern's internal labor force worked on dry storage facilities, it was required to obtain more expensive contract labor to perform other functions in the plants that could have been performed by the employees involved in SNF-related activities. In addition, other activities which could have been performed by the internal employees were delayed. These circumstances make it more than reasonable for Southern to recover the costs of its own employees as damages.

Indeed, the Government's own expert witness admitted that it would have been reasonable for Southern to recover the cost of the more expensive contract labor:

> Q: [T]o the extent Southern Nuclear's damages claim captures the cost of the SNC employee instead of the contractor employee, it would be your opinion that the government has been undercharged for the damages?
>
> A: That's correct.

(7/27/2005 E. R. Johnson Dep. at 84.)

With respect to overhead, this Court has awarded an allocable share of general overhead as damages in a breach of contract action. In *Chain Belt Co.*, 127 Ct. Cl. 38, the government

sold a manufacturing plant building to Chain Belt, but did not vacate the entire premises by the time required by the sales contract. In addition to payments to outside contractors to repair the floors and move certain government machinery, this Court allowed Chain Belt to recover breach of contract damages for the cost of watchmen, real estate taxes, insurance and fire protection, building maintenance and repairs, and "general administration expense, 5 percent." *Id.* at 56 n.5. These general overhead expenses were allocated to the portion of the plant that the government did not vacate based on the square footage of the whole plant. *Id.*

Moreover, where the allocation of supervision and overhead is consistent with the accounting practices required by federal and state regulatory authorities, recovery has been allowed. *See Department of Water & Power*, 131 F. Supp. at 330 (allowing electric utility to recover supervision and overhead costs incurred to repair an electric system damaged by a government truck where allocations of such costs made in accordance with "the accounting procedure recommended by the Federal Power Commission [FERC's predecessor] and the California Public Utilities Commission").

In computing it damages, Southern used its standard accounting practices to allocate labor and supervision costs to the SNF project, just as it does for other projects not a part of this litigation. Moreover, Southern's allocation is consistent with the accounting practices required by FERC, the Alabama PSC, and the Georgia PSC.[25]

Southern's costs for internal labor, overhead, and engineering supervision are incremental, reasonable, and recoverable.

---

[25] Moreover, the accuracy of the allocations of overhead and supervision is further supported by the fact that APC and GPC have competing interests to incur only those costs allocable to their facilities, and no more, or risk disallowance of recovery by their respective public service commission.

### 6. The Private Fuel Storage Costs Were Reasonable Expenditures

Southern funded the Private Fuel Storage, or PFS, project to store SNF at a private facility to be developed in Utah. The Government proposes to disallow the amount Southern paid into the project because "Southern Nuclear viewed PFS as an insurance policy" and because we now know, in hindsight, that state regulatory authorities have not thus far barred the storage of SNF in Alabama or Georgia. (L. Johnson Rep. at 17, 26-27, 34.) Accordingly, Southern has not had to use the PFS facility to date. (*Id.*) This argument fails on the black-letter contract law rule of mitigation "a party that takes steps that seemed reasonable at the time will not be judged by hindsight." *Citizens Federal Bank*, 66 Fed. Cl. at 185 (quoting E. Allan Farnsworth, *Contracts* § 12.12).

At the time Southern's managers made the decision to assist in funding the PFS project, the State of Minnesota had challenged the continuance of storing SNF at a nuclear plant site within its borders. Further, the slow pace of Government progress in developing and licensing SNF storage technology threatened further delays in the Yucca Mountain repository.

Relying on their experience in successful nuclear plant management, Southern's managers decided to join with other experienced nuclear utilities in funding the PFS project. *See Commercial Fed. Bank, F.S.B.*, 59 Fed. Cl. at 355. At the time Southern's managers made the decision to fund PFS, this decision offered three principal benefits. First, in case of a state regulatory limit on the ability to store SNF in Alabama or Georgia, Southern would have had an alternative place to store SNF if the Government did not begin SNF removal. Absent an operational Yucca Mountain repository, MRS, or other facility, a state law limitation on storage at plant sites would threaten to shut down Plants Farley, Hatch, and Vogtle unless Southern had a contingency plan.

Second, using the most skilled and experience nuclear plant managers and engineers from the private sector held great promise of developing the technology necessary to store and transport SNF at a rate faster than the Government would otherwise develop such technologies. Pushing the Government along would increase the likelihood that the Yucca Mountain repository would be completed sooner and avoid a total breach of the Contracts for which Southern was then scheduled to pay hundreds of millions of dollars to the Government for an indefinite period.

Third, like the Government's proposed MRS facility, a PFS facility would provide a place for temporarily storing SNF while the permanent repository was being constructed. The PFS facility could thus reduce the amount of additional on-site SNF storage capacity that would be needed because of the Government's partial breach.

