IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| SOUTHERN NUCLEAR OPERATING, COMPANY, ALABAMA POWER COMPANY, and GEORGIA POWER COMPANY, | ) | |
| Plaintiffs, | ) | |
| v. | ) | No. 98-614C (Senior Judge Merow) |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

DEFENDANT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

Pursuant to this Court's order dated April 5, 2005, defendant, the United States, respectfully submits the following memorandum of contentions of fact and law.

SUMMARY OF ARGUMENT

This case involves a damages claim by plaintiffs, Alabama Power Company ("Alabama Power"), Georgia Power Company ("Georgia Power") and Southern Nuclear Operating Company ("Southern Nuclear") (collectively, the "plaintiffs"), for $69.7 million in past costs that they have allegedly incurred to date for, among other things, the design, licensing, and fabrication of dry storage facilities at two of their nuclear facilities and the licensing and installation of additional racks in the wet pool at plant Vogtle to store plaintiffs' spent nuclear fuel ("SNF"). Plaintiffs also seek damages of $8.5 million for amounts paid for the licensing of the yet-to-be constructed Private Fuel Storage ("PFS") facility in Utah. Finally, plaintiffs seek $28.9 million in pre-judgment interest – an amount totaling nearly 40 percent of plaintiffs' asserted actual costs. Plaintiffs contend that the Government is liable for these costs because their need for additional storage was wholly caused by the Government's failure to begin

accepting SNF from commercial nuclear reactors on January 31, 1998 pursuant to the Standard Contracts between the Department of Energy ("DOE") and Alabama Power and Georgia Power.[1]

Plaintiffs' damages claims are grossly in excess of the amounts actually incurred as a result of DOE's breach of the Standard Contract. At trial, the Government will demonstrate that plaintiffs would have required significant additional storage at two of their facilities regardless of the Government's performance under the Standard Contract and that plaintiffs' damages claim fails to properly account for these significant additional costs.

First, plaintiffs' damages theory is premised upon an SNF acceptance rate to which DOE expressly refused to obligate itself under the Standard Contract. As this Court is aware, the Standard Contract does not contain an acceptance rate, but, instead, contains a mechanism for the development of an acceptance rate as DOE's acceptance capacity becomes clear. Plaintiffs contend that the Standard Contract obligated DOE to accept SNF at a rate that was tied to the industry-wide generation rate and eliminated the backlog of SNF at commercial nuclear reactors. Pl. Br. at 24. However, during contract formation, DOE rejected language requested by the plaintiffs and others that would have tied the acceptance rate to the annual generation rate and to a reduction of the backlog. In support of their litigation position, plaintiffs rely upon language

---

[1] By motion dated December 21, 2001, the Government sought to dismiss Southern Nuclear Operating Company as a plaintiff in this case because Southern Nuclear does not have a contract with the Government for the acceptance of spent nuclear fuel and therefore is not in privity with the Government. The Court, by order dated April 7, 2004, denied the Government's motion without prejudice, indicating that the Government could reassert the matter prior to the entry of any judgment in the case. In their pretrial brief, plaintiffs incorrectly describe Southern Nuclear as a party to the Standard Contracts. See Plaintiffs' Memorandum of Contentions of Fact and Law ("Pl. Br.") at 1, 18. Our reference to "plaintiffs" throughout this brief should not be construed as a waiver of our contentions regarding Southern Nuclear's status in this litigation or its entitlement to any damages arising from DOE's breach.

contained in a contract recital that simply states that DOE has the responsibility to remove SNF "as expeditiously as practicable" once a repository is open, language that does not confer an enforceable obligation upon DOE as a matter of fact or law. Plaintiffs also rely upon program documents generated after the period of contract formation that outline DOE's plans and goals, but that do not establish contract obligations regarding the acceptance rate.

At trial we will show that rather than plaintiffs' contractually rejected acceptance obligation, the proper rate of acceptance for the Court to apply is that which was developed pursuant to the terms of the Standard Contract and in accordance with the constraints upon DOE's acceptance of SNF imposed by Congress. This rate was first set forth in the 1991 Annual Capacity Report ("ACR"), as required by the Standard Contract.[2] Based upon the allocations available to the plaintiffs pursuant to this rate and the oldest-fuel-first acceptance queue established pursuant to the Standard Contract, plaintiffs would have required dry cask storage at plant Hatch and would have been obligated to fully rack the Unit 1 spent fuel pool at plant Vogtle even if DOE had met the terms of the Standard Contract and begun accepting SNF on January 31, 1998. Applying the proper rate of acceptance to the "but for" world, among other adjustments, plaintiffs' claims for past costs properly are reduced to $14.4 million for the breaches to date.

---

[2] The 1991 ACR projects DOE's acceptance capacity for the first 10 years of performance (1998-2007). For the purposes of the upcoming trial, the Court need not reach any conclusions about performance after 2007 because, in accordance with the recent decision of the United States Court of Appeals for the Federal Circuit in <u>Indiana Michigan Power Co. v. United States</u>, __ F.3d __, 2005 WL 2173563 (Fed. Cir. Sept. 9, 2005), the rate of acceptance at which DOE was obligated to perform in 2008 and beyond may be determined in the future proceedings, when, and if, plaintiffs bring future claims for damages.

Second, plaintiffs seek reimbursement of the $8.5 million that they have paid for the licensing of the Private Fuel Storage ("PFS") facility in Utah. Pl. Br. at 60-61. However, plaintiffs cannot recover these costs as damages because they were incurred for a highly speculative venture that had little chance – applying foresight – of providing plaintiffs with an appropriate or, even, available alternative option for the storage of SNF. Plaintiffs invested in PFS only as an "insurance policy" to the construction of on-site dry storage facilities and plaintiffs now do not plan to utilize any PFS facility. As a result, plaintiffs' contributions to PFS merely increased the damages allegedly owing to plaintiffs and did not constitute reasonable mitigation.[3] Significantly, the Federal Circuit in Indiana Michigan Power Co., 2005 WL 2173563, affirmed the trial court's factual findings that found that amounts paid to PFS by Indiana Michigan Power Company ("Indiana Michigan") did not constitute reasonable mitigation. The same facts that supported that conclusion in Indiana Michigan support a similar conclusion here.

Third, the Government will establish that there are further, significant reductions that must be made to plaintiffs' claim to eliminate costs that are not attributable to DOE's breach. Specifically, the Government's auditors have eliminated costs that would have been incurred even if DOE had commenced acceptance of SNF in 1998. The Government also will show that other alleged costs, such as prejudgment interest charges and charges associated with internal company labor and overhead are not properly recovered here either as a matter of law or of fact. Further, the Government has eliminated additional costs based upon plaintiffs' failure to

---

[3] Plaintiffs also are able to receive a profit from their investment in PFS to the extent the facility ever is constructed and operated.

properly mitigate damages. These costs include the $8.7 million associated with the premature loading of dual purpose casks in 2000 at plant Hatch that improperly increased the damages allegedly resulting from DOE's delay and that could have been avoided altogether. Finally, the Government's auditors have eliminated costs contained in plaintiffs' claims because plaintiffs have not provided adequate support for these costs.

## STATEMENT OF FACTS

### I. THE ORIGINAL PROVISIONS OF THE NUCLEAR WASTE POLICY ACT

On January 7, 1983, the Nuclear Waste Policy Act of 1982 ("NWPA"), Pub. L. 97-425, 96 Stat. 2201 (codified at 42 U.S.C. §§ 10101-10270 (1982)), was enacted. In its statement of the statutory purposes underlying the NWPA, Congress identified the following four objectives: developing repositories to ensure the protection of the public and the environment from the hazards posed by SNF and high level radioactive waste ("HLW"); establishing Federal responsibility and policy for the disposal of SNF and HLW; defining the relationship between the Federal Government and state governments regarding SNF and HLW disposal; and establishing

> . . . a Nuclear Waste Fund, composed of payments made by the generators and owners of such waste and spent fuel, that will ensure that the costs of carrying out activities relating to the disposal of such waste and spent fuel will be borne by the persons responsible for generating such waste and spent fuel.

Id. § 10131(b).

The NWPA sets forth a specific process by which the Secretary of Energy, the President of the United States, and the United States Congress would determine a site for a repository for the permanent deep geologic disposal of SNF. See 42 U.S.C. §§ 10132, 10134, 10135. In

addition to this process for the siting of a repository, the Secretary was to "prepare a comprehensive report, to be known as the mission plan, which shall provide an informational basis sufficient to permit informed decisions to be made in carrying out the repository program and the research, development, and demonstration programs required under this chapter." 42 U.S.C. § 10221(a) (1982). The Secretary was to provide a draft mission plan to the states, affected Indian tribes, the NRC, and other Federal Government agencies within 15 months of the date of the NWPA's enactment. Id. § 10221(b)(1). The Secretary was to obtain those entities' comments, revise the draft mission plan in response to them, and, within 17 months of the NWPA's enactment, to provide the appropriate committees of Congress with the mission plan. Id. § 10221(b)(2)-(3).

Congress also included in the NWPA provisions allowing the Secretary to study the possibility of creating Monitored Retrievable Storage ("MRS") facilities, with Congress finding that "long-term storage of high-level radioactive waste or spent nuclear fuel in monitored retrievable storage facilities is an option for providing safe and reliable management of such waste or spent fuel." 42 U.S.C. § 10161(a)(1) (1982). By July 1, 1985, the Secretary was to "complete a detailed study of the need for and feasibility of, and shall submit to the Congress a proposal for, the construction of one or more monitored retrievable storage facilities for high-level radioactive waste and spent nuclear fuel." Id. § 10161(b)(1). The proposal was to "include, for the first such facility, at least 3 alternative sites and at least 5 alternative combinations of such proposed sites and facility designs . . . ." Id. § 10161(b)(4). However, the NWPA provided that any MRS facility that Congress might authorize in response to the

Secretary's proposal could "be constructed in any State in which there is located any site approved for site characterization under section 10132 of this title." Id. § 10161(g).

In addition, the NWPA provided that the Secretary would enter into contracts with the owners and generators of SNF of domestic origin for "the acceptance of title, subsequent transportation, and disposal of such [SNF]." 42 U.S.C. § 10222(a)(1) (1982). The contracts had to "provide for payment to the Secretary of fees . . . sufficient to offset expenditures" described elsewhere in the statute. Id.

## II. THE DEPARTMENT OF ENERGY'S PROMULGATION OF THE "STANDARD CONTRACT FOR DISPOSAL OF SPENT NUCLEAR FUEL AND/OR HIGH-LEVEL RADIOACTIVE WASTE" THROUGH NOTICE AND COMMENT RULEMAKING IN THE FEDERAL REGISTER

### A. The Proposed Rule

On February 4, 1983, the Department of Energy ("DOE"), in furtherance of its obligations pursuant to the NWPA, 42 U.S.C. § 10222, published a notice of proposed rulemaking in the Federal Register, proposing terms for the "Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste" ("Standard Contract") mandated by the NWPA, 42 U.S.C. § 10222. See 48 Fed. Reg. 5458 (Feb. 4, 1983). The proposed Standard Contract provided a mechanism for determining both the order in which, and the rate at which, the various contract holders' SNF would be accepted. As for the order of SNF acceptance, the Standard Contract proposed that DOE would issue an "acceptance priority ranking" ("APR") of SNF and/or HLW, through which SNF and/or HLW would receive acceptance priority based generally upon its age. Id. at 5464 (Art. VI.B.3). Although the proposed Standard Contract itself did not identify a specific rate by which DOE would accept contract holders' SNF, it provided for DOE's issuance of documents for planning purposes to assist in the eventual

definitization of the specific rate and order of SNF acceptance and disposal. Id. at 5463 (Art. V.B.5 & Art. V.B.6). The proposed contract further provided that, following DOE's issuance of planning documents, rates of SNF acceptance, as well as the specific order of SNF acceptance from particular contract holders, would be defined through the contract holders' submission of, and DOE's approval of, delivery commitment schedules ("DCSs"). Id. at 5462. The proposed Standard Contract also provided for the contract holders' subsequent submission of Final Delivery Schedules ("FDSs"), which would serve to take the annual allocation defined in a DCS and further refine it to reflect as closely as possible the month(s) and day(s) upon which SNF acceptance would occur in that year. Id. at 5463 (Art. IV.C).

The term "DOE facility" in the proposed Standard Contract referred to a facility for disposal, in a permanent repository, of the SNF and/or HLW. Id. at 5462 (Art. I.11). The proposed rule provided that written comments had to be submitted by March 7, 1983. Id. at 5458.

B. Public Comments

DOE received numerous comments in response to the proposed rule. A number of the comments recognized that the Standard Contract did not establish a specific rate at which DOE must accept SNF, and sought to have such a rate included. Alabama Power and Georgia Power submitted almost identical comments regarding the spent fuel receipt rate:

> The draft contract recognizes that the annual capacity of the DOE disposal facilities may not be adequate to handle the level of deliveries of spent fuel desired by the holders of such fuel. In this regard, it is important that the annual receipt rate of the disposal facility being designed be commensurate with the quantities of spent nuclear fuel being generated annually and also the need to reduce the back-log of spent fuel as expeditiously as possible. Consistent with Section 302(a)(5) of the Act, the contract should

> express the intent of DOE to take title to spent nuclear fuel as expeditiously as practicable upon the request of the generator or owner.

DX 5.081 at 8 (ARC0010680) (Georgia Power's comments) (emphasis added); DX 5.028 at 8 (ARC0010281) (Alabama Power's comments). The Edison Electric Institute ("EEI"), an association of the nuclear power industry to which both Alabama Power and Georgia Power belonged, requested as follows:

> The contract should include a recognition that DOE will design its facilities with the capacity to receive SNF/HLW at a rate commensurate with the amount of SNF/HLW then being generated together with the accumulated backlog of SNF/HLW. We believe that DOE should be able to take delivery of SNF/HLW equal to that year's generation plus a reasonable share of the backlog. While the contract may not be the appropriate place to commit DOE to a specific numerical receiving rate, DOE should recognize, at least qualitatively, the need to have adequate annual receiving capacity to handle industry needs.

DX 5.034, Attachment A at 2 (ARC0010334). Alabama Power and Georgia Power participated in the development of these comments. See DX 5.028 at 1 (ARC0010274); DX 5.081 at 1 (ARC0010673).

Other utilities submitted similar comments seeking firm commitments regarding the rate of DOE performance. For instance, Tennessee Valley Authority ("TVA") submitted a comment, stating that "a commitment to do no more than start accepting deliveries by 1998 is empty and meaningless without setting forth some reasonable minimum rate of acceptance which corresponds to the purposes of the Act." DX 5.063 at 5 (ARC0010537). TVA recognized that, "[o]f course, under the priority ranking system in the draft contract, it would be difficult at the time contracts are executed to give each Purchaser assurances of delivery acceptance at any specific rate," but suggested that "[t]his could, however, be done on an industry wide basis." Id.

TVA suggested that DOE add a contract provision to provide that "DOE shall start accepting delivery of SNF or HLW not later than January 31, 1998, at not less than the annual rate [at which] SNF and/or HLW is then being produced from civilian nuclear power plants covered by contracts . . . ." Id.

DOE also received comments seeking a commitment for DOE to accept SNF at the rates set forth in the Mission Plan. For instance, Florida Power & Light Company, expressly stated that DOE should create a mandatory obligation that would require DOE to accept SNF and HLW at the rates identified in the Mission Plan, once that plan was approved by Congress:

> The [NWPA] specifically requires the Department of Energy to prepare a Mission Plan detailing a schedule for the construction of repositories and their capacities (Section 301). It is proposed that once this Mission Plan has been approved by Congress (18 months after the enactment of the [NWPA]), it becomes the standard by which contract performance by the DOE is judged. It is suggested that Article V B (3) be modified to include the statement:
>
>> "Should the DOE fail to meet the schedule and capacities detailed in the approved 1984 DOE Mission Plan, because of Force Majeure or other causes, DOE shall, to the extent permitted by the [NWPA], as it may be amended from time to time, bear the reasonable and necessary incremental costs of storage or alternative disposal incurred by the Purchaser."

DX 5.043, attachment 1 at 1 (ARC0010439).

EEI also suggested that "[t]he definition of 'DOE Facility' (Article I.11) should be broadened to include destinations other than the repository." DX. 5.034, Attachment A at 4 (ARC0010336). EEI stated that "[t]he contract does not recognize the possibility that DOE might send SNF/HLW to an intermediate location (such as a monitored retrievable storage facility) before it goes to a repository" and that, "[t]o accommodate this, the definition of 'DOE

Facility' should be broadened." DX 5.034, Attachment A at 5 (ARC0010337). See also DX 5.014 (ARC0010180) (change to contract language "would implicitly recognize DOE's option to reprocess SNF or to utilize Monitored Retrievable Storage prior to permanent disposal"); DX 5.069 (ARC0010625) ("[t]his change would recognize the possibility of DOE shipping SNF/HLW to an intermediate storage facility such as a monitored retrievable storage facility").

