**Tennessee Valley Authority v. U.S. No. 01-249C July 14, 2005**

**Heritage Reporting Corporation**

**Page 2078 to Page 2330**

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

*HERITAGE REPORTING CORPORATION*
*1220 L Street, N.W.*
*Suite 600*
*Washington, DC 20005*
*Phone: 202-628-4888*
*FAX: 202-371-0935*

Page 2186

THE COURT: Mr. Kiraly, I believe – Mr. Crawford?

MR. CRAWFORD: No further questions.

THE COURT: Mr. Shea, may I excuse Mr. Kiraly as a witness?

MR. SHEA: You may, Your Honor.

THE COURT: Mr. Kiraly, I may now excuse you as a witness, and I do so with appreciation, and thanks for your testimony here yesterday and today. You are excused.

THE WITNESS: Thank you, Your Honor.

THE COURT: Thank you. Now, before Ms. – while we're getting set up and Mr. Palmer and others would start getting set up, may I use this little hiatus to make my request to counsel? It really is directed, Ms. Orfield, to the lead counsel and Mr. Shea as the counsel of record. Obviously, there are embedded in Mr. Kiraly's testimony, as there have been some other witnesses, but especially Mr. Kiraly's testimony, some legal concepts. And to my mind, some of those, not all, but some of those legal concepts are reflected in a decision by the Federal Circuit styled Wickham Contracting Company v. Fischer, 12 FR 3d 1574, decided in 1994. That deals specifically with

Page 2187

overhead and AFUDC, what might pass in this case for AFUDC, but that is a case in which a government contractor was making a claim. This case is a little different. This is just the reverse because the government is providing the service to the private party, rather than the private party providing a service to the government. And my, what I would ask counsel to do when you're engaged in post-trial briefing in this case is to deal with the converse situation in contrast to a case such as Wickham. Am I getting through? I'm trying to be as brief and concise as I can in making this request.

MS. ORFIELD: I think it's clear, Your Honor.

THE COURT: Thank you, Ms. Orfield. Mr. Shea?

MR. SHEA: Absolutely clear, Your Honor, you may have recalled, but I sort of argued that to begin the litigation.

THE COURT: I understand, I understand. It's just that because of Mr. Kiraly's testimony, it's embedded all the way through, and I just think we have to deal with this explicitly. Are we ready, Ms. Sullivan?

Page 2188

MS. SULLIVAN: We are, Your Honor.

MR. LO RE: Your Honor, I wondered if maybe we could just take a very quick break while we set up and if we could reconnoiter here momentarily?

THE COURT: Yes, in fact, we'll go off the record for a minute. Everyone can stay, or they may leave. It's up to them.

MS. SULLIVAN: Thank you, Your Honor.

(Whereupon, a short recess was taken.)

MS. SULLIVAN: Your Honor, Ms. Heide Herrmann is with Mr. Morgan in Los Alamos. She's a member of our office. Just to speed things along, may I ask, Ms. Herrmann, could you make sure the following exhibits are easily accessible for Mr. Morgan: The binder containing Defendant's Exhibit 5, the separate documents Defendant's Exhibit 5.034, 5.063, Defendant's Exhibit 28, Defendant's Exhibit 27, and Defendant's Exhibit 37. Do you have all those documents?

MS. HERRMANN: Yes, I believe I do.

(Discussion off the record.)

THE COURT: Ms. Sullivan, would you formally call Mr. Morgan as a witness?

MS. SULLIVAN: Yes, Your Honor. The government calls Robert L. Morgan as its next

Page 2189

witness.

THE COURT: Mr. Morgan, I'm authorized by statute and rule to administer the oath to you by this remote means, if you're testifying by video conference. If I give you the oath, will you respond, please?

THE WITNESS: Yes, I will respond.

THE COURT: All right, thank you.

Whereupon–

ROBERT MORGAN

a witness, called for examination, having been duly sworn, was examined and testified as follows:

THE WITNESS: I do.

THE COURT: Would you please state your full name for the record?

THE WITNESS: Robert L. Morgan.

THE COURT: Thank you, Mr. Morgan. And, Ms. Sullivan, you may proceed.

MS. SULLIVAN: Thank you, Your Honor.

DIRECT EXAMINATION

BY MS. SULLIVAN:

Q. Mr. Morgan, when did you serve as the director of what became known as the Office of Civilian Radioactive Waste Management?

A. From late January 1983 until sometime in

Page 2190

January of 1984.
Q. And was the office called by a different name when you first became director?
A. Yes, it was a different name.
Q. And do you recall that name?
A. It was the Nuclear Waste Project Office, as I recall.
Q. Mr. Morgan, how were you selected to be the director?
A. I was selected by Secretary Hodel.
Q. And as director, to whom did you report?
A. To the Secretary.
Q. How many years were you with the Department of Energy and its predecessor agencies?
A. I joined the Atomic Energy Commission in 1965 and retired in 1988.
Q. Mr. Morgan, do you hold a Bachelor's degree?
A. Yes, I do.
Q. And from where?
A. The United States Military Academy.
Q. When was that degree conferred?
A. 1952.
Q. And in what subject is that degree?
A. Military engineering.

