**Yankee Atomic Electric v U.S Nos.: 98-126C, 98-154C, 98-474C August 2, 2004**

**Heritage Reporting Corporation**

**Page 3378 to Page 3660**

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

*HERITAGE REPORTING CORPORATION*
*1220 L Street, N.W.*
*Suite 600*
*Washington, DC 20005*
*Phone: 202-628-4888*
*FAX: 202-371-0935*

Page 3626

normal way of doing business.
Q Do you recall that it translated into any specific requirements that you are aware of?
A No. No, sir.
Q All right, sir. Mr. Morgan, do you recall discussing with Mr. Mills the utilities' belief that the contract – I'm sorry, I already asked that question.
I believe you testified that Mr. Mills discussed with you his belief that the utilities – I'm sorry, the utilities' belief that the contract should contain an acceptance rate; is that correct?
A That's my understanding, correct.
Q And do you recall how he conveyed that idea to you?
A Correctly.
Q Okay. Face to face?
A Yes.
Q In discussions with you in your office?
A Well, he said that, yes, it should include a rate, and I said no.
Q And why did you tell him no?
A Because that was contrary to what was in the rule-making process. That was – several of the comments from utilities had requested that. And in

Page 3627

the process of resolution and prior to publishing the final rule-making, that was denied.
Q All right, sir. Do you recall why it was that that was denied?
A Because of the uncertainties. We didn't know at that time what an acceptance rate would be or could be, and that we had no conceptual design of facilities. We were looking at three different media. One was basalt, one was tuff, and one was salt. And there's no question that the activities in a salt dome would be much less of a construction problem than in the other media. And you could actually run the drifts faster in a salt media.
Q All right, sir. What about plans for transportation at the time the contract was formed? Did you have plans for transportation at the time the contract was being – I'm sorry, when I say at the time the contract was formed, I mean between the time that the draft contract was published and the time the contract was published.
A I was aware that there were inadequate commercial licensed casks available for what would be needed, and that we had to establish a program to get NRC certified casks.
Q All right. So during the time the contracts

Page 3628

were formulated, did you have a plan, a specific plan to be able to do that?
A No.
Q All right, sir. Mr. Morgan, Mr. Mills testified earlier in this trial that after his discussion with you and other program leaders, you agreed that the acceptance rate under the contract would be sufficient to cover the rate of the generation of spent nuclear fuel at the time plus some amount to work off the backlog. Did you agree to that?
A No.
Q Did you make any representations to Mr. Mills or any other representative of the utilities concerning a specific –
A No.
Q – rate?
A No.
Q Did you ever tell Mr. Mills or anyone else that, even though the contract itself would not contain a specific acceptance rate, nonetheless, you agreed that the rate the utilities wanted would be the rate that DOE would begin to use?
A No.
MR. SHAPIRO: Objection. Leading.

Page 3629

THE COURT: Well, I take it that you are asking about specific – I'll overrule the objection. The answer can stand. I think it was a no.
BY MR. MILLER:
Q Mr. Morgan, when you were director of the program, did you ever make any representations to utility representatives in private that were different than the public positions that you took on the program?
A No.
Q And conversely, did you make any public announcements with respect to the program and then in private give different assurances?
A No.
Q Mr. Mills testified earlier in this trial, Mr. Morgan, that you and other DOE officials discouraged written communications with him about the various aspects of the program that you discussed with him. Do you – did you do that?
A That's simply not true.
Q What about your staff? Are you aware that your staff did that?
A No.
Q All right. After publication of the draft contract in the Federal Register, did EEI give you

Page 3630

written input on their position?
A Yes.
Q All right. I would like to show you what's been identified as Defendant's Exhibit 2.034.
MR. MILLER: Your Honor, I have a paper copy for the Court if you would like it.
THE COURT: Thank you, Mr. Miller.
MR. MILLER: Mr. Morgan, do you need a paper copy?
THE WITNESS: No, thank you.
BY MR. MILLER:
Q Mr. Morgan, I'm showing you now on the screen what's been admitted as Defendant's Exhibit 2.034. And I'll ask you if you recognize that.
A Yes, I do.
Q What is it? What do you recognize it to be?
A It's a letter from Edison Electric Institute to me as the project director on – the subject being the standard contract.
Q All right, sir. And do you recognize this to be EEI's comments on the draft contract?
A Yes.
Q All right. Specifically, I'll refer you to page 8 of that letter in the first paragraph. Do you see that?

