**Yankee Atomic Electric v. U.S. Nos.: 98-126C, 98-154C, 98-474C August 11, 2004**

**Heritage Reporting Corporation**

**Page 4614 to Page 4865**

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

*HERITAGE REPORTING CORPORATION*
*1220 L Street, N.W.*
*Suite 600*
*Washington, DC 20005*
*Phone: 202-628-4888*
*FAX: 202-371-0935*

Page 4710

memo to which the plaintiffs have referred that Mr. Rusch had – that has Mr. Rusch's name on it in fact somehow goes with the concurrence on the prior page.
With that understanding, we will not object to this series of documents being admitted as a single exhibit.
JUDGE MEROW: Well, okay. Then with that explanation, Plaintiff's Exhibit 1972 is admitted into evidence.
(PX Exhibit 1972 was received in evidence.)
MR. LESTER: I've been told, Your Honor, the prior exhibit the plaintiffs had tried to introduce was Plaintiff's Exhibit 1951, and I understand that that exhibit's being withdrawn and that it will not be admitted here.
MR. SHAPIRO: That's correct, Your Honor. That was subsumed within the larger one.
JUDGE MEROW: Okay. 1951 is considered withdrawn. Does that take up our prelunch – anything else?
MR. STOUCK: Take up the other matters at the end of the day.
JUDGE MEROW: Fair enough. We'll break

Page 4711

for lunch. And what time?
MR. LESTER: I'm told Mr. Milner cannot be here until 2 o'clock, so if we could resume at 2, that would be great.
JUDGE MEROW: Okay, we'll resume at 2 o'clock.
(Luncheon recess taken from 12:40 p.m. through 2:06 p.m.)
- AFTERNOON SESSION -
MS. SULLIVAN: Government's ready to call its next witness.
JUDGE MEROW: Fine.
MS. SULLIVAN: We call Ronald Milner to the stand, please.
(The witness was sworn.)
MS. SULLIVAN: Thank you, Your Honor.
RONALD MILNER
was sworn and testified as follows:
DIRECT EXAMINATION
BY MS. SULLIVAN:
Q Good afternoon, Mr. Milner.
A Good afternoon.
Q Mr. Milner, are you currently employed in the Office of Civilian Radioactive Waste Management at the Department of Energy?

Page 4712

A Yes, I am.
Q What is your current position?
A Chief operating officer.
Q What are your responsibilities as chief operating officer?
A I assist the deputy director for strategy and program development in the day-to-day management of that office.
Q And do you report to the deputy director?
A Yes, I do.
Q And who is the department director?
A Ted Gerrish.
Q Does anybody report to you?
A Not directly.
Q How long have you served as chief operating officer?
A In total, about four years.
Q When did you first join the Office of Civilian Radioactive Waste Management?
A I believe it was April of '84.
Q What was your first position? And I'm going to refer to it as RW, if that's all right.
A Okay.
Q What was your first position with RW?
A I was the branch chief of the

Page 4713

organization.
Q What were your responsibilities in that position?
A Preparation of total system life cycle cost, adequacy analyses and the first mission plan.
Q What position did you next hold in RW?
A I was a division director.
Q And what were your responsibilities in that position?
A Budget, human resources, total system life cycle costs, fee adequacy analyses.
Q And what position did you next hold in RW?
A Next, I was first acting director and then permanent director of the Office of Storage and Transportation.
Q And do you remember when you became acting director of the Office of Storage and Transportation?
A Roughly 1990.
Q And how long did you serve as director of the Office of Storage and Transportation?
A About four years.
Q What were your responsibilities as acting and then director of the Office of Storage and Transportation?
A Management of the MRS monitor to treatable

Page 4714

storage program, transportation program, waste acceptance issues, such as preparation of the annual capacity reports, processing of delivery commitment schedules and so forth.

Q You said that you were responsible for management of the MRS process. What specifically were you doing?

A At that point in time, we were attempting to find a volunteer site to construct an MRS.

Q Do you recall, was Dr. Bartlett the director of the program while were you the acting director and director of the Office of Storage and Transportation?

A Yes, he was.

Q Did you report to Dr. Bartlett?

A Yes.

Q After serving as the director of office – of storage and transportation, what position did you next hold?

A Director of the Office of Program Management and Integration.

Q And what were your responsibilities in that position?

A The program's budget, human resources, preparation of total system life cycle costs and fee

Page 4715

adequacy analysis.

Q Did you also have responsibility for regulatory interface with the NRC?

A Yes, uh-huh.

Q And then what position did you hold next after you were director of program management and integration?

A After that, I was appointed the acting deputy director of the program.

Q Do you recall approximately when that was?

A I believe that was 1996.

Q And how many times have you served as deputy director of the program?

