**No. 98-614C**
**(Senior Judge Merow)**

---

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**SOUTHERN NUCLEAR OPERATING COMPANY,**
**ALABAMA POWER COMPANY AND GEORGIA POWER COMPANY,**

**Plaintiffs,**

**v.**

**THE UNITED STATES,**

**Defendant.**

---

# PLAINTIFFS' POST-TRIAL BRIEF

---

**M. Stanford Blanton**
**BALCH & BINGHAM LLP**
**1710 Sixth Avenue North**
**Birmingham, AL 35203**
**Telephone: (205) 226-3417**
**Facsimile: (205) 226-8798**

**Of Counsel:**

**Ed R. Haden**
**K. C. Hairston**
**BALCH & BINGHAM LLP**
**1710 Sixth Avenue North**
**Birmingham, AL 35203**
**Telephone: (205) 251-8100**
**Facsimile: (205) 226-8798**

**Ronald A. Schechter**
**Jeffrey L. Handwerker**
**Matthew Shultz**
**ARNOLD & PORTER LLP**
**555 Twelfth Street, N.W.**
**Washington, D.C. 20004-1202**
**Telephone: (202) 942-5000**
**Facsimile: (202) 942-5999**

**March 17, 2006**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..... vi

INTRODUCTION ..... 1

BACKGROUND ..... 3

STATEMENT OF THE CASE ..... 7

STATEMENT OF FACTS ..... 14

I. Proposed Findings of Fact ..... 14

II. Southern's Three Nuclear Plants ..... 19

III. The Nuclear Waste Policy Act of 1982 and the Standard Contract Require an SNF Acceptance Rate that Avoids the Need for Additional Dry Storage and Reduces the SNF Backlog to Allow for Timely Decommissioning ..... 22

A. Congress Enacted the Nuclear Waste Policy Act for the Purpose of Avoiding Spent Nuclear Fuel Storage Problems at Nuclear Reactor Sites ..... 22

B. DOE's Implementation of the NWPA. ..... 24

1. The Standard Contract. ..... 25

2. Annual Capacity Reports, Acceptance Priority Rankings, and Delivery Commitment Schedules. ..... 28

IV. From the Outset of the Program, DOE Interpreted its Contract Obligations Consistent with the Intent that No Utility Would Have To Build Additional At-Reactor Storage Space for SNF Discharges After January 31, 1998. ..... 29

A. DOE Documents. ..... 30

B. Testimony ..... 35

V. DOE Also Intended to Operate the Program to Remove SNF at a Rate Sufficient to Work-Off the Backlog of SNF Stored at Reactor Sites and to Ensure Timely Decommissioning of Nuclear Plants. ..... 37

VI. DOE Based All of its Operational and Financial Planning On A Receipt Rate That Would Eliminate The Need For Additional Storage and Reduce the Backlog at a Reasonable Rate. ..... 40

A. DOE Has Consistently Identified the 3000 MTU Rate as the Desired Steady-State Rate. .......... 40

B. DOE Has Repeatedly Used a 3000 MTU Rate in Its Financial Planning Documents. .......... 44

VII. DOE's Evolving Strategy for Use of a Monitored Retrievable Storage Facility. .......... 45

A. DOE Announces Five-Year Delay in the Start of Repository Operations and Proposes Use of a Monitored Retrievable Storage Facility in the Interim. .......... 45

B. The 1987 NWPA Amendments .......... 48

C. DOE Publishes the 1990 Annual Capacity Report. .......... 51

D. DOE Publishes the 1991 Annual Capacity Report and Projects a 900 MTU Acceptance Rate Beginning in 1998 Based on the Operation of an MRS. .......... 52

E. DOE Continued to Assert the MRS Facility Capacity Limitations as the Basis for the 900 MTU Acceptance Rate Even After It Abandoned Plans for Such a Facility. .......... 55

VIII. The Delivery Commitment Schedule Process. .......... 56

IX. Expert Testimony Regarding Acceptance Rate. .......... 62

A. THE REASONABLE ACCEPTANCE RATE REQUIRED BY THE STANDARD CONTRACT .......... 63

1. Results Using Strict "Oldest Fuel First" Priority Rankings .......... 66

2. Results Using Intra-Company Exchanges of Acceptance Rights. .......... 69

3. Other Available Means to Avoid Additional Dry Storage. .......... 70

B. SOUTHERN NUCLEAR'S FUEL ACCEPTANCE RIGHTS. .......... 72

X. The Government's Partial Breach of the Contracts. .......... 73

XI. Summary of Southern's Damages .......... 73

A. Overview of Southern's Evidence. .......... 73

B. Southern's Evidence. .......... 74

C. Overview of the Government's Damages Evidence. .......... 78

XII. The Principal Contested Damages Issues. .......... 79

A. The Number of Casks Loaded at Plant Hatch. 80

1. Southern's Policies Regarding Full Core Reserves 80

2. Reasons for Operating Reserve Policies. 84

B. Southern Would Not Have Required Dry Cask Storage Had the Government Performed as Required by the Standard Contracts. 88

1. The Parties' Experts Agree that Southern would have Avoided Dry Storage at Plant Hatch had the Government Performed. 88

2. Southern would have Installed the Second Bathtub Rack had the Government Performed. 88

C. The Dry Storage Facilities Were Required at Plant Hatch in the Breach Case. 89

D. The Government's Position Regarding the Number of Casks. 91

E. The HI-STAR Issue. 93

1. The Development and Commencement of Operation of the Plant Hatch Dry Fuel Storage Facility. 93

2. Southern's Decision to Purchase the HI-STAR Casks Was Reasonable When Made. 95

3. Costs Associated with Use of HI-STARs. 97

F. Southern's Use of Internal Labor and Allocation of Overhead. 101

G. Private Fuel Storage. 101

H. Miscellaneous Adjustments. 103

1. Work platform for cask loading. 103

2. Standby Welding Time. 104

I. Southern's Cost of Capital 104

SUMMARY OF THE ARGUMENT 106

ARGUMENT 111

I. The Law of Damages. 111

A. The Measure of Damages 111

1. Southern Is Entitled to be Placed In As Favorable An Economic Position as if No Partial Breach Had Occurred.................................... 111

2. Mitigation.......................................................................................... 112

3. The Burdens of Proof.......................................................................... 114

B. The Time Period Covered by Southern's Damages Claim. ............................. 115

II. Southern's Damages. ............................................................................................ 116

A. Overview of Southern's Damages. ................................................................. 116

B. Foreseeability, Certainty, and Causation. ....................................................... 118

1. Southern's Damages Were Foreseeable............................................... 118

2. Southern's Damages Are Certain......................................................... 119

3. Southern's Damages Were Proximately Caused by the Government's Partial Breach. ............................................................. 119

III. The Government's Challenges to Southern's Damages ............................................... 121

A. The "Alternate Rate" of SNF Acceptance. ...................................................... 121

1. A 3000 MTU Per Year Acceptance Rate Is Required By The Standard Contract and Is Reasonable................................................... 121

2. A 3000 MTU Acceptance Rate Would Have Eliminated The Need For Additional On-Site Dry Storage At Each Of Southern Nuclear's Plants, Was Contemplated By The Parties, Was Paid For By Southern Nuclear, And Is Reasonable. ................................................ 125

B. The Number of Casks Loaded at Plant Hatch................................................. 136

1. The Size of the Operating Reserves in the Breach and Non-Breach Scenarios. .......................................................................................... 137

2. Southern's Nuclear Witnesses Demonstrated the Reasonableness of Southern's Operating Reserves, and the Government Presented No Proof that Southern's Approach was Unreasonable. ............................. 139

C. The "Bathtub Rack" Adjustment. ................................................................... 142

1. Southern's Management's Decision Not to Temporarily Use the Second Bathtub Rack in the Hatch Pool was Reasonable. ..................... 142

2. The Government's Adjustment Fails To Account For The Cost of Installing the Additional Bathtub Rack. 146

D. The HI-STAR Casks Adjustment. 146

1. The Purchase of the HI-STARs Was Reasonable. 147

2. Southern Reasonably Began Loading HI-STARs in 2000. 149

3. The Proposed Upender Pad Adjustment Is Erroneous. 150

E. The Internal Labor Adjustment. 151

F. The Private Fuel Storage Adjustment. 155

G. The Miscellaneous Costs Adjustments. 161

1. Work platform for cask loading. 161

2. Standby Welding Time. 161

H. The Cost of Capital Adjustment. 162

CONCLUSION 165

CERTIFICATE OF SERVICE 167

# TABLE OF AUTHORITIES

## Cases

*Alaska Pulp Corp. v. United States*, 59 Fed. Cl. 400 (2004) .......... 114

*Bluebonnet Sav. Bank, F.S.B. v. United States*, 266 F.3d 1348 (Fed Cir. 2001) .......... 163

*Bluebonnet Sav. Bank, F.S.B. v. United States*, 339 F.3d 1341, 1344 (Fed Cir. 2003) .......... 163

*Burke v. Thomas J. Fisher & Co.*, 127 F. Supp. 1 (D.D.C. 1953) .......... 124

*Centex Corp. v. United States*, 55 Fed. Cl. 381 (2003), *aff'd*, 395 F.3d 1283 (Fed. Cir. 2005) .......... 163

*Citizens Federal Bank*, 66 Fed. Cl. .......... passim

*Clements Auto Supply Co. v. Service Bureau Corp.*, 298 F. Supp. 115 (D. Minn. 1969), *aff'd in relevant part*, 444 F.2d 169 (8th Cir. 1971) .......... 152

*Commercial Federal Bank, F.S.B. v. United States*, 59 Fed. Cl. 338, 355 (2004), *aff'd*, 125 Fed. Appx. 1013 (Fed. Cir. 2005) .......... 114

*Commonwealth Edison Co. v. United States*, 56 Fed. Cl. 652 (2003) (Hewitt, J.) .......... passim

*Convoy Co. v. Sperry Rand Corp.*, 672 F.2d 781 (9th Cir. 1982) .......... 152

*Department of Water & Power v. United States*, 131 F. Supp. 329 (S.D. Cal. 1955) .......... 165

*Dunn Appraisal Co. v. Honeywell Information Systems, Inc.*, 687 F.2d 877 (6th Cir. 1982) .......... 153

*Energy Capital Corp. v. United States*, 302 F.3d 1314 (Fed. Cir. 2002) .......... 111

*First Nationwide Bank v. United States*, 56 Fed. Cl. 438 (2003) .......... 114, 149

*Freeport Sulphur* .......... 154

*Gevyn Construction Corp. v. United States*, 827 F.2d 752 (Fed. Cir. 1987) .......... 164

*Howell v. United States*, 51 Fed. Cl. 516 (2002) .......... 127

*In re Kellett Aircraft Corp.*, 186 F.2d 197 (3rd Cir. 1950) .......... 114, 149

*In re Northern States Power Co.*, 604 N.W.2d 386 (Minn. Ct. App. 2000) .......... 140

*Indiana Michigan Power Co. v. Department of Energy*, 88 F.3d 1272 (D.C. Cir. 1996) .......... passim

*Indiana Michigan Power Co. v. United States*, 422 F.3d 1369 (Fed. Cir. 2005) .......... passim

*Indiana Michigan Power Co. v. United States*, 57 Fed. Cl. 88 (2003) .......... passim

*Indiana Michigan Power Co. v. United States*, 60 Fed. Cl. 639 (2004), *aff'd*, 422 F.3d 1369 (2005) .......... passim

*Intrepid v. Pollock*, 907 F.2d 1125 (Fed. Cir. 1990) ........ 115

*KMS Fusion, Inc. v. United States*, 36 Fed. Cl. 68 (1996), *aff'd mem.*, 108 F.3d 1393 (Fed. Cir. 1997) ........ 126

*LaSalle Tallman Bank, F.S.B. v. United States*, 317 F.3d 1363 (Fed. Cir. 2003) ........ 112

*LaSalle Talman Bank, F.S.B. v. United States*, 317 F.3d 1363 (Fed. Cir. 2003) ........ 163

*LaSalle Talman Bank, F.S.B. v. United States*, 45 Fed. Cl. 64, 111 (1999), *rev'd on other grounds*, 317 F.ed 1363 (Fed. Cir. 2003) ........ 114, 157

*Maine Yankee Atomic Power Co. v. United States*, 225 F.3d 1336 (Fed. Cir. 2000) ........ 4

*Massachusetts Bay Transp. Auth. v. United States*, 129 F.3d 1226 (Fed. Cir. 1997) ........ 111, 152

*Minpeco, S.A. v. Hunt*, 686 F. Supp. 420 (S.D.N.Y. 1988) ........ 163

*Morris v. United States*, 39 Fed. Cl. 7 (1997) ........ 124

*Northern States Power Co. v. United States Dep't of Energy*, 128 F.3d 754 (D.C. Cir. 1997), *cert. denied*, 525 U.S. 1016 (1998) ........ 4, 132

*Northern States Power Co. v. United States*, 224 F.3d 1361 (Fed. Cir. 2000) ........ 4, 5

*Pacific Gas & Elec. Co. v. Howard P. Foley Co.*, Civ. No. 85-2922 SW, 1993 WL 299219 (N.D. Cal. July 27, 1993) ........ 163

*S. J. Groves & Sons Co. v. Warner Co.*, 576 F.2d 524 (3d Cir. 1978) ........ 113

*Sacramento Mun. Util. Dist. v. United States*, 63 Fed. Cl. 495 (2005) ........ 6, 123

*Salles v. United States*, 156 F.3d 1383 (Fed. Cir. 1998) ........ 126

*Systems Fuels, Inc. v. United States*, 66 Fed. Cl. 722 (2005) ........ 6, 123

*Tennessee Valley Authority v. United States*, 69 Fed. Cl. 515 (2006) ........ passim

*United Power Ass'n v. L.K. Comstock & Co.*, 1992 U.S. Dist. LEXIS 18874, Civ. No. 3-89 766, 1992 WL 402906 (D. Minn., Oct. 27, 1992) ........ 163

*United States v. New England S.S. Co.*, 297 F. 651 (S.D. N.Y. 1923) ........ 153

*United States v. The John R. Williams*, 144 F.2d 451 (2d Cir.), *cert. denied*, 323 U.S. 782 (1944) ........ 153, 154

*Westfed Holdings, Inc. v. United States*, 52 Fed. Cl. 135 (2002), *aff'd in relevant part & rev'd in part on other grounds*, 407 F.3d 1352 (Fed. Cir. 2005) ........ 163

*Wickham Contracting Co. v. Fischer*, 12 F.3d 1574 (Fed. Cir. 1994) ........ 164

*Yankee Atomic Electric Co. v. United States*, No. 98-126C (Fed. Cl. June 26, 2003) ........ passim

**Statutes**

28 U.S.C. § 2516 ........ 162, 163, 164

42 U.S.C. § 7133 ........ 23

42 U.S.C. §§ 10101-10270 ........ 22, 48, 132

42 U.S.C. § 10168 ........ 48, 133, 134

42 U.S.C. § 10221 ........ 41

42 U.S.C. § 10222 ........ passim

42 U.S.C. § 10224 ........ 25

42 U.S.C. §§ 10132-10145 ........ 23

Nuclear Waste Policy Amendments Act of 1987, Pub. L. No. 100-203, §§ 5001-65, 101 Stat. 1330-1, -227 to -253 (1987) ........ passim

**Regulations**

48 Fed. Reg. 5458-71 ........ 25, 132

48 Fed. Reg. 16590-16608 ........ passim

**Legislative History**

128 Cong. Rec. 8002 ........ 23

128 Cong. Rec. 26317 (Sept. 30, 1982) ........ 23

H.R. Rep. No. 97-491 ........ 24

H.R. Rep. No. 97-785 ........ 22, 23

**Other Authorities**

11 *Corbin on Contracts* § 1039 ........ 114

13 Weekly Comp. Pres. Doc. 502 (1977) ........ 22

3 Dan B. Dobbs, *Law of Remedies* § 12.6(1)(6) (2d ed. 1993) ........ 113

6A Charles Alan Wright, et al., *Federal Practice & Procedure* § 1508 ........ 115

E. Allan Farnsworth, *Contracts* § 12.12 .......................................................................... 148

*Restatement (Second) of Contracts* § 204 ............................................................... 27, 63, 127

*Restatement (Second) of Contracts* § 344 .......................................................................... 111

*Restatement (Second) of Contracts* § 347 .............................................................. 112, 113, 138, 159

*Restatement (Second) of Contracts* § 350 ................................................................. 112, 113

*Restatement (Second) of Contracts* § 351 .......................................................................... 118

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **Alabama Power Company, Georgia Power Company and Southern Nuclear Operating Co., Inc.,** | ) | |
| **Plaintiffs,** | ) | |
| **v.** | ) | **No. 98-614C (Senior Judge Merow)** |
| **THE UNITED STATES,** | ) | |
| **Defendant.** | ) | |

## PLAINTIFFS' POST-TRIAL BRIEF

Plaintiffs Alabama Power Company ("APC"), Georgia Power Company ("GPC"), and Southern Nuclear Operating Company, Inc., ("SNC")[1] (collectively, "Southern")[2] submit this Post-Trial Brief. This Post-Trial Brief addresses the findings of fact and conclusions of law necessary to calculate the amount of damages for which the Government is liable because of its breach of the four contracts (the "Contracts") that required it to remove, starting no later than January 31, 1998, the spent nuclear fuel ("SNF") generated by all contract holders, which includes Southern's three nuclear plants: Plant Hatch, Plant Farley, and Plant Vogtle.

## INTRODUCTION

On July 29, 1998, Southern filed a Complaint seeking damages for, among other things, partial breach of three Contracts. On October 4, 2002, Southern filed its First Amended

[1] SNC, while not a party to the Contracts, administers those Contracts on behalf of APC and GPC as their agent. (Trial Tr. vol. 1, 120, 123, 125-26, Oct. 17, 2005) (Long Test.) [Hereinafter "Tr."] SNC, APC and GPC incorporate Plaintiffs' Response to the Government's Motion to Dismiss Southern Nuclear Operating Company as a Plaintiff for Lack of Subject Matter Jurisdiction. (Jan. 24, 2002, Dkt. 119.)

[2] Prior to the incorporation of SNC in 1990, SNC's functions were performed by Southern Company Services, Inc. ("SCS"). (Tr. 119) (Long Test.) References to "Southern" include SCS for that period.

Complaint for the same continuing partial breach clarifying that certain SNF had been covered by a fourth Contract. On September 23, 2005, Southern filed an Amended and Supplemental Complaint that updated Southern's damages on the same partial breach of the Contracts by the Department of Energy ("DOE").

On April 7, 2004, this Court granted Southern's motion for summary judgment on the issue of DOE's liability for partial breach of the Contracts. Specifically, this Court noted, "[t]here is no dispute concerning the fact that the United States, operating through the DOE, failed to meet the contractual requirement to begin disposition of the nuclear waste covered by the Standard Contracts by no later than January 31, 1998." (Order of April 7, 2004, Dkt. 234, at 5.) On April 5, 2005, this Court set the damages issues for trial beginning on October 17, 2005. (Order of April 5, 2005, Dkt. 276, at 2.)

On September 9, 2005, the Federal Circuit held in *Indiana Michigan Power Co. v. United States*, 422 F.3d 1369 (Fed. Cir. 2005), that a nuclear utility could not presently sue for damages arising from the Government's future breaches of the standard contract for the removal of SNF (the "Standard Contract"). Accordingly, on September 16, 2005, this Court limited, pursuant to Southern's request, the presentation of evidence for damages incurred through December 31, 2004, allowing Southern to bring future actions for partial breaches taking place after that date. (Order of Sept. 16, 2005, Dkt. 304, at 2.)

The parties tried the damages case before this Court from October 17 to 21, October 24 to 27, 2005, and January 30 to 31, 2006. Southern presented evidence that the Nuclear Waste Policy Act of 1982 ("NWPA") and the Contracts required DOE to accept SNF at a rate sufficient to eliminate the need for storage capacity expansions at its plants after 1998 and to reduce the inventory of SNF existing as of 1998 so that the SNF inventories would be eliminated by the time

Southern completed the decommissioning of its facilities. Southern presented evidence that the 3000 metric ton uranium ("MTU") per year steady-state acceptance rate published in numerous DOE planning documents since the execution of the Contracts satisfies those objectives, and that it is a reasonable and economically efficient acceptance rate for the DOE spent nuclear fuel program. Southern also presented evidence that it has suffered over $101,900,000 (*see infra* note 50) in damages, with costs of capital, through December 31, 2004, ($77,202,000 in nominal damages) as a result of the Government's partial breach.

The Government presented evidence in an effort to support a two-part position that Southern's damages should be reduced. First, the Government argued that Southern's damages should be limited to $16,707,846 (Tr. 2349) (Johnson Test.), based on the application of an alternate SNF acceptance rate of 900 MTUs per year set forth in certain DOE planning documents in the early 1990s – a rate that was never legally authorized and was abandoned as a planning basis for the program by 1995. Second, the Government argues that if the 3000 MTU rate is applied, only $38,574,066 (*id.* at 2348) in nominal damages should be recovered by Southern, based on a variety of arguments that Southern's managers, with years of nuclear experience, either expended funds unreasonably or that the funds expended were not the result of the Government's partial breach of contract.

## BACKGROUND

Prior to this case being filed, the United States Court of Appeals for the District of Columbia Circuit held in two separate opinions that the Government had an unconditional obligation under the Contracts to commence removal of SNF no later than January 31, 1998, and that the Government cannot rely on its failure to construct a repository in accordance with the NWPA as an excuse for its non-performance. *See Northern States Power Co. v. United States*

*Dep't of Energy*, 128 F.3d 754, 760 (D.C. Cir. 1997), *cert. denied*, 525 U.S. 1016 (1998); *Indiana Michigan Power Co. v. Department of Energy*, 88 F.3d 1272, 1276-77 (D.C. Cir. 1996). In the seven years between Southern's filing of this lawsuit and its culmination in a damages trial, the Court of Appeals for the Federal Circuit and the Judges of this Court have resolved many of the issues relevant to this case.

Among the issues that have been resolved are the following:

First, the United States Court of Appeals for the Federal Circuit held that the Court of Federal Claims has jurisdiction to consider suits for partial breach of contract brought by nuclear utilities that entered into contracts with the Government. *Maine Yankee Atomic Power Co. v. United States*, 225 F.3d 1336, 1341-42 (Fed. Cir. 2000); *Northern States Power Co. v. United States*, 224 F.3d 1361, 1367 (Fed. Cir. 2000). In *Maine Yankee*, 225 F.3d at 1342, the Federal Circuit concluded as a matter of law that the Government's failure to begin acceptance of SNF by January 31, 1998, was a partial breach of contract that extended to *all nuclear utilities*: "The breach involved all the utilities that had signed the contract — the entire nuclear electric industry." The Federal Circuit also held that the unavoidable delays clause of the contracts applied only to the types of delays that "routinely" arise after performance under the contract had begun and not to the delay of "a critical and central obligation of the contract" — to begin acceptance of SNF by January 31, 1998. *Id.* at 1341.

Second, in light of the Federal Circuit's rulings in *Maine Yankee*, 225 F.3d at 1342, and *Northern States*, 224 F.3d at 1367, this Court granted Southern's motion for summary judgment on the issue of the Government's contract liability. Apr. 7, 2004 Order, Docket No. 234, at 5. This Court found that the Government partially breached the Standard Contracts it had entered

into with Southern, which obligated the Government to begin and continue disposal of SNF by no later than January 31, 1998. *Id.*

Third, Judge Hewitt, Judge Hodges, and Your Honor have denied the Government's partial summary judgment motions that the 900 Metric Tons of Uranium ("MTU") per year acceptance rate contained in the 1991, 1992, and 1995 Annual Capacity Reports ("ACRs") is the reasonable and appropriate acceptance rate on which to base the utilities' damages. *See Commonwealth Edison Co. v. United States*, 56 Fed. Cl. 652, 666-67 (2003) (Hewitt, J.); *Indiana Michigan Power Co. v. United States*, 57 Fed. Cl. 88, 97-100 (2003) (Hodges, J.); *Yankee Atomic Electric Co. v. United States*, No. 98-126C (Fed. Cl. June 26, 2003) [hereinafter "*Yankee Atomic*"] (order adopting Judge Hewitt's opinion in *Commonwealth Edison* to extent applicable). The Government's 900 MTU per year acceptance rate is based on limits that the 1987 Amendments to the NWPA imposed on a Monitored Retrievable Storage ("MRS") facility. *See Indiana Michigan*, 57 Fed. Cl. at 100; *Commonwealth Edison*, 56 Fed. Cl. at 666. Because DOE was never authorized to build an MRS facility and because it was illegal under the 1987 Amendments to the NWPA to store SNF at an MRS before a permanent repository was licensed, the *Indiana Michigan* and *Commonwealth Edison* courts rejected the Government's position that its damages should be limited based on an acceptance rate derived from the operation of an MRS facility. *See Indiana Michigan*, 57 Fed. Cl. at 100; *Commonwealth Edison*, 56 Fed. Cl. at 666. Judge Hewitt concluded:

> The court does not agree with defendant that it is entitled to limit its damages based upon an optional disposal method of which it did not avail itself. The 10,000 MTU limitation applied only to a MRS until a permanent repository began accepting SNF; the 1987 Amendments did not apply this limitation to DOE's obligation to dispose of SNF under the Standard Contract beginning January 31, 1998.

*Commonwealth Edison*, 56 Fed. Cl. at 666.

Fourth, Judge Hewitt in *Commonwealth Edison* rejected another Government argument, that the Delivery Commitment Schedule ("DCS") process described in the Standard Contract, which the DOE contracting officer acknowledged was suspended in 1997 in a purported effort to limit the Government's damages, should define the amount of SNF that the Government was required to accept in the non-breach scenario. Judge Hewitt properly held that the DCS process was a planning tool and that it did not create any binding obligation on either the Government or the utilities. *See Commonwealth Edison*, 56 Fed. Cl. at 663, 665-66. Judge Hewitt stated, "In these circumstances, plaintiff's submission and defendant's acceptance of the proposed DCSs did not create a contractually binding obligation for either party." *Id.* at 666 (citations omitted).

Other Judges on this Court have agreed with Judge Hewitt that the DCS process did not create any obligation between the Government and the utilities nor did it alter the Government's obligations under the Standard Contract. *See Systems Fuels, Inc. v. United States*, 66 Fed. Cl. 722, 732 (2005) (Braden, J.) (finding that "[t]here is absolutely no evidence in the record that the ACR and DCSs were binding on either party" and that "as a matter of law, the ACR and DCSs did not amend the Standard Contract"); *Sacramento Mun. Util. Dist. v. United States*, 63 Fed. Cl. 495, 505 (2005) (finding that "the DCSs imposed no legal obligation on either party to the DOE Standard Contract" and that "[t]he record contains no evidence that separate consideration was offered by the Government to support an independent contract modifying the DOE Standard Contract.") (Braden, J.); *Indiana Michigan*, 57 Fed Cl. at 97-98 (Hodges, J.) ("The Contract does not use [ACRs] and [DCSs] to determine an Acceptance Rate. The [DOE] did not consider these forms to be binding. . . . The Contract contemplated that DOE would use these reports for planning purposes only. The [ACRs] disclaimed any other purpose, specifically stating that they were not binding on either party." (footnotes and citations omitted)).

Fifth, because an acceptance rate term is missing from the Standard Contracts, it has been established that the Court must supply a reasonable acceptance rate term. *See Commonwealth Edison*, 56 Fed. Cl. at 662, 667. In its April 7, 2004 Order, this Court adopted Judge Hewitt's reasoning in *Commonwealth Edison*, but left final resolution of the acceptance rate issue for trial. April 7, 2004 Order, at 6. The April 7 Order granted Southern's motion for partial summary judgment on liability, leaving for trial the proof of Southern's damages.[3] *Id.* at 4-5.

Sixth, on January 31, 2006, Judge Lettow issued his opinion in *Tennessee Valley Authority v. United States*, 69 Fed. Cl. 515 (2006) (hereinafter "*TVA*"), holding that TVA, which had incurred past damages in storing SNF, could recover those damages. Those damages included the cost of dry storage facilities, internal labor and overhead, and the cost of capital.

## STATEMENT OF THE CASE

Southern has incurred substantial costs related to the design, engineering, licensing, construction, installation, operation, and maintenance of additional SNF storage because of the Government's partial breach of the Contracts. At Plant Hatch, Southern has constructed a licensed Independent Fuel Storage Installation ("ISFSI"), which currently consists of four concrete pads, each with a capacity to hold twelve dry SNF storage casks. By December 31, 2004, Southern had purchased twenty-two dry casks, loaded SNF into these casks, and placed the loaded casks onto Plant Hatch's ISFSI. Construction of an ISFSI at Plant Farley began in 2000. As of December 31, 2004, Southern had purchased three dry storage casks for Plant Farley.

[3] This Court dismissed the takings claim as duplicative of the contract claim, but denied the Government's motion to dismiss the illegal exaction claim. April 7, 2004 Order at 4-5, 7-8. This Court also denied the Government's motion to dismiss any claim for damages arising from Greater than Class C radioactive waste. *Id.* at 5-6.

Because of the Government's breach, Plant Vogtle procured and installed additional SNF pool racks during the period of 1998 to 2000.

The arguments in this damages case fall into two categories: (1) the annual rate at which DOE was required to remove SNF from Southern's plant sites; and (2) the reasonableness of Southern's nuclear engineers and managers' actions taken to store SNF on-site given DOE's partial breach.

**The 3000 MTU Acceptance Rate**

Determining the acceptance rate required by the Contracts is a critical element in calculating Southern's damages, because the higher the required acceptance rate, the more usable space that Southern would have had in its reactor pools, and the higher the damages Southern is due for storing up to that amount of SNF. Southern has demonstrated that DOE's contractual obligation was to remove SNF at the rate of 3000 MTUs per year after a 5-year ramp-up period. The Government argues that the rate should be set at 900 MTUs. Southern presented evidence that demonstrated that the 3000 MTU rate: (i) would accomplish the parties' intent to avoid additional at-reactor storage after January 31, 1998, and remove the backlog of SNF at a reasonable pace; (ii) is reflected in published DOE documents from the 1983 Draft Mission Plan to the 2004 Annual Capacity Report and Acceptance Priority Ranking; (iii) was used to compute the adequacy of the $850 million that Southern has paid for DOE to remove its SNF; and (iv) would have allowed for timely decommissioning of the plants. The 900 MTU rate was based on a Monitored Retrievable Storage ("MRS") facility that was never authorized by law and would not have prevented additional on-site storage at most utilities after January 31, 1998.

**The Government's Challenges to Southern's Damages**

Using the 3000 MTU annual acceptance rate published by DOE, the damages incurred at Plant Hatch, Plant Farley, and Plant Vogtle total $101,900,000 through December 31, 2004. At this acceptance rate, the Government does not dispute $38,574,066 in damages.[4] The difference between the damages numbers derives from the Government's challenges to several of the damages items. Principally, the Government challenges the reasonableness of the decisions made by Southern's skilled and experienced team of nuclear engineers and nuclear managers in keeping sufficient space in Southern's reactor pools to allow the plants to continue to operate safely and efficiently. Because the Government withdrew its only expert witness with nuclear engineering and management experience, it cannot bear its burden of proving that the Southern's nuclear engineers and managers acted unreasonably in mitigating damages.

<u>The Operating Reserve Southern is Using and Its Loading Schedule, including the Number of Casks and Associated Infrastructure, is Reasonable</u> – The Government challenges the size of the operating reserve – usable space – Southern maintained in the Plant Hatch pool that was shared by two reactors. The larger the reserved space in the pool, the more SNF that must be removed and stored to create and maintain that reserve and the more damages that will be incurred. Based on the additional operational risk forced on Southern by the Government's partial breach, Southern's nuclear engineers and plant managers testified that an operating reserve of 2 full core reserve ("FCR") – the amount of pool space needed to store a discharge of all the fuel from both reactors that share the pool – was reasonable. The Government argues that Southern should have used an operating reserve of only 1 FCR for the shared pool. Without a nuclear

---

[4] At an acceptance rate of 900 MTUs per year, which as discussed supra has been previously rejected, the Government calculates Southern's damages to be $16,707,846. (Tr. 2348) (Johnson Test.)

operations expert, the Government's evidence consists of some of Southern's internal documents that tracked when the reactor pools would run out of a 1 FCR, as opposed to a 2 FCR operating reserve, and testimony by its economist, Dr. Neuberger, as to his interpretation of Southern's accountant's spreadsheet for tracking fuel discharges. The spreadsheet used the 1 FCR to show the effect of cask loading on pool capacity.

Southern presented the testimony of Messers. Lou Long, David Bland, and Jim Wade, who have decades of nuclear engineering and management experience, that demonstrated that while a 1 FCR operating reserve is the minimum required for safe operation over the short term, their judgment is that a target of 2 FCR is the best operating reserve for efficient long-term plant operation. Two FCRs provide a margin of space in the pool in case both reactors have to be shut down for either maintenance or an NRC-ordered shut down, a storage cask or canister is defective or arrives late, or labor or equipment problems delay taking SNF out of the pool and placing it on the ISFSI. Further, Southern showed that while some documents tracked when Plant Hatch's pool would breach the 1 FCR limit, others tracked when Plant Hatch would breach both the 1 FCR and the 2 FCR target. Southern's accounting and damages expert, Ken Metcalfe, explained that his spreadsheet does not establish a 1 FCR policy for Plant Hatch, but merely tracks when Southern has actually loaded SNF into casks. Southern showed that had DOE performed, DOE would have removed substantially more SNF than Southern's actual loading schedule – which the Government is challenging as unreasonable.

<u>Southern's Decision to Forgo Installation of the Second Bathtub Rack was Reasonable.</u> – The Government challenges Southern's loading of SNF at an ISFSI in 2000 because Southern could have installed a second bathtub rack in the bathtub area of the Plant Hatch pool and delayed loading casks from 2000 to 2001. Southern presented the testimony of its nuclear engineers and

managers, Lou Long, Jim Wade, and David Bland, that once it was clear that Southern would have to build an ISFSI, the better and safer operational decision was to not install the second rack, have it contaminated with radiation, and expose its workers to more radiation in order to gain only a temporary delay in loading SNF into dry storage. Because the bathtub area of the pool was needed for the operation of the pool, Southern would have taken the second bathtub rack out of the pool the next year to reclaim the usable space (to store tools, contaminated equipment, etc). Had DOE performed, however, Mr. Long explained that Southern would have installed the second bathtub rack for $419,800 because that would have avoided building the ISFSI for millions of dollars as DOE would have removed SNF fast enough to reduce the SNF in the pool and provide an operating reserve of more than 1 FCR and, eventually, to more than 2 FCRs.

The Government countered this evidence only with the testimony of its economist, Dr. Neuberger, that the breach and non-breach case should, in the abstract, keep all variables the same. He conceded, however, that he did not have the expertise to evaluate the reasonableness of how Southern's nuclear engineers and managers would react to different facts and circumstances in operating Plant Hatch.

<u>Southern's Purchase of Three HI-STAR Casks was Reasonable</u> – The Government challenges Southern's purchase of three HI-STAR casks for use in storing SNF at Plant Hatch in 2000 and related equipment and labor costs. Based on Dr. Neuberger's manipulations of Southern's actual cask loading schedule, the Government contends that Southern could have waited until just before it lost its 1 FCR total operating reserve at Plant Hatch in 2001 to remove SNF from the pool and by that time less expensive HI-STORM casks (which are licensed only for storage) would have been available. Contrary to the Government's argument, Mr. Long testified that while the HI-STAR casks were more expensive than the subsequently used HI-STORM

casks, the HI-STARs had the additional function of transporting SNF off-site to a facility such as PFS and being reused. Further, Mr. Bland's testifimony establishes that the purchase of the HI-STARs was reasonable because at the time the purchase decision was made, Southern had not yet received approval from the Nuclear Regulatory Commission ("NRC") to add racks to the Plant Hatch pool that were necessary to extend to extend Plant Hatch's 1 FCR minimum operating reserve from 2000 to 2001, as well as because it was the first SNF loading campaign that Southern had ever attempted. Any delay because of what at the time was a very uncertain licensing process, a defective or late arriving cask or canister, labor shortages, or equipment problems could have resulted in a reduction of the operating reserve below 1 FCR. Moreover, when the decision to begin loading was made in 1999, the HI-STAR casks had at least begun the licensing process before the NRC, whereas the HI-STORM casks had not.

Southern's Internal Labor, Overhead, and Engineering Supervision Damages are Incremental **–** The Government challenges the costs of Southern's own labor for SNF loading on the grounds that Southern would have incurred that payroll cost regardless of DOE's partial breach. Southern presented the testimony of Mr. Lou Long who explained that had Southern's workers not been used to load SNF, they would have been working on other backlogged maintenance projects at the plants. Southern was deprived of the value of this work by DOE's partial breach. Such mitigation is especially appropriate where the use of Southern's own workers to load SNF was less expensive than using outside contractors.

The Government also challenges Southern's allocation of engineering supervision and overhead to the SNF project as non-incremental. Southern's accounting and damages expert, Mr. Ken Metcalfe, testified that Southern allocated labor and overhead to the SNF project in a manner consistent with generally accepted accounting principles, public service commission requirements,

and the manner in which Southern allocates such costs to all other projects and that recovery of such costs by Southern in this matter was appropriate and consistent with his experience of over 20 years on government contract matters. The courts have allowed the Government and private plaintiffs to recover the costs of their own labor, overhead, and supervision incurred to mitigate damages.

Southern's Payments to the Private Fuel Storage Program were Reasonable – The Government challenges as unreasonable, Southern's payments beginning in the mid-1990s and ending in 2004 to Private Fuel Storage, LLC ("PFS"), an entity that recently has been licensed to store SNF in Utah. The Government asserts that the PFS program was speculative, Southern viewed it as an "insurance policy," and there was a profit potential. Unlike in *Indiana Michigan*, 60 Fed. Cl. 639, 58-59 (2004), however, the Government presented no expert testimony on this issue in this case, Southern presented DOE's own statements that PFS was reasonable, and, subsequent to the *Indiana Michigan* decision, the NRC approved PFS's application for a license. In addition, Messers. Long and Cocherell testified that due to the certainty that Southern would have to store its own SNF and the uncertainty of whether a State would bar or prohibitively tax SNF a decade in the future, Southern determined that it was reasonable in the mid-1990s to explore an off-site private ISFSI. Southern never earned any profit and stopped making payments in 2004 after it completed its ISFSIs in Georgia and Alabama and no adverse political action was taken.

Southern's Cost of Capital is a Reasonable Cost Actually Incurred that is Not Pre-Judgment Interest – The Government asserts that Southern's cost of capital on past damages constitutes pre-judgment interest on a claim and therefore is not recoverable as a matter of law. Southern presented the testimony of its accounting, finance, and economic damages expert Ken

Metcalfe, that the cost of capital, however, represents a real economic cost, was computed in a manner consistent with industry accounting rules, and varies from year to year based on the cost of equity and debt capital in the markets and the capital structure of the relevant entities. The cost of capital is a separate component of damages and pre-judgment interest, if applicable, would apply on top of such cost. This Court in *TVA*, 69 Fed. Cl. at 540-42, allowed the nuclear utility to recover the cost of capital relating to construction period interest, incurred in building SNF storage facilities.

## STATEMENT OF FACTS

### I. Proposed Findings of Fact.

As demonstrated below, both parties submitted voluminous evidence and testimony regarding the formation of the Contracts, the performance due Southern from the Government under those Contracts, and the consequences of the Government's failure to perform. Southern proposes the following findings of fact are supported by a preponderance of the evidence and should govern the assessment of its damages:

1. Southern entered into four separate Contracts with the United States pursuant to the NWPA for the removal of SNF from its three nuclear power plants. Southern has paid all fees due the Government under those Contracts.

2. The Contracts required DOE to commence acceptance of SNF from utilities on January 31, 1998, on an oldest fuel first basis and to do so as expeditiously as practicable, consistent with the twin goals of the NWPA of avoiding additions of on-site storage capacity after that date and to reduce the backlog of SNF and thus avoid delays in the decommissioning of nuclear power plants at the end of their useful life.

3. The Contract does not set out an explicit utility or industry aggregate acceptance rate.

4. DOE has adopted an industry-wide acceptance rate of 3000 MTUs per year as a steady-state acceptance rate under the Contract, after a five year ramp up period in which the DOE would remove 400, 600, 1200 and 2000 MTUs of SNF in each of the first four years. The 3000 MTU rate is consistent with the performance objectives intended by the parties at the time of contracting.

5. The 3000 MTU rate, as reflected most recently in DOE's 2004 Annual Capacity Report and Acceptance Priority Ranking, is a reasonable rate based on the expectations of the parties to the Contract.

6. If DOE had commenced performance utilizing the 3000 MTU acceptance rate, DOE would have removed a sufficient amount of SNF from Southern's plants such that none of Southern's nuclear plants would have been required to expand their on-site SNF storage capacity after 1998.

7. As a proximate result of the Government's partial breach of contract, Southern was required to construct and commence operation of dry cask storage facilities at two of its plants and to rerack one of the SNF storage pools at another of its plants in order to maintain the operational reliability of the plants, including a reasonable operating reserve in the SNF pools. There is no credible evidence that Southern acted unreasonably in expanding the capacity of its SNF storage capability or that its actions were caused by anything other than the Government's partial breach of contract.

8. Southern employees and supervisors were diverted from other productive work to work on the construction and operation of dry cask storage facilities and the re-rack, and as a

result, the portion of their cost to Southern that is attributable to that effort was the proximate result of the Government's breach.

9. Southern invested in PFS in order to pursue the development of a potential alternative SNF storage facility as a contingency in case its on-site storage facilities could not be completed or operated for the life of the nuclear plants. It was reasonable for Southern to pursue this alternative option in light of the Government's failure to provide any credible guidance about when it would perform the Contracts, and in light of local opposition in some areas of the country that had complicated the on-site expansion of storage capacity.

10. The nominal damages to Southern of expansions of on-site storage capacity due to the Government's failure to perform, through December 31, 2004, are:

| | |
|---|---|
| APC | $17,275,000 |
| GPC | 59,927,000 |
| Total | $77,202,000 |

11. In addition to its nominal damages, Southern suffered actual economic damages in the form of the cost of its capital to finance the SNF storage expansions. Adding the cost of capital to its damages, Southern's damages as of December 31, 2004 total $101,900,000.[5]

At trial, Southern presented testimony from its current and former nuclear executives and managers, with a combined 155 years of experience in the successful management of nuclear power plants. Southern's fact witnesses were:

- **Louis Long** is currently the Vice President for Technical Support of SNC, with responsibility over the Contracts and for the development of SNF storage at Plants

[5] Prior to this Court's order stating that damages should be computed through December 31, 2004, Southern's damages expert, Mr. Metcalfe, had computed Southern's total damages through December 31, 2004, including cost of capital damages through August 31, 2005, as $105,628,000. At trial, Mr. Metcalfe noted removing the cost of capital for the eight months from January 1 through August 31, 2005, would result in total damages as of December 31, 2004, of $101,900,000. (Tr. 1539-40) (Metcalfe Test.)

Hatch, Farley, and Vogtle. Mr. Long has 35 years of experience with nuclear engineering and nuclear plant management. Mr. Long received his bachelor's degree in physics and his master's degree in nuclear engineering from Georgia Tech in 1966 and 1968, respectively. After assessing Soviet and Chinese nuclear weapons for the United States Army in the 1960s, Mr. Long began work in 1970 as a licensing engineer for Plant Hatch. Since then, he has managed hundreds of engineers responsible for the modification and operation of Southern's three nuclear plants, including the construction of SNF storage facilities. (Tr. 114-22.) (Long Test.)

- **Ronald Cocherell** is the Nuclear Fuel Services Manager for SNC. He has over 25 years of nuclear-related engineering and management experience. Mr. Cocherell received a bachelor's and a master's degree in nuclear engineering from the University of Florida. Since joining the Southern Company in 1978, his duties have included planning nuclear fuel cycles, long range fuel planning for SNF storage, monitoring pool reserve capacities, and administering the Contracts. (Tr. 240-51) (Cocherell Test.)

- **Bruce Hunt** is currently the Nuclear Fuels Manager of SNC. He has 33 years of experience in operating and managing nuclear fuel. Mr. Hunt received his bachelor's degree in engineering physics from Cornell University and a master's degree in nuclear engineering from the Georgia Institute of Technology. Since joining Southern in 1972, Mr. Hunt has managed several areas relating to nuclear fuel, including, but not limited to, reactor core design, nuclear fuel procurement, nuclear fuel cycle planning, nuclear fuel performance, nuclear fuel surveillance and SNF Contract administration. (Tr. 439-43) (Hunt Test.)

- **David Bland** is the President of Trivis, Incorporated and previously worked for Southern in a variety of positions, including Senior Reactor Operator and manager of the Plant Hatch SNF dry storage project. He has over 20 years of nuclear-related engineering and management experience, and has managed and participated in the construction of Independent Spent Fuel Storage Installations ("ISFSIs"), including the Plant Hatch ISFSI and several SNF dry storage loading campaigns. Mr. Bland received a nuclear engineering degree from the University of Florida and a master's in business administration from Samford University. Mr. Bland also received his senior reactor operator license, which authorized him to run a nuclear power plant. (Tr. 1141-55) (Bland Test.)

- **Jim Wade** is a Mechanical/Civil Supervisor for Southern Nuclear. He has 22 years of nuclear-related engineering and management experience, and has managed several SNF dry storage loading campaigns at Plant Hatch. Mr. Wade received a bachelor's degree in mechanical engineering from the Georgia Institute of Technology. His duties have included implementing and operating Plant Hatch's dry storage system, selecting dry storage technologies, preparation of cask loading schedules, and monitoring pool reserve capacities. (Tr. 884-90) (Wade Test.)

- **Thomas McCallum** is a Project Manager for Southern Nuclear and has managed the construction of Plant Farley's ISFSI and related dry storage procurement and planning activities. He has over 20 years of nuclear-related engineering and management experience. Mr. McCallum received a bachelor's and a master's degree in mechanical engineering from Mississippi State University. Mr. McCallum also served as a senior reactor operator. Since joining Southern Company in 1983, his duties have included implementing and operating Plant Farley's dry storage system, selecting dry storage technologies, preparation of cask loading schedules, and monitoring pool reserve capacities. (Tr. 1258-71) (McCallum Test.)

Southern also presented the testimony of two expert witnesses:

- **Eileen Supko** is a Senior Consultant with Energy Resources International, Inc., a firm that consults on nuclear fuel cycle issues, including spent fuel management. She has extensive experience with the NWPA and the Standard Contracts at issue in this case. This Court accepted Ms. Supko as an expert in nuclear engineering, DOE's waste management program, storage and disposal of SNF, modeling of SNF acceptance rate scenarios and allocation rates, and allocations of SNF acceptance rights. (Tr. 878-81) (Supko Test.)

- **Kenneth Metcalfe** is the President of The Kenrich Group LLC, a business and litigation consulting firm. He is a Certified Public Accountant and a Certified Valuation Analyst, and he has computed accounting, financial, and economic damages in matters involving the construction and operation of over 40 nuclear plants during the past 20 years. (Tr. 1406) (Metcalfe Test.) This Court accepted Mr. Metcalfe as an expert in computing accounting, financial, and economic damages relating to nuclear plants and government contracts. (*Id.* at 1449.)

At trial, Southern's fact witnesses testified based on their decades of successful experience in operating Southern's nuclear plants as to the operational issues created by the Government's breach of the Contracts and as to what actions would have been reasonable for Southern to take in managing Southern's SNF had the Government met its obligations under the Contracts (*i.e.*, the non-breach case) and what steps were reasonable for Southern to take when the Government breached its obligations under the Contracts (*i.e.*, the breach case).

The Government presented testimony from three DOE employees whose only relevant experience was the administration of DOE's High Level Waste Program that has never accepted any SNF, and an economist and a certified public accountant, neither of whom had any relevant

nuclear experience. No Government witness with any nuclear plant operations experience provided any testimony as to what actions would have been reasonable had the Government performed under the Contracts or what actions were reasonable or what actions were appropriate from an operational or technical perspective in light of the Government's partial breach of Contract. (Tr. 2034; 2192-2193.) (Neuberger Test.) No Government witness challenged Ms. Supko's conclusions regarding a reasonable acceptance rate or presented any analysis supporting an alternative rate.

## II. Southern's Three Nuclear Plants.

SNC operates three nuclear plants – Plant Farley in Alabama and Plants Hatch and Vogtle in Georgia. (Tr. 126) (Long Test.); PX 750, Appx. A; PX 751, Appx. A; PX 752, Appx. A.) While APC owns Plant Farley and GPC owns a majority of Plants Hatch and Vogtle,[6] SNC operates the three nuclear plants and deals with government entities, including DOE, as agent for APC and GPC, on all issues regarding the Contracts. (Tr. 126-27) (Long Test.)[7]

Each of Southern's three plants has two nuclear reactors. (Tr. 134) (Long Test.) Hatch Unit 1 began operation in 1974, and Hatch Unit 2 began operation in 1978. (PX 751, Appx. A.) Farley Units 1 and 2 began operations in 1977 and 1981, respectively. (PX 750, Appx. A.)

[6] Alabama Power owns 100% of Plant Farley. Georgia Power owns 50.1% of Plant Hatch and 45.7% of Plant Vogtle. Plant Hatch is also owned by Oglethorpe Power Company (30%), Municipal Electric Authority of Georgia (17.7%) and the City of Dalton (2.2%). Plant Vogtle is also owned by Oglethorpe Power Corporation (30%), Municipal Electric Authority of Georgia (22.7%), and the City of Dalton (1.6%). (PX 6 (Kenrich Report) at 1.) GPC is authorized to operate Plants Hatch and Vogtle on behalf of its co-owners, including execution and administration of the Contracts, and GPC is a signatory to the Contracts. (PX 751 (Hatch Contracts); PX 752 (Vogtle Contract.)) GPC has delegated its operational and contractual responsibilities on behalf of its co-owners to SNC. (Tr. 126-27) (Long Test.)

[7] SNC, APC, and GPC are subsidiaries of the Southern Company. (Tr. 126) (Long Test.) The Southern Company is a publicly traded holding company. (*Id.*)

Vogtle Units 1 and 2 began operations in 1987 and 1989, respectively. (PX 651 at 8; Tr. 133 (Long Test.))

Each of the three plants use nuclear reactors to produce heat that creates steam that turns turbines that generate electricity sold to APC's and GPC's customers. (Tr. 142) (Long Test.) Southern's Nuclear plants are the largest generators on its system. Electricity generated by Southern's three nuclear plants is substantially less expensive than electricity generated by oil, coal, or natural gas fired generators and for that reason are employed as "baseload" generation, meaning they are operated 24 hours per day and 7 days per week when they are available. (*Id*. 136.) Without the operation of any one of its three nuclear plants, Southern would have to generate electricity using higher cost plants or purchase electricity at a substantially higher cost in order to supply APC's and GPC's customers. (*Id.* at 138-39.) As a result, it is critical that Southern operate and maintain the plants so as to minimize forced outages (*i.e.*, outages due to factors other than re-fueling).

The fuel used in Southern's six reactors is in the form of enriched uranium pellets that are stacked into long metal tubes called "fuel rods." (Tr. 1427) (Metcalfe Test.) The fuel rods are placed into an array called an "assembly." (Tr. 142 (Long Test.); PX 651 (Kenrich Report) at 9.) The assembly is then placed in the reactor. (Tr. 1427) (Metcalfe Test.) When the nuclear fuel assemblies are placed into the reactor, nuclear fission takes place, generating extreme heat. (Tr. 142) (Long Test.) The heat is used to produce steam that turns turbines that generate electricity. (*Id*.)

After four to six years, the usable energy in the uranium pellets in an assembly becomes depleted, or spent, and the old assembly must be replaced with an assembly with new uranium. (Tr. 141) (Long Test.) The depleted assembly is referred to as SNF. The SNF is discharged from

the reactor into a connected pool to make room for new uranium fuel to be placed in the reactor. (*Id.*) Because the SNF is highly radioactive, it must be stored in the pool in racks to protect Southern's workers and the environment. (Tr. 143 (Long Test.); Tr. 1484 (Metcalfe Test.)) The SNF must remain in racks in the pool for several years to cool. (Tr. 476) (Hunt Test.)

At Plant Hatch, the reactor pools are connected such that both reactors use a single, shared pool. (Tr. 134) (Long Test.) Similarly, at Plant Vogtle, both nuclear reactors use a single, shared pool. (*Id.*) At Plant Farley, each reactor has its own separate pool. (*Id.*) The shared pool at Plant Hatch contains a rectangular inset area, referred to as the "bathtub" area that is used for the operation and storage of neutron monitoring instruments and other tools, as well as storing contaminated control rods, and conducting maintenance operations. (*Id.* at 144, 156.)

In order to unload the used fuel assemblies – SNF – into the pool and reload new assemblies, space in the reactor pools is required. (Tr. 144) (Long Test.) The space in the pools is limited by the number of spaces for SNF assemblies in the racks in the pool. (Tr. 255) (Cocherell Test.) The regularly scheduled discharges of SNF for storage into the pool gradually fill the limited space in the racks. Unless SNF is removed from the pool, the regular discharges of SNF into the pool would fill all the space in the pool, preventing the discharge of any further SNF and requiring the reactor to be shut down. (Tr. 144) (Long Test.) Accordingly, to prevent the shut down of nuclear reactors, usable pool space must be maintained by taking SNF out of the pool and placing it in dry storage. (*Id.*)

Southern's Plants Hatch and Farley were originally licensed and constructed in the 1970s, when the common understanding of both the nuclear industry and the federal government was that SNF would be removed from the SNF pool for reprocessing. (Tr. 285-286) (Cocherell Test.) As a result, the pools were not intended to store SNF for the life of the plant. (*Id.*) In 1977, President

Carter effectively halted reprocessing of spent nuclear fuel by private industry in the United States. (*Id*. at 285-86.) The prohibition of reprocessing left utilities with no place to store fuel other than in the SNF pools at their reactor sites. Plants Hatch and Farley have constructed dry storage facilities, also known as ISFSIs, to store SNF because the pools do not have enough capacity to hold all of the SNF discharged by their reactors. (Tr. 202 (Long Test.); PX 651 (Kenrich Report) at 24.) Plant Vogtle, which was licensed for operation after the enactment of the NWPA, was equipped with storage capacity that was adequate to accept discharges through approximately 2007. (Tr. 167, 168) (Long Test.); (*id.* 281-82) (Cocherell Test.); PX 800.) In approximately 1999 one of Plant Vogtle's pools was re-racked to provide storage capacity through 2016. (*Id*.).

## III. The Nuclear Waste Policy Act of 1982 and the Standard Contract Require an SNF Acceptance Rate that Avoids the Need for Additional Dry Storage and Reduces the SNF Backlog to Allow for Timely Decommissioning

### A. Congress Enacted the Nuclear Waste Policy Act for the Purpose of Avoiding Spent Nuclear Fuel Storage Problems at Nuclear Reactor Sites.

Because SNF storage pools constructed prior to 1977 had been built at capacity levels that assumed SNF would be reprocessed, a federal solution was urgently needed to solve the problem posed by the impending shortage of SNF storage capacity at reactor sites. ((PX 510) 13 Weekly Comp. Pres. Doc. 502, 503 (1977); (Tr. 444-45) (Hunt Test.)); *see also* H.R. Rep. No. 97-785, pt. 1, at 46-47; (McDuffie Dep. 36-37, Mar. 18, 2002) (Plaintiffs' Deposition Designation ("PDD") 20.)

On January 7, 1983, President Reagan signed the NWPA, Pub. L. 97-245, 96 Stat. 2201 (codified at 42 U.S.C. §§ 10101-10270 (1982)), into law to address the problem of accumulating SNF at private industry reactor sites. The NWPA provided a framework for the safe, permanent

disposal of the wastes of nuclear power generation by the Federal Government, an obligation that the Federal Government had recognized since the passage of the Atomic Energy Act of 1954. (Lawrence Dep. 53, May 20, 2002) (PDD 18); Rusche Dep. 45-46, May 16, 2002 (PDD 34); Morgan Dep. 231-39, Mar. 22, 2002 (PDD 27); 128 Cong. Rec. 26317 (Sept. 30, 1982) (Rep. Skeen); (128 Cong. Rec. 8002) (April 28, 1982) (Sen. McClure); *see also* 42 U.S.C. § 7133(a)(8)(C) (providing that the Secretary of Energy shall delegate to an Assistant Secretary the responsibility for "the establishment of temporary and permanent facilities for storage, management, and ultimate disposal of nuclear wastes").

The NWPA sought to address the problem of SNF accumulation at reactor sites by: (1) ensuring that the accumulation of waste at utility reactor sites would not interfere with electricity generation or result in premature shutdown of nuclear reactors; and (2) preventing any delay in decommissioning reactor sites after their scheduled shut down. (Morgan Dep. 198, 314, Mar. 21 & 22, 2002 (PDD 26, 27); Rusche Dep. 376-77, May 17, 2002 (PDD 35); Barrett Dep. 475, Apr. 23, 2002) (PDD 2); Milner Dep. 273-74, May 2, 2002 (PDD 22.) The NWPA as originally enacted contained a series of milestone events that intended to lead to the operation of a repository and acceptance of SNF and high-level radioactive waste ("HLW") beginning no later than January 31, 1998. 42 U.S.C. §§ 10132-10145 (1982); H.R. Rep. No. 97-785, pt. 1, at 32-34 (1982); *Indiana Michigan Power Co. v. Dep't of Energy*, 88 F.3d 1272, 1277 (D.C. Cir. 1996).

To effectuate disposal beginning January 31, 1998, to create a legal relationship between the parties, and to implement the requirement that the Government recover the costs of the waste management system from the nuclear industry, the NWPA authorized the DOE to enter into contracts for the acceptance, transportation, and disposal of SNF. 42 U.S.C. § 10222(a)(1) (1982). The NWPA specified that the contracts with utilities were to provide that

> (A) following commencement of operation of a repository, the Secretary shall take title to high-level radioactive waste or spent nuclear fuel involved as expeditiously as practicable upon the request of the generator or owner of such waste or spent fuel; and
>
> (B) in return for the payment of fees established by this section, the Secretary, beginning not later than January 31, 1998, will dispose of the high-level radioactive waste or spent nuclear fuel involved as provided in this subchapter.

42 U.S.C. § 10222(a)(5) (1982). Furthermore, the NWPA required the utilities to enter into the contracts by June 30, 1983, or risk not having their operating licenses renewed and not having their SNF disposed of at the federal repository. 42 U.S.C. § 10222(b)(1)(A), (b)(2); *see* (Tr. 461-62) (Hunt Test.).

Congress intended for the Standard Contracts to be a quid pro quo under which DOE would dispose of SNF and the utilities would pay for the service. H.R. Rep. No. 97-491, pt. 1, at 58 (1982) ("Section 124 authorizes the Secretary to contract with utilities … to provide repository services in exchange for payments. . . ."); H.R. Rep. No. 97-491, pt. 1, at 59 (1982) (DOE "is responsible for disposing of [HLW or SNF] … in permanent disposal facilities, beginning not later than January 1998, *in return for the payment* of fees established by this section.") (emphasis added); Standard Contract, 10 CFR pt. 961, pmbl. & art. VIII (PX 2); *see also Indiana Michigan Power Co.*, 88 F.3d at 1276. Southern has paid approximately $850,000,000 in fees to DOE under its Contracts in exchange for the Government's promise to remove SNF from its plant sites. (Tr. 251) (Cocherell Test.)

**B. DOE's Implementation of the NWPA.**

In 1983, DOE began to undertake its responsibilities to implement the Act by establishing a Nuclear Waste Policy Act Project Office. (Lawrence Dep. 24-25, May 20, 2002 (PDD 18); (PX 45) Memorandum from Robert Morgan to Nuclear Waste Policy Act Project Officer

Personnel (Jan. 28, 1983)) Later, as required by the NWPA, the DOE created the Office of Civilian Radioactive Waste Management ("OCRWM"). 42 U.S.C. § 10224 (1982). These offices began to undertake implementation of the NWPA and the ultimate disposal of SNF and HLW.

### 1. The Standard Contract.

On February 4, 1983, after receiving preliminary comments from nuclear industry groups, the DOE published a proposed "Standard Contract for Disposal of Spent Nuclear Fuel and/or High Level Radioactive Waste" in the Federal Register. Proposed Standard Contract, 48 Fed. Reg. 5458-71 (Feb. 4, 1983) (to be codified at 10 C.F.R. pt. 961) (PX 1.) The Federal Register Notice accompanying the draft contract acknowledged that "[t]he Act directs DOE to begin repository operations no later than January 31, 1998." *Id.* at 5458. The DOE also noted that under 42 U.S.C. § 10222(b)(1)(A), utilities that owned SNF were required to sign a contract by June 30, 1983, or receive the affirmation of the Secretary of Energy that they were actively and in good faith negotiating a contract. *Id.* at 5458-59.

APC and GPC both submitted comments on the proposed contract. In their letters to Robert Morgan, DOE's interim director of the program, both companies stated,

> [W]e would like to emphasize the importance of the annual receipt rate of the disposal facility being designed, to the extent practicable, to be commensurate with the levels of spent nuclear fuel being generated annually and the need to also reduce the back-log of spent fuel as expeditiously as possible. Consistent with section 302(a)(5) of the Act, the contract should express the intent of DOE to take title to spent nuclear fuel as expeditiously as practicable upon request of the generator or owner.

(PX 47 (Letter from F.L. Clayton, Sr., Vice President of APC, to Robert Morgan (Mar. 4, 1983)); (PX 46 (Letter from J.T. Beckham, Vice President & Gen. Manager Nuclear Generation of GPC, to Robert Morgan (Mar. 4, 1983.))[8]

Bruce Hunt, Southern's Manager of Nuclear Fuel, took part in the events and discussions surrounding the development of the Standard Contract. (Tr. 447) (Hunt Test.) He testified that the utilities and DOE understood that, consistent with the NWPA, the "expeditiously as practicable" standard required DOE to remove SNF from reactor sites such that the utilities would not have to add additional at-reactor storage after January 31, 1998. (*Id*. at 454-55.)

On April 18, 1983, DOE published the final version of the Standard Contract. ((PX 2) Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste, 48 Fed. Reg. 16590-16608) (Apr. 18, 1983) (to be codified at 10 C.F.R. pt 961) [hereinafter "Standard Contract"]. The Standard Contract requires DOE to commence disposal of SNF and/or HLW on or before January 31, 1998. *See id.* pmbl., art. II, 48 Fed. Reg. at 16600.

As APC and GPC had requested, and in direct response to the companies' comment letters, DOE included the following language in the text of the Standard Contract: "Whereas the DOE has the responsibility, following commencement of operation of a repository, to take title to the spent nuclear fuel or high-level radioactive waste involved *as expeditiously as practicable* upon the request of the generator or owner of such waste or spent nuclear fuel . . . ." Standard Contract, pmbl., art. II, 48 Fed. Reg. at 16600 (emphasis added); *see* (Tr. 546-50) (Hunt Test.); Morgan Dep. 105-06, Mar. 21, 2002) (PDD 26.)) This "new second 'Whereas' clause, relating to the

---

[8] Industry groups also commented on the lack of any performance standards contained within the contract. In particular, the Edison Electric Institute ("EEI") and the Utility Nuclear Waste Management Group ("UNWMG") noted the lack of any performance standards other than the January 31, 1998 date. (PX 48 (Letter from John J. Kearney, Senior Vice President, Edison Electric Institute, to Robert Morgan, Acting Director, OCRWM (May 20, 1983.))

responsibility of DOE to take title to SNF or HLW 'as expeditiously as practicable,' [was] added to follow the language of the [NWPA] (§ 302(a)(5), 42 U.S.C. 10222(a)(5))." ((PX 2) Standard Contract, 48 Fed. Reg. at 16591)

Beyond incorporating the request of APC and GPC that DOE would agree to take title to waste as expeditiously as practicable, the final rulemaking on the Standard Contract did not directly address the issue of acceptance rates or the utilities' comments on the issue. *See id.* at 16598.

On June 13, 1983, APC executed Standard Contract No. DE-CR01-83NE44361 for Plant Farley ("Farley Standard Contract.") (PX 750.) On June 10, 1983, GPC executed Contract No. DE-CR01-83NE44386 for Plant Vogtle ("Vogtle Standard Contract") (PX 752), and Contracts No. DE-CR01-83NE44478, and No. DE-CR01-83NE44479, for Plant Hatch ("Hatch Standard Contracts.") (PX 751.) The Standard Contracts APC and GPC ultimately executed contained no term specifying the rate at which the DOE would accept SNF. *See* (PX 750 (Farley Standard Contract); (PX 752 (Vogtle Standard Contract); (PX 751 (Hatch Standard Contracts.)[9] Michael Lawrence, the Deputy Director of the NWPA Project Office at the time the Standard Contracts were signed, testified that the Standard Contract did not contain a specific acceptance rate because in 1983 it was not possible to specify an exact rate for SNF acceptance that was to begin in 1998.

---

[9] *See also* (PX 4 (1987 Annual Capacity Report) at 14) ("The Contract makes no provisions for the minimum amount of SNF that DOE will accept and transport in a given period."); Zabransky Dep. 30, Apr. 17, 2002 (PDD 41); Milner Dep. 42, May 1, 2002 (PDD 21.)) *See generally Commonwealth Edison Co. v. United States*, 56 Fed Cl. 652, 662 (2003) (holding that the Standard Contract is missing an acceptance rate term and that the court is obligated to supply "'a term which is reasonable in the circumstances'") (quoting *Restatement (Second) of Contracts* § 204 (1981)).

(Lawrence Dep. 62-63, May 20, 2002) (PDD 18.)[10] Furthermore, a December 1991 memorandum noted, "The Standard Disposal Contract . . . was unfortunately developed in such a way that the terms and conditions contained numerous omissions, inconsistencies, ambiguities and contradictions." (PX 73 (Annual Capacity Report Issues Status Report) at 1) (Dec. 31, 1991); *see also* (Brownstein Dep. 514-19, Apr. 11, 2002) (PDD 9.)

APC, GPC, and their agent Southern recognized that the Standard Contract contained open issues, including the absence of a specific schedule of acceptance rates. However, they understood from DOE officials' statements and published documents that the DOE interpreted both the NWPA and the Standard Contract to require DOE to perform SNF disposal services at a rate sufficient to avoid the need for additional at-reactor storage after January 31, 1998, and to reduce the backlog of fuel accumulated prior to that date so that APC and GPC could decommission their reactors in a timely manner. (Tr. 462-63, 475-77) (Hunt Test.); *see* (Trebules Dep. 53, Apr 17, 2002) (PDD 38); (Brownstein Dep. 70, Apr. 9, 2002) (PDD 7.)

### 2. Annual Capacity Reports, Acceptance Priority Rankings, and Delivery Commitment Schedules.

The Standard Contract requires DOE to issue so-called "Annual Capacity Reports" ("ACRs") to assist the utilities with planning for their at-reactor storage. *See id.* art. IV.B.5.b., 48 Fed. Reg. at 16601. This provision was added at the request of the utilities. *Id.* at 16592; (Morgan Dep. 139-41, Mar. 21, 2002) (PDD 26) (provision was added solely because of utility requests for planning forecasts and that the Annual Capacity Report was not intended for any purpose other than utility planning). The Standard Contract states that these ACRs are "for

[10] *See* (Morgan Dep. 12, June 25, 2002) (PDD 28); *see also* (Cole Dep. 34-39, Mar. 12, 2002) (PDD 11) (acceptance rates should depend on projections of discharge rates by utilities, facility design, and cost).

planning purposes." Standard Contract art. IV.B.5.b., 48 Fed. Reg. at 16601. Furthermore, each ACR that DOE has issued to date has explicitly stated that it is for planning purposes only and is not contractually binding on either DOE or the utilities. *See, e.g.*, (PX 4 (1987 Annual Capacity Report) at 2; PX 8 (1991 Annual Capacity Report) at 1-2 (Dec. 1991); (PX 14 (2004 Acceptance Priority Ranking & Annual Capacity Report) at 1 (July 2004)); *see also* Tr. 1990-91 (Zabransky Test.) ("The ACR in itself is a planning document.")

The Standard Contract also requires DOE to issue so-called "Acceptance Priority Rankings" ("APRs") annually after April 1, 1991. Standard Contract art. IV.B.5.a, 48 Fed. Reg. at 16601. The purpose of these APRs is to rank each utility's SNF based on the age of the SNF, giving highest priority to the oldest fuel – what is known as "oldest fuel first" or "OFF." *See id.* Thus, this ranking was intended to indicate when DOE would accept a particular utility's SNF.

As discussed more fully below, *see infra* pp. 56-62, the Standard Contract also provides for a process whereby utilities submit information, in the form of Delivery Commitment Schedules ("DCSs"), concerning the SNF or HLW they will deliver to the DOE for disposal. *See* (PX 2 (Standard Contract), at art.V.B, 48 Fed. Reg. at 16601) After the DCSs are approved and within one year prior to delivery, utilities are required to submit Final Delivery Schedules ("FDSs"), which provide more specific information regarding the SNF that will be delivered to DOE. (*Id.* art.V.C, 48 Fed. Reg. at 16601.) DOE has suspended the DCS process, and no utility has ever received an FDS (Tr. 2000-2001) (Zabranksy Test.)

## IV. From the Outset of the Program, DOE Interpreted its Contract Obligations Consistent with the Intent that No Utility Would Have To Build Additional At-Reactor Storage Space for SNF Discharges After January 31, 1998.

The contemporaneous documentation and testimony in the record of this case demonstrate that, from the very beginning of the SNF program, authorized DOE officials recognized and acted

consistently with the understanding that the NWPA required DOE to implement a program, through the Standard Contract, that would avoid the need for Southern, and other utilities, to build additional SNF storage space at their reactor sites after January 31,1998, and to reduce the backlog of SNF at a reasonable rate. *See* (Tr. 1914-15) (Pollog Test.)

**A. DOE Documents.**

At a December 1983 conference of utilities and other SNF Program participants held only a few months after the Standard Contract was signed, Robert Morgan, the Acting Director of the NWPA Project Office, stated that the basic strategy of the program was that "beginning in 1998, utilities *will not have to provide any additional storage facilities on site*. During the first year of operation of the repository in 1998, we should be receiving fuel at a rate so that no utility would have to add any further storage facilities either on site or at another location." (PX 53 (Robert Morgan, Proceedings of the 1983 Radioactive Waste Management Program, December 12-15, 1983: Program Overview), at 11 (Feb. 1984)) (emphasis added); *see* (Tr. 476-77 (Hunt Test.) (testifying as to his understanding of DOE's responsibilities under the Standard Contract based on DOE's public statements); *see also* (Morgan Dep. 38-43, Mar. 21, 2002) (PDD 26.)

In the initial draft of the OCRWM's Mission Plan (the draft closest in date to the execution of the Contracts), which was provided to the utilities in December of 1983, OCRWM stated:

> Every activity specified in the Mission Plan is targeted toward one fundamental objective: To accept commercial high-level radioactive waste for safe management, storage, and permanent disposal on a firm schedule, beginning not later than January 31, 1998. Further, *the waste acceptance schedule will initially preclude the need for additional at-reactor storage after January 31, 1998* and, ultimately, remove from at-reactor storage all waste that is more than 5-years old.

(PX 35 (Draft—Civilian Radioactive Waste Management Program Mission Plan, vol. 1: Overview and Current Program Plans) at 1-1 (Dec. 20, 1983)) [hereinafter "1983 Draft Mission Plan"] (emphasis added). The 1983 Draft Mission Plan went on to state:

> The waste materials will be accepted in accordance with a Waste Acceptance Schedule designed to provide an acceptance rate in the first five years such that *no utility will have to provide additional storage capacity after January 31, 1998. Subsequently, the acceptance rate will be equal to or greater than the actual discharge rate of spent fuel each year.*

(*Id.* at 2-1) (emphasis added).[11] DOE adopted this approach to "ensure that all utilities will be able to establish firm planning schedules for the disposition of their radioactive wastes sufficiently early to determine their on-site interim storage needs prior to 1998." *Id.*

These statements are consistent with the NWPA, the contracting parties' intent, and their understanding as to DOE's obligations under the Standard Contract. *See* (Tr. 465-67, 475-76) (Hunt Test.)

The 1983 Draft Mission Plan also set forth a waste acceptance schedule showing an acceptance rate of 1800 MTUs in 1998 ramping up to an acceptance rate of 3000 MTU in 2003. The rate of 3000 MTUs after a five-year ramp-up period "is set to prevent, in the aggregate, the need for utilities to provide additional on-site storage after 1998 . . . ." (PX 35 (1983 Draft Mission Plan), *supra*, at 2-2; Tr. 470 (Hunt Test.)); *see also* (Morgan Dep. 149-56, Mar. 21, 2002 (PDD 26)). At current SNF discharge rates of approximately 2000 MTU,[12] this acceptance rate schedule would also begin to reduce the backlog of SNF at reactor sites. *See* (Tr. 469-70) (Hunt

[11] *See also* (PX 28 (FY 1984 Guidance for Nuclear Waste Fund (NWF) Evaluations (Dec. 1983), enclosure) at 2; Morgan Dep. 205-12, Mar. 21, 2002 (PDD 26.)) The underlying premises for the planning base of the *FY 1984 Guidance for Nuclear Waste Fund (NWF) Evaluations*, prepared in December of 1983, as part of the DOE's preparation of the 1984 Fee Adequacy Report was that DOE would accept waste starting in 1998 at a rate sufficient to preclude additional at-reactor storage and thereafter at a rate greater than or equal to the utilities' SNF discharge rate. *See* (FY 1984 Guidance for Nuclear Waste Fund (NWF) Evaluations, *supra*, enclosure at 2.)

[12] (Tr. 1894) (Pollog Test.)

Test.). Again, this acceptance rate is consistent with the parties' intent and their understanding of DOE's obligations under the Standard Contract. *See* (*id.* at 470.)

In February 1984, eight months after APC and GPC signed their Standard Contracts, OCRWM Acting Director Michael J. Lawrence (Robert Morgan's successor as Acting Director) testified before the Energy Conservation and Power Subcommittee of the House Committee on Energy and Commerce regarding the DOE's 1985 budget. Lawrence testified that by achieving the NWPA's fundamental objective of accepting high-level radioactive waste on a firm schedule beginning no later January 31, 1998, utilities would not need to build additional at-reactor storage after January 31, 1998, and all waste would ultimately be removed from reactor sites. (PX 54 (Michael J. Lawrence, Acting Director, Office of Civilian Radioactive Waste Management, Department of Energy, Statement Before the Subcommittee on Energy Conservation and Power, House Committee on Energy and Commerce), at 2 (Feb. 22, 1984)); *see also* (Lawrence Dep. 201-04, May 20, 2002 (PDD 18); Lawrence Dep. 302-05, May 21, 2002 (PDD 19)). Again, this public statement was consistent with APC's and GPC's understanding as to DOE's responsibilities under the Standard Contract. (Tr. 482-83) (Hunt Test.)

The April 1984 draft of the Mission Plan, which DOE circulated to SNF Program participants, noted that DOE was developing a waste acceptance schedule in accordance with the Standard Contract. (PX 37 (Draft Mission Plan for the Civilian Radioactive Waste Management Program) at 1-1 (Apr. 1984)) [hereinafter "1984 Draft Mission Plan"]. This draft Mission Plan further noted that "[i]n the event of a delay in repository operation, the Department could take the waste materials in accordance with the Waste Acceptance Schedule and arrange for either continued storage at the utilities in Federal storage casks, or for storage elsewhere pending transfer

to the repository." (*Id.* at 2-1.) The draft contained an acceptance schedule which ramped up to a steady-state rate of 3000 MTUs by the sixth year of operation. (*Id.* at 2-2 tbl.II-1.)

While the 3000 MTU steady-state SNF acceptance rate was consistent with the 1983 Draft Mission Plan, Southern was concerned that DOE had removed from the 1984 Draft Mission Plan those portions of the 1983 Draft Mission Plan that set forth the parties' intent and understandings with respect to the DOE's obligations under the Standard Contract. (Tr. 485-86, 489-90) (Hunt Test.) In a July 1984 letter, Southern urged DOE to include in the Mission Plan a clear and unequivocal statement concerning the obligations it had undertaken in the Standard Contracts. *See* (PX 267 (Letter from Bruce Hunt to Charles Head, Acting Dir. of Operations Div. of OCRWM) at 2 (July 6, 1984); Tr. 488-89 (Hunt Test.)) The letter also expressed Southern's belief that

> a clear understanding was reached between DOE and the utilities, upon contracting, concerning DOE's commitment to remove spent fuel from utility plant sites to Federal facilities on a firm and certain basis starting in 1998. Further, we believe the strategy expressed by DOE in December 1983, under which sufficient spent fuel would be shipped to Federal facilities beginning in January 1998 so that no additional construction of storage capacity at utility plant sites would be required after 1998 is a fair, reasonable, and proper interpretation of NWPA requirements.

(PX 267 (Letter from Bruce Hunt to Charles Head), *supra*, at 2; Tr. 488-89 (Hunt Test.))

Furthermore, also in July 1984, Michael Lawrence, who by this time had left DOE headquarters and moved on to a position at DOE's Richland Operations Office, expressed concern that the 1984 Draft Mission Plan had not taken account of potential costs of continued storage at reactors after 1998. (PX 506 (Letter from Michael J. Lawrence, Manager, DOE Richland Operations, to Ben C. Rusche, Director, OCRWM) at 1-2 (July 23, 1984 ); Lawrence Dep. 324-28, May 21, 2002 (PDD 19)) In his letter, Mr. Lawrence commented:

> Page 2-1, first paragraph [of the draft mission plan] states "The acceptance rate is based on the emplacement capacity currently projected for the two planned geologic repositories. . . ." *Based upon our interpretation of the NWPA, the*

> *minimum acceptance rate should be based upon the rate at which spent fuel is generated by civilian nuclear power reactors. This would be consistent with the NWPA intent that no power reactor would require additional spent fuel storage after January 31, 1998.*

(Letter from Lawrence to Rusche, *supra*, enclosure 1, at 1) (emphasis added).

In June 1985, DOE issued its Mission Plan for the CRWM program. This Mission Plan noted that "[t]he growing accumulation of this waste in temporary storage poses potential health and safety problems for the public. It also threatens to overload the storage capacity of individual reactors and eventually the entire nuclear power industry." (PX 38 (Mission Plan for the Civilian Radioactive Waste Management Program, Volume I, Parts I & II) at 4 (June 1985)) [hereinafter "Final Mission Plan"]. Accordingly, the Final Mission Plan provides that one of DOE's prime objectives was to

> vigorously pursue the Act's directive to begin accepting spent fuel and high-level waste for disposal no later than January 31, 1998, and to continue to dispose of the waste in a highly efficient manner consistent with the continued orderly operation of the Nation's nuclear power-generation plants.

(*Id.* at 15.) The Final Mission Plan also noted that its objective was to "[a]ccept civilian spent fuel at an annual rate that will allow the utilities to maintain orderly operations of their nuclear power plants. . . ." (*Id.* at 29.) The Final Mission Plan further stated that DOE intended to "[a]ccept the current planning-base spent-fuel inventory of 130,000 MTU consistent with the objective of cost-effective operations while providing tangible evidence that DOE fully intends to dispose of spent fuel in a timely manner." (*Id.* at 29.)

The Final Mission Plan showed DOE accepting 3000 MTU of SNF by the sixth year after the DOE began removing SNF. (*Id.* at 26.) This 3000 MTU steady-state SNF acceptance rate was consistent with the 1983 Draft Mission Plan and the 1984 Draft Mission Plan. (Tr. 515-16) (Hunt Test.)

**B. Testimony**

Robert Morgan, the first head of DOE's SNF acceptance program, testified that the intent of the NWPA was to avoid having utilities provide on-site storage after 1998. (Morgan Dep. 43-45, Mar. 21, 2002 (PDD 26.)[13] Mr. Morgan also testified that by July 2001, DOE would match or exceed the rate of discharge of SNF. (Morgan Dep. 48-49, Mar. 21, 2002) (PDD 27.)

The second Acting Director of OCRWM, Michael J. Lawrence, testified that the intent of the NWPA and DOE was to allow utilities to avoid building additional storage facilities. (Lawrence Dep. 187-89, May 20, 2002 (PDD 18); Lawrence Dep. 336-37, May 21, 2002 (PDD 19.))[14] Mr. Lawrence further testified that if "acceptance rates were as anticipated [shortly after executing the contract] . . . it would preclude the need for additional storage capacity." (Lawrence Dep. 304-05, May 21, 2002) (PDD 19.)

Robert Roselli, one of the three individuals who drafted the Standard Contract, testified that he understood that DOE was responsible for providing or eliminating the need for additional at-reactor storage after 1998. (Roselli Dep. 140, 148-49, Apr. 15, 2002) (PDD 33.) He testified, "[A]fter 1998, the utilities would not have to build on-site storage. They could rely upon the Government to either accept fuel for disposal or provide some other means." (*Id.* at 140-41.)

Victor Trebules, the DOE employee who had responsibility for coordinating preparation of the Mission Plan, testified that DOE's objective was "reaching waste acceptance rates that would

---

[13] In his deposition, Mr. Morgan exhibited a 180-degree reversal of position. Early in the deposition Mr. Morgan testified that it was his responsibility to determine for DOE what the intent of the NWPA was, and it was his determination that the NWPA intent was to prevent utilities from having to provide additional on-site storage after 1998. *See* (Morgan Dep. at 43-45, Mar. 21, 2002) (PDD 26.) Later, after a couple of breaks, Mr. Morgan testified that he did not know what the intent of the NWPA was and that it was only the DOE's goal to prevent utilities from having to provide on-site storage. *See* (*id.* at 116-17.)

[14] While Lawrence disclaimed that this intent was a "requirement," he acknowledged that DOE was charged with carrying out the intent of the law. (Lawrence Dep. 334, May 21, 2002) (PDD 19.)

preclude the utilities from having to provide additional on-site storage." (Trebules Dep. 52, Apr. 17, 2002) (PDD 38.)

Ben Rusche, the first politically appointed director of OCRWM, testified that there was a "strategy" or "objective" of preventing additional on-site storage. (Rusche Dep. 159, May 16, 2002) (PDD 34.) He further testified that this goal was "consistent" with the NWPA. (*Id.* at 170-71, 244-46); *see also* (Rusche Dep. 376-77, May 17, 2002) (PDD 35.)

Tom Pollog, DOE's Rule 30(b)(6) witness on the rate of acceptance the DOE planned to use under the Standard Contract and on the rate of acceptance DOE used in its estimates from 1982 to 1987, testified that DOE's goal in the mid-1980s was to "alleviate the purchasers' need to have storage outside of their [spent fuel] pools" and that the rate as calculated by DOE that would achieve that objective was 3000 MTUs per year. (Pollog Rule 30(b)(6) Dep. 96-97, Apr. 11, 2002) (PDD 26.)

Lake Barrett, the acting or deputy director of the office of OCRWM from 1993 until February 2002, testified that Congress did not intend for utilities to pay the cost of building additional SNF storage in addition to billions of dollars in fees after the congressionally mandated deadline for DOE to begin SNF acceptance. (Barrett Dep. 1064-65, May 8, 2002) (PDD 4.)

Ronald Milner, the current Chief Operating Officer of OCRWM and long-time DOE employee testified that his understanding of the SNF program was that DOE "would pick up the fuel before a utility ran out of pool storage capacity which would then force it to shut down." (Milner Dep. 85, May 1, 2002) (PDD 21.)

Alan Brownstein, who was in charge of DOE's interface with utilities for over 10 years, testified that the "goal" and "objective" of DOE was to eliminate the need for utilities to provide on-site storage after DOE began acceptance and that this goal was communicated to utilities.

(Brownstein Dep. 80, Apr. 9, 2002 (PDD 7); Brownstein Dep. 412, Apr. 10, 2002 (PDD 8); *see also* Brownstein Dep. 60-61, Apr. 9, 2002 (PDD 7.))

Patrick McDuffie, a retired employee of Battelle, DOE's principal contractor during the early years of the program, and original author of the first Annual Capacity Report ("ACR"), testified that the intent of these reports was to devise a rate which "would allow the minimum or require the minimum at-reactor storage." (McDuffie Dep. at 38, 111- 13, Mar. 18, 2002 (PDD 20.))

Billy Cole, who served as Manager of Waste Acceptance for DOE's principal contractor from 1984 until 1989, testified that the "basic purpose" of the SNF program was to "keep the utilities from having to run out of storage space," and the "basic strategy" and "primary mission" of the NWPA was to prevent utilities from "having to add more storage." (Cole Dep. 80-81, Mar. 12, 2002 (PDD 11.)) Mr. Cole testified that the intent of the DOE at the time of the execution of the Standard Contract was "to get a facility operating in '98, to take the stuff away fast enough so the utilities would not have to add additional storage. That was the intent." (*Id.* at 202.) Mr. Cole testified that to meet this goal, and the goal of reducing the backlog of accumulated fuel, the DOE adopted a 3000 MTU acceptance rate. (*Id.* at 175-76.)

## V. DOE Also Intended to Operate the Program to Remove SNF at a Rate Sufficient to Work-Off the Backlog of SNF Stored at Reactor Sites and to Ensure Timely Decommissioning of Nuclear Plants.

The intent of the NWPA was to do more than simply avoid additional at-reactor storage after 1998; the NWPA also was intended to require DOE to reduce the backlog of SNF and to remove SNF from reactor sites to avoid interference with the normal decommissioning of the reactors. *See* (Barrett Dep. 52-55, 57-59, 120-22, Apr. 22, 2002 (PDD 1); Barrett Dep. 475, Apr. 23, 2002 (PDD 2); Barrett Dep. 1163-65, May 10, 2002 (PDD 5.)) Indeed, the Standard

Contract did not limit DOE's removal obligation to the SNF discharged after January 31, 1998, but expressly provided that "DOE shall accept title to *all* SNF . . . and dispose of such material." Standard Contract, art. IV(B)(1) (emphasis added.) The Standard Contract was intended to allow timely decommissioning of nuclear plants. *See* (Barrett Dep. 475, Apr. 23, 2002) (PDD 2.) Mr. Barrett testified that this was the basis for the Standard Contract provision that DOE would remove any SNF over five years old. (*Id.*) According to Thomas Pollog's testimony at trial, an acceptance rate set to allow timely decommissioning of reactor sites would "prevent a situation where your only thing left on that site is the spent fuel." (Tr. 1924-25) (Pollog Test.)

DOE also intended to operate the SNF program at a steady-state SNF acceptance rate sufficient to remove SNF from reactor sites quickly enough to work-off the backlog of SNF that had accumulated at reactor sites. *See* (Trebules Dep. 53, Apr. 17, 2002 (PDD 38); Brownstein Dep. 70, Apr. 9, 2002 (PDD 7.))[15] In his Rule 30(b)(6) deposition on acceptance rate estimates used by DOE from 1982 through 1987, Thomas Pollog stated that beyond the short-term goal of relieving at-reactor storage problems, over the long term the SNF acceptance rate needed to be "sufficient to deplete the backlog of spent fuel at reactors." (Pollog Rule 30(b)(6) Dep. 203-04, Apr. 11, 2002) (PDD 26.) Michael Lawrence acknowledged that DOE's objective was to prevent shutdowns and reduce the backlog of accumulated fuel. (Lawrence Dep. 142, May 20, 2002) (PDD 18.) To meet this goal of reducing the backlog of accumulated fuel, the DOE adopted a 3000 MTU acceptance rate. (Cole Dep. 175-76, Mar. 12, 2002) (PDD 11).[16]

In addition, the parties to the Standard Contract understood that it was DOE's obligation to remove SNF at a rate sufficient enough to reduce the backlog of SNF stored at reactor sites.

---

[15] *See also* (Trebules Dep. 97-99, 121, Apr. 17, 2002 (PDD 38); Trebules Dep. 19-21, Apr. 18, 2002 (PDD 39.))

[16] *See also* (McDuffie Dep. 114, Mar. 18, 2002 (PDD 20); Barrett Dep. 52-55, 57-59, Apr. 22, 2002 (PDD 1); Barrett Dep. 1163-65, May 10, 2002 (PDD 5.))

(Tr. 475, 477, 548-49) (Hunt Test.) This obligation is embodied in the NWPA's and the Standard Contract's "as expeditiously as practicable" requirement. (*Id.* at 474, 576-77) (Hunt Test.) At trial, David Zabransky, currently DOE's contracting officer responsible for the Standard Contracts, testified that, during his time working at Wisconsin Electric Power Co. (Tr. 1978-1994) (Zabransky Test.), he believed that a reasonable acceptance rate under the contract was one that would have worked off the backlog of SNF stored at reactor sites (*Id.* 1982-83.) At trial Mr. Zabransky testified:

> Q. Okay. Now, when you were at WEPCO managing spent fuel and the contract, you believed that a reasonable acceptance rate under the contract was one that would have kept up with discharge and worked off the backlog of spent fuel at the utility sites, did you not?
>
> A. I did, yes.

(*Id.* at 1981-82.)

Furthermore, DOE also intended to operate the SNF program to prevent delays in decommissioning reactors after their scheduled permanent shutdown. (Tr. 476 (Hunt Test.); Milner Dep. 273-74, May 2, 2002 (PDD 22); Morgan Dep. 313-15, Mar. 22, 2002 (PDD 27.)) According to Lake Barrett, a prior deputy director of DOE's OCRWM program, the 3000 MTU rate was the most efficient and reasonable rate to accomplish this purpose. He testified: "If you make [the acceptance rate] too high, then you have – you would work quickly off the backlog and then you would have a lot of idle capacity. If it was too low, you would have reactors needing to put in dry storage and 3,000, based on the early 1980s, seemed like a reasonable number to use." (Barrett Dep. 1332-33. May 10, 2002) (PDD 5.) Mr. Barrett further testified that the 2000 MTU rate would not fulfill the intent of the NWPA. (*Id.* at 1370-71.)

## VI. DOE Based All of its Operational and Financial Planning On A Receipt Rate That Would Eliminate The Need For Additional Storage and Reduce the Backlog at a Reasonable Rate.

DOE has consistently identified 3000 MTU as the desired steady-state rate for the life of the SNF program. *See* (Tr. 1914-18) (Pollog Test.) DOE has based all operational and financial planning for the Civilian Radioactive Waste Program on a receipt rate of 3000 MTU, or a similar rate. *See* (Tr. 1850-53, 1855) (Kouts Test.) DOE has consistently recognized that a 3000 MTU acceptance rate is necessary to accommodate the SNF discharge rate projected for 1998 and beyond, plus an incremental amount sufficient to eliminate SNF inventories at reactor sites. *See* (Tr. 469-70, 526, 535-36) (Hunt Test.)[17] In addition, DOE has repeatedly used a 3000 MTU rate in its financial documents assessing the costs of the program and the adequacy of the 1 mil per kilowatt hours fee it charges nuclear utilities under the NWPA. This rate is consistent with the parties' understanding as to DOE's obligations for picking up SNF. (Tr. 545) (Hunt Test.)

### A. DOE Has Consistently Identified the 3000 MTU Rate as the Desired Steady-State Rate.

The NWPA provided that the Secretary of Energy was to prepare a report known as the "Mission Plan," which was to provide a "basis sufficient to permit informed decisions to be made

---

[17] Indeed, some of the initial DOE program documents eventually projected an even higher acceptance rate of approximately 6000 MTU based upon the opening of a second repository several years after the first repository. *See, e.g.*, (PX 27 (Report on Financing the Disposal of Commercial SNF and Processed HLRW), at 8-11 (July 1983); (PX 35 (1983 Draft Mission Plan), *supra*, at 2-3, 2-6.)) The Report contemplated two repositories each with a steady-state receipt rate of 3000 tons per year beginning in the sixth year after the DOE begins removing SNF. (Report on Financing the Disposal of Commercial SNF and Processed HLRW, *supra*, at 9); *see* (Tr. 542-42) (Hunt Test.) The projections were based on estimates that the total number of commercial nuclear reactors in the United States would grow to a larger number than it actually did and, therefore, there would be more SNF to dispose. Following the slower actual growth of the nuclear power industry, the DOE subsequently deferred plans for a second repository. (PX 40 (OCRWM Mission Plan Amendment), at 13, 14 (June 1987.))

in carrying out the repository program and the research, development, and demonstration programs required under this chapter." 42 U.S.C. § 10221(a) (1982). The 1983 Draft Mission Plan dated December 20, 1983, approximately seven months after the Standard Contracts were signed, projected a 3000 MTU rate after a 5-year ramp-up period, which it described as the rate "set to prevent, in the aggregate, the need for utilities to provide additional on-site storage after 1998." (PX 35 (1983 Draft Mission Plan), *supra*, at 2-2, 2-3); *see* (Tr. 468, 492, 526) (Hunt Test.) (3000 MTU rate would preclude the need to add SNF storage and begin reducing backlog of SNF). The 1984 Draft Mission Plan, issued in April 1984, showed DOE accepting 3000 MTU by the sixth year after DOE began removing SNF. (PX 37 (1984 Draft Mission Plan), *supra*, at 2-2 tbl.II-1; Tr. 483 (Hunt Test.)) Consistent with the two draft Mission Plans, the OCRWM's Final Mission Plan, issued in June 1985, also showed the DOE accepting 3000 MTU of SNF by the sixth year after the DOE began removing SNF. (PX 38 (Final Mission Plan), *supra*, at 26); *see* (Tr. 515-16) (Hunt Test.)

In June 1988, following the enactment of the Nuclear Waste Policy Amendments Act of 1987, Pub. L. No. 100-203, §§ 5001-65, 101 Stat. 1330-1, -227 to -253 (1987) (codified as amended in scattered sections of 42 U.S.C.) [hereinafter "1987 NWPA Amendments"], the DOE issued its second Draft Mission Plan Amendment. This Draft Mission Plan Amendment projected a steady-state repository receipt rate of 3000 MTUs by the sixth year after DOE began removing SNF and a steady-state receipt rate of 2700 MTUs at an MRS facility by the fifth year. OCRWM (PX 42 (Draft 1988 Mission Plan Amendment), at 19) [hereinafter "1988 Draft Mission Plan Amendment"]. Also in June 1988, DOE published its second ACR as required by the Standard Contract. The 1988 ACR showed the DOE accepting 3000 MTUs by the sixth year after DOE began removing SNF. (DX 71 (1988 Annual Capacity Report), at 5.)

Furthermore, the OCRWM's most recent versions of its Waste Management System Requirements Documents, which control the planning for the SNF program, project a 3000 MTU steady-state rate from the fifth year of operation through the end of waste emplacement. (PX 170 (Civilian Radioactive Waste Management System Requirements Document, Rev. 05/DCN05), at 10-11 tbl.1 (May 2002); PX 180 (Civilian Radioactive Waste Management System Requirements Document, Rev. 06), at 8 tbl.1 (Sept. 2004).)[18] Moreover, Susan Klein, DOE's Rule 30(b)(6) witness on the issue of the rate at which DOE is planning to accept SNF once acceptance begins, testified that the DOE plans to ramp up to 3000 MTUs by the fifth year after DOE begins removing SNF. (Klein Rule 30(b)(6) Dep. 240-42, Apr. 24, 2002 (PDD 13); Klein Rule 30(b)(6) Dep. 351, Apr. 25, 2002 (PDD 14).)

In its most recent Acceptance Priority Ranking and Annual Capacity Report ("APR/ACR") – issued in July 2004 – DOE again published an acceptance rate of 3000 MTU by the fifth year after it begins acceptance of SNF. (PX 14 (2004 Acceptance Priority Ranking & Annual Capacity Report), at 2 (July 2004).)

Finally, testimony from DOE personnel confirms that DOE has adopted the 3000 MTU steady-state rate as the operating rate for the SNF program. At trial, Christopher Kouts and David Zabransky testified that the 3000 MTU rate is a reasonable and appropriate acceptance rate for the SNF program. (Tr. 1844, 1856) (Kouts Test.); (*id.* at 1987-88) (Zabransky Test.); *see also* (*id.* at 1924) (Pollog). Mr. Kouts further testified that a 3000 MTU acceptance rate has been accepted as the optimum design rate for the SNF program for a long time. *See* (Tr. 1845-48) (Kouts Test.) In

[18] In addition, OCRWM's most recent Waste Acceptance System Requirements Document projects a 3000 ton steady-state rate from the fifth year of operation through the end of waste emplacement. (PX 98 (Civilian Radioactive Waste Management System, Waste Acceptance System Requirements Document), at 46, Table 7-1 (Jan. 2002)); *see* (Klein Rule 30(b)(6) Dep. 288-90, Apr. 25, 2002) (PDD 14.)

fact, DOE has analyzed higher and lower rates, but has not changed from the 3000 MTU design rate as a result. (*Id.* at 1847-48.)

Moreover, Lake Barrett testified that, had DOE begun performing in 1998 as required by the NWPA and the Standard Contract, it would have operated at a 3000 MTU steady-state rate after a ramp-up period. (Barrett Dep. 120-21, May 14, 2002) (PDD 6.) He further testified that DOE's plans for removing SNF from reactor sites from the mid-1980s through the mid-1990s supported the 3000 MTU rate. (Barrett Dep. 189, 197-98, Apr. 22, 2002) (PDD 1.) Mr. Barrett also testified that the 3000 MTU rate was chosen "as a proper balance for total life-cycle costs as well as near-term cash flow requirements and performance. If you make the number too high, then you have – you would quickly work off the backlog, and then you would have a lot of idle capacity. If it was too low, you would have reactors needing to put in dry storage, and 3,000, based on an early 1980s, seemed like a reasonable number to use." (Barrett Dep. 1332-33, May 10, 2002) (PDD 5)

Billy Cole stated that DOE began using the 3000 MTU rate from the outset of the SNF program. (Cole Dep. 175, Mar. 12, 2002) (PDD 11.) Furthermore, Thomas Pollog, the DOE's Rule 30(b)(6) representative on the rate of acceptance the DOE planned to use under the Standard Contract and the rate of acceptance in estimates made by DOE from 1982 to 1987, testified in his depositions that the 3000 MTU was the rate DOE determined was needed to avoid at-reactor storage. Pollog 30(b)(6) Dep. 96-97, Apr. 11, 2002 (PDD 29); Pollog 30(b)(6) Dep. 12, Apr. 12, 2002 (PDD 30.)).

**B. DOE Has Repeatedly Used a 3000 MTU Rate in Its Financial Planning Documents.**

The NWPA requires DOE to review annually the adequacy of the fees paid by utilities, which were initially set by statute at 1 mil per kilowatt hour ("1mil/kWh") of electricity generated by a nuclear plant. 42 U.S.C. § 10222(a)(4). The acceptance rate is important for evaluating the cost of the program because it is an important factor in how the program's systems and facilities will be designed. (Tr. 517-18) (Hunt Test.) To this end, DOE repeatedly has used a 3000 MTU rate for projecting total system life cycle costs against which the adequacy of the fees paid by the utilities is measured.[19] (*Id.* at 526); *see* (Barrett Dep. 348-50, Apr. 23, 2002) (PDD 2.)

For example, a DOE document setting out the DOE's assumptions for estimating the Total System Life Cycle Costs for the SNF program distributed in December 1994 projected an acceptance rate of 3000 MTU by the fifth year of operation following commencement in 2010. (PX 161 (1995 TSLCC Assumptions Package), at 3, 13-15); *see* (Milner Dep. 375-79, May 2, 2002) (PDD 22). Subsequently, in OCRWM's September 1995 Analysis of the Total System Life Cycle Cost of the Civilian Radioactive Waste Management Program, the DOE projected a steady-state acceptance rate of 3000 MTU by the fifth year of operation. (PX 23 (Analysis of the Total System Life Cycle Cost of the Civilian Radioactive Waste Management Program), at 8 (Sept. 1995)) [hereinafter "1995 TSLCC"]. Lake Barrett testified that the 1995 TSLCC is a baseline

[19] *See, e.g.*, (PX 16 (Preliminary Analysis of Total System Life Cycle Cost of the Commercial High-Level Radioactive Waste Disposal Program) at 2-4 (Apr. 27, 1984); PX 17 (Analysis of the Total System Life Cycle Cost for the Civilian Radioactive Waste Management Program), at 2-3 (Apr. 1985); PX 18 (Analysis of the Total System Life Cycle Cost for the Civilian Radioactive Waste Management Program) at 14, 22 (Apr. 1986); PX 24 (Analysis of the Total System Life Cycle Cost of the Civilian Radioactive Waste Management Program), at 15 (Dec. 1998); PX 25 (Analysis of the Total System Life Cycle Cost for the Civilian Radioactive Waste Management Program), at 4-14 (2001.))

document which contained the rate at which DOE believed it could perform. (Barrett Dep. 1334-35, 1343, May 10, 2002) (PDD 5.)

Furthermore, in its studies of the adequacy of the 1 mil/kWh fee that utilities pay to fund the SNF program, the DOE has repeatedly used a 3000 MTU steady-state rate of SNF acceptance. *See, e.g.*, (PX 29 (Nuclear Waste Fund Fee Adequacy: An Assessment), at 3 (July 1984); PX 30 (Nuclear Waste Fund Fee Adequacy: An Assessment), at 3 (Feb. 1985); PX 30 (Nuclear Waste Fund Fee Adequacy: An Assessment), at 3-4 (Mar. 1986))

## VII. DOE's Evolving Strategy for Use of a Monitored Retrievable Storage Facility.

### A. DOE Announces Five-Year Delay in the Start of Repository Operations and Proposes Use of a Monitored Retrievable Storage Facility in the Interim.

In the 1987 Draft Mission Plan Amendment, DOE announced a projected delay in the commencement of operations of the first repository from 1998 until 2003. (PX 39 (1987 Draft Mission Plan Amendment), *supra*, at 5).) To accept waste despite the delay, the DOE proposed opening a Monitored Retrievable Storage ("MRS") facility in 1998. (*Id.* at 10.)

In March 1987, the DOE published its "Monitored Retrievable Storage Submission to Congress." The report was issued to fulfill Section 141 of the NWPA, which required DOE to study the MRS concept and report back to Congress. (PX 59 (Monitored Retrievable Storage Submission to Congress, vol. 1: The Proposal), at iii, 1 (1987.)) To allay concerns that an MRS facility would become a de facto repository, DOE proposed that Congress link the startup of waste acceptance at an MRS to the issuance of a construction authorization for the repository. (*Id.* at 5.) DOE also proposed a limit on the total capacity of an MRS facility of 15,000 MTU. (*Id.*) Under this proposal, the MRS facility was intended to operate for only five years as the sole facility in the waste management system; that is, before a permanent repository came on-line. *See* (Tr. 1813-

15) (Kouts Test.) Thus, as proposed, the MRS facility would not have operated for 10 years as a standalone facility. (*Id.* at 1817.)

The purpose of DOE's MRS proposal was to prevent the need for additional SNF storage between 1998, the year in which DOE was contractually obligated to begin SNF acceptance, and 2003, the year DOE was projecting it would begin acceptance, at the time. In this regard, Ben Rusche, Director of OCRWM at the time, testified before the Senate Committee on Energy and Natural Resources,

> The proposal, that is for you to authorize a capacity of 15,000 metric tons, which is about five or six years direct output from the discharge of reactors at that time. The 10,000 metric tons that we talked about was the amount of at-reactor storage that could be avoided in the five year period between 1998 and 2003.
>
> That is the time between the MRS would come into operation, if the proposal is accepted, and 2003, the date in which we project the first repository would be in operation. That is the origin of those numbers.

(PX 517 (Legislative History of the Nuclear Waste Policy Act Amendments of 1987 (Excerpts from S. Hearing Rpt. No. 100-230, pt. 2) (Testimony of Ben Rusche)), at 213.)) Furthermore, Mr. Rusche testified,

> [A]n MRS facility consistent with the draft Mission Plan Amendment is estimated to eliminate the need for additional storage capacity at more than 15 reactor sites in the period 1998 to 2003 and could offset more than 10,000 metric tons of at-reactor storage. This would result in a savings to the ratepayer of about $1 billion at the reactor sites, based on our current best estimate of that reactor storage being about $100 per kilogram.

(*Id.* at 168.)

In June 1987, DOE published the final version of the 1987 Mission Plan Amendment. As in the draft amendment, the DOE noted a delay in repository operations from 1998 until 2003. (PX 40 (1987 Mission Plan Amendment), *supra*, at 6.) As in the draft amendment and the MRS facility proposal to Congress, the Mission Plan Amendment proposed operation of an MRS facility beginning in 1998, with repository operation commencing in 2003. (*Id.* at 12.) While the

MRS facility would provide some interim storage, DOE still intended the MRS to be an "integral" facility and not a location for long-term storage. (Milner Dep. 553-54, May 3, 2002) (PDD 23.) DOE projected that the MRS facility would operate as a stand-alone facility only from 1998 until 2003 and would have begun shipping fuel to a repository after five years. (*Id.* at 555-56; PX 40 (1987 Mission Plan Amendment), *supra*, at 12, 61) Even with the capacity limit, DOE's Chief Operating Officer, Ron Milner, admitted that the MRS facility could have operated at an annual acceptance rate approaching 3000 MTUs, consistent with prior planning bases. (Milner Dep. 555-56, May 3, 2002) (PDD 23.)

Under its revised acceptance schedule published in the 1987 Mission Plan Amendment, DOE projected that it would begin accepting SNF at an MRS facility at a rate of 1200 MTUs in 1998. (PX 40 (1987 Mission Plan Amendment), *supra*, at 61) This would increase to 2650 MTUs by 2004. (*Id.*) Total system acceptance would reach 3000 MTUs by 2008 – 350 MTUs to a repository and 2650 MTUs to the MRS. (*Id.*) The "full-scale" receipt rate at the MRS facility was projected to be 2650 MTU. (*Id.* at 62.) This rate was possible despite the proposed 15000 MTUs capacity limit, as the permanent repository was supposed to begin operating in 2003 and receive SNF from the MRS facility. (*Id.* at 61-62); *see also* (Barrett Dep. 206-07, Apr. 22, 2002) (PDD 1.) The acceptance rates in the 1987 Mission Plan Amendment were based on DOE's objective to provide relief to utilities with potential at-reactor storage problems and to reduce the backlog of SNF at reactor sites. (Pollog 30(b)(6) Dep. 202-03, Apr. 11, 2002) (PDD 29.)

Also in June 1987, DOE published the 1987 ACR, which utilized the 1987 Mission Plan Amendment's acceptance rates. (PX 4 (1987 Annual Capacity Report), *supra*, at 7). In the 1987 ACR, the DOE projected that it would initially accept waste at a rate of 1200 MTUs beginning in 1998 and ramp up to 2650 MTUs by 2004. (*Id.*) The acceptance rates in the 1987 ACR were also

based on the objective of relieving utilities with at-reactor storage problems and the need to reduce the backlog of SNF at reactor sites. (Pollog 30(b)(6) Dep. 202-03, Apr. 11, 2002) (PDD 29.)

**B. The 1987 NWPA Amendments**

In December 1987, Congress passed the 1987 NWPA Amendments. The 1987 NWPA Amendments authorized DOE, for the first time, to construct an MRS facility. 42 U.S.C. § 10162(b). Congress did not require construction of an MRS facility, but merely authorized DOE to construct one if an appropriate site could be located. *Id*. Because of continued concerns about the MRS becoming a de facto repository, Congress imposed more stringent linkages than DOE had proposed in the 1987 Mission Plan Amendment.

Two of these linkages are important in this case: First, while DOE had proposed that commencement of *waste acceptance* at an MRS facility could not begin until receipt of construction authorization for the repository, Congress precluded the commencement of *construction* of an MRS facility until receipt of construction authorization for the repository. 42 U.S.C. § 10168(d)(1). Second, the 1987 NWPA Amendments established an MRS capacity limit of 10,000 MTUs until a repository had opened and an MRS facility capacity limit of 15,000 MTUs after the repository had opened. 42 U.S.C. §§ 10168(d)(3) and (4).

In June 1988, following the enactment of the 1987 NWPA Amendments, DOE issued another draft Mission Plan amendment. This amendment projected that waste acceptance would begin at a repository in the year 2003. (PX 42 (1988 Draft Mission Plan Amendment), at 15.) Despite the fact that DOE itself had asked for some MRS facility restrictions, DOE observed that the linkages that Congress had imposed, particularly the linkage of the construction of the MRS facility to the issuance of the construction authorization for the repository, made it unlikely that DOE would accept waste prior to 2003. (Tr. 1987 (Zabransky Test.); Tr. 1819-23 (Kouts Test.))

If construction authorization for the repository was received in 1998, DOE stated that waste acceptance at an MRS facility would also start in 2003. (PX 42 (1988 Draft Mission Plan Amendment), *supra*, at 15.)

On September 23, 1988, Bruce Hunt, Southern's Manager of Nuclear Fuel, sent a letter to DOE noting Southern's continued "concern over what appears to be an indication by DOE that it may not comply with its obligations under APC and GPC disposal contracts and the possible use of the Nuclear Waste Fund for at-reactor storage." The letter stated,

> [DOE's] departure from the NWPA's requirements is completely unacceptable. APC and GPC do not agree with the DOE's assertion that the owners and generators of SNF will continue to be responsible for the waste material after 1998. The DOE's obligations under the disposal contract begin January 31, 1998 and the DOE is responsible for the SNF after that date. The DOE's assertions in the ACR and DMPA [Draft Mission Plan Amendment] that it will not accept any SNF until 2003 is contrary to the disposal contract and the expressed will of Congress.

(PX 64 (Letter from Bruce Hunt, Manager, Nuclear Fuel, Southern Company Services, Inc., to Robert Woytko, Contracting Officer, DOE) (Sept. 23, 1988)); *see* (Tr. 532-34) (Hunt Test.)[20]

In June 1988, DOE published its second Annual Capacity Report. Consistent with the 1988 Draft Mission Plan Amendment, the DOE projected in this ACR that it would begin acceptance of waste beginning in 2003 and would ramp-up to 3000 MTUs by 2008, the sixth year after operations commenced. (DX 71 (1988 Annual Capacity Report), *supra*, at 5.) The 1988 ACR acknowledged that the MRS facility linkages in the 1987 NWPA Amendments made it unlikely that SNF acceptance would begin before 2003. (*Id.* at 4.) Furthermore, the 1988 ACR assumed that an MRS facility would begin operations five years after the receipt of repository construction authorization and that an MRS facility and the repository would begin operations simultaneously. (*Id.* at 5, 6.)

---

[20] *See also* (PX 65 (Letter from Bruce Hunt, Manager, Nuclear Fuel, Southern Company Services, Inc., to Charles Head, DOE) (Oct. 26, 1988.))

In November 1989, DOE published a "Report to Congress on Reassessment of the Civilian Radioactive Waste Management Program," which it issued after a comprehensive review of the repository schedule directed by the Secretary of Energy. (PX 67 (Report to Congress on Reassessment of the Civilian Radioactive Waste Management Program), at vii) [hereinafter "1989 Reassessment Report"]. In the 1989 Reassessment Report, DOE announced that its ability to accept waste at an MRS in 1998 required modification of the 1987 NWPA Amendments' linkages between the repository and MRS schedules. (*Id*. at ix-x, 17.)[21] The report noted that DOE hoped to work with Congress to modify the linkages imposed by the 1987 NWPA Amendments, so that an MRS could open in 1998 on a schedule independent from the schedule for the repository. (*Id.* at 11-12, 18.) DOE stated that it would pursue two parallel tracks for MRS siting — through the Nuclear Waste Negotiator and through a DOE MRS site selection process. *Id.* at 18-19. The report also announced that the expected start of repository operations would be delayed from 2003 to 2010. *Id.* at vii, 8-11.

In April 1990, DOE sent letters to APC, GPC, and other utilities stating that, despite the requirements of the Standard Contract, it would not issue a 1989 ACR, in light of the 1989 Reassessment Report and the need to develop revised acceptance schedules. (PX 70 (Letter from

[21] *See also* (PX 68 (Nuclear Waste: Is There a Need for Federal Interim Storage? (Nov. 1, 1989)) [hereinafter "MRS Commission Report"]. In the MRS Commission Report, the MRS Commission found: (1) an MRS facility as linked to the repository under the 1987 NWPA Amendments is not justifiable; (2) that the advantages to an MRS facility would justify the cost of building an MRS over the no-MRS option only if: (a) there were no linkages to the repository; (b) the MRS could be built promptly and be up and running early in the program; and (c) the repository were delayed significantly. *See* (*id.* at iii.) Specifically, the MRS Commission recognized the concern that an unlinked MRS facility could become the de facto repository and that some linkages were justified, but concluded that the problem was that the 1987 NWPA Amendment linkages (which tied the start of construction of an MRS facility to the receipt of construction authorization for the repository) would make it impossible for the MRS to begin commencing waste acceptance more than three years before the repository. (*Id.* at xvi.)

Carol M. Rueter, DOE Contracting Officer, to Manager, Nuclear Fuel Services, Southern Company Services, Inc.) (Apr. 27, 1990.))

**C. DOE Publishes the 1990 Annual Capacity Report.**

In December 1990, DOE published its third Annual Capacity Report. This was the first such report after the announcement of the delay in repository operations until 2010. The acceptance rates in the 1990 Annual Capacity Report marked a departure from those in previous ACRs. Instead of one acceptance schedule, DOE provided two potential acceptance schedules, an "Upper Bounding Case" and a "Lower Bounding Case." ((PX 7) 1990 Annual Capacity Report 4-5, 7 (Dec. 1990.))

The Upper Bounding Case projected a ramp-up to 3000 MTUs and was based on the rates contained in the 1988 ACR. (*Id.* at 5-7); *see* (Tr. 1867) (Pollog Test.) However, the rates in the 1988 Draft Mission Plan Amendment, upon which the 1988 ACR was based, had assumed the start of repository operations in 2003. (PX 42 (1988 Draft Mission Plan Amendment), *supra*, at 19.) The Upper Bounding Case assumed acceptance would start at an MRS in 1998, a repository start date of 2010, and congressional repeal of both the capacity and siting linkages for an MRS. (PX 7 (1990 Annual Capacity Report), at 4; Tr. 1828-29 (Kouts Test.)

The Lower Bounding Case ramped up to 875 MTUs by the third year of operations and remained at that rate. (PX 7 (1990 Annual Capacity Report), *supra*, at 7.) This schedule of acceptance rates was consistent with the 1987 NWPA Amendment's 10,000 MTU limit on MRS capacity, but, to be implemented, it would have required modification of the statutory schedule linkages. (*Id.* at 5.) DOE could not have performed at this Lower Bounding Case with the linkage between construction of an MRS facility and repository construction authorization in place. (Tr. 1831) (Kouts Test.) With this schedule linkage in place and with DOE's planned repository

construction schedule, the MRS facility would be able to operate for only three years before the repository came online. *See* (Tr. 1830-32) (Kouts Test.) That is, the MRS facility would begin operations in 2007 and the repository would be available by at least 2010, the third year thereafter. *See* (*id.*) DOE's conclusion that MRS facility operations would not commence until 2007 was also consistent with the conclusion of the MRS Commission that, under the siting linkages imposed by the 1987 NWPA Amendments, an MRS facility could not commence operations more than three years before the commencement of repository operations. *See supra* note 21. (PX 59 (Monitored Retrievable Storage, Submission to Congress), at 2; Tr. 1753-58 (Kouts Test.); Tr. 1989 (Zabransky Test.))

### D. DOE Publishes the 1991 Annual Capacity Report and Projects a 900 MTU Acceptance Rate Beginning in 1998 Based on the Operation of an MRS.

In December 1991, DOE published its fourth ACR. This report contained a revised schedule that assumed operations solely at an MRS facility that would remain subject to the 1987 NWPA Amendments' 10,000-ton capacity limit for the period from 1998 through 2007. (PX 8 (1991 Annual Capacity Report), at 4 (Dec. 1991). The projected annual acceptance rates in the 1991 ACR were as follows:

| **Year** | | **SNF (MTU)** |
|---|---|---|
| 1998 | | 400 |
| 1999 | | 600 |
| 2000 | | 900 |
| 2001 | | 900 |
| 2002 | | 900 |
| 2003 | | 900 |
| 2004 | | 900 |
| 2005 | | 900 |
| 2006 | | 900 |
| 2007 | | 900 |
| | Total | 8,200 |

(*Id.* at 5.)

As with the Lower Bounding case from the 1990 ACR, the 1991 ACR acceptance rates assumed congressional modification of the statutory schedule linkage between the start of MRS facility construction and repository construction authorization. (*Id.* at 4; Tr. 1996 (Zabransky Test.)); *see* (*id.* at 1868 (1991 ACR rate "very similar" to 1990 ACR's Lower Bounding case) (Pollog Test.)) The 1991 ACR also assumed that operations at an MRS facility would begin in 1998, but acknowledged that if the MRS facility–repository schedule linkages remained in place, SNF acceptance would not begin until 2007. (1991 ACR, *supra*, at 4.) Thus, in the absence of modifications to the 1987 NWPA Amendments, given the delay in repository operations until 2010, the aggregate acceptance rate for each of the years between 1998 and 2007 would be zero.

The 900 MTU rate in the 1991 ACR was based on the 10,000-ton limit contained in the 1987 NWPA Amendments allocated over the twelve-year period between 1998 and 2010, the date of expected start of repository operations. (Tr. 1994 (Zabransky Test.); *see* (*id.* at 1775 (Kouts

Test.); *id.* at 1866 (Pollog Test.).[22] However, the rates in the 1991 Annual Capacity Report were inconsistent with the linkage requirements of the 1987 NWPA Amendments and, therefore, could not have been used in the absence of a further amendment to the NWPA to remove the statutory provisions linking MRS facility construction to the schedule for a repository. *See* (Tr. 1989-90) (Zabransky Test.)[23]

DOE acknowledged that, with the linkages as enacted (which have never been modified or repealed) the longest an MRS facility could operate prior to the commencement of operations at a repository is three years. (PX 134 (The DOE Position on the MRS Facility), at 4-5 (June 1989); Tr. 1823 (Kouts Test.)) DOE estimated a five-year construction period from receiving construction authorization for the repository until the repository began operations. (The DOE Position on the MRS Facility, *supra*, at 4 (PX 134; Tr. 1826 (Kouts Test.)) The MRS would have to be constructed during this period. (Tr. 1819-22) (Kouts Test.) The repository construction schedule was never estimated to be 10 years. (*Id.* at 1823-26.)

Most importantly, however, the 900 MTU rate also would not meet the stated objectives of the NWPA and of the Civilian Radioactive Waste Management Program — to accept SNF at a sufficient rate above the annual discharge rate so that no utility would have to build at-reactor storage space for discharges after January 31, 1998, and to remove the backlog at a reasonable pace. (Barrett Dep. 340-45, Apr. 23, 2002) (PDD 2); *see also* (Tr. 1922-23 (Pollog Test.) (at a 900 MTU rate with acceptance beginning in 1998, utilities would need to build additional storage some time after 2007); Barrett Dep. 1369-72, May 10, 2002 (PDD 5.))

---

[22] *See also* (Cole Dep. 129-31, 180, Mar. 12, 2002 (PDD 11); Pollog Rule 30(b)(6) Dep. 162, Apr. 11, 2002 (PDD 29.))

[23] *See also* (Cole Dep. 363-64, Mar. 13, 2002 (PDD 12); Pollog 30(b)(6) Dep. 134-35, Apr. 12, 2002 (PDD 30); Barrett Dep. 453, Apr. 23, 2002 (PDD 2); Brownstein Dep. 328-38, Apr. 10, 2002 (PDD 8); Milner Dep. 414, May 3, 2002 (PDD 23); Zabransky Dep. 328-29, Apr. 18, 2002 (PDD 42.))

### E. DOE Continued to Assert the MRS Facility Capacity Limitations as the Basis for the 900 MTU Acceptance Rate Even After It Abandoned Plans for Such a Facility.

In March 1993, DOE published the 1992 ACR. Like the 1991 ACR, this report assumed acceptance at an MRS facility beginning in 1998 and ramped up to a steady-state rate of 900 MTU. (PX 10 (1992 Annual Capacity Report) *supra*, at 4.) As in the 1990 and 1991 ACRs, DOE acknowledged that, "[i]f the current linkages between MRS facility construction and repository construction authorization are maintained, it is estimated that facility operations and initial acceptance of SNF by DOE could not start until at least 2007." (*Id.* at 3.)

By the end of 1994, however, efforts to site an MRS facility "effectively ceased." (Tr. 1773, 1793-94) (Kouts Test.) Mr. Zabransky testified that DOE stopped submitting Delivery Commitment Schedules for SNF that it owned in 1994 (Tr. 1979) (Zabransky Test.), thus demonstrating that DOE understood there would be no operational MRS in 1998.

Moreover, by 1995 DOE no longer included an MRS facility in its program planning, and efforts to construct an MRS facility had ceased. *See* (*id.* at 1833-35, 1839-40 (Kouts Test.); PX 78 (1995 TSLCC Assumptions Package), *supra*, at 3, 13-15.)[24] Notwithstanding that plans for an MRS facility had been abandoned, DOE continued to assert that the MRS facility's capacity limitation was the basis for its SNF acceptance rates. The 1995 APR/ACR acceptance rates, which were the same as those contained in the 1991 and 1992 ACRs, were based "on the assumption of SNF acceptance beginning in 1998 at a Monitored Retrievable Storage Facility," (PX 823 (1995 Acceptance Priority Ranking & Annual Capacity Report), at 3 (Mar. 1995)), and

[24] *See also* (Barrett Dep. 779-80, Apr. 26, 2002 (PDD 3); Barrett Dep. 963-64, May 8, 2002 (PDD 4); Barrett Dep. 1246-47, May 10, 2002 (PDD 5); Zabransky Dep. 344-45, 358-59 Apr. 18, 2002 (PDD 42); Milner Dep. 114-17, May 1, 2002 (PDD 21); Milner Dep. 378, May 2, 2002 (PDD 22); Milner Dep. 620-22, 705-06, May 7, 2002 (PDD 24.))

that the MRS facility–repository schedule linkage was eliminated, (Tr. 1996 (Zabransky Test.) However, the 900 MTU rate as shown in the 1990 and 1991 ACRs and the 1995 APR/ACR never applied in the context of a stand-alone permanent repository. *See* (*id.* at 1999 (Zabransky Test.); Barrett Dep. 947-50, May 8, 2002 (PDD 4); Zabransky Dep. 363, Apr. 18, 2002 (PDD 42); Milner Dep. 711-12, May 7, 2002 (PDD 24.))[25] In fact, in one of his depositions, Mr. Barrett testified that utilities should not rely on the rates in the March 1995 APR/ACR as a basis for planning, but should look to the 3000 MTU rate in the TSLCCs and other documents. (Barrett Dep. 1418-20, May 10, 2002) (PDD 5.) After the 1995 APR/ACR, the DOE did not publish another APR/ACR until 2004. *See* (PX 103 (Letter from David Zabransky, Contracting Officer, DOE, to Ronald Cocherell, Manager, Nuclear Fuel Services, Southern Nuclear Operating Co.) (Aug. 14, 2002.)) When asked whether DOE's continued use of the MRS-inspired 900 MTU rate was related to potential litigation, Mr. Zabransky testified:

> Q. It's true, isn't it, Mr. Z[a]bransky, that in having that 900 metric ton rate in this 1995 ACR, the intention of the Department of Energy was to try to minimize its liability to contract holders?
>
> A. I think I've said that I'm sure that was one of the things they might have been thinking about.

(Tr. 1998) (Zabransky Test.)

## VIII. The Delivery Commitment Schedule Process.

The Standard Contract sets forth a process that requires utilities to provide information, in the form of Delivery Commitment Schedules ("DCSs"), concerning the SNF or HLW they will

---

[25] One of the reasons DOE continued to use the 900 MTU acceptance rate was to attempt to limit its liability to nuclear utilities. *See* Tr. 1999-2000 (Zabransky Test.); *see also* Zabransky Dep. 364-65, Apr. 18, 2002 (PDD 42); Barrett Dep. 557-71, 585-92, Apr. 26, 2002 (PDD 3); Barrett Dep. 911-23, May 8, 2002 (PDD 4); Barrett Dep. 1426-27, May 10, 2002 (PDD 5).

deliver to the DOE for disposal. *See* (PX 2 (Standard Contract), at art.V.B, 48 Fed. Reg. at 16601).) Pursuant to the Standard Contract, beginning on January 1, 1992 a utility must identify, based on the most recent APR, all SNF or HLW it wishes to deliver to DOE starting 63 months after the date the DCS is submitted. (*Id.* art.V.B.1, 48 Fed. Reg. at 16601.) DOE then has three months to approve or disapprove the DCS. (*Id.*) Within one year prior to delivery, the utility is required to submit a FDS, which provides more specific information regarding the SNF that will be delivered to DOE. (*Id.* art.V.C, 48 Fed. Reg. at 16601.) DOE must then approve or disapprove the FDS within 45 days of receipt. (*Id.*) Up to two months prior to submitting a FDS, a utility is allowed to adjust the quantities listed on its DCS by twenty percent. (*Id.* art. V.B.2, 48 Fed. Reg. at 16601.)

The DCS process was for planning purposes only. Nancy Slater-Thompson, the DOE official in charge of receiving and processing DCS submissions during the early 1990s, testified that she did not consider the DCS binding on either DOE or the utilities. (Slater-Thompson Dep. 98-99, June 13, 2002) (PDD 37.) Furthermore, Alan Brownstein, the DOE official responsible for the division that handled the DCSs during the early and middle 1990s, testified that the DCSs were exclusively for planning purposes. (Brownstein Dep. 376-78, Apr. 10, 2002 (PDD 8); Brownstein Dep. 427, June 14, 2002 (PDD 10)); *see* (Tr. 1901-02 (Pollog Test.))[26] Moreover, the DCS Instructions sent to utilities in 1992 made clear that DCS submittals were not binding and were subject to modification in the event that the waste management system in the 1991 ACR, which assumed an MRS facility that was not consistent with the siting linkages from the 1987 NWPA Amendments, was modified. (PX 74 (DCS Instructions), at ¶ 7(c).)

---

[26] *See also* (Lawrence Dep. 131, May 20, 2002 (PDD 18); Morgan Dep. 135, June 25, 2002 (PDD 28.))

As just noted, on March 4, 1992, the DOE contracting officer sent a letter to APC and GPC forwarding instructions for completing and submitting DCS forms as provided in Article V.B.1 of the Standard Contract. (PX 74 (Letter from M. Detmer, Contracting Officer, DOE, to Ronald Cocherell, Manager, Nuclear Fuel Services, Southern Operating Co.) (Mar. 4, 1992); Tr. 1904-05 (Pollog Test.)) The letter stated that DCS submittals were to be made beginning January 1, 1992, and that the submittals should be based on the 1991 ACR, or the then applicable report. (PX 74 (Mar. 4, 1992 Letter from Detmer to Cocherell, *supra*; Tr. 1904-05 (Pollog Test.)) The instructions directed that the "[t]he DCS should be submitted by all Purchasers with allocations in the 1991 Annual Capacity Report ("ACR") (or subsequent ACRs, as appropriate) as specified in Article V.B of the Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste." (PX 74 (DCS Instructions), at ¶ 2.) The instructions further directed, consistent with the Standard Contract, that utilities "shall submit DCSs at least 63 months prior to requested delivery." (PX 74 (DCS Instructions), at ¶ 3.) The DCSs did not require a specific delivery date, only a delivery year. (*Id.* ¶ 2.4.)

The instructions allow that, "[o]nce a Purchaser has an allocation, any SNF owned by the Purchaser can be designated for delivery against that allocation. The DCS does not restrict the Purchaser to deliver the specific SNF that was the basis for the allocation (see also Item 7(h))." (*Id.* ¶ 7(b).) The instructions also state that, "if the DCS does not reflect delivery rights available to the Purchaser, the DCS will be disapproved and returned to the Purchaser." (*Id.* ¶ 8; Tr. 324 (Cocherell).) In addition, the utilities are warned that "the total quantity of SNF designated for delivery must not exceed the allocation in the ACR; exceeding the allocation will result in disapproval of the DCS(s)." (DCS Instructions ¶ 2.7.)

On September 30, 1996, Ronald Cocherell, SNC's Manager of Nuclear Fuel Services, wrote a letter to the DOE Contracting Officer submitting Southern's DCSs based on the 1995 APR/ACR. (PX 82 (Letter from Ronald Cocherell, Manager, Nuclear Fuel Services, Southern Operating Co., to Douglas Baptist, Contracting Officer, DOE) (Sept. 30, 1996); Tr. 334-35 (Cocherell Test)) The letter stated that Southern's submittal of the required DCS forms (outlining delivery to DOE of 4 and 24 SNF assemblies in 2001) did not signify SNC's "acceptance of the removal rates contained in the current ACR." In addition, Mr. Cocherell noted that "Southern Nuclear believes the ACR rates are too low and are therefore inadequate." (Sept. 30, 1996 Letter from Cocherell to Baptist, *supra*; Tr. 335-36 (Cocherell Test.))

On October 21, 1996, Mr. Cocherell wrote the Contracting Officer a second letter resubmitting Southern's DCSs because of an error that required revising the delivery date for the 24 assemblies noted in the September 1996 submission from 2001 to 2002. (PX 83 (Letter from Ronald Cocherell, Manager, Nuclear Fuel Services, Southern Operating Co., to Douglas Baptist, Contracting Officer, DOE (Oct. 21, 1996)); Tr. 366 (Cocherell Test.))[27] Like the September 1996 letter, this letter also protested the acceptance rate shown in the 1995 ACR. (*Id.*) Southern never received a response from DOE regarding the protest of the removal rate contained in its September 30, 1996 and October 21, 1996 letters.

Unlike prior years, the acceptance schedule in the 1995 APR/ACR contained no specific years indicating when DOE would accept SNF but instead it indicated the acceptance rates for the generic years "Year 1," "Year 2," and so on to "Year 10." (PX 823 (1995 APR/ACR), *supra*, at

[27] In addition, this letter acknowledged that "the notice for pickup of the first 4 Hatch assemblies" was made 12 months later than the contract's nominal 63-month specified lead time and on the understanding that "DOE should be able to accept the initial delivery specification for 2001, notwithstanding the reduced notification lead time." (Oct. 21, 1996 Letter from Cocherell to Baptist, *supra*.)

4.) DOE noted this change and stated that, "[d]ue to the uncertainty associated with the date of commencement of operation of the waste management system, the annual nominal waste acceptance rates are presented by year(s) of operation of the system rather than by specific calendars year(s)." (*Id.* at 3-4; Tr. 1970-71 (Zabransky Test.)) By eliminating the specific years in the 1995 APR/ACR, DOE effectively eliminated any basis for determining the due date of the DCS forms at that time. (Tr. 333) (Cocherell Test.); *see* (*id.* at 2001 (Zabransky Test.); Zabransky Dep. 348-49, Apr. 18, 2002 (PDD 42.)) Despite this problem, Southern submitted the DCSs described above using the acceptance rates shown in the 1995 APR/ACR and assuming that DOE would begin acceptance of SNF in January 1998, with the caveat that such action was not to be construed as acceptance of the 1995 APR/ACR's acceptance rate. (Sept. 30, 1996 Letter from Cocherell to Baptist, *supra*; Oct. 21, 1996 Letter from Cocherell to Baptist, *supra*; Tr. 334-35 (Cocherell Test.)

On March 13, 1997, DOE responded to Southern's DCS submittals, informing Southern that "[t]he Department is not able at this time to approve your DCS submittal. Consequently, the Department hereby waives until further notice the contract requirement that you provide a revised schedule within 30 days." (PX 86 (Letter from Beth A. Tomasoni, Contracting Officer, DOE, to Ronald Cocherell, Manager, Nuclear Fuel Services, Southern Operating Co. (Mar. 13, 1997)); Tr. 336-37 (Cocherell Test.); *id.* at 1969 (Zabransky Test.)) Southern's DCSs were not approved because DOE had suspended the DCS process. (Tr. 1966, 1968) (Zabransky Test.)

After the Court of Appeals for the D.C. Circuit's decision in *Indiana Michigan*, 88 F.3d 1272, DOE, on the advice of counsel, stopped processing DCS forms and voided certain DCS forms that previously had been approved. (Tr. 1961-62, 2001 (Zabransky Test.); Zabransky Dep. 38-39, Apr. 17, 2002 (PDD 41); Zabransky Dep. 438, Apr. 18, 2002 (PDD 42.)) Following that

decision, DOE stopped approving any DCS form submittals. *See* (Tr. 2001-02 (Zabransky Test); Zabransky Dep. 32-33, Apr. 17, 2002 (PDD 41.)) DOE has not approved any DCS forms since March 1997. *See* (Tr. 2001-02 (Zabransky Test.); Zabransky Dep. 636-37, Apr. 19, 2002 (PDD 43)).[28] As a result of DOE's suspension of the process in early 1997, it became impossible for a utility to obtain an approved DCS Form. (Tr. 2001 (Zabransky Test.); Zabransky Dep. at 353-5, Apr. 18, 2002 (PDD 42.))

In August 2002, DOE, through the Contracting Officer, David Zabransky, informed Southern that it will not make acceptance allocations for 2008 and 2009 and will not process DCSs for those years. (PX 103 (Letter from David Zabransky, Contracting Officer, Department of Energy, to Ronald Cocherell, Manager, Nuclear Fuel Services, Southern Nuclear Operating Company, Inc. (Aug. 14, 2002))

In July 2004, Southern received a letter from DOE announcing the resumption of the DCS process. (PX 179 (Letter from David Zabransky, Contracting Officer, DOE, to Ronald Cocherell, Manager, Nuclear Fuel Services, SNC, with attached DCS Instructions and Sample DCS (July 28, 2004)); Tr. 337-38 (Cocherell Test); *id.* at 1973-74 (Zabransky Test.)) Utilities were directed to use the 2004 ACR to develop the DCSs they would be submitting. (July 28, 2004 Letter from Zabransky to Cocherell, *supra*; Tr. 337 (Cocherell Test.)) This request was for new DCSs even though some utilities had outstanding DCSs that had not been acted upon. *See* (Tr. 1908-09 (Pollog Test.))

DOE terminated the new DCS process in December 2004, a little over four months after resuming the process. (PX 181 (Letter from David Zabransky, Contracting Officer, DOE, to

---

[28] *See also* (Barrett Dep. 1095-97, May 8, 2002 (PDD 4); Brownstein Dep. 375, Apr. 10, 2002 (PDD 8); Cole Dep. 204, Mar. 12, 2002 (PDD 11); Klein Rule 30(b)(6) Dep. 104-05, 109-10, Apr. 24, 2002 (PDD 13.))

Ronald Cocherell, Manager, Nuclear Fuel Services, SNC) (Dec. 1, 2004); Tr. 338 (Cocherell Test.); *id.* at 1974-75 (Zabransky Test.)) At the time, Southern had not submitted any new DCSs in response to DOE's July 2004 letter resuming the DCS process. (Tr. 339) (Cocherell Test.) Had Southern submitted DCSs, they would have been returned. (Dec. 1, 2004 Letter from Zabransky to Cocherell, *supra*; Tr. 339 (Cocherell Test.); *id.* at 2002 (Zabransky Test.))

DOE will not resume the DCS process until it has a reasonably firm date for the beginning of repository operations that will allow the utilities to comply with the required 63-month lead time for DCS submittals. (Tr. 2002-04 (Zabransky Test.); *id.* at 1853-54 (Kouts Test.)) Thus, it is impossible for a utility to hold an approved DCS until DOE has a plan to open a repository within at least 63 months. (*Id.* at 1826 (Kouts Test.)) Currently there is no planned start-date for the repository and the DCS process has not resumed. (*Id.* at 1910) (Pollog Test.). Southern currently does not have any outstanding requests from DOE for the submission of DCSs, and Southern has no approved DCSs. (*Id.* at 340 (Cocherell Test.)

## IX. Expert Testimony Regarding Acceptance Rate.

Southern Nuclear presented the expert testimony of Eileen Supko, a senior consultant and owner of Energy Resources International, to assist the Court with regard to two issues.[29] First, she provided expert testimony regarding the reasonable acceptance rate in the non-breach case.[30] Second, she identified the quantities of SNF that DOE would have accepted from Southern Nuclear's plants in the non-breach case through 2004, under the acceptance rate identified in her

[29] In conjunction with her testimony, Ms. Supko prepared an expert report that described her analysis and presented her conclusions. (PX 624 (Supko Report)); *see also* (Tr. 668) (Supko Test.) (report admitted into evidence).

[30] Ms. Supko described the non-breach case as reflecting the manner in which DOE would have performed had it not partially breached the Standard Contract. *See, e.g.* (Tr. 763) (Supko Test.)

first opinion.[31] The Court accepted Ms. Supko as an expert in nuclear engineering, DOE's nuclear waste management program, storage and disposal of spent nuclear fuel, modeling of SNF acceptance rate scenarios and allocation rates, and allocations of SNF acceptance rights. (Tr. 878-81) (Supko Test.)[32] Ms. Supko's expert opinions on each of these issues are summarized below.

### A. THE REASONABLE ACCEPTANCE RATE REQUIRED BY THE STANDARD CONTRACT

As described more fully in Section III of the Argument, this Court, in adopting the reasoning of *Commonwealth Edison Co. v. United States*, 56 Fed. Cl. 652, 662 (2003), held that the Standard Contract is missing an acceptance rate term and that, under those circumstances, it is the Court's obligation to supply "a term which is reasonable in the circumstances." (Q*uoting Restatement (Second) of Contracts* § 204 (1981)).[33] Ms. Supko presented expert testimony to assist the Court in determining a reasonable acceptance rate under the Standard Contract in the non-breach case.

Ms. Supko assessed the reasonableness of SNF acceptance rate scenarios in the non-breach world against two principal criteria: (1) Whether, after the start of SNF acceptance in 1998, utilities generally would no longer need to add additional SNF storage capacity at nuclear power plants or at any other location; and (2) Whether SNF would be accepted at a rate that would allow DOE to reduce the backlog of SNF inventories that had accumulated at nuclear power plant sites,

---

[31] Ms. Supko's conclusions are based in part on the use of ERI's SPNTFUEL Model. (PX 624 at 8; Tr. 660.) The Government has acknowledged, and Ms. Supko has confirmed, that with the same inputs, the SPNTFUEL Model produces essentially the same results as DOE's fuel acceptance model. (Tr. 659, 769-72) (Supko Test.)

[32] Ms. Supko described her experience and background in these areas at (Tr. 647-58) (Supko Test.)

[33] *See also Ind. Mich. Power Co. v. United States*, 57 Fed. Cl. 88, 96 (2003) (Hodges, J.) ("Here, the contract term is missing entirely.").

to allow timely decommissioning of nuclear power plants. (PX 624 (Supko Report), at 1 n.2; Tr. 669 (Supko Test.)) As noted above, there is uncontradicted evidence, found in numerous DOE documents and in the testimony of numerous DOE representatives, that these acceptance rate criteria are consistent with the requirements of the NWPA and the Standard Contract. *See* (Tr. 1998) (Zabransky Test.); *see also* (PX 624 (Supko Report), at 24-26; Tr. 707 (Supko Test.))[34]

Ms. Supko identified three key factors that she deemed important in determining a reasonable acceptance rate in the non-breach case:

> (1) The amount of additional spent fuel storage that utilities would have had to add had DOE begun acceptance of SNF in 1998, as the Standard Contract required;
>
> (2) The number of years after each plant is shut down for decommissioning that SNF remains on site prior to acceptance by DOE; and
>
> (3) The extent to which DOE would use the annual steady-state acceptance capacity over the life of the waste management program.[35]

(PX 624 (Supko Report) at 12-13; Tr. 677-678 (Supko Test.))

---

[34] Ms. Supko testified:

> "Q: And how did DOEs actions and words in implementing the program and the Act -- sorry, the contract and the Act compare with the[se] requirements[?]. . .
>
> A: My review of DOE's documents and of the testimony that I reviewed showed that DOE's implementation was consistent with the[se] requirements. . . ."

In addition, the Court in *TVA v. United States*, 69 Fed. Cl. 515, 519 (2006), held that "[o]ne of the goals of the [NWPA] was to reduce the backlog of spent nuclear fuel that had accumulated at nuclear power facilities around the nation," and that "[a]nother goal . . . was to preclude utilities' need to provide for storage of spent fuel outside the pools attendant to their reactors."

[35] Again, these factors find support in the testimony of DOE representatives. (Pollog, Rule 30(b)(6) Deposition, April 11, 2002, p. 96-97 (PDD 29); Barrett, Deposition, May 10, 2002, p. 1332-34 (PDD 5.))

Ms. Supko explained that, for more than a decade, she had used these factors in her work for nuclear utilities, to evaluate spent fuel acceptance scenarios in circumstances unrelated to the SNF litigation; she noted that these factors were important to nuclear utilities as part of their planning and budgeting processes. She stated that the second and third factors related to the efficiency of the waste management program: whether the system was under built -- requiring that SNF be stored at a utility's site long after the plant shut down, resulting in significant additional storage costs -- or overbuilt -- removing fuel at such a quick rate that the system would have unused capacity after a relatively short period of time. (Tr. 678-79 (Supko Test.); *see also id.* at 671-72.)) An efficient waste management program would be costly to the utilities that were paying for the system, because it would require them to pay either for on-site storage of SNF or for a system that operated at its peak high acceptance rate for only a few years.[36]

Using these factors, Ms. Supko evaluated four spent nuclear fuel scenarios in the non-breach world, in which DOE began SNF acceptance in 1998, as required by the Standard Contract. (PX 624 (Supko Report) at 12, tbl. 1; Tr. 673-77 (Supko Test.)) Scenario 1 ramped up over five years to reach a steady-state annual rate of acceptance of 3000 MTU in 2002, which Ms. Supko described as being consistent with numerous DOE planning documents and the testimony of numerous DOE witnesses.[37] (PX 624 (Supko Report) at 13, 27-28; Tr. 709 (Supko Test.)) Scenarios 2 and 3 ramp up to a 900 MTU rate in 2000, year three of system operation. Scenario 2 remains at 900 MTUs as a steady-state rate, whereas Scenario 3 eventually ramps up to a steady-state rate of 3000 MTUs in 2015, year 18 of system operation. Scenario 4 involved a ramp up to 6,000 MTU in 2005, or year eight. (PX 624 (Supko Report) at 12.))

---

[36] Ms. Supko noted that DOE documents showed that DOE designed the fuel management program to operate for a 40-year period. (Tr. 672) (Supko Test.)

[37] *See TVA*, 69 Fed. Cl. at 519; *Indiana Michigan Power Co. v. United States*, 57 Fed. Cl. 88, 99 (2003).

Ms. Supko testified that Scenarios 2 and 3 were based in part on the 1991 ACR, which derived its acceptance rate scenario based upon the presumption that DOE would have an MRS available as an interim storage facility. As Ms. Supko recognized, DOE was barred by law from using an MRS in the manner in which was described in the 1991 ACR. (PX. 624 (Supko Report) at 11 n. 18; Tr. 675-76 (Supko Test.))[38] The 1991 ACR provided an acceptance rate only for the first ten years of system operation. In Scenario 2, Ms. Supko used the 900 MTU rate as the steady-state rate. In Scenario 3, she derived a ramp up schedule, to 3000 MTU in 2015, based on DOE's 1992 ACR and its 1990 TSLCC. (PX. 624 (Supko Report) at 11; Tr. 676-77.)[39] Ms. Supko selected Scenario 4 to show "the effect of a higher acceptance rate scenario . . . on a utility's spent fuel storage requirements." (Tr. 677) (Supko Test.)

### 1. Results Using Strict "Oldest Fuel First" Priority Rankings

Ms. Supko testified that the Standard Contract assigns priority for acceptance of SNF on an "oldest fuel first" ("OFF") basis. (Tr. 663-64) (Supko Test.); (PX 624 (Supko Report) at 8-9.) Although she noted that the Contract also provided alternatives to OFF,[40] her initial analysis was

[38] DOE recognized in the 1991 ACR that it could not operate an MRS in the manner assumed by that document. (1991 ACR, *supra*, at 4.) *See Indiana Michigan*, 57 Fed. Cl. at 98, 99-100; *Commonwealth Edison Co. v. United States*, 56 Fed. Cl. 652, 666 (2003); *see also TVA*, 69 Fed. Cl. at 53.

[39] The government has relied upon rates similar to those in Scenarios 2 and 3 in its defense of the SNF cases. For example, in this case, the Government's experts presented alternative damages calculations based on "acceptance at a rate of 400 MTUs increasing to 900 MTUs and ultimately to 3000 MTUs." (PX 607 (Johnson Report) p. 36; PX. 594 (Neuberger Report) at 12.)

[40] These included intra-company exchanges of acceptance rights, exchanges of acceptance rights among utility companies, and the right of a utility to increase the quantity of SNF that DOE must pick up by 20%. (PX 624 (Supko Report) at 9; Tr. 663-65 (Supko Test.)) As described more fully below, Ms. Supko performed an analysis that presumed intra-company exchanges and discussed qualitatively the impact of the ability to increase acceptance rates by 20%. (Tr. 664-65) (Supko Test.)

based on a strict OFF acceptance priority. (PX 624 (Supko Report) at 16; Tr. 663-65 (Supko Test.)) She presented the following results of her analysis of how each of the four scenarios measured up against the three factors she identified as important to determining a reasonable acceptance rate:

| Comparison of Factors Important to Spent Fuel Acceptance | | | | |
|---|---|---|---|---|
| **Spent Fuel Acceptance Evaluation Factors** | **Spent Fuel Acceptance Rate Scenario** | | | |
| | **Scenario 1**<br><br>**3000 MTU** | **Scenario 2**<br><br>**900 MTU** | **Scenario 3**<br><br>**92 ACR** | **Scenario 4**<br><br>**6000 MTU** |
| Additional Storage Requirements (MTU) | 1,030 | 13,130 | 6,200 | 740 |
| Average Post Shutdown Storage Time (Years) | 9 | 64 | 16.5 | 6 |
| Years Maximum Acceptance Capacity Utilized | 28 | 101 | 24 | 6 |

(Tr. 681-82) (Supko Test.)

Ms. Supko concluded that only Scenario 1 – the 3000 MTU case – presented a reasonable acceptance rate that fulfilled the requirements that, after the start of spent fuel acceptance in 1998, utilities generally would no longer need to add additional spent fuel storage capacity, and that DOE would accept at a rate that would allow it to reduce the SNF backlog to allow timely decommissioning of nuclear power plants. (Tr. 690, 694) (Supko Test.) She noted that Scenario 1 required the industry as a whole to store considerably less than 2000 MTU, the cumulative amount that the industry discharged in one year (*id.* at 689); as described more fully below, Ms. Supko opined that the industry could have accommodated these quantities of SNF without having to build additional dry storage facilities (*id.*) In contrast, Scenarios 2 and 3 – the 900 MTU cases –

required storage of the equivalent of multiple years' discharges, for which significant additional dry storage capacity would have to be built. (*Id.* at 690-91, 692-93.)

Ms. Supko also noted that Scenario 1 – the 3000 MTU case -- required a relatively short average time period for post-shutdown fuel storage, thereby allowing nuclear plants to decommission in a cost-effective manner. (Tr. 694) (Supko Test.) In contrast, Scenario 2 – 900 MTU case – required a utility on average to maintain on-site storage of SNF after shutdown for a period that was longer than the period for which it could be licensed to operate, and Scenario 3 – 900 MTU case -- required a utility to maintain on-site storage for a period considerably longer than Scenario 1.[41] (*Id.* at 691.) Ms. Supko stated that Scenario 1 allowed the nuclear waste management program to operate in an efficient manner – the system would operate at maximum capacity for 28 years (after five-year ramp-up), which compared well with the planned 40-year operation period for the program. (*Id.* at 690.) Again, in contrast, Scenario 2 – the 900 MTU case – would require the program to operate for more than a century.[42] Finally, Ms. Supko testified that, under Scenario 1, "Southern Nuclear would not have been required to build dry storage at any of their plants." (*Id.* at 710.) The Government does not contest this conclusion. (PX 594 (Neuberger Report) at 17) ("As with the Kenrich simulation, no casks are required at [Plants Hatch or Farley] in the but for scenario.")[43]

---

[41] Ms. Supko testified that a reasonable post-shutdown storage period was five to ten years. (Tr. 828) (Supko Test.) She noted that the range of post-shutdown periods under Scenario 1 was five to approximately 12 to 14 years, while the range for Scenario 3 was about 12 to 20 years. (*Id.* at 689-90, 693.) She also noted that these averages are "driven upward because there are 14 shutdown nuclear plants, some of which shut down in the 1960s. So in 1998 they would have already have been storing fuel for 20 years." (*Id.* at 829.)

[42] Although Scenario 3 had a lower post-shutdown storage and fewer full capacity operation periods than Scenario 2, this did not overcome the high volume of fuel that would have to be stored on-site. (Tr. 690-93) (Supko Test.)

[43] Ms. Supko performed her initial analyses based upon the presumption that no nuclear utilities would seek an extension of their operating licenses (from 40 to 60 years). (PX 624 (Supko

DOE similarly chose the 3000 MTU rate because operating the SNF program at that acceptance rate was reasonable, efficient and cost-effective. As Lake Barrett testified at deposition, the 3000 MTU rate was chosen

> as a proper balance for total life-cycle costs as well as near-term cash flow requirements and performance. If you make the number too high, then you have – you would quickly work off the backlog, and then you would have a lot of idle capacity. If it was too low, you would have reactors needing to put in dry storage, and 3,000, based on an early 1980s, seemed like a reasonable number to use.

(Barrett Dep. 1332-33, May 10, 2002) (PDD 5.)

### 2. Results Using Intra-Company Exchanges of Acceptance Rights.

Ms. Supko testified that, under the Standard Contract, a nuclear power company that operated more than one nuclear power plant could "swap" pick-up allocations among its plants – for example, Southern Nuclear could allow Plant Farley to use a pick-up allocation for Plant Vogtle. (Tr. 664, 701-02) (Supko Test.) Her analysis above presumed that no such intra-company swaps took place, even if such a swap could have avoided the need for the utility to avoid construction of a dry storage facility. Ms. Supko did another analysis that presumed that intra-company swaps did take place in the nuclear industry as a means of avoiding the need for dry storage. She testified that the results of her analysis were as follows:

---

Report) at 8; Tr. 663 (Supko Test.)) She testified at trial that she ran her analysis again, presuming license extensions for all utilities. She stated that "the additional storage requirements in Scenario 1 and Scenario 4 don't change. . . . The additional storage requirements in Scenario 2 increase dramatically to more than 30,000 metric tons. The additional storage requirements in Scenario 3 increase . . . by a few hundred metric tons. The average post shutdown storage times in Scenarios 1 and 4 decrease and the average post shutdown time in Scenario 2 increases significantly into the 80 years or longer [range]. And Scenario 3 decreases somewhat." (Tr. 836) (Supko Test.) These results did not affect Ms. Supko's overall conclusions. (*Id.* at 783.)

**Sensitivity Analysis Regarding Intra-Company Use of Acceptance Rights**
**Comparison of Factors Important to Spent Fuel Acceptance**

| Spent Fuel Acceptance Evaluation Factors | Spent Fuel Acceptance Rate Scenario | | | |
|---|---|---|---|---|
| | **Sensitivity 1**<br><br>**3000 MTU** | **Sensitivity 2**<br><br>**900 MTU** | **Sensitivity 3**<br><br>**92 ACR** | **Sensitivity 4**<br><br>**6000 MTU** |
| Additional Storage Requirements (MTU) | 690 | 9,500 | 4,980 | 540 |
| Average Post Shutdown Storage Time (Years) | 9 | 65 | 16.5 | 6 |
| Years Maximum Acceptance Capacity Utilized | 28 | 101 | 24 | 6 |

(Tr. 704-06) (Supko Test.) Ms. Supko's conclusion based upon this sensitivity analysis was the same as described above: only Scenario 1 – the 3000 MTU case – presented a reasonable acceptance rate that minimized the need for additional on-site storage and that allowed DOE to work off the SNF backlog to allow timely decommissioning. (*Id.* at 705.)

### 3. Other Available Means to Avoid Additional Dry Storage.

Ms. Supko noted that, under both of the analyses described above, Scenario 1 left the nuclear industry with some quantities of SNF on site. She described the manner in which nuclear utilities would have addressed these quantities of SNF had DOE begun performance in 1998, as required by the Standard Contract. Ms. Supko testified that under her initial analysis – which did not presume intra-company swaps to avoid additional storage –approximately a dozen utilities, excluding Southern, each would have had to deal with under 100 MTU of SNF, in some cases involving one or two reloads (*i.e.*, the amount of fuel replaced during a refueling outage) of fuel.

(Tr. 685) (Supko Test.) She testified that, in the non-breach world, these utilities would *not* have constructed dry storage facilities to accommodate such small quantities of SNF – "there are a wide range of things that could have been done, had they believed performance was going to occur." (Tr. 689) (Supko Test.) The range of options would have included changing "nuclear waste management plans" by, for example, "increas[ing] fuel burnups" or, if possible, lengthening the utility's fuel discharge cycle. (*Id.* at 684.) Utilities also could "provid[e] additional racks, provid[e] temporary racks. . . [or use] part of the full core discharge capability." (*Id.* at 689.)[44]

Ms. Supko also testified that the Standard Contract provided nuclear utilities with additional means by which they could have avoided additional dry storage in the non-breach world. First, the Standard Contract allowed a utility to increase the amount of SNF that DOE would pick up in a particular year by up to 20% of its allotted amount. (PX 624 (Supko Report) at 17; Tr. 665 (Supko Test.)) Ms. Supko stated that, because of this provision of the Contract, "it is possible that the additional storage requirements" described above "would have been at least twenty percent lower…." (PX 624 (Supko Report) at 17.)[45] She testified that, "[i]f those plants that required additional storage . . . utilized the plus 20 percent flexibility, that 690 [MTU figure] would go down to 552," (Tr. 812-13) (Supko Test.), an amount that could have been accommodated without building dry storage facilities.

[44] Ms. Supko's testimony is consistent with the Court's conclusions in *TVA v. United States*, which noted that, "[g]iven the proportionately large cost of building and operating dry storage facilities, TVA would have had several options available in the but-for scenario to deal with its spent fuel while avoiding dry storage." *TVA*, 69 Fed. Cl. at 532.

[45] Ms. Supko noted that she did not presume that *all* utilities would increase the pickups by 20%; she focused "only . . at that portion who had additional storage requirements calculated" under her analysis. (Tr. 856) (Supko Test.) The Court in *TVA* rejected the government's challenge to the viability of the "plus or minus 20%" provision, noting that the DOE contracting officer, David Zabransky, "expressed an understanding that the Standard Contract would require DOE to accommodate a request by a utility under" this provision. *TVA*, 69 Fed. Cl. at 533.

Second, Ms. Supko testified that the Standard Contract allowed nuclear operating companies to exchange acceptance rights with another company, with DOE's consent. (PX 624 (Supko Report) at 17; Tr. 664 (Supko Test.)) She noted that the use of such exchanges could result in a reduction in the industry-wide amount of SNF that would have required on-site storage in the non-breach case. (PX 624 (Supko Report), at 17.)[46] Because Southern would not have required on-site storage in the non-breach case, such exchanges would have no effect on Southern's damages.

**B. SOUTHERN NUCLEAR'S FUEL ACCEPTANCE RIGHTS.**

Finally, Ms. Supko calculated SNF acceptance rights for Southern Nuclear's nuclear power plants, presuming that Scenario 1 applied in the non-breach case – *i.e.*, a steady-state acceptance rate of 3000 MTU after a five-year ramp-up, with DOE commencing acceptance on an industry-wide basis in 1998. (PX 624 (Supko Report) at 31-37; Tr. 710-11 (Supko Test.)) She also did a similar calculation, based upon the presumption that DOE would commence acceptance in 2010.[47] (PX 624 (Supko Report) at 38-40.) The purpose of these calculations was to provide input for the calculation of Southern Nuclear's damages caused by DOE's partial breach of the Standard Contract. (Tr. 711-12) (Supko Test.))

Ms. Supko presented the results of her calculations in a series of tables that appeared in her report. (PX 624 (Supko Report) at 38-40.) Ms. Supko calculated that, absent the partial breach, DOE would have accepted 737.7 MTUs from Southern's power plants by 2005. (PX 624 (Supko

[46] The Court in *TVA* described as "unavailing" the government's argument that it was speculative to rely upon the development on an inter-utility exchange "market." *TVA*, 69 Fed. Cl. at 533.

[47] Subsequent to the submission of Ms. Supko's report, DOE announced that it will not commence acceptance in 2010, and "they do not have a schedule for when they might begin repository operation." (Tr. 861) (Supko Test.)

Report) at 35-37.) To ensure the accuracy of her calculations, she compared them to the allocations contained in the 2004 APR/ACR. She noted that her figure "is the same number that was contained in DOE's APR/ACR document." (Tr. 714) (Supko Test.)

## X. The Government's Partial Breach of the Contracts.

Southern has paid all of the fees required under the Contracts – some $850 million – and continues to pay millions each year in fees as required under the Contracts. (Tr. 251) (Cocherell Test.) In the early 1990s, DOE began to acknowledge that it would not meet its 1998 deadline. *See* (PX 80 (DOE Notice of Inquiry), 60 Fed. Reg. 21793, 21797 (May 3, 1995); *see also* (PX 7 (1990 Annual Capacity Report), at 5) ("[I]f current linkages to the repository are maintained, it is estimated that commencement of facility operations and initial acceptance of SNF/HLW by DOE would not start until 2007.") DOE failed to commence acceptance of SNF as required by the Contract on January 31, 1998, including Southern. (Tr. 302, 328, 368) (Cocherell Test.) DOE has not accepted any SNF pursuant to the Contracts and has not announced any plan to do so.[48]

## XI. Summary of Southern's Damages

### A. Overview of Southern's Evidence.

Southern's damages in this case consist in large part of the costs Southern's experienced nuclear plant managers decided to incur to mitigate the impact of the Government's partial breach of the Contracts. Instead of allowing their reactors pools to fill with SNF and their reactors to shut down, and instead of being forced to generate or purchase higher cost replacement energy,

---

[48] Federal Circuit affirmed this Court's holding in *Maine Yankee Atomic Power Co. v. United States*, 225 F.3d 1336 (Fed. Cir. 2000), that the Government had partially breached the Standard Contracts.

Southern's management decided to incur the smaller cost of constructing facilities (*e.g.*, ISFSIs) on-site, loading SNF into casks and placing those casks on the ISFSIs.

Relying on the experienced business judgment of Southern's managers and nuclear engineers for what steps were necessary to construct dry storage facilities, Ken Metcalfe, President of The Kenrich Group LLC, calculated Southern's damages. (Tr. 1405-06, 1457-58) (Metcalfe Test.)

**B. Southern's Evidence.**

This Court certified Mr. Metcalfe, a Certified Public Accountant and Certified Valuation Analyst, as an expert on accounting, financial, and economic damages relating to nuclear plants and government contracts. (Tr. 1445-49) (Metcalfe Test.) Using the same methodology that he had learned to become a Certified Public Accountant and Certified Valuation Analyst, that he had taught, and that he had applied for over 20 years in computing damages related to over 40 nuclear plants, Mr. Metcalfe calculated Southern's damages in this case. (*Id.* at 1445-49.) He calculated the difference between the economic position that Southern would have occupied as of December 31, 2004, had DOE performed under the Contracts and the economic position that Southern actually occupied on December 31, 2004, on account of the Government's partial breach. (*Id.* at 1452-53.) Southern's actual position, of course, takes into account the actions Southern has taken to maintain the operational reliability of its nuclear plants. (*Id.* at 1453-54.)

Mr. Metcalfe's calculation of Southern's damages was based on Southern's accounting records, and the testimony of Southern executives and employees regarding the actions actually taken to develop and utilize SNF storage facilities at Southern's plants, as well as Southern's investment in a potential off-site ISFSI being developed by Private Fuel Storage, LLC. (Tr. 1456-61; 1528) (Metcalfe Test.) Mr. Metcalfe calculated the damages suffered by Southern by activity

at each plant based on the difference between the actual costs incurred by Southern and the costs that would have been incurred had the Government performed at the 3000 MTU annual rate. (*Id.* at 1458, 1482, 1499.) To determine the amount of SNF that the Government would have removed from its plant sites in the non-breach scenario at the 3000 MTU rate, Mr. Metcalfe relied on the testimony of Ms. Eileen Supko, who testified concerning her SNF acceptance model. (*Id.* at 1454.) Mr. Metcalfe also calculated the cost to Southern of financing the costs Southern incurred to mitigate the impact of DOE's partial breach by determining the utilities' weighted average cost of capital of the funds expended. (*Id.* at 1545-47.) He reflected Southern's damages both in terms of nominal dollars and in dollars adjusted for Southern's cost of capital that he testified was necessary to make Southern economically whole.

The total damages for all of Southern's plants are summarized as follows:

**TOTAL DAMAGES BY PLANT**

| **Plant** | **Nominal Damages** | **Damages Including Cost of Capital** |
|---|---|---|
| Hatch | $54,524,000 | $75,758,000 |
| Farley | 17,275,000 | 21,317,000 |
| Vogtle | 5,403,000 | 8,553,000 |
| **TOTAL** | $77,202,000 | $105,628,000[49] |

(Tr. 1571-72) (Metcalfe Test.)

Southern's damages for each plant are comprised of categories of costs associated with the Government's partial breach. The damages for each plant are summarized as follows:

[49] This amount represents total damages through December 31, 2004, with Southern's cost of capital computed through August 31, 2005. Limiting Southern's cost of capital damages only to the period ending, December 31, 2004, the total damages with cost of capital included were $101,900,000. (Tr. 1539) (Metcalfe Test.)

**Plant Hatch.** The damages for Plant Hatch are derived from the cost of the actual design, licensing, and construction of a SNF dry storage facility on the plant site, the cost of purchasing and loading 22 dry storage casks with 1496 SNF assemblies and transporting those casks to the dry storage facility through December 31, 2004, addition of one bathtub rack in the reactor pool, and Plant Hatch's share of Southern's payments to Private Fuel Storage LLC ("PFS"). (Tr. 1531) (Metcalfe Test.) The total nominal cost of those efforts was $61,427,000. (*Id.* at 1532.) Southern offset this amount of damages by the "non-breach" costs of $6,903,000, which consists of costs that would have been incurred in loading 1664 SNF assemblies into DOE casks had DOE performed at the 3000 MTU per year rate and the cost of adding both bathtub racks in order to maintain minimum operating reserves.[50] (*Id.*) The net nominal damages figure for Plant Hatch was therefore $54,524,000 (*Id.* at 1572.) Mr. Metcalfe then added $21,234,000, to account for Southern's cost of capital incurred in connection with the development of the dry storage facility. (*Id.* at 1572.) Total damages for Plant Hatch are therefore $75,758,000. (*Id.*)

**PLANT HATCH DAMAGES**

| | Nominal Breach Costs | Less: Nominal Non-Breach Costs | Nominal Damages | Damages Including Cost of Capital |
|---|---|---|---|---|
| ISFSI | $25,871.000 | - | $25,871,000 | $37,554,000 |
| Dry Casks | 18,978,000 | - | 18,978,000 | 24,536,000 |
| Loading to ISFSI | 10,570,000 | - | 10,570,000 | 13,572,000 |
| Bathtub Rack Additions | 3,186,000 | 3,606,000 | (419,800) | (591,000) |
| Loading DOE Containers | - | 3,297,000 | (3,297,000) | (3,935,000) |
| Private Fuel Storage | 2,822,000 | - | 2,822,000 | 4,322,000 |
| TOTAL | $61,427,000 | $6,903,000 | $54,524,000 | $75,758,000 |

(Tr. 539-40, 1529) (Metcalfe Test.)

[50] In *TVA*, 69 Fed. Cl. at 542-43, the Court held that no offsets were necessary. Under that holding, Southern's nominal damages would be equal to its costs in the breach case without any offset.

**Plant Farley.** The damages for Plant Farley are derived from the cost of the actual design, licensing and construction of an SNF dry storage facility on the plant site and the cost of purchasing three casks, which had not been loaded as of December 31, 2004, plus Plant Farley's payments to PFS. (Tr. 1540) (Metcalfe Test.) The total nominal costs of those efforts were $20,100,000, while the costs that would have been incurred in loading 528 SNF assemblies into DOE casks had the DOE performed was estimated to be $2,825,000, resulting in nominal damages of $17,275,000. (*Id.*) Mr. Metcalfe testified that Southern's cost of capital attributable to the development of the dry storage facility at Plant Farley was $4,042,000, for total damages for Plant Farley of $21,317,000. (*Id.* at 1540-41.)

**PLANT FARLEY DAMAGES**

| | Nominal Breach Costs | Less: Nominal Non-Breach Costs | Nominal Damages | Damages Including Cost of Capital |
|---|---|---|---|---|
| ISFSI | $14,821.000 | - | $14,821,000 | $17,274,000 |
| Dry Casks | 2,191,000 | - | 2,191,000 | 2,498,000 |
| Loading to ISFSI | 266,000 | - | 266,000 | 306,000 |
| Spent Fuel Pool Racks | - | - | - | - |
| Loading DOE Containers | - | 2,825,000 | (2,825,000) | (3,571,000) |
| Private Fuel Storage | 2,822,000 | - | 2,822,000 | 4,810,000 |
| TOTAL | $20,100,000 | $2,825,000 | $17,275,000 | $21,317,000 |

(Tr. 1540-41) (Metcalfe Test.)

**Plant Vogtle.** The damages for Plant Vogtle for the period ending December 31, 2004, are derived from the cost of a rack addition in the Plant Vogtle SNF pool that would not have been necessary had the Government performed. (Tr. 1541) (Metcalfe Test.) The cost of the rack addition plus Plant Vogtle's share of PFS was $5,538,000, while the cost of loading assemblies into DOE casks had the DOE performed was estimated to be $135,000. (*Id.*) Total damages for

Plant Vogtle are therefore $5,403,000 on a nominal basis and $8,553,000 including cost of capital. (*Id.* at 1541-42.)

**PLANT VOGTLE DAMAGES**

| | Nominal Breach Costs | Less: Nominal Non-Breach Costs | Nominal Damages | Damages Including Cost of Capital |
|---|---|---|---|---|
| ISFSI | - | - | - | - |
| Dry Casks | - | - | - | - |
| Loading to ISFSI | - | - | - | - |
| Spent Fuel Rerack | $2,716,000 | - | $2,716,000 | $4,423,000 |
| Loading DOE Containers | - | 135,000 | (135,000) | (145,000) |
| Private Fuel Storage | 2,822,000 | - | 2,822,000 | 4,275,000 |
| TOTAL | $5,538,000 | $135,000 | $5,403,000 | $8,553,000 |

(Tr. 1541) (Metclafe Test.)

**C. Overview of the Government's Damages Evidence.**

Unlike Mr. Metcalfe's expert opinions on Southern's damages, the Government's damages evidence was not supported by the testimony of a Government witness with any nuclear engineering or operations experience. Instead, the Government's damages evidence consisted of challenges, or "adjustments" to certain aspects of Southern's damages claim as calculated by its economist, Dr. Jonathan Neuberger, and its accountant, Larry Johnson. In short, the Government's accountant and economist, neither of whom had any nuclear engineering or nuclear management experience, attempted to second guess Southern's team of experienced nuclear engineers and nuclear managers on the decisions they made years ago regarding the number of casks to load in order to maintain efficient nuclear reactor operations, the size of safe and efficient operating reserves for differently configured reactor pools, the type of casks to load from the reactor pools, the various aspects of constructing an ISFSI, etc.

The Government did not contest $38,574,066 of Southern's damages claim, assuming the applicability of the 3000 MTUs per year SNF acceptance rate, and Mr. Johnson's testimony establishes that at least that amount is recoverable by Southern if damages are calculated based on the 3000 MTU annual rate. (Tr. 2323) (Johnson Test.) Further, Mr. Johnson testified that Southern was entitled to a minimum of $ 16,707,846 in damages at the 900 MTU per year SNF acceptance rate advocated by the Government. (*Id.* at 2325-26.)

Mr. Johnson's principal adjustments to Southern's damages claim can be grouped into six general categories:

| | | |
|---|---|---|
| 1. | Number of assemblies/casks actually loaded by Southern was unreasonable | $ 7,697,015[51] |
| 2. | Purchase of Three HI-STAR casks was unreasonable | 14,919,855[52] |
| 3. | Internal labor, supervision and overhead costs are not recoverable | 6,466,016 |
| 4. | Private Fuel Storage LLC costs are not recoverable | 8,466,672 |
| 5. | Southern's Cost of Capital is not recoverable | 28,423,972[53] |
| 6 | Other/Miscellaneous | 660,604[54] |
| TOTAL ADJUSTMENTS | | $66,634,134 |

## XII. The Principal Contested Damages Issues.

As noted above, the Government's damages expert has questioned Southern's damages in six principal areas. Set out below is a summary of the evidence on each of these issues. In most instances, the Government's position is based on nothing more than after-the-fact second guessing by the Government's economist and accountant – neither of whom have any experience in the

[51] This adjustment does not include the cost of three HI-STAR casks included in the HI-STAR adjustment.

[52] This amount includes not only the three HI-STAR casks, but associated structures and equipment.

[53] This amount is the cost of capital adjustment through August 31, 2005.

[54] This amount includes $419,800 for the second bathtub rack.

operation of nuclear facilities – of the actions that Southern's experienced officials and employees took to mitigate the harm caused by the Government's partial breach of contract. The other adjustments are based largely on direction the experts received from counsel for the Government.

### A. The Number of Casks Loaded at Plant Hatch.

The Government's first challenge relates to the number of casks Southern actually loaded and transported to the ISFSI at Plant Hatch. The Government's position is that Southern loaded too many casks – it should have loaded only 9 casks, rather than the 22 casks that Southern's managers and employees thought were necessary and prudent. To understand the error in the Government's arguments, it is necessary to understand the principles that govern the safe operation of a nuclear utility, as well as the storage limitations associated with a utility's reactor pool.

#### 1. Southern's Policies Regarding Full Core Reserves

The effective operating capacity of a reactor pool for a nuclear plant depends on a number of factors:

- The total number of SNF assemblies that are licensed to be stored in the pool;
- The cumulative number of assemblies that have already been discharged into the pool;
- The number of assemblies in each discharge per fuel cycle, and
- The amount of reserve storage capacity that should be maintained in the pool for safe and efficient operation of the plant.

(Tr. 267-74 (Cocherell Test.); Tr. 150-51 (Long Test.); Tr. 271-72 (Tr. 776) (Supko Test.)

The amount of usable space in a reactor pool is measured in the number of full core reserves ("FCRs") – the amount of space necessary to hold all of the fuel contained in a reactor core.

A plant that does not have adequate pool capacity to accept newly discharged SNF assemblies cannot refuel, and therefore cannot operate. (Tr. 144) (Long Test.) Such a plant can also experience increased cost and loss of efficiency, and its workers can suffer increased doses of radiation. (*Id.* at 138-39.) Southern presented the testimony of Messrs. Louis Long, Vice President for Technical Services of SNC, James Wade, Project Manager for the Plant Hatch SNF Dry Storage Project, and Tom McCallum, Project Manager for the Dry Storage Projects for Plants Farley and Vogtle, on the issue of adequate operating reserves. Each of these individuals are engineers who have worked in nuclear power generation for over two decades, in Mr. Long's case for 35 years. (*Id.* at 114-22.)

Mr. Long explained Southern's twin goals of safety and efficiency and how these goals affected Southern's basic decision-making process regarding its nuclear plants, including its decisions regarding maintenance of adequate storage capacity in the spent fuel pools. He noted that nuclear power had "the cheapest production cost" of any form of energy in the Southern system, and that Southern operates its "nuclear plants 24 hours a day, seven days a week, as long as we can run them." (Tr. 136) (Long Test.)

Mr. Long also testified that "there are no emissions associated with generation of nuclear power . . . . And these emissions get traded in markets when they get generated out of our other coal plants making them more expensive, but nuclear is quite candidly the – kind of the best source of generation we have both in terms of cost and emissions for our system." (*Id.*)

Mr. Long then described the economic impact on Southern's overall operations if one of its nuclear plants had to shut down because of inadequate space in its pool: "Well, **when you lose**

**a nuclear plant, you have to replace it with something else that is going to be more expensive** and have, you know, whatever emission penalties go along with that source of replacement power. And economically, the price of electricity for the entire system goes up." (*Id.* at 139) (emphasis added).

Mr. Long noted that these economic considerations led Southern to be conservative in its decision-making, to avoid risks that could result in having to shut down a nuclear reactor: "[B]ecause it [a nuclear plant] is so valued and so important, we're just very conservative about the decisions we make that have to do with the operation of that plant. And quite candidly, it is very consistent with our overall goals." (*Id.*)

Mr. Long also testified that conservative decision-making was consistent with the goal of protecting public health and safety.

> **Our number 1 goal is safety**. I'm talking about nuclear safety. And the decisions we make are conservative decisions with always in mind that our role is to protect the public health and safety. . . .
>
> **Given the choice between doing one thing and another, you always want to err on the side that would have the least impact. And we do that as part of our nuclear safety mantra and the way we live by.** That really dovetails quite well into **the conservative approach we take toward investing in our plants and making decisions such that contingencies are taken into account and planned for and don't give us reason to shut down our plants unexpectedly**.

(Tr. 127, 36-140) (Long Test.) (emphases added).

The desire to avoid shutting down its reactors led Southern to take a conservative approach to SNF management and to management of its spent fuel pools. The Government offered no testimony from any witness with training or experience in nuclear plant management regarding the basic decision model Southern uses in its nuclear plant management.

In addition, the Government has not provided Southern with any realistic basis upon which to plan for the Government's commencement of performance at any of its sites. Indeed, DOE

officials have recently announced that DOE has no schedule for removing SNF from Southern's reactor sites. (Kouts Dep. at 72; 4/12/05 (PDD 17); Zabransky Dep. at 30 (PDD 45); Tr. 1807-10 (Kouts Test.); Tr. 2001-03 (Zabransky Test.) As a result, in order to protect the operating capability of its most valuable generating assets, Southern has and must continue to plan conservatively to ensure that each nuclear plant is able to continue to operate assuming a continuing indefinite delay on the part of the Government. (Tr. 137-40) (Long Test.)

After initial expansions of pool capacity in the early 1980s, Southern had enough usable space in its pools through the early 1990s that the adoption of a specific policy regarding pool operating reserves was not critical to plant operation or planning. (Tr. 477-79) (Hunt Test.) Instead, it simply noted in various documents when the minimum safe operating reserve – 1 full core reserve ("FCR") – would be lost, *i.e.*, when the Hatch shared pool would lose the ability to discharge even one reactor core. *See, e.g.*, (DX 38, DX 39, DX 101, DX 104, DX 106, DX 312, DX 313, DX 324.) In addition, for planning purposes, Southern also monitored when each of its units would lose two (2) FCRs (or one FCR per reactor) in the shared pools. *See, e.g.*, (PX 789; PX 800; DX 208.)

As the prospect of the Government's delay in performing the Contracts began to impact Southern's planning for the operation of its plants, Southern's management was required to make plans regarding the timing of SNF storage expansions, which necessitated consideration of its pool operating reserve policy. (Tr. 161) (Long Test.). Messrs. Long, Wade, and McCallum testified that a reasonable short-term operating practice, regardless of whether the pool serves one or two reactors, requires that a nuclear plant operator maintain at a minimum sufficient space in the pool: (1) to accommodate the discharge of a complete reactor core into the pool in the event a reactor core must be completely unloaded in order to inspect, maintain, or repair the reactor; (2) to

accommodate any new fuel that must be loaded into the reactor through the pool at the next refueling; and (3) to maneuver tools, racks, new fuel and SNF for operating and maintenance purposes. (Tr. 144-51 (Long Test.); Tr. 954-55 (Wade Test.); Tr. 1366-77 (McCallum Test.)) The amount of usable space in a reactor pool is measured in the number of full core reserves ("FCRs") – the amount of space necessary to hold all of the fuel contained in a reactor core. As a long-term operating practice, the witnesses agreed that reasonable plant operation for a pool servicing two reactors, such as Plants Hatch and Vogtle, required that maintenance of 1 FCR for each reactor served by pool (*i.e.*, at least 2 FCRs for a shared pool).

**2. Reasons for Operating Reserve Policies.**

For the shared pools at Plant Hatch, Southern adopted a policy of one FCR per unit (or a total of two FCRs for a pool as the long-term operating practice in light of Southern's twin goals of safety and operational reliability.[55] (Tr. 145-50) (Long Test.) Southern's management also has concluded that one FCR is the minimum short-term requirement for reliable operation of Plant Hatch, so that one FCR was therefore the trigger for adding dry storage. Nonetheless, this short-term requirement did not change Southern's long-term objective of maintaining a 2 FCR reserve in Hatch's shared pool. (Tr. 144-51 (Long Test.); Tr. 945-57 (Wade Test.))

There are two principal reasons for the need to maintain 2 FCRs, or 1 FCR for each unit, for Southern's shared pools at Plant Hatch. First, because both units at Plant Hatch utilize the same reactor model, an NRC directive or other requirement to inspect or conduct work on the particular reactor design installed at Plant Hatch could require the offloading of the reactor core from both units. The availability of 2 FCRs in the Hatch pool would allow both cores to be

[55] Southern took a similar approach at Plant Vogtle. The Government has not challenged any of Southern's damages at Vogtle based on FCR issues.

offloaded simultaneously, substantially reducing the duration of the forced outage and enhancing the availability of the plant. (Tr. 955) (Wade Test.) As Mr. Long explained, the potential over the long term for both reactors at Plant Hatch to be simultaneously shut down and the cost of such a shut down economically justifies maintaining a long-term target operating reserve of 1 FCR for each reactor. (Tr. 145-49) (Long Test.) However, because of the Government's partial breach of the Contracts, Southern is currently operating at less than 1 FCR per unit at Hatch and is recovering the additional FCR gradually over time. Mr. Long explained that this approach made sense, based on the relatively low probability of needing both reserves in the short term versus the relatively higher probability of needing both reserves over the remaining life of the plant as the plant ages:

> Q. Well, if it is so important to have dual core off-load capability, why haven't you recovered it already [at Plant Hatch]?
>
> A. Because it is a risk management kind of decision that you make. Not all decisions are black and white. There is a probability of having to off-load one core at a time. There is a less probability to have to off-load two simultaneously.
>
> But as our plants grow older, get older, I think that the probability increases, and, therefore, we made a short-term judgment that we can live with something happening and us being able to kind of manage through that problem by doing this, and this, but we would really like to have dual core off-load capability. So we're working as a matter of policy to try and, for our system, to have the capability.

(Tr. 148-49) (Long Test.)

The second principal reason for Southern's management's preference for maintaining 1 FCR per reactor, or 2 FCRs total, at Plants Hatch and Vogtle is to guard against contingencies in the dry cask loading process that could impact operational reliability. A problem with any of the number of factors that go into a casks loading campaign (*e.g.*, late arrival of or defect in casks, the unavailability of internal and contract labor, the malfunctioning of cranes, the malfunctioning of

helium evaporators, the late arrival of or defect in canisters, stop-work order from the NRC) could result in a delayed loading of SNF from the pool to the ISFSI. (Tr. 956-57) (Wade Test.) Indeed, at another nuclear plant, the NRC stopped cask loading campaigns for well over a one-year period. (Tr. 1163) (Bland Test.)

During each refueling outage, Plant Hatch loads approximately three and one-half casks – the minimum amount required to maintain a stable level of SNF in the pool. (Tr. 957-58) (Wade Test.) Thus, if Plant Hatch maintained an operating reserve of only 1 FCR total for the entire shared pool, an unexpected delay in a single loading campaign followed by a regular discharge of SNF would bring the operating reserve below the 1 FCR for the entire pool. At that point, a need to offload the core from either reactor would force that reactor to shut down because there would be insufficient space in the pool to offload. The shut down of the nuclear reactor would force Southern to generate or purchase replacement electricity at a substantially higher cost. (Tr. 136-39) (Long Test.).

The Plant Hatch pool has 6078 spaces for SNF assemblies, including 168 that were added in 2000 to the bathtub area. (PX 594 (Neuberger Report), at Ex. 3 – Actual Scenario – Fuel Model Assumptions, *id.* at Hatch SNF Inventory Tallies); Tr. 1495 (Metcalfe Test.)) Each Hatch reactor contains 560 fuel assemblies in the reactor core, approximately 35% to 40% of which are removed each refueling outage. *See* (Tr. 141) (Long Test.) Therefore, the Plant Hatch pool can hold 5518 assemblies while maintaining one FCR and 4958 assemblies while maintaining a 2 FCR operating reserve. (Tr. 1516 (Metcalfe Test.); PX 656 (Kenrich Fuel Mgmt. Model), at KRG 00681.) With the addition of an extra set of racks that were purchased but not installed in 2000, the Plant Hatch capacity could have been expanded to 6245 spaces, which would have allowed 5685 assemblies to be stored in the pool while maintaining one FCR and 5125 assemblies while

maintaining an operating reserve of 2 FCRs. (PX 594 (Neuberger Report), at Ex. 3 – But for Scenario; *id.* at Hatch SNF Inventory Table.))

The Plant Vogtle pool had spaces for 2276 SNF assemblies before the addition of racks in 1999 containing an additional 1188 spaces. (Tr. 317-19) (Cocherell Test.) Each Vogtle reactor core contains 193 assemblies. ((PX 594) (Neuberger Report) Ex. 3 – Actual Scenario – Fuel Model Assumptions; *id.* at Vogtle SNF Inventory Table.) Therefore, the Plant Vogtle capacity with one FCR would have been 2083 assemblies before the 1999 re-rack. (*Id.*)

Plant Farley is a two-unit reactor with a separate dedicated SNF pool for each reactor. (Tr. 134) (Long Test.) Plant Farley has space for 1358 SNF assemblies in the Unit One pool and 1386 assemblies in the Unit Two pool. (PX 594 (Neuberger Report) Ex. 3 –Model Assumptions – Actual Scenario.) Each reactor core contains 157 assemblies. (*Id.*) Unlike Plant Hatch, however, the entire reactor core is placed in the Plant Farley pool each time the reactor is refueled. (Tr. 1365-71) (McCallum Test.) Thus, each pool must maintain available space for a minimum of 1 FCR plus enough additional space to hold the new fuel being loaded into the reactor, approximately 65-69 assemblies. (*Id.*) Southern's nuclear plant managers determined that it was appropriate to use 1 FCR plus enough space for two loads of fresh fuel as an operating reserve. (*Id.* at 1364-77; PX 869.) The Government offered no testimony of any witness with nuclear plant operating or management experience regarding the appropriate reserve capacity at Plant Farley. To avoid the construction of dry storage at Plant Farley, DOE would have had to remove only one reload prior to the fall of 2005, (Tr. 166) (Long Test.), which clearly would have been the case had DOE performed as required by the Contracts. Had DOE performed, no dry cask storage would have been added at Plant Farley (Tr. 315) (Cocherell Test.)

### B. Southern Would Not Have Required Dry Cask Storage Had the Government Performed as Required by the Standard Contracts.

#### 1. The Parties' Experts Agree that Southern would have Avoided Dry Storage at Plant Hatch had the Government Performed.

Had the Government commenced industry-wide performance in 1998 at the 3000 MTU annual rate, with a five-year ramp-up period, it would have begun removing SNF from Plant Hatch no later than 2001, from Plant Farley no later than 2002, and from Plant Vogtle no later than 2006. ((PX 594) (Neuberger Report) Ex. 3 – But for Scenario – SNF Inventory Tables for Hatch, Farley, Unit 1, Farley Unit 2, and Vogtle); Tr. 1513 (Metcalfe Test.)) The Government concedes that, had DOE performed at this rate, Southern would not have required additional dry storage at any of its plants. (PX 594 (Neuberger Report), at 17.) In addition, DOE's removal of SNF from Southern's reactor pools would have created valuable empty space that could be used to enhance the operational reliability of the plants, as well as for maintenance, testing, and other nuclear pool operations. (Tr. 2121, 2144 (Neuberger Test.); Tr. 144-51 (Long Test); Tr. 954-55 (Wade Test.); Tr. 1366-67 (McCallum Test.))

#### 2. Southern would have Installed the Second Bathtub Rack had the Government Performed.

Had DOE performed at the 3000 MTU annual rate, it would have picked up enough SNF at Plant Hatch by 2002 to allow that facility to maintain the preservation of the minimum 1 FCR operating reserve for the shared pool without the addition of dry storage capacity. (Tr. 962 (Wade Test.); PX 594 (Neuberger Report) at 17.)) In the non-breach case, in order to maintain a minimum reserve of 1 FCR until 2002, Southern could have installed an additional rack in the bathtub region of the Hatch reactor pool. (Tr. 160-62) (Long Test.) This would have provided an additional 167 assemblies of SNF storage space, enough for one refueling, at an installation cost

of $419,800. (*Id.* at 101; Tr. 262 (Cocherell Test.); Tr. 1532 (Metcalfe Test.)) The temporary installation of the second bathtub rack in the non-breach scenario, if necessary at all, would be reasonable because it would enable Southern to avoid the construction and operation of the dry storage facility. (Tr. 160-62 (Long Test.); Tr. 1532, 1688-89 (Metcalfe Test.)) The extra 167 assemblies of space would have allowed the Hatch pool capacity to last until 2002, by which time DOE would have removed 520 SNF assemblies from the Plant Hatch pool, not only maintaining the minimum 1 FCR but also making significant progress in recovering the valuable second FCR. (Tr. 307-09 (Cocherell Test.); Tr. 161-62 (Long Test.); Tr. 962 (Wade Test.))

**C. The Dry Storage Facilities Were Required at Plant Hatch in the Breach Case.**

When it became clear that the Government would breach the Contracts by not removing SNF from Southern's plant sites starting January 31, 1998, Southern had two options: (1) allow its reactor pools to fill up and its plants to shut down, or (2) provide for its own additional SNF storage facilities. *See, e.g.*, (PX 856 (Hatch Strategic Plan) at 10 (May 1997.)) Given the Government's history of non-performance and the Government's lack of clarity as to when and at what rate it would perform in the future, Southern's management concluded that long-term dry cask storage, first at Plant Hatch, then at Plant Farley, and in the future at Plant Vogtle, presented the best option for dealing with the dilemma created by the Government's breach. (*Id.*; Tr. 133, 165 (Long Test.); PX 865 (Farley Strategic Plan) at 15 (May 1997); PX 800 (Vogtle Strategic Plan) at SN 152238 (April 23, 1997.))[56]

---

[56] Southern constructed an ISFSI at Plant Farley in 2004 and began loading casks in 2005. (PX 225 (Plant Farley Dry Storage Schedule at SNCARE1985); (Tr. 1364-6, 1379-80) (McCallum Test.) Under the Federal Circuit's *Indiana Michigan* decision, the costs for the loading activities are not being claimed in this case. Similarly, the costs to be incurred in the future for building an ISFSI at Plant Vogtle will be claimed in subsequent litigation.

In a dry cask system, SNF is taken from racks in the pool and loaded into a metal canister that is welded shut, dried, and filled with helium. (Tr. 1285) (McCallum Test.) The canister is then placed inside a concrete cask, or overpack, that is then transferred outside the reactor building and placed on the ISFSI – consisting of a heavily-engineered reinforced concrete pad and a monitoring system. (*Id.* at 1191-94.) In planning its dry cask storage operation, Southern selected Holtec as its storage system vendor. Holtec supplies one type of canister that is useable in either a HI-STAR cask, that is licensed for both transportation and storage, or a HI-STORM cask, that is licensed only for storage. (Tr. 173-74) (Long Test.))

A HI-STAR cask can be lowered into the SNF pool for loading. (Tr. at 889-92) (McCallum Test.) The loading of a HI-STORM cask requires an additional step because the HI-STORM cask is not lowered into the pool. Instead, a transfer cask, known as a HI-TRAC cask, is submerged in the pool and a loaded canister is placed inside it. (*Id.* at 893-96.) The HI-TRAC transfer cask is then removed from the pool, and the canister is welded, dried, and filled with helium. (*Id.*) The HI-TRAC transfer cask is then placed on top of a HI-STORM cask, the bottom of the HI-TRAC is opened and the canister is lowered into the HI-STORM cask below. (*Id.* at 911.) The HI-STORM cask is then transferred to the ISFSI. (*Id.* at 913-14.)

At the time Southern began its dry cask storage efforts at Plant Hatch, the Holtec technology was very new and was not fully licensed, and the industry had limited experience in the construction and operation of dry storage facilities. (Tr. 178-80) (Long Test.); Tr. 1164 (Bland Test.) Moreover, some nuclear utilities had experienced failed attempts to implement dry storage systems. (Tr. 956-57 (Wade Test.); Tr. 1164 (Bland Test.))

Designing an ISFSI is closely akin to creating a new nuclear plant, (Tr. 1153-54) (Bland Test.) In order to implement a dry storage system at Plant Hatch, Southern had to conduct

extensive engineering design work, licensing activities, procurement and fabrication activities, construction activities, testing activities, and training for ISFSI operations. (*Id.*) The four Plant Hatch ISFSI pads are approximately 31 feet by 96 feet in size and made primarily out of steel and specially ordered concrete. (*Id.* at 1195-96 (Bland Test.); Tr. 2387 (Johnson Test.))[57]

Southern began the engineering and licensing work for the Plant Hatch ISFSI in 1998 and completed construction of the ISFSI for Plant Hatch in mid-2000. (Tr. 159) (Long Test.) The first three casks, containing 204 SNF assemblies, were loaded and placed on the ISFSI through the Summer of 2000. (PX 657 (Kenrich Fuel Mgmt. Model) at KRG00697, 701.) By December 31, 2004, Southern had purchased 22 dry casks for Plant Hatch, loaded them with 1496 SNF assemblies, and placed the loaded casks onto the ISFSI. (*Id.*) (Tr. 1508-1510) (Metcalfe Test.)[58]

### D. The Government's Position Regarding the Number of Casks.

The Government's economist, Dr. Neuberger, acknowledged that Plants Hatch and Farley would not have needed to add dry storage and that Plant Vogtle would not have needed to re-rack had the DOE performed at the 3000 MTU rate. (Tr. 2110, 2123 (Neuberger Test.); PX 594

[57] In order to implement a dry storage system at Plant Farley, Southern had to conduct the same type of engineering design, licensing, procurement and fabrication, construction, testing and implementation activities as it did for Plant Hatch. (Tr. 1195-96) (Bland Test.); (Tr. 1297-1325) (McCallum Test.)) The three Farley ISFSI pads are approximately two feet thick and can hold up to twelve casks each – in a two-by-six array. (Tr. 1312-19) (McCallum Test.) The three Farley ISFSI pads are constructed out of highly engineered steel and concrete. (Tr. 1318-19) (McCallum Test.)

[58] Because of the Government's partial breach, Plant Vogtle procured and installed additional SNF pool racks during the period of 1998 to 2000. (Tr. 167-68); (Long Test.) (Tr. 278-83) (Cocherell Test.) This allowed Southern to delay building dry storage facilities at Plant Vogtle until 2015. (*Id.*; Tr. 1613) (Metcalfe Test.)) Southern has adopted a plan to begin expending funds for dry storage at least by 2010, and to complete the design, license, engineering, and construction of a dry storage facility at Plant Vogtle to be operational by 2015. (*Id.*) Based on the rate of SNF discharged from its reactors, Plant Vogtle would lose 1 FCR per reactor, or 2 FCR total, in its shared pool in 2015 if it does not add storage capacity. (*Id.* at 1613-14) (Metcalfe Test.)

(Neuberger Report) at 17.)) Dr. Neuberger's testimony consisted of alternative simulations of Southern's cask loading campaigns intended to show that Southern could have loaded less SNF into casks than it has actually loaded without losing a single FCR at Plant Hatch. (Tr. 2115-45) (Neuberger Test.) Neuberger assumed a maximum of 1 FCR in the shared pools in his alternate simulation of the HNP model without any technical basis for doing so, and he acknowledged that he lacked any experience in the operation of a nuclear power plant. (*Id.* at 2033-34, 2098-99.) The Government presented no expert or lay testimony of a witness with nuclear engineering experience or nuclear management experience upon which Dr. Neuberger could have relied in rejecting Southern's management's decision regarding the size of an operating reserve.

In selecting a 1 FCR operating reserve for the shared Hatch pool, Neuberger conceded that he simply assumed away Southern's operational and engineering factors considered by Southern's nuclear engineers and managers in developing the operating reserve target of 1 FCR per reactor. (*Id.* at 2065, 2129.) Neuberger also conceded that his simulations would result in fewer SNF assemblies being loaded than if DOE actually performed, and that Southern's actual loading campaigns did not load as many assemblies as DOE would have loaded at the 3000 MTU acceptance rate. (*Id.* at 2123, 2141, 2144-45.). Thus, Dr. Neuberger conceded that neither his simulations nor Southern's actual loading campaign put Southern in as good a position relative to the space in its SNF pools as DOE performance at the 3000 MTU rate. (*Id.* at 2144-45.)

The Government's accountant, Mr. Johnson, merely calculated the monetary impact of Dr. Neuberger's simulations. (Tr. 2194, 2369) (Johnson Test.) Based on Dr. Neuberger's simulations showing that the maintenance of a maximum of 1 FCR at Plant Hatch required Southern to load only 9 casks, rather than the 22 actually loaded, Mr. Johnson asserted that Southern's damages should be reduced by the cost of purchasing and loading 13 (*i.e.*, 22 casks – 9 casks) casks. (*Id.*

2300, 2366.) Mr. Johnson's adjustments, however, failed to account for the cost of additional racks in the so-called "bathtub" area of the Plant Hatch pool that Dr. Neuberger's simulations assumed would be installed. (*Id.* at 2400-07.)

**E. The HI-STAR Issue.**

This issue centers on the reasonableness of the decision by Southern's nuclear engineers and managers to load SNF into three HI-STAR casks at Plant Hatch in 2000. Based on his economic model, Dr. Neuberger has concluded that Southern was not required to load any casks at Hatch in 2000. (Tr. 2054) (Neuberger Test.) Instead, Dr. Neuberger concluded that Southern should have begun loading SNF in 2001, using the less expensive HI-STORM casks. (*Id.*) As described below, the Government's position on this issue does not reflect the practical realities of operating a nuclear utility.

**1. The Development and Commencement of Operation of the Plant Hatch Dry Fuel Storage Facility.**

The design, licensing and construction of the ISFSI is similar to the design, licensing and construction of a small nuclear power plant in terms of effort and complexity. (Tr. 1153-54) (Bland Test.) Because the loading and storing of SNF casks entails a long lead time, Southern began planning for cask loading and storage on an ISFSI in the late-1990s. (*Id*. at 1182-84.) As David Bland, who served as Southern's Plant Hatch Dry Storage Project Manager, testified:

> To create a facility – again, remember our end date, which was in the summer of 2000, we needed to have loaded three systems to maintain single-core offload. To be able to achieve that requires a long line of successful activities. We've got to build these pieces of equipment that can take as much as a year to do. We've got to construct the facilities on which they're doing it, which again can take as much as a year to do. We have to -- before we can do either of those, we have to produce the designs under which we'll do that work, which takes from six months -- six to

> nine months to do. So in reality, for a load to occur in the summer of 2000, we're back in mid '98, late '98, no later than early '99 making decisions about what we're going to load or we're not going to make it. "

(Tr. 1180-83) (Bland Test.)

As Southern had never undertaken the long lead-time and complex task of the engineering, licensing and construction of an ISFSI, and the execution of a SNF cask loading campaign, Plant Hatch's management targeted mid- to late 2000 for the commencement of operation of the Plant Hatch facility. At the time the decision was made to conduct the actual loading campaign, Plant Hatch had enough licensed capacity units in its SNF pool to maintain a 1 FCR total operating reserve for both units after the 2001 refueling outage. (*Id.*) By choosing to load casks a few months ahead of the loss of the minimum reserve, Southern sought to give itself time to deal with any unexpected delays in licensing or construction of the facilities, or in the acquisition and loading of casks. (Tr. 955-57) (Wade Test.) Although the licensing process was underway to authorize the installation of additional racks that would maintain the 1 FCR until 2000, that process had not been completed when the decisions regarding the dry storage operation were made, and neither the timing nor the result were certain. (Tr. 1223-26 (Bland Test.); DX 217 (Letter from Louis Sumner to Charles Hawney, NRC) (Apr. 13, 1998.))

Even with the additional racks, which were licensed by NRC in March of 2000 and installed in the Plant Hatch pool thereafter, had the performance of cask loading and the ISFSI storing campaign not been successfully implemented in late 2000, the operating reserve at Plant Hatch would have fallen below the minimum of 1 FCR, with the next scheduled discharge due in early 2001. (Tr. 1180) (Bland Test.) By adding 167 spaces through additional racks in the bathtub area of the Hatch pool, and by loading successfully in 2000, Southern maintained its minimum operating reserve of 1 FCR through 2000, and then began to build back toward its long-term operating reserve target of 1 FCR per reactor, or 2 FCRs total for the shared pool.

The timing of the initial Plant Hatch loading campaign was, therefore, reasonable and based on sound nuclear operating principles. The Government offered no evidence other than its economists, Dr. Neuberger's, manipulation of a spreadsheet showing actual loading schedules to support the Government's contention that Southern should have waited until 2001 to begin to load casks at Plant Hatch.

#### 2. Southern's Decision to Purchase the HI-STAR Casks Was Reasonable When Made.

The first three SNF casks that Southern purchased for Plant Hatch were HI-STAR casks. (Tr. 175) (Long Test.) HI-STAR casks can be used for both SNF storage and transportation. (*Id.*) They are also more expensive than the remainder of casks that Southern purchased – HI-STORM casks – that can be used only for storage of SNF. (*Id.* at 173.) The decision to purchase HI-STAR casks for the initial loading campaign at Plant Hatch was based primarily on their progress in obtaining a license from NRC relative to the HI-STORM casks, as Mr. Long explained:

> Q. [A]t the time you had to make a decision about what kind of overpack you were going to use, where was the HI-STORM compared to the HI-STAR in terms of regulatory approval?
>
> A. It [the HI-STORM] was behind it [the HI-STAR]. Because all – the HI-STORM didn't get licensed until like 2000, at the time we loaded our cask for the HI-STAR. So it's licensing was behind …. We would have been – well, we picked the system that was going through the licensing process first, that was due to get out first, so it could be licensed on our site where we could use it. And we were in a rush for time. So that's why we chose to do what we did.

(Tr. 186) (Long Test.)

In addition, Mr. Bland, testified:

> Q. Okay. And do you recall in early '99 where HI-STAR was in that process?
>
> A. In early '99, we had gotten the NRC to agree that it was safe. I don't think we had yet the certificate done, not even sure we were very far through the

rule-making process. It's a little bit fuzzy, but we really got a lot of that stuff towards the end of '99, early 2000.

Q. And where was HI-STORM?

A. HI-STORM was lagging. Now, by lagging, remember, the [M]PC itself had now been reviewed by the NRC and endorsed as a safe product and so what the review for the HI-STORM was focusing on was the other two overpack components that are unique to the HI-STORM. But they still required review because they did provide safety functions and they still required evaluation. And even once that was complete, they had to go through this rule-making process as well because they were unique components with regard to that work too. And so to my memory, at least in the '99 time frame that -- well, frankly, that process is hard to predict, you know? Because as long as there's one more question on a technical reviewer's mind, even if there's only one question, it could be three years before you get a final answer. So you can't very well predict rule making and evaluation process, you can only try your best to manage it.

(Tr. 1182-84) (Bland Test.)

Thus, at the time its managers and engineers were required to decide which cask would be used for the initial loading campaign, the HI-STAR cask design was the only Holtec design that had progressed far enough in the NRC licensing process to provide any confidence that they would be available when needed. (*Id.*) In contrast, at the time of the decision there was no way to predict when the HI-STORM would be licensed. (*Id*.)

In addition to the relatively greater certainty that the HI-STAR casks would be available when needed, the HI-STAR casks had the extra function of transportability that would allow the Government to transport the casks away from the reactor site to, for example, Yucca Mountain, or an MRS, or would allow Southern to transport SNF to the PFS facility in Utah. (Tr. 185) (Long Test.) At the time the decision was made to purchase the HI-STARs, the Government had not announced that it would not accept transportable casks. (Zabransky Dep. at 54-55, April 12, 2005) (PDD 45.) To the contrary, the Government was encouraging the use of multi-purpose

canisters (*i.e.*, canisters that could be used to store and transport SNF) that would have been housed in the HI-STAR casks.[59]

Finally, DOE has announced that it will not accept Southern's SNF in canisters such as those being stored on the Southern ISFSI. (Zabransky Dep. at 55, 4/12/2005 (PDD 45.)) As a result, the SNF stored in canisters on Southern's plant sites will have to be removed from the canister in order to deliver it to the Government. (*Id.*) Unless the Government removes a significant amount of Southern's SNF prior to the decommissioning of the plant, a prospect that appears most unlikely given the Government's acknowledgement that it currently has "no plan" to pick up Southern's SNF, Southern's SNF pools would likely be shut down and unavailable for the removal operation. (Tr. 1910 (Pollog Test.)) In that event, Southern would be forced to ship SNF offsite to be removed from its canisters in order to deliver the SNF to the Government.[60] (Tr. 173-74 (Long Test.)) The reusable HI-STAR casks could be used for that purpose. (*Id.*)

**3. Costs Associated with Use of HI-STARs.**

The Government's accountant, Mr. Johnson, testified that it was unreasonable for Southern to have purchased the three HI-STAR casks because the Government's economist, Dr. Neuberger, asserted that Southern did not need to load casks in 2000, and the less expensive HI-STORM

[59] *See infra* note 81.

[60] Of course, the cost of removing the SNF from the canisters, disposing of the canisters, and loading it into new containers provided by the Government would be recoverable because placement of the SNF in Southern's canisters in the first place was the proximate result of the Government's breach. Such casks would be the subject of a future action under this Court's Order of December 20, 2004.

casks became available by 2001 (Tr. 2270-71) (Johnson Test.)[61] Mr. Johnson had no basis for his opinion other than Dr. Neuberger's simulations that showed Southern loading its first SNF in 2001 and that Southern, having purchased a sufficient number of HI-STARs to be able to ship a cask off site if necessary, began to use HI-STORM. (Tr. 2257-58, 2269-70, 2368) (Johnson Test.)) Mr. Johnson asserted that the following costs should be excluded from Southern's damages based on his contention that they are solely attributable to the three HI-STAR casks used by Southern in its initial loading campaign.

[61] Mr. Johnson further testified that he excluded the Hi-STAR casks at the request of the Government's counsel. (Tr. 2270-71) (Johnson Test.)

| **Item**[62] | **Cost** |
|---|---|
| Cask procurement costs of the first three HI-STAR casks | $ 3,458,904 |
| Southern Company Services HI-STAR system specific engineering work | 50,362 |
| Williams Power labor performed under temporary MWOs related to HI-STAR system | 135,696 |
| Construction of a HI-STAR upender pad | 803,404 |
| Gantry Crane rails for Hl-STAR upender pad | 105,697 |
| Holtec International NRC demonstration costs for HI-STAR system | 1,125,407 |
| NRC demonstration costs for HI-STAR system | 606,897 |
| Rail cars leased for HI-STAR operations | 108,645 |
| 900 Gantry Crane used for the 2000 loading campaign | 80,752 |
| HI-STAR closure materials | 161,784 |
| Manatowak Crane leased for the 2000 loading campaign | 682,887 |
| HI-STAR Cask Cradle cancellation charges | 168,240 |
| Cancellation charges due to transition in lifting equipment from HI-STAR to HI-STORM operations | 30,606 |
| HI-STAR Cask Cradle | 225,983 |
| Metal plates used to test HI-STAR Cask Cradle | 99,732 |
| Holtec engineering analyses related to the HI-STAR system | 57,583 |
| Cradle Drop Analysis related to HI-STAR system | 125,000 |
| Leasing of a rail car to transport the HI-STAR casks to the plant site | 87,500 |
| Williams Power labor for maintenance of HI-STAR casks | 15,713 |
| Holtec delay charges related to the 2000 loading campaign | 280,000 |
| Materials related to loading of the first three casks | 50,491 |
| Williams Power labor relating to loading the first three casks | 477,172 |
| Other contract labor related to loading the first three casks | 595,063 |
| Total HI-STAR System Related Costs | 9,533,518 |
| Upender Pad | 5,083,728 |
| Adjustment to Rail Car Costs | (50,000) |
| Leasing of 90 Ton HTC crane | 21,359 |
| Strong back support beam | 223,250 |
| Expediting charge for vertical cask transporter or "crawler" | 108,000 |
| Updated Total: | **$14,919,855** |

[62] *See* (Tr. 2295-96 (Johnson Test.) (cask procurement); *Id.* at 2297 (Southern Company Services Engineering); *Id.* (Williams Power Labor); *Id.* at 2269 (Upender Pad); *Id.* at 2280 (Gantry Crane); *Id.* at 2284-85 (Holtec Demonstration Costs); *Id.* at 2304 (NRC Demonstration Costs); *Id.* at 2285-86 (Railcars); *Id.* at 2286 (900 Gantry Crane); *Id.* at 2288 (HI-STAR Closure Materials); *Id.* at 2288-89 (Manatowak Crane); *Id.* at 2282 (Cask Cradle Cancellation); *Id.* at 2287 (Cancellation Charges for Lifting Equipment Transition); *Id.* at 2281 (Cask Cradle); *Id.* at 2282 (Metal plates); *Id.* at 2296 (Holtec Engineering); *Id.* at 2297 (Cradle drop analysis); *Id.* at 2298 (Leasing of Railcar); *Id.* (Williams Power Maintenance Labor); *Id.* at 2303 (Holtec Delay Charges); *Id.* at 2305 (Materials relating to loading); *Id.* (Williams Power Loading Labor); *Id.* (Other Contract Labor); *Id.* at 2271-72 (Upender Pad); *Id.* at 2289 (Leasing of 90 ton crane); *Id.* at 2290 (Strong Back Support); *Id.* at 2291 (Expediting Charge for Crawler).

Mr. Johnson's HI-STAR adjustment includes over $5 million of SCS engineering costs for the design of the "upender pad" at Plant Hatch's ISFSI, and he testified that those costs should be disallowed because of their relationship to the HI-STAR casks. (Tr. 2370-2371) (Johnson Test.) The upender pad is used to stand the HI-STAR casks upright upon delivery. (Tr. 1235-38) (Bland Test.) The $5 million adjustment includes the cost of all ISFSI engineering performed between 1998 and 2000. (Tr. 2373) (Johnson Test.) Mr. Johnson included these costs because the upender pad design was included in the work order for the ISFSI engineering and based on his understanding that the upender design work was done between 1998 and 2000. (Tr. 2373-74) (Johnson Test.).

At trial, however, the testimony of Mr. Bland that only a few hours of engineering time in 1999 went into designing the upender pad was undisputed (Tr. 1242-1243) (Bland Test.) Mr. Bland also testified without dispute that SCS simply took the design for the entire ISFSI and scaled it down for the upender pad. (*Id.* 1259) Mr. Johnson was unaware of this trial testimony at the time he decided to disallow the cost and could not identify evidence that the work on the upender was done in 1998 or 2000. (Tr. 2390) (Johnson Test.) Moreover, Mr. Johnson conceded that his adjustment for the upender pad amounted to 77% of the entire engineering cost of the Hatch ISFSI, while the area of the upender pad was only approximately 7% as large as the total area of the ISFSI. (*Id.* at 2388-92). Mr. Johnson conceded that the testimony provided by Mr. Bland was "inconsistent" with his position to disallow 77% of the total engineering costs for the Hatch ISFSI on account of the upender pad and to exclude over $5 million from Southern's claim. (*Id.*)

### F. Southern's Use of Internal Labor and Allocation of Overhead.

In adding SNF storage capacity, Southern, in part, used its own workforce and supervisors. (Tr. 169) (Long Test.) Southern used its own forces where feasible because they were more reliable, better trained and less expensive than outside contractors. (*Id.* at 168-72; Tr. 1125-28 (Wade Test.)) In order to work on the dry storage project or load casks, these employees had to be taken from other maintenance duties at the plants, resulting in maintenance backlogs. (Tr. 169-71) (Long Test.) As noted by Mr. Wade and Mr. Long at trial, Southern's decision to utilize internal labor allowed Southern to minimize the damages resulting from the Government's breach, and such decision resulted in an incremental cost to Southern because such employees were unable to work on other backlogged maintenance projects that would have benefited the company. (Tr. 1125-28) (Wade Test.) Southern used its standard accounting practices to allocate labor and supervision costs to the SNF project, just as it does for other projects not a part of this litigation. (Tr. 1565-69) (Metcalfe Test.). Moreover, Southern's allocation is consistent with generally accepted accounting principles and accounting practices required by the Alabama PSC and the Georgia PSC. (*Id.*)

### G. Private Fuel Storage.

In an effort to protect against the uncertainties associated with implementing a dry storage system and to reduce the likelihood of having to shut down its reactors because of the Government's impending partial breach, Southern joined with several other nuclear utilities to develop the Private Fuel Storage ("PFS") project in Utah in the mid-1990s. (Tr. 186-87) (Long Test.). The purpose of the PFS project was to construct a privately operated ISFSI. (*Id.* at 186.) SNF would be shipped from reactor sites to the PFS facility in Utah. (*Id.*) Much like the Government's proposed MRS facility, the proposed PFS facility would allow participating utilities

to store SNF until the Yucca Mountain repository becomes operational. (*Id.* at 186-87.) Southern made the decision to participate in PFS in the mid-1990s, at a time when DOE's future performance, and the feasibility of onsite SNF storage were subject to great uncertainty. (*Id.* at 187.) Utilities in other States had faced local political opposition to onsite storage and expensive taxation, and the NRC licensing process was untested. (*Id.* at 187, 205-6.) Southern made $8,466,674 in payments to PFS between 1995 and 2004. (PX 715 at KRG00230.)

In February 2002, prior to Southern's payments to PFS in 2002 to 2004, DOE issued a draft Environmental Impact Statement for a Geologic Repository for the Disposal of Spent Nuclear Fuel and High-Level Radioactive Waste at Yucca Mountain, Nye County, Nevada, that stated:

- "There are a number of possibilities that DOE could pursue, ........ One such centralized storage possibility, the proposed Private Fuel Storage Facility for commercial spent nuclear fuel in Utah, is currently in the Nuclear Regulatory Commission licensing process."

- "There are a number of possibilities that the Nation could pursue, ....... One such centralized storage possibility, the proposed Private Fuel Storage Facility......"

- "DOE recognizes interim storage at the Private Fuel Storage facility in Utah to be a reasonably foreseeable future action and has included this proposed action...."

(PX 817 (DOE's Environmental Impact Statement) at 39, 108, vol. III § 9.1.)

The NRC approved the license for the PFS facility on September 9, 2005. (Tr. 339-40) (Cocherell Test.) Southern made payments to PFS in 2002, 2003, and 2004 totaling $1,152,600 after DOE publicly made the above statements confirming the reasonableness of PFS. (PX 428, SNOC007755, 7758, 7761, 7764; PX 715 at 3178.))

After five years of operating its Hatch ISFSI and one year of operating its Farley ISFSI without restrictions by the Georgia or Alabama public service commissions or expensive tax

increases by the legislature of each State, Southern' s nuclear plant managers made the decision to discontinue contributions to PFS. (Tr. 205 (Long Test.); DX 338.)

The Government offered no witness with any nuclear plant management experience to testify as to whether Southern's nuclear plant management's decision to pursue PFS as an option in the event of difficulty in implementing dry storage was unreasonable mitigation.

**H. Miscellaneous Adjustments.**

**1. Work platform for cask loading.**

The Government asserts that the costs related to a movable work platform used at Plant Hatch to support workers while they are welding or bolting the top on a cask before the cask is moved to the ISFSI or offsite storage facility is a non-incremental cost. (Tr. 2364-65 (Johnson Test.) Had DOE performed, however, Southern believes that DOE would have provided such loading equipment. As Jim Wade testified at trial, Southern believes that DOE would have supplied this item had it not breached the Contracts:

> Q. But you would agree Southern Nuclear would need the 228-foot platform to load to a DOE cask, is that right?
>
> A. I don't – well, we would have assumed that the DOE would have provided access to the top of their casks, but since we have it, you [DOE] can use it.

(Tr. 1063-64) (Wade Test.)

Mr. Wade's assumption is supported by the language in the Standard Contract that acknowledges DOE will supply equipment necessary to load the cask:

> DOE shall arrange for, and provide, a cask(s) and all necessary transportation of the SNF and/or HLW from the Purchaser's site to the DOE facility. Such cask(s) shall be furnished sufficiently in advance to accommodate scheduled deliveries. Such cask(s) shall be suitable for use at the Purchaser's site, meet applicable regulatory requirements, and be accompanied by pertinent information including, but not limited to, the following:

. . . .

Sufficient documentation on **the equipment supplied by DOE**.

Standard Contract Section IV (B)(2)(emphasis added).

### 2. Standby Welding Time.

To weld casks closed, Southern originally hired contract welders during the first loading campaigns at Plant Hatch. Because the welders are not constantly welding, they charged Southern "standby time," while they waited to weld the next cask. Jim Wade testified:

> Q I want to ask you a question or two about welding. I believe Mr. Ekman had asked you a few questions about downtime for welders. Do you know if that's industry practice for companies to pay downtime for welding?
>
> A That is my normal understanding. I mean, you know, we went to Welding Services to hire welders that were prequalified, precertified to make these welds. And my understanding is that they get normally a 40-hour week and we reserve those welders for that. Best of my understanding is it is not an uncommon practice to do that throughout the industry.

(Tr. 1129-1130) (Wade Test.)

It's industry practice for contractors to charge downtime. (*Id.*) Welders that have been specially trained to weld dry storage casks, who are working on a plant site miles from other possible job sites, charge down time when you require them to be on site but not working. (*Id.*) In short, Southern's nuclear plant managers decided that paying welders for standby time between cask loadings was reasonable in loading and closing the casks before they were placed outside on the ISFSI. (*Id.*)

## I. Southern's Cost of Capital

Mr. Metcalfe, Southern's damages expert, testified concerning the cost of funds required to develop additional SNF storage capacity. (Tr. 1542-51) (Metcalfe Test.) While Southern did not

borrow money specifically to finance the dry storage projects, Mr. Metcalfe testified that the cost of funds committed to the SNF storage expenses is a real economic cost to Southern and is a required element of damages in this matter in order to make Southern economically whole for DOE's partial breach. (*Id.* 1542.) Specifically, the cost of capital accounts for the impact of inflation on dollars and the cost of money in the credit and equity markets. (*Id.* at 1542-43.) Mr. Metcalfe testified that utilities regularly account for a portion of the cost of capital for construction period interest as Allowance for Funds Used During Construction ("AFUDC"), which is computed at a rate that includes both credit and equity components. (*Id.* at 1543-50-51.)

To compute Southern's cost of capital, Mr. Metcalfe estimated the weighted average cost of capital for APC and for GPC and its co-owners of Plants Hatch and Vogtle. (Tr. 1545-46) (Metcalfe Test.) These costs approximated the cost for going into the credit and equity markets to obtain capital – also equivalent to the "hurdle rates" that Southern used to determine whether to engage in a new project. (*Id.* at 681.) Of course, capital used for storing SNF was capital that Southern could not use for other projects.

Mr. Metcalfe explained that his cost of capital computations did not constitute "pre-judgment interest" for several reasons. First, the rate used to compute the cost of capital differs based on the weighted cost of debt and equity each year, while the rate for pre-judgment interest is fixed regardless of capital market changes. (Tr. 1547-48) (Metcalfe Test.) Second, the cost of capital is a separate component of damages – a real economic cost of money spent on SNF storage facilities, while pre-judgment interest is simply an add-on to all cost components including the cost of capital. (*Id.* at 1548-49.) Third, Federal Energy Regulatory Commission ("FERC") rules recognize the cost of capital as a real cost in computing such costs for AFUDC. (*Id.* at 1550-51.)

## SUMMARY OF THE ARGUMENT

Southern's damages claim is based on the difference between the cost of SNF storage and management it would have incurred through December 31, 2004 had the Government performed at the 3000 MTU SNF acceptance rate and the costs it has actually incurred because of the Government's failure to perform at any rate of acceptance. Of $101 million in damages, the Government concedes well over $38 million in damages if the 3000 MTU rate is applied to Southern's damages claim and concedes over $16 million in damages if the Government's purported rate of 900 MTUs per year were to be applied.

The measure of damages applicable to this claim is that which would place Southern in as good a position as if the Government had performed in accordance with the Contract. Similarly, Southern is entitled to recover the costs of mitigating the harm of the Government's breach unless the Government can prove that Southern's actions were unreasonable.

The Contracts clearly provide that the Government was to commence the removal of SNF from nuclear plant sites on January 31, 1998, that it was to do so as "expeditiously as practicable" based on the date of the discharge of SNF from the various reactor sites, with oldest fuel entitling the owner to priority over newer fuel, and that the Government was to continue to remove SNF from the reactor sites until all of the fuel was removed. The evidence also establishes that DOE understood at the time of contracting that it was obligated to remove SNF at a rate sufficient to eliminate the necessity for plant owners to add storage capacity for SNF after January 31, 1998 and that the rate should be high enough to eliminate the backlog of SNF on plant sites by the time the plants had concluded decommissioning the buildings and other structures on the plant site. Finally, the evidence clearly establishes that an SNF acceptance rate of 3000 MTUs per year is the aggregate industry acceptance rate that accomplishes the aforementioned requirements most

efficiently and the DOE has adopted that rate as the design basis for its SNF disposal program for that reason.

The Contracts do not explicitly set out an acceptance rate for SNF, therefore the Court must determine the acceptance rate based on the reasonable expectations of the parties to the Contract. As demonstrated above, the 3000 MTU rate adopted by the Government as the design basis for its SNF disposal program clearly is a reasonable rate and is within the expectations of the parties. The alternative rate advocated by the Government of 900 MTU per year is clearly not reasonable. The 900 MTU rate was based on the assumed repeal of statutory restrictions on the construction and operation of a hypothetical monitored retrievable storage (MRS) facility that was never proposed in Congress, let alone enacted. Further, the rate was abandoned as a planning basis by DOE in 1994, when the effort to site and construct the MRS facility ceased. Finally, the 900 MTU rate accomplishes none of the requirements that the parties to the Contracts understood to be the obligation of the Government and executives of DOE agree are the objectives of the NWPA.

Assuming the applicability of the 3000 MTU rate, the Government asserts that Southern's damages should be reduced to approximately $39 million based on contentions that (1) Southern has loaded an excessive number of SNF assemblies into dry storage facilities constructed at the site of GPC's Plant Hatch; (2) Southern purchased three HI-STAR storage and transportation casks rather than less expensive HI-STORM storage only casks; (3) Southern should not be able to recover the labor costs of its own employees, along with the cost of their supervision and overhead, that were involved in expanding the SNF storage capacity at its plant sites. (4) Southern should not be able to recover the cost of its investment in PFS, an alternate SNF storage facility being developed in Utah and (5) Southern should not be able to recover its cost of capital expended in the expansion of its storage facilities. The Government does not dispute that Southern

would not have required dry storage facilities and its Plants Hatch and Farley or the re-rack of one of the SNF pools at Plant Vogtle if the DOE had performed at the 3000 MTU rate.

The Government's adjustments to the number of SNF assemblies loaded at Plant Hatch are not supported by logic or evidence. There is no evidence that the number of assemblies loaded from the Plant Hatch pool into dry storage was not consistent with reasonable nuclear operating practice, and there is emphatic testimony from Southern's team of nuclear engineers and managers that Southern's loading policy was and is reasonable. Further, the evidence is undisputed that DOE would have removed more SNF assemblies from Southern's pool had it performed at the 3000 MTU rate than Southern actually removed, providing Southern with valuable space in the pool. The evidence is undisputed that DOE would have removed far more SNF assemblies than Dr. Neuberger's simulation suggests that Southern would have removed. The Government's position in this regard flies in the face of the measure of damages in this case, *i.e.*, that Southern is entitled to be placed in as good a position as had the Government performed. Accordingly, Southern is entitled to recover the costs associated with the loading of all of the SNF it has actually removed.

The Government's adjustment for Southern's purchase of three HI-STAR casks for the initial SNF loading campaign at Plant Hatch is equally unavailing, Again, the evidence related to this adjustment consisted of the Government's economist and accountant second-guessing the decisions of Southern's experienced team of engineers concerning the reasonableness of purchasing the HI-STAR casks. Southern's management established that the HI-STAR was the only cask that had the promise of being licensed by the time it was needed and that it had the added benefit of being transportable. Waiting on the HI-STORM to be licensed would have complicated the design and commencement of operation of the Plant Hatch facility to the point

that it could have put plant reliability at risk – a risk that dwarfs the difference in cost between the HI-STARs and HI-STORMs. Moreover the transportability, and re-useability, of the HI-STAR casks makes it possible to use the casks at each of Southern's plant sites to remove an entire reload of SNF in the event an off-site storage facility becomes available, or in the event SNF needs to be shipped off the plant site for any other reason. The Government has no basis for its adjustment other than that the HI-STORM casks were eventually licensed, are less expensive, and that Southern began to use them after the three HI-STARs were loaded.

The Government's adjustment for internal labor, supervision, and overhead is based on the invalid assumption that the cost of a non-breaching parties' employees who are involved in mitigation activities are not recoverable. Southern presented undisputed evidence that employees whose salaries, etc. are included in the damages claim were diverted from other productive work to work on SNF storage efforts. The law is clear that such costs are recoverable. *See TVA*, 69 Fed. Cl. at 537-39.

The cost of Southern's investment in PFS is also recoverable. In the mid-1990s when the initial decision to invest in PFS was made, Southern knew only that the Government was unlikely to perform its obligations under the Contracts for the foreseeable future, a condition that still exists today. At that time Southern had not constructed on-site SNF storage facilities and did not know what technical or political obstacles it would face in constructing those facilities, or whether the centralized, multi-user facility such as PFS might be more economical than on-site facilities. Because the Government's breach of contract threatened the operability of three of Southern's most valuable assets, Southern reasonably, and wisely, invested in PFS as an alternative rather than putting all of its "eggs" in the on-site storage "basket." When it became obvious that the PFS facility would not be available in time for use by Southern, it ceased its investments. The

Government has not produced one word of testimony that Southern's investment was unreasonable.

Finally, Southern seeks to recover the cost of capital associated with its SNF storage expansions made necessary by the Government's breach. Southern used capital to construct SNF storage facilities instead of using capital for other projects. This capital was not costless. The Government contends that Southern's cost of capital is essentially pre-judgment interest the recovery of which is barred by law. Unlike a fixed statutory prejudgment interest rate, Southern's cost of capital rate fluctuates each year with the cost of debt and equity capital in the markets. Further, unlike a statutory prejudgment interest rate, Southern's cost of capital is based on an estimate of the weighted average cost of capital for utilities like Southern. Recovery of cost of capital during construction periods is expressly approved by FERC. This Court has allowed such recovery. *See TVA*, 69 Fed. Cl. at 541-42.

## ARGUMENT

### I. The Law of Damages.

#### A. The Measure of Damages

##### 1. Southern Is Entitled to be Placed In As Favorable An Economic Position as if No Partial Breach Had Occurred.

The issue in this proceeding involves a determination of the damages Southern suffered as a result of the Government's partial breach of the Contracts. "The remedy for breach of contract is damages sufficient to place the injured party in as good a position as it would have been had the breaching party fully performed." *Indiana Michigan*, 422 F.3d at 1373 (internal quotations omitted).[63] *See Massachusetts Bay Transp. Auth. v. United States*, 129 F.3d 1226, 1232 (Fed. Cir. 1997). ("The general rule is that damages for breach of contract shall place the wronged party in as good a position as it would have been in, had the breaching party fully performed its obligation."); *Restatement (Second) of Contracts* § 344(a) (1981).

In *TVA*, 69 Fed. Cl. 515, this Court explained:

> To recover damages, [the nuclear utility] must show that "(1) the damages were reasonably **foreseeable** by the breaching party at the time of contracting; (2) the breach is a substantial **causal factor** in the damages; and (3) the damages are shown with reasonable **certainty**." *Indiana Mich.*, 422 F. 3d at 1373 (citing *Energy Capital Corp. v. United States*, 302 F.3d 1314, 1320 (Fed. Cir. 2002)). *See also Indiana Mich.*, 422 F. 3d at 1376 ("[plaintiff] must prove foresee ability, causation, and reasonableness").

(Emphases added.)

---

[63] It is noteworthy that neither of the Government's expert witnesses accepted the Federal Circuit's articulation of the black letter law of damages. (Tr. 2115 (Neuberger Test.); Tr. 2339-45 (Johnson Test.))

**2. Mitigation.**

Southern's damages are comprised principally of costs that were incurred to mitigate the consequences of the Government's partial breach of Contract. "[O]nce a party has reason to know that performance by the other party will not be forthcoming, ... he is expected to take such affirmative steps as are appropriate in the circumstances to avoid loss by making substitute arrangements or otherwise." *Indiana Mich.*, 422 F.3d at 1375 (quoting *Restatement (Second) of Contracts* § 350 cmt. b. There is no dispute that Southern acted to mitigate the damages caused by DOE's partial breach. Southern accordingly fulfilled its obligations to take affirmative steps to avoid loss. *See Indiana Mich.*, 422 F.3d at 1375 (citing *Restatement (Second) of Contracts* § 350(2)). Southern's expenses of its mitigation efforts accordingly are recoverable. *See TVA*, 69 Fed. Cl. at 523. The Government bears the burden of proving that Southern's actions to mitigate DOE's partial breach were unreasonable. *See id.*

The fact that damages include mitigation costs does not affect the general rule that Plaintiffs are entitled to be placed in as good a position as had the Defendant performed. The law is clear in the context of mitigation, the economic position of the non-breaching party must be "as it would have been had the breaching party fully performed." *Indiana Michigan*, 422 F.3d at 1373; *TVA*, 69 Fed. Cl. at 522 (quoting *Indiana Michigan*, 422 F.3d at 1373). In short, Southern may recover the reasonable costs of mitigation incurred to place it in the same position as it would have enjoyed had no partial breach occurred. *See LaSalle Tallman Bank, F.S.B. v. United States*, 317 F.3d 1363, 1371-72 (Fed. Cir. 2003) (stating that mitigation cannot place the non-breaching party in a better position than had performance occurred); *TVA*, 69 Fed. Cl. at 523; *see generally Restatement (Second) of Contracts* § 347 cmt. e (1981) ("The injured party is limited to damages based on his actual loss caused by the breach.")

In addition, that a mitigation activity was not ultimately successful does not mean that it is not recoverable. *See Southern Nuclear Operating Co. v. United States*, No. 98-614C, Docket No. 297, Order, at 5-6 (Aug. 19, 2005) ("Furthermore, mitigation does not require clairvoyance. Reasonable expenses are recoverable regardless of whether the economics were realized. *See* 3 Dan B. Dobbs, *Law of Remedies* § 12.6(1)(6), at 127 (2d ed. 1993) ("[T]he plaintiff's damages are adjusted upwards to reflect all the reasonable costs he incurs in attempting to avoid losses, whether or not he was successful in doing so."); *Restatement (Second) of Contracts* § 347, cmt. c. (costs incurred in reasonable efforts to avoid loss are recoverable "whether successful or not"); *see also TVA*, 69 Fed. Cl. at 523.

Further, in determining the compensability of a substitute mitigating transaction (*e.g.*, replacement SNF storage facilities), it is well recognized that some discrepancies may exist between the contracted-for transaction and the substitute mitigating transaction. "If discrepancies between the transactions can be adequately compensated for in damages, the alternative [mitigating] transaction is regarded as a substitute and such damagers [mitigation costs] are awarded." *Restatement (Second) of Contracts* § 350 cmt. e (1981).

Mitigating measures are not unreasonable based merely on the availability of other alternatives, or on the basis of hindsight. As long as the activity was reasonable at the time it was undertaken, the cost of a mitigation activity is recoverable. *See Citizens Federal Bank*, 66 Fed. Cl. at 185 n.1 (citing *S. J. Groves & Sons Co. v. Warner Co.*, 576 F.2d 524, 528 (3d Cir. 1978) ("it is immaterial that hindsight may later prove that the method of cover used was not the cheapest or most effective") (citation omitted). This Court has explained:

> Consistent with this fundamental principle of mitigation damages, this court has repeatedly rejected attempts by the Government to come in years after the fact and claim that the nonbreaching parties failed to mitigate properly. In *Commercial Federal Bank, F.S.B. v. United States*, the Government opposed lost profits

> damages on the ground that the plaintiff made no effort to mitigate the purported harm. 59 Fed. Cl. 338, 355 (2004)[, *aff'd*, 125 Fed. Appx. 1013 (Fed. Cir. 2005)]. . . . Critically, the court explained, **"[i]t is not the task of the court to second guess the judgment of a skilled team of managers with a history of successful institutional management."** *Id.* As Judge Bruggink held in *First Nationwide Bank v. United States*, "'[t]he rule of mitigation of damages may not be invoked by a contract breaker … merely for showing that the injured person *might* have taken steps which … would have been more advantageous to the defaulter.'" 56 Fed. Cl. 438, 444 (2003) (quoting *In re Kellett Aircraft Corp.*, 186 F.2d [197,] 198-99 [(3rd Cir. 1950)]) (alterations in original).

*Citizens Federal Bank*, 66 Fed. Cl. at 185 (emphasis added).

Further, the non-breaching party must pay the least reasonable cost for mitigation necessary to retain the non-breach economic position. *See LaSalle Talman Bank, F.S.B. v. United States*, 45 Fed. Cl. 64, 111 (1999) ("[A] plaintiff is not entitled to recover mitigation expenses that are excessive."), *rev'd on other grounds*, 317 Fed. Cl. 1363 (Fed. Cir. 2003).

### 3. The Burdens of Proof.

In general, the non-breaching party has the burden to prove its damages "by a preponderance of the evidence." *Alaska Pulp Corp. v. United States*, 59 Fed. Cl. 400, 413-14 (2004). While Southern bears the initial burden of proving foreseeability, reasonable certainty of amount, and causation, "the breaching party [*i.e.*, the Government] has the burden of proof on a failure to mitigate [properly] defense." *First Nationwide Bank v. United States*, 56 Fed. Cl. 438, 444 (Fed. Cl. 2003). 11 *Corbin on Contracts* § 1039, p. 216 (2002) ("The burden of proving that losses could have been avoided by reasonable effort and expense must always be borne by the party who has broken the contract."); *TVA*, 69 Fed. Cl. at 523 ("the government bears the burden of showing that TVA's mitigation efforts were unreasonable").

### B. The Time Period Covered by Southern's Damages Claim.

Consistent with *Indiana Michigan*, 422 F.3d at 1377-78, and the parties agreement, this Court ordered that damages in this case be limited to damages incurred through December 31, 2004. (Order of Sept. 16, 2005, Dkt. 304, at 2.) Future damages will be the subject of future litigation. (*Id.*) Pursuant to RFCF 15(a) and (d), Southern filed its Amended and Supplemental Complaint on September 23, 2005, claiming additional damages from the Government's continuing breach of the Contracts through December 31, 2004. (Plaintiffs' Amended and Supplemental Complaint, Sept. 23, 2005, Dkt. 308.) As stated in Southern's Motion for Leave to File an Amended and Supplemental Complaint under RFCF 15(a) and (d) to Update the First Amended Complaint for Post-Filing Damages and to Allow Post-2004 Damages to be Claimed in a Separate Complaint,[64] a Rule 15(d) supplemental complaint claiming increased damages arising from a continuing wrong relates back to the original complaint and is not barred by a statute of limitations. *See* 6A Charles Alan Wright, et al., *Federal Practice & Procedure* § 1508, p. 200 ("To date, **no court has suggested that the statute of limitations would bar a supplemental complaint that merely seeks additional damages** because of the aggravation of injuries originally recited or otherwise brings the earlier pleading up to date.") (Emphasis added); *Intrepid v. Pollock*, 907 F.2d 1125, 1129-30 (Fed. Cir. 1990) (applying Rule 15(d) to hold that a supplemental complaint related back to the filing date of the original complaint and was not barred by the statute of limitations); *TVA*, 69 Fed. Cl. at 523-24 (allowing amended and supplemental complaint and citing *Intrepid*, 907 F.2d at 1129).[65]

---

[64] Southern incorporates by reference all of the arguments made in its Motion for Leave to File an Amended and Supplemental Complaint, Sept. 23, 2005, Dkt. 308.)

[65] The Government has been on notice of the continuing nature of its partial breach and of Southern's claims for continuing damages since it received Southern's original Complaint on July 29, 1998 – more than seven years ago. The Amended and Supplemental Complaint relate back,

Southern's damages for this case begin with the first damages incurred in anticipation of the Government's breach and end with damages incurred through December 31, 2004.

## II. Southern's Damages.

### A. Overview of Southern's Damages.

Southern presented fact and expert testimony regarding the damages proximately caused by the Government's breach based on the following formula:

Breach Costs – Non-Breach Costs = Damages

(Tr. 1456) (Metcalfe Test.) Based on this formula, and on the evidence presented by Southern of both the costs incurred as a result of the Government's breach and the costs that would have been incurred had the Government performed, Southern's damages expert Mr. Metcalfe calculated Southern's damages to be $105,628,000. The Government has challenged $66,634,934 of these damages presuming the 3000 MTU acceptance rate applies. A summary of Southern's damages by plant and the government's challenges follows:

---

and the 28 U.S.C. § 2501 six-year statute of limitations cannot bar any of Southern's post-July 29, 1998 damages claims. *See* 6A Charles Alan Wright, et al., *Federal Practice & Procedure* § 1508, p. 203 (explaining that courts have rejected application of the doctrine of relation back in a manner that would bar recovery based on events between the date of the original and supplemental complaints) (citing *Security Insurance Company v. United States*, 338 F.2d 444 (9th Cir. 1964) (Miller Act case); *William Inglis & Sons Baking Co. v. ITT Cont'l Baking Co.*, 668 F.2d 1014, 1056-1057 (9th Cir. 1981) (rejecting argument that the relation back doctrine as applied to a supplemental complaint "**left a gap between the two damage periods of one year for purposes of the federal claims** (February 2, 1972 – February 6, 1973) and four years for purposes of the pendent state claims (February 2, 1972 – February 6, 1976)."), *cert. denied*, 459 U.S. 825 (1982) (emphasis added).

**Government's Proposed Reductions to Southern's Damages**
**(Through December 31, 2004, Assuming a 3000 MTU Acceptance Rate)**[66]

| Item | Hatch | Farley | Vogtle | Totals |
|---|---|---|---|---|
| Southern's Net Damages Claim | $75,758,000 | $21,317,000 | $8,553,000 | $105,628,000 |
| Cask Loading Schedule (including No. of Casks and associated infrastructure) | (7,697,015) | -0- | -0- | (7,697,015) |
| HI-STAR Casks | (14,919,855) | -0- | -0- | (14,919,855) |
| Internal Labor, Overhead | (5,660,623) | (821,103) | 15,710 | (6,466,016) |
| Private Fuel Storage | (2,822,224) | (2,822,224) | (2,822,224) | (8,466,672) |
| Other Adjustments | (1,080,404) | 13,391 | (190,893) | (1,080,404) |
| Cost of Capital | (21,233,039) | (4,042,192) | (3,148,741) | (28,423,972) |
| Installation of Second Bathtub Rack* | 419,800 | -0- | -0- | $419,800 |
| Government's Damages | $22,766,840 | $13,631,481 | $2,597,745 | $38,993,866 |

The Government's damages expert, Mr. Johnson, opined that Southern had suffered a minimum of $38,993,866[67] in damages assuming an acceptance rate of 3000 MTUs per year and

[66] Mr. Johnson's Expert Report classifies damages (in nominal dollars) in broad categories of not reasonable, not incremental, not reasonably certain, and unreviewed/unsupported. (PX 607 (Johnson Report) at 8.) The above chart (in 2005 dollars) categorizes Mr. Johnson's adjustments based on the purported reason for the adjustment (*i.e.*, loading schedule, etc.). *See also* (Tr. 1475 (Metcalfe Test.); *id.* 2367, 2372 (Johnson Test.) (Cask Loading) ($6,189,680, $1.5 million [$1,507,335]); *id.* 2310, 2370, 2297, 2289, 2290, 2291 (HI-STAR Casks) ($9,533,518, $5,083,728, $50,000 [$87,500 – 37,500], $21,359, $223,250, $108,000); *id.* 2257, 2262, 2263, 2265-66, 2267, 2313-14, 2318-19 (Internal Labor, Overhead) ($1,779,286, $750,731, $1,607,937, $2,267,929, $2,534,372, $1,965,637, $269,324, $288,857, $266,034, $1,253,285, $130,083, $377,541, $207,840, and $15,710,000); *id.* 2306, 2315, 2320 (Private Fuel Storage) ($2,822,224, $2,822,224, and $2,822,224); *id.* 2237, 2303, 2235-36, 2229, 2238, 2256 (Other Adjustments) ($48,284; $50,000, $65,112 [$121,124 - $56,012], $795,442, $64,976, and $56,590); *id.* 2407 (Bathtub Rack) ($419,800); *id.* 2347 (Government's Damages) ($22,764,640 [$22,344,840 plus the $419,800 from second bathtub rack], $13,631,481, and $2,597,745.)

[67] Johnson testified that the damages Southern had suffered was $38,574,066 [*id.* at 2347], but he did not include the installation of the second bathtub rack ($419,800). The total including the bathtub rack is $38,993,866.

had suffered a minimum of $16,707, 846 in damages assuming an acceptance rate of 900 MTUs per year. (Tr. 2325-26) (Johnston Test.) Mr. Johnson likewise opined that the Government's only challenges to Southern's damages are those embodied either in the adjustments, or in the Government's alternative 900 MTUs per year acceptance rate damages calculations. (*Id.* at 2323-26.)

### B. Foreseeability, Certainty, and Causation.

#### 1. Southern's Damages Were Foreseeable.

Southern's damages arising from the Government's breach of the Contracts — the cost of storing SNF — were reasonably foreseeable by the Government and it does not claim otherwise. The Restatement defines foreseeability as follows: "(2) Loss may be foreseeable as a probable result of a breach because it follows from the breach (a) in the ordinary course of events, or (b) as a result of special circumstances, beyond the ordinary course of events, that the party in breach had reason to know." *Restatement (Second) of Contracts* § 351(1). As this Court stated in *TVA*, 69 Fed. Cl. at 528.

> DOE was aware of the nation's growing spent nuclear fuel inventory at the time it entered into the TVA Contract. DOE designed its waste disposal plan to collect all new SNF created by the nations' nuclear utilities, as well as to reduce and eventually eliminate the backlog of SNF that utilities had generated to date. . . .. DOE also recognized that utilities might be forced to build additional on-site storage facilities if DOE were not successful in performing under its contracts for SNF disposal, as reflected by the fact that one of DOE's goals was to preclude the utilities' need to provide storage outside their spent fuel pools. . . . . In short, the court finds that it was entirely foreseeable to DOE that failure to perform under the contract would result in damages of the nature and magnitude that TVA claims.

Similarly, Southern contracted with the Government and paid the Government to store all the SNF generated by its facilities. Absent performance by DOE, only two reasonable alternatives existed: for Southern to store the SNF on-site, or for Southern to store SNF off-site at a facility

such as PFS – both of which were foreseeable remedies at the time Southern signed the Contracts. Instead, testimony from DOE officials and numerous Government documents confirm that the Government contemplated exactly the kinds of costs included in Southern's claim**.** *See, e.g.*, (PX 35 (1983 Draft Mission Plan) at 1-2, 2-5); PX 68 (Nuclear Waste: Is There a Need for Federal Interim Storage?) (Nov. 1, 1989.))

**2. Southern's Damages Are Certain.**

With respect to the certainty of the amount, the Government has stipulated that the costs underlying Southern's damages claim have been incurred in the amount claimed by Southern through December 31, 2004, and that they are sufficiently supported by Southern's accounting books and records. (Tr. 6.)

**3. Southern's Damages Were Proximately Caused by the Government's Partial Breach.**

Southern built its dry cask storage facilities at Plants Hatch and Farley and re-racked the Plant Vogtle reactor pool in response to DOE's breach of the Contracts. The testimony of Southern's witnesses and internal Southern documents prove that Southern recognized that DOE would breach the Contracts and that Southern would have to build dry cask storage to store SNF itself as a result.

As noted in Southern's 1997 Strategic Plan for Plant Hatch: "Because of the U.S. Department of Energy's (DOE) continuing delay or the lack of a feasible alternative offsite storage option, Hatch intends to add dry cask storage capacity as early as 1999." (PX 856 (Hatch Strategic Plan) at 10.)

As noted in Southern's 1997 Strategic Plan for Plant Farley: "If necessary, because of the U.S. Department of Energy's (DOE) continuing delays or the lack of a feasible alternative offsite storage option, additional onsite storage could be obtained, most likely using transportable dry-storage technology." (PX 865 (Farley Strategic Plan) at 15.)

As noted in Southern's Strategic Plan for Plant Vogtle: "[B]ecause of DOE's continuing delay or the lack of a feasible alternative off-site storage option, additional on-site storage could be obtained, most likely using transportable dry storage technology." (PX 800) (Vogtle Strategic Plan.)

Further, Mr. Long, Southern's vice president in charge of SNF operations, testified:

> Remember, we're an operating nuclear power plant. This whole business of ISFSI and having to store these casks out in rods, or out in the yard is not part of our core business. It is something we're being made to have to do because the Department of Energy did not come and pick up our fuel and we would not be in that business but for that. And if there was a choice where I didn't have to build an ISFSI and I had to put in, you know, a second set of racks for a while, in the unit 1 pool, I probably would have selected to do that rather than go out and build this thing out there.

(Tr. 160-61) (Long Test.)

Southern's decision to build dry storage was made in direct response to DOE's breach. (Tr. 160-161) (Long Test.) Had DOE removed SNF from Southern's plant sites in accordance with the 3000 MTU rate that DOE has selected a the design basis for its SNF disposal program, Southern would have had more than enough capacity in its SNF pools and would never have constructed ISFSIs or added additional storage racks in the pools. (Tr. 309, 315-316, 319-20) (Cocherell Test.). Had DOE performed at the 3000 MTU acceptance rate it has included in its major planning documents, it would have accomplished the dual purposes of the NWPA and the Contracts, eliminating the need for additional storage plus removing the backlog of SNF in time to avoid impact on timely decommissioning.

## III. The Government's Challenges to Southern's Damages

### A. The "Alternate Rate" of SNF Acceptance.

The principal difference between the parties relative to the damages Southern suffered as a result of the Government's partial breach relates to the SNF acceptance rate which should be applied in the "non-breach" case. This acceptance rate determines how many SNF assemblies DOE would have accepted in a particular year had DOE commenced performance in accordance with the Contract. The Government has presented "alternate rate" damages calculations based on the 900 MTU rate contained in DOE's 1991 Annual Capacity Report. Southern's position is that damages should be evaluated based on the 3000 MTU acceptance rate DOE has selected for operation of the SNF program.

#### 1. A 3000 MTU Per Year Acceptance Rate Is Required By The Standard Contract and Is Reasonable.

As noted in the Background section above, the Judges of this Court, in this case and in other SNF cases, have already addressed many of the issues related to determining the reasonable acceptance rate that would have applied had DOE began accepting SNF on January 31, 1998, as required by the Standard Contract. First, Judge Hewitt, Judge Hodges, and Your Honor have held that, because an acceptance rate term is missing from the Standard Contracts, the Court must supply a reasonable acceptance rate term. *See Commonwealth Edison*, 56 Fed. Cl. at 667; *Indiana Michigan*, 57 Fed. Cl. at 96; *Yankee Atomic*, slip op. at 2 (order adopting Judge Hewitt's opinion in *Commonwealth Edison* to the extent applicable).[68]

---

[68] In its April 7, 2004 Order, this Court's adopted Judge Hewitt's reasoning in *Commonwealth Edison*, but left final resolution of the acceptance rate issue for trial. April 7, 2004 Order, at 6.

As discussed more fully below, it is clear that an acceptance rate term is missing from Southern's Contracts with DOE. Furthermore, the record establishes that the intent of the parties to the Standard Contracts was that DOE would accept SNF at a rate sufficient enough (1) to eliminate the need for utilities to build additional SNF storage at their reactor sites or elsewhere and (2) to remove the backlog of SNF already stored at reactor sites to allow timely decommissioning of reactors once they have permanently shutdown.

Eileen Supko's expert testimony establishes that an acceptance rate of 3000 MTUs a year satisfies both of these criteria and is reasonable. Furthermore, the record in this case shows that DOE has consistently used a 3000 MTU rate in its planning documents. Moreover, on much the same evidence as presented in this case, Judge Hodges in *Indiana Michigan* indicated that if DOE had begun acceptance of SNF on January 31, 1998, as required by the Standard Contract, DOE would have performed at a rate of 3000 MTU a year. *Indiana Michigan*, 57 Fed. Cl. at 99-100; *see also TVA*, 69 Fed. Cl. at 530-33. Therefore, this Court should find that Southern Nuclear's damages should be measured using a 3000 MTU annual acceptance rate.

Second, Judge Hewitt, Judge Hodges, and Your Honor have rejected the Government's argument that the 900 MTU per year acceptance rate contained in the 1991, 1992, and 1995 Annual Capacity Reports ("ACRs") is the reasonable and appropriate acceptance rate on which to base utilities' damages. *See Commonwealth Edison*, 56 Fed. Cl. at 666-67; *Indiana Michigan Power*, 57 Fed. Cl. at 97-100; *Yankee*, slip op. at 2. As discussed below, the record in this case shows that the Government's 900 MTU a year acceptance rate is unreasonable. That rate is based on limits that the 1987 Amendments to the NWPA imposed on a Monitored Retrievable Storage ("MRS") facility. *See also Indiana Michigan*, 57 Fed. Cl. at 100; *Commonwealth Edison*, 56 Fed.

---

The April 7 Order granted Southern Nuclear's Motion for Partial Summary Judgment on Liability, leaving for trial the proof of Southern Nuclear's damages. *Id.* at 4-5.

Cl. at 666. DOE was never authorized to build an MRS facility, and it was illegal under the 1987 Amendments to the NWPA to store SNF at an MRS before a permanent repository was licensed. The *Indiana Michigan* and *Commonwealth Edison* courts, therefore, properly rejected the Government's argument that its damages should be limited based on an acceptance rate derived from the operation of an MRS facility. *See Indiana Michigan*, 57 Fed. Cl. at 100; *Commonwealth Edison*, 56 Fed. Cl. at 666. The record in this case establishes the same facts.

In addition, Ms. Supko demonstrated that a 900 MTU would require nuclear utilities to build significant amounts of additional dry storage capacity and would not permit timely decommissioning of nuclear facilities after they shut down. The Court therefore should reject the Government's argument that its damages should be limited based on a 900 MTU annual acceptance rate.

Third, Judge Hewitt in *Commonwealth Edison* rejected the Government's argument that the DCS process should define the amount of SNF that the Government was required to accept in the non-breach world. Judge Hewitt properly held that that the DCS process was a planning tool that it did not create any binding obligation on either the Government or the utilities. *See Commonwealth Edison*, 56 Fed. Cl. at 663, 665-66.

Other judges on this Court have agreed with Judge Hewitt that the DCS process did not create any binding obligation between the Government and the utilities and did not alter the Government's obligations under the Standard Contract. *See Systems Fuels*, 66 Fed. Cl. at 732 (Braden, J.); *Sacramento Mun. Util. Dist.*, 63 Fed. Cl. at 505 (Braden, J.); *Indiana Michigan*, 57 Fed Cl. at 97-98 (Hodges, J.).

In addition, the Government's argument is refuted by the principle that conditions or the performance of contractual obligations which would be futile because of the other party's prior

breach are excused. The Government's announcements that it would not perform, and its suspension of the DCS process, excused Plaintiffs from any obligation to submit a DCS, at least until 63 months prior to the date the Government commits to remove SNF. The only purpose of a DCS was to assist DOE in making transportation and other technical arrangements for the delivery of the SNF. In the absence of the Government's commitment to take delivery within 63 months of a date certain, the DCS process is academic.

For the Plaintiffs to submit delivery commitment schedules after DOE has clearly indicated its intention not to accept any SNF would be a futile act. Such an act is not required under long-standing precedent. *See, e.g.*, *Morris v. United States*, 39 Fed. Cl. 7, 22 n. 20 (1997) ("[T]he law will not require the doing of a futile act."). A useful explanation of this accepted principle was outlined in 1953 by the United States District Court for the District of Columbia, which stated:

> As a general rule it is, of course, true that all conditions in the contract must be fulfilled except when the performance of the condition is excused or when it is so apparent that even if there were performance the other party to the contract would nevertheless refuse to carry out its obligation. . . . The seller was already substantially notified that the purchaser was not ready to perform its obligations under the contract. Hence to require the seller to do anything further under the circumstances would be to stand on useless ceremony and it is well settled that the law does not require performance of a useless act.

*Burke v. Thomas J. Fisher & Co.*, 127 F. Supp. 1, 3 (D.D.C. 1953).

The record here confirms that the DCSs were not binding on either party and were never intended to define the rate at which DOE would accept SNF from utilities. Accordingly, the Court should find that the DCS process and the DCSs have no bearing on the DOE's acceptance rate obligation or on Southern Nuclear's damages.

**2. A 3000 MTU Acceptance Rate Would Have Eliminated The Need For Additional On-Site Dry Storage At Each Of Southern Nuclear's Plants, Was Contemplated By The Parties, Was Paid For By Southern Nuclear, And Is Reasonable.**

The Court's Order of April 7, 2004, denied the parties' cross-motions for partial summary judgment regarding the acceptance rate applicable to the Standard Contract. In denying Southern Nuclear's motion, the Court posed four questions regarding the appropriate acceptance rate. The answers to those questions, as found in the trial record, compel the conclusion that the reasonable acceptance rate required by the Standard Contract is 3000 MTU a year, following a five-year ramp up period.

**a. "Would excess capacity at other utilities also be utilized to avoid additional on-site storage?"**

No. Had the Government performed at the 3000 MTU rate with a five-year ramp up, Southern Nuclear would not have needed to exchange acceptance allocations with other utilities to avoid the addition of dry storage facilities at its plant sites – the Government's performance at that rate would have been sufficient. (PX 651 (Kenrich Report) at 24; Tr. 710 (Supko Test.)) The Government does not dispute this fact. (PX 594 (Neuberger Report) at 17.).

**b. "What rate of acceptance by DOE would have been necessary to avoid additional on-site storage at APC or GPC given the age of their stored fuel, their SNF pool capacity, and the production of waste at the specified plants in this litigation?"**

As noted immediately above, the acceptance rate that Southern Nuclear has presented – a 3000 MTU steady-state rate, after a five year ramp up – would have avoided the need for additional dry storage facilities at Southern Nuclear's plant sites. Again, there is no dispute as to

this fact. (PX 651 at 24 (Kenrich Report); Tr. 710 (Supko Test); PX 594 (Neuberger Report) at 17.)

**c. "Would such a rate be within the range contemplated by the parties?"**

Yes, the parties clearly contemplated a 3000 MTU acceptance rate at the time they executed the Standard Contract, because such rate would have fulfilled the requirements of the Contract as the parties understood them at the time: it would have precluded the need for additional at-reactor storage and reduced the backlog of SNF at reactor sites to allow timely decommissioning. DOE and Southern Nuclear documents from the timeframe in which the Contracts were executed (*i.e.*, the early and mid-1980s), the testimony of DOE officials and Southern Nuclear representatives involved in the SNF program at that time, and the Government's operational and financial planning documents all confirm that the 3000 MTU acceptance rate was within the range contemplated of the parties, and was, in fact, specifically contemplated as the requirement of the Contract.

The Standard Contract does not contain a term for the rate of acceptance of SNF. "When a written document does not state the complete understanding memorialized therein, the missing terms may be proven." *Salles v. United States*, 156 F.3d 1383, 1384 (Fed. Cir. 1998). To determine the intent of the parties to a contract, the Court can look to "all the relevant circumstances surrounding the transaction," including the "conduct of the parties before the advent of controversy, oral statement, writings, the recitals to a contract, prior negotiations, and other conduct by which the parties manifest their assent." *KMS Fusion, Inc. v. United States*, 36 Fed. Cl. 68, 76 (1996), *aff'd mem.*, 108 F.3d 1393 (Fed. Cir. 1997). Further, "[w]hen the parties to a . . . contract have not agreed with respect to a term which is essential to a determination of their

rights and duties, a term which is reasonable in the circumstances is supplied by the court." *Howell v. United States*, 51 Fed. Cl. 516, 523 (2002) (quoting *Restatement (Second) of Contracts* § 204 (1981)); *Commonwealth Edison*, 56 Fed. Cl. at 662.

#### i. The Parties' Intent Was that DOE Would Accept SNF at a Rate Sufficient (1) to Eliminate the Need for Additional On-Site Storage and (2) to Remove the Backlog of SNF to Allow Timely Decommissioning

Even though the Standard Contract does not contain a specific acceptance rate term, Southern Nuclear understood from DOE officials' statements, DOE's published documents, and DOE's conduct that DOE interpreted the Standard Contract, and the NWPA, to require DOE to pick-up SNF at a rate sufficient to avoid the need for additional at-reactor storage after January 31, 1998, and to reduce the backlog of accumulated SNF so that Southern Nuclear's nuclear plants could decommission in a timely manner. *TVA*, 65 Fed. Cl. at 519; *Indiana Michigan*, 57 Fed. Cl. at 99; *Commonwealth Edison*, 56 Fed. Cl. at 667.

In 1982, Tom Beckam and Fred Clayton, then Southern Nuclear Vice Presidents, wrote letters to DOE regarding the initial draft of the Contracts, in which they expressed Southern Nuclear's view that the Contracts should commit the Government to remove SNF at a rate that eliminated the need to expand SNF storage at Southern Nuclear's plants after 1998. (PX 47 (Letter from F. L. Clayton, Sr., Vice President of APC, to Robert Morgan (March 4, 1993); PX 46 (Letter from J. T. Beckam, Vice President & General Manager Nuclear Generation of GPC, to Robert Morgan (March 4, 1983.)) In response to those letters, DOE included language requested by Southern Nuclear that DOE was obligated to remove SNF "as expeditiously as practicable" from Southern Nuclear's plant sites. (Tr. 460 (Hunt Test.); Standard Contract, publ., art. II. As Bruce Hunt, Southern Nuclear's Manager of Nuclear Fuel, testified, both DOE and the utilities

understood that the "expeditiously as practicable" standard required DOE to remove SNF from reactor sites at a rate sufficient to preclude the need for additional at reactor storage. (Tr. 447, 454-55) (Hunt Test.)

Furthermore, DOE documents contemporaneous with the promulgation and execution of the Standard Contracts, as well as the testimony of DOE representatives, demonstrate that DOE interpreted its contractual obligations to require it to accept SNF at a rate sufficient to preclude additional at-reactor storage and to remove the SNF backlog in order to allow timely reactor decommissioning. *See supra* at pp. 29-39. In particular, the 1983 Draft Mission Plan provides that the program's SNF acceptance schedule would be "designed to provide an acceptance rate in the first five years such that no utility will have to provide additional storage capacity after January 31, 1998. Subsequently, the acceptance rate will be equal to or greater than the actual discharge rate of spent fuel each year." (PX 35 (1983 Draft Mission Plan, *supra*, at 2-1.)

Furthermore, in deposition, Alan Brownstein, who was in charge of DOE's interface with nuclear utilities for over ten years, testified,

> Q: All right, but the DOE goal or objective was to eliminate the need for utilities to provide on-site storage after the DOE began acceptance of spent nuclear fuel, is that correct?
>
> A: That was a goal.

(Brownstein Dep. 412, Apr. 10, 2002) (PDD 8) Moreover, Lake Barrett, the acting or deputy director of OCRWM from 1993 until February 2002, testified at deposition:

> Q: My understanding is that one of the goals of the Civilian Radioactive Waste Management Program was to design a system that could take spent nuclear fuel at a rate that would eliminate the need for utilities to provide for additional on-site storage after January 31st, 1998. Is that correct?
>
> A: No.
>
> Q: What is not correct about that statement?

> A: I never considered the design of the system to solely try to avoid spent-fuel pool overflows. I tried to design the system to be as large as you could reasonably make it to avoid not only spent-fuel overflows but pool rerackings to allow shut-down reactors to empty their sites. For all those other reasons in addition to. So the way you phrased it I don't think is correct.

(Barrett Dep. 1368-69, May 10, 2002) (PDD 5.)

As Bruce Hunt testified, these contemporaneous documents and testimony embody the contracting parties' intent and their understanding as to DOE's obligations under the Standard Contract, and also are consistent with the NWPA. (Tr. 447, 454-55, 460) (Hunt Test.)

**ii. DOE Has Based All Operational and Financial Planning on a 3000 MTU Acceptance Rate.**

DOE documents and testimony consistently identify 3000 MTUs per year, or a similar rate, as the desired steady-state rate for the SNF program, and DOE has used the 3000 MTUs per year rate as the basis for all of its operational and financial planning, including the adequacy of the 1 mil/kWh fee it charges nuclear utilities. In fact, at trial Christopher Kouts, Director of OCRWM's Office of Systems Analysis and Strategy Development, testified at trial that 3000 MTU is a reasonable and appropriate acceptance rate for the program. (Tr. 1844, 1856) (Kouts Test.) He further testified that the 3000 MTU rate has been accepted as the optimum design rate for the program for a long time. *See* (*id.* at 1845-48.) Furthermore, DOE's most recent APR/ACR shows that DOE plans on using a 3000 MTUs per year SNF acceptance rate. (PX 14 (2004 APR/ACR), *supra*, at 2.) Bruce Hunt testified that this rate is consistent with the parties' understanding as to DOE's SNF acceptance obligations under the Standard Contract. (Tr. 545) (Hunt Test.)

Finally, based on similar evidence, Judge Hodges in *Indiana Michigan* found that DOE would have performed at a steady-state acceptance rate of 3000 MTUs per year after a five-year ramp-up. *Indiana Michigan*, 57 Fed. Cl. at 99-100; *see also TVA*, 69 Fed. Cl. at 530-33.

**iii. A 3000 MTU Acceptance Rate Satisfies the Criteria for DOE's Performance and Is Reasonable.**

Eileen Supko, whom the Court accepted as an expert witness in, among other things, nuclear engineering and DOE's nuclear waste management program, presented an expert report and expert testimony regarding the reasonable SNF acceptance rate under the Standard Contract. Her report involved modeling various acceptance rate scenarios to show which rate would have been sufficient to preclude additional at-reactor storage and to remove the SNF backlog in order to allow timely reactor decommissioning had DOE commenced performance when required by the Standard Contract.

Ms. Supko concluded that a 3000 MTU steady-state rate, with a five-year ramp-up, fulfilled these requirements, and was reasonable, efficient, and practical. This rate essentially eliminated the need for additional on-site dry storage, allowed timely decommissioning, and permitted DOE to operate the fuel management system for a reasonable period of time. *See supra* pp. 62-72; (Tr. 669-73, 710) (Supko Test.)

Lake Barrett, the former Deputy Director of the DOE radioactive waste program, agreed that the 3000 MTU rate in the 2004 APR/ACR is "reasonable." According to Mr. Barrett's deposition testimony:

> Q: And I'll take it a step further. Do you believe that the 3,000 annual steady-state rate is a reasonable rate for DOE to plan to use in terms of taking spent nuclear fuel from utilities?
>
> A: I think it's a reasonable rate. There may be better rates that if we -- if the nation gets a little clearer that we're going to really perform I think we will

refine that number and we may, based on events of September 11th, maybe it will be raised.

Q: And would you agree that the 3,000 annual steady-state rate is a rate that is consistent with achieving the objectives that you enumerated earlier?

A: Generally so, yes.

(Barrett Dep. 1370-71, May 10, 2002) (PDD 5.)

**iv. The Government's Suggested Rates Are Neither Reasonable nor within the Contemplation of the Parties.**

Notwithstanding the overwhelming evidence supporting the 3000 MTUs per year rate, the Government has argued in various cases for four alternate annual rates of acceptance: 0, 1, 900, and 2,100 MTU per year. First, in its motion for summary judgment regarding the acceptance rate in this case, the Government argued that absent a completed and approved DCS, it had no contractual obligation to pick up any SNF. (Def.'s Mot. for Partial Summ. J. Regarding the Rate of Spent Nuclear Fuel Acceptance, at 10-22.) However, the record in this case demonstrates that DOE has stated that the DCSs were non-binding, has suspended the DCS process for several periods, and has never finalized any submitted DCSs. *See supra* pp. 56-62. Based on similar evidence, Judge Hewitt, in *Commonwealth Edison*, rejected the Government's argument, reasoning:

> The 1991 ACR itself states that "[a]s specified in the Standard Contract, the ACR is for planning purposes only and thus is *not contractually binding* on either DOE or [plaintiff.]" Defendant eventually conceded at oral argument that the ACRs were for planning purposes. DOE's position that it would reject plaintiff's DCS submission if it "exceed[ed] the allocation in the [1991] ACR" is inconsistent with plaintiff's justified expectation that the ACRs were negotiable and to be used for "planning purposes." The parties could not have expected that planning documents would create binding contractual obligations.
>
> In these circumstances, *plaintiff's submission and defendant's acceptance of the proposed DCSs did not create a contractually binding obligation for either party*. Even if the process defined in Article V of the Standard Contract could, if followed

> and completed in good faith, create a contractual obligation, the third step in the process was not completed because plaintiff did not submit and defendant did not approve a FDS for any year.

*Commonwealth Edison*, 57 Fed. Cl. at 666 (emphasis added) (citations omitted).

Furthermore, at trial, DOE witnesses testified that the 3000 MTU rate would be a contractual obligation only if DCSs are submitted and approved. (Tr. 1853) (Kouts Test.); *see id.* at 2002-04 (Zabransky Test.).[69] However, this state of affairs could occur only if a repository was operational or within 63 months of becoming operational. *Id.* at 1853-55 (Kouts Test.). Thus, it appears to be the Government's position that without an operational repository, or one that will soon be operational, it has no obligation to accept any SNF. *See* (*id.* at 2003-04) (Zabransky Test.) However, in *Northern States Power Co. v. United States Department of Energy*, 128 F.3d 754 (D.C. Cir. 1997), the Court of Appeals for the District of Columbia Circuit ordered DOE not to defend its failure to begin SNF acceptance by January 31, 1998, on the grounds that there was no permanent repository. *Id.* at 760. The D.C. Circuit soundly rejected DOE's attempt to recycle, in a form different from that previously rejected in *Indiana Michigan Power Co. v. Department of Energy*, 88 F.3d 1272 (D.C. Cir. 1996), its argument that it has no obligation to accept SNF absent a permanent repository. *Id.* DOE's DCS argument is another attempt to revitalize this same argument and should again be rejected.

At the time the Contracts were executed, it was clear that DOE understood that its obligation under the NWPA was to commence operation at a repository no later than January 31, 1998 (48 Fed. Reg. 5458-71 (Feb. 4, 1983.)) Thus, at the time of contracting, DOE believed that

[69] However, as Mr. Kouts testified at trial, the 3000 MTU per year acceptance rate, which DOE set as the program's design rate, determines how the repository will be designed. (Tr. 1846) (Kouts Test.) Thus, it is not the repository design that sets the acceptance rate.

it was obligating itself to the "repository acceptance rate" commencing 1998. The Government cannot avoid its acceptance rate obligation by shirking its obligation to construct a repository.

Second, the Government has argued that absent an agreement on the rate of acceptance between the parties, it was required only to *commence* acceptance of SNF in 1998 and that it had the unfettered discretion to choose any rate, regardless of how slow. Reply to Pls.' Opposition to Def.'s Mot. for Partial Summ. J. and Resp. to Pls.' Cross-Mot. for Partial Summ. J. Regarding the Rate of Spent Nuclear Fuel Acceptance, at 26-31. Judge Hewitt and Judge Hodges both rejected this argument as advocating an illusory contract. *See Commonwealth Edison*, 56 Fed. Cl. at 665; *Indiana Michigan*, 57 Fed. Cl. at 97.

Third, the Government also argued in this case that it could accept SNF at an annual rate of only 900 MTUs per year. Def.'s Reply at 25-29. The Government based its 900 MTUs per year rate on the acceptance limits of its temporary plans for a 10,000 MTU MRS facility allocating the 10,000 MTUs of capacity over a twelve-year period with a two-year ramp-up, resulting in an acceptance rate of 900 MTU per year rate for 10 years. *See supra* pp. 51-56; (Tr. 1774, 1786) (Kouts Test.)

The Government's arguments with respect to a 900 MTU per year acceptance rate fail not only because they are fundamentally inconsistent with the intentions of the parties, (PX 35 (1983 Draft Mission Plan, *supra*, at 2-1); Brownstein Dec., Apr. 10, 2002) (PDD 8); Barrett Dep. 1368-69, May 10, 2002 (PDD 5); Tr. 447, 454-55, 460 (Hunt Test.)), but also because the 900 MTU annual rate is inconsistent with the requirements in the NWPA for construction of a MRS facility. The 1987 Amendments to the NWPA, among other requirements, provide: (1) that construction of an MRS could not begin until the NRC had granted DOE authorization to begin construction of the repository, 42 U.S.C. § 10168(d)(1), and (2) that the MRS's capacity was limited to 10,000

MTU until a repository opens and 15,000 MTU thereafter, 42 U.S.C. §§ 10168(d)(3) – (4). *See supra* pp. 48-51. The construction schedules for the repository and the MRS facility were such that the MRS would have operated at most for three years prior to commencement of repository operations and would not have operated for ten years before the repository opened as the 900 MTU rate assumes. (Tr. 1822-26) (Kouts Test.) DOE officials have conceded that the 900 MTUs per year rate would have required further amendments to the NWPA, which were never enacted, to de-link the MRS construction from repository construction. *Id.* at 1820-21.

Moreover, by 1995 an MRS facility was no longer a viable option for DOE to meet the January 31, 1998, deadline. (Tr. 1775, 1822-26) (Kouts Test.) At trial, Mr. Zabransky indicated that one of the reasons DOE continued to use the 900 MTU per year acceptance rate was to attempt to limit its legation liability to utilities. *See* (Tr. 1999-2000) (Zabransky Test.); *see also supra* note 25. Accordingly, Judge Hewitt, Judge Hodges, and Your Honor all have rejected the Government's asserted 900 MTU per year rate. *See Commonwealth Edison*, 57 Fed. Cl. at 666; *Indiana Michigan*, 57 Fed. Cl. at 100; *Yankee*, No. 98-126C, at *2.

In addition, Ms. Supko, Southern Nuclear's expert, demonstrated that a 900 MTU rate – either a 900 MTU steady-state rate that remained at that level for the length of the waste acceptance program or increased to 3000 MTUs in year 20 of waste acceptance – was not reasonable, because it required significant amounts of additional on-site dry storage and unreasonably long post-shutdown storage periods, and, with the first of these rates, operation of the fuel management system for more than a century. *See supra* p. 67.

Finally, at the *Yankee* trial, the Department of Justice invented a 2100 MTU annual acceptance rate, on the theory that it was 100 MTUs greater than the annual rate at which the nuclear industry discharges SNF. Def.'s Initial Post-Trial Br. 12, *Yankee*, No. 98-126C. The

2100 MTU rate has never appeared in DOE planning documents -- and indeed conflicts with those documents -- and is contradicted by DOE officials' statements regarding what would constitute a reasonable acceptance rate. For example, Lake Barrett testified:

> Q: In your opinion would a steady-state rate of 2,000 MTUs on an annual basis be consistent with achieving those same objectives?
>
> A: I would think that's low.
>
> Q: Why?
>
> A: Because that's about what the generation rate is, and if we start with that, matching the generation rate at 2010 – if we steady state at 2010, all the fuel that's in dry storage and a lot of the shut-down reactors, it will be difficult to avoid new storages or prolong decommissionings.

(Barrett Dep. 1371, May 10, 2002) (PDD 5).

Indeed, none of these acceptance rates suggested by the Government would result in no additional dry storage after 1998 or allow timely decommissioning or efficient utilization of a repository. As noted above, Ms. Supko modeled two variations of the 900 MTU rate and concluded that neither rate was reasonable, because they also resulted in significant additional dry storage requirements and prevented timely decommissioning. For the purposes of this case, Ms. Supko did not model the 2100 MTU rate invented by the Justice Department in *Yankee* because that rate has not appeared in *any* DOE documents in the twenty-plus years since Congress passed the NWPA. (Tr. 838) (Supko Test.) However, it is apparent from the analyses that she did perform that such an acceptance rate would be unreasonable – not only because it would result in significant amounts of additional dry storage, but also because it would not result in timely decommissioning.

**d. "When would disposition have to commence in order to avoid additional on-site storage at APC or GPC?"**

Had DOE begun performance in 1998 under the 3000 MTU rate scenario, using a strict "oldest fuel first" ("OFF") acceptance priority, it would have commenced removal of SNF at Plant Hatch in 2001 and at Plant Farley in 2002. (Tr. 292-94 (Cocherell Test.); PX 7 (1990 Annual Capacity Report) at Appx. A.)) Both parties agree that commencement of performance under that schedule would have been sufficient to eliminate the need for dry cask storage at both of those plants. (PX 651 (Kenrich Report) at 24; Tr. 710 (Supko Test.); PX 594 (Neuberger Report) at 17.)

**B. The Number of Casks Loaded at Plant Hatch.**

Because the SNF discharges and overall pool size are not in dispute, the reasonableness of Southern's cask loading schedule depends on the appropriate size of the operating reserve to be maintained in its reactor pools. Southern has transferred 22 casks, containing 1496 assemblies from the shared pool at Plant Hatch to dry storage through December 31, 2004, and by that date was prepared to load three casks (which would hold 96 assemblies) from Unit One of Plant Farley. The Government has proposed adjustments to Southern's damages of approximately $11 million,[70] based on an assertion, unsupported by any evidence, that it is unreasonable for Southern to have loaded more than 9 casks, containing 612 SNF assemblies, from the Plant Hatch pool. The Government's position is based on the erroneous assumptions that 1 FCR is an adequate long-term reserve for a shared pool and (2) that DOE would have removed only enough SNF to maintain a maximum of 1 FCR for the entire Hatch pool had DOE performed at the 3000 MTU rate.

[70] The Government asserts that Southern's damages should be reduced by 13 (22 casks – 9 casks) casks - $7,697,000 for 10 HI-STORM casks and $14,919,855 for 3 HI-STAR casks. (Tr. 2368-72) (Johnson Test.)

**1. The Size of the Operating Reserves in the Breach and Non-Breach Scenarios.**

A critical mistake in the Government's claimed adjustments to Southern's damages is that it is based on an assumption that in the "non-breach" case, Plant Hatch would have maintained a maximum of 1 FCR and, consequently, that the number of SNF assemblies loaded pursuant to Plant Hatch's actual cask loading schedule exceeds the number of assemblies that would have been loaded by DOE using the 3000 MTU rate DOE has decided to use when it begins performance of the Contract.

To the contrary, Southern's target operating reserves and the consequent loading schedules have resulted in an actual operating reserve that is less than the operating reserve that it would have enjoyed had DOE performed.

**Hatch Shared Pool 2004**[71]

| Operating Reserve Had DOE Performed | Actual Operating Reserve |
|---|---|
| 1.9 FCR | 1.7 FCR |

[71] For planning purposes, Southern's engineers measure the amount of operating reserve each year by the maximum amount of fuel in a pool before fuel is taken out of the pool for storage. (Tr. 1501) (Metcalfe Test.) Had DOE performed, the usable space in the pool for 2004 would have been calculated by reducing the capacity of the pool – 6245 assemblies – by the amount of SNF at the beginning of the year – 4971 assemblies – and by the amount of that year's discharge – 228 assemblies – to get 1046 assemblies of usable space. (PX 594 (Neuberger Report) Ex. 3 – Fuel Mgmt. Model – But for Scenario – Model Assumptions for Hatch; *id.* at Hatch SNF Inventory Table.) Dividing the 1046 assemblies by the number of assemblies per FCR – 560 assemblies – yields an operating reserve of 1.86 FCRs, or 1.9 FCRs rounded. (*Id.* at Model Assumptions for Hatch.) In the breach case, the actual capacity of the pool – 6078 assemblies – is reduced by the 4907 assemblies of SNF in the pool at the beginning of the year and by the 228 assemblies that were discharged to obtain usable pool space of 943 assemblies. (*Id.* at Actual Scenario – Model Assumptions for Hatch; *id.* at Hatch SNF Inventory Table) Dividing the 943 assemblies by the number of assemblies per FCR – 560 assemblies – yields an operating reserve of 1.68 FCRs, or 1.7 FCRs rounded. (*Id.* at Model Assumptions for Hatch.)

The Government's economist, Dr. Neuberger, as well as Mr. Johnson, the Government's damages witness, acknowledged that had the Government performed at the 3000 MTU per year rate that Dr. Neuberger's simulations left Southern with less available space in its SNF pool by the end of 2004 than DOE performance at the 3000 MTU rate would have. (Tr. 2121) (Neuberger Test.); Tr. 2366-67 (Johnson Test.)) Southern's actual loading schedule, while making progress toward the desired operating reserve, has provided Southern with less useable space than DOE performance would.[72] Indeed, regardless of pool capacity, DOE would have picked up more SNF assemblies in the non-breach case than Southern has actually loaded. Southern's actual loading schedule, upon which Southern's damages are based, is reasonable, and the Government has not shown Southern's damages are unreasonable based on Dr. Neuberger's simulation that holds Plant Hatch to a maximum of 1 FCR for the entire pool.[73]

In *Indiana Michigan Power Co. v. United States*, 60 Fed. Cl. 639, 654-55 (2004), *aff'd*, 422 F.3d 1369 (2005), the nuclear utility attempted to justify all of its future damages by the assertion of a hypothetical policy to maintain 2.9 FCR operating reserve (554 assemblies ÷ 193 assemblies in a reactor core). The court found, however, that Indiana Michigan's reserve policy, had never been adopted prior to the litigation and that the policy had been contradicted by the

[72] By comparison, the number of assemblies that the DOE needed to pick up in order for Hatch to avoid dry storage would be equivalent to a cumulative industry-wide DOE pickup through 2002 of 4865 MTUs, which in turn equates to an annual steady-state SNF acceptance rate of 1500 MTUs per year, assuming the ramp up described in DOE planning documents. There is clearly no basis in the record for such a low rate.

[73] The rule against excessive mitigation costs only prevents recovery of excessive costs spent to place the non-breaching party in the same economic position it would have enjoyed absent the breach. The rule does not require a reduction in mitigation such that the non-breaching party does not reach the same economic position it would have enjoyed absent the breach. *See Restatement (Second) of Contracts*, § 347 cmt. a; *id.* at § 350, illus. 16; *Indiana Michigan*, 422 F.3d at 1373.

deposition testimony of Indiana Michigan's own engineer who had stated a smaller operating reserve would be adequate. *Id.*[74]

In contrast, Southern's actual – not hypothetical- cask loading campaign is designed to recover an FCR per reactor – in the case of Plant Hatch that would be 2 FCRs. The authenticity – and reasonableness - of Southern's operating reserve is demonstrated not only by several pre-litigation documents dating back to 1997 articulating a desire to maintain a reserve per reactor and by the consistent deposition and trial testimony of its nuclear engineers and managers (Messers. Long and Bland), it is demonstrated by Southern's actions, which were funded by Southern's own money, in loading casks at a rate designed to recover 1 FCR per reactor. Moreover, the Government could not produce a single witness with any credentials that would testify that Southern's reserve policy was unreasonable.[75]

**2. Southern's Nuclear Witnesses Demonstrated the Reasonableness of Southern's Operating Reserves, and the Government Presented No Proof that Southern's Approach was Unreasonable.**

Mr. Long, based on his 35 years of experience in nuclear plant operations and management, testified that Southern set its operating reserve based on the company's twin goals of safety and operational efficiency. (Tr. 127, 145-50) (Long Test.) Mr. Long testified that a short-term minimum operating reserve equal to a total of 1 FCR at Plant Hatch's shared pool was

[74] Indiana Michigan's engineers emphasized that the utility had to shut down both reactors in the shared pool at the same time several years earlier. *Indiana Michigan*, 60 Fed. Cl. at 555 n. 33. Offloading both 193 assembly cores during a simultaneous shut down, however, would have required an operating reserve of only 386 assemblies (*i.e.*, 2 FCRs), not 544 assemblies (*i.e.*, 2.9 FCRs).

[75] After the Government's designated nuclear operations expert, Mr. E.R. Johnson, provided his expert report and testified at deposition, the Government withdrew him as an expert and did not offer his report. Accordingly, neither E.R. Johnson's expert report nor his deposition are in evidence.

reasonable. (*Id.* at 145.) For short periods of time, the low probability of needing to unload both cores into the pool simultaneously, compared with the expense of recovering an FCR for each unit immediately, justifies the use of 1 FCR as a temporary, short-term minimum. (*Id.* at 145-47.) For a longer term, the probability of discharging both cores is greater. (*Id.* at 148-50.) Therefore, Mr. Long testified that a target operating reserve of 2 FCRs is appropriate for Plant Hatch's shared pool over the long term because the risk of simultaneous maintenance and simultaneous outages of the nuclear reactors increase as the reactors age and as the time period increases in duration. (*Id.*) For example, there is a greater likelihood of NRC ordering all reactors of the BWR type used at Plant Hatch to shut down for maintenance because a defect is found in a similar reactor located in another plant as such plants get older. (*Id.*) This difference in probability explains why Southern used the loss of 1 FCR total for the shared pool as the threshold for adding onsite storage and why, although 1 FCR per reactor is the long-term target, Southern has not yet reached the target but is instead loading casks to reach that target gradually, by 2007. *See* (Tr. 148 (Long Test.); PX 594 (Neuberger Report) Ex. 3 Actual Scenario for Hatch – SNF Inventory Tabled.)

Mr. Long also explained that the simultaneous off-load capability is more economically efficient because the simultaneous shut down results in less total down time for both reactors than a staggered shut down. (Tr. 149) (Long Test.) The more shut down time, the more money Southern must expend to bring a higher cost generating plant on line or purchase replacement electricity elsewhere. (*Id.* at 149, 137-38.)[76]

---

[76] Southern is not alone in selecting a 2 FCR operating reserve for a pool that serves two nuclear reactors. *See, e.g.*, *In re Northern States Power Co.*, 604 N.W.2d 386, 388 & n.1 (Minn. Ct. App. 2000) (upholding public service commission's decision that, among other things, required the nuclear utility to maintain a 2 FCR reserve for a pool that served two nuclear reactors – "A condition to the approval was that NSP establish cooling pool storage space for a full core **off-load**, which entailed the ability to store the 121 fuel assemblies from each of Prairie Island's two reactors – for a total of 242 assemblies . . . . A full core **off-load** is the process of removing all the

The Government offered no testimony of any person with nuclear plant operating or management experience – or nuclear experience of any kind - on what constitutes a reasonable operating reserve for a nuclear power plant. Instead, the Government's economist, Dr. Neuberger simply manipulated Southern's damages expert's spreadsheet to reflect a maximum—as opposed to a minimum—reserve of 1 FCR at Plant Hatch. (Tr. 2039–41) (Neuberger Test.) Mr. Johnson's damages adjustment for "excessive loading of casks" at Plant Hatch is based solely on Neuberger's simulation. (Tr. 2366-67) (Johnson Test.)[77]

Notwithstanding his manipulation of the reserve calculations, Dr. Neuberger conceded that he was not qualified to render an opinion as to the reasonableness from an operational or technical perspective of Southern's goal of recovering 1 FCR per unit for the HNP pool, of the number of casks actually loaded by Southern, or as to the technical or operating considerations underlying Southern's SNF loading schedule. (Tr. 2033-34) (Neuberger Test.) Indeed, Dr. Neuberger admitted that Southern's nuclear engineers and managers were in a better position to determine the number of casks loaded:

> Q. Well, Dr. Neuberger, weren't the Plaintiffs [*i.e.*, Southern] in the best position to know how many casks are required at their nuclear facilities?
>
> A. They certainly are, and I'm not proposing to tell them how many casks to load.

---

fuel assemblies from the two nuclear reactor cores at Prairie Island, and then placing the assemblies into the storage pool. The **off-load** would be necessary when, for example, NSP wanted to work on the reactors").

[77] Although the Government has not asserted adjustments to Southern's damages based on the construction of the ISFSI at Plant Farley or the purchase of the three casks that were loaded in 2005, Mr. McCallum, based on his 20 years of nuclear plant operation and management experience, explained the reasonableness of Southern's operating reserve for each separate reactor pool at Plant Farley. (Tr. 1364-77 (McCallum Test.) The need to place new fuel in the pool before loading because of the smaller reactor building at Plant Farley makes an operating reserve equal to 1 FCR plus two loads of new fuel reasonable. (*Id.*) The construction of the Farley ISFSI and the purchase of the casks was based on Plant Farley's need to maintain 1 FCR plus space for new fuel in each pool. (*Id.*)

(*Id.* at 2055.)

No other witness for either side or any documentary evidence suggests that Southern's target operating reserve is unreasonable or that Southern loaded an excessive number of SNF assemblies into casks.[78] "It is not the task of the court to second guess the judgment of a skilled team of managers with a history of successful institutional management." *Citizens Federal Bank*, 66 Fed. Cl. at 185. The Government has clearly failed to meet its burden of proof that Southern's actual mitigation has been unreasonable.

### C. The "Bathtub Rack" Adjustment.

#### 1. Southern's Management's Decision Not to Temporarily Use the Second Bathtub Rack in the Hatch Pool was Reasonable.

The Government's Dr. Neuberger testified that Southern has loaded three casks more than necessary at Plant Hatch, and that Southern was not required to load any casks at Hatch before 2001, because it could have installed an additional storage rack in the "bathtub" area of the spent fuel pool. Dr. Neuberger assumed that because Messrs. Long and Bland testified that a second rack could have been installed in the bathtub area to avoid dry storage in the non-breach case, the rack should have been installed in lieu of loading the first three casks at Plant Hatch in the breach case.

Further, the Government's economist, Dr. Neuberger, argued that Southern's damages must be reduced because of certain "discrepancies" between the breach case and the non-breach case (*e.g.*, size of operating reserve in non-breach and breach cases and installation of second bathtub rack at Plant Hatch in both non-breach and breach cases). (Tr. 2039-41) (Neuberger

[78] While certain of Southern's documents monitored the loss of the minimum 1 FCR as the minimum operational requirements, *see, e.g.*, DX 38, DX 39, DX 104, others monitored the loss of 2 FCRs as well, *see, e.g.*, PX 789, PX 800, DX 208.

Test.); Def.'s Mem. of Contentions of Fact and Law at 60, 61, 63, Dkt. 309. The *Restatement (Second) of Contracts*, however, states: "If *discrepancies* between the transactions [*i.e.*, non-breach transaction and breach-mitigating transaction] can be adequately compensated for in damages, the alternative transaction is regarded as a substitute and such damages [*i.e.*, reasonable costs of mitigation] are awarded." *Id.* at cmt. e (emphasis added). The *Restatement* illustrates this concept as follows:

> 5. A Contracts to sell to B a sued machine to be delivered at B's factory by June 1, for $10,000. A breaks the contract by repudiating it on May 1. By appropriate efforts B could buy a similar machine form another seller for $11,000 in time to be delivered to the factory by June 1, but does not do so and looses a profit of $25,000 that he would have made from the use of the machine. . . .
>
> . . . .
>
> 12. The facts being otherwise as stated in Illustration 5, the other seller will not deliver the similar machine to B's factory, and insists that B take possession of it two weeks earlier than he can install it in his factory, but B can arrange to have it stored for two weeks and shipped to his factory for $1,500. B's damages do not include the loss of the $25,000 profit, but he can recover the $1,500 as well as the $1,000 from A.

*Id.* at § 350 illus. 5 & 12. Thus, the Restatement recognizes that the non-reaching party will take different actions in the non-breach case (no storage or shipment) and the breach case (storage and shipment).

Similarly, *TVA*, 65 Fed. Cl. at 532, this Court recognized that in the "but for" or non-breach case, a nuclear utility could and would take different actions than it would under the breach case:

> Given the proportionately large cost of building and operating dry storage facilities, TVA would have had several options available in the but-for scenario to deal with its spent fuel while still avoiding dry storage. These options included encroachment on full core reserve, increasing TVA's allotments with DOE, exchanging allotments with other utilities, cask-pit storage, and transshipment of SNF to other plants.

Likewise, given the proportionately larger cost of building an ISFSI at Plant Hatch ($20 million) versus the cost of installing the second bathtub rack ($419,800), the Court should recognize that Southern would act reasonably under the different set of circumstances presented by the non-breach case (no ISFSI would have to be built if the second bathtub rack was installed) and the breach scenario (the ISFSI would have to be built in any event).[79] The Government's contention that Southern should have installed the second bathtub rack in 2000 (and then taken it out of the pool, decontaminated it, and later decommissioned it) in order to delay loading casks for one year fails as a matter of fact and law.

As Mr. Long and Mr. Bland testified, because Southern had already decided to build the ISFSI, the temporary installation of the second bathtub rack would not have been a reasonable nuclear operating procedure. (Tr. 160-61 (Long Test.); Tr. 1185-90 (Bland Test.); Tr. 960 (Wade Test.)) The second rack would have taken up valuable pool space that is used for maintenance activities and tool storage. (Tr. 144) (Long Test.) Further, installation of the rack would have contaminated that rack with radiation and exposed Southern's workers to radiation for only a temporary delay in loading. (Tr. 1185-90) (Bland Test.) Based on their decades of experience in operating and managing nuclear plants, Mr. Long and David Bland testified that foregoing the

---

[79] Indeed, on cross-examination, Dr. Neuberger conceded, that different assumptions could reasonably be used in the breach and non-breach cases:

> Q. … I think you agree, probably without qualification, that if the installation of that second bathtub rack allowed Southern Nuclear to avoid a dry cask storage facility at all at Plant Hatch, that would be a rational, economically rational thing to do?
>
> A. It certainly may be from an operational standpoint. (Tr. 2134) (Neuberger Test.) Dr. Neuberger simply had no expertise with which to assess the reasonableness of Southern Nuclear's operating decisions. (*Id.* at 2033-34.)

installation of the second bathtub rack was reasonable. (Tr. 161 (Long Test.); Tr. 1185-90 (Bland Test.))

Neither the Government's economist nor its accountant, who have never even worked in a nuclear plant, are in a position to question the technical judgment of Southern's executives on this issue. Neither Dr. Neuberger nor Mr. Johnson has the requisite expertise to question the rationale for Mr. Bland and Mr. Long's decision to forgo the installation of the additional rack, or to question their judgment that the rack would have been installed in the non-breach case.. (Tr. 2033-34 (Neuberger Test.); Tr. 2192-96 (Johnson Test.)).[80] Indeed, Dr. Neuberger appears to agree that Southern would have installed the second rack in the non-breach case. (Tr. 2134) (Neuberger Test.) This second guessing of what Southern's experienced managers actually concluded was in the best interest of Plant Hatch only highlights the Government witnesses' lack of expertise. *See Commercial Fed. Bank, F.S.B.*, 59 Fed. Cl. at 355 ("**It is not the task of the court to second guess the judgment of a skilled team of managers with a history of successful institutional management**.") (Emphasis added); C*itizens Federal Bank*, 66 Fed. Cl. at 185.

Finally, it was the Government's wrongful conduct – the breach of its contractual duty to remove the SNF – that forced SNC to decide whether or not to install the second rack. *See Citizens Federal Bank*, 66 Fed. Cl. at 185. ("Where a choice has been required between two reasonable courses, the person whose wrong forced the choice can not complain that one rather than the other was chosen.") Southern's management implemented an SNF storage strategy that it believed, and still believes was prudent and reasonable, and the Government has presented no evidence to the contrary. As a result the Government has not come close to meeting its burden of

[80] Indeed, Dr. Neuberger appears to agree that Southern would have installed the second rack in the non-breach case. (Tr. 2134) (Neuberger Test.) It is Mr. Long and Mr. Bland's actual decision not to install the rack, not their hypothetical decision to install the rack that Dr. Neuberger questions.

proving that Southern's action in loading three casks rather than installing the additional rack was unreasonable.

### 2. The Government's Adjustment Fails To Account For The Cost of Installing the Additional Bathtub Rack.

As indicated above, the Government's 13-cask adjustment to Southern's claim is based upon (1) the assertion that Southern should have only loaded 9 casks at Plant Hatch through 2004; which in turn is based on (2) the assertion that Southern should have installed the second additional rack in the bathtub area of the Plant Hatch pool. (Tr. 2393-94) (Johnson Test.) Mr. Johnson, however, failed to account for the $419,800 cost of installing the additional bathtub rack. (*Id.* 406-07.) As a result, the asserted adjustment overstates the difference in cost between the 22 casks and the 9 casks by $419,800. (*Id.*)

## D. The HI-STAR Casks Adjustment.

The first three SNF casks that Southern purchased for Plant Hatch were HI-STAR casks. HI-STAR casks can be used for both SNF storage and transportation. They are also more expensive than the remainder of casks that Southern purchased – HI-STORM casks – that can be used only for storage of SNF.

In another example of after-the-fact criticism, Mr. Johnson and Dr. Neuberger, the Government's witnesses on damages, contend that Southern should not have purchased the three dual-purpose HI-STAR casks, which are NRC-certified for storage and transportation, but only the less-expensive, storage only HI-STORM casks. Beginning with this assumption, Mr. Johnson further opines that Southern should not recover costs incurred (1) to demonstrate the loading of the HI-STAR cask to the NRC, (2) to construct a railroad spur used in the HI-STAR loading

operation, (3) to lease cranes and railcars, (4) of a "strong back support beam," (5) of a HI-STAR Cask Cradle, and (6) to engineer and construct an "upender pad" used to unload the HI-STARs upon delivery. The total adjustment asserted by the Government regarding the HI-STARs is over $14.5 million.

**1. The Purchase of the HI-STARs Was Reasonable.**

In 1998, Plant Hatch was scheduled to lose its 1 FCR total operating reserve in June of 2000 and all of its SNF storage decisions were based on that date. (Tr. 1222-26) (Bland Test.); DX 217 (Letter from Louis Sumner to Charles Hawney (NRC) (Apr. 13, 1998.)) Subsequently, because of the uncertainties in licensing and developing the storage systems, Southern decided to pursue licensing and installation of one set of storage racks to guard against the possibility that the cask loading campaign fell behind schedule and could not relieve the pool capacity before June 2000 when the pool would lose 1 FCR total operating reserve. (*Id.*) Although these additional racks provided Plant Hatch with the ability to maintain 1 FCR through 2001, they were not licensed, and the first one was not installed until mid-2000, by which time the HI-STARs had already been purchased and delivered. (*Id.*)

Mr. Long testified that at the time Southern contracted to purchase the three HI-STAR casks – 1999 – that cask design was the only Holtec (the manufacturer) design licensed by the NRC for use. (Tr. 178-80) (Long Test.) In addition, the HI-STAR casks had the extra function of transportability that would allow the Government to transport the casks away from the reactor site to, for example, Yucca Mountain or an MRS, and would allow Southern to transport SNF to the PFS facility in Utah. (*Id.* at 185.) At the time the decision was made to purchase the HI-STARs,

the Government had not announced that it would not accept transportable casks.[81] To the contrary, the Government was encouraging the use of multi-purpose canisters (*i.e.*, canisters that could be used to store and transport SNF) that would have been housed in the HI-STAR casks.[82]

Subsequently, when the NRC licensed the less expensive, storage-only HI-STORM casks on May 31, 2000, Southern began purchasing the HI-STORM casks. (Tr. 201) (Long Test.) As with the decision not to install the second rack in the bathtub region of the Hatch pool, Southern's decision to purchase the HI-STAR casks was reasonable. The Government's house-of-cards argument that the HI-STAR casks and all costs dependant thereon should be disallowed totally collapses when one considers the facts and circumstances that confronted Southern's managers and engineers at the time they made the decision to mitigate damages by purchasing the HI-STAR casks. *See Citizens Federal Bank*, 66 Fed. Cl. at 185 (quoting E. Allan Farnsworth, *Contracts* § 12.12) ("[A] party that takes steps that seemed reasonable at the time will not be judged by hindsight."). Because of the long lead time to implement dry storage, Southern had to select a

[81] *See, e.g.*, (PX 167 (DOE Civilian Radioactive Waste Management Requirements Document, REV 5 (Jan. 1999) (Description of Revision made in 1996 to the requirements ) at iii ("Provides notice to users on MPC Policy Change, *i.e.*, The CRWMS will accept and accommodate a variety of cask/canister systems for commercial SNF which are currently available or are being developed. These may be individual spent fuel assemblies; or single, dual or triple purpose cask or canister systems...."; PX 168 (DOE Civilian Radioactive Waste Management Requirements Document, REV 5 DCN1 (May 2000)) (Description of Revision made in 1996 to the requirements) at HQR-058-0752) ("Provides notice to users on MPC Policy Change, *i.e.*, The CRWMS will accept and accommodate a variety of cask/canister systems for commercial SNF which are currently available or are being developed. These may be individual spent fuel assemblies; or single, dual or triple purpose cask or canister systems...."); PX 180 (DOE Civilian Radioactive Waste Management Requirements Document, REV 6 (Sept. 2004)) (Description of Revision made in 1996 to the requirements) at vii ("Provides notice to users on MPC Policy Change, *i.e.*, The CRWMS will accept and accommodate a variety of cask/canister systems for commercial SNF which are currently available or are being developed. These may be individual spent fuel assemblies; or single, dual or triple purpose cask or canister systems...." at 9; "CRWMS elements and facilities shall be capable of accommodating a range of storage and transportation technologies, including multipurpose, dual-purpose, and single-purpose canisters, as well as bare SNF assemblies."))

[82] (*Id.*)

cask type prior to the actual loading date, and design and implement changes to its plant site to load such casks – at the time the decision was made, the HI-STAR was the only licensed Holtec cask. (Tr. 1180-83) (Bland Test.) For Southern to have selected and expended money to implement a non-licensed, and thus unusable, cask would have been unreasonable.

Again, it is not appropriate for the Government's economist and accountant to "second guess the judgment of a skilled team of managers with a history of successful [nuclear plant] management." *See Commercial Fed. Bank, F.S.B.*, 59 Fed. Cl. at 355. *See Citizens Federal Bank*, 66 Fed. Cl. at 185 ("As Judge Bruggink held in *First Nationwide Bank v. United States*, '"[t]he rule of mitigation of damages may not be invoked by a contract breaker ... merely for showing that the injured person *might have* taken steps which ... would have been more advantageous to the defaulter."' 56 Fed. Cl. 438, 444 (2003) (quoting *In re Kellett Aircraft Corp.*, 186 F.2d at 198-99) (alterations in original).") The cost of the three HI-STAR casks and the related expenses are recoverable mitigation expenses.

### 2. Southern Reasonably Began Loading HI-STARs in 2000.

Mr. Johnson's adjustment for HI-STARs is based on his assumption, derived from one of Dr. Neuberger's simulations of the Kenrich damages model, that Southern should not have loaded casks at Plant Hatch until 2001, and therefore could have waited on HI-STORMS to be licensed by NRC. (Tr. 2369, 2270-71) (Johnson Test.) David Bland testified that to build Southern's first ISFSI and load its first casks required lead time. (Tr. 1180) (Bland Test.) When it became evident that DOE would not perform its obligations under the Contracts and that Plant Hatch would lose 1 FCR in its pool after the 2001 refueling outage unless SNF was move to dry storage prior to that time, Southern initiated a plan to load casks in mid-to late 2000. (Tr. 1180) (Bland Test.) Dry storage systems were a very new technology and this was Plant Hatch's first loading campaign.

(Tr. 179-80 (Long Test.)) It would have exposed the plant to great risk for Southern to have attempted to implement dry storage as a last minute remedy. (Tr. 1180, 1153-53, 1251-52 (Bland Test.)). *See Citizens Federal Bank*, 66 Fed. Cl. at 185 ("[i]t is not the task of the court to second guess the judgment of a skilled team of managers with a history of successful institutional management.").

As with his other adjustments, Mr. Johnson has no technical basis for his contention that Southern loaded casks too early — he merely asserts it based on Dr. Neuberger's simulations, which likewise lack any technical support. (Tr. 2193-94) (Johnson Test.) Like his other baseless assertions regarding the reasonableness of Southern's actions in managing its spent fuel pools, this assertion is refuted by overwhelming evidence to the contrary. (Tr. 1180) (Bland Test.) The decision to load casks in the summer of 2000, rather than just prior to the 2001 outage, was a natural outgrowth of a reasonable concern over implementing a first of a kind process and a first of a kind technology in an operating nuclear power plant. (*Id.*). The Government is not in a position to second guess Southern's judgment on this issue. *See Citizens Federal Bank*, 66 Fed. Cl. at 185.

**3. The Proposed Upender Pad Adjustment Is Erroneous.**

Over $5 million of the Government's almost $15 million "HI-STAR adjustment" to Southern's damages relates to the engineering cost for an "upender pad" constructed at Plant Hatch to make delivery of the HI-STAR casks possible. (Tr. 2384-90) (Johnson Test.) Because the engineering for the upender pad was included in the work order for the engineering for the rest of the Hatch ISFSI; and because Mr. Johnson understood from some source that was not identified at trial that the engineering for the upender pad occurred between 1998 and 2000, Mr. Johnson

excluded all engineering costs for the ISFSI during those years. (*Id.* at 2373-80.) This adjustment is specious and in direct conflict with the evidence.

First, it is clear from the testimony of David Bland, the project manager for the Hatch ISFSI construction that the engineering for the upender pad occurred only in 1999. (Tr. 2378-79 (Johnson Test.); Tr. 1242-43 (Bland Test.)) Mr. Johnson had apparently not reviewed Mr. Bland's testimony in this regard but acknowledged it refuted his exclusion of all ISFSI engineering costs from 1998-2000. (Tr. 2377-78) (Johnson Test.)

Second, Mr. Bland's testimony conclusively establishes that the engineering for the upender pad was a relatively minor expense compared to the engineering for the ISFSI. (Tr. 1242-43) (Bland Test.). It is also undisputed that the ISFSI was subject to much stricter regulatory requirements than the upender pad and that Southern's engineers were able to simply scale down engineering work that had already been done for the ISFSI to design the upender pad. (*Id*. at 1238-39). In contrast, the Government's adjustment would exclude 100% of the engineering cost for the ISFSI during 1998-2000 and 77% of the total engineering costs for the ISFSI. (Tr. 2389) (Johnson Test.) Given that the total area of the upender pad is only 7% of the ISFSI, the Government's $5 million adjustment is neither reasonable nor supported by any evidence. (*Id.*)

### E. The Internal Labor Adjustment.

In adding SNF storage capacity, Southern, in part, used its own workforce and supervisors and allocated overhead to the SNF projects in accordance with its standard accounting practices. The Government's witnesses contend that the cost of labor, overhead, and engineering supervision for Southern's employees who worked on SNF storage facilities are not recoverable because

Southern would have paid such costs even without the Government's breach. (Tr. 2257-58) (Johnson Test.)

It is undisputed that Southern's use of its own employees instead of outside contractors saved money. Mr. Wade testified to this without contradiction by any Government witness (Tr. 1125-1128) (Wade Test.) Thus, Southern's efforts to mitigate the harm caused by the Government's partial breach were reasonable.

In addition, the Government's argument runs afoul of basic contract law. "The general rule is that damages for breach of contract shall place the wronged party in as good a position as it would have been in, had the breaching party fully performed its obligation." *Massachusetts Bay Transp. Auth.*, 129 F.3d at 1232. The courts have recognized that to place a non-breaching party "in as good a position" as it would have enjoyed in a non-breach scenario requires the award of damages for the reasonable cost of internal labor and supervision to mitigate the breach. Had the breaching party performed, the non-breaching party's employees could have performed other tasks. For example, in *Convoy Co. v. Sperry Rand Corp.*, 672 F.2d 781, 785-86 (9th Cir. 1982), the court of appeals affirmed an award of breach of contract damages for a defective computer system, stating:

> Univac argues that as a matter of law supervisory staff costs cannot be recovered because the plaintiff would have paid the staff's salary in any event. . . .
>
> **The issue is not whether Convoy would have paid the supervisors' salaries if the defendant had not breached the contract, but whether the breach deprived Convoy of the services it paid for. . . .**
>
> In *Clements Auto Supply* [*Co. v. Service Bureau Corp.*, 298 F. Supp. 115, 134 (D. Minn. 1969), *aff'd in relevant part*, 444 F.2d 169 (8th Cir. 1971)], the court found that the supervisors' services were effectively lost to the plaintiff during the time they supervised a system which was of little benefit to the company. In relying on *Clements Auto Supply*, the district court implicitly found that Convoy had lost the benefit of its supervisors' services for the time they spent supervising the computer system.

(Emphasis added.)[83] *See Dunn Appraisal Co. v. Honeywell Information Systems, Inc.*, 687 F.2d 877, 883-84 (6th Cir. 1982) (upholding award of damages for labor of plaintiffs' employees and supervisor in fraudulent-inducement-of-contract case resulting from purchase of inadequate computer system).

Indeed, the Government has sued and recovered for the cost of its own employees and facilities needed to repair damage caused by private parties. For example, in *United States v. The John R. Williams*, 144 F.2d 451 (2d Cir.), *cert. denied*, 323 U.S. 782 (1944), a private tugboat damaged a submarine cable, and the government repaired the cable using its own boat and crew. While the private party argued that the repair work "did not prevent the use of the [government's] vessel for other repair work and, therefore, added nothing to the [government's] necessary outlay," the Second Circuit upheld that award of damages for the Government's repair boat and crew. *Id.* at 453. Similarly, in *United States v. New England S.S. Co.*, 297 F. 651 (S.D. N.Y. 1923), the

[83] Similarly, in a negligence case, the Fifth Circuit affirmed an award of damages to place a dock owner in as good a position as it enjoyed prior to the injury to its dock by awarding the cost of internal labor as damages, stating:

> Freeport has arranged with an independent engineering concern to be furnished supplemental personnel when its own salaried engineering staff is overworked. Because Freeport found it unnecessary to tap this outside [firm] during the period of the engineering work on the dock, Pansuiza contends that, were it not for the dock work, Freeport's engineers would have been idle or engaged in essentially nonproductive work. Pansuiza argues, therefore, that the engineering work was performed without any additional expense or overhead. We reject this argument as being wholly based on speculation. It is at least as plausible that there were other Freeport projects that would have been worked on by Freeport's internal engineers, but were not of such an emergency nature that they required the immediate employment of the outside firm.
>
> . . . .
>
> The cost of repairs performed internally by the injured party, including overhead, are recoverable in a negligence action. . . . The district court properly concluded that Freeport was entitled to recover its in-house engineering costs.

*Freeport Sulphur Co. v S/S Hermosa*, 526 F.2d 300, 303-04 (5th Cir. 1976).

Government sued for the costs of repairing damage to a Navy ship caused by a private ship. While the private party argued that "[t]he government had five dry docks at the yard; except for the use in question [*i.e.*, repairing the Navy's damages ship], all were idle during the repairs," the court awarded damages for the cost of the Navy crewmen and the Navy's dock facilities used to take the ship to the dockyard and repair it. (Tr. 654-55.)

In *TVA*, 69 Fed. Cl. at 539, this Court stated:

> In accord with those decisions, as well as federal common law and maritime tort precedents such as *The John R. Williams* and *Freeport Sulphur*, the fact that TVA used its own internal resources to support its mitigation is not fatal to its claim for damages in mitigating a breach of contract. Rather, **the test for recovery is a targeted one: whether use of the internal resources by TVA deprived it of the ability to employ those resources on other projects.** That TVA would have paid its employees in all events is not material to this inquiry.

(Emphasis added.)

Both Messrs. Long and McCallum testified that Southern would have used its own employees to reduce maintenance backlogs had they not been required to use those employees to mitigate damages from the Government's breach (Tr. 169-172 (Long Test.); Tr. 1287 (Bland Test.)) The Government did not present a witness to contradict this testimony. Although Mr. Johnson assumed that Southern's use of internal labor reflected idle capacity in the plant staffs, he proferred no analysis of staff size to support his assumption. (Tr. 2257-62) (Johnson Test.) Southern's internal labor was incremental and is recoverable.

With respect to overhead, this Court has awarded an allocable share of general overhead as damages in a breach of contract action. In *Chain Belt Co.*, 127 Ct. Cl. 38, the government sold a manufacturing plant building to Chain Belt, but did not vacate the entire premises by the time required by the sales contract. In addition to payments to outside contractors to repair the floors and move certain government machinery, this Court allowed Chain Belt to recover breach of contract damages for the cost of watchmen, real estate taxes, insurance and fire protection,

building maintenance and repairs, and "general administration expense, 5 percent." *Id.* at 56 n.5. These general overhead expenses were allocated to the portion of the plant that the government did not vacate based on the square footage of the whole plant. *Id.*

Moreover, where the allocation of supervision and overhead is consistent with the accounting practices required by federal and state regulatory authorities, recovery has been allowed. *See Department of Water & Power*, 131 F. Supp. at 330 (allowing electric utility to recover supervision and overhead costs incurred to repair an electric system damaged by a government truck where allocations of such costs made in accordance with "the accounting procedure recommended by the Federal Power Commission [FERC's predecessor] and the California Public Utilities Commission").

In computing its damages, Southern used its standard accounting practices to allocate labor and supervision costs to the SNF project, just as it does for other projects not a part of this litigation. (Tr. 1561) (Metcalfe Test.) Moreover, Southern's allocation is consistent with the accounting practices required by FERC, the Alabama PSC, and the Georgia PSC. (*Id.* at 1560-62.)

Southern's costs for internal labor, overhead, and engineering supervision are incremental, reasonable, and recoverable.

### F. The Private Fuel Storage Adjustment.

In the mid-1990s, when it became clear that DOE would breach the Contracts, Southern could maintain its operations only by storing its SNF either on its own private ISFSIs in Alabama and Georgia or on another private ISFSI, such as the PFS facility in Utah. (Tr. 185-86) (Long Test.) At the time, both the technology and the licensing process for dry cask storage installation was untested and uncertain. (*Id.* at 186-87.) Similarly, the local political reaction to the

construction and operation of dry cask facilities on plant sites was unknown, although at least one utility had faced substantial local opposition to its facility. (Tr. 187) (Long Test.) In this context, investment in an alternative to the onsite storage was determined to be a reasonable thing to do by Southern's management. Instead of risking the shut down of their most valuable assets – its nuclear plants – more than 10 years in the future, Southern's nuclear plant managers mitigated their damages in part by investing a relatively small amount in the PFS project, thus securing its ownership in such facility. (*Id.* at 186-88)

The NRC's acceptance of PFS licensing submittals over the years and DOE statements that PFS storage was "reasonable" encouraged Southern to continue that funding. (Tr. 186 (Long Test.); Tr. 339-40 (Cocherell Test.); PX 817 (DOE, Final E.I.S. (Feb. 2002)) at vol. III § 9.1.) After its ISFSIs at Plants Hatch and Farley had been constructed and were operating without negative legislative action, Southern stopped making payments to PFS in 2004, but retained its interest. (DX 338) While the potential for future profit was mentioned with respect to PFS (Tr. 211) (Long Test.), Southern never actually earned any profits. (*Id.*)

The Government attempts to bear its burden to show that Southern's nuclear plant managers' decision was unreasonable without any testimony from any witness who has ever managed or worked at a nuclear plant. The Government simply asserts that PFS is speculative, it is basically an insurance policy, it has profit potential, and PFS payments were disallowed in *Indiana Michigan*, 60 Fed. Cl. at 658-59, *aff'd*, 422 F.3d 1369. These arguments fail.

Because of the long lead time for constructing and licensing an ISFSI, something private nuclear utilities had never done, Southern's nuclear plant managers decided to start the decade long process of designing and licensing an ISFSI outside of Alabama and Georgia. (Tr. 187) (Long Test.) The Government's lawyers argue that without threatened legislative action, Southern

nuclear plant managers should not have spent money on PFS. The nuclear plant managers with the responsibility of keeping Southern's nuclear plants running did not know in 1995 what the political situations in Alabama and Georgia would be in 2005. (*Id.* at 209, 187.) Southern's skilled team of nuclear plant managers with a history of successful nuclear plant management were not willing to speculate that all would be well if they just did nothing for 10 years – until they had no option but on-site storage. *See Citizens Federal Bank*, 66 Fed. Cl. at 185 ("[i]t is not the task of the court to second guess the judgment of a skilled team of managers with a history of successful institutional management.")

That PFS was, effectively, an insurance policy – a risk mitigation device – does not prevent such costs from being recovered as damages. Indeed, the Government has been required to pay damages in part made up of insurance costs before. *See Chain Belt*, 127 Ct. Cl. 35 (awarding plaintiff damages against the Government in part for "insurance"). The critical factor is whether the decision to shift of the risk of the loss event is reasonable under the circumstances. Given the substantial economic impact of shutting down the nuclear plants, Southern's nuclear plant managers decided to shift part of that risk. (Tr. 136-38, 155) (Long Test.)

That a mitigation activity may at some point in the future operate and generate a profit does not prevent recovery of costs of that activity as damages. For example, in *LaSalle Talman Bank. F.S.B. v. United States*, 317 F.3d 1363, 1372 (Fed. Cr. 2003), a Winstar case, the plaintiff bank entered into a transaction with another financial institution to mitigate the impact of the Government's breach of contract. The plaintiff bank subsequently earned profits arising from the transaction. *Id.* at 1373. The Federal Circuit held that the profits actually earned reduced the plaintiff bank's damages. *Id.* Moreover, Southern did not actually earn a profit from PFS. (Tr. 211) (Long Test.)

In *Indiana Michigan*, 60 Fed. Cl. at 641, Judge Hodges denied that utilities damages for PFS for five reasons. First, "[c]osts incurred before the breach are not permitted in a partial breach case" as a matter of law. *Id.* Second, the utility's witness on PFS "agreed that plaintiff's investment in PFS was a 'speculative' venture." *Id.* at 659. Third, PFS "would not be ready in time for plaintiff." *Id.* at 658. Fourth, the Government "could not have foreseen" that utilities would fund a PFS alternative. *Id*. at 659. Finally, the PFS alternative was not reasonable because "[m]embers of the Consortium had problems with NRC licensing and funding for construction, and they still do." *Id.* at 659.

The legal and evidentiary basis for Judge Hodges ruling on PFS in *Indiana Michigan* does not apply to this case. First, Judge Hodge's ruling that, as a matter of law, pre-breach costs are not recoverable in a partial breach case was overruled by the Federal Circuit. *See Indiana Michigan*, 422 F.3d at 1375 (stating that there is "no reason why efforts to avoid damages in contemplation of a partial breach should not ... be recoverable," just as they are recoverable for mitigation upon a total breach.") As a matter of law, this basis for denial of PFS costs no longer exists.

Second, unlike Indiana Michigan's witness, Southern's witnesses on PFS, Messers. Lou Long and Ron Cocherell, did not "agree[] that [Southern's] investment in PFS was a 'speculative venture.'" Mr. Long stated that Southern's nuclear managers decided that an off-site private ISFSI was reasonable given the uncertainty of whether storage restrictions or expensive taxes would effectively prohibit on-site storage of SNF over the next several years. (Tr. 205) (Long Test.)

When asked whether shipments of SNF to PFS were included in a study concerning the decommissioning of Plant Hatch, Mr. Cocherell stated: "At this time in 1996, Private Fuel Storage is still very speculative, it's very early in the process, … it's still in the licensing phase…. So I

would say that we really can't rely upon including it in any decommissioning studies at this time." (Tr. 396-97) (Cocherell Test.) In 1996, judging whether PFS, which was then unlicensed, would impact the decommissioning of Plant Hatch decades later was indeed less than certain. This does not mean that the plan to license and construct an ISFSI in less than 10 years was a lark, or that Southern's own nuclear managers did not believe was a reasonable and small investment.

In any event, the rule against "speculative" damages applies to the amount of damages, not the prospect for the success for the mitigating activity. *See TVA*, 69 Fed. Cl. at 543 (damages must be "shown with reasonable certainty. . . . . While the amount of damages need not be 'ascertainable with absolute exactness or mathematical precision[,]' recovery for speculative damages is precluded.") (quoting *Indiana Michigan*, 422 F.3d at 1373). The amount of damages for PFS is certain because the money has actually been paid – $8.2 million – and the Government has stipulated to it. (Tr. 6.)

The proper question is whether the payments constituted reasonable mitigation at the time they were made. That there was some question of whether PFS would ultimately be successful does not make it unreasonable. A guarantee of success is not required for mitigation to be recoverable. *See Restatement (Second) of Contracts* § 347, cmt. c. (costs incurred in reasonable efforts to avoid loss are recoverable "whether successful or not"); *see also TVA*, 69 Fed. Cl. at 523.

Indeed, the PFS facility for which Southern paid $8.2 million was much less "speculative" than the MRS or the repository for which Southern has paid $850 million. During the 1990s, NRC, accepted licensing submittals from the PFS entity. In 2002, DOE stated that PFS was "reasonable," and in 2005 the NRC approved the construction license for PFS. (PX 9 (DOE, E.I.S., at vol. III § 9.1g); Tr. 339-40 (Cocherell Test.))

Third, if the PFS facility would have been operational in 2002, it could have enabled Southern to avoid construction of dry storage facilities at Plants Farley and Vogtle. (Tr. 1380) (McCallum Test.) Plant Hatch would have needed the PFS alternative to be ready in 2000 to avoid building a PFS. Nonetheless, had the State of Georgia banned the storage of SNF at Plant Hatch or taxed it to the extent that such storage was not cost effective, PFS provided an alternative storage site to which SNF stored at a Plant Hatch ISFSI could be moved. *See* (Tr. 205, 185) (Long Test.) With this knowledge, Southern's experienced nuclear plant managers decided each year to keep the plans for an alternative storage site alive by authorizing annual contributions through 2004. (*Id.* at 215.) Moreover, had Plant Hatch been forced to shut down in 2001, an operating PFS in 2002 could have been used to minimize the shut down time.

Fourth, the assertion that the Government could not have foreseen utilities' funding of a PFS facility fails on its face. In 1998, when the Government breached the Contracts, Southern had two obvious options to avoid shut down: store the SNF at ISFSIs located at the plant sites or store the SNF at an ISFSI at the PFS site. With the NRC working with the PFS entity to license the facility (Tr. 186) (Long Test.) and with DOE stating that PFS was a reasonable SNF storage alternative, Southern's continuing contributions were foreseeable. *See* (PX 817 (DOE, E.I.S.) at vol. III § 9.1) ("DOE recognizes interim storage at the Private Fuel Storage facility in Utah to be a reasonably foreseeable future action.…"). Indeed, Southern made payments to PFS in 2002, 2003, and 2004 totaling $1,152,600 (*after* DOE had publicly announced that PFS was "reasonable"). (*Id.*; PX 428, SNOC007755, 7758, 7761, 7764.)

Fifth, while the perceived problems with licensing up to the time of trial influenced Judge Hodge's decision, it should not influence the Court's decision in this case because the NRC approved the license for the PFS in 2005. (Tr. 339-40) (Cocherell Test.)

Southern's nuclear plant managers made reasonable decisions to make annual payments to the PFS entity prior to the completion and operation of the ISFSI's in Alabama and Georgia and made the reasonable decision to stop making payments after the completion and successful operation of ISFSIs in Alabama and Georgia without negative legislative action.

**G. The Miscellaneous Costs Adjustments.**

**1. Work platform for cask loading.**

The Government asserts that a movable work platform used to support workers while they are welding or bolting the top on a cask before the cask is moved to the ISFSI or other offsite facility is a non-incremental cost. Had DOE performed, however, Southern believes that DOE would have provided the necessary loading equipment, such as the work platform. At trial, Jim Wade testified that he believed that DOE would have supplied this item. (Tr. 1063-1064) (Wade Test.) Mr. Wade's assumption is supported by the language in the Standard Contract that acknowledges DOE would have supplied necessary equipment to load casks. *See* (Standard Contract Section IV (B)(2)). At trial, the Government did not provide any evidence to demonstrate that DOE would not have supplied the work platform. Because the work platform would have been supplied by DOE, Southern's costs related to purchasing the work platform is incremental and claimable as damages.

**2. Standby Welding Time.**

To weld casks closed, Southern originally hired contract welders during the first loading campaigns at Plant Hatch. Because the welders are not constantly welding, they charged Southern "standby time," while they waited to weld the next cask. At trial, Jim Wade testified that it was standard industry practice to pay contract welders downtime. Jim Wade further noted that

Southern's contractor welders were "prequalified" and "precertified to make these welds." (Tr. 1129-30) (Wade Test.) Welders that have been specially trained to weld dry storage casks, who are working on a plant site miles from other possible job sites, charge down time when you require them to be on site but not working. (*Id*.) Southern's nuclear plant managers decided that paying welders for standby time was reasonable and necessary. (*Id*.) At trial, the Government did not provide evidence that there were any other available welding contractors with experience in welding casks that would not have charged Southern downtime. Without the possibility of a cheaper available option, no further mitigation was possible. Indeed, Southern eventually acquired the expertise to weld casks with internal labor – a cost that the Government is also asking this Court to disallow. (Tr. 2257-58) (Johnson Test.)

**H. The Cost of Capital Adjustment.**

Southern has included in its damages claim the cost of capital for the investment in dry storage facilities necessitated by the Government's breach of contract. This claim represents the cost of financing actually incurred by Southern in connection with these facilities. The Government asserts that Southern's cost of capital for this investment is the equivalent of pre-judgment interest and is thus not recoverable as a matter of law. The Government's expert, Dr. Neuberger, however, has admitted that the cost of capital is a real cost. (Tr. 2084) (Neuberger Test.)

The legal question before the Court is whether the cost of capital represents an element of damages arising out of the Government's breach of contract or prejudgment interest on Southern's claim for damages which is not recoverable against the Government under 28 U.S.C. § 2516(a).[84]

[84] 28 U.S.C. § 2516(a) provides:

Because neither the Contract nor the NWPA address the allowance of prejudgment interest on "claims," the determinative issue is whether Southern's cost of capital is distinguishable from prejudgment interest.

This Court has distinguished between interest "on a claim" (*i.e.*, prejudgment interest which begins accruing when a claim arises and continues to accrue during the entire pendency of the claim on the entire amount of the claim) and interest as a component of a claim – financing costs that represent a claim in themselves. *Centex Corp. v. United States*, 55 Fed. Cl. 381, 390 (2003), *aff'd*, 395 F.3d 1283 (Fed. Cir. 2005). The Federal Circuit has held that such financing costs are recoverable so long as they are foreseeable. *Bluebonnet Sav. Bank, F.S.B. v. United States*, 266 F.3d 1348, 1354-58 (Fed Cir. 2001); *Bluebonnet Sav. Bank, F.S.B. v. United States*, 339 F.3d 1341, 1344 (Fed Cir. 2003); *LaSalle Talman Bank, F.S.B. v. United States*, 317 F.3d 1363 (Fed. Cir. 2003). As the Court stated in *Westfed Holdings, Inc. v. United States*, 52 Fed. Cl. 135, 163 (2002):

> Interest on a claim against the United States is precluded under 28 U.S.C. § 2516(a) (1994) unless permitted under a contract or Act of Congress. Plaintiff contends that the **"interest"** it seeks is not the "interest on a claim" barred under *28 U.S.C. § 2516*(a), **but is a "claim for interest incurred as the consequence of a breach."** Westfed Damages Opp. at 30. Plaintiff argues by analogy to areas of law such as antitrust and RICO where **a distinction 'between interest as an element of damages and 'interest on a claim'" is well-recognized.** *Id.* at 31. In these areas, plaintiff finds support for its argument that its bond debt and incurrence of bond debt are compensable reliance damages. *See, e.g.*, *Pacific Gas & Elec. Co. v. Howard P. Foley Co., Civ. No. 85-2922 SW, 1993* WL 299219, at *4 (N.D. Cal. July 27, 1993) ("**The mere fact that []damage can be computed in terms of 'interest' does not make it impermissible prejudgment interest**."); *United Power Ass'n v. L.K. Comstock & Co.*, 1992 U.S. Dist. LEXIS 18874, Civ. No. 3-89 766, 1992 WL 402906, at *8 (D. Minn., Oct. 27, 1992) ("The court finds that the cost of borrowed funds is a separate and compensable element of actual damage."); *Minpeco, S.A. v. Hunt*, 686 F. Supp. 420, 425-27 (S.D.N.Y. 1988)

---

(a) Interest on a claim against the United States shall be allowed in a judgment of the United States Court of Federal Claims only under a contract or Act of Congress expressly providing for payment thereof.

> ("[Interest on a loan] is an actual expense, a claim for actual damages which should be treated like any other damage claim.").
>
> **The court agrees that the 'interest' Westfed seeks to recover is not prejudgment interest.** Westfed seeks to recover a cost expended in reliance on the contract in the form of interest. Such a characterization has been accepted by recent case law in this court.

(Emphases added), *aff'd in relevant part & rev'd in part on other grounds*, 407 F.3d 1352 (Fed. Cir. 2005).

As this Court stated in *TVA*, 69 Fed. Cl. at 541-42.

> TVA does not issue debt to raise proceeds for any specific capital project. . . . In effect, the government argues that because TVA cannot point to a specific debt instrument as the source for the funds used in the dry storage construction projects, TVA does not satisfy the standards set forth in *Wickham* [*Contracting Co. v. Fischer*], 12 F.3d 1574 (Fed. Cir. 1994), for inclusion of AFUDC as damages. . . . However, TVA is not required to meet a standard as stringent as the one the government postulates. The rule of *Wickham* and *Gevyn Construction* [*Corp. v. United States*], 827 F.2d 752, 754 (Fed. Cir. 1987)] was designed to bar "interest" on equity as forbidden by 28 U.S.C. § 2516(a). *See Wickham*, 12 F.3d at 1582 (citing *Gevyn Constr.*, 827 F.2d at 754). TVA has satisfied that criterion as shown by its capital structure and its use of a widely-accepted, FERC-mandated standard for calculating the cost of the funds used in building the dry storage facilities. Thus, **the government's contention that *Wickham* and *Gevyn Construction* should be extended by requiring a match between capital expenditures and specific debt instruments is rejected**.

(Emphasis added.)

Southern's claim for the cost of capital incurred represents an actual expense incurred during the construction and operation of additional storage facilities as a result of the Government's partial breach. (Tr. 1542-45) (Metclafe Test.) Southern expended capital both during the construction period and after construction of the ISFSIs were completed for operations. (*Id.* at 1544.)

While AFUDC accounting requires capitalization of construction period costs of capital for subsequently amortization into the rate base (*id.* at 1543), damages law allows Southern to recover all damages incurred through December 31, 2004 now, *see TVA*, 69 Fed. Cl. at 542. Thus,

Southern can recover the cost of capital incurred during construction of the ISFSIs and the cost of capital expended after construction (*e.g.*, for operations, including labor to load casks) now.

Consistent with the rate computation of AFUDC, Southern computed its cost of capital based on the estimated weighted average cost of capital available to APC, GPC, and GPC's co-owners during each year in which capital was expended on SNF storage facilities. (Tr. 1546-47) (Metcalfe Test.) *See Department of Water & Power v. United States*, 131 F. Supp. 329, 331 (S.D. Cal. 1955) (allowing electric utility to recover damages from the government where allocations of costs were made in accordance with "the accounting procedure recommended by the Federal Power Commission [FERC's predecessor] and the California Public Utilities Commission"). Unlike a fixed statutory prejudgment interest rate, Southern's cost of capital rate fluctuates with the debt and equity markets for each year. (*Id.* at 1548.)

Were capital free, prejudgment interest, if applicable, would still apply to the other components of Southern's claim. (Tr. 1548-49) (Metcalfe Test.) As debt and equity funds were not free during the years in which APC, GPC, and GPC's co-owners expended capital to store SNF (*id.* at 1546-47), Mr. Metcalfe testified that the application of prejudgment interest to Southern's claims would result in the application of pre-judgment interest on top of Southern's cost of capital. (*Id.* at 1549-50.) Southern seeks damages for its cost of capital incurred in building the dry storage facilities, not for interest on top of that cost of capital.

## CONCLUSION

Southern respectfully asks this Court to enter findings of fact and to make conclusions of law consistent with this brief and enter judgment awarding Southern $101,900,000 in damages.

Respectfully submitted,

Dated: March 17, 2006

s/ M. Stanford Blanton

M. Stanford Blanton
BALCH & BINGHAM LLP
1710 Sixth Avenue North
Birmingham, AL 35203
Telephone: (205) 226-3417
Facsimile: (205) 226-8798

*COUNSEL OF RECORD FOR PLAINTIFFS*

Of Counsel:

Ed R. Haden
K. C. Hairston
BALCH & BINGHAM LLP
1710 Sixth Avenue North
Birmingham, AL 35203
Telephone: (205) 251-8100
Facsimile: (205) 226-8798

Ronald A. Schechter
Jeffrey L. Handwerker
Matthew Shultz
ARNOLD & PORTER LLP
555 Twelfth Street, N.W.
Washington, D.C. 20004-1202
Telephone: (202) 942-5000
Facsimile: (202) 942-5999

**CERTIFICATE OF SERVICE**

I hereby certify that on this 17th day of March, 2006, a copy of the foregoing "PLAINTIFFS' POST-TRIAL BRIEF" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ M. Stanford Blanton