The Government's expert witness, Mr. Ed Johnson, testified in his deposition that a utility could and should make contingency plans for taking SNF out of its reactor pool in the event dry cask storage was prevented or delayed and that such plans would constitute a kind of "insurance" that is an incremental cost. (E.R. Johnson Dep. at 118-127.) Further, the Government did in fact subsequently develop SNF rail transportation plans that showed routes going to and from the proposed PFS facility in Utah. (Final Environmental Impact Statement for a Geological Repository for the Disposal of Spent Nuclear Fuel and High Level Radioactive Waste at Yucca Mountain, Nye County, Nevada, Fig. 6-12 (Feb. 2002).) Southern's PFS costs are reasonable.

**7. The Williams Services' and Southern Company Services' Costs Are Fully Supported by the Evidence Presented to the Government.**

The Government's experts propose to disallow damages for Williams's and Southern Company Services' costs because "Plaintiffs did not provide a response to our request [for

additional documentary support] until a few weeks prior to the date of this report. Consequently, we are unable to evaluate these costs at this point in time, however, to the extent we have the opportunity to do so at a later date, my opinion will consider whether or not the asserted costs have been supported." (L. Johnson Rep. at 18.) (E.R. Johnson Rep., at 6.)

Williams provides contract labor to perform numerous types of jobs at Plants Hatch and Farley. Certain of the jobs performed by Williams involve the construction and maintenance of SNF storage facilities. From 1999 to 2004, only approximately 6.5% of Williams work related to SNF storage and is claimed by Southern in this case.

The work of Williams employees is performed under the direct instruction of a Southern supervisor who signs off on their time cards. The work, and resulting labor cost, is traced to particular projects by job number. Accordingly, when Williams submits an invoice to Southern, the cost is broken out by job numbers. These job numbers are reflected on Maintenance Work Orders, or MWOs. After reviewing voluminous accounting and other data, the Government's auditors requested that Southern provide them with the MWOs to assist them in tracing the amounts paid to Williams to the SNF jobs. Southern provided the MWOs.

Southern Company Services ("SCS") performs engineering and design tasks for Southern. When Southern was forced to add SNF storage capacity, it requested engineering studies, drawings, and assessments from SCS. SCS then billed Southern for these services. In addition to the documents initially submitted showing the amount of SCS charges related to SNF storage facilities, the Government's auditors requested SCS's Design Input Records ("DIRs")

which are documents that list all of the engineering, studies, and other tasks, that SCS performed on the SNF projects. Southern provided the requested DIRs.[26]

A review of the Williams MWOs and SCS DIRs further support the amounts that Southern paid to add additional storage capacity at Plants Hatch and Farley.

[26] The Government's expert witness similarly would disallow the cost of certain items that ultimately could not be used, such as cancellation fees for a second rail car engine, engineering costs for a building, and delay charges. (L. Johnson Report, at Ex. 6, p. 53, 52, & Ex. 8, p. 63.) Southern's decisions to incur such costs were reasonable at the time they were made and such costs are recoverable. *See Restatement (Second) of Contracts* § 350(2) ("The injured party is not precluded from recovery by the rule stated in Subsection (1) [*i.e.*, the duty to mitigate] to the extent that he [the non-breaching party] has made reasonable but unsuccessful efforts to mitigate."); *id.* at cmt. a ("Subsection (2) protects him if he has made actual efforts by allowing him to recover . . . if his efforts prove unsuccessful."); *id.* at § 347, cmt. c. ("Incidental losses include costs incurred in a reasonable effort, whether successful or not, to avoid loss, as where a party pays brokerage fees in arranging or attempting to arrange a substitute transaction.").

## CONCLUSION

This Court should award damages to Southern for partial breach of contract in the amount of $153,288,216.

Respectfully submitted,

Dated: September 2, 2005

/s M. Stanford Blanton

M. Stanford Blanton
BALCH & BINGHAM LLP
1710 Sixth Avenue North
Birmingham, AL 35203
Phone: (205) 226-3417
Fax: (205) 226-8798

COUNSEL OF RECORD FOR PLAINTIFFS

Of Counsel:

Ed R. Haden
K. C. Hairston
BALCH & BINGHAM LLP
1710 Sixth Avenue North
Birmingham, AL 35203-2015
Phone: (205) 251-8100
Fax: (205) 226-8798

Ronald A. Schechter
Jeffrey L. Handwerker
ARNOLD & PORTER LLP
555 Twelfth Street, N.W.
Washington, D.C. 20004-1202
Phone: (202) 942-5777
Fax:(202) 942-5999

**CERTIFICATE OF SERVICE**

I hereby certify that on this 2nd day of September, 2005, a copy of the foregoing "PLAINTIFFS' MEMORANDUM OF CONTENTIONS OF FACT AND LAW" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s M. Stanford Blanton
Of Counsel