C. The Final Rule

On April 18, 1983, DOE issued the Standard Contract as a final rule. The final rule, as promulgated, made certain modifications to the Standard Contract set forth in the proposed rule. Although the proposed rule provided that "services provided to the Purchaser by DOE under this contract are related to disposal of SNF," 48 Fed. Reg. at 5462, that "disposal" was defined as emplacement in a permanent repository, id., and that such "disposal" services would begin by January 31, 1998, id., the final Standard Contract eliminated any requirement for DOE to begin SNF "disposal" in a permanent repository by January 31, 1998. Instead, the final Standard Contract only required DOE to begin SNF acceptance by January 31, 1998, after the commencement of "facility" operations. 10 C.F.R. § 961.11, Art. II. The "facility" to which the final Standard Contract refers is either a permanent repository to be constructed pursuant to the NWPA or such other facility to which SNF might be shipped by DOE prior to its transportation to a permanent repository. Id. § 961.11, Art. I.10. As the preamble to the final rule expressly recognized, the final Standard Contract would not obligate DOE to have an operational permanent repository by January 31, 1998:

> The definition of "DOE facility" (Article I.10) was expanded to expressly state, in accordance with the Act, that there may be an interim storage facility (or facilities) which DOE may utilize prior to emplacement in a repository.

48 Fed. Reg. 16590, 16591 (Apr. 18, 1983).

DOE did not adopt the suggestion of EEI and many of the utilities to incorporate into the contract a requirement that DOE accept SNF at a rate equal to the annual generation rate plus some additional amount to reduce the accumulated backlog. DOE determined it could not include this requirement due to the number of uncertainties concerning the acceptance of SNF by DOE in 1998. Yankee Atomic Transcript, August 2, 2004, 3621:20-3622:4 (Mr. Robert Morgan, the first Director of the Office of Civilian Radioactive Waste Management testified: "I felt that the Nuclear Waste Policy Act requirements were extremely difficult because of the licensing, potential litigation, technical issues, stakeholder issues, that it was going to be difficult to meet the '98 date. And that I felt that it would be inappropriate and not required by the [A]ct to have a rate of acceptance in the contract."); 3626:9-3627:13 (rejection of request by utilities in comments during rulemaking); Tennessee Valley Authority Transcript, July 14, 2005, 2198:15-2199:3; 2209:14-20 (DOE's rejection of EEI's request for whereas clause). Instead, as Mr. Morgan testified, the contract provided that the acceptance rate would be developed later. Yankee Transcript, 3657:8-12 (Standard Contract provides that "there would be a process that would be an acceptance rate that would be negotiated with DOE at a later point in time."); Tennessee Valley Authority Transcript, 2221:18-2222:2 (acceptance rate to be determined at a later date).

The utilities acknowledged that DOE rejected their request regarding the inclusion of a qualitative description of the acceptance rate in both internal memoranda and correspondence with DOE. For example, TVA noted that its request regarding the acceptance rate term had been rejected:

> DOE did not accept TVA's suggestion that DOE should start accepting delivery of SNF and HLW in 1998 at a rate not less than that which they are being produced by the civilian nuclear power industry as a whole. The final contract does obligate DOE to issue, not later than July 1, 1987, an annual capacity report for planning purposes and, beginning April 1, 1991, annual capacity priority rankings (the oldest SNF and HLW having priority) for receipt by the DOE repository. DOE is also obligated to provide annual reports giving the waste disposal programs' plans and cost projections.

DX 32, Attachment 2 at 3 (TV1471) (TVA memorandum, dated May 24, 1983); see also DX 37 at 1 (Yankee Atomic memorandum, dated January 20, 1984). In a letter to Robert Morgan, EEI complained that the Standard Contract as promulgated lacked "standards or milestones for DOE's performance . . . ." DX 34, Attachment 1 at 1 (SN011049). Mr. Morgan, responding to this criticism, stated that the issue of the lack of standards for DOE's performance as well as other issues, "were addressed in the preamble to the April 18, 1983, final rule." Id., Attachment 3 at 1 (SN011057). However, Mr. Morgan also noted that "any issue can be readdressed by industry and, I would add, by the Government as well, after individual contracts are signed with utilities." Id.

DOE likewise did not adopt Florida Power & Light Company's request that DOE add a contract clause obligating DOE to accept SNF and/or HLW under "the schedule and capacities detailed in the approved 1984 DOE Mission Plan . . . ." DX 5.043, attachment 1 at 1 (ARC00010439). Apparently, the utilities contemplated renewing this request in a rulemaking

petition concerning the Standard Contract. DX 36 at 2 (YDK045589) (Yankee Atomic memorandum, dated October 19, 1983).

The final Standard Contract included a "Disputes" clause, the purpose of which was to provide a mandatory administrative mechanism for the resolution of contract disputes arising under the contract:

> Except as otherwise provided in this contract, any dispute concerning a question of fact arising under this contract which is not disposed of by agreement shall be decided by the Contracting Officer, who shall reduce his decision to writing and mail or otherwise furnish a copy thereof to the Purchaser. The decision of the Contracting Officer shall be final and conclusive unless within ninety (90) days from the date of receipt of such copy, the Purchaser mails or otherwise furnishes to the Contracting Officer a written appeal addressed to the DOE Board of Contract Appeals (Board). . . .

10 C.F.R. § 961.11, Art. XVI.A (emphasis added).

Finally, the final Standard Contract contained an integration clause, precluding reliance upon any representation, promise, or condition not expressly incorporated into the contract:

> This contract, which consists of Articles I through XXII and Appendices A through G, annexed hereto and made a part hereof, contains the entire agreement between the parties with respect to the subject matter hereof. Any representation, promise, or condition not incorporated in this contract shall not be binding on either party. No course of dealing or usage of trade or course of performance shall be relevant to explain or supplement any provision contained in this contract.

10 C.F.R. § 961.11, Art. XXII.

III. PLAINTIFFS' EXECUTION OF THEIR STANDARD CONTRACTS

On June 10, 1983, Georgia Power executed three Standard Contracts with DOE. One contract covered the SNF generated at the Alvin W. Vogtle Electric Generating Plant ("plant Vogtle") (DX 1), and two contracts covered the SNF generated at the Edwin I. Hatch Electric Generating Plant ("plant Hatch"). DX 2 and 3. On June 13, 1983, Alabama Power executed one Standard Contract with DOE, covering the SNF generated at the Joseph M. Farley Nuclear Plant ("plant Farley"). DX 4. All of these Standard Contracts contained the same terms and conditions as the final rule promulgated by DOE on April 14, 1983. See DX 1-4.

IV. ISSUANCE OF THE MISSION PLAN AND ITS AMENDMENT

In June 1985, DOE issued the Mission Plan, in accordance with the requirements of 42 U.S.C. § 10221 (1982), which was to "provide an informational basis sufficient to permit informed decisions to be made in carrying out the repository program and the research, development, and demonstration programs required under this chapter." 42 U.S.C. § 10221 (1982). In the 1985 Mission Plan, DOE projected for informational purposes that an initial permanent repository would begin operations in 1998 and that a second permanent repository would commence operations in 2006. DX 44 at 25 (HQR0031129) ("Assumptions About Geologic Repositories, A. Number of Repositories, Two"); id. at 26 ("Table 2-2 shows a schedule that is based on the current estimated emplacement capacities of the two planned geologic repositories, one of which is currently authorized"). Based upon these assumptions, the Mission Plan at pages 26-27 in Tables 2-2 and 2-3 uses a two repository assumption and the following waste acceptance rates (the improved system with an MRS):

| | Authorized System | | Improved System |
|---|---|---|---|
| Year | First Repository MTU | Second Repository | MTU |
| Pre-1998 | | | 2,200 |
| 1998 | 400 | | 3,000 |
| 1999 | 400 | | 3,000 |
| 2000 | 400 | | 3,000 |
| 2001 | 900 | | 3,000 |
| 2002 | 1,800 | | 3,000 |
| 2003 | 3,000 | 400 | 3,000 |
| 2004 | 3,000 | 400 | 3,000 |
| 2005 | 3,000 | 400 | 3,000 |
| 2006 | 3,900 | 400 | 3,900 |
| 2007 | 4,800 | 400 | 4,800 |
| Total | 21,600 | | 34,900 |

DX 44 at 26-27 (HQR0031130-HQR0031131). These same schedules projected annual generation rates of approximately 3,000 MTU in 1998 and increasing in future years. Id.

The Mission Plan noted that these schedules were "only an approximation of how the system may operate and is subject to considerable variation. The DOE will further define and specify the system acceptance parameters as the program progresses." DX 44 at 29 (HQR0031133). The Mission Plan further advised that,

> Under the terms of the contracts for disposal services that have been signed between the DOE and the utilities, an annual capacity report with projected annual receiving capacities and rankings will be issued by the DOE beginning in 1987. In 1991, the DOE will begin to publish firm waste-acceptance schedules for individual reactors, including shipment allocations.

DX 44 at 29 (HQR0031133).

In the 1987 Mission Plan Amendment, which DOE submitted to Congress in June 1987, DOE recommended deferral of the date contemplated for operation of the first repository from 1998 to 2003, with the second repository becoming operational by 2023. It explained that this recommendation was based upon experience gained in the program, a budget decrease for fiscal

year 1987, and budget uncertainty for fiscal year 1988. The Mission Plan also noted that DOE could nonetheless start accepting waste in 1998 at an MRS facility.[4] DX 63 at 6 (HQR0031634).

Further, in the 1987 Mission Plan Amendment, DOE stated that, "[l]ike the schedule in the 1985 Mission Plan, the schedule presented here is only an approximation of how the system may operate and is subject to considerable variation." DX 63 at 60 (HQR0031687). The 1987 Mission Plan Amendment also acknowledged the importance of the Annual Capacity Report that would be issued in 1991; namely, that it would be used in the DCS process. DX 63 at 60 (HQR0031687).

## V. THE 1987 AMENDMENTS TO THE NUCLEAR WASTE POLICY ACT

On December 22, 1987, after DOE submitted the 1987 Mission Plan Amendment, Congress amended the NWPA "to redirect the program for the management and disposal of spent nuclear fuel and high-level radioactive waste under the [NWPA]." S. Rep. No. 100-152, at 1 (Sept. 1, 1987). The Senate Committee on Energy and Natural Resources reported, in considering legislation to amend the NWPA, that "[t]he schedules included in the NWPA have proven to be overly ambitious," and that "[t]his has been largely due to the need to provide additional time for completion of necessary technical work and additional time for public participation." Id. at 5. The committee reported that, "[i]n the four and a half years since passage of the NWPA, it has become clear that the program laid out in the Act will take longer to complete than was anticipated and that completion will be at much greater cost." Id. It further reported that, "[i]n addition to cost and schedule considerations, a number of other circumstances

---

[4] The ability to start accepting waste in 1998 at an MRS facility was dependent upon congressional authorization. See 42 U.S.C. § 10161(b)-(c) (1982).

have changed since passage of the NWPA," including that, "as we approach major decision points in the nuclear waste program, there will be great potential for political opposition . . . ." Id.

The 1987 amendments to the NWPA directed DOE to characterize a single site, at Yucca Mountain in Nevada, for development of a single permanent repository and to terminate activities at all other sites. 42 U.S.C. § 10172(a). The 1987 amendments also authorized the Secretary to site, construct, and operate one, but only one, MRS facility. 42 U.S.C. § 10162(b). However, the 1987 amendments provided that "construction of [the MRS] facility may not begin until the Commission has issued a license for the construction of a repository under section 115(d)." 42 U.S.C. § 10168(d)(1). Finally, it also provided that "the quantity of [SNF] at the site of such facility at any one time may not exceed 10,000 metric tons of heavy metal until a repository under this Act first accepts [SNF]." Id. § 10168(d)(3).[5]

## VI. DOE'S ISSUANCE OF ANNUAL CAPACITY REPORTS

### A. The 1987 Through 1990 Annual Capacity Reports

Beginning in 1987, in compliance with the NWPA and the language of the Standard Contract, DOE issued an "Annual Capacity Report." As each of these ACRs expressly stated, "[a]s specified in the Contract, the ACR is for planning purposes only and thus is not contractually binding on either DOE or the Purchasers." DX 62 at 2 (HQR0012713), DX 71 at 1

[5] The 1987 amendments to the NWPA also established the Office of the Nuclear Waste Negotiator. 42 U.S.C. § 10242(a). That office was to seek to enter into negotiations with states and Indian tribes to "attempt to reach a proposed agreement" with them through which a state or Indian tribe "would agree to host a repository or [MRS] facility with such State or reservation." Id. § 10243(a). The authorization for that office expired in 1994, id. § 10250, without any agreements with any states or Indian tribes.

(HQR0012617), DX 87 at 2 (HQR0012494) ("projections in this initial report are based on current plans and best available information; they are not contractually binding"). Further, each of the ACRs from 1987 through 1990 contained the following, or substantially similar, language:

> Beginning in 1991, the ACR acceptance ranking will be converted into an Annual Priority Ranking for receipt of SNF/HLW. In 1992, based on this priority ranking, the Purchasers will submit to DOE for approval, Delivery Commitment Schedules identifying the SNF/HLW that Purchasers propose to deliver to the DOE waste management system (WMS). Once approved, these schedules will become the basis for Final Delivery Schedules to be submitted by the Purchasers not less than 12 months before the date of DOE's anticipated acceptance of title to the SNF/HLW and subsequent transport to a DOE facility.

DX 62 at 2 (HQR0012713), DX 71 at 2 (HQR0012618), DX 87 at 2 (HQR0012494).

B. The 1991 Annual Capacity Report

In December 1991, DOE issued its "Annual Capacity Report" for that year, DOE-RW-331P. DX 97 at 1-2 (HQR0012362-HQR0012363). The 1991 ACR was significant because it was the last ACR that would be issued prior to the contract holders' submission of DCSs beginning January 1, 1992. See 10 C.F.R. § 961.11, Art. V.B.1. In that regard, the 1991 ACR provided that, "[b]eginning in January 1992, the Purchasers may submit Delivery Commitment Schedules (DCS) to DOE identifying the range of SNF that the Purchasers propose to deliver to the Federal Waste Management System (FWMS) beginning sixty-three months thereafter." DX 97 at 2 (HQR0012363). It also stated that "[t]he Purchasers' allocations for each delivery year are presented in Tables A.1 through A.10 in Appendix A, and should be used as the basis for submitting DCSs." DX 97 at 2 (HQR0012363). See DX 97 at 7 (HQR0012368) ("[t]hese allocations are the basis for DCS submittals").

The 1991 ACR specified the following acceptance allocations:

TABLE 2.1

Projected Waste Acceptance Rates for Spent Nuclear Fuel

| Year | | SNF (MTU) |
|---|---|---|
| 1998 | | 400 |
| 1999 | | 600 |
| 2000 | | 900 |
| 2001 | | 900 |
| 2002 | | 900 |
| 2003 | | 900 |
| 2004 | | 900 |
| 2005 | | 900 |
| 2006 | | 900 |
| 2007 | | 900 |
| 2008 | | 900 |
| | TOTAL | 8,200 |

DX 97 at 5 (HQR0012366). These allocations were created with the knowledge that no permanent repository would be available by January 31, 1998. Id. at 4 (HQR0012365). Thus, as DOE explained, "the waste acceptance projections used in this ACR are representative of a FWMS [Federal Waste Management System] configuration authorized by the NWPA, which includes a Monitored Retrievable Storage (MRS) facility." Id. In particular, they "are consistent with the 10,000 MTU storage capacity limit contained in the NWPA for an MRS facility before a repository starts operation." Id. DOE noted, however, that the schedule assumed that the schedule linkages between the MRS construction and repository construction authorization would be broken. Id.

In a memorandum dated December 20, 1991, Ronald A. Milner, Associate Director for Storage and Transportation, stated in a memorandum to John Bartlett, Director, Office of Civilian Radioactive Waste Management, as follows:

> The 1991 ACR assumes that FWMS [Federal Waste Management System] operations commence in 1998 and the system configuration is that authorized by the Nuclear Waste Policy Amendments Act of 1987, specifically a Monitored Retrievable Storage facility with a 10,000 MTU storage limit prior to repository operations.
>
> The 1991 ACR differs from previously published ACRs for two reasons. First, while the information in the ACR has traditionally been used for planning purposes only, the allocations in the 1991 ACR will also serve as the basis for submission of Delivery Commitment Schedules (DCS) by the Contract holders. These DCSs, which will provide planning information for waste acceptance activities, may be submitted to the Department as early as January 1, 1992.

DX 98.