Page 2191

Q. Mr. Morgan, do you also hold a Master's degree?
A. Yes, I do.
Q. And where did you obtain that Master's degree?
A. From MIT.
Q. And when was that degree conferred?
A. 1959.
Q. And what subject is your Master's degree?
A. I have a Master's degree in civil engineering and a Master's degree in nuclear .engineering.
Q. Mr. Morgan, did you serve in the Army?
A. Yes, I did.
Q. For how long?
A. 13 years.
Q. And after you left the Army, where were you first employed?
A. At the Savannah River operations office at the Atomic Energy Commission.
Q. Would you please summarize briefly your positions from the time you joined the Atomic Energy Commission until the time you retired from the Department of Energy?
A. From 1965 to 1966, I was division director

Page 2192

of the heavy water organic pool reactor program at Savannah River. 1966 to 1973, I was the senior site representative at Canoga Park, adjoining to the national core of the reactor development and technology division of the Atomic Energy Commission. '73 to 1980, I was deputy manager of the Savannah River operations office. And then in 1980, I was selected as manager of the Savannah River operations office.
Q. And did you remain the manager of the Savannah River operations office until you retired in 1988?
A. Yes, though I had some details in Washington with the Nuclear Waste Policy Act and also the Assistant Secretary for defense programs.
Q. Mr. Morgan, how have you been employed since you retired from the Department of Energy in 1988?
A. Could you repeat the question, please?
Q. Yes. How have you been employed since you retired from DOE in 1988?
A. From 1988 until 1990, I did consulting with various companies that were doing business with the Department of Energy. And then in 1990, I joined an 8A firm called Mesa, which was doing environmental

Page 2193

impact statements for the Department of Energy. I left there in 1995. And then since 1995, I have been in consulting again.
Q. Thank you. Mr. Morgan, what was accomplished during your year as director of the Office of Civilian Radioactive Waste Management?
A. The first activity was the notification of the governments that were affected in the program. They had, there was a requirement within the Nuclear Waste Policy Act that they be notified. The second thing was regarding the contract with the utilities. The Federal Register notice had been sent out as the draft, it actually got to the Federal Register after I had arrived, but I had not seen it when it was transmitted to the Federal Register. We resolved the comments from that and published the final ruling for the contract. We then started into the mission plan, which was to try to integrate all the activities of the repository, the monitored retrievable storage and transportation activities that would be required over the Act.
Q. Thank you. I think you just said the answer to this next question, but let me ask it again. What was the status of the development of the standard contract when you arrived at the Office of

Page 2194

Civilian Radioactive Waste Management?
A. There had been a draft of that contract submitted to the Federal Register, and then we received comments on that draft, and then --
THE COURT: Mr. Morgan, we're making an adjustment, so we don't get feedback on your voice transmission. It'll just take a moment. I think we'll be fine now, Ms. Sullivan.
MS. SULLIVAN: Thank you, Your Honor.
BY MS. SULLIVAN:
Q. Mr. Morgan, let me ask the question again, what was the status of the development of the standard contract when you arrived to be director of the Office of Civilian Radioactive Waste Management?
A. When I arrived or accepted the position in Washington, the draft of the contract had already been transmitted to the Federal Register for publication. After it was published, we received comments from the utilities and the states and other interested parties, and then we resolved those comments and submitted the final ruling to the Federal Register.
Q. Do you recall meeting with utility representatives prior to the publication of the final standard contract?

Page 2195

A. Yes.
Q. With whom did you meet?
A. I met with representatives of Edison Electric Institute and several of the utility members of EEI and, I believe, several states.
Q. And what did you discuss in your meeting with EEI?
A. They felt very strongly that the contract should include a rate of acceptance beginning in 1998, which we denied.
Q. And what did you discuss in your meeting? Actually, let me back up. You testified that you met with several of the utilities. Were there several meetings that you had with individual utility representatives?
A. Primarily, there was a, as I recall, a meeting at EEI where several of the utilities were present, and I met also with General Electric and Westinghouse, and I'm not sure of how many other utilities we met with.
Q. And briefly, what was the issue that you discussed? Do you recall what the issue was that you discussed with GE and Westinghouse?
MR. SMALL: Objection, Your Honor, I don't understand how these discussions are relevant to this

Page 2196

lawsuit, and they're hearsay.
THE COURT: Well, let's sort out relevance first. Ms. Sullivan?
MS. SULLIVAN: Your Honor, my questions are geared to the period of contract formation, meetings and input that DOE had with regard to the final standard contract and what inputs there were to that document. I understand that the standard contract is at issue in this case and what terms were and were not negotiated during the period of contract formation is my question about meetings held with utilities.
THE COURT: Mr. Small, do you have anything further?
MR. SMALL: Your Honor, the question in this case would be whether such a term was negotiated with TVA.
THE COURT: Liability has been established. However, we do have a rate issue in the case that has been raised regarding damages, so I'm going to take the testimony. Now, since we are past the relevance objection, Mr. Small, do you have something further that you'd care to add?
MR. SMALL: Additionally, Your Honor, I also had an objection on the grounds of hearsay