Page 3631

A Yes.
Q All right, sir. It's been blown up on the screen for you there. Can you see it?
A Yes.
Q All right, sir. If you would, sir, read the first sentence into the record, please, sir. It begins with although.
A Although the contract is generally comprehensive and complete, there are two significant issues on which the proposed contract is silent, DOE performance standards and purchaser remedies. Article 2 states that the disposal services shall commence not later than January 31, 1998, a provision consistent with the Nuclear Waste Policy Act.
Q All right, sir. I'm sorry. Would you go on and just read the next two sentences?
A However, no other milestones are included. Nor does the contract commit DOE to accept any given quantity of SNF/HLW, period.
Q All right, and SNF refers to spent nuclear fuel?
A Yes. And HLW is high-level waste.
Q All right, sir. And do you recall that statement to be true, that last statement that you read, that is, that the draft does not – the draft

Page 3632

contract did not commit DOE to accept any given quantity of SNF?
A That's correct.
Q All right, sir. I'll next refer you to page 2 of appendix A, which is an attachment of this letter. And if you'll look at the second paragraph, please, sir. All right. Do you see that blown up on the screen for you, sir?
A Yes.
Q All right, sir, beginning in the sentence in the middle of the page that begins while the contract, do you see that?
A Yes.
Q Would you read that, please, sir?
A While the contract may not be the appropriate place to commit DOE to a specific, numerical receiving rate, DOE should recognize, at least quantitatively, the need to have adequate annual receiving capacity to handle industry needs.
Q All right, sir. Please go on.
A This would be consistent with the direction of section 302(a)(5) of the act that DOE will take title to spent nuclear fuel and high-level waste as expeditiously and practicable upon request of the

Page 3633

generator or owner.
Q All right. That's "as expeditiously"?
A Expeditiously as practical. Right. Excuse me.
Q That's all right, sir. Start with the sentence that begins with "a new clause."
A A new clause should be added, and then there's a clause.
Q All right, sir. Would you just read that?
A Whereas DOE recognizes that its ability to take the delivery of spent nuclear fuel and/or high-level radioactive waste must be commensurate with the amount of such fuel and waste then being generated, together with the amount of such fuel and waste previously generated, and consistent with its obligation to take title to such fuel and waste as expeditiously as practicable upon the request of the owner or generator of such fuel and waste.
Q All right, sir. Now, do you recall that to be the acceptance rate that Mr. Mills discussed with you when he came to talk to you about the contract acceptance rate?
A Yes.
Q And, sir, when you published the final rule in April of 1983, did you include that qualitative

Page 3634

whereas clause that was requested?
A No.
Q And why? For what reason did you take that – did you not include it, if you will?
A Because the entire program had not been defined. We did not know what the acceptance rate would be. And we felt that that should be included in the mission plan.
Q All right, sir. We'll talk about the mission plan a little bit later. But did you – even though you didn't put an acceptance rate in the final contract, did you give any different assurances to anyone about some unwritten agreement on acceptance rates in the contract?
A No.
Q In that regard, Mr. Morgan, do you recall Mr. Mills asserting to you that the 1-mill fee be paid – that was being paid under the contracts was in return for a specific rate of performance on DOE's part?
A I don't know that I can say that was what was specifically said, but that was certainly part of the – what I understand the message that he was transmitting.
Q Okay. And did you ever agree with Mr. Mills

Page 3635

that the 1-mill fee was being paid in return for some level of DOE performance under the contract?
A No. I did not agree with that.
Q All right. The question of – I'm sorry. I'll start again.
I'm sorry, you may have answered this. If you did I apologize. Do you recall if Mr. Mills ever equated the rate, the acceptance rate that the utilities wanted in the contract to some specific number of metric tons of uranium per year?
A I don't really recall.
Q All right, sir. Even if he had done so, would a specific number have mattered to you at the time the contract was formed?
A No.
Q Why is that?
A It was premature.
Q Why was it premature?
A Again, because of the status of the program, in the contract, which was, you know, happening immediately after my arrival, that process, that I felt it was inappropriate to – for us to commit to any receipt rates at that time.
Q All right.
A And that it was to be dealt with in the

Page 3636

mission plan.
Q All right, sir. Now, did you ever agree with Mr. Mills that the 1-mill fee was being paid by the utilities in return for a 3,000 MTU acceptance rate?
A No. No.
Q All right, sir. In the context of the contract, do you recall the concept of oldest fuel first or OFF?
A Yes.
Q And what was that concept?
A The concept was to take the oldest fuel first –
Q All right, sir.
A – from the utilities. In other words, first out of the reactor would be the priority of acceptance to the repository.
Q All right. Do you recall, sir, why you indicated that there needed to be a priority of acceptance?
A Well, because everybody would like to get rid of their fuel as quickly as possible. And we felt that we should take the oldest fuel first. And of course that would be the fuel that had the greatest decay so it would have less heat load on the

Page 3637

repository.
Q All right, sir. Did you believe at the time the contracts were formed that you would be able to accept everything utilities wanted you to take all at once?
A No.
Q And why was that, sir?
A It was impossible. It couldn't be done. One for the reason that you're going to have to have a certain rate of acceptance at a repository, which would not meet the – what the utilities would like to release to us.
Q All right, sir. Do you recall a provision in the contract that allowed utilities to exchange their allocations of acceptance?
A Yes.
Q Do you recall if that was requested by the utility?
A Yes. And then there were – during the rule-making process, there were utilities that thought that should be removed. And in the process, we resolved that by leaving that provision in.
Q All right, sir. I'll show you now Yankee Exhibit Number 30.
MR. MILLER: All right, Your Honor, I'm