A I was acting deputy two different times.

Q And what time periods were those?

A It was '96 through '99, roughly, and then 2001 through 2002, roughly.

Q What position did you hold in between these periods that you were data director?

A Chief operating officer.

Q And were your responsibilities as the chief operating officer then substantially the same as they are today?

A Substantially the same, yes.

Q And then in 2002, is that when you became

Page 4716

chief operating officer again?

A Yes, uh-huh.

Q Mr. Milner, prior to joining RW, where were you employed?

A With the Department of Energy with the – first with the Strategic Petroleum Reserve and then with the Office of Conservation and Renewable Energy.

Q Prior to becoming a DOE employee, where were you employed?

A Prior to that, I served eight years as a Naval officer.

Q Mr. Milner, do you hold a Bachelor's degree?

A Yes, I do.

Q In what?

A Mechanical engineering.

Q Where did you obtain that degree?

A University of Mississippi.

Q When?

A 1966.

Q And do you also hold a Master's degree?

A I do.

Q In what subject?

A Also mechanical engineering.

Q When did you obtain that degree?

Page 4717

A 1967.

Q Was that also from the University of Mississippi?

A Yes.

Q Can we have Plaintiff's Exhibit 95, please?

MS. SULLIVAN: May I approach?

JUDGE MEROW: Sure.

MS. SULLIVAN: We're going to look at several different pages of this exhibit, so I'd like to provide copies to the Court as well.

JUDGE MEROW: All right.

MS. SULLIVAN: Plaintiff's Exhibit 95 is a multivolume set. What I provided to the Court and the witness is simply an excerpt of that document.

BY MS. SULLIVAN:

Q Mr. Milner, do you have water there? Do you want a cup of water?

A Yeah, that would be great.

MS. SULLIVAN: Could I get a cup of water for the witness, Your Honor?

JUDGE MEROW: Of course.

BY MS. SULLIVAN:

Q Mr. Milner, do you recognize the document that I've handed to you and put up on the computer

Page 4722

Q Thank you. Mr. Milner, did DOE evaluate possible contingencies in the mission plan?
A Yes, it did.
Q Can we go to page 20 of this document? Can you highlight the text on the page? Mr. Milner, could you read the highlighted sentence?
A Should no repository be constructed and an MRS facility not be authorized, utilities would continue to be responsible for storing the spent fuel at reactor sites.
Q Was one of the contingencies that DOE evaluated in the mission plan the possibility that DOE could not construct either an MRS or a repository?
A Yes, it certainly was.
Q Mr. Milner, I believe you testified that DOE prepared the mission plan because it was a requirement of the NWPA.
A That's correct.
Q Okay. Do you remember whether there was specific statutory provision that went to the mission plan?
A I believe there was, yes.
Q Mr. Milner, I've handed you an excerpt from Title 42 of the US Code, Section 10-221, which is titled mission plan. Do you recognize this provision

Page 4723

to be the provision that sets forth the requirements of the mission plan?
A Yes, I do.
Q Mr. Milner, did you have an understanding as to whether this provision contained a requirement for the mission plan to set forth a specific acceptance rate?
A I did not.
Q Why did DOE include acceptance rates in the mission plan?
A Well, one of the requirements for the mission plan was to provide an estimation of – of how long the repository would be in operation before it was closed. To do that, you had to assume an acceptance rate, so there were acceptance rates assumed in the mission plan as examples of how the – the program might be operated.
Q Thank you. And that requirement, is that set forth on – as your understanding of that requirement is set forth in paragraph 9, A9 of this provision?
A Yes.
Q Thank you. Could we go back to Plaintiff's Exhibit 95, please? Page 26. Mr. Milner, for some

Page 4724

reason our electronic copy – I checked it against the paper copy. For some reason, it's turned. I don't know why we turned it but it's – same information is there. I think the information just got squeezed. Mr. Milner, do you recognize the schedule that's set forth on page 26 of the mission plan?
A Yes. That was an example of – of how the authorized system might operate.
Q How many repositories did DOE assume would be constructed at the time the mission plan was prepared?
A Two.
Q Can we go to page 29? Can you bring up the first full paragraph under the numbered paragraphs? Mr. Milner, can you read that section, that highlighted material?
A It should be emphasized that this schedule is only an approximation of how the system may operate and is subject to considerable variation. The DOE will further define and specify the system acceptance parameters as the program progresses.
Q Mr. Milner, does that paragraph accord with your recollection regarding the schedule set forth in the mission plan?