The utility industry recognized the importance of the 1991 ACR in the determination of delivery commitments for performance beginning in 1998. See, e.g., DX 99 at 2 and 3 (SN169910) (UWASTE memorandum explaining that the ACR and APR "are necessary to properly complete the DCS forms."); DX 100 at 2 (SN170373) (same); DX 66 at 8 (YDK038298) (UNWMG memorandum describing the 1991 ACR as "contractually binding.")

C. The 1992 Through 1995 Annual Capacity Reports

The 1992 ACR, which was issued in May 1993, contained the same acceptance rates as the 1991 ACR. DX 121 at 4 (HQR 0012324). The 1992 ACR also provided that, "[d]uring the first ten years following projected commencement of the Civilian Radioactive Waste Management System (CRWMS) operation, the total quantity of SNF that could be accepted is projected to be 8,200 MTU." DX 121 at v (HQR 0012319). It stated that "[t]his is consistent with the storage capacity licensing conditions imposed on an MRS facility by the NWPA." Id. The ACR also stated that, "[a]s specified in the Standard Contract, the ACR is for planning

purposes only and, thus, is not contractually binding on DOE or the Purchasers." DX 121 at 1-2 (HQR0012321-22).

In 1995, DOE issued a combined APR and ACR, to "establish[] the order in which the Department allocates the projected acceptance capacity for commercial [SNF]" and to appl[y] projected nominal acceptance rates for the system to the priority ranking in the APR, resulting in individual allocations for the owners and generators expressed in metric tons per uranium (MTU)." PX 13 at 1 (HQR-001-2246). The 1995 ACR contained substantially similar SNF acceptance rates as the 1991 and 1992 ACRs, identifying a projected nominal waste acceptance rate of 8,200 for the first 10 years of SNF acceptance:

> Table 1. Projected Nominal Waste Acceptance Rates for Spent Nuclear Fuel

| Year | SNF (MTU) |
|---|---|
| Year 1 | 400 |
| Year 2 | 600 |
| Year 3 | 900 |
| Year 4 | 900 |
| Year 5 | 900 |
| Year 6 | 900 |
| Year 7 | 900 |
| Year 8 | 900 |
| Year 9 | 900 |
| Year 10 | 900 |
| TOTAL | 8,200 |

PX 13 at 4. See DX 97 at 5 (HQR0012366), DX 121 at 4 (HQR0012324). The 1995 ACR also contained the following statement:

> The ACR (see Appendix B) applies a 10-year projected nominal waste acceptance rate to the APR, resulting in individual capacity allocations. In the previous ACR, the projected nominal acceptance rate was based on the assumption of SNF acceptance beginning in 1998 at a Monitored Retrievable Storage facility prior

> to repository operations. Due to the uncertainty associated with the date of commencement of operation of the waste management system, the annual nominal waste acceptance rates are presented by year(s) of operation of the system rather than by specific calendar year(s). The projected nominal acceptance rates also reflect the capacity limit imposed by the Act on such a storage facility prior to repository operations. These projected nominal waste acceptance rates are presented in Table 1. The Department will continue to process DCS submittals on an annual basis.

PX 13 at 3-4 (emphasis added). The 1995 ACR also provided that, "[a]s specified in the Standard Contract, the ACR is for planning purposes only and, thus, is not contractually binding on either DOE or the Purchasers." PX 13 at 1. However, it also provided that "[t]hese capacity allocations, as listed in the ACR, form the basis for the Purchasers' submittal of Delivery Commitment Schedules (DCS)." Id.

## VII. PROGRAM DOCUMENTS REFLECT PLANNED ACCEPTANCE AT AN MRS FACILITY

### A. Program Reassessment And 1991 Draft Mission Plan Amendment

In November 1989, the Secretary of Energy submitted a report to Congress regarding DOE's reassessment of the program. In this report, DOE stated that it would be unable to begin operations at a repository until 2010, because there was insufficient time to perform the scientific investigation necessary. PX 67 at ix-x (YMP0020191). However, DOE also stated that it planned "to work with Congress to modify the current linkages between the repository and the MRS facility and to embark on an aggressive program to develop an integrated MRS facility for spent fuel." Id. DOE further advised that "if the linkages [were] modified, it [was] likely that waste acceptance at an MRS facility could begin by 1998 or soon thereafter." Id.

In September 1991, DOE issued another Draft Mission Plan amendment, which provided further details upon the "action plan" set forth in the Secretary's 1989 Reassessment. DX 94 at

HQR0030799 ("[1989 Reassessment] stated that further details on the Secretary's action plan would be provided in a revised Mission Plan."). In accordance with the 1989 Reassessment, the 1991 Draft Mission Plan Amendment reaffirmed DOE's plans to begin performance in 1998 at an MRS.

> To achieve the objective of timely and adequate waste acceptance, we plan to develop an MRS facility that is to start waste acceptance in 1998. To make this possible, the President's legislative package for the National Energy Strategy includes a provision to repeal the schedule linkages established in the Nuclear Waste Policy Amendments of 1987 (Amendments Act). This could also be achieved by congressional enactment of a negotiated siting agreement reached through the efforts of the Nuclear Waste Negotiator.

DX 94 at 18 (HQR0030825). The schedule set forth in the 1991 Mission Plan Amendment showed acceptance by DOE up to the 10,000 MTU limit on the MRS until the repository began operations in 2010. DX 94 at 205-206.

### B. Preliminary Estimates Of The Total-System Life Cycle Cost For The Restructured Program

DOE's anticipation of performance at an MRS was also reflected in the cost analyses it performed around the time of the 1991 ACR to support the adequacy of fees collected for the Nuclear Waste Fund. The fee paid by utilities, 1 mil per kilowatt hour, was determined by Congress in enacting the NWPA. 42 U.S.C. § 10222(a)(2). Pursuant to the NWPA, DOE is required to annually assess whether the fees collected pursuant to statute are adequate to fund all of the efforts necessary to implement the NWPA. 42 U.S.C. § 10222(a)(4). The Secretary is to advise Congress if the fee is found to be inadequate. Id. To determine whether the fee is adequate, DOE first prepares a Total System Life Cycle Cost report, in which it projects the total cost of the program. Yankee Atomic Transcript, 4727:8-12 (Testimony of Ronald Milner). This

total system cost projection is based upon the projected number of years that the program is estimated to operate, projected transportation requirements, projected interest rates and other factors. See, e.g., PX 16 and 27. The current program plans, including acceptance rate projections, type and location of receiving facilities, scope of the transportation program, are the basis for the total cost estimate. Yankee Atomic Transcript, 4727:20-22 (Mr. Milner: the basis for the assumptions are the current program planning bases.); DX 330 at 2 ("It must be recognized that the waste management system is continually evolving. The TSLCC estimates represent snapshots in time which incorporated all available and appropriate information on program activities up to a specific point in time in order to develop a comprehensive set of estimates for the system.").

In its Preliminary Estimates of the Total-System Life Cycle Cost For The Restructured Program: An Addendum to the May 1989 Analysis of the Total Life Cycle Cost for the Civilian Radioactive Waste Management Program, December 1990, ("1990 PETSLCC") DOE utilized a schedule that was explicitly based upon acceptance starting at an MRS. DX 330. The first ten years are identical to the ACR schedule, with the exception of the second year of acceptance, where the 1990 PETSLCC contemplates that 400 MTU rather than 600 MTU would be accepted. Id. This schedule goes on to show what DOE anticipated the transition from a repository to an MRS would look like. Id. In year eleven and year twelve of acceptance, 900 MTU would be accepted. In years thirteen through seventeen 1800 MTU would be accepted. And only in year eighteen would the system accept 3000 MTU. Id.

## VIII. INDUSTRY SUBMISSION OF DELIVERY COMMITMENT SCHEDULES

By letter dated March 4, 1992, the DOE contracting officer issued a letter to plaintiffs and other utilities, along with the instructions for the submission of delivery commitment schedules. DX 102. The contracting officer stated that "[t]he allocations in the 1991 Annual Capacity Report (ACR) should be the basis for the DCS submittals." Id. The accompanying instructions provided that purchasers could "begin submitting to the Department of Energy (DOE) Delivery Commitment Schedules (DCS) that identify all spent nuclear fuel (SNF) the Purchasers plan to deliver to DOE beginning 63 months thereafter." Id. The instructions stated that "[t]he DCS provides the Purchasers with the opportunity to inform DOE of their plans for utilizing their allocations of projected Federal waste management system (FWMS) acceptance capacity." Id. They further provided that, "[f]or each allocation listed in the 1991 ACR (or subsequent ACRs, as appropriate), a Purchaser must submit at least one DCS for that allocation at least 63 months prior to the date that the allocation occurs (e.g., if a Purchaser has an allocation in 1998, a DCS must be submitted for that allocation by September 30, 1992)." Id.

The DCS instructions were developed with the full participation of the nuclear industry. See, e.g., DX 91 at 3 (SN169940) (UWASTE memorandum advising members that DOE had issued the draft DCS instructions and that the Standard Contract Task Force would meet to develop comments); DX 92 (Minutes of Standard Contract Task Force meeting, during which members met with DOE to discuss and provide comments upon the draft DCS instructions); DX 96 at 3 (SN169920) (UWASTE memorandum advising members that Standard Contract Task Force had provided comments to DOE upon another draft of the DCS instructions); see DX 80 (Minutes of High-Level Waste/Spent Fuel Storage Working Group Meeting stating that “[b]y

1/1/92, each utility is required to submit a DCS to DOE" and that the task force would be "following this closely."). After the instructions were issued, utilities met with DOE again to discuss the instructions. DX 103.

Recognizing the need to submit DCSs to claim allocations, many utilities submitted timely DCSs that were approved by DOE. For example, Wisconsin Electric Power Company ("WEPCO") submitted DCSs for all of its allocations in the first ten years of acceptance in 1992. Yankee Atomic Transcript 4115:20-4117:2 (Testimony of David Zabransky). WEPCO submitted these DCSs for approval, believing that they "represented a commitment." Yankee Atomic Transcript 4116:6. Eight other utilities also submitted DCSs for all of their allocations in the first ten years of contract performance after 1998. Appendix to Defendant's Reply to Plaintiffs' Opposition to Defendant's Motion for Partial Summary Judgment and Response to Plaintiffs' Cross-Motion for Summary Judgment Regarding the Rate of Spent Nuclear Fuel Acceptance at 1. Moreover, every utility with an allocation in 1998 and 1999, with the exception of one utility, submitted a DCS for that allocation. Id. All of those DCSs were approved by DOE. Every utility with an allocation in 2000, with the exception of two utilities, submitted a DCS that was approved by DOE. Id.

In a memorandum dated August 26, 1992 from Mr. Fennell to Mr. Cocherell, the two individuals responsible for administering the Standard Contracts for Alabama Power and Georgia Power, plaintiffs accurately described the mechanism for defining DOE's delivery obligations in accordance with the DCS process. Specifically, Mr. Fennell explained:

> Under the spent fuel disposal contracts, submittal of a Delivery Commitment Schedule (DCS) form to DOE for pickup of spent fuel is required 63 months prior to the year of the fuel pickup. The Annual Capacity Report, last issued in December 1991, provides

> the basis for determining the expected delivery schedule which in turn provides the timing of the DCS form submittal. The first DCS forms submittal due date is September 30, 1992, for the 1998 initial year of spent fuel pickup specified under the spent fuel contracts. The first Southern Electric System submittal would be required by September, 1995 for a 2001 projected DOE pickup from Plant Hatch.

DX 110; DX 99 at 2 (SN169910) (UWASTE memorandum stating the same understanding); see also DX 105 at 3 (SN172054) (Mr. Fennell's report upon DCS process and recommendation to submit plaintiffs' DCS forms by September 30, 1992). In a memorandum dated November 12, 1991, Mr. Fennell explained that none of plaintiffs' fuel was scheduled for pickup in 1998. DX 95 at 2 (SN172239).

By letter dated October 21, 1996, Mr. Cocherell submitted two DCSs for delivery of 0.8 and 4.5 MTU of SNF in years 2001 and 2002, respectively, from plant Hatch. DX 198. In his letter, Mr. Cocherell acknowledged that the DCS for 2001 did not comport with the contract requirement to submit the DCS 63 months in advance of the requested acceptance. Id. Mr. Cocherell also noted that, "[t]he attached [DCS] meets the notice obligations under the spent fuel disposal services Contracts but does not indicate Southern Nuclear's acceptance of the removal rates contained in the current ACR. Southern Nuclear believes the ACR rates are too low." Id. This statement is the only evidence in the record that plaintiffs disputed their allocations in the ACR. In response to the submissions for plant Hatch, DOE, by letter dated March 13, 1997, stated that it was "not able at this time to approve your DCS submittal" and "[c]onsequently, the Department hereby waives until further notice the contract requirement that you provide a revised schedule within 30 days." DX 203.

## IX. THE APPLICATION OF THE TERMS OF THE STANDARD CONTRACT TO PLAINTIFFS' DAMAGES CLAIMS

### A. In The "But For" World, Plants Hatch And Vogtle Both Required Additional On-Site SNF Storage After January 31, 1998

At trial, the Government will establish that, based upon the application of the 900 MTU acceptance rate set forth in the 1991 ACR and the maintenance of a single full core reserve, Georgia Power would have been required to construct a dry storage facility at plant Hatch for the storage of 14 dry storage casks. Expert Witness Report of Jonathan A. Neuberger, Ph.D., dated June 10, 2005 ("Neuberger Rep."), Exh. 4. Indeed, the need for additional dry storage capacity at plant Hatch, assuming timely DOE performance, was expressly recognized by plaintiffs during early planning stages for alternative storage facilities. See, e.g., DX 158 at 2, 9; DX 154 at 2. Likewise, at plant Vogtle, based upon the acceptance rate of 900 MTUs and a single full core reserve, Georgia Power would have been required to rack the Unit 1 wet pool in the "but for" world. Neuberger Rep., 12.

### B. The Evidence Demonstrates Georgia Power Seeks To Maintain A Single Full Core Reserve At Plants Hatch And Vogtle

The evidence will demonstrate that the operating reserves at plants Hatch and Vogtle have historically been a single full core reserve per pool, in contrast to the two full core reserve per pool advocated in plaintiffs' brief. Plants Hatch and Vogtle each have two operating reactors that share either a single wet pool (plant Hatch) or that have two connected wet pools that are used interchangeably to store SNF discharged from both reactors (plant Vogtle). Pl. Br. at 16-17. There is no regulatory requirement that a nuclear facility maintain full core reserve in its wet pools. Deposition of Eileen Supko (“Supko Dep.) 66:11-67:2; Deposition of Louis Long (“Long Dep.”) 85:13-86:3. In the industry, it is an accepted practice to maintain a full core reserve in

each spent fuel pool. DX 101. As a result, multiple reactors that share a single spent fuel pool typically will maintain a single full core reserve in that pool. Similarly, reactors that have their own, independent spent fuel pools will maintain a single reserve per pool. The purpose of the full core reserve is to allow the core of a reactor to be offloaded during any outage for reloading or repairs and for any unanticipated technical issues that may arise. "Assessment of Damages Resulting From The Department Of Energy's Failure To Perform Its Contractual Obligation Regarding Southern Nuclear Operating Company's, Alabama Power Company's And Georgia Power Company's Spent Nuclear Fuel," dated January 31, 2005 ("Kenrich Rep."), at 9-10.

Plaintiffs' full core reserve policies at plants Hatch and Vogtle historically have been consistent with the standard industry practice of one full core reserve per pool. See, e.g., DX 101 ("The one full core reserve has been established at Hatch since the late 1970's."); DX 106 ("It is noted that maintenance of the single full core capability is still the official planning basis for Hatch . . ."). There is no probative evidence that plaintiffs have a two full core reserve policy at those facilities. In contrast, there are numerous exhibits either that articulate a single full core reserve policy or that track the loss of single full core reserve in the Hatch and Vogtle wet pools. See, e.g., DX 38, DX 101, DX 104, DX 312, DX 313, DX 324.

### C. Implementing A Two Full Core Reserve Policy Requires Additional Storage At Plants Hatch And Vogtle In The "But For" World

To the extent that this Court finds a two full core reserve policy at plants Hatch and Vogtle, the evidence will demonstrate that each of these plants would have been required to add storage in the "but for" world in the form of dry storage at plant Hatch and reracking at plant Vogtle, regardless of the rate applied to plaintiffs' claims. See Neuberger Rep., 17. Specifically, pursuant to the Government’s contractual obligation, as set forth in the 1991 ACR, and assuming

a two full core reserve, Georgia Power would need to load additional casks to the ISFSI at plant Hatch over-and-above the 14 needed in the single reserve scenario and would need space in the wet pool at plant Vogtle for an additional 297 assemblies. Neuberger Rep., Exh. 4. Assuming the acceptance rate advocated by plaintiffs and a two full core reserve, Georgia Power would have needed to load eight casks at plant Hatch from 2000-2001. Neuberger Rep., Exh. 6. Likewise, Georgia Power would have needed capacity for an additional 87 assemblies at plant Vogtle. Id. In either scenario, damages would require adjustment to reflect the cask loading at plant Hatch and reracking at plant Vogtle that would have been required based upon that full core reserve.[6] With respect to plant Farley, if the Court finds that Alabama Power was somehow required to maintain a single full core reserve plus a reload of fresh fuel for each wet pool as set forth in plaintiffs' brief, Alabama Power would require dry storage of three casks at plant Farley if DOE had begun performance in 1998 at the 1991 ACR rate. See Neuberger Rep., Exh. 4.