Page 2197

because I anticipated that the witness was being asked what was said at a meeting that occurred many, many years ago.
THE COURT: Well, if Mr. Morgan were to answer that a certain person said a certain thing, which would be absolutely remarkable at this time, that would be hearsay. If he relates what he now believes to be the gist of the meetings and the points or objections that were posed, that's a different matter, that's not hearsay. And so with that as a general guide, let's go forward. Ms. Sullivan?
MS. SULLIVAN: Thank you, Your Honor, and I will tailor my question to the Court's guidance. Thank you.
BY MS. SULLIVAN:
Q. Mr. Morgan, you testified that you met with GE and Westinghouse. Do you recall the topics that were discussed during that meeting?
A. The topic that were discussed were charges relating to fuel prior to the establishment of the 1 mil per kilowatt hour. The problem was that GE's fuel did not have the irradiation that Westinghouse did, and therefore, there was going to be more fuel elements from GE submitted per kilowatt hour than

Page 2198

there was from Westinghouse.
So we were trying to formulate a way to make it an equitable cost for both GE and Westinghouse. This is the fuel that existed prior to the establishment of the 1 mil per kilowatts. The average of the expenses to GE and Westinghouse had to be an average of 1 mil per kil watt for the aggregate of that fuel.
Q. Thank you, Mr. Morgan. Turning back to what you recall about your discussions regarding the rate of acceptance, I believe you testified that the request of the utilities with regard to the rate of acceptance was rejected. Why was the request rejected?
A. The Nuclear Waste Policy Act was a series of requirements that I felt were extremely difficult to meet. There were many technical unknowns, what would be the licensing requirements from NRC, what would be the characterization requirements of a repository, and that there was the potential intervention by some of the stakeholders.
But I felt that there was a potential that Congress may change the law which, in effect, they did at a later point in time. So I felt it was absolutely impossible or incomprehensible that I

Page 2199

would agree to an acceptance rate with all these unknowns. I felt that that would be just absolutely inappropriate.
Q. Mr. Morgan, do you have the exhibits that comprise Defendant's Exhibit 5 before you?
MS. SULLIVAN: Ms. Herrmann, could you provide those exhibits to Mr. Morgan? Your Honor, this is a binder that's been provided to the Court.
THE WITNESS: Yes, I have.
MS. SULLIVAN: Thank you. And, Your Honor, we elected not to use the Trial Director because, if we did do that, we would lose Mr. Morgan's picture.
BY MS. SULLIVAN:
Q. So, Mr. Morgan, did you have an opportunity to review the stack of materials that's been placed in front of you prior to before we began today?
A. This entire record was transmitted to me by e-mail yesterday, and I spent last evening and a little time this morning going through these records.
Q. Mr. Morgan, do you recognize the set of documents before you to be the administrative record to the standard contract?
A. Yes, I do.
Q. Do you recall receiving these documents in the course of the development of the standard

Page 2200

contract?
A. Yes.
Q. And were these documents sent directly to you?
A. I beg your pardon?
Q. Were these documents sent directly to you?
A. Some of them were sent directly to me. Some were sent to the contracting officer who had signed the rule. But I did review all of these records when they came in.
Q. And why did you review these documents?
A. Because I was held responsible for the contract by the Secretary of Energy and I felt that I had to review those in the rule-making, and I had the responsibility of making the decision as to whether they were included or not.
Q. Thank you, Mr. Morgan.
MS. SULLIVAN: Your Honor, at this time, the government moves for admission of Defendant's Exhibit 5, which is the administrative record for the development of the standard contract. I have questions about two particular sets of comments in this document – I mean, in this set of documents, but I would like to move for admission of the entire record.

Page 2201

THE COURT: Before we get Mr. Small's reaction to that request, would you please, Ms. Sullivan, identify for the Court exactly what you mean by Defendant's Exhibit 5?
MS. SULLIVAN: Yes, Your Honor. Defendant's Exhibit 5, which are Defendant's exhibits, they're broken up through Defendant's Exhibit 5.000 through Defendant's Exhibit 5.086.
THE COURT: Does that, and this is not going to make sense to Mr. Morgan, but does that essentially comprise this first volume?
MS. SULLIVAN: Yes, Your Honor, that has been provided to the Court.
THE COURT: All right. Mr. Small?
MR. SMALL: Your Honor, we do not dispute that the volume contains letters that were received by DOE regarding the standard contract, apparently, in 1983, but we just had a few minutes to look at it. On the other hand, Your Honor, the letters predominantly – I mean, I think there might be one in there from TVA, but predominantly, they're from other utilities, not TVA.
And to that extent, they're hearsay, and also, Your Honor, the vast bulk of this record is totally irrelevant to any issue in this case, and to