Page 3642

BY MR. MILLER:
Q Can you see that okay, Mr. Morgan?
A Yes.
Q The cover page of this document says that it's the proceedings of the 1983 Civilian Radioactive Waste Management information meeting, December 12th to the 15th, 1983.
Do you see that?
A Yes.
Q All right. Do you recall this proceeding, Mr. Morgan?
A Yes.
Q All right. Specifically, I'll refer you to page 11. And do you recognize – recognize page 11, Mr. Morgan? Can you see it?
A Yes.
Q I've got a paper copy.
A No, I can see it.
Q Do you recall making a presentation at this December '83 information meeting?
A Yes.
Q All right. I'll refer you specifically to the second column – I'm sorry, to the right-hand column, the second paragraph. And I believe this document refers to your having just received a

Page 3643

preliminary draft of volume 1 of the mission plan. And you hoped to have that available to interested parties, the states and others, by Christmas. Do you see that?
A Yes.
Q And do you recall whether or not you were able to make that draft mission plan available at or around that time?
A I know we put out the mission plan around that time. But I'm not sure whether it made the Christmas date or not.
Q All right. How about the fourth paragraph, sir. Would you have a look at that. I'm sorry. It's the next paragraph. Okay. Do you see that paragraph now, the one that's highlighted, Mr. Morgan?
A Yes.
Q Would you read that first sentence, please, sir?
A I would like to talk a little bit about the strategy as laid out in the mission plan and what we intend to do. I think most of you know that the act requires that we receive waste from the utilities by January 1, 1998.
Q All right, sir. I'm sorry. I was just referring to the first sentence there.

Page 3644

And long about the middle of the paragraph where it says the basic strategy, do you see that?
A Yes.
Q Would you read that, please, sir?
A The basic strategy which we've outlined in the mission plan is that beginning in 1998 utilities will not have to provide any additional storage facilities on the site.
Q All right, sir. Now the word you used there was strategy. Did you believe that the information you set out in the mission plan was a contractual requirement?
A No.
Q What was it then?
A As required by the act, section 3, it was an informational document, clearly not contractual.
Q All right, sir. And in your mind what did it represent to the program?
A It represented the goals and what we would like to accomplish relative to specific activities.
Q All right, sir. And so with respect to your previous statement about dealing with the acceptance rate in the mission plan, we'll talk a little bit about the mission plan in a minute, but did you perceive the rates in the mission plan to be

Page 3645

contractual requirements?
A No.
Q All right, sir. Now, I would like to refer you to the last sentence in that paragraph – I'm sorry, Dawn. The last sentence in that same paragraph.
Would you just read that, please, sir?
A During the first year of operation of the repository in 1998, we should be receiving fuel at a rate so that no utility would have to add any further storage facilities either on site or at another location.
Q All right, sir. Did you feel that statement reflected contractual intent on the part of the Department?
A No.
Q All right, sir. Once, again, sir, what did you think it represented?
A It was in the plan to notify or let the utilities realize that they would not have to make additional commitments for on-site storage after the beginning of 1998. But they would – if you look at the mission plan, it shows –
Q Which we're going to do in just a minute.
A It shows an increase of stored fuel because

Page 3646

the rate starting in 1998 did not meet the discharge rates until later on in the program.

Q All right, sir. We'll look at that now, if you don't mind.
Yankee Atomic Exhibit 636. All right.
Mr. Morgan, I'm showing you now what's Plaintiffs' Exhibit 636. Do you recognize this document, sir?

A Yes.

Q And is this the document that was – that was produced by the program during your tenure?

A Yes.

Q All right, sir. If you'll look at page 1-2, please, sir, and the last paragraph. And the first sentence in that paragraph, sir, would you just read it.

A It is the department's intent to update this mission plan periodically as the program progresses.

Q I'm sorry, sir. The first sentence that's highlighted there.

A Oh, the first sentence.

Q Yes, sir. In that paragraph?

A The mission plan has been prepared as a means of both planning the program and demonstrating its conformance to the requirements of the act.

Q All right, sir. And do you recall that –

Page 3647

that that's what you intended the mission plan to be at the time you published this document?

A Yes. It was an informational document.

Q All right, sir. What relationship did it have to the department's contract with the utilities?

A None.

Q And once again, sir, did this statement that's contained in the – I apologize. Let me move on to page 2-1, please.
And actually, I want to – sorry. Can you blow this up.
The last paragraph is the one I wanted to ask you about there, Mr. Morgan. Do you see that?

A Yes.

Q All right, sir. Once again, that first sentence there, would you read that?

A This approach is designed to ensure that all utilities will be able to establish firm planning schedules for the disposition of their radioactive waste sufficiently early to determine their on-site interim storage needs prior to 1998.

Q All right, sir. And just go on. Read the –

A Until 1998, each utility will be responsible for providing its own additional on-site interim

Page 3648

storage unless the utility applies for and is certified for the Federal Interim Storage Program.