Page 4725

A Yes, it does.
Q Could we bring up the last paragraph on this page and, Mr. Milner, would you read the last two sentences that are highlighted there?
A Under the terms of the contracts for disposal services that have been signed between the DOE and the utilities, an annual capacity report with projected annual receiving capacities and rankings will be issued by the DOE beginning in 1987. In 1991 the DOE will begin to publish firm waste acceptance schedules for individual reactors, including shipment allocations.
Q Mr. Milner, what was your understanding of the term "firm waste acceptance schedules" as that term's used in that paragraph?
A That would be the schedules that DOE was committing to to accept the waste.
Q Did DOE publish, if I recall, waste acceptance schedules in 1991?
A Yes, it did.
Q Where were those schedules set forth in the annual capacity report for that year? And what were utilities to do with these schedules set forth in the annual capacity report?
A They were to utilize those to develop

Page 4726

their delivery commitment schedules, DCSs, for submittal to the department.
Q And which office within DOE prepared the 1991 ACR?
A The Office of Civilian Radioactive Waste Management.
Q And which office within RW?
A The Office of Storage and Transportation.
Q That was your office?
A Yes, it was.
Q Mr. Milner, in your various positions within DOE, have you had responsibility for preparing total system life cycle costs?
A Yes, I have.
Q Have you also had responsibility for preparing what are referred to as fee adequacy studies?
A Yes.
Q Could you explain to the Court what a total system life cycle cost is, or a TSLCC?
A It was a – an estimate at any given time of – of the total costs of – of the entire waste management system from identifying sites, characterizing sites through construction operation of the system and – and ultimately decommissioning.

Page 4727

Q Decommissioning of what?
A Of the repository facilities.
Q What is a fee adequacy study?
A The fee adequacy studies using the – the cost estimates as a basis attempted to analyze whether or not the fee that was being paid by the utilities was adequate to cover the – the costs.
Q Why is a TSLCC, or total system life cycle cost report, prepared?
A Well, one, it's – it's good to keep track of the estimate of the program costs but principally is – is input to the fee adequacy analysis.
Q And why are fee adequacy studies prepared?
A They're mandated by the act.
Q By the Nuclear –
A Waste Policy Act.
Q Are there assumptions made for the preparation of a TSLCC?
A Yes, there are.
Q What is the basis for those assumptions?
A They were the current program planning bases at the time.
Q Has DOE changed the assumptions that form the basis for TSLCCs over time?
A Yes.

Page 4728

Q Can we have Plaintiff's Exhibit 248, please?
Mr. Milner, I've handed you what's been marked as Plaintiff's Exhibit 248. Do you recognize this document?
A Yes, I do.
Q Could you tell the Court what the document is?
A Well, it – again, it's – the title basically says preliminary estimate of the restructured program, which was an addendum to a prior – prior TSLCC analysis.
Q Were you involved in the preparation of this document?
A No, I was not.
Q Okay. Are you familiar with this document based upon your work with other TSLCCs?
A Yes.
Q Can we go to page 1, please? Can we bring out the first paragraph on the page and highlight the third sentence?
Mr. Milner, would you read the highlighted portion into the record, please?
A The primary use for the total system life cycle costs, TSLCC, analysis is to provide cost data

Page 4729

necessary for determining whether the fees paid by the waste generators will be sufficient to fully cover the costs of the program, parentheses, the fee adequacy analysis.
Q Okay, thank you. For our court reporter, as you read things, you can take your time. Thank you.
Mr. Milner, the sentence that you read, does – just read, does that sentence accord with your understanding as to the purpose of the TSLCC?
A Yes, it does.
Q Can we go to page 2, please? And in the first full paragraph, bring that out. The first two sentences.
Mr. Milner, would you please read those – the highlighted material into the record?
A It must be recognized that the waste management program is continually evolving. The TSLCC estimates represent snapshots in time which incorporated all available and appropriate information on program activities up to a specific point in – specific point in time in order to develop comprehensive set of cost estimates for the system.
Q Mr. Milner, do you agree with that statement regarding the nature of TSLCCs?

Page 4730

A Yes, I do.
Q Can we go back to page 1 of this document, that first paragraph again? Mr. Milner, in that paragraph there's a reference to report to Congress on reassessment of the Civilian Radioactive Waste Management Program issued by the Secretary of Energy in November of 1989.
A Yes.
Q Do you recall that reassessment?
A Yes, I do.
Q Do you recall what the result of that reassessment was?
A I think principal result of that reassessment was the repository would not be able to be opened until the your 2010.
Q Okay. As a result of that reassessment, was there a date by which the MRS was to be opened?
A 1998.
Q Can we go to pages 4 and 5? Could I ask you to read the highlighted sentences into the record?
A The TSLCC estimates presented in this report are updated estimates from the May 1989 TSLCC analysis which reflect the changes in the system outlined in the secretary's reassessment of the Waste Management Program. As such, these estimates are