---

[6] The Government will present evidence that demonstrates that the rack addition at plant Vogtle should not be recoverable here. The connected wet pools at plant Vogtle were designed to identical specifications and were originally intended both to be fully racked with high density racks in the late 1980s, prior to the commencement of operations. Deposition of Ronald Cocherell ("Cocherell Dep."), 83:20-86:14, 308:20-309:14; Deposition of Kenneth Metcalfe ("Metcalfe Dep."), 407:8-408:1. However, due to the excessive cost of the Vogtle facility ($8.9 billion), Georgia Power decided not to proceed with the racking of the Unit 1 wet pool in an effort to reduce the cost overruns at that time by delaying the cost associated with utilizing plant Vogtle's full capacity. Cocherell Dep., 83:20-86:14, 308:20-309:14; Metcalfe Dep., 407:8-408:1. The Government contends that plaintiffs cannot recover the costs associated with racking the Vogtle Unit 1 wet pool because that pool would have been fully racked but for the construction cost overruns. Plaintiffs made a business decision in the late 1980s not to fully rack the pools and should not be able to use that business decision to transform otherwise non-incremental costs into recoverable damages.

## X. THE EVIDENCE WILL ESTABLISH THAT PLAINTIFFS' INVESTMENT IN PRIVATE FUEL STORAGE DID NOT CONSTITUTE REASONABLE MITIGATION

Plaintiffs' damages claim includes approximately $8.5 million in costs associated with their pursuit of an off-site SNF storage alternative known as Private Fuel Storage ("PFS"). PFS involves a consortium of utilities that seek to license and, allegedly, construct a private off-site ISFSI in Utah for the storage of commercial SNF. See, e.g., DX 222. Plaintiffs' investment in PFS began in 1995 and, according to their damages claim, plaintiffs' last investment in PFS was made in 2004. Long Dep., 188:6-189:7. Plaintiffs did not have any contractual obligation to make that 2004 payment to PFS. Cocherell Dep., 388:7-389:12. To date, plaintiffs have invested approximately $8.5 million in the PFS effort, approximately $1.86 million of which was spent after the plant Hatch ISFSI was first loaded in 2000. Kenrich Damages Model, A52-A54.

At the time plaintiffs elected to invest in the PFS effort, PFS was a highly speculative solution to the alleged space constraints in their three facilities' wet pools. In order to operate and accept commercial SNF, PFS needed to be licensed by the NRC and constructed by PFS members. Long Dep., 184:23-185:16; Cocherell Dep., 420:4-421:4. Additionally, PFS would have required the ability to ship large quantities of SNF across the country to the PFS facility. PFS applied for a license from the NRC in 1997. Cocherell Dep., 398:21-399:6. That license was granted eight years later in September 2005. PFS still faces issues related to the construction of the facility, estimated in 1995 to cost approximately $100 million. Cocherell Dep., 406:22-407:1; DX 161, 162. Transportation issues also abound including expected opposition from the State of Utah and potential opposition from cities and states across the United States that would be in the transportation path to any PFS facility. Cocherell Dep.,

399:15-400:20. Each of these concerns was well known to plaintiffs at the time they decided to begin investing in that project. Cocherell Dep., 399:15- 400:20.

Plaintiffs would never have been able to use PFS as mitigation. First, plaintiffs allegedly required additional storage as early as 2000 at plant Hatch, by 2005 at plant Farley and by 2006 at plant Vogtle. However, as early as 1998, plaintiffs recognized that, "Southern Nuclear is also part of a joint utility effort to develop a private fuel storage facility for operation as early as the year 2002, not in time to address Hatch storage requirements by the year 2000." DX 223. PFS also was a more costly storage alternative than on-site storage – a fact of which plaintiffs were aware at the beginning of their involvement. Cocherell Dep., 416:18-417:2; Long Dep., 190:11-191:4; DX 143.

Finally, we will show that plaintiffs did not pursue PFS as their first choice alternative. From the beginning, plaintiffs intended PFS to serve merely as an insurance policy in the unlikely event that the state governments in Alabama and Georgia implemented dry storage restrictions similar to those implemented in Minnesota in the mid-1990s. Long Dep., 180:3-181:12. Of course, unlike Minnesota, no such actions were expected (Deposition of Richard Fennell ("Fennel Dep."), 234:17-235:9) and, ultimately, none were taken by either state to limit plaintiffs ability to construct dry storage facilities. Cocherell Dep., 405:18-406:4. Although a formal decision has not been made, plaintiffs do not anticipate using any PFS facility if ultimately constructed. Long Dep., 193:16-193:23. Moreover, as a founding member of the PFS consortium, plaintiffs may profit from PFS if it is developed. Cocherell Dep.,

409:2-409:21; Long Dep., 182:13-183:13; DX 143, DX 145, DX 162. Plaintiffs' claim does not include any offset for these potential profits.[7]

## ARGUMENT

### I. PLAINTIFFS BEAR THE BURDEN AT TRIAL OF ESTABLISHING THAT THEIR CLAIMED COSTS WERE CAUSED BY THE GOVERNMENT'S DELAY

As the United States Court of Appeals for the Federal Circuit recently recognized, the mere fact of DOE's breach of the Standard Contract does not "perforce" make all of a utility's costs "to store its SNF recompensable: [a plaintiff] must prove foreseeability, causation, and reasonableness," Indiana Michigan Power Co. v. United States, No. 04-5122, 2005 WL 2173563, at *5 (Fed. Cir. Sept. 9, 2005), and it must prove these elements "by a preponderance of the evidence." Alaska Pulp Corp. v. United States, 59 Fed. Cl. 400, 413-14 (2004). According to the precedent of this circuit, TVA bears the burden of introducing clear proof that it was injured as a direct result of DOE's delay in accepting its SNF. Myerle v. United States, 33 Ct. Cl. 1, 27 (1897). Further, the "measure of damages to be applied in the particular case is irrelevant until the claimant has established the fact of losses that were the natural and proximate result of the

[7] In addition to these damages theories, as part of the Government's evidence at trial, we anticipate that Mr. Kouts and perhaps other witnesses will testify regarding the reasons for DOE's delay in beginning SNF acceptance and its excusability. The Court may find it necessary to resolve these issues at trial.

breach of contract." Willems Indus., Inc. v. United States, 155 Ct. Cl. 360, 376, 295 F.2d 822, 831 (1961). "Absent tangible proof of damages, [a party] may not recover for an alleged injury." Roseburg Lumber Co. v. Madigan, 978 F.2d 660, 667 (Fed. Cir. 1992).[8]

## II. PLAINTIFFS CANNOT PROVE THEIR BASIC ASSUMPTION THAT DOE WAS OBLIGATED TO ACCEPT SNF AT AN ANNUAL RATE OF 3,000 MTU

### A. Plaintiffs Cannot Establish That DOE Was Obligated To Accept SNF At A Rate Sufficient To Preclude The Need For Additional At-Reactor Storage And To Accept Some "Backlog" Of Utility-Stored SNF

In their brief, plaintiffs have identified the base assumption upon which their damages claim depends. Specifically, plaintiffs tie their damages to the assertion that DOE contractually obligated itself to accept SNF and/or HLW at a rate that (1) would eliminate the need for utilities to provide additional on-site storage after January 31, 1998, and (2) would reduce the backlog of SNF and/or HLW already stored by utilities up until that deadline. Pl. Br. at 22. Based upon the application of this alleged contractual term, plaintiffs conclude that DOE was obligated to accept SNF beginning in 1998 at an annual rate of 3,000 Metric Tons Uranium ("MTU"), after a short five-year "ramp-up" period. Id. Plaintiffs fail, however, to establish that this two-part test and resultant rate of acceptance were incorporated into the Standard Contract as obligations or that the test and rate even are supported by the alleged “intent” of the NWPA.

The evidence that will be presented at trial contradicts plaintiffs’ assertions that the parties intended that DOE would create an acceptance rate that satisfied plaintiffs' "two-part

[8] Plaintiffs assert that the Federal Circuit has found that this Court has jurisdiction over plaintiffs' partial breach claim. Pl. Br. at 3. While the Government does not dispute this contention, we note that issues relating to the basis and scope of this Circuit's jurisdiction in the SNF cases is currently upon appeal before the Federal Circuit. PSEG Nuclear, L.L.C. v. United States, Misc. Docket No. 786 (Fed. Cir. Aug. 4, 2005).

test." As the Court is aware, DOE published the Standard Contract at issue here as a "proposed rule" in the Federal Register. 48 Fed. Reg. 5458 (Feb. 4, 1983). In response to that proposed rule, several nuclear utilities and industry groups, including plaintiffs, submitted comments requesting, among other things, that DOE place into the Standard Contract an obligation requiring DOE to accept SNF at a pre-determined minimum rate, to adopt as contractual obligations the acceptance rates that would be identified in the statutorily-required Mission Plan, or to accept SNF "at a rate commensurate with the amount of [SNF] then being generated together with the accumulated backlog of [SNF]." See DX 5.063 at 5 (ARC0010537), DX 5.013 (ARC0010169), DX 5.017 at 5 (ARC0010216), DX 5.0028 at 8 (ARC0010281), DX 5.033 at 1 (ARC0010316), DX 5.066 (ARC0010568), DX 5.081 at 8 (ARC0010680). Although "[a]ll comments received by DOE in response to its proposed rule of February 4, 1983, both at the public hearing and the written comments received thereafter, were carefully reviewed and fully considered in the formulation of this final rule," 48 Fed. Reg. 16,590, 16,590 (Apr. 18, 1983), DOE declined to agree to these requests. In the final Standard Contract that it promulgated in the Federal Register, DOE specifically and intentionally excluded the creation of any contractual obligations to meet any pre-determined acceptance rate because it could not know, in 1983, the scope and extent of the technical and other obstacles that it would face in attempting to develop an operational repository. TVA Transcript, July 14, 2005, 2198:11-2199:3; 2209:14-20 (Testimony of Robert Morgan, then-Director of the Office of Civilian Radioactive Waste Management); Yankee Atomic Transcript, August 2, 2004, 3621:20-3622:4; 3626:9-3627:13 (same).

The only contract language to which plaintiffs refer in support of their contentions regarding the intent of the parties is the second recital of the Standard Contract which provides:

> Whereas, the DOE has the responsibility, following commencement of operation of a repository, to take title to the spent nuclear fuel or high-level radioactive waste involved as expeditiously as practicable upon the request of the generator or owner of such waste or spent nuclear fuel.

DX 1, 2, 3 and 4; Pl. Br. at 24-25. Plaintiffs assert that, because they requested that this language be included in conjunction with a request that DOE accept sufficient amounts of waste to preclude the need to add additional storage capacity after 1998, the inclusion of "as expeditiously as possible" language evidences a meeting of the minds regarding this obligation. Pl. Br. at 24-25 (referring to DX 5.028 and 5.081 (comments of Alabama and Georgia Power upon the proposed Standard Contract)). However, as a matter of fact and law, this recital does not support the two-part test advocated by plaintiffs here and cannot be read to impose a requirement upon DOE to perform at an acceptance rate that would meet the two-part test.

As a matter of fact, the language "as expeditiously as practicable" in plain English does not rise to the level of the objective, measurable two-part test plaintiffs seek to impose upon DOE in this litigation. Instead, the language "as expeditiously as practicable" is not amenable to any objective measure of performance. Moreover, the language "as expeditiously as practicable" is conditioned upon the commencement of operation of a repository, although the D.C. Circuit has held that acceptance at a repository was not a required element of performance by 1998. Indiana Michigan Power Co. v. Department of Energy, 88 F.3d 1272, 1276 (D.C. Cir. 1996). As a matter of law, while "recitals may be read in conjunction with the operative portions of a contract in order to ascertain the intention of the parties . . . they cannot create any right beyond

those arising from the operative terms of the document." Blackstone Consulting Inc. v. United States, 65 Fed. Cl. 463, 470 (2005) (quoting KMS Fusion, Inc. v. United States, 36 Fed. Cl. 68, 77 (1996), aff'd 108 F.3d 1393 (Fed. Cir. 1997), and Grynberg v. Federal Energy Regulatory Comm'n, 71 F.3d 413, 416 (D.C. Cir. 1995)). This recital, without more, simply does not evidence a meeting of the minds regarding the requirement to accept at an objective rate that would preclude the need to add additional storage capacity or supporting the conclusion that DOE was obligated to perform at annual acceptance rate of 3,000 MTU.

Further, it is clear that, even if the Court were to accept parol evidence to determine whether the contract contains any such obligation, the nuclear utilities consistently understood that it did not. In interpreting the requirements of a contract, the behavior of parties before the "advent of controversy" is often more revealing than the contract language alone. Omni Corp. v. United States, 41 Fed. Cl. 585, 591 (1998). "A principle of contract interpretation is that the contract must be interpreted in accordance with the parties' understanding as shown by their conduct before the controversy." Julius Goldman's Egg City v. United States, 697 F.2d 1051, 1058 (Fed. Cir. 1983), cert. denied, 464 U.S. 814 (1983). Here, the history of the notice-and-comment rulemaking itself is extremely clear in evidencing that DOE did not obligate itself to satisfy plaintiffs' two-part test and that the nuclear utilities were well aware of that fact. In other utilities' internal documents from 1983 and 1984, soon after the Standard Contract was executed, those utilities indicated that DOE had not obligated itself in the contract to satisfy a minimum performance rate, and witnesses from other utilities have previously testified at trial that they understood that DOE had never agreed to satisfy any specific rate of acceptance. See, e.g, DX

32, attachment 2 at 3 (TV1471); DX 37 at 1.[9] Moreover, in correspondence with DOE soon after the publication of the final rule, but prior to the execution of the Standard Contract by individual utilities, the utilities complained about the fact that DOE had not included any additional performance obligations in the contract. DX 31 at 1-2. Clearly, the industry's "understanding" that DOE had some minimum acceptance rate obligation was created after disputes about timely SNF acceptance began. The contemporaneous evidence should preclude any reading of plaintiffs' two-part test into the Standard Contract.

Moreover, plaintiffs' damages claim is inconsistent with their contention that DOE was obligated to perform at a rate that would preclude the need for utilities to add any additional storage capacity beginning in 1998. According to plaintiffs' damages claim, plaintiffs would have added two additional storage racks after 1998 to the plant Hatch pool to provide sufficient storage until plant Hatch could deliver SNF to DOE in 2002. Kenrich Rep. 23. In fact, plaintiffs installed one of these two racks in the plant Hatch pool after 1998 and prior to completing the construction of its ISFSI at a cost in excess of $3.1 million. Kenrich Damages Model, 23 and A3 (KRG00722). However, in contravention of their "no additional at-reactor storage" theory, plaintiffs do not seek to recover the costs of installing these additional racks after 1998 from the Government. Instead, the $3.1 million incurred cost has not been passed along as a damage and

---

[9] Although resort to parol evidence is neither necessary nor appropriate in interpreting an unambiguous contract, to the extent that parol evidence is deemed relevant or admissible in interpreting the terms of the Standard Contract, the standardized nature of the contract at issue here requires interpretation of its terms in a uniform manner as applied to all contract holders, not simply plaintiffs, "without regard to [a particular contract holder's individual] knowledge or understanding of the standard terms of the writing." Restatement (Second) of Contracts § 211 (1981). Accordingly, to the extent that parol evidence is admissible here, review of other contract holders' understandings of the contract requirements is as relevant as a review of plaintiffs' individual understandings.

plaintiffs also have credited the Government with an offset of approximately $420,000 for the second rack that was not inserted into the pool but that allegedly would have been in the "but for" world. If DOE had a contractual obligation to accept at a rate that eliminated the need for "additional at-reactor storage," plaintiffs' claim should include the costs associated with bathtub racks. However, the claim does not include those amounts and that fact expressly is inconsistent with plaintiffs' litigation position[10] regarding DOE's obligation under the Standard Contract.