Page 2206

Q. Mr. Morgan, could I ask you to turn to what is marked as Defendant's Exhibit 0.34?
A. Yes, I have that document.
Q. Okay. Mr. Morgan, do you recognize this to be a copy of the Edison Electric Institute's comments on the standard contract, the draft standard contract?
A. Yes.
Q. Do you recall reviewing this set of comments at the time it was submitted?
A. Do I recall receiving this?
Q. No, my question, do you recall reviewing this document?
A. It's still – I still didn't hear the question.
Q. My question was whether you recalled reviewing this document.
A. Yes, I reviewed this document.
Q. Thank you. Mr. Morgan, what is your understanding as to what the Edison Electric Institute is?
A. The Edison Electric Institute is an association of electric generating companies, and I believe that they are a Washington lobbying group.
Q. Thank you. Mr. Morgan, would you please

Page 2207

turn to page eight of the letter from EEI?
A. Page eight?
Q. Yes. And, Mr. Morgan, I would like to read a portion of that first paragraph into the record and then ask you a question. The paragraph begins, "Although the contract is generally comprehensive and complete, there are two significant issues on which the proposed contract is silent, DOE performance standards and purchaser remedies. Article II states that the disposal services shall commence not later than January 31st, 1998, a provision consistent with the Nuclear Waste Policy Act. However, no other milestones are included, nor does the contract commit DOE to accept any given quantity of SNF/HLW." Do you see where I've read, Mr. Morgan?
A. Yes, I see that.
Q. Mr. Morgan, do you recall the concern from EEI that is raised in the portion of the paragraph that I just read?
A. Yes, I recall this concern.
Q. And could I direct your attention to two pages later in the document, the second page of the attached detailed comments, do you have that page in front of you, Mr. Morgan?
A. Yes, I do.

Page 2208

Q. And that second paragraph on that page reads, "The contract should include a recognition that DOE will design its facilities with the capacity to receive SNF/HLW at a rate commensurate with the amount of SNF/HLW then being generated, together with the accumulated backlog of SNF/HLW.
We believe that DOE should be able to take delivery of SNF/HLW equal to that year's generation, plus a reasonable share of the backlog. While the contract may not be the appropriate place to commit DOE to a specific numerical receiving rate, DOE should recognize at least qualitatively the need to have adequate annual receiving capacity to handle industry needs.
This would be consistent with the direction of Section 302(a)(5) of the Act that DOE take title to SNF/HLW as expeditiously as practicable upon request of the generator or owner. A new clause should be added."
And then, Mr. Morgan, if you turn the page, the clause reads, "Whereas DOE recognizes that its ability to take delivery of spent nuclear fuel and/or high-level radioactive waste must be commensurate with the amount of such fuel and waste then being generated, together with the amount of such fuel and

Page 2209

waste previously generated, and consistent with its obligation to take title to such fuel and waste as expeditiously as practicable upon the request of the owner or generator of such fuel and waste."
Mr. Morgan, do you recall reviewing the material that I just read from EEI's comments on the draft standard contract?
A. Yes, I recall that.
Q. Mr. Morgan, did DOE consider this request by EEI for a qualitative description of the rate of acceptance to be included in the contract?
A. We considered it and rejected it.
Q. And why was it rejected?
A. Because of the uncertainties of the program that I mentioned earlier; and it was impossible for me to commit to a given rate with the unknowns that we were facing. The Nuclear Waste Policy Act did not include an acceptance rate, and so we were well within what we felt was the law that was passed by Congress.
Q. Mr. Morgan, would you please turn your attention now to what's marked as Defendant's Exhibit 5.063?
A. Yes, ma'am.
Q. Mr. Morgan , do you recognize this document

Page 2210

to be TVA's comments on the standard contract?
A. This document that I have does not have a cover letter on it, and so I can't say whether this was addressed to me, but I do know that we've reviewed comments from TVA.
Q. And if I could direct your attention to the first page of the exhibit, I believe the fourth line down in the first paragraph reads, "TVA believes a separate contract should be made for each reactor unit." Do you see that?
A. No, I don't. This is on page – the first page?
Q. The first page under general comments, the fourth line in that first paragraph.
A. Yes.
Q. "TVA believes."
A. Yes.
Q. Okay. Does that provide any insight as to whether these were TVA's comments on the contract?
A. I don't understand that question, I'm sorry.
Q. I'm being inartful, and I apologize. You said that it doesn't have a cover letter, but you do recall receiving comments from TVA that were reviewed, is that correct?