Q All right, sir. Do you recall that that represented your view at the time, that was that utilities were responsible for providing their own additional on-site interim storage?

A Yes.

Q And once again in your mind, you intended this plan to inform the utilities about what they could anticipate as far as their additional storage?

A Yes.

Q All right, sir. If we go to the bottom of 2-2 and the top of 2-4.
All right, now, Mr. Morgan, I believe that in between pages 2-2 and 2-4 there's a table that we'll talk about in a minute. But I believe that this language that's highlighted here on 2-2, 2-4 – 2-4 is a continuation of 2-2. So I'll ask you to read that – just read it to yourself and let me know when you're finished.

A I'm finished.

Q All right, sir. Now in the first sentence there you say: While the department's acceptance rate during the initial 5 years is set to prevent, in the aggregate, the need for utilities to provide

Page 3649

additional on-site storage after 1998. Do you see that there?

A Yes.

Q In that part of that sentence that I read, what does in the aggregate mean? Do you recall?

A The total discharge from the utilities versus the acceptance at the repository.

Q Okay. I'm sorry. When you referred to the in the aggregate, as far as the department's acceptance rate is concerned, what was –

A The total.

Q What did you mean?

A The total. In the aggregate means if you look at the discharge – well, in total, you don't – most of the utilities won't have to add on-site storage.

Q All right, sir. And the sentence that begins the planning basis, do you see that?

A Yes.

Q I'll read that. The planning basis assumes that, after 1998, individual utilities who actually realize this need – and that is the need for expanded storage, I believe – will arrange for the right to ship spent fuel to the Department from a utility who is next in the queue in shipment allocation.

Page 3650

Do you see that?
A Yes.
Q And it goes on to say subject to prior approval by the Department. Do you see that?
A Yes.
Q Do you understand that to refer to the exchange provision?
A Yes.
Q All right, sir. So as far as individual utilities were concerned, if they had individual storage needs after 1998, you anticipated that they could use the exchange provision to cover that?
A Yes.
Q All right, sir. Could we look at table 2-2. I'm sorry. That's table II-1. That's what I intended to refer to. Can you see that, Mr. Morgan?
A Yes, I can.
Q In the lower right-hand corner it looks like this page fell in between pages 2-2 and 2-1, right, sir?
A Yes.
Q Up at the top, that's called the Waste Acceptance Schedule. Do you see that?
A Yes.
Q All right, sir. Do you recognize this waste

Page 3651

acceptance schedule?
A Yes.
Q And what did it indicate to you?
A It indicated our goal on the first repository acceptance MTUs in 1988 for 5 years at one rate, and then subsequent years at 3,000 MTU. It shows the second repository coming on line after the first 5 years. Then it has a column of cumulative acceptance. And the remaining backlog, which doesn't start being reduced until 3 years after the second repository, or 2 years after the second repository is in place and operating.
Q All right, sir. Now, I believe you – you may have misspoken. I believe you said it shows a schedule beginning in 1988. You meant 1998, did you not?
A 1998, yes.
Q All right, sir. And once again, it's – the rates that are reflected in this table, did you consider those to be contractual requirements?
A No.
Q And why was that?
A Because the mission plan as stated in section 3 was an informational document, not a contractual document.

Page 3652

Q All right, sir. And did you ever represent to anybody in discussions with – well, any utility representatives or anyone that the mission plan reflected contractual obligations?
A No, I did not.
Q And is that, sir, because of the many uncertainties that you've already testified to that existed at the time?
A That's correct.
Q All right, sir.
Sir, the column that's entitled – the second column from the left that's entitled annual spent fuel generation, do you see that?
A Yes.
Q Mr. Mills said he believed that this column was not accurate. Did you have any reason then or do you have any reason now to doubt – to doubt the validity of the figures in that column?
A That was the information that we had at the time.
Q All right. Do you recall what the source of the information was?
A No, I don't.
Q All right, sir. But you believe that information to be accurate there?

Page 3653

A Yes.
Q All right, sir. Now, Mr. Morgan, Mr. Mills testified that he met with you after this draft mission plan was issued to register his disappointment, the utilities' disappointment with your statement about the goal of preventing the need for additional at-reactor storage and eventually matching the generation reg. Do you recall him talking to you about that?
A I'm sure he did.
Q All right, sir. And he also said that the acceptance schedule that's reflected in this table II-1 did not comport with the agreed understanding that he had with you and other DOE officials about the acceptance rate that was expected under the contract. Do you remember that?
A I did not have an agreement with him as to acceptance rate, period.
Q All right, sir. But do you recall him expressing that opinion to you about the rates reflected in the mission plan?
A Start back over –
Q All right, sir.
A – because I'm thinking that you're still referring to agreements that I had with Mr. Mills.