Page 4731

derived in the same manner as those presented in May 1989, since the majority of the assumptions and methodologies have remained unchanged; however, a major change in the schedule had a significant impact on the updated estimates. Thus, the difference between the May 1989 estimates and the updated estimates represent the overall cost impact due to the restructured program.
Q Mr. Milner, were you responsible for the preparation of the 1989 TSLCC?
A I believe I was.
Q It was a long time ago. Could we go to appendix A, page A1?
Mr. Milner, what information is presented in table A1 of this document?
A That's the waste acceptance schedule, which included acceptance rates, amount of material that would be stored at the MRS at any given point in time, cumulative numbers.
Q So is it your understanding that these are the waste acceptance assumptions for the preparation of this TSLCC?
A Yes.
Q This is an addendum to the 1989 TSLCC.
Can we have Plaintiff's Exhibit 976, please?

Page 4732

Mr. Milner, do you recognize what's been marked as Plaintiff's Exhibit 976?
A Yes. It's the 1986 TSLCC estimate.
Q Were you involved in the preparation of this document?
A I believe I was, yes.
Q Can we go to page 2? And can we highlight the first three sentences of the first paragraph?
Mr. Milner, could you read the highlighted portion, please?
A Two important program developments pertinent to the TSLCC analysis have emerged since the previous analysis in January 1985. First, the president has determined that defense high-level waste, parentheses, DHLW, should be emplaced in the civilian geologic repositories. Second, the DOE has announced its plans to seek Congressional approval for a monitored retrievable storage, parentheses MRS, facility that will be fully integrated into the overall waste management system.
Q Thank you. Mr. Milner, based upon what you just read, do you recall what the basis for the 1986 TSLCC was?
A Essentially would have been the mission plan.

Page 4733

Q Thank you. Can we have Plaintiff's Exhibit 982, please?
MS. SULLIVAN: Your Honor, I should note that on Plaintiff's Exhibit 976, I provided to counsel and to the witness just an excerpt of that document. It also is a multivolume – volume document.
BY MS. SULLIVAN:
Q Mr. Milner, do you recognize Plaintiff's Exhibit 982?
A Yes. It's the 1998 TSLCC analysis.
Q Were you responsible for the preparation of this document?
A Not directly, no.
Q Okay. Would you have reviewed it prior to its issuance?
A Yes.
Q Can we go to page 1 of this document, please? Paragraph one, second sentence. Mr. Milner, can you read that highlighted material, please?
A This estimate is consistent with the viability assessment of a repository at Yucca Mountain, parentheses, VA, design basis and cost estimate, parentheses, DOE 1998, extended to address total system costs for all waste planned for disposal in a geologic repository for the total system life

Page 4734

cycle.
Q Thank you. Mr. Milner, what was the basis for the 1998 TSLCC?
A The viability assessment that was submitted to Congress.
Q Can we go to page little Roman numeral v, the introduction by – actually, let me ask you, this indicates that Lake Barrett was the acting director at the time this document was signed. Were you the deputy director at that time?
A Acting deputy director, yes.
Q Thank you.
Could we highlight the second paragraph, bring up the second paragraph?
Mr. Milner, could you read that portion, the highlighted portion into the record?
A This TSLCC analysis differs from the previous TSLCC analysis published in 1995, as several key assumptions have changed. First, additional waste from US Department of Energy, parentheses DOE, owned and managed SNF and HLW, disposition of surplus weapons plutonium have been included.
Second, the repository would remain open for at least 100 years following initial waste emplacement and would have the capability to be kept

Page 4735

open with appropriate maintenance and monitoring for up to 300 years. Costs are included in this analysis for 100 years of monitoring.
Third, unlike the 1995 TSLCC analysis that relied heavily on the use of multipurpose canisters, this analysis provides the capability to dispose of a wide range of canistered and uncanistered SNF as well as HLW.
Q Thank you. Mr. Milner, once a new TSLCC has been issued, is the old TSLCC still valid?
A No, it is not.
Q Why not?
A Well, you would issue a new one once the assumptions have changed, the program has evolved.
Q Does DOE prepare a test TSLCC every year?
A Not every year.
Q Mr. Milner, I believe you already testified that it was your office that was responsible for the issuance of the 19 – or the preparation of the 1991 ACR, correct?
A Yes.
Q Were you – was your office also responsible for the preparation of the 1990 ACR?
A Yes, it was.
Q Could I have Defendant's Exhibit 130,