### B. Plaintiffs Cannot Rely Upon Program Planning Documents To Establish The Government's Obligation To Accept SNF At An Annual Rate Of 3,000 MTU

Unable to demonstrate that the Standard Contract requires that DOE accept at a 3,000 MTU rate, plaintiffs apparently intend to prove that the 3,000 MTU rate is somehow mandatory because it has appeared in numerous DOE planning documents. Pl. Br. at 25-26. However, the documents upon which plaintiffs rely to evidence DOE's eventual "intent" annually to accept 3,000 MTUs of SNF generally depend upon the existence of an operational <u>repository</u>. Yet, the Standard Contract does not require DOE to begin SNF acceptance at a repository. To the contrary, the language of the Standard Contract explicitly contemplates that DOE may accept SNF <u>either</u> at a repository <u>or</u> at "such other facility(ies) to which [SNF] and/or [HLW] may be shipped by DOE prior to its transportation to a disposal facility." 10 C.F.R. § 961.11, Art. I.10. In fact, between the proposed rule and the final rule, the definition of the type of "facility" to which DOE could deliver SNF was expanded to expressly state, in accordance with the [NWPA], that there may be an interim storage facility (or facilities) which DOE may utilize prior

---

[10] Ms. Eileen Supko, one of plaintiffs' experts, acknowledged during her deposition that the two-part test was provided to her by counsel for plaintiffs, rather that from any document or other contemporaneous source. Supko Dep., 60:10-61:4.

to emplacement in a repository." 48 Fed. Reg. 16590, 16591 (Apr. 18, 1983). As we discussed in prior briefing upon summary judgment, pursuant to the rationale of the United States Court of Appeals for the District of Columbia Circuit in Indiana Michigan Power Co. v. Department of Energy, 88 F.3d 1272 (D.C. Cir. 1996), DOE was not obligated to have an operational repository by January 31, 1998, precluding any argument that DOE was somehow obligated to accept SNF at the rates it had anticipated for SNF acceptance at a repository. Because DOE was entitled to accept SNF at a facility other than a repository, plaintiffs' reliance upon planning documents relating to SNF acceptance at a repository is meaningless.

Moreover, the planning documents upon which plaintiffs intend to rely uniformly and expressly indicate that they are "not contractually binding," that they do not establish acceptance rates that create mandatory obligations, and that they were only for planning purposes. See, e.g., DX 44 (in 1985 Mission Plan, DOE expressly represented that "[i]t should be emphasized that this schedule is only an approximation of how the system may operate and is subject to considerable variation" and that "DOE will further define and specify the system acceptance parameters as the program progresses".) Each Annual Capacity Report issued between 1987 and 1990 expressly advised contract holders that, in 1991, but not before, DOE would begin publishing firm individual utility acceptance schedules in accordance with the contracts, including shipment allocations. Although plaintiffs appear to rely in part upon the 1985 Mission Plan and its drafts to establish DOE's "intent" to accept SNF at a 3,000 annual rate, several commenters, prior to the promulgation of the final Standard Contract, had requested that DOE add a contract provision obligating itself to accept SNF at whatever rates were identified in the

Mission Plan. See DX 5.043, Attachment 1 at 1 (ARC0010439). However, as previously discussed, DOE intentionally declined to create any such obligation.[11]

In addition to the Mission Plan, plaintiffs apparently plan to rely upon various Total System Life Cycle Cost reports and Fee Adequacy studies that DOE has prepared throughout the program. The purpose of the fee adequacy studies (although required by the NWPA) and total system life cycle cost analyses is solely to determine whether the fees paid into the Nuclear Waste Fund are sufficient to pay for the costs of the entire program. Contrary to plaintiffs' assertion, Pl. Br. at 26, these reports do not establish that the Government has charged the utilities fees based upon a 3,000 MTU acceptance rate. Instead, the acceptance rate is one of many assumptions necessary to determine the total cost of the program. The acceptance rate is used to determine the length of time that the DOE acceptance facilities will need to operate. The TSLCC reports incorporate the program assumptions, including acceptance rate, as they exist at the time that they are prepared. For example, in the early studies cited by plaintiffs, DOE planned to perform at two repositories, with a cumulative acceptance rate of 6,000, not the 3,000 MTU rate upon which plaintiffs rely. PX 27 at 12 (PNL0202529) and PX 16 at 2-4

[11] Importantly, the 1985 Mission Plan upon which plaintiffs rely was created pursuant to a statutory requirement for submission to Congress. 42 U.S.C. § 10221(b)(3). After DOE submitted the 1985 Mission Plan and a 1987 Mission Plan Amendment to Congress, Congress enacted the 1987 amendments to the NWPA, presumably after considering DOE's Mission Plan submissions and evaluating the state of DOE's program. As it was entitled to do, Congress significantly modified the scope of the program at that time, limiting DOE's focus for development of a repository to one site, Yucca Mountain, and establishing linkages between a Monitored Retrievable Storage ("MRS") facility and a repository. 42 U.S.C. §§ 10133, 10161-69. Plaintiffs' reliance upon documents prepared for Congress that relate to possible circumstances and scenarios that could have existed prior to congressional review of and action upon those pre-amendment planning documents does not support its argument that DOE has somehow obligated itself to accept SNF at a 3,000 MTU rate, regardless of whether a repository is available.

(PNL0201505). In the later studies cited by plaintiffs, DOE planned to perform at a repository beginning in 2010. PX 24 at 13-15 and PX 25 at 1-3. Interestingly, plaintiffs do not cite to the 1990 PETSLCC, which shows performance at an MRS at a steady-state rate of 900 MTU until a repository opens with no ramp-up to 3,000 until 2015. DX 330 at A-1 to A-3.

Plaintiffs can identify no language by which DOE somehow agreed or even suggested that the acceptance rates in any planning documents which DOE issued were contractually binding or constituted anything other than DOE's hopes and goals for its program. In National By-Products, Inc. v. United States, 186 Ct. Cl. 546, 405 F.2d 1256 (1969), the Court of Claims recognized that, "[b]efore a representation can be contractually binding, it must be in the form of a promise or undertaking . . . and not a mere statement of intention, opinion, or prediction." Id. at 558-59, 405 F.2d at 1263. In a dispute involving whether the Government had contractually agreed that it would build a right-bank levee, the Court in National By-Products determined that, although the Government's representative had represented during contract negotiations "that in its then view the right-bank dike would eventually come into being," such "a representation, without more, would not indicate the Government's commitment to build it, or its guarantee that it would be built." Id. at 570-71, 405 F.2d at 1270. "Rather, the representation would simply mirror the Government's current belief, opinion or prediction, even its fervent hope that this would occur," which could not constitute a contractual obligation upon the Government's part. Id. at 571, 405 F.2d at 1270; see id. at 570, 575, 405 F.2d at 1269, 1272 ("we attribute the Corps' activity in later acting as a catalyst for local action to provide right-bank protection to its public-minded concern with the problem . . . and not to any feeling of *contractual* liability" (italics in original)); see Commercial Metals Co. v. United States, 176 Ct. Cl. 343, 349 (1966) ("the

Railroad's historical practice – which has not been incorporated in any written pronouncement for the information of the public – could not modify the plain language of the sales contract between the plaintiff and the Railroad . . . ."); Branhill Realty Co. v. Montgomery Ward & Co., 60 F.2d 922, 923 (2d Cir. 1932) (although parties discussed lessee's use of leased premises as chain store, lessee "did not bind itself so to do" in the contract, so that lessee "might, at its option, use them either for a chain store or for any lawful purpose"). Because DOE has never obligated itself to satisfy a 3,000 MTU acceptance rate, the Court cannot incorporate such a requirement into the Standard Contract.

Much of the "evidence" upon which plaintiffs apparently intend to rely to support the alleged intent of the Standard Contract and the NWPA is not even admissible for these purposes. For instance, plaintiffs cite to the deposition testimony of Mr. Lake Barrett as evidence of the "intent" of Congress in the NWPA. Pl. Br. at 25. This method of discerning the intent of these documents is inadmissible, since even the opinions of individuals who actually participated in the legislative process are irrelevant to a proper interpretation of the requirements of a statute. See, e.g., Selman v. United States, 204 Ct. Cl. 675, 685 n.6, 498 F.2d 1354, 1359 n.6 (1974) (affidavit of a United States Senator concerning particular legislation was "without evidentiary value" because "no member of a legislature, outside of the legislature, is empowered to speak with authority for that body"); accord Department of Energy v. Westland, 565 F.2d 685, 690-91 (CCPA 1977); United States Steel Corp. v. United States, 618 F. Supp. 496, 500 n.5 (CIT 1985). Moreover, Mr. Barrett was not involved with the program at the time of the enactment of the NWPA. Barrett Dep., Apr. 22, 2002, 119:8-16. Plaintiffs cannot rely upon the beliefs of various individuals who began working with the NWPA long after Congress enacted it as to the meaning

that Congress presumably intended when it passed the Act as evidence of the obligations to be imposed upon DOE for the measurement of damages.

Importantly, the Standard Contract contains an integration clause, which expressly provides that the written language in the Standard Contract "contains the entire agreement between the parties with respect to the subject matter hereof." 10 C.F.R. § 961.11, Art. XXII(A). It further states that "[a]ny representation, promise, or condition not incorporated in this contract shall not be binding on either party" and that "[n]o course of dealing or usage of trade or course of performance shall be relevant to explain or supplement any provision contained in this contract." Id. Plaintiffs' interpretation of the Standard Contract, which reads into the agreement the alleged program hopes and goals over a 20-year period, completely eradicates the integration clause from the Standard Contract. Although "parol evidence 'must be admissible on the issue of the extent to which a written agreement is integrated, for . . . the writing cannot prove its own integration,'" McAbee Constr, Inc. v. United States, 97 F.3d 1431, 1434 (Fed. Cir. 1996) (quoting Sylvania Elec. Prods., Inc. v. United States, 198 Ct. Cl. 106, 458 F.2d 994, 1006 (1972)), the fact that the Standard Contract contains an integration clause makes plaintiff's burden of establishing a lack of integration "extremely heavy." Id. Further, given that the Standard Contract was promulgated through notice-and-comment rulemaking, any parol evidence should consist solely of the record of administrative rulemaking, in accordance with the proper means of interpreting regulations. Plaintiffs' efforts to introduce extensive deposition testimony and other documents to identify the contractual intent evidenced by the language of the Standard Contract are insupportable.

C. Plaintiffs Cannot Establish That An Annual Acceptance Rate Of 3,000 MTU Is Necessary To Satisfy The Requirements To Which Plaintiffs Contend DOE Obligated Itself

Even if plaintiffs could establish the existence of the two-part requirement (eliminating additional at-reactor storage, and accepting some "backlog"), they have not established that an annual steady-state rate of 3,000 MTU is necessary to satisfy that purported requirement. As the evidence at trial will establish, the annual generation rate of SNF in the commercial nuclear industry is approximately 2,000 MTUs per year. Perhaps recognizing that a rate of 3,000 MTU is not necessary to meet this two-part test, plaintiffs state that Ms. Supko will testify that a 3,000 MTU acceptance rate will also "allow timely decommissioning, and ensure that the SNF system was not overbuilt and underutilized" and that, therefore, the rate is "reasonable." Pl. Br. at 26. However, plaintiffs also cannot demonstrate that these two additional goals are obligations assumed by DOE in the Standard Contract. Therefore, the Court cannot impose requirements upon DOE based upon these goals. Plaintiffs can identify no reason that an acceptance rate of 2,100 MTUs, or any annual SNF acceptance rate below or above, would not satisfy the alleged two-part requirement that they claim the contract contains. The absence of this evidence precludes any finding that the Court must measure damages against the annual rate of 3,000 MTU.

III. DAMAGES SHOULD BE MEASURED AGAINST THE ACCEPTANCE OBLIGATIONS DEVELOPED PURSUANT TO THE SCHEDULE MECHANISM IN THE CONTRACT

A. The Acceptance Schedule Was Established In The Dealings Between The Parties

Although plaintiffs ask the Court to impose into the Standard Contract an obligation for DOE to accept 3,000 MTUs of SNF every year soon after 1998, to do so the Court would have to

ignore the actual language of the Standard Contract, which, instead of creating an obligation to accept 3,000 MTU per year, contains a scheduling provision that ultimately allows DOE to select the appropriate SNF acceptance rate, subject only to a review for abuse of discretion by the Energy Board of Contract Appeals ("EBCA"). Pursuant to this scheduling mechanism, DOE issued the 1991 ACR and requested DCSs from utilities, many of which it then approved, thereby defining the schedule of performance beginning in 1998. If the Court disregards these provisions and the actions of the parties in accordance with these provisions, the Court is left with no method by which to assess damages arising from DOE's delay.

As we have explained in briefing on the Government's motion for summary judgment regarding the rate of acceptance, instead of agreeing to a specific minimum acceptance rate or creating standards that would obligate DOE to satisfy a minimum rate, the Standard Contract creates a contractual mechanism for the development of a specific acceptance schedule that establishes, in essence, a two-phase process. First, the Standard Contract's schedule terms seek to obtain the agreement of the parties to a specific schedule for the acceptance of an individual contract holder's SNF and HLW. Pursuant to the terms of the Standard Contract, DOE was to issue, beginning not later than July 1, 1987, "an annual capacity report [("ACR")] for planning purposes," identifying "projected annual receiving capacity" at any DOE facilities and annual acceptance ranking for acceptance of contract holders' SNF and/or HLW for the first 10 years "following the projected commencement of operation of the initial DOE facility." 10 C.F.R. § 961.11, Art. IV.B.5(b). Subsequently, beginning on April 1, 1991, DOE was to issue "an annual acceptance priority ranking" ("APR") for receipt of the contract holders' SNF, "based on the age of SNF and/or HLW as calculated from [its] date of discharge." Id., Art. IV.B.5(a).

Second, the contract holder, "[a]fter DOE has issued its proposed acceptance priority ranking" on April 1, 1991, and no earlier than January 1, 1992, would submit a delivery commitment schedule ("DCS") identifying "all SNF and/or HLW the [contract holder] wishes to deliver to DOE beginning sixty-three (63) months thereafter," for DOE's approval or disapproval. 10 C.F.R. § 961.11, Art. V.B.1 (emphasis added). If DOE approves the DCS, the parties have effectively agreed and defined the amount of SNF that DOE will accept from that contract holder 63 months later. Id. If DOE disapproves the first DCS submission, the contract holder is entitled to make a second DCS submission, again for DOE's approval or disapproval. Id. If DOE approves the second DCS submission, the parties have, as stated above, effectively defined the amount of SNF that DOE will accept from that contract holder 63 months later. Id. If DOE disapproves the second submission, DOE responds with its own proposed schedule, which the contract holder may accept or, alternatively, may attempt to negotiate with DOE. Id., Art. V.B.2. The contract holder may then submit its dispute to the contracting officer for a decision, and the contracting officer's final decision upon the DCS "shall be final and conclusive" until, within 90 days, the contract holder appeals to the Energy Board of Contract Appeals. Id., Art. XVI.A; see McDonnell Douglas Corp., ASBCA No. 26747, 83-1 BCA ¶ 16,377, at 81,421 (1983) (boards of contract appeals "[h]istorically and traditionally" assumed jurisdiction over non-monetary "disputes as to the interpretation of contract provisions and determination of the rights and obligations of the parties under the provisions of the contract").

DOE and the utilities acted in accordance with these provisions to develop the schedule for waste acceptance beginning in 1998. As we anticipate establishing at trial, the rates of SNF acceptance identified in the 1991 ACR were predicated upon the requirements of the 1987

NWPA amendments, which precluded DOE from accepting more than 10,000 MTUs of SNF for storage at a Monitored Retrievable Storage ("MRS") facility prior to the operation of a Federal repository. 42 U.S.C. § 10168(d)(1). When developing the 1991 ACR, and anticipating operation of a repository in 2010, DOE divided the 10,000 MTU acceptance limitation across the 12-year period from 1998 (when it anticipated that MRS operations would begin) to 2010.[12]

DOE then drafted, with the assistance of the utilities, the instructions for the submission of DCSs. See, e.g., DX 91, 92, 99, 105 and 110. After the instructions were issued, numerous utilities submitted DCSs that were then approved by DOE. In fact, by letter dated October 21, 1996, plaintiffs submitted two DCSs for plant Hatch complaining about the allocations set forth in the accompanying ACR. DX 198. Although the Standard Contract provided for an appeal, plaintiffs did not pursue this dispute farther.

Although numerous contract holders submitted DCSs that DOE approved, plaintiffs appear to assert that they had some greater right to acceptance of SNF beginning in 1998. Plaintiffs cannot present any evidence regarding how they, or any other contract holder, would have been able to convince DOE, in 1998, to accept significantly more SNF than that identified in previously approved DCSs. Under its theory of the contract, had DOE begun SNF acceptance in 1998, all of the previously approved DCSs would have been worthless, and DOE would somehow have accepted SNF in substantially greater quantities than those to which it previously

[12] In fact, plaintiffs' proposal to obligate DOE to accept 3,000 MTUs of SNF annually after a five-year ramp-up period would have placed DOE in direct conflict with the statutory limitations imposed by the 1987 amendments to the NWPA, which precluded DOE from accepting more than 10,000 MTUs of SNF prior to the operation of a repository. In 1989, DOE informed nuclear utility contract holders that it did not anticipate that a Federal repository would be available until 2010, but that it anticipated being able to begin SNF acceptance at an MRS in 1998.

had agreed. In essence, plaintiffs simply read the 63-month notice requirement in the acceptance schedule contract provisions out of the contract, in violation of standard contract interpretation principles, leaving DOE with no way to determine each utilities acceptance rights. See Gould, Inc. v. United States, 935 F.2d 1271, 1274 (Fed. Cir. 1991).