Page 2211

A. That is correct.
Q. Okay. But without a cover letter, you don't know whether these were TVA's comments?
A. I can't, you know, say whether these were TVA comments sent to me, and, again, it's been a long time since I looked at some of these records.
Q. Well, let me ask you this, do you agree that there are statements with regard to, that mention TVA in them, in this document?
A. Yes.
Q. Mr. Morgan, would you please turn to page five of this document?
A. Yes.
Q. And I direct your attention to the middle of that page, and I'm going to read a section into the record that begins, "In addition, a commitment to do no more than start accepting deliveries by 1998 is empty and meaningless without setting forth some reasonable minimum rate of acceptance which corresponds with the purposes of the Act. Of course, under the priority ranking system in the draft contract, it would be difficult at the time contracts are executed to give each purchaser assurances of delivery acceptance at any specific rate. This could, however, be done on an industry

Page 2212

wide basis. Accordingly, the following DOE responsibilities should also be added to Section B of Article V: DOE shall start accepting delivery of SNF or HLW not later than January 31st, 1998 at not less than the annual rate of SNF and/or HLW is then being produced from civilian nuclear power plants covered by the contract with DOE for disposal of SNF and/or HLW.
After January 31st, 1998, DOE shall be prepared to accept delivery of SNF and/or HLW produced prior to set date on a schedule sufficient to provide for delivery consistent with decommissioning plans for purchasers, nuclear power plants specified in Appendix A."
Mr. Morgan, do you recall reviewing the provision or the request and the comments that I just read?
A. I recall reviewing these comments, and they were denied.
Q. And why were they denied?
A. It would be unconscionable for me as a program director to make commitments that held the government responsible for things that I was not sure that we could meet because of the uncertainties of the program that I discussed earlier. I don't know

Page 2213

how else to say it, but it is not, it was not required by Nuclear Waste Policy Act, and we did not include it.
Q. Mr. Morgan, would you now look at Defendant's Exhibit 28, please?
MS. SULLIVAN: Your Honor, I understand that Defendant's Exhibit 28 has already been admitted into evidence.
THE COURT: Yes, on the 21st of June.
MS. SULLIVAN: Thank you, Your Honor.
BY MS. SULLIVAN:
Q. Mr. Morgan, I'd like you to turn to the third page of this document, which is titled, "Summary of Disposition of Major TVA Comments."
A. Yes.
Q. Do you have that in front of you?
A. Yes.
Q. And I'd like to read the comment and the response and then ask you a question.
"Comment: The contract should address at least the minimum duties DOE must perform in return for payments to the Nuclear Waste Fund.
"Response: DOE made little in the way of substantive changes defining their responsibilities. The second recital was changed by adding the phrase

Page 2214

'as expeditiously as possible regarding DOE's responsibilities for taking title to spent nuclear fuel or high-level radioactive waste.' Some clarifications were made regarding establishment of the acceptance priority ranking of purchasers. However, no substantive dates or rates of removal of SNF are established beyond the requirements of the Act, which requires DOE to start accepting SNF by 1998."

Mr. Morgan, the last sentence of that response that I read regarding some clarifications were made, but no substantive dates or rates of removal of SNF were established, that statement, does it comport with your recollection of DOE's consideration of TVA's comments regarding the acceptance rate?

A. Yes.

Q. I now direct your attention to what is page five of this document, but it's marked page three at the top.

A. Page five?

Q. Page five of the document, but it's marked page three, and it's with the third comment. The number three is at the top.

A. Yes.

Page 2215

Q. Great. I'll forego reading the comment, but I'll read the response and then ask you a question.

"Response: DOE did not accept TVA's suggestion that DOE should start accepting delivery of SNF and HLW in 1998 at a rate not less than that which they are being produced by the civilian nuclear power industry as a whole. The final contract does obligate DOE to issue not later than January 1st, 1987 a capacity report for planning purposes and, beginning April 31st, 1991, annual acceptance priority ranking the oldest SNF and HLW having priority for receipt by the DOE repository. DOE is also obligated to provide annual reports giving the waste disposal program's plans and cost projections."

Mr. Morgan, the response that I just read, does that comport with your recollection of DOE's consideration of TVA's comments regarding what should be included in the contract with regard to acceptance rate?

A. Yes.

Q. Mr. Morgan, could I now ask you to look at Defendant's Exhibit 27?

A. I have that.

Q. Mr. Morgan, this is a copy of a May 20th,

Page 2216

1983 letter from Edison Electric Institute to you. Have I described the document correctly?

A. Yes, I recall this document.

Q. And do you recall receiving this document?

A. Yes, specifically.

Q. And why do you recall receiving this document?

A. I beg your pardon?

Q. Why do you recall receiving this document?

A. Because it was the same theme after the final rule-making that they had presented to us during the rule-making process.

Q. And what did you do in response to this letter?

A. I'm not sure what the response was. I don't have that – I don't know whether it was answered specifically or not. I can't say right now. I don't recall.

MS. SULLIVAN: Your Honor, at this time, I'd like to move for admission of Defendant's Exhibit 27.

THE COURT: Mr. Small?

MR. SMALL: Your Honor, I don't understand that the proper foundation has been laid for 27. It appears to be a copy of an Edison Electric Institute

Page 2217

letter that was sent to DOE in May of 1983. However, it was not part of the rule-making for the standard contract. It was, as I understand his testimony, it was sent after the close of the rule-making, and the witness is unable to say what, if anything, was done in response to it.