Page 3654

And I didn't have any agreement with Mr. Mills.
Q All right, sir. I believe you said that you recalled Mr. Mills discussing with you the rates that are reflected in the draft mission plan –
A Yes.
Q – that we've been talking about –
A Yes.
Q – is that correct?
Do you recall that he said that the rates, the schedule there didn't comport with the utilities' understanding that he thought he had with you and other DOE officials about the acceptance rate that they expected under the contract?
A I did not have any agreements with Mr. Mills or any of the utilities as to rates of acceptance.
Q Under the contract?
A Under the contract or relative to this schedule, this table.
Q All right, sir. Just a few more questions and I believe I'll be finished with my direct testimony, Mr. Morgan.
Do you recall if before the Nuclear Waste Policy Act, was there a specific statutory direction to DOE to develop a repository?
A Not that I know of.

Page 3655

Q Okay. By the way, after you took over the program, did Mr. Brewer, Mr. Coffman, did they have anything to do with decision making on the program?
A No.
Q All right. So you and your new staff in the – in the office were the – were you the sole individuals responsible for implementing the act?
A I was responsible –
Q You were?
A – for implementing the act.
Q The buck stopped with you; is that correct, sir?
A Yes, sir.
Q I'm sorry?
A Yes, sir.
Q And you reported to Secretary Hodel; is that correct?
A That's correct.
Q Okay. Between the time the draft contract was published and the final contract was published, had you begun to develop the design for the repository?
A That was in the process. So, yes, we would have started development of a design.
Q Okay. What about specific design –

Page 3656

repository design receipt rates? Had you begun to do that at the time the contract was formed?
A No.
Q Do you recall Mr. Mills representing to you or arguing to you that the acceptance rate under the contract should be the repository design receipt rate?
A There wasn't a receipt rate under – in the contract.
Q Yes, sir.
A So the question again?
Q Yes. Do you recall that Mr. Mills asserted to you that that's the rate that should be in the contract, the repository design receipt rate?
A I don't – I'm sure that he could have. I don't know.
Q Okay, sir. Had he done so at the time, would you have made a representation to him that the contract receipt rate would be the repository design receipt rate?
A Absolutely not.
Q And why was that? Why would you not have done so?
A Because we dealt with that in the rule-making process. And there was no way that I would go through a rule-making process without, you

Page 3657

know, in the contract, and denying a receipt rate and turn around and make a – an agreement otherwise. That's ludicrous.
Q All right, sir. Do you recall if the contract did address the manner in which DOE would accept spent nuclear fuel from the utilities?
A Yes. In the appendices.
Q All right. And do you recall what the contract said about it in general?
A That there would be a process that would be an acceptance rate that would be negotiated with DOE at a later point in time.
Q All right, sir. At the time the contract was finalized, did you know what that rate would be?
A No.
MR. MILLER: All right, sir. Just one moment, Your Honor, to make sure –
THE COURT: Take all the time you need.
MR. MILLER: All right. Your Honor, due to the lateness of the hour, is it all right that we break for tonight? It may be I have a few additional questions. I would sort of like to, especially considering the hour, to consider that.
THE COURT: Sure. We can do that.
MR. MILLER: All right. Thanks, Your Honor.

**Yankee Atomic Electric v. U.S Nos.: 98-126C, 98-154C, 98-474C August 3, 2004**

**Heritage Reporting Corporation**

**Page 3661 to Page 3887**

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

*HERITAGE REPORTING CORPORATION*
*1220 L Street, N.W.*
*Suite 600*
*Washington, DC 20005*
*Phone: 202-628-4888*
*FAX: 202-371-0935*

Page 3661

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

YANKEE ATOMIC ELECTRIC COMPANY, )
CONNECTICUT YANKEE ATOMIC POWER )Case Nos.:
COMPANY, and MAINE YANKEE ATOMIC ) 98-126C
POWER COMPANY, ) 98-154C
Plaintiffs, ) 98-474C
)
THE UNITED STATES, )
Defendant. )

Courtroom 5
National Courts Building
717 Madison Place, N.W.
Washington, D.C.

Tuesday, August 3, 2004
Volume 16

The parties met, pursuant to the notice of the Judge, at 10:00 a.m.

BEFORE: THE HONORABLE JAMES F. MEROW

Page 3662

APPEARANCES:
ON BEHALF OF YANKEE ATOMIC ELECTRIC COMPANY,
CONNECTICUT YANKEE ATOMIC POWER COMPANY and MAINE
YANKEE ATOMIC POWER COMPANY:
JERRY STOUCK, ESQ.
ROBERT SHAPIRO, ESQ.
PETER J. SKALABAN, JR., ESQ.
VIVEK K. HATTI, ESQ
Spriggs & Hollingsworth
1350 I Street, N.W.
Washington, D.C. 20005
(202) 898-5800

ON BEHALF OF YANKEE ATOMIC ELECTRIC COMPANY,
CONNECTICUT YANKEE ATOMIC POWER COMPANY:
MERRILL J. ATKINS, ESQ.
Assisting General Counsel
19 Midstate Drive
Auburn, Massachusetts 01560
(508) 721-3042

(Appearances Continued on the Next Page.)