Page 4736

please? Mr. Milner, do you recognize this document?
A Yes, I do.
Q Could you identify it for the Court, please?
A Yes. It was my action memo to the director of RW seeking his approval to publish the 1990 ACR.
Q Who was the director at the time you prepared this memo?
A Dr. John Bartlett.
Q Could we go to the second page, if we could? Now, Mr. Milner, is that your signature on the second page of this document?
A Yes, it is.
Q Okay. Do you recognize that other signature to be that of Mr. Bartlett?
A Yes.
Q Or Dr. Bartlett, excuse me.
A Yes.
Q Could we go back to the first page, please? Could we bring out the second paragraph, the first paragraph under discussion, and highlight it?
Mr. Milner, would you please read that, the highlighted portion, into the record?
A The ACR is required to project both the

Page 4737

annual receiving capacity of the waste management system and the annual acceptance ranking of contract holders for ten years following projected commencement of facility operations. The information in the ACR is for planning purposes only and is scheduled to be replaced as required by the contract by a contractually binding annual acceptance priority ranking report on April 1991.
Q Thank you. Mr. Milner, does that excerpt that you just read comport with your recollection regarding the issuance of the 1991 ACR?
A Yes, it does.
Q Can we have Defendant's Exhibit 23, please? Mr. Milner, do you recognize Defendant's Exhibit 23?
A Yes, I do.
Q Would you identify it for the Court, please?
A It was my action memorandum to the director, Dr. Bartlett, seeking his approval for issuing the 1991 ACR.
Q At the time you prepared this memo, did you believe that MRS could still be sited so that DOE could accept spent fuel beginning in 1998?
A Yes, at that time.

Page 4738

Q At the time you prepared this memo, were you responsible for MRS siting activities?

A Yes.

Q And approximately at the time of this memo, approximately how much time did you devote to MRS siting activities?

A Oh, probably something like 30 or 40 percent of my time.

Q Can we highlight the second paragraph in the background, please? We haven't highlighted that, but could you read the portion that's been blown up into the record?

A The 1990 ACR stated that it would be the last ACR to be issued and would be replaced by the acceptance priority ranking, parentheses APR. However, based on discussions with contract holders and their representatives, the department elected to continue to publish the ACR. This change in plans was conveyed to contractholders in a May 15, 1991 from – letter from the department's contracting officer.

Q Thank you. Mr. Milner, does that sentence accord with your recollection of DOE's decision regarding the issuance of the 1991 ACR?

A Yes, it does.

Page 4739

Q Can we go to the second page of this document? Actually, can we stop that for a second? Mr. Milner, is that your signature on that page?

A Yes, it is.

Q Do you recognize the other signature to be that of Mr. – Dr. Bartlett?

A Yes.

Q Now, could we bring up the first paragraph and highlight the second sentence? Mr. Milner, could you read that highlighted portion into the record?

A While not stated in the ACR, this rate was selected because it is theoretically sufficient to eliminate in the aggregate the need for additional at-reactor out-of-pool storage starting in 1998.

Q Mr. Milner, what was your understanding as to the – about the rates that were contained in the 1991 ACR with regard to meeting any additional at-reactor storage needs?

A Well, if – if you looked at, as it says in the aggregate, you looked at each utility and what their projected spent fuel discharges would be, what their pool storage capacities would be and you aggregated the shortcomings, this rate would have in the aggregate prevented any further need for out-of-pool storage.

Page 4740

Q Okay. Plaintiff's Exhibit 629, please? Mr. Milner, you've been provided with a copy of Plaintiff's Exhibit 629. Do you recognize this document?

A Yes, I do.

Q Would you identify it for the Court, please?

A Yes. It was my memo to the director, Dr. Bartlett, seeking his approval to issue for comment a draft of the annual acceptance priority ranking.

Q Okay. Can we go to the second page of this document? Do you recognize that to be your signature on that page?

A Yes.

Q Could we go back to the first page? Would you bring up the third paragraph, the second paragraph under "discussion"? Mr. Milner, could you read that portion into the record, please?

A The publication of the APR begins the contractually binding waste acceptance process. The APR will be used in conjunction with waste acceptance rates to be published in the 1991 annual capacity report, parentheses ACR, as the basis for purchasers to submit delivery commitment schedules, parentheses

Page 4741

DCS, beginning in January 1992 for the department's approval. In turn, purchasers will have the opportunity to exchange approved DCSs, also subject to departmental approval.

Q Thank you. Mr. Milner, does this statement that you just read accord with your understanding as to how firm waste acceptance schedules were to be established with individual utilities?

A It does, yes.

Q Mr. Milner, are you familiar with DOE's plans for the steady-state acceptance rate?

A I believe I am, yes.

Q What is that rate that you're familiar with?

A The steady-state acceptance rate, the design rate, if you will, of the system is 3,000 metric tons per year.

Q Thank you. During your tenure at DOE, has DOE assumed any other design rate for the repository?

A No.