B. Some Of The Decisions Issued Since The Government Filed Its Motion Regarding The Spent Nuclear Fuel Acceptance Rate Incorrectly Analyze The Standard Contract Schedule Provisions

Plaintiffs, seeking to diminish the significance of the DCS process in defining DOE's obligations, rely heavily upon the Court's decisions in Commonwealth Edison Co. v. United States, 56 Fed. Cl. 652 (2003),[13] and Indiana Michigan Power Co. v. United States, 57 Fed. Cl. 88 (2003).[14] Those decisions, with all due respect, do not consider the practicalities of the acceptance of SNF necessitated by the Standard Contract.

In Commonwealth Edison, the Court rejected the Government's arguments that the schedule provisions contained in the Standard Contract provide the mechanism for determining the SNF acceptance schedule. Yet, the Court in the Commonwealth Edison decision did not explain – from a practical standpoint – the manner in which SNF acceptance would, or will,

[13] Although the Court in this case has "adopt[ed] the same approach as that applied in the Yankee litigation " regarding the Commonwealth Edison decision, the Court did recognize that "[t]he rate issue, to the extent relevant, must be resolved by further proceedings." Order (Apr. 7, 2004). As is made clear by the parties' pretrial submissions, determination of the acceptance rate at which DOE was obligated to perform beginning in 1998 is critical to the assessment of damages.

[14] The Court's decision in Indiana Michigan upon the Government's motion for summary judgment regarding the rate of acceptance was not upon appeal to the Federal Circuit. The Federal Circuit dismissed the Government's cross-appeal of this decision, stating that the "trial court's rate calculation determination was not necessary to the judgment." Indiana Michigan Power Co. v. United States, 04-5139 (Fed. Cir. Oct. 13, 2004) (unpublished opinion).

work absent reference to that schedule mechanism. Finding that the delivery commitment schedule ("DCS") process did not limit the contract holder's damages or limit its right to the acceptance of larger amounts of SNF than identified in those DCSs, the Court found that the DCS process was only "non-binding and preliminary." Id. at 663. Yet, the Court did not explain the manner in which SNF acceptance could practically operate under the Standard Contract without reference to the DCS process: specifically, without the DCS process, the Standard Contract contains no requirement that the contract holder notify DOE of the amount of SNF it wants DOE to take in any particular year (either in advance or on the day that acceptance is desired); no notice of the location, date, or time for that acceptance within a particular year; and no notice of the characteristics of the SNF that will need to be accepted at that time or the size of the cask that DOE will have to procure to transport the SNF. Without requirements for advance notice, such as that required by the DCS provisions, and given the long lead times that many aspects of DOE's performance take (such as the procurement of the transportation casks), DOE could never perform the Standard Contract if interpreted as it has been in the ComEd case. Further, the Commonwealth Edison Court fails to explain how, given its belief that the DCS provisions of the Standard Contract are meaningless, DOE would be able to perform its obligations to accept SNF. In Indiana Michigan, the Court of Federal Claims stated that its "obligation is to provide a rate of [SNF] acceptance that the Department of Energy would have employed in absence of the breach." Id. at 100 (emphasis added). With all due respect, that focuses upon the wrong question. The issue presented requires a determination of the rate of SNF acceptance pursuant that DOE was contractually obligated to satisfy. DOE cannot be held financially responsible in damages for a failure to take actions that it might have elected

voluntarily to perform, even though it was not required to do so. The only damages that the Court can award are those based upon DOE's breach of its obligation to perform actions that it was contractually obligated to perform. Accordingly, the Court's finding in Indiana Michigan that "[n]othing in the record supports the collection rate that defendant would use – 900 metric tons per year," id. at 98, is irrelevant to the identification of the rate at which DOE was contractually obligated to accept SNF.

If the trial court's decisions in Commonwealth Edison and Indiana Michigan eliminate the existing schedule terms from the Standard Contract, the Court is left with no mechanism in the Standard Contract for determining the SNF that it would have been accepted, when it would have accepted that SNF and from which utility, had DOE begun timely performance. Also, given that plaintiffs and the other utilities still expect performance upon the Standard Contract, DOE is also left with no mechanism for determining when, how, or where DOE will accept SNF and/or HLW in the future.[15] In essence, the Court's decisions have rendered the schedule terms of the Standard Contract so indefinite that the Standard Contract is inoperable. Contrary to plaintiffs' suggestion, Pl. Br. at 26-27, the Court cannot simply supply this missing term and determine what would be a "reasonable" acceptance rate.

The Court of Claims has previously observed that, "[n]ormally, the task of supplying a missing, but essential, term (for an agreement otherwise sufficiently specific to be enforceable) is the function of the court." David Nassif Assocs. v. United States, 214 Ct. Cl. 407, 423, 557

[15] DOE clearly plans to use ACRs and DCSs to define DOE's acceptance obligations in the future. By letter dated July 28, 2004, DOE's contracting officer, David Zabransky, issued a new ACR and DCS instructions and requested that plaintiffs and other utilities submit DCSs in anticipation of performance in 2010. PX 179. This process was later suspended. PX 181.

F.2d 249, 258 (1977). However, the limitation upon the Court's ability to supply its own term is clearly stated: "for an agreement otherwise sufficiently specific to be enforceable." Id.

A court cannot make contracts for the parties. To be valid and enforceable, "a contract must have both consideration to ensure mutuality of obligation . . . and sufficient definiteness so as to 'provide a basis for determining the existence of a breach and for giving an appropriate remedy.'" Ridge Runner Forestry v. Veneman, 28 F.3d 1058, 1061 (Fed. Cir. 2002) (citations omitted). If an agreement is missing one or more essential terms, an agreement to agree upon those terms is unenforceable because it lacks mutuality of intent and sufficient definiteness to determine the rights and liabilities of the parties. See Modern Sys. Tech. Corp. v. United States, 979 F.2d 200, 204 (Fed. Cir. 1992); Bel Pre Health Care Center, Inc. v. United States, 24 Cl. Ct. 495, 496 (1991) ("[i]f an essential term, such as the quantity term, has been omitted then there can be no basis for deciding whether the agreement has been broken; the definiteness necessary for enforceability is lacking"), aff'd, 980 F.2d 745 (Fed. Cir. 1992) (table); Transamerica Equip. Leasing Corp. v. Union Bank, 426 F.2d 273, 274 (9th Cir. 1970) ("[w]here an agreement is not sufficiently definite to enable a court to give it an exact meaning or where an essential element is reserved for future agreement of both parties, a legal obligation cannot result"). "Courts refuse to enforce agreements that contain indefinite promises or terms they deem essential because judicial clarification of the uncertainty entails great danger of creating intentions and expectations that the parties themselves never entertained." Neeley v. Bankers Trust Co. of Tex., 757 F.2d 621, 628-29 (5th Cir. 1985); see Mays v. Trump Indiana, Inc., 255 F.3d 351, 357-58 (7th Cir. 2001) ("mere agreement to agree does not a binding contract make" without agreement upon "all essential terms that are to be incorporated in the document"); Shann v. Dunk, 84 F.3d

73, 78-81 (2d Cir. 1996) ("[w]e believe the issue of Shann's liability for the deferred payments was of such importance that, if the district court finds the parties failed to agree on it, the court would be required to void the contract for absence of an essential term").

Obviously, as indicated in the Court of Claims' decision in Nassif, certain terms of a contract that are "essential" to it in some respects may, in certain circumstances, be identified by the Court, which must consider what "the parties would have agreed upon at the time of their initial . . . negotiations . . . ." David Nassif, 214 Ct. Cl. at 376, 644 F.2d at 7. However, at a certain point, the missing term becomes so essential to the formation of the contract that the Court, if it supplies the missing term itself, creates a contract to which the parties had never agreed. In this case, the "missing" term that plaintiffs seek to have the Court impose into the Standard Contract is one of the central aspects of the Standard Contract and increases the past damages that plaintiffs could recover by $63.8 million, in nominal dollars. Moreover, the Court's ruling upon the acceptance term will likely control the future damages to which plaintiffs may be entitled, which plaintiffs estimate to be $15.4 million through 2020 at the 3,000 MTU rate that they advocate. This enormous variance in the effect of the acceptance schedule term upon the parties' rights, obligations, and damages cannot be said to be minor and, in fact, is one of the most essential terms of the Standard Contract. To the extent that the Court disagrees with our demonstration that the schedule provisions of the Standard Contract and the approved DCSs identify the parties' obligations in this case, the Court cannot merely impose its own view of a reasonable schedule term. A rejection of the our position would effectively render the Standard Contract too indefinite to enforce. See Massengill v. Guardian Mgt. Co., 19 F.3d 196, 202 (5th Cir. 1994) ("When a writing does not show the parties' agreement on a minor contract term, the

reviewing court may supply a reasonable interpretation. . . . *But essential contract terms may not be supplied by a court*. 'If any essential term is left unresolved, there is simply no contract and no obligation on the parties.'" (emphasis added; citation omitted; applying Mississippi law)); see also Coyle's Pest Control, Inc. v. Cuomo, 154 F.3d 1302, 1306 (Fed. Cir. 1998) (refusing to read "reasonable" term into contract, court found contract unenforceable as indefinite quantity contract because it lacked minimum quantity term).[16]

As we have established in our motion for partial summary judgment regarding the rate of SNF acceptance, the Standard Contract provides a mechanism for establishing the SNF acceptance schedule, including the rate of SNF acceptance. As we will establish at trial, the parties followed that mechanism for a significant period of time. As a result, a schedule exists that the Court should view as the contractual "schedule" for purposes of assessing damages. Absent the Court's reliance upon that prior schedule, we cannot identify any basis upon which the Court could justify its imposition of its own schedule into this contract.

## IV. PLAINTIFFS CANNOT ESTABLISH THE NECESSARY CAUSAL LINK BETWEEN ALL OF THEIR CLAIMED STORAGE CONSTRUCTION COSTS AND DOE'S DELAY IN BEGINNING SNF ACCEPTANCE

Plaintiffs cannot recover any of their alleged damages unless they establish that they would not have incurred these construction costs had DOE timely begun SNF acceptance. See

[16] It is true that the appellate court has found that a contract term which allows for future negotiation "impliedly places an obligation on the parties to negotiate in good faith," Aviation Contractor Employees, Inc. v. United States, 945 F.2d 1568, 1572 (Fed. Cir. 1991), and that, where the contract and applicable regulations provide guidelines for negotiations of future agreements, the Court may "determine whether or not the government negotiated according to the contract." City of Tacoma, Dep't of Public Utilities v. United States, 31 F.3d 1130, 1132 (Fed. Cir. 1994). However, that review does not empower the Court to create a contract for the parties where the "missing" terms are so essential to the central purpose of the contract that the absence of the terms renders the contract too indefinite to enforce.

Bluebonnet Sav. Bank, F.S.B. v. United States, 339 F.3d 1341, 1344-45 (Fed. Cir. 2003) (citing White v. Delta Constr. Int'l, Inc., 285 F.3d 1040, 1043 (Fed. Cir. 2002)). To the contrary, "the non-breaching party 'should on no account get more than would have accrued if the contract had been performed.'" White, 285 F.3d at 1043 (quoting DPJ Co. v. FDIC, 30 F.3d 247, 250 (1st Cir.1994)).

In their pretrial brief, plaintiffs contend that the costs incurred to date to construct dry storage facilities at plant Hatch and plant Farley and install additional racks in the spent fuel pool at plant Vogtle are all the result of DOE's failure to begin timely performance upon their Standard Contracts for these facilities. Pl. Br. at 23. Yet, this contention is based upon the unsupportable claim that DOE was obligated to perform at a 3,000 MTU annual acceptance rate after a five-year ramp-up period. If the Court properly finds that the Government was only obligated to accept the amounts of SNF set forth in the 1991 ACR against which the utilities submitted DCSs, plaintiffs claim for the costs of the installation of additional storage facilities at plant Hatch significantly is reduced and the costs for the rerack at plant Vogtle is eliminated. Likewise, applying a 3,000 rate and assuming a two full core reserve policy at plants Hatch and Vogtle would result in plaintiffs incurring additional storage costs at both plants in the "but for" world. Plaintiffs' claim for the costs of additional storage at plant Farley remains unaffected by rate, provided that the Court finds that plaintiffs' policy is to maintain only one full core reserve in each plant Farley wet pool. If the Court accepts plaintiffs' contention that they maintain a single full core reserve plus a reload for each of plant Farley's wet pools, then, under a 900 MTU rate, on-site dry storage would have been required in the "but for" world. The evidence will show that, regardless of DOE's delay in beginning SNF acceptance from the nuclear industry,

plaintiffs, under any reasonable SNF acceptance scenario, would have been required to construct a dry storage facility at plant Hatch and would have needed additional racks at plant Vogtle. Plaintiffs' alleged damages must be reduced consistent with these "but for" world realities.[17]

## V. PLAINTIFFS' DAMAGES CLAIM AND THE EVIDENCE TO BE ADDUCED AT TRIAL SUPPORTS A FINDING THAT PLAINTIFFS' POLICY IS TO MAINTAIN A SINGLE FULL CORE RESERVE IN THE WET POOLS AT PLANTS HATCH AND VOGTLE

### A. Georgia Power's Historic Operating Reserve At Plants Hatch And Vogtle Is A Single Full Core Reserve

At trial, the evidence will demonstrate that the operating reserves at plants Hatch and Vogtle have historically been a single full core reserve per pool, in contrast to the two full core reserve assumption set forth in plaintiffs' brief, which only serves to escalate plaintiffs' damages claim. In fact, there is no evidence that plaintiffs have an official policy concerning full core reserve for plants Hatch and Vogtle upon which the Court may rely to find the existence of a two full core reserve at those facilities. In contrast, there are numerous exhibits either that articulate a single full core reserve policy or that track the loss of single full core reserve in the Hatch and Vogtle wet pools. See, e.g., DX 38, DX 101, DX 104, DX 312, DX 313, DX 324. Moreover, as will be discussed below, plaintiffs' damages claim is predicated upon a finding that plaintiffs would have maintained a single full core reserve policy in the "but for" world. Based upon these facts, and absent any regulatory requirement to maintain a higher reserve, plaintiffs' assertions that they now have decided officially to maintain a higher full core reserve than historically

[17] Because the 3,000 MTU rate is based upon operation of a repository, plaintiffs appear to insinuate that DOE was obligated to have a repository in place by 1998 or, perhaps, at least by 2008. However, the United States Court of Appeals for the District of Columbia Circuit has expressly rejected any argument that the Federal repository had, or has, to be available by any particular date. Indiana Michigan, 88 F.3d at 1276.

maintained – at the Government's sole expense – should not provide a basis for a damages award against the Government.[18]

### B. Contrary To The Arguments In Their Pretrial Brief, Plaintiffs' Damages Claim Is Predicated Upon The Existence Of A Single Full Core Reserve Policy At Plants Hatch And Vogtle

In their brief, plaintiffs assert that the "Government's and Southern's experts agree that at an annual rate of 3,000 MTUs per year industry-wide . . . Southern would have avoided the construction of any dry storage facilities at any of Southern's nuclear plants and the latest Vogtle pool capacity expansion." Pl. Br. at 23. Plaintiffs further argue that maintaining a single full core reserve represents a "degraded operating standard that is not a reasonable industry practice, prudent under state law, or consistent with its performance obligation." Pl. Br. at 43. In contravention to the strong language in plaintiffs' brief, plaintiffs' assertion that additional storage is needed at plants Hatch and Vogtle – beyond the bathtub racks installed at plant Hatch, is predicated upon this Court adopting a single full core reserve policy at plants Hatch and Vogtle. The single full core reserve allegedly advocated by the Government is based entirely

[18] In their brief, plaintiffs attempt to denigrate the Government's criticism of the inconsistent assumptions upon which their claim is based by describing the Government's position as a ".5 per reactor" full core reserve instead of as a single full core reserve. See Pl. Br. at 43. Plaintiffs' nomenclature is an attorney-created fiction that appears nowhere in any exhibits concerning the full core reserve policies at plants Hatch and Vogtle. The lack of any reference to a ".5 per reactor" reserve is particularly telling given the volume of documents that reference full core reserve policies at plants Hatch and Vogtle that are consistent with a single full core reserve at each facility or, as plaintiffs now assert, a reserve of ".5 per reactor." See, e.g., DX 101, DX 106. Plaintiffs cannot dispute the historical reserve policies at plants Hatch and Vogtle. Instead, they attempt to diminish the significant evidence supporting the imposition of a single full core reserve per pool with the imposition of fictional and, previously nonexistent, nomenclature. Indeed, plaintiffs' attempts to redefine their historic policies demonstrate the tenuousness of their position at trial concerning full core reserve at plants Hatch and Vogtle.

upon the evidence in this case and upon the damages theory for which plaintiffs' experts will argue at trial.