THE COURT: Well, I don't have a difficulty with the foundation in that respect because Mr. Morgan just testified he recalls specifically receiving it. I've got a small problem on relevance because it appears that this letter and the attachment relate to the controversy in the early mid-'80s over the way in which the fee would be computed.

MS. SULLIVAN: Your Honor, I agree that that is the primary focus of the letter. However, there is an issue with regard – there's a mention made of the acceptance rate issue, and that's what I wanted to ask Mr. Morgan about, not about the fee issues, but I understood that I was not to ask any substantive questions prior to seeking admission of the document.

THE COURT: That's right. Where?

MS. SULLIVAN: If you look at the bottom paragraph that begins, "Considering," there's a

sentence five lines down that begins, "Several of these" – sorry, "However, many problems remain. Several of these are of such magnitude," and then it continues, "These include the lack of standards or milestones for DOE's performance."
And that was the section of the letter that I was planning to ask Mr. Morgan about.
THE COURT: Mr. Small?
MR. SMALL: I have no objection to the letter coming in for discussion of that particular topic.
THE COURT: All right. It's admitted, granted, of limited relevance.
MS. SULLIVAN: Thank you, Your Honor.
(Defendant's Exhibit Number 27 was received in evidence.)
BY MS. SULLIVAN:
Q. Mr. Morgan, can I direct your attention to that last paragraph on the first page, which I was just discussing with the Court, and I'd like to read that paragraph into the record and then ask you a question about it.
"Considering the compressed schedule under which it was drafted, the disposal contract is a credible, although by no means a perfect document.



DOE staff worked hard in its development and did accommodate many of the comments that we submitted on the proposed draft contract.
However, many problem areas remain.
Several of these are of such magnitude that were it a normal commercial transaction, the contract would never be signed in its current form. These include a lack of standards or milestones for DOE's performance, absence of utility review rights on the DOE program, inadequate protection for utilities against nuclear and nonnuclear liability," and it continues.
Mr. Morgan, my first question is, does this statement comport with your recollection as to DOE's consideration of comments submitted by EEI?
A. Yes.
Q. And the statement about the lack of standards or milestones for DOE's performance, does that also comport with your understanding as to DOE's treatment of EEI's comments?
A. The understanding of the Nuclear Waste Policy Act, it was an off-budget item, and that the, that fees collected from the utilities would be utilized to run the program and develop a repository or a monitored retrievable storage. The idea here,



or the concept was that it was to be paid for by the utilities, whatever that cost was, and that annually, we were to look at the rates that were charged to see if that covered the cost of the activities that we were doing in the program.
So we did not commit to specific receipt rates because of the uncertainties that faced us in this program.
Q. Thank you, Mr. Morgan. You can set that document aside. Mr. Morgan, at the time the standard contract was drafted, what was the status of the design for a repository?
A. I'd say it was preconceptual. In other words, we didn't have a complete conceptual design, but we had been working on a design for the repository.
Q. And at the time the standard contract was drafted, what was the status of DOE's plan for transporting spent nuclear fuel to a repository?
A. There were inadequate licensed casks by NRC to move the amount of fuel that would be projected, and we entered into a fuel cask development program, so that we would have casks available to move the fuel when they were needed.
Q. Mr. Morgan, what information would DOE have



needed in 1983 to be able to either put a firm acceptance rate or a qualitative statement like EEI suggested into the contract?
A. Could you repeat the question, please?
Q. Sure. What information would DOE have needed in 1983 to be able to either put a firm acceptance rate or a qualitative statement regarding the acceptance rate like EEI suggested into the standard contract?
A. Well, we would have had to known, know the licensing requirements placed upon us by NRC. We would have had to know the potential interventions or lawsuits that could come at us from the stakeholders. We would have to have all the information down whole in the repository to make sure it was an acceptable location for spent fuel, and I guess, you know, excuse me, but we'd need a crystal ball.
Q. Mr. Morgan, how was the specific acceptance rate to be determined?
A. I don't understand that question. I guess it was – we were at that point in time looking at a later date of establishing the acceptance rates. I believe it was something like 1991, that by that time, we felt that we would have information available to make some commitments, whether it be at

Page 2222

the repository or at the monitored retrievable storage facility.
Q. Mr. Morgan, after the contract was issued in the Federal Register and the contracts were signed, what did you next focus upon as director of the Office of Civilian Radioactive Waste Management?
A. We had interactions with the states and stakeholders. We focused primarily on putting together a program that would reach the goals of the Nuclear Waste Policy Act with a repository, the transportation requirement and the monitored retrievable storage. We worked on what we called a mission plan of how to get there which integrated all these various parts.
Q. Mr. Morgan, would you please look at Defendant's Exhibit 37? Mr. Morgan, Defendant's Exhibit 37 is titled, "The Proceedings of the 1983 Civilian Radioactive Waste Management Information Meeting," that took place December 12th through 15th of 1983. Have I correctly described Defendant's Exhibit 37 that you have before you?
A. Yes.
Q. Do you recall this meeting in December of 1983?
A. Yes, I do.