Page 3663

APPEARANCES CONTINUED:

ON BEHALF OF MAINE YANKEE ATOMIC POWER COMPANY:
JOSEPH D. FAY, ESQ.
General Counsel
Maine Yankee
321 Old Ferry Road
Wiscasset, Maine 04578
(207) 882-5603

On Behalf of the Defendant:
HAROLD LESTER, JR., ESQ.
JOHN EKMAN, ESQ.
MARIAN E. SULLIVAN, ESQ.
HEIDE L. HERRMANN, ESQ.
R. ALAN MILLER, ESQ.
KEVIN B. CRAWFORD, ESQ.
RUSSELL SHULTIS, ESQ.
U.S. Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530
(202) 305-7562

***Index appears at end of transcript***

Page 3664

P R O C E E D I N G S
- - - - - -
MR. MILLER: Your Honor, we appreciate the Court's indulgence in letting us get our thoughts together over the evening hours. I just have one additional question for Mr. Morgan on my direct examination.
THE COURT: Go ahead, whenever you're ready.
Whereupon--
ROBERT MORGAN
a witness, called for examination, having been previously duly sworn, was examined and testified further as follows:
DIRECT EXAMINATION (Resumed)
BY MR. MILLER:
Q. All right. Sir, if we could go back on Plaintiff's 678. Mr. Morgan, you recall we talked about this exhibit yesterday in your testimony?
A. Yes.
Q. And you recall this document, do you not?
A. Yes.
Q. Mr. Morgan, you recognize this, do you not, as the second page of the statement you made at the December 1983 information meeting?
A. Yes.

Page 3665

Q. Sir, if you can, just reading from the one-sentence paragraph that begins, "This is our basic strategy," do you see that?
A. Yes.
Q. If you could just read that to the end of the page, the rest of the page, please, sir and then let me know when you're done.
A. I'm done.
Q. Could you just explain to the Court, Mr. Morgan, what it was you were trying to convey in this last part of your statement?
A. I was trying to convey that, although the schedules we felt were very tight, it was our intent to meet the requirements of the Nuclear Waste Policy Act and receive fuel in January 1988.
Q. I'm sorry, sir, you said January 19 --
A. 1998.
Q. All right, sir.
A. And that even though it was tight, we had the alternative to kick in, which was the monitored retrievable storage program, and that would be the back up. We were also trying to do everything we could relative to the repository by doing as many things in parallel as we could to reduce the schedule.

Page 3666

Q. All right, sir, and so that's what you were trying to convey as a result of your, of the last part of your statement there?
A. Yes.
Q. All right, sir.
MR. MILLER: No further questions at this time, Your Honor.
THE COURT: Okay. Cross-examination.
MR. MILLER: Mr. Morgan, do you need some water up there?
THE WITNESS: I would appreciate it.
MR. MILLER: All right.
CROSS-EXAMINATION
BY MR. SHAPIRO:
Q. Good morning, Mr. Morgan.
A. Good morning.
Q. I have a few questions for you. Let me start off about, and I just want to confirm something I think I understood from your direct testimony. You first got a copy and read the Nuclear Waste Policy Act after the Secretary asked you to take your deposition, is that right?
A. That's correct.
Q. So you weren't involved at all in the development of that Act?

Page 3667

A. That's correct.
Q. And after your approximately one-year tenure as acting director of the Nuclear Waste Project Office, you didn't follow what happened with the nuclear waste program after that time, did you?
A. No, I was busy with other activities.
Q. And you didn't subsequently consult with any entity on issues that involved commercial spent nuclear fuel?
A. I think that when Mr. Rusche was appointed, we shared an apartment in Washington, D.C. and to say that we never talked about the Nuclear Waste Policy Act would be incorrect.
Q. But other than your informal interactions with Mr. Rusche?
A. That's correct.
Q. Now, you spoke a number of times in your direct examination, Mr. Morgan, about what you did not agree to in terms of putting into the contract, but actually, while you were at the Nuclear Waste Project Office, the Department of Energy never really defined how the scheduling process for accepting spent fuel would work, isn't that true?
A. I believe that was in the appendices of the contract.

Page 3668

Q. But while you were there, did the project office define how the scheduling process would work?
A. Well, that was defined in the contract.
Q. I want to ask you a few questions about the contract in just a moment. Mr. Morgan, while you were acting director, did you deal with actual pickups of spent nuclear fuel and high-level waste?
A. Did I deal with the acceptance of fuel?
Q. Right.
A. We accepted no fuel during the time that I was there.
Q. So you didn't have occasion to deal with those issues?
A. That's correct.
Q. Now, you were not actually involved in the decision to develop the standard contract on rule-making, were you? You weren't the one who decided to use a notice and comment rule-making process to develop the project?
A. No, that had started before I arrived.
Q. And in fact, you don't know why, in fact, the Nuclear Waste Policy Act even specified that the program would be pursued through contracts, do you?
A. I didn't, I don't understand the question.
Q. The Nuclear Waste Policy Act directs that