Q During your tenure at DOE, are you aware of any planning basis by which – by DOE in which DOE has assumed a three-year ramp-up period to a steady-state rate of 3,000 MTU?

Page 4742

A No, not that I'm aware.
Q At the time DOE issued the 1991 ACR, was DOE planning to accept waste at a 3,000 MTU rate beginning in 1998?
A No.
Q Why not?
A At – at that time, we assumed that an MRS would be operational in the system. The MRS had a capacity limit of 10,000 metric tons, so a ramp-up rate was designed such that you would not exceed that rate before the repository began operation.
Q Mr. Milner, during Dr. Bartlett's tenure as director, do you recall consideration of the idea that DOE should remove all five-year-old cooled fuel from shutdown reactors?
A What I recall is Dr. Bartlett on occasion mentioning that gee, that would be something that would be good to do or that perhaps we might should look at. I would characterize it as thinking out loud, I guess, really.
Q Do you recall receiving any direction from Dr. Bartlett to implement an acceptance rate that would have allowed all five-year-old cooled fuel to be removed from shutdown reactors?
A No.

Page 4743

Q Would you have been responsible during Dr. Bartlett's tenure for determining what such an acceptance rate would be if you had been directed to develop one?
A I – I would have, yes.
Q Mr. Milner, do you recall attending industry meeting – sorry, attending meetings with utility representatives with Dr. Bartlett?
A Yes.
Q Was attending utility meetings with Dr. Bartlett among your responsibilities?
A It was, yes.
Q Do you recall any meetings at which utility representatives expressed great interest in pursuing exchanges?
A No.
MS. SULLIVAN: One moment, Your Honor. Your Honor, I have nothing further at this time. I would move for admission of Plaintiff's Exhibit 629. That's an exhibit that was on Plaintiff's may-use list. I notified Mr. Shapiro the night before last that we expected that we might use it with Mr. Milner. Mr. Milner's identified the document and authenticated it.
MR. SHAPIRO: We have no objection, Your

Page 4744

Honor.
JUDGE MEROW: Plaintiff's 629 is admitted in evidence.
(PX Exhibit 629 was received in evidence.)
MS. SULLIVAN: Thank you, Your Honor. Might we have a break for the witness?
MR. SHAPIRO: Certainly.
JUDGE MEROW: Do you want to take a – sure. Return about – on the hour?
MR. SHAPIRO: 3 o'clock?
JUDGE MEROW: 3 o'clock.
MS. SULLIVAN: Thank you, Your Honor.
(Recess taken from 2:47 p.m. through 3:03 p.m.)
JUDGE MEROW: Mr. Shapiro?
MR. SHAPIRO: Thank you, Your Honor.
CROSS-EXAMINATION
BY MR. SHAPIRO:
Q My name is Robert Shapiro.
A Uh-huh.
Q I'd like to start out asking you some questions about the rate of acceptance. You discussed that topic in various planning documents in your direct examination.
Now, if I understand correctly, the

Page 4745

Department of Energy's purpose in publishing the information contained in documents like the mission plan was for utilities to use it for – for planning purposes, correct?
A Well, in the mission plan at – at that time, since it was the very beginning of the program, we were simply trying to illustrate how a system might operate. I think at that stage of the game, it was too early to say you could use that for planning purposes.
Q What about the mission plan amendment?
A Oh, I think that might have been suitable for some very early planning.
Q And let me turn to the TSLCC. One of the objectives of the TSLCC report is to make cost estimates that reflect as closely as possible the most current Department of Energy program strategy for – for meeting the – the legislative milestones, correct?
A True.
Q And one of your concerns has been to try to ensure that the program is using the same set of numbers and the same assumptions in various documents, correct?
A Well, if you're talking about from – from

Page 4758

Q And that's because that – that three-year difference between repository and MRS opening, that represented the department's best estimate of how quickly it could get an MRS up and running given the linkages?
A Correct.
Q Now, you believed at the time of that November 1989 report to Congress on the reassessment of the Civilian Radioactive Waste Management Program that if the statutory linkages were modified, that the department could begin to accept waste beginning in 1998?
A Yes.
Q And by 1991, you believe that if the linkages between the MRS construction and the repository authorization were maintained so the initial acceptance by DOE could not begin until 2007?
A Correct.
Q And ultimately, the DOE abandoned its effort to site an MRS sometime roughly between 1991 and 1994?
A Yeah, I think it was probably closer to 1994.
Q And even by February of 1994, RW was doing contingency planning for the possibility that an MRS