Plaintiffs' strongly worded arguments concerning the Government's allegedly unreasonable position concerning full core reserve ignore the fact that, in order to avoid the construction of dry storage at plant Hatch in the "but for" world under the rate assumptions set forth in plaintiffs' brief, plant Hatch must operate only with one full core reserve in its pool from 2000-2002, even assuming the capacity additions underlying plaintiffs' damages theory. Likewise, to avoid racking the Vogtle Unit 1 wet pool as plaintiffs contend would have occurred in the "but for" world, plant Vogtle would be required to operate only with one full core reserve in its connected pools for a five year period from 2005-2009. Indeed, the "degraded operating standard that is not a reasonable industry practice, prudent under state law, or consistent with its performance obligation," Pl. Br. at 43, underlies plaintiffs' damages theory in this case and is professed with the text of plaintiffs' own expert reports. If this Court were to impose upon plaintiffs their now-favored two full core reserve policy, in the "but for" world, plant Hatch would be required to add dry storage for a total of eight casks in 2000 and 2001 and plant Vogtle's rack addition would have been required. The full core reserve policy set forth in the Government's expert reports is not the imposition of a "degraded operating standard" upon plaintiffs. Rather, it represents the theory underlying plaintiffs' damages claim against the Government.

By their argument, plaintiffs seek to impose costs upon the Federal Government for the maintenance of reserve capacity that plaintiffs contend they would not have maintained in the "but for" world in which the costs associated with the maintenance of a larger reserve would

have been borne solely by plaintiffs. Costs that plaintiffs themselves allegedly would not have been willing to incur in a "but for" world should not be imposed upon the Government here. This Court, based upon the evidence and upon plaintiffs' underlying damages theory, should find that a single full core reserve is appropriate at plants Hatch and Vogtle. To the extent this Court finds a two full core reserve policy is appropriate – consistent with plaintiffs' pretrial brief – damages for plant Hatch and Vogtle must be reduced to reflect consistent full core reserve policies in the actual and "but for" worlds.

C. To Award Damages Related To Alabama Power For Plant Farley At A 900 MTU Rate Of Acceptance, The Court Must Implement A Fungible Single Full Core Reserve Policy Per Pool At That Facility

In our expert reports, we acknowledge that plant Farley would not have had to construct additional on-site storage under either plaintiffs' 3,000 MTU rate or the 900 MTU rate set forth in the 1991 ACR. However, to award damages under the 900 MTU rate as set forth in the Government's expert reports, this Court must find that Alabama Power would have maintained at plant Farley a single full core reserve and that it would have been willing to briefly encroach upon that reserve in order to avoid constructing dry storage. As set forth in the Government's expert reports, at a 900 MTU rate, plant Farley's two wet pools each are within the single full core reserve plus a re-load for a total of six years at Farley 1 and two years at Farley 2 through 2009, and in both 2007 and 2009, Farley Unit 1 must operate inside a single full core reserve. To the extent that the Court accepts plaintiffs' contentions concerning the full core reserve policy at plant Farley and imposes a single full core reserve plus one reload per pool, Alabama Power would have been required to load at least three casks in order to maintain that reserve. In that

event, damages would need to be reduced to account for the additional costs plaintiffs would have incurred to maintain that reserve in the "but for" world.

## VI. PLAINTIFFS HAVE FAILED TO PROPERLY MITIGATE THEIR DAMAGES

The general rule in any damages claim is that "a party cannot recover damages for loss that he could have avoided by reasonable efforts." Robinson v. United States, 305 F.3d 1330, 1333 (Fed. Cir. 2002) (quoting Restatement (Second) of Contracts § 350, cmt. b) (emphasis in original). Moreover, plaintiffs must mitigate any potential damages "at the least cost to the defendant." LaSalle Talman Bank, F.S.B. v. United States, 45 Fed. Cl. 64, 111 (1999) (quoting Northern Helex Co. v. United States, 207 Ct. Cl. 862, 524 F.2d 707, 713 (1975)), rev'd on other grounds, 317 F.3d 1363 (Fed. Cir. 2003). The least-cost principle "precludes rewarding a plaintiff for undertaking a form of mitigation that is considerably more costly than other available means of mitigation." LaSalle, 45 Fed. Cl. at 111. To determine whether an attempt at mitigation was appropriate, courts consider whether a reasonable person, in light of the known facts and circumstances, would have taken steps to avoid certain damages. Koby v. United States, 54 Fed. Cl. 493, 497 (Fed. Cl. 2002). Here, plaintiffs failed to undertake certain reasonable mitigation actions resulting in significantly higher costs that now are sought as damages.

### A. Plaintiffs Could Have Reasonably Avoided More Than $8.7 Million At No Cost To The Government By Installing The Second Bathtub Rack Licensed, Constructed, and Purchased For Plant Hatch

In connection with plaintiffs' attempt to maintain a single full core reserve in the plant Hatch spent fuel pool, plaintiffs contracted for and purchased two bathtub racks containing space

for 168 assemblies each. Deposition of David Bland ("Bland Dep."), 156:14-20.[19] These two bathtub racks cost plaintiffs more than $3.1 million. Kenrich Rep., at Kenrich Damages Model, A41 (KRG00765). While the two racks were delivered by Holtec to plant Hatch, only one of the two racks was installed in the plant Hatch wet pool. Kenrich Rep., 23; Deposition of Bruce Hunt ("Hunt Dep."), 47:6-12. That installation allowed Georgia Power to maintain a single full core reserve at plant Hatch through the loading of the three Hi-STAR dual purpose casks in 2000. Metcalfe Dep., 322:15-323:2. Based upon the loading of the Hi-STAR casks in 2000, the second rack was never installed and remains at plant Hatch. Bland Dep., 157:20-158:16.

Plaintiffs' damages claim assumes that, in the "but for" world, both bathtub racks would have been installed in the wet pool at plant Hatch. Kenrich Rep., 22. As a result, plaintiffs' claim includes a credit of approximately $420,000 to the Government for the installation costs that allegedly would have been incurred had DOE begun SNF acceptance from the industry in 1998 and from plant Hatch specifically in 2001. Id. The installation of these two racks in the "but for" world precludes the need for Georgia Power to load casks to dry storage in 2000 at plant Hatch. See Neuberger Rep., Exh. 5a. Therefore, plaintiffs, at relatively minimal cost to themselves, are able to avoid significant costs associated with dry storage in the "but for" world that otherwise would come entirely at their expense. In the actual world, plaintiffs did not install the second rack and, instead, incurred in excess of $8.7 million to load three Hi-STAR casks in 2000, including significant licensing, design, construction, and equipment costs that would have no application to the Hi-STORM loading campaigns commenced the following year and

---

[19] Had both racks been installed, it was estimated that one space would be inaccessible, thereby adding a total of 335 spaces to the plant Hatch wet pool. Metcalfe Dep., 318:15-319:22.

assumed throughout the life of the plant. Expert Report of R. Larry Johnson, dated June 10, 2005 ("L. Johnson Rep."), 15.

Plaintiffs have a duty to undertake reasonable actions in order to mitigate their damages. Installing that second bathtub rack at zero cost to the Government with a resultant savings of $8.7 million clearly would have mitigated significant damages. Moreover, the installation of the second rack would have been reasonable. Installation of the second rack must have been reasonable, as the installation is assumed by plaintiffs in the "but for" world to reduce costs associated with on-site dry storage that plaintiffs would have incurred but could not have recovered from the Government in this case. If the installation is reasonable to reduce plaintiffs' costs in the "but for" world, it must be reasonable to reduce the Government's costs in the actual world. If unreasonable, plaintiffs' "but for" scenario must dissemble as well. In either case, costs associated with the three Hi-STAR casks loaded in 2000 must be borne by plaintiffs.

Plaintiffs now argue that the placement of the second rack in the bathtub region of the plant Hatch wet pool would have been an "unsound decision." Pl. Br. at 46. Plaintiffs note that if the rack had been installed, "it would have been unloaded, removed, and properly disposed of upon the commencement of the operation of the dry storage facility." Id. Plaintiffs continue, stating that the installation "would have contaminated the rack and would have increased the amount of radioactive waste to be disposed of at the decommissioning of the reactor." Id. Plaintiffs then criticize the Government's expert, Dr. Jonathan Neuberger, because he purportedly had not been informed of the alleged technical issues implicated by the installation of the second bathtub rack. Plaintiffs' assertions are inconsistent with their litigation position

concerning the "but for" world, overstate the concerns relating to contamination, and mischaracterize Dr. Neuberger's opinion.

First, plaintiffs admit that "[h]ad the Government commenced performance and had Southern been able to avoid dry storage by installing the rack, it is undisputed that Southern would have done so." Pl. Br. at 46 n.18. Indeed, other than this relatively ambiguous statement, plaintiffs make no mention of the fact that their damages claim assumes the allegedly "unsound decision" to install the second rack to avoid dry storage in the "but for" world. However, if the installation of the rack truly is unsound in the actual world, the same conclusion must be made in the "but for" world. Plaintiffs cannot credibly contend that the implementation of "unsound decisions" only would be made to reduce their costs, yet not to reduce the damages now sought from the Government.

Second, plaintiffs overstate the concerns related to the contamination of the two racks. Plaintiffs installed one of the two racks, thereby creating the contamination issues that now, apparently, counsel against the installation. Additionally, to the extent that the contamination issues are significant and costly, the Government notes that plaintiffs' offsets to their claim do not include any component for decontamination or disposal of either bathtub rack. While these costs should be included as an offset in any event, their omission demonstrates that the contamination issue is overstated. Plaintiffs also ignore the fact that Georgia Power purchased for plant Vogtle previously-used high density racks from Maine Yankee Atomic Power Company that required decontamination and transportation from Maine to Georgia. Concerns related to the decontamination of 335 temporarily installed locations at plant Hatch are inconsistent with the purchase and transportation of previously-used racks containing more than

1400 locations at plant Vogtle. Plaintiffs raise the contamination issue now to attempt to argue against the installation they assume in the "but for" world. However, that issue is a red herring and should be disregarded.

Finally, plaintiffs mischaracterize Dr. Neuberger's opinion. Dr. Neuberger will not be presenting any technical opinions in this case. Rather, Dr. Neuberger was retained as an economist and as an expert damages witness to analyze, among other things, the inconsistencies between the assumptions underlying the "but for" world for which plaintiffs pay and the assumptions underlying the actual world for which the Government is being asked to pay. Dr. Neuberger simply notes that plaintiffs were able to avoid significant costs in the "but for" world associated with cask loading through the installation of the second bathtub rack. He notes further that by applying the same assumption in the actual world plaintiffs could have avoided the 2000 loading campaign and, therefore, all of the costs associated with the Hi-STAR casks loaded in that campaign. To the extent any experts have proceeded uninformed, it is plaintiffs' damages experts who assumed apparently "unsound" conduct in the "but for" world in the first place.

If the installation of the second rack was reasonable to save plaintiffs the costs associated with installing dry storage capacity at plant Hatch, the installation also constitutes reasonable mitigation of the Government's damages. The Court should not permit plaintiffs to stake out inconsistent arguments that significantly reduce their "but for" world costs while significantly increasing the Government's actual world financial obligations.

B. Plaintiffs' Investment In Private Fuel Storage Was Not Reasonable Mitigation

Plaintiffs' damages claim seeks costs totaling $8.5 million associated with their pursuit of an off-site PFS storage facility. To determine whether an attempt at mitigation was appropriate, courts consider whether a reasonable person, in light of the known facts and circumstances, would have taken steps to avoid certain damages. Koby v. United States, 54 Fed. Cl. 493, 497 (Fed. Cl. 2002). Plaintiffs' investment in PFS fails to meet the reasonableness standards set forth by the Court. Indeed, this Court already has found that the claims relating to PFS brought by another member of that consortium were not recoverable because the investment did not constitute reasonable mitigation. Indiana Michigan Power Co. v. United States, 60 Fed. Cl. 639 (2004), aff'd, __ F. 3d __, 2005 WL 2173563 (Fed. Cir. Sept. 9, 2005).

At the time plaintiffs elected to invest in the PFS effort, PFS was a highly speculative solution to plaintiffs' alleged impending space constraints. First, PFS was a first-of-a-kind facility that required licensing from the NRC, construction by PFS members, and the resolution of issues relating to the transcontinental shipment of SNF. Resolution of two of these issues – well known at the inception of PFS – remains uncertain, at best. And, contrary to plaintiffs' assertion that the Government is engaged in "Monday morning quarterbacking" (Pl. Br. at 47), all of these concerns were well known to plaintiffs at the time they decided to begin investing in that project. Cocherell Dep., 399:15- 400:20. Second, PFS was unlikely ever to mitigate plaintiffs' costs here. As set forth in their brief, plaintiffs allegedly required additional storage as early as 2000 at plant Hatch, by 2005 at plant Farley and by 2006 at plant Vogtle. Yet, as early as 1998, plaintiffs recognized that, "Southern Nuclear is also part of a joint utility effort to develop a private fuel storage facility for operation as early as the year 2002, not in time to

address Hatch storage requirements by the year 2000." DX 223. Indeed, plaintiffs incurred costs to expand storage at each of their facilities early in their membership in PFS. Ultimately, licensing obtained in September 2005 came too late to assist plaintiffs and there is no evidence that the issues relating to construction and transportation will be resolved soon. In any event, PFS was a more costly storage alternative than on-site storage – a fact of which plaintiffs were aware at the beginning of their involvement.

Finally, PFS was not pursued as a first choice alternative by plaintiffs. All along, plaintiffs intended PFS to serve merely as an insurance policy in the unlikely event that the state governments in Alabama and Georgia implemented dry storage restrictions similar to those implemented in Minnesota in the mid-1990s. However, no such actions in either state were expected and, ultimately, none were taken to limit plaintiffs ability to construct dry storage facilities. While a formal decision has not been made, plaintiffs do not anticipate using any PFS facility if ultimately constructed. And the profit potential available to plaintiffs as founding members of the PFS consortium, militate against an award of damages here.

Additionally, PFS was unlikely ever to mitigate plaintiffs' costs here. Notwithstanding the fact that PFS was unlikely to be constructed – and, ultimately, was not constructed – in time to accommodate SNF from plaintiffs' facilities, PFS was a more costly storage alternative than on-site storage, a fact of which plaintiffs were aware at the beginning of their involvement. PFS also was not pursued as a first choice alternative by plaintiffs. From the beginning, plaintiffs intended PFS to serve merely as an insurance policy in the unlikely event that the state governments in Alabama and Georgia implemented dry storage restrictions similar to those implemented in Minnesota in the mid-1990s. Of course, unlike Minnesota, no such actions in

either Georgia or Alabama were expected and, ultimately, none were taken by either state to limit plaintiffs ability to construct dry storage facilities. In any event, although a formal decision has not been made, plaintiffs do not anticipate using any PFS facility if ultimately constructed. Finally, as a founding member of the PFS consortium, plaintiffs may profit from PFS if it is developed, yet plaintiffs' claim does not include any offset for any potential profits.

The PFS venture was speculative from its inception, was unlikely to solve plaintiffs' capacity concerns, and was, in fact, unlikely ever to be used by plaintiffs for the storage of their SNF. The application of the law to the evidence in this case leads to a finding that plaintiffs' investment in PFS was not reasonable mitigation of damages. Instead, the investment simply increased the Government's exposure without any legitimate possibility of reducing the damages.

## VII. PLAINTIFFS CANNOT ESTABLISH THAT THE COSTS THEY ALLEGEDLY INCURRED FOR INTERNAL LABOR, OVERHEAD AND ENGINEERING SUPERVISION WERE INCREMENTAL TO DOE'S BREACH

In order to recover costs as damages in this case, plaintiffs must establish that the costs incurred were incremental to DOE's breach of the Standard Contract and otherwise would not have been incurred had DOE performed its contractual obligations. Indiana Michigan, 2005 WL 2173563 at *5; Fawick Corp. v. United States, 149 Ct. Cl. 623, 637 (1960); San Carlos Irrigation & Drainage Dist. v. United States, 111 F.3d 1557, 1563 (Fed. Cir. 1997) ("[a] plaintiff must show that but for the breach, the damages alleged would not have been suffered" (emphasis added)); accord United Indus. Syndicate, Inc. v. Western Auto Supply Co., 686 F.2d 1312, 1316 (8th Cir. 1982) ("[t]he fundamental measure of contract damages is that which places the nonbreaching party in the position it would have been but for the breach"). With respect to the costs for internal labor, overhead, and engineering supervision, plaintiffs cannot meet their

burden. Instead, there is significant evidence that most, if not all, of these costs would have been incurred even if DOE performed under the Standard Contract.