Page 2223

Q. What was the purpose of the meeting?
A. To provide information to the utilities, the contractors, stakeholders, of what we had been doing and where we were trying to go.
Q. Could I direct your attention to pages 11 and 12 of Defendant's Exhibit 37?
A. Yes.
Q. Mr. Morgan, do you recognize those pages to be a written set of your comments at the meeting?
A. These are my comments at this meeting.
Q. Do you recall that you and others prepared written comments that were compiled into a meeting record?
A. I don't understand the question.
Q. Do you recall that you and others prepared written comments, and that those written comments were compiled into a meeting record?
A. Yes.
Q. And why was that record compiled?
A. We wanted to be totally open and have records of what transpired in the process.
MS. SULLIVAN: Your Honor, at this time, the government would move for admission of Defendant's Exhibit 37 into evidence.
THE COURT: Mr. Small?

Page 2224

MR. SMALL: Your Honor, I have no objection to the admission of the cover page and pages 11 and 12, which this witness has testified to as being the statements that he provided at the conference. However, the document itself is, I think, almost 500, if not over 500 pages long. Let's see, it's about 426 pages long and contains many papers and statements by many people. I don't see any relevance to all those statements, Your Honor. I do understand the relevance of Mr. Morgan's statement, and I have no objection to the admissibility of it, the cover and his statement, pages 11 and 12.
THE COURT: Ms. Sullivan?
MS. SULLIVAN: Your Honor, I understand there's been previous discussion about the admission of this exhibit, and I would ask Mr. Lo Re address the issue.
MR. LO RE: Yes, Your Honor, you may recall that this was an exhibit, this exhibit is a larger version, if you will, of PX-8. PX-8 is exactly what Mr. Small just described, which is the cover of this meeting and I believe the paper that Mr. Morgan presented. At the time that Plaintiffs moved for the admission of this document, we objected on the

Page 2225

grounds of completeness and explained that in fact DX-37, which we have before, us was the complete version of the document. I will note for the record that there are, as Mr. Small points out, several – a number of other reports, written papers, including several papers that were written by TVA employees. For purposes of completeness, we waited until we put Mr. Morgan on, but I believe he's just testified that the document itself is a compilation of papers from that meeting and therefore admissible.
THE COURT: Mr. Small?
MR. SMALL: Your Honor, I believe it is a compilation of papers from the meeting. That's certainly what it appears to be. There has been no testimony, however, that it's an official public document or anything like that adopted by the Department. Also, while there's been a reference to there were papers by TVA employees, to my knowledge, there's been no identification of which papers were by TVA employees. As I recall, there was a reference perhaps to one, but I don't recall any reference other than to one single one, and Mr. Lo Re just, I think, used the word plural, and I'm not aware that there are,

Page 2230

would be a sufficient foundation. I heard him testify that these were what everyone said, but I did not hear the witness testify that he was present at the entire meeting.

THE COURT: Well, no, but I think it's been established by Mr. Morgan that this was intended to be a complete compilation of the presentations at the meeting, and accordingly, DX-37 is admitted, and it's admitted in lieu of PX-8.

(Defendant's Exhibit Number 37 was received in evidence.)

THE COURT: I just note for the record that pages five through seven of this document appear to contain a statement by Daniel Boggs, Deputy Secretary, U.S. Department of Energy. It's a good thing this case isn't in the Sixth Circuit or Chief Judge Boggs would be recused from the case, and that's a relief to my family because one of my sons, my youngest son is going to be clerking for Chief Judge Boggs in about a month.

Ms. Sullivan, you may continue.

MS. SULLIVAN: Thank you, Your Honor, these are my last questions.

BY MS. SULLIVAN:

Q. Mr. Morgan, could I ask you to turn to

Page 2231

pages 11 and 12 of Defendant's Exhibit 37?

A. Yes.

Q. And may I direct your attention to the paragraph in the right-hand column which begins, "I would like to talk," and I'll read this paragraph into the record and ask you a question or two.

"I would like to talk a little bit about the strategy as laid out in the mission plan and what we intend to do. I think most of you know that the Act requires that we receive waste from utilities by January 1st, 1998. Technically, the Act does not specify how much waste or spent fuel we must begin receiving at that time. In fact, if we accepted one spent fuel element in 1998, we would technically be in accordance with the Act.

However, we did not believe that that meets the intent of the Act. The basic strategy which we've outlined in the mission plan is that, beginning in 1998, utilities will not have to provide any additional storage facilities on-site. During the first year of the operation of the repository in 1998, we should be receiving fuel at a rate so that no utility would have to add any further storage facilities either on-site or at another location."

Mr. Morgan, do you recall that portion of

Page 2232

your comments?

A. Yes, I do.

Q. Why did you make that statement?

A. Why did I make that statement?

Q. Yes.

A. I made it because the Nuclear Waste Policy Act clearly did not specify a repeat rate, but that we recognized that it may be the intent, or our program should be put together to meet the acceptance rate that we were going to put into the mission plan which, as I recall, there was an increase in backlog that went until 2003, but with a lead time of about five years to provide on-site storage that, in '98, that they would not have to make any further commitments for storage of fuel on-site.