Page 3673

Q. But nevertheless, Mr. Morgan, the subject to make sure that the fee will provide sufficient revenues to cover the program, that was important, wasn't it?
A. Yes.
Q. And that was something that would have concerned you when you were acting director of the program?
A. It was required by the Act to assess the one mill per kilowatt after a year.
Q. Well, this document actually came out in June 1983, closer to six months, didn't it?
A. That's what it says. I don't know if it was published at that point in time or if it was published later.
Q. And this document was prepared after extensive analyses, wasn't it?
MR. MILLER: Objection, Your Honor, foundation, the witness said he hadn't seen the document.
BY MR. SHAPIRO:
Q. You were director of the program, weren't you?
A. Yes.
Q. Well, if I could turn your attention to the

Page 3674

third paragraph on the first page, the same page we're looking at, I'll read that first sentence of that paragraph to you. "This report presents the results of extensive analyses that explore the cost of implementing a nuclear waste disposal program."
A. Yes.
Q. Do you recall such analyses?
A. I don't recall such analyses. This was not required by the Act until one year after the Act was enacted.
Q. But it was important, whenever the timing was, to make sure you got the analysis right to make sure the fee covered the cost of the program, wasn't it?
A. That's correct.
Q. If I could ask you to turn your attention to page 11 of this document, do you see that, Mr. Morgan?
A. Yes.
Q. And on this page, in fact, there is a reference case for receipt of spent nuclear fuel by the government. It's shown there in that, in this table?
A. That's correct.
Q. And this was part of the analysis that

Page 3675

determined whether or not that fee was going to be adequate?
A. I testified regarding this table, which is, I believe, the exact same numbers that were in the mission plan, and that's what I testified to yesterday.
Q. And you thought that these numbers were reasonable for purposes of the analysis of making sure that the fee was adequate?
A. At this time, it was.
Q. And other than the acceptance rate shown on this table on page 11 of Plaintiff's Exhibit 971, there is not another reference case for waste acceptance, other than this one, when you were acting director, was there?
A. This table was published in the mission plan that came out in December 1983.
Q. And this was, and the acceptance rate that's shown here, roughly 1,800 MTU per year for the first five years and then 3,000 MTU thereafter, that was really the only acceptance reference piece –
A. That was a reference case we were using at the time.
Q. You certainly weren't looking at any reference case that would accept lesser amounts of

Page 3676

spent fuel, were you, than what's indicated here in 978?
A. No, but I do recall that the mission plan that was finally submitted the following year by Mike Lawrence had reduced numbers in it.
Q. Well, I suspect we'll get to that mission plan when we get to Mr. Lawrence or even Mr. Rusche following your testimony, Mr. Morgan.
A. Fine.
Q. I appreciate your help with that document. I want to turn now to a slightly different subject. Actually, it really concerns the document that Mr. Miller just asked you about, but let me ask you a few questions before we turn to that document. It was your belief, when you were acting director, that the Department of Energy should adopt a strategy such that no utility would have to plan or construct additional at-reactor storage after 1998, isn't that correct?
A. That's correct. Let me just add that there would, there might have to have been contracts by the utilities entered into prior to January 1998 where construction would be going on after that date, so that there would be no new contracts required by the utilities. That was our intent.

Page 3685

we get to that now since you've asked for it? I don't want to deny you the document. As you'll see, this one is marked Plaintiff's Exhibit 636.
A. Correct.
Q. And we were starting to talk about the acceptance rates, which you spoke about to some extent yesterday, and those were on a table on page 2-3. Do you see that table?
A. Yes.
Q. And do you see the acceptance rate that's indicated there, again, it's 1,800 MTU for five years and then 3,000 MTU thereafter?
A. Yes.
Q. And you thought that was a reasonable acceptance rate for the program, correct?
A. At that time, yes.
Q. And this acceptance rate, again, the 1,800 MTU for five years and 3,000 MTU thereafter, this acceptance rate in the draft mission plan was intended to be enough, as you indicated earlier, to avoid the need for additional at-reactor storage after January 31, 1998, correct?
MR. MILLER: Objection, asked and answered numerous times.
THE COURT: Well, one more time won't hurt.

Page 3686

I'm going to overrule the objection. If you will answer?
THE WITNESS: Again, you will note that when the first repository opens in 1998, there is still, on the right-hand column, an increase in the backlog, and that, when I testified earlier, I believe said that there would be no need for additional commitments for construction of on-site storage facilities, but that there would be some commitments that would be in construction during that time, after 1998.
BY MR. SHAPIRO:
Q. You couldn't solve all of the problems that utilities would have in storing spent fuel, but you could solve a lot of them, is that what you're saying?
A. That was our attempt.
Q. The bottom line is that, in your opinion, DOE should perform the removal of spent nuclear fuel as fast as it reasonably could, didn't you?
A. I believe that was the intent of Congress and the Act.
Q. I want to switch subjects just a little bit to the kinds of things that the program was intended to accept. I want to focus on high-level waste. Was