Page 4759

might not be sited at all. True?
A I don't recall that, but potentially.
Q Well, let me ask you again about your deposition. And this was a short one. Let me ask you if you recall the following question and giving the following answer. Page 359 if counsel wants to follow.
MS. SULLIVAN: Which day?
MR. SHAPIRO: It's May 2.
BY MR. SHAPIRO:
Q Are you on that page, Mr. Milner?
A Yes, sir.
Q Start on line 5. Do you recall being asked the following question and giving the following answer?
Question: So at least as of February of 1994, OCRWM was concerned about the possibility that an MRS might not be sited?
Answer: We were certainly doing contingency planning for that, yes.
That was your testimony, Mr. Milner?
A Yes, it was.
Q And that was accurate testimony?
A Yes, at the time.
Q Do you have a different opinion now,

Page 4760

Mr. Milner?
A Well, that was two and a half years ago. I have different recollections than what I did two and a half years ago, but no, that would be accurate.
Q Now, as of December 1994, that – the end of that year, there was no development work on an interim storage facility, was there, Mr. Milner?
A By that time no, I don't believe so.
Q And DOE has no current plans to site an MRS?
A No.
Q Do you believe that – that an MRS would have offered a better opportunity for the department of meeting the objective of accepting waste by 1998?
A Yes, I do.
Q I'm going to turn to the subject of delivery commitment schedules. You touched on that a little bit during your direct testimony. I'd like to ask you two questions. First, you would agree that if there was no facility to accept fuel in 1998, then the delivery commitment schedules that were entered into between utilities and the department would not be binding and would have to be reevaluated, true?
A Well, I certainly recall discussions as to what would – what would happen in that case and yeah,

Page 4761

I think we would have certainly had to reevaluate what would have occurred.
Q So the delivery commitment schedules could change if circumstances change?
A Potentially, that would have to be evaluated, yes.
Q If circumstances change, the DCSs could change. True?
A I'd have to know what the circumstances were before I knew whether they would change or not.
Q In your opinion, the delivery commitments were really best estimates, good-faith commitments on quantity and timing?
A No, I viewed the DCSs as a binding commitment.
Q Let me go back to your deposition again, once again May 2, the same day that we were at, this time page 396. Have you found that page, Mr. Milner?
A Yes, I have.
Q I'm going to start on line 12. Do you recall being asked the following question and giving the following answer?
Question: Does it change your view about the binding commitment reflected in the DCS? There was an objection from Mr. Shultis.

Page 4766

consideration.

THE WITNESS: Right. Well, on my recollection, our – our schedules were based on 400 metric tons the first year, 600 the second and then 900 for the remaining eight years in that case, so they were – they were based on a ten-year allocation. There was a 12-year difference in the assumed start of operation between an MRS and a repository, so in the first two years you would have accepted a thousand metric tons and then in the next ten years you would have accepted 9,000 metric tons which – so you would have stayed, as I recall, under the 10,000 metric ton cap.

JUDGE MEROW: I think he's worried more about when you could start accepting.

BY MR. SHAPIRO:

Q That's right. The – well, let me first go to this specific question that I asked, because I believe you gave a different answer at your deposition. Let's take a look at that, Mr. Milner. If you could turn this time to tab 5 of your binder. It's still May 7, but there were two sessions on May 7th. Specifically, on page 31 – I'll let you find that. Have you found that page, Mr. Milner?

A Yes, uh-huh.

Page 4767

Q It's a little bit long, but I'll go through it. And my question for you is, were you – were you asked the following series of questions and gave the following answers, starting on line 4 on page 31?

I mean, assuming then that the purchasers followed the instructions and submitted DCSs based on the schedules in the 1991 annual capacity report, then the DCSs would be based upon a waste acceptance schedule that was inconsistent with the statutory linkages and the Nuclear Waste Policy Act.

Objection from Mr. Shultis.

Answer: You're talking schedule linkage?

By Mr. Skalaban: Yes, sir.

And your answer: Well, I just don't view it as inconsistent in the sense that certainly in my opinion at the time, there was a possibility of that schedule linkage being removed.

Question: But it was – but the schedule linkage was there?

Answer: Yes.

Question: And so the law then existed as it exists now because I don't believe – well, scratch that. As the law then existed, the DCSs were based on a waste acceptance schedule that was inconsistent with

Page 4768

the Nuclear Waste Policy Act schedule linkages as they existed at this time.

And your answer: Sitting here today looking at that, that would be my opinion.

MS. SULLIVAN: Objection. I don't think that that was the question that was asked of the witness on cross, but we can clean that up on redirect.

BY MR. SHAPIRO:

Q That was your – your truthful testimony, Mr. Milner?

A That was my truthful testimony. If I may, there are, in my view, capacity linkages with the MRS to 10,000 metric tons and there are schedule linkages that – that being that an MRS could not be sited by the department until a repository site was selected, the – the particular assumption at that time, the MRS program was working with the then-office of the nuclear waste negotiator to attempt to find a volunteer MRS site. It was – all of the program planning assumptions at that time assumed if you were successful in finding a volunteer MRS site, that – that those negotiations will hopefully lead to – to removal or at least alteration of – of some of those

Page 4769

linkages, certainly schedule linkage.