As part of their claim, plaintiffs have included all internal labor costs that were billed to any allegedly damages-related project, such as the plant Hatch and Farley ISFSIs and the plant Vogtle rerack. These costs were added to the claim without regard to the job duties of the employees performing the tasks, to the scheduling of the tasks, or to the amount of time spent by each employee upon a damages-related project. Instead, any time that was billed to a project was charged to the damages claim as well. "It is settled . . . that a contractor is not entitled to recover 'expenses which would properly have been incurred regardless of the [breach].'" Boyajian v. United States, 423 F.2d 1231, 1236 (Ct. Cl. 1970) (quoting Saddler v. United States, 287 F.2d 411, 415 (Ct. Cl. 1961)). Rather, plaintiffs may only recover for labor performed by their employees to the extent that they can show that these labor costs represent an incremental cost. See also Wilner v. United States, 23 Cl. Ct. 241, 258, 262-63 (1991) (allowing recovery for hours that would not have been worked but for the delay).

Consistent with this principle, salaries or wages generally may represent an incremental cost or damage under two circumstances. First, an employer may recover where the employer actually pays his employee because of the breach. In this regard, the United States Court of Appeals for the Eighth Circuit has refused to award such damages to a corporate employer where there was no evidence that its employee "requested payment, that payment was made, or that the parties intended such a payment to be made" for the additional time he had worked because of the breach. Wilson v. Marquette Elecs., Inc., 630 F.2d 575, 586 (8th Cir. 1980) (rejecting claim that $40,000 in "lost time" for employee labor was recoverable because no showing that company lost any money because of time employee was forced to spend on project); see also

AES Tech. Sys., Inc. v. Coherent Radiation, 583 F.2d 933, 943 (7th Cir. 1978) (plaintiff not entitled to damages where breach did not "prohibit . . . employees from working on other projects"). Second, courts have generally sustained recovery for employees' lost time only where the plaintiff has foregone other contractual opportunities. Thus, recovery is only available where "salary and other overhead items allocated as a bookkeeping matter to a broken contract would in fact have been recovered in a substitute contract." Autotrol Corp. v. Cont'l Water Sys. Corp, 918 F.2d 689, 693 (7th Cir. 1990) (Posner J.); 22 Am. Jur. 2d *Damages* § 416 (2004); accord S.W. Eng'g Co. v. Cajun Elec. Power Coop., 915 F.2d 972, 978-979 (5th Cir. 1990); Willred Co. v. Westmoreland Metal Mfg. Co., 200 F. Supp. 59, 66 (E.D. Pa. 1961). It is a question for the fact-finder to determine whether such a contract reasonably could have been acquired. Autotrol, 918 F.2d at 693. Here, this type of damage award is wholly inappropriate because plaintiffs cannot demonstrate any alternative, profitable responsibilities to which they could have allocated their employees but for the Government's breach. Cf. id. (noting that "[t]here was testimony that Autotrol's controls division was consistently overbooked with new projects and had a consistent record of profitability. . . .").[20]

---

[20] The cases that plaintiffs cite in their pretrial brief do not change this analysis. As an initial matter, two of the cases cited in support for their conclusion that labor costs are recoverable are not contract cases. See Freeport Sulphur Co. v. The S/S Hermosa, 526 F.2d 300 (5th Cir. 1976) (tort claim based upon vessel collision with dock); United States v. The John R. Williams, 144 F.2d 451 (2d Cir. 1944) (admiralty claim based upon negligence of party for damage to submarine telephone cable). Further, in Convoy Co. v. Sperry Rand Corp., 672 F.2d 781 (9th Cir. 1982), the United States Court of Appeals for the Ninth Circuit expressly noted that the district court found that the plaintiff had lost the benefit of its supervisors' services as a direct result of the breach. Id. at 785-86. The court in Dunn Appraisal Co. v. Honeywell Information Sys. Inc., 687 F.2d 877 (6th Cir. 1982), reached a similar conclusion. Id. at 884 (relying upon Convoy and holding that the breach deprived the plaintiff of the salary employee's services).

At trial, the Government will show that plaintiffs' damages claim misstates the incrementality of these personnel and overhead charges. The Government will present testimony that demonstrates that plaintiffs planned work upon damages-related projects around other work needed at their facilities so as not to interfere with regular activities and to draw upon the existing workforce during slower periods of time. Deposition of Jim Wade ("Wade Dep."), 53:1-54:19. Employees generally were assigned to work upon damages-related projects based upon their availability. Id. Plaintiffs structured activities, such as loading campaigns, in an effort to avoid paying overtime or incurring otherwise unnecessary contractor expenses. Wade Dep., 53:18-54:8, 327:3-19. Plaintiffs neither can identify any material number of employees that was retained solely because of the work upon damages-related projects nor identify employees who were terminated at the completion of work upon these projects. Additionally, plaintiffs have introduced no evidence concerning the work that would have been performed by these employees had they not been engaged in the damages-related projects or contractors that were added to the facility to account for the diversion of resources to damages-related activities. Plaintiffs' failure is demonstrative of their inability to establish incrementality and is not surprising given that, between 1999 and 2003, between 38% and 92% of the employees charging time to damages related activities charged less than $5,000 of their total annual compensation as an incremental cost in any particular year. L. Johnson Rep., 10-11. These costs are not incremental simply because plaintiffs so assert. Instead, plaintiffs bear the burden of establishing incrementality for each of the costs asserted in damages.[21]

---

[21] Plaintiffs' brief incorrectly simplifies the Government's position upon the utility personnel and overhead costs. Our position is not that, as a matter of course, these costs are not recoverable. Rather, to the extent that plaintiffs establish that employees were retained based upon work being performed upon incremental projects, that overtime was paid in connection

Finally, the Government's damages expert removed all utility personnel costs from plaintiffs' claim, including approximately $4.6 million that was included by plaintiffs as offsets to that claim. L. Johnson Rep., Exhs. 4, 13, and 16. To the extent that the Court allows plaintiffs to recover the time spent by utility personnel, the offsets related to the time spent by utility personnel must be included to reduce plaintiffs' damages.

## VIII. PLAINTIFFS' CLAIMED DAMAGES MUST BE REDUCED BY AT LEAST AN ADDITIONAL $1,221,477 BASED UPON LACK OF SUPPORT

Plaintiffs must provide appropriate documentary or other support from their records to establish their damages claims. See Roseburg Lumber Co. v. Madigan, 978 F.2d 660, 667 (Fed. Cir. 1992) (plaintiff must provide adequate support for claimed costs). A contractor's failure to present any documentary support for its assertions that it incurred costs, precluding the Government from verifying that the costs were incurred and the reasons for their incurrence, precludes any recovery of those costs. Barrow Utils. & Elec. Co. v. United States, 20 Cl. Ct. 113, 121 (1990). If plaintiffs fail to meet their burden with regard to any particular claimed damage, they cannot recover that claimed damage, and plaintiffs cannot place upon the Government the burden of disproving a presumption that each of their damages is adequately supported and reasonably certain. See Quiman, S.A. v. United States, 39 Fed. Cl. 171, 183 (1997), aff'd, 178 F.3d 1313 (Fed. Cir. 1999). The burden of proof in this case rests squarely upon plaintiffs.

with those projects, or that contractors were retained to supplement staff based upon work upon those projects, such costs may be recoverable. There is little evidence to suggest that plaintiffs can establish any of these three qualifications with respect to the vast majority of the internal personnel and overhead costs which they claim.

In its November 8, 2002 order, this Court ordered plaintiffs to participate in an audit of the alleged damages to be sought at trial. That order subsequently was supplemented by order dated April 7, 2004. In connection with that audit, the Government served hundreds of audit requests seeking documents supporting each underlying cost in excess of $5,000 sought by plaintiffs in their damages claim. The purpose of these requests was to confirm that the costs were, in fact, incurred and paid by plaintiffs. The audit was intended to, among other things, allow the parties to stipulate to incurred and paid costs from an accounting perspective to limit, as much as possible, the trial to issues concerning causation. By the time the Government served its expert reports on June 10, 2005, plaintiffs had not provided sufficient support to allow the Government's auditors to verify the payment of certain costs that plaintiffs are claiming here. This lack of support caused Mr. Johnson to question those costs from an accounting standpoint. Since that time, plaintiffs have provided additional documentary support for certain previously unsupported costs. However, at least $1,221,477 remains unsupported in the claim.[22]

Plaintiffs' failure to support certain costs in their damages claim constitutes additional grounds for reduction of that claim. Based upon plaintiffs' failure to provide sufficient support for all of their allegedly incurred costs, at least $1,221,477 should be deducted from plaintiffs' damages claim based upon the lack of proper accounting record support. At trial, we will

---

[22] As we represented during the September 15, 2005, pretrial conference, plaintiffs now have provided sufficient evidence from an accounting perspective to confirm that the $7,059,853 in costs associated with Southern Company Services ("SCS") was incurred and paid by plaintiffs. With respect to the still unsupported costs associated with Williams Power Corporation ("Williams"), totaling $5,730,104, the Government has requested, and expects to receive, additional information from plaintiffs supporting those costs. We timely will inform plaintiffs if and when, from an accounting perspective, those costs are considered supported. However, even if supported from an accounting perspective, the Government may challenge some or all of the SCS and Williams costs as non-incremental to plaintiffs' damages claim.

identify costs that are unsupported. Nevertheless, because it is plaintiffs' burden to establish appropriate support for all of their claimed costs, the Court should disallow recovery for any costs that plaintiffs failed properly to support during the audit process.

## IX. PLAINTIFFS' CLAIM FOR THE COST OF CAPITAL GROSS-UP OF PAST COSTS SIMPLY IS A LEGALLY UNSUPPORTED ATTEMPT TO RECOVER PREJUDGMENT INTEREST

Plaintiffs have improperly included nearly $29 million in their damages claim associated with the application of their costs of capital to gross-up their past costs so as to account for the time value of money. Because these alleged costs simply are a thinly-veiled attempt to recover prejudgment interest, plaintiffs are precluded from recovering these costs as a matter of law.

Interest upon a claim against the United States is precluded under 28 U.S.C. § 2516(a) unless permitted under a contract or Act of Congress. In their brief, plaintiffs concede, as they must, that "neither the Contract nor the NWPA address the allowance of prejudgement interest on 'claims.'" Pl. Br. at 53-54. This concession alone is fatal to plaintiffs' claim.

Plaintiffs' attempt to circumvent the well-established rule precluding the recovery of prejudgment interest by contending that the cost of capital gross-up for its past costs does not represent interest "on a claim," which they concede would be barred, but rather constitutes interest as a component of a claim. Pl. Br. at 53-54. As the United States Supreme Court explained in Library of Congress v. Shaw, 478 U.S. 310 (1986), "'the force of the no-interest rule cannot be avoided simply by devising a new name for an old institution: '[T]he character or nature of 'interest' cannot be changed by calling it 'damages,' 'loss,' 'earned increment,' 'just compensation,' 'discount,' 'offset,' or 'penalty,' or any other term, because it is still interest and the no-interest rule applies to it.'" Contel Advanced Systems, Inc., 384 F.3d at 1379 (citing Shaw, 478 U.S. at 321). Importantly, the Supreme Court has identified the underlying purpose

behind prejudgment interest which is to make the injured party whole. Monessen Southwestern Railway Co. v. Morgan, 486 U.S. 330, 345 (1988) (Blackmun, J., concurring in part, dissenting in part) (stating that Supreme Court repeatedly has repeatedly "authorized prejudgment interest for economic injury when the purpose of the overall award is to make the plaintiff whole").

Here, plaintiffs' attempt to recover this cost of capital gross-up plainly is an attempt to "make themselves whole" based upon the time value of money and therefore constitutes interest upon a claim, rather than a distinct element of their damages claim. As we will demonstrate at trial, and as Dr. Neuberger explained in his expert report in this case, from an economics perspective, plaintiffs' claim for the cost of capital gross-up upon their past damages claim is the equivalent in all material respects to a claim for prejudgment interest. Indeed, plaintiffs' own expert conceded as much at his deposition.

> Q. And what's the purpose of prejudgment interest?
>
> A. I believe that the purpose of prejudgment interest at least in part is to make the wronged party whole.
>
> Q. What's the purpose of the cost of capital analysis that you performed?
>
> A. The weighted average cost of capital is a more direct and appropriate way of making the party whole, the wronged party whole.

Metcalfe Dep., 294:1-10. In other words, contrary to plaintiffs' litigation-inspired argument, plaintiffs' expert agrees that the purpose of the cost of capital is simply a "more direct and appropriate" way of effectuating the purpose of prejudgment interest. Further, this Court has unequivocally rejected claims for the replacement cost of capital because such claims are simply disguised claims for prejudgement interest. See Columbia First Bank v. United States, 54 Fed. Cl. 693, 699-700 (2002) (rejecting plaintiff's claim for $4.4 million to "compensat[e] the

plaintiff for the lost use of the money for the intervening period" because such cost violated ban upon prejudgment interest).

Finally, plaintiffs' reliance upon several Winstar cases for the proposition that the recovery of the borrowed cost of capital is recoverable is misplaced. Pl. Br. at 54-55. Plaintiffs did not borrow monies to finance their past damages and did not incur any out-of-pocket financing costs paid to third parties. Rather, plaintiffs simply utilized their own funds to pay for their past costs. As a result, plaintiffs merely are claiming an economic cost associated with the financing of past costs. But, as this Court recently explained, "in Winstar cases, plaintiffs cannot recover damages under a cost replacement capital theory for costs they did not actually incur." Standard Federal Bank v. United States, 62 Fed. Cl. 265, 292 (2004). This is precisely what plaintiffs are attempting to do in claiming as a damage their cost of capital gross-up in this case. As a matter of law and fact, plaintiffs are not entitled to recover the cost of capital incurred upon the dry storage project.[23]

## X. PLAINTIFFS' DAMAGES ARE LIMITED BY THE DECISION IN INDIANA MICHIGAN AND BY THIS COURT'S APPLICATION OF THAT DECISION

Plaintiffs' damages claim and their brief contain significant future costs allegedly resulting from DOE's breach of the Standard Contract. Indeed, of the $152 million claim originally pursued by plaintiffs, $73 million relates to damages that post-date December 31, 2004. Consistent with the Federal Circuit's decision in Indiana Michigan Power Co. v. United States, __ F.3d __, 2005 WL 2173563 (Fed. Cir. Sept. 9, 2005), and this Court's September 16,

---

[23] In the Indiana Michigan litigation, the trial court rejected plaintiff's gross-up of its past costs based upon the principles articulated in Shaw. It is worth noting that the individuals responsible for preparing the plaintiff's claim in Indiana Michigan are, with one exception, those responsible for preparing plaintiffs' claim here.

2005 order, those future damages will be left for a future litigation. For the purposes of the Government's pretrial brief, the Government notes that it disputes plaintiffs' future damages claims and contests the litigation-inspired theories underlying those future claims, including plaintiffs' contentions concerning the required capacity of their dry storage facilities through 2020 at plants Hatch and Farley and the purported need to construct a dry storage facility at plant Vogtle that is wholly unsupported by the record in this case. The Government reserves all right to challenge these claims in the future and will specifically address any future damages asserted here when they are brought in an action consistent with the Indiana Michigan decision.

The Government understands that plaintiffs will move to file a “supplemental” complaint to provide the Court with jurisdiction to hear evidence at trial concerning costs incurred to December 31, 2004, pursuant to the Court’s September 16, 2005 order. In response to this motion, the Government will provide the results of its analysis of the effect of the Federal Circuit’s decision in Indiana Michigan upon the Court’s jurisdiction to award damages for all damages incurred up to December 31, 2004.

## CONCLUSION

For the reasons outlined above, the Government respectfully requests that the Court enter judgment in the Government’s favor.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/Harold D. Lester, Jr.
HAROLD D. LESTER, JR.
Assistant Director

OF COUNSEL:

STEPHEN FINN
HEIDE L. HERRMANN
MARIAN E. SULLIVAN
Trial Attorneys
Commercial Litigation Branch
Civil Division
Department of Justice
Washington, D.C. 20530

s/John C. Ekman
JOHN C. EKMAN
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington D.C. 20530
Tele: (202) 307-6288
Fax: (202) 307-2503

September 28, 2005

Attorneys for Defendant

CERTIFICATE OF FILING

I hereby certify that on this 28th day of September, 2005, a copy of foregoing "DEFENDANT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Marian E. Sullivan