And that's what we were, that was a goal we were trying to achieve.

Q. Was DOE obligating itself to accept fuel at the rate set forth in the mission plan?

A. Was it a DOE obligation to accept fuel?

Q. Yes.

A. Is that right?

Q. At the rate set forth in the mission plan.

A. No.

Q. Why not?

Page 2233

A. Because there's a, one of the – a commitment, a contractual commitment is one thing, and another is the mission goal that we were trying to meet. It was not a contractual requirement, but this is what we interpreted the Nuclear Waste Policy Act to say. I will have to say that there were two separate bills, one passed by the House and one passed by the Senate, and that we did not have the benefit of a conference report to get to the final language.

So we had to assume the intent because it was not specified. Some of the members of Congress wanted total emphasis on monitored retrievable storage. Others wanted emphasis on the repository. So we walked a fine line between the different directions that we were hearing from Congress.

Q. Mr. Morgan, you just testified about the intent of the NWPA, and your statement, the portion of your statement that I read makes a reference to regarding the intent of the NWPA or the Nuclear Waste Policy Act. How did you determine what you believed to be the intent of the Nuclear Waste Policy Act?

A. How did we determine that?

Q. Yes.

A. By reading the Nuclear Waste Policy Act;

Page 2234

that was our, that was our direction.

Q. From your review, did you have an understanding that the NWPA contained specific requirements regarding the rate at which DOE would accept spent nuclear fuel from the utilities?

A. It was silent on rate acceptance.

Q. Did you understand from your review of the Act that DOE was required to accept spent nuclear fuel at a rate that would preclude utilities from having to add further storage facilities on-site?

A. No, that was not a commitment or a requirement of the Act.

Q. And did you understand from your review of the Act that DOE was required to accept spent nuclear fuel at a rate that would work down the backlog of spent nuclear fuel in a specific amount of time?

A. No, that was not part of the Act either.

Q. Mr. Morgan, I'd like to direct your attention to the next paragraph of your statement, and I'd like to read that into the record and then ask you a couple questions. That portion reads, "After the initial operation of the repository through the first few years, we would anticipate that the weight of acceptance of fuel should be the rate of discharge from reactors that are in operation at

Page 2235

the time. So by the year 2000 or 2001, we should be accepting in the repository the amount of fuel as being discharged from the reactors. It is anticipated that at that point, we would look at bringing home a second repository. According to the Act, the second repository follows the first repository by four or five years. We are looking at the sensitivity of that sequence, and we may use the second repository to start working on the backlog of fuel." And then the statement continues. Mr. Morgan, do you recall that portion of your statement?

A. Yes, I do.

Q. And why did you make that statement?

A. I made it because I thought that that's what we had in the mission plan, though it had not been published at that point in time, but when the mission plan, when we finally published that in late December of the numbers, I think, working down backlogs started in the year 2003, so I was off, so there's an inconsistency between my statement here and the mission plan that came out after that.

Q. At the time you made the statement, did DOE know how much spent nuclear fuel would be discharged

Page 2236

from operating reactors on an annual basis in 2000 or 2001?

A. We had estimates from the industry what discharge weights were going to be, but those changed every year somewhat, so these were estimates only.

Q. And to meet the goal set forth in the portion of your statement that I just read, did you envision that a second repository would be needed?

A. Yes.

Q. And could I direct your attention back to that first paragraph that I read? You described the mission plan as containing a strategy. Why do you describe it as containing a strategy?

A. It was a strategy to integrate all the activities under the Nuclear Waste Policy Act, and it was a plan that we would hope to accomplish, but we were not contractually required to do it.

Q. So did you understand this strategy, as you termed it, to be a contractual requirement?

A. I beg your pardon?

Q. Did you understand this strategy, as you've described it to be, a contractual requirement?

A. Absolutely not.

MS. SULLIVAN: One moment, Your Honor.

THE COURT: Yes.

Page 2237

MS. SULLIVAN: Nothing further, Your Honor, thank you. Mr. Morgan, we're finished with our questions, but I believe that opposing counsel has some questions, so if you'll just stay where you are.

THE COURT: Mr. Morgan, I believe Mr. Small representing the Tennessee Valley Authority will have time for cross-examination now. Mr. Small, you may proceed.

MR. SMALL: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. SMALL:

Q. Mr. Morgan, you've testified that at least some utilities had serious reservations about the standard contract because of the absence of a rate term, isn't that correct?

A. I cannot understand, I didn't understand you at all, sir.

Q. I'll try again, Mr. Morgan. In the summer of 1983, some utilities – let me start over again, Mr. Morgan. Can you hear me okay now?

THE COURT: Mr. Morgan?

THE WITNESS: I still didn't hear. I'm sorry. I'm not – I don't understand.

BY MR. SMALL:

Q. Mr. Morgan, can you hear me now?