Page 3687

your understanding that the standard contract's definition of high-level waste covered waste from utilities that they had taken from the core of their reactors that the NRC considered high-level waste, correct?
A. The Act says that, if the NRC defines core components as high-level waste, they will be accepted in the repository. They have to be defined as high-level waste by NRC.
Q. I want to get to your understanding, Mr. Morgan.
A. That was my understanding of what was in the Act.
Q. Let me ask you just a couple more questions. Wasn't it your understanding that this high-level waste included material that utilities had taken from their core, including shrouds, holders, end caps?
A. At that time, there had not been a definition by NRC that this was to be considered high-level waste, so I did not consider it. I believe it was still GTCC.
Q. I'm going to turn back to your deposition again, and this is on a different day. And here, I have a question and answer that's a little bit longer

Page 3688

than the last one. Maybe it would make sense to put that in front of you, so we can make sure we're all on the same page, June 25th of 2002. Mr. Morgan, I'm going to refer you to page 24.
A. At which tab?
Q. The June 25th tab, the last one.
A. What page, please?
Q. 24.
A. Yes.
Q. And I'll read it for you. It's a little bit long. I'm going to start on line 13 where a question begins. It starts:
"Okay. And then starting on line 11, your next answer, you said this, 'This to me deals with some of the high-level waste that some of the utilities had taken from their core that the Nuclear Regulatory Commission considered defined as high-level waste' or maybe defining, it might be a transcription error."
"My question is, Can you tell me just a little bit more about what you had in mind with this phrase 'high-level waste' that some of the utilities had taken from their core? What materials are we talking about?"
And your answer, "Some of the material that

Page 3693

proceeding, there might have been a little bit of confusion on that point.
But ultimately, we're talking about the same relevancy. Thank you for your time.
THE WITNESS: You're welcome.
THE COURT: Any redirect?
MR. MILLER: Short redirect, Your Honor.
THE COURT: One more round here.
REDIRECT EXAMINATION
BY MR. MILLER:
Q. You thought you were going to get away, didn't you, Mr. Morgan?
THE COURT: I don't blame you, you want to go back to Oregon, I think.
THE WITNESS: I now live in Colorado.
THE COURT: Oh, Colorado.
BY MR. MILLER:
Q. Mr. Morgan, did DOE elect not to put a rate of acceptance in the standard contract?
A. Yes.
Q. Was that a deliberate choice on your part?
A. Yes.
Q. Did DOE feel – well, can you tell me why you didn't, that you didn't put a specific rate of acceptance in the contract?

Page 3694

A. I felt that it, because of the uncertainties of the program, which I've discussed earlier, the NRC licensing process characterization, the R&D and other activities, that I thought it was not prudent to put an acceptance rate in the contract.
Q. And what about your knowledge of the technical or technological or scientific capabilities that you were going to have to have at the repository, did you know what those were at that time?
A. Not in total because of the fact that NRC had not identified the requirements for licensing.
Q. Okay.
A. And quite honestly –
Q. I'm sorry.
A. Geologists are great. It's a historical science, not a predictive science, and they can tell you what happened five million years ago, but they won't tell you what's going to happen tomorrow, and that was a problem that we had to deal with.
Q. So that was a concern of yours?
A. Yes, that was a concern of mine.
Q. In your mind, I'm sorry, in your mind, was this program a first of its kind of project?

Page 3695

A. Yes.
Q. Was it possible for DOE to predict, in 1983, what rates they would be able to use in accepting fuel in 1998?
A. No.
Q. Based on your understanding of the Act, the NWPA, did it require that DOE accept spent nuclear fuel and high-level waste starting in '98 at a rate that would preclude utilities from adding further storage facilities on-site?
A. No, that was not part of the Act.
Q. Was that a program goal that you had at the time you were director –
A. That was a program goal that we identified in the mission plan.
Q. And is that a goal that DOE specifically declined to put in the contract?
A. Yes. I must say that we hadn't identified, at the time the contract was signed or prepared, we had not identified the acceptance rates that we later included in the mission plan. We hadn't gotten that far at the time of the contract. The Act required that we have the utilities sign a contract by June 30th, 1983, and we had not gotten to any design, conceptual design on the repository at that time.

Page 3696

Q. All right, sir. In your mind, Mr. Morgan, what's the difference between a program goal and a contractual requirement?
A. They were totally separate. The contract was the agreement between DOE and the utilities, and the program goal was our best efforts at meeting the requirements of the Act. They were totally different.
MR. MILLER: I have no further questions, Your Honor. Thank you, Mr. Morgan.
THE COURT: Anything further?
MR. SHAPIRO: Nothing further, Your Honor.
THE COURT: All right. You're excused, and thank you very much for your testimony.
THE WITNESS: Thank you, sir.
MR. MILLER: Your Honor, the government calls, as its next witness, Mr. Benard Rusche.
Whereupon–
BENARD C. RUSCHE
a witness, called for examination, having been duly sworn, was examined and testified as follows:
THE COURT: Just take a seat.
DIRECT EXAMINATION
BY MR. MILLER:
Q. Are you all set, Mr. Rusche?