Q But the schedule linkage was, in fact, there at the time it was delivered and the schedules were there?

A Correct.

Q And these delivery commitment schedules were inconsistent with the laws as it stood at that time?

A It was inconsistent with the scheduling and –

JUDGE MEROW: Wouldn't they make conditional upon the – didn't the approval say they were conditioned upon approval of a repository, or something of that nature?

THE WITNESS: Yes, sir.

JUDGE MEROW: Rather than just approval?

THE WITNESS: Yes, sir.

MR. SHAPIRO: Thank you, Your Honor.

BY MR. SHAPIRO:

Q I'd like to switch topics a little bit. We discussed a little bit the issue of dealing with shutdown reactors and – and providing priority acceptance for shutdown reactors. I have a few questions on that subject.

The Department of Energy does have an

Page 4782

regarding your understanding of the intent of the program was to work off the backlog. Do you remember that testimony in the cross-examination?
A Yes, yes.
Q When you say intent was to work off the backlog, what do you mean?
A Intent to me would be that that would be a – a program goal or – or one of the planning assumptions.
Q Are you referring to a contractual intent when you use the word "intent" in that statement?
A No, not at all.
Q Mr. Milner, you were also asked about the approval of DCSs being conditioned upon the existence of a facility or the delivery date being conditioned upon the existence of a facility. Do you remember that testimony?
A Yes, uh-huh.
Q Do you recall whether all DCSs were approved with that conditional statement?
A I – I don't recall whether all of them were.
Q Okay. Can we look at – and I apologize, I don't have the exhibits for the witness. We'll have to rely on the computer. I am going to look first at

Page 4783

29, I believe. Yeah, 29.003. Can you put that on the computer, please?
Mr. Milner, I apologize, I don't have a paper copy for you. Defendant's Exhibit 29.003 has been talked about by other witnesses, is a letter from contracting officer to M.E. Thomas of Maine Yankee. Do you recall Mr. Thomas at Maine Yankee?
A No, I don't offhand.
Q Okay. And it – the first sentence of that letter reads: The Department of Energy has reviewed and approved the six delivery commitment schedules by Maine Yankee, and it goes on to provide the numbers. Copies of the accrued DCSs are enclosed for your records.
And attached to this document, if we could go to the next page, are a series of DCSs. Do you see that they have been approved?
A Yes, uh-huh.
Q And how do you know that those have been approved?
A I see the approved by DOE signature.
Q Okay. And do you – do you see the conditional statement that you testified about earlier regarding the delivery date?
A No, I don't.

Page 4784

Q Okay. And could we go to –
JUDGE MEROW: Do you recall, Mr. Milner, though, before the Court of Appeals for the District of Columbia told us otherwise, that it was DOE's position, which you attempted to establish by rule making, that the obligation of DOE to perform under this contract was subject to the existence of a – of a repository?
THE WITNESS: I do. I recall that had been the department's position until the court decision, sir.
MS. SULLIVAN: Thank you, Your Honor.
BY MS. SULLIVAN:
Q Could we go to Defendant's Exhibit 30.018? Mr. Milner, this is a letter from Beth Tomasoni dated June 14, 1995 to Mr. Buchheit at Yankee Atomic again forwarding approved delivery commitment schedules. The third sentence in the first paragraph reads: The proposed delivery date is dependent upon existence of an operational repository or an interim storage facility constructed under that – the act. Do you see that language?
A Yes, I do.
Q Okay. Do you recall – does that refresh your recollection as to Department of Energy's

Page 4785

statements to that effect at or about this time?
A Yes.
Q 1995?
A Yes, yes.
Q Okay. If we could go to the next page, and could you enlarge the section 2.0, delivery information, commitment information? And, Mr. Milner, do you see the statement that's been typed in there? The proposed delivery date is dependent upon the existence of an operational repository or interim storage facility constructed under the act.
A I do.
Q Is that the conditional language that you recall?
A Recall, yes.
Q Mr. Milner, do you recall your testimony – one second, Your Honor. Let's actually go to something else. Mr. Milner, do you still have Defendant's Exhibit 23 in front of you?
A Yes.
Q Okay. Could we go to the second page of Defendant's Exhibit 23 in that second – that last – second – first paragraph, the last sentence. And

CERTIFICATE OF FILING

I hereby certify that on this 17th day of October, 2005, a copy of foregoing "DEFENDANT'S TESTIMONY DESIGNATIONS" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Marian E. Sullivan