No. 98-614C
(Senior Judge Merow)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

SOUTHERN NUCLEAR OPERATING COMPANY,
ALABAMA POWER COMPANY,
GEORGIA POWER COMPANY,

Plaintiffs,

v.

UNITED STATES,

Defendant.

---

# DEFENDANT'S POST-TRIAL BRIEF

---

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

HAROLD D. LESTER, JR.
Assistant Director

JOHN C. EKMAN
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington D.C. 20530
Tele: (202) 353-0897
Fax: (202) 307-2503

Attorneys for Defendant

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

STEPHEN FINN
JOSHUA E. GARDNER
HEIDE L. HERRMANN
MARIAN E. SULLIVAN
Trial Attorneys
Commercial Litigation Branch
Civil Division
Department of Justice
Washington, D.C. 20530

May 24, 2006

# TABLE OF CONTENTS

PAGE

DEFENDANT'S POST-TRIAL BRIEF . . . . . . . . . . 1

SUMMARY OF ARGUMENT . . . . . . . . . . 1

STATEMENT OF FACTS . . . . . . . . . . 8

I. THE ORIGINAL PROVISIONS OF THE NUCLEAR WASTE POLICY ACT . . . . . . . . . . 8

II. THE "STANDARD CONTRACT FOR DISPOSAL OF SPENT NUCLEAR FUEL AND/OR HIGH-LEVEL RADIOACTIVE WASTE" WAS CREATED THROUGH NOTICE AND COMMENT RULEMAKING IN THE FEDERAL REGISTER . . . . . . . . . . 11

A. The Proposed Rule . . . . . . . . . . 11

B. Public Comments . . . . . . . . . . 12

C. The Final Rule . . . . . . . . . . 18

III. PLAINTIFFS' EXECUTION OF THEIR STANDARD CONTRACTS . . . . . . 22

IV. ISSUANCE OF THE MISSION PLAN AND ITS AMENDMENT . . . . . . . . . . 22

A. The Documents That Set Forth DOE's Early Program Plans . . . . . . . . . 22

B. Testimony About DOE's Obligation And Early Program Plans . . . . . . . 27

V. THE 1987 AMENDMENTS TO THE NUCLEAR WASTE POLICY ACT . . . . . . . . . . 37

VI. PLANNED ACCEPTANCE AT AN MRS FACILITY UNTIL 2010 . . . . . . . . 38

A. Program Reassessment And 1991 Draft Mission Plan Amendment . . . . 38

B. DOE's Efforts To Site And Plans To Perform At An MRS . . . . . . . . . . 40

TABLE OF CONTENTS (cont'd)

PAGE

VII. DOE'S ISSUANCE OF ANNUAL CAPACITY REPORTS . . . . . . . . . . . . . . . 41

A. The 1987 Through 1990 Annual Capacity Reports . . . . . . . . . . . . . . . . . 41

B. The 1991 Annual Capacity Report . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

C. The 1992 Through 1994 Annual Capacity Reports . . . . . . . . . . . . . . . . . 47

VIII. INDUSTRY SUBMISSION OF DELIVERY COMMITMENT SCHEDULES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

IX. THE TOTAL SYSTEM LIFE CYCLE COST REPORTS AND FEE ADEQUACY REPORTS ARE BASED UPON THE THEN-CURRENT TECHNICAL BASELINE FOR THE PROGRAM . . . . . . . . . . . . . . . . . . . . . . 53

X. ADDITIONAL FACTS AFFECTING THE PLAINTIFFS' CLAIM . . . . . . . . . 55

A. Plaintiffs Historically Have Operated Their Facilities With A Single Full Core Reserve In Their Wet Pools . . . . . . . . . . . . . . . . . . . . . 55

B. The Government's Expert Witnesses Offered Significant Testimony Relevant To Determining The Quantum Of Plaintiffs' Damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

1. The Testimony Of The Government's Accounting And Damages Expert, R. Larry Johnson . . . . . . . . . . . . . . . . . . . . . . . 64

2. The Testimony Of The Government's Economics and 67 Modeling Expert, Dr. Jonathan Neuberger . . . . . . . . . . . . . . . . . 65

3. Summary Of The Work Performed By Plaintiffs' Damages Expert, Kenneth Metcalfe . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

C. The Application Of The Terms Of The Standard Contract And Plaintiffs' Full Core Reserve Policies Reduce Plaintiffs' Asserted Damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

1. In The "But For" World, And Under A 900 MTU Rate Of Acceptance, Plants Hatch And Vogtle Both Required Additional On-Site SNF Storage After January 31, 1998 . . . . . . 68

TABLE OF CONTENTS (cont'd)

PAGE

2. Applying A Single Full Core Reserve Assumption To Plaintiffs' Damages Claim Demonstrates That Plant Hatch Has Loaded An Unreasonable Number Of Casks To Its ISFSI . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

3. Of The $17,230,533 Related To Plaintiffs' Decision To Exceed One Full Core Reserve In The Actual World, At Least $9,533,518 Is Related To The Decision To Load Hi-STAR Casks In 2000 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

D. Implementing A Two Full Core Reserve Policy Requires Additional Storage At Plants Hatch And Vogtle In The "But For" World Regardless Of The Rate Of Acceptance Applied To Plaintiffs' Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

E. Plaintiffs' Damages Require Further Adjustment To Reflect Actual Costs Incurred As A Result Of DOE's Partial Breach . . . . . . . . . 76

1. Plaintiffs Failed To Establish That Internal Labor Charges Were Incremental To DOE's Partial Breach . . . . . . . . . . . . . . . . 80

2. In Addition To Adjustments Related To Cask Loading And Internal Labor, Plaintiffs' Alleged Damages Associated With Plant Hatch Require Further Adjustment . . . . . . . . . . . . . . 83

3. Other Than The Adjustment Associated With The Maine Yankee Racks At Plant Vogtle, The Remaining Adjustments At Plants Farley And Vogtle Largely Are Associated With PFS, Prejudgment Interest, and Internal Labor Charges . . . . . . . 86

XI. PLAINTIFFS' INVESTMENT IN PRIVATE FUEL STORAGE . . . . . . . . . . . 86

XII. PLAINTIFFS' ASSERTED COST OF CAPITAL CONSTITUTES PRE-JUDGMENT INTEREST AND, IN ANY EVENT, WAS NOT A COST INCURRED BY ANY OF THE NAMED PLAINTIFFS IN THIS CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

TABLE OF CONTENTS (cont'd)

PAGE

ARGUMENT . . . 92

I. SOUTHERN NUCLEAR OPERATING COMPANY IS NOT A PROPER PARTY PLAINTIFF IN THIS CASE . . . 92

II. PLAINTIFFS BEAR THE BURDEN OF ESTABLISHING ALL ELEMENTS OF THEIR CLAIM, INCLUDING LIABILITY, CAUSATION, FORESEEABILITY, AND REASONABLE CERTAINTY . . . 94

A. Plaintiffs Have The Burden Of Proving All Elements Of Their Case . . . 94

B. Plaintiffs' Burden Includes Their Obligation To Establish A Reasonable "But For" World Against Which To Measure Whether DOE's Delay "Caused" Them To Incur Incremental Costs . . . 95

C. Plaintiffs Have The Burden Of Demonstrating That Their Claimed Damages Were Foreseeable . . . 97

D. Plaintiffs Must Prove Their Damages With Reasonable Certainty . . . 98

E. After Establishing The Legal And Factual Predicates To Damages, Plaintiffs Must Demonstrate That Their Action Mitigated Those Damages . . . 99

II. PLAINTIFFS HAVE FAILED TO ESTABLISH THAT, IN THE "BUT FOR" WORLD, DOE WAS CONTRACTUALLY OR STATUTORILY OBLIGATED TO ACCEPT SNF AT AN ANNUAL RATE OF 3,000 MTU . . . 100

A. The Plaintiffs Have Failed To Establish That DOE Was Obligated To Accept SNF At A Rate Sufficient To Preclude The Need For Additional At-Reactor Storage And To Allow "Timely Decommissioning" . . . 100

1. The Plaintiffs Have Failed To Identify Any Language In Either The NWPA Or The Standard Contract That Requires DOE To Satisfy The Plaintiffs' Proposed Two-Part Obligation . . . 100

TABLE OF CONTENTS (cont'd)

PAGE

2. The Plaintiffs Failed To Establish That, In Light Of The Contract's Integration Clause, The Contract Is Not Fully Integrated . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 102

3. Even If The Court Considered Parol Evidence To Seek To Interpret The Contract's Terms, The Plaintiffs Have Failed To Identify Any Contemporaneous Evidence Supporting Their Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 106

B. Plaintiffs Cannot Rely Upon Program Planning Documents To Establish The Government's Obligation To Accept SNF At An Annual Rate Of 3,000 MTU . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 111

1. As A Factual Matter, The Documents Upon Which The Plaintiffs Rely To Demonstrate DOE's Intent To Accept SNF At A 3,000 MTU Rate Relate To Acceptance At A Repository . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 111

2. As A Legal Matter, Program Documents Expressing An Agency's Hopes And Goals Do Not Somehow Become Contract Obligations, Absent An Express Modification Of The Contract . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 115

C. Plaintiffs' Argument That The NWPA And The Standard Contract Require DOE Meet A Qualitative Two-Part Obligation Fails To Account For The Significant Changes In The Industry Over The Course Of The DOE Program . . . . . . . . . . . . . . . . . . . . . . . 117

D. The 3,000 MTU Rate Of Acceptance That The Plaintiffs Advocate Does Not Satisfy The Two-Part, Qualitative Obligation Upon Which The Plaintiffs Rely To Justify That Rate . . . . . . . . . . . . . . . . . . 121

III. THE COURT SHOULD REJECT EILEEN SUPKO'S OPINIONS CONCERNING THE "REASONABLENESS" OF A PARTICULAR RATE OF ACCEPTANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 124

A. Ms. Supko's Opinions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 124

TABLE OF CONTENTS (cont'd)

PAGE

B. The Court Should Reject Ms. Supko's Opinions Because They Are Neither Relevant Nor Reliable . . . 126

1. Ms. Supko's Opinions Are Not Relevant To Any Issue In This Case . . . 126

2. Ms. Supko's Opinions Should Be Afforded Little, If Any, Weight Because They Are Not Reliable . . . 127

C. The Court Should Disregard Ms. Supko's Opinions Because Her Model Lacks Evidentiary Support . . . 132

D. Ms. Supko's Model Inconsistently Mixes Information From The "But For" And Actual Worlds . . . 136

E. Even If The Court Were To Accept Counsel's Assertion Concerning The Two "Primary Requirements," A 3,000 MTU Rate Of Acceptance Does Not Satisfy These Two Requirements Under Ms. Supko's Model . . . 139

IV. ANY DAMAGES IN THIS CASE SHOULD NOT BE MEASURED AGAINST ANY ACCEPTANCE RATE GREATER THAN THAT TO WHICH DOE ACKNOWLEDGED IT WAS WILLING TO COMMIT . . 146

A. Contrary To The Plaintiffs' Representations, The Standard Contract Is Not "Missing" An Acceptance Rate Term . . . 146

B. Absent Agreement By The Parties Upon The Rate Of Acceptance, The Court Must Ensure That The Plaintiffs Do Not Obtain Greater Rights Through Litigation Than They Would Have Under The Contract . . . 150

C. The Court Must Ensure That It Does Not Create A Contract For The Parties To Which They Had Not Mutually Agreed . . . 153

D. In This Case, Damages Must Not Be Measured Against Any Rate Of Acceptance Greater Than That Identified In The 1991 ACR . . . 154

TABLE OF CONTENTS (cont'd)

PAGE

E. Some Of The Decisions Issued Since The Government Filed Its Motion Regarding The Spent Nuclear Fuel Acceptance Rate Incorrectly Analyze The Standard Contract Schedule Provisions . . . . . 157

V. PLAINTIFFS HAVE NOT ESTABLISHED THE NECESSARY CAUSAL LINK BETWEEN ALL OF THEIR CLAIMED STORAGE CONSTRUCTION COSTS AND DOE'S DELAY IN BEGINNING SNF ACCEPTANCE . . . . . 161

VI. PLAINTIFFS FAILED TO ESTABLISH THAT THE COSTS THEY ALLEGEDLY INCURRED FOR INTERNAL LABOR, OVERHEAD, AND ENGINEERING SUPERVISION WERE INCREMENTAL TO DOE'S BREACH . . . . . 162

VII. THIS COURT SHOULD ADJUST AN ADDITIONAL $5,006,399 ASSOCIATED WITH CASKS THAT WOULD HAVE BEEN LOADED TO THE PLANT HATCH ISFSI AFTER 2004 . . . . . 167

VIII. EVEN IF THIS COURT FINDS THAT DOE WAS OBLIGATED TO PERFORM AT A 3,000 MTU RATE OF ACCEPTANCE, THE PLAINTIFFS' DAMAGES SIGNIFICANTLY ARE OVERSTATED . . . . . 168

IX. PLAINTIFFS CANNOT RELY UPON DIFFERENT FULL CORE RESERVE POLICIES IN THE "BUT FOR" AND ACTUAL WORLDS IN ESTABLISHING CAUSATION FOR THE INCREMENTAL NATURE OF DRY STORAGE COSTS . . . . . 169

A. Plaintiffs' Damages Claim And The Evidence Adduced At Trial Supports A Finding That Plaintiffs' Historic Operating Reserve Of Single Core Offload Is Appropriate In Determining Damages . . . . 169

B. The Government's Case Concerning Full Core Reserve Is Based Upon The Testimony Of Plaintiffs' Personnel And Historic Operating Documents . . . . . 174

C. To Award Damages Related To APC For Plant Farley At A 900 MTU Rate Of Acceptance, The Court Must Implement A Fungible Single Full Core Reserve Policy Per Pool At That Facility . . . . . 176

TABLE OF CONTENTS (cont'd)

PAGE


X. SOUTHERN NUCLEAR'S INVESTMENT IN PRIVATE FUEL STORAGE IS NOT RECOVERABLE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 177

A. Plaintiffs Failed To Establish that GPC or APC Paid Any Money In Connection With PFS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 177

B. Even If GPC Or APC Had Been Responsible For PFS Costs, They Were Not Foreseeable And Did Not Constitute Reasonable Mitigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 177

XI. PLAINTIFFS' CANNOT RECOVER THEIR CLAIM FOR THE COST OF CAPITAL GROSS-UP OF PAST COSTS AS A MATTER OF LAW OR FACT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 182

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 185

# TABLE OF AUTHORITIES

CASES PAGE(S)

AES Technology System, Inc. v. Coherent Radiation,
583 F.2d 933 (7th Cir. 1978) .......... 163

Abbott Labs. v. Brennan,
952 F.2d 1346 (Fed. Cir. 1992) .......... 97

Alaska Pulp Corp. v. United States,
59 Fed. Cl. 400 (2004) .......... 94

Autotrol Corp. v. Cont'l Water Sys. Corp,
918 F.2d 689 (7th Cir. 1990) .......... 163

Aviation Contractor Employees, Inc. v. United States,
945 F.2d 1568 (Fed. Cir. 1991) .......... 160

BMW Manufacturing Corp. v. United States,
241 F.3d 1357 (Fed. Cir. 2001) .......... 101

Barron Bancshares, Inc. v. United States,
366 F.3d 1360 (Fed. Cir. 2003) .......... 103

Barrow Utils. & Elec. Co. v. United States,
20 Cl. Ct. 113, 121 (1990) .......... 99

Bel Pre Health Care Center, Inc. v. United States,
24 Cl. Ct. 495, 496 (1991), aff'd, 980 F.2d 745 (Fed. Cir. 1992) (table) .......... 153

Blackstone Consulting Inc. v. United States,
65 Fed. Cl. 463 (2005) .......... 109

Bluebonnet Savings Bank, FSB v. United States,
67 Fed. Cl. 231 (2005) .......... 97, 120

Bluebonnet Savings Bank, F.S.B. v. United States,
266 F.3d 1348 (Fed. Cir. 2001) .......... 133

Bluebonnet Savings Bank, F.S.B. v. United States,
339 F.3d 1341 (Fed. Cir. 2003) .......... passim

Bohac v. Department of Agriculture,
239 F.3d 1334 (Fed. Cir. 2001) .......... 98

TABLE OF AUTHORITIES (cont'd)

CASES PAGE(S)

Boyajian v. United States,
423 F.2d 1231 (Ct. Cl. 1970) ........ 162

Branhill Realty Co. v. Montgomery Ward & Co.,
60 F.2d 922 (2d Cir. 1932) ........ 116, 152

Brown v. Wal-Mart Stores, Inc.,
402 F. Supp. 2d 303 (D. Maine 2005) ........ 129

California Federal Bank v. United States,
395 F.3d 1363 (Fed. Cir. 2005) ........ 96

Castle v. United States,
48 Fed. Cl. 187 (2000), aff'd in part, rev'd in part and remanded in part,
301 F.3d 1328 (Fed. Cir. 2002) ........ 133

City of Tacoma, Department of Public Utilities v. United States,
31 F.3d 1130 (Fed. Cir. 1994) ........ 160

Coast Federal Bank, FSB v. United States,
48 Fed. Cl. 402 (2000) ........ 97

Columbia First Bank v. United States,
54 Fed. Cl. 693 (2002) ........ 183

Columbia First Bank v. United States,
60 Fed. Cl. 97 (2004) ........ 4, 97

Commercial Metals Co. v. United States,
176 Ct. Cl. 343, 349 (1966) ........ 116

Commonwealth Edison Co. v. United States,
56 Fed. Cl. 652 (2003) ........ 157, 158

Convoy Co. v. Sperry Rand Corp.,
672 F.2d 781 (9th Cir. 1982) ........ 164

Coyle's Pest Control, Inc. v. Cuomo,
154 F.3d 1302 (Fed. Cir. 1998) ........ 160

TABLE OF AUTHORITIES (cont'd)

CASES PAGE(S)

Daubert v. Merrill Dow Pharmaceuticals, Inc.,
509 U.S. 579 (1993) ........................................................................ 126, 128, 130

David Nassif Associates v. United States,
214 Ct. Cl. 407, 557 F.2d 249 (1977) ................................................ 147, 154

Department of Energy v. Westland,
565 F.2d 685 (C.C.P.A. 1977) ........................................................... 101

Dolphin Tours, Inc. v. Pacifico Creative Services, Inc.,
773 F.3d 1506 (9th Cir. 1985) ........................................................... 132

Dunn Appraisal Co. v. Honeywell Information Systems, Inc.,
687 F.2d 877 (6th Cir. 1982) ............................................................. 164

England v. Contel Advanced Systems, Inc.,
384 F.3d 1372 (Fed. Cir. 2004) .......................................................... 182

Ericsson, Inc. v. Harris Corp.,
352 F.3d 1369 (Fed. Cir. 2003) .......................................................... 132

Fawick Corp. v. United States,
149 Ct. Cl. 623, 637 (1960) ................................................................ 95

Fifth Third Bank v. United States,
55 Fed. Cl. 223 (2003) ..................................................................... 7, 133

Florida Power & Light Co. v. United States,
64 Fed. Cl. 37 (2005), interlocutory appeal pending sub nom.
PSEG Nuclear, L.L.C. v. United States, No. 05-5162 (Fed. Cir. filed Aug. 5, 2005). . 102

Foley Co. v. United States,
11 F.3d 1032 (Fed. Cir. 1993) ............................................................ 102

Fraas Surgical Mfg. Co. v. United States,
215 Ct. Cl. 820, 571 F.2d 34 (1978) .................................................. 149

Framlau Corp. v. United States,
568 F.2d 687 (Ct. Cl. 1977) ............................................................... 184

TABLE OF AUTHORITIES (cont'd)

CASES PAGE(S)

Franklin Federal Savings Bank v. United States,
55 Fed. Cl. 108 (2003) ..... 133

Freeport Sulphur Co. v. The S/S Hermosa,
526 F.2d 300 (5th Cir. 1976) ..... 164

Fuesting v. Zimmer, Inc.,
421 F.3d 528 (7th Cir. 2005) ..... 128, 130

Gardner & North Roofing & Siding Corp. v. Board of Governors of the Fed. Reserve Sys.,
464 F.2d 838 (D.C. Cir. 1972) ..... 101

Gevyn Construction Corp. v. United States,
827 F.2d 752 (Fed. Cir. 1987) ..... 184

Glendale Federal Bank, FSB v. United States,
43 Fed. Cl. 390 (1999) ..... 134

Glendale Federal Bank, FSB v. United States,
239 F.3d 1374 (Fed. Cir. 2001) ..... 97, 134

Globe Savings Bank v. United States,
61 Fed. Cl. 91 (2004) ..... 28

Grynberg v. Federal Energy Regulatory Commission,
71 F.3d 413 (D.C. Cir. 1995) ..... 109

Guillory v. Domtar Indus. Inc.,
95 F.3d 1320 (5th Cir. 1996) ..... 136

Home Savings of America v. United States,
57 Fed. Cl. 694 (2003), aff'd in part, rev'd in part, 399 F.3d 1341 (Fed. Cir. 2005) ..... 133

Honeywell, Inc. v. United States,
228 Ct. Cl. 591, 661 F.2d 182 (1981) ..... 104

In the Matter of Community Medical Center,
623 F.2d 864 (3d Cir. 1980) ..... 152

TABLE OF AUTHORITIES (cont'd)

CASES PAGE(S)

Indiana Michigan Power Co. v. United States,
57 Fed. Cl. 88 (2003) .......... passim

Indiana Michigan Power Co. v. United States,
60 Fed. Cl. 639 (2004), aff'd, 422 F.3d 1369 (Fed. Cir. 2005) .......... passim

Indiana Michigan Power Co. v. United States,
88 F.3d 1272 (D.C. Cir. 1996) .......... 51, 110, 111

Indiana Michigan Power Co. v. United States,
422 F.3d 1369 (Fed. Cir. 2005) .......... passim

J.D. Hedin Construction Co. v. United States,
197 Ct. Cl. 782, 456 F.2d 1315 (1972) .......... 96, 184

Julius Goldman's Egg City v. United States,
697 F.2d 1051 (Fed. Cir. 1983), cert. denied, 464 U.S. 814 (1983) .......... 106

KMS Fusion, Inc. v. United States,
36 Fed. Cl. 68 (1996), aff'd 108 F.3d 1393 (Fed. Cir. 1997) .......... 109

Kidder, Peabody & Co. v. IAG Int'l Acceptance Group N.V.,
28 F. Supp. 2d 126 (S.D.N.Y. 1998) .......... 133

Koby v. United States,
53 Fed. Cl. 493 (2002) .......... 99, 151, 152

Kumho Tire Co. v. Carmichael,
526 U.S. 137 (1999) .......... 128

LaSalle Talman Bank, F.S.B. v. United States,
45 Fed. Cl. 64 (1999) , rev'd on other grounds, 317 F.3d 1363 (Fed. Cir. 2003) .......... 99, 133

Landmark Land Co. v. United States,
256 F.3d 1365 (Fed. Cir. 2001) .......... 98

Liberty Bank v. Talman Home Mortgage Corp.,
877 F.2d 400 (5th Cir. 1989) .......... 152

TABLE OF AUTHORITIES (cont'd)

CASES PAGE(S)

Library of Congress v. Shaw,
478 U.S. 310 (1986) .......... 182

Long Island Savings Bank v. United States,
63 Fed. Cl. 157 (2004) .......... 28

Massengill v. Guardian Mgt. Co.,
19 F.3d 196 (5th Cir. 1994) .......... 160

Mays v. Trump Indiana, Inc.,
255 F.3d 351 (7th Cir. 2001) .......... 153

McAbee Constr, Inc. v. United States,
97 F.3d 1431 (Fed. Cir. 1996) .......... 103

McDonnell Douglas Corp.,
ASBCA No. 26747, 83-1 BCA ¶ 16,377 (1983) .......... 149

Menne v. Celotex Corp.,
861 F.2d 1453 (10th Cir. 1988) .......... 96

Microstrategy Inc. v. Business Objects, S.A.,
429 F.3d 1344 (Fed. Cir. 2005) .......... 128

Modern Systems Technology Corp. v. United States,
979 F.2d 200 (Fed. Cir. 1992) .......... 153

Monessen Southwestern Railway Co. v. Morgan,
486 U.S. 330 (1988) .......... 182

Myerle v. United States,
33 Ct. Cl. 1, 27 (1897) .......... 94, 95, 96

National By-Products, Inc. v. United States,
186 Ct. Cl. 546, 405 F.2d 1256 (1969) .......... 115, 116

National School of Aeronautics, Inc. v. United States,
135 Ct. Cl. 343, 142 F. Supp. 933 (1956) .......... 100

Needleman v. John Hancock Life Ins. Co.,
No. 03-1955, 2006 WL 842370 (N.D. Tex. Mar. 31, 2006) .......... 126

TABLE OF AUTHORITIES (cont'd)

CASES PAGE(S)

Neeley v. Bankers Trust Co. of Texas,
757 F.2d 621 (5th Cir. 1985) ..................... 153

Northern Helex Co. v. United States,
207 Ct. Cl. 862, 524 F.2d 707 (1975), cert. denied, 429 U.S. 866 (1976) .... 95, 97, 98, 99

Northern States Power Co. v. United States Department of Energy,
128 F.3d 754 (D.C. Cir. 1997), cert. denied, 525 U.S. 1015 & 1016 (1998) .................. 2

Oddi v. Ford Motor Co.,
234 F.3d 136 (3d Cir. 2000) ..................... 129, 130

Omni Corp. v. United States,
41 Fed. Cl. 585 (1998) ..................... 106

Point Productions A.G. v. Sony Music Entertainment, Inc.,
215 F. Supp. 2d 336 (S.D.N.Y. 2002) ..................... 96

Prudential Insurance Co. v. United States,
801 F.2d 1295 (Fed. Cir. 1986) ..................... 98

Quiman, S.A. de C.V. v. United States,
39 Fed. Cl. 171 (1997), aff'd, 178 F.3d 1313 (Fed. Cir. 1999) ..................... 95

Ramsey v. United States,
121 Ct. Cl. 426, 101 F. Supp. 353 (1951) ..................... 95

Rapid City Indian Health Advisory Bd. of Directors,
ASBCA No. 26641, 83-1 BCA ¶ 16,311 (1983) ..................... 149

Ridge Runner Forestry v. Veneman,
28 F.3d 1058 (Fed. Cir. 2002) ..................... 153

Rink v. Cheminova, Inc.,
400 F.3d 1286 (11th Cir. 2005) ..................... 126

Robertson v. National R.R. Passenger Corp.,
No. 98-1397, 1999 WL 280407 (E.D. La. May 3, 1999) ..................... 28, 29

Robinson v. United States,
305 F.3d 1330 (Fed. Cir. 2002) ..................... 99

TABLE OF AUTHORITIES (cont'd)

CASES PAGE(S)

Roseburg Lumber Co. v. Madigan,
978 F.2d 660 (Fed. Cir. 1992) .......... 94, 98

Rumsfeld v. Freedom N.Y., Inc.,
329 F.3d 1320 (Fed. Cir. 2003) .......... 103

S.W. Engineering Co. v. Cajun Electric Power Cooperative,
915 F.2d 972 (5th Cir. 1990) .......... 163

Sacramento Municipal Utility District v. United States,
70 Fed. Cl. 332 (2006) .......... 125, 129, 164

Saddler v. United States,
287 F.2d 411 (Ct. Cl. 1961) .......... 162

San Carlos Irrigation & Drainage District v. United States,
877 F.2d 957 (Fed. Cir. 1989) .......... 94

San Carlos Irrigation & Drainage District v. United States,
111 F.3d 1557 (Fed. Cir. 1997) .......... 95

Santa Fe Engineers, Inc. v. United States,
801 F.2d 379 (Fed. Cir. 1986) .......... 104

Seaboard Lumber Co. v. United States,
308 F.3d 1283 (Fed. Cir. 2002) .......... 126

Shann v. Dunk,
84 F.3d 73 (2d Cir. 1996) .......... 153

Shapiro, Lifschitz, & Schram, P.C. v. Hazard,
90 F. Supp. 2d 15 (D.D.C. 2000) .......... 28

Shyface v. Secretary of Health and Human Servs.,
165 F.3d 1344 (Fed. Cir. 1999) .......... 97

Singer Co. Librascope Div. v. United States,
568 F.2d 695 (Ct. Cl. 1977) .......... 184

Southern California Federal Savings & Loan Association v. United States,
422 F.3d 1319 (Fed. Cir. 2005) .......... 103

TABLE OF AUTHORITIES (cont'd)

CASES PAGE(S)


Southern National Corp. v. United States,
57 Fed. Cl. 294 (2003) .......... 134

Southern Pacific Co. v. Darnell-Taenzer Lumber Co.,
245 U.S. 531 (1918) .......... 96

Southern Pacific Communications Co. v. AT&T,
556 F. Supp. 2d 825 (D.D.C. 1982) .......... 133, 171

Standard Federal Bank v. United States,
62 Fed. Cl. 265 (2004) .......... 184

Suess v. United States,
52 Fed. Cl. 221 (2002) .......... 134

Sylvania Electric Products, Inc. v. United States,
198 Ct. Cl. 106, 458 F.2d 994 (1972) .......... 103

Tennessee Valley Authority v. United States,
60 Fed. Cl. 665 (2004) .......... passim

Tennessee Valley Authority v. United States,
69 Fed. Cl. 515 (2006) .......... 95, 165, 184

Thomas W. Yoder Co.,
VABCA No. 997, 74-1 BCA ¶ 10,424 (1974) .......... 149

Transamerica Equipment Leasing Corp. v. Union Bank,
426 F.2d 273 (9th Cir. 1970) .......... 153

United States Fidelity & Guaranty Co. v. United States,
230 Ct. Cl. 355, 676 F.2d 622 (1982) .......... 149

United States Steel Corp. v. United States,
618 F. Supp. 496 (C.I.T. 1985) .......... 101

United States v. The John R. Williams,
144 F.2d 451 (2d Cir. 1944) .......... 164, 175

Wells Fargo Bank v. United States,
88 F.3d 1012 (Fed. Cir. 1996) .......... 96, 98

TABLE OF AUTHORITIES (cont'd)

CASES PAGE(S)

White v. Delta Construction International, Inc.,
285 F.3d 1040 (Fed. Cir. 2002) ........ 94, 152, 161

Wickham Contracting Co. v. Fischer,
12 F.3d 1574 (Fed. Cir. 1994) ........ 184

Willems Industries., Inc. v. United States,
155 Ct. Cl. 360, 295 F.2d 822 (1961) ........ 94, 133

Willred Co. v. Westmoreland Metal Mfg. Co.,
200 F. Supp. 59 (E.D. Pa. 1961) ........ 163

Wilner v. United States,
23 Cl. Ct. 241, 258, 262-63 (1991) ........ 162

Wilson v. Marquette Elecs., Inc.,
630 F.2d 575 (8th Cir. 1980) ........ 163

Young v. James Green Mgt., Inc.,
327 F.3d 616 (7th Cir. 2003) ........ 28

Zaremba v. General Motors Corp.,
360 F.3d 355 (2d Cir. 2004) ........ 129, 130

Zenith Electronics Corp. v. WH-TV Broadcasting Corp.,
395 F.3d 416 (7th Cir.), cert. denied, 125 S. Ct. 2978 (2005) ........ 128, 129

STATUTES AND REGULATIONS

10 C.F.R. § 961.11 ........ passim

42 U.S.C. §§ 10101-10270 ........ 10

42 U.S.C. § 10131 ........ 101

42 U.S.C. §§ 10132 ........ 9

42 U.S.C. §§ 10133 ........ 112

TABLE OF AUTHORITIES (cont'd)

STATUTES AND REGULATIONS PAGE(S)

42 U.S.C. § 10161 .......... 9, 10, 26

42 U.S.C. § 10162 .......... 38

42 U.S.C. § 10168 .......... 38, 155

42 U.S.C. § 10172 .......... 38

42 U.S.C. § 10221 .......... passim

42 U.S.C. § 10242 .......... 38

48 Fed. Reg. 16590 (April 18, 1983) .......... 18, 19, 20, 104, 111

48 Fed. Reg. 5458 (Feb. 4, 1983) .......... 11, 12, 104

Fed. R. Evid. 106 .......... 28

Fed. R. Evid. 801 .......... passim

S. Rep. No. 100-152, at 1 (Sept. 1, 1987) .......... 37, 38

MISCELLANEOUS

W. Keeton, et al., Prosser and Keaton on the Law of Torts 266-68 (5th ed. 1984) .......... 96

1 R. Lord, Williston on Contracts § 4:26 (4th ed. 1990) .......... 150, 151

11 A. Corbin, Corbin on Contracts § 1079 (interim ed. 1979) .......... 150, 151

11 W. Jaeger, Williston on Contracts § 1407 (3d ed. 1968) .......... 150, 152

Am. Jur. 2d Damages § 416 (2004) .......... 163

Restatement of Contracts § 344 cmt. a (1932) .......... 150, 151

Restatement (Second) of Contracts § 204 (1981) .......... 146

Restatement (Second) of Contracts § 211 (1981) .......... 105

TABLE OF AUTHORITIES (cont'd)

MISCELLANEOUS PAGE(S)

Restatement (Second) of Contracts § 347 .......... 132

Restatement (Second) of Contracts § 350 cmt. b .......... 99

Restatement (Second) of Contracts § 351 cmt. a .......... 98

Restatement (Second) of Contracts § 352 cmt. a .......... 98

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| SOUTHERN NUCLEAR OPERATING, COMPANY, ALABAMA POWER COMPANY, and GEORGIA POWER COMPANY, | ) | |
| Plaintiffs, | ) | |
| v. | ) | No. 98-614C (Senior Judge Merow) |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

DEFENDANT'S POST-TRIAL BRIEF

Pursuant to this Court's order dated January 31, 2006, defendant, the United States, respectfully submits the following post-trial brief.

SUMMARY OF ARGUMENT

This partial breach action involves a damages claim by plaintiffs, Alabama Power Company ("APC"), Georgia Power Company ("GPC"), and Southern Nuclear Operating Company ("Southern Nuclear") (collectively, the "plaintiffs"), for $107 million in costs through December 31, 2004, that they allegedly have incurred for, among other things, the design, licensing, and fabrication of dry storage facilities at two of the nuclear facilities at issue in this litigation and the licensing and installation of additional racks in the wet pool at one of GPC's nuclear reactor sites, the A.W. Vogtle Electric Generating Plant, Units 1 and 2 ("Vogtle"), in which to store GPC's spent nuclear fuel ("SNF"). Plaintiffs also are seeking $8.5 million for amounts that Southern Nuclear paid for a yet-to-be constructed Private Fuel Storage, LLC ("PFS") facility in Utah, a venture that Southern Nuclear recently has abandoned. Finally, plaintiffs seek $28.9 million in pre-judgment interest, an amount that totals nearly 40 percent of the plaintiffs' asserted past damages. Plaintiffs contend that the Government is liable for these

costs because the need for additional storage was wholly caused by the Government's failure to begin accepting SNF from commercial nuclear reactors on January 31, 1998, pursuant to a Standard Contract between the Department of Energy ("DOE") and APC and 2) three Standard Contracts between DOE and GPC.

As the Court is aware, on June 13, 1983, the Department of Energy ("DOE") entered into a "Standard Contract For Disposal Of Spent Nuclear Fuel And/Or High-Level Radioactive Waste," the basic terms of which are published at 10 C.F.R. § 961.11, with APC for the Joseph M. Farley Nuclear Plant, Units 1 and 2 ("Farley"), that APC owns. Compl. ¶¶ 9 & 14. On June 10, 1983, GPC executed three Standard Contracts with DOE for its nuclear power plants: the Edwin I. Hatch Nuclear Plant, Units 1 and 2 ("Hatch"), and Units 1 and 2 at Vogtle. Compl. ¶¶ 9 & 14. Previously, in its order dated April 7, 2004, the Court found that DOE had partially breached the contracts that it had entered with APC and GPC and was liable to APC and GPC for contract damages resulting from the partial breach. Order, at 4-5 (Apr. 7, 2004).[1] Further, pursuant to the Court's order dated September 16, 2005, the trial of this matter was limited to

---

[1] As the Court is aware, because of a writ of mandamus issued by the United States Court of Appeals for the District of Columbia Circuit in Northern States Power Co. v. United States Department of Energy, 128 F.3d 754 (D.C. Cir. 1997), cert. denied, 525 U.S. 1015 & 1016 (1998), the Government is "preclude[d] . . . from concluding that its delay is unavoidable on the ground that it has not yet prepared a permanent repository or that it has no authority to provide storage in the interim" or from "implement[ing] any interpretation of the Standard Contract that excuses its failure to perform on the grounds of 'acts of Government in either its sovereign or contractual capacity.'" Id. at 760. Because of this writ of mandamus, we have been unable to assert in this litigation that DOE's delay is covered by the "Unavoidable Delays" clause in the Standard Contract, Article IX.A. To the extent that the writ of mandamus were lifted or found ineffective, we would be able to assert that position here. However, in light of the existing writ, we have been unable to do so.

those damages in this case that were incurred on or before December 31, 2004. Order, at 2 (Sept. 16, 2005). Based upon these parameters, the parties presented their cases at trial.

With regard to the specific damages claims that the plaintiffs have raised in this litigation, the Court, as an initial matter, should dismiss Southern Nuclear as a plaintiff in this case. As we established in earlier briefing filed on December 21, 2001, and March 22, 2002, Southern Nuclear is not a party to the Standard Contracts that APC and GPC entered and, without any privity of contract, lacks standing to maintain a contract action against the United States.[2] In fact, this Court, in its April 7, 2004 order, recognized that, "[a]bsent contractual privity between [Southern Nuclear] and the United States, no judgment can be rendered in favor of [Southern Nuclear]." Order, at 4 (Apr. 7, 2004). As we will discuss later in this brief, the plaintiffs seek to recover damages that Southern Nuclear, and only Southern Nuclear, has incurred. Because it lacks standing to maintain any action against the United States, it cannot recover those damages.

Regardless of Southern Nuclear's lack of standing, plaintiffs' damages claims grossly exceed the amounts that they actually incurred as a result of DOE's breach of the Standard Contract. Indeed, the Government established at trial that APC and GPC would have required significant additional storage at two of their facilities regardless of the Government's performance under the Standard Contract and that plaintiffs' damages claim fails properly to

---

[2] In its April 7, 2004 order, the Court recognized that, although Southern Nuclear had asserted a "taking" claim in its complaint, "[n]o 'taking' claim divorced from the contract derived rights is asserted" and that Southern Nuclear "has not pleaded any 'taking' claim independent of the Standard Contracts executed by APC and GPC." Order, at 4 n.1 (Apr. 7, 2004). The Court dismissed the plaintiffs' takings claims for failure to state a claim upon which relief can be granted. Order, at 5 (Apr. 7, 2004).

account for these significant additional costs. Moreover, the Government established that the plaintiffs failed to mitigate their damages at plant Hatch by overloading expensive dry casks from their wet pools to dry storage to maintain an unnecessarily high and historically unsupported dual full core reserve in Hatch's wet pool. With regard to plaintiffs' damages, those claims are meritless or overstated for numerous reasons, including the following:

First, plaintiffs' damages theory is premised upon an SNF acceptance rate to which DOE expressly refused to obligate itself under the Standard Contract. At trial, plaintiffs contended that the "Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste" ("Standard Contract") and the Nuclear Waste Policy Act of 1982 ("NWPA"), Pub. L. 97-425, 96 Stat. 2201 (codified at 42 U.S.C. §§ 10101-10270 (1982)), obligated DOE to accept SNF at a rate that eliminated the need for utilities to construct additional at-reactor storage after 1998 and that allowed for timely decommissioning of shutdown facilities. See Pl. Br. 37-39.[3] However, the plaintiffs' litigation theory is belied by the text of the Standard Contract and the NWPA, as well as by the plaintiffs' comments in the administrative rulemaking leading to the promulgation of the Standard Contract terms. Indeed, during contract formation, not a single utility or industry representative requested the inclusion of language that tied DOE's performance to the construction of at-reactor storage and to timely decommissioning. Instead, the comments by APC and GPC, among others, sought inclusion of language in the Standard Contract that would have obligated DOE to implement an acceptance rate tied to the annual generation rate of operating reactors and to a reduction of the backlog of SNF stored at utilities nationwide in 1998 (not the need for at-reactor storage and timely decommissioning). The two-

[3] "Pl. Br. __" refers to Plaintiffs' Post-Trial Brief, filed March 17, 2006.

part requirement that the plaintiffs assert was the "intent of the parties" and upon which their damages claim hinges simply <u>never</u> was advanced by utilities during contract formation.

In any event, during the process of contract formation, DOE rejected creating any "requirement" that was tied to the generation rate and backlog, the actual request that several utilities and industry groups, including APC and GPC, had made regarding contract terms. As a result, for the Court to find that the Standard Contract contained a qualitative two-part performance standard, this Court must impose upon DOE a contract term that was rejected during contract formation. Moreover, the plaintiffs' reliance upon a "whereas" clause as imposing their proposed two-part requirement as a contract obligation lacks support in fact and law. Likewise, DOE program documents generated <u>after</u> the period of contract formation that outline DOE's <u>plans</u> and <u>goals</u> fail to establish a contract <u>obligation</u> regarding the acceptance rate or the adoption of any two-part "requirement" as a contract right.

The imposition of plaintiffs' two-part, qualitative requirement also is contradicted when analyzed in relation to plaintiffs' damages theory. While tying DOE's performance obligation to the two-part requirement, the plaintiffs argue that DOE would have met this alleged obligation by accepting SNF at a 3,000 MTU steady-state rate with a short four-year ramp-up period. However, had DOE performed under the rate advocated by the plaintiffs in the "but for" world, it would have been in breach of the plaintiffs' two-part test with respect to GPC and many other contract holders because the rate advocated by the plaintiffs is not high enough to preclude the need for additional storage and allow for timely decommissioning, as those concepts are defined by plaintiffs. Since the two-part test is the basis for the plaintiffs' assertions concerning the proper rate, any "but for" rate must satisfy DOE's alleged contractual obligations. If the rate

fails to satisfy DOE's performance obligations, the plaintiffs have failed in their burden of proving the "but for" world, having instead established nothing more than a new and hypothetical breach world.

In contrast to the plaintiffs' theory concerning the contractually-mandated rate of acceptance, the proper rate of acceptance for the Court to apply is that which was developed pursuant to the terms of the Standard Contract and in accordance with the constraints upon DOE's acceptance of SNF that Congress imposed. This rate was first set forth in the 1991 Annual Capacity Report ("ACR"), as required by the Standard Contract. Based upon the allocations available to the plaintiffs pursuant to this rate and the Standard Contract's oldest-fuel-first ("OFF") acceptance queue requirement, the plaintiffs would have required dry cask storage at plant Hatch and would have been obligated to rack the Unit 1 spent fuel pool at plant Vogtle, even if DOE had begun accepting SNF on January 31, 1998. Applying the proper rate of acceptance to the "but for" world, among other adjustments, plaintiffs' claims for past costs properly are reduced to no more than $16,707,845 for the breaches to date. As we will discuss below, to the extent that the Court were to elect to ignore the schedule terms of the Standard Contract and to impose a greater rate than that to which DOE committed or, at best, was willing to commit itself, it would render the contract too indefinite to enforce.

Second, plaintiffs seek reimbursement of the $8.5 million that they have paid for the licensing of the Private Fuel Storage ("PFS") facility in Utah. Pl. Br. 101-103. These costs are not recoverable for several reasons. As an initial matter, the United States Court of Appeals for the Federal Circuit decision in Indiana Michigan Power Co. v. United States, 422 F.3d 1369 (Fed. Cir. 2005), precludes recovery of plaintiffs' contributions PFS. Specifically, in

considering a claim for PFS contributions, the Federal Circuit held that, "[w]hile DOE should have foreseen that its breach would force Indiana Michigan to find alternate storage for its SNF, it is not liable for such a speculative venture and unforeseeable costs." Id. at 1376. Additionally, the only record evidence shows that Southern Nuclear, and not APC or GPC, invested in PFS. Because Southern Nuclear lacks contractual privity with the United States, it has no basis upon which to recover these costs from the Government. Regardless of these defenses, the evidence at trial in this case confirmed the Federal Circuit's conclusion that PFS was a highly speculative venture; that, at the time that Southern Nuclear was deciding to invest in PFS, it should have realized that PFS had no chance of providing APC or GPC with an alternative option for the storage of SNF; and that PFS was not "foreseeable" at the time of contract formation. As early as 1994, the plaintiffs were aware that PFS would not be available in time to resolve storage issues at plants Hatch and Vogtle. Ultimately, Southern Nuclear's contributions to PFS were not foreseeable, merely increased the damages allegedly owing to plaintiffs, and did not constitute reasonable mitigation.

Third, the Government established that the plaintiffs failed properly to account for every cost that they would have incurred in the "but for" world and that are, therefore, not attributable to DOE's breach. Additionally, the Government also demonstrated that certain other costs, such as plaintiffs' claim for prejudgment interest and charges associated with internal company labor and overhead, are not properly recovered here either as a matter of law or fact.

Finally, this Court should eliminate additional costs based upon the plaintiffs' failure to properly mitigate damages. The plaintiffs ask the Court to make different assumptions regarding their operations in the actual and "but for" worlds, although the operating policies that it asks the

Court to assume in the "but for" world existed from the beginning of operations through 2000. The application of these inconsistent operating assumptions results in additional costs of more than $17 million. Because these additional costs result from plaintiffs' failure employ the same mitigation measures in the actual world that it claims it would have employed in the "but for" world, plaintiffs' claim for these costs as damages should be denied.

## STATEMENT OF FACTS

### I. THE ORIGINAL PROVISIONS OF THE NUCLEAR WASTE POLICY ACT

On January 7, 1983, the Nuclear Waste Policy Act of 1982 ("NWPA"), Pub. L. 97-425, 96 Stat. 2201 (codified at 42 U.S.C. §§ 10101-10270 (1982)), was enacted. In its statement of the statutory purposes underlying the NWPA, Congress identified the following four objectives: (1) developing repositories to ensure the protection of the public and the environment from the hazards posed by SNF and high level radioactive waste ("HLW"); (2) establishing Federal responsibility and policy for the disposal of SNF and HLW; (3) defining the relationship between the Federal Government and state governments regarding SNF and HLW disposal; and (4) establishing "a Nuclear Waste Fund, composed of payments made by the generators and owners of such waste and spent fuel, that will ensure that the costs of carrying out activities relating to the disposal of such waste and spent fuel will be borne by the persons responsible for generating such waste and spent fuel." Id. § 10131(b). Importantly, the Act said nothing about any obligation to preclude nuclear utilities from having to construct additional at-reactor storage or to assist them with timely decommissioning.

The NWPA sets forth a specific process by which the Secretary of Energy, the President of the United States, and the United States Congress would determine a site for a repository for

the permanent deep geologic disposal of SNF. See 42 U.S.C. §§ 10132, 10134, 10135. In addition to this process for the siting of a repository, the Secretary was to "prepare a comprehensive report, to be known as the mission plan, which shall provide an informational basis sufficient to permit informed decisions to be made in carrying out the repository program and the research, development, and demonstration programs required under this chapter." 42 U.S.C. § 10221(a) (1982). The Secretary was to provide a draft mission plan to the states, affected Indian tribes, the NRC, and other Federal Government agencies within 15 months of the date of the NWPA's enactment. Id. § 10221(b)(1). The Secretary was to obtain those entities' comments, revise the draft mission plan in response to them, and, within 17 months of the NWPA's enactment, to provide the appropriate committees of Congress with the mission plan. Id. § 10221(b)(2)-(3).

Congress also included in the NWPA provisions allowing the Secretary to study the possibility of creating Monitored Retrievable Storage ("MRS") facilities, with Congress finding that "long-term storage of high-level radioactive waste or spent nuclear fuel in monitored retrievable storage facilities is an option for providing safe and reliable management of such waste or spent fuel." 42 U.S.C. § 10161(a)(1) (1982). By July 1, 1985, the Secretary was to "complete a detailed study of the need for and feasibility of, and shall submit to the Congress a proposal for, the construction of one or more monitored retrievable storage facilities for high-level radioactive waste and spent nuclear fuel." Id. § 10161(b)(1). The proposal was to "include, for the first such facility, at least 3 alternative sites and at least 5 alternative combinations of such proposed sites and facility designs . . . ." Id. § 10161(b)(4). However, the NWPA provided that any MRS facility that Congress might authorize in response to the

Secretary's proposal could "be constructed in any State in which there is located any site approved for site characterization under section 10132 of this title." Id. § 10161(g).

The SNF acceptance requirements of the NWPA were not self-executing. Instead, the NWPA provided that the Secretary would enter into contracts with the owners and generators of SNF of domestic origin for "the acceptance of title, subsequent transportation, and disposal of such [SNF]." 42 U.S.C. § 10222(a)(1) (1982). The contracts had to "provide for payment to the Secretary of fees . . . sufficient to offset expenditures" described elsewhere in the statute. Id. The NWPA also required that:

> Contracts entered into under this section shall provide that –
>
> (A) following commencement of operation of a repository, the Secretary shall take title to the high-level radioactive waste or spent nuclear fuel involved as expeditiously as practicable upon the request of the generator or owner of such waste or spent fuel; and
>
> (B) in return for the payment of fees established by this section, the Secretary, beginning not later than January 31, 1998, will dispose of the high-level radioactive waste or spent nuclear fuel involved as provided in this subtitle.

42 U.S.C. § 10222(a)(5). The NWPA did not identify any other contractual requirements for the contracts authorized by 42 U.S.C. § 10222(a)(5). More specifically, the NWPA contained no provisions concerning the specific rate of acceptance to be included in the contracts or concerning qualitative standards that DOE was obligated to include in the contract with respect to the rate of SNF acceptance. See generally 42 U.S.C. §§ 10101-10270; see also Tr. 549:15-19 (Hunt) (NWPA does not contain language the utilities will not have to pay for additional storage after 1998); Tr. 562:23-563:1 (Hunt) (NWPA does not contain a specific rate of acceptance).

## II. THE "STANDARD CONTRACT FOR DISPOSAL OF SPENT NUCLEAR FUEL AND/OR HIGH-LEVEL RADIOACTIVE WASTE" WAS CREATED THROUGH NOTICE AND COMMENT RULEMAKING IN THE FEDERAL REGISTER

### A. The Proposed Rule

On February 4, 1983, DOE – in furtherance of its obligations pursuant to the NWPA, 42 U.S.C. § 10222 – published a notice of proposed rulemaking in the Federal Register, proposing terms for the "Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste" ("Standard Contract") mandated by the NWPA, 42 U.S.C. § 10222. See 48 Fed. Reg. 5458 (Feb. 4, 1983). The proposed Standard Contract provided a mechanism for determining both the order in which, and the rate at which, the various contract holders' SNF would be accepted. As for the order of SNF acceptance, the Standard Contract proposed that DOE would issue an "acceptance priority ranking" ("APR") of SNF and/or HLW, through which SNF and/or HLW would receive acceptance priority based generally upon its age. Id. at 5464 (Art. VI.B.3). Although the proposed Standard Contract itself did not identify a specific rate by which DOE would accept contract holders' SNF, it provided for DOE's issuance of documents for planning purposes to assist in the eventual definitization of the specific rate and order of SNF acceptance and disposal. Id. at 5463 (Art. V.B.5 & Art. V.B.6). The proposed contract further provided that, following DOE's issuance of planning documents, rates of SNF acceptance, as well as the specific order of SNF acceptance from particular contract holders, would be defined through the contract holders' submission of, and DOE's approval of, delivery commitment schedules ("DCSs"). Id. at 5462. The proposed Standard Contract also provided for the contract holders' subsequent submission of Final Delivery Schedules ("FDSs"), which would serve to take the annual allocation defined in a DCS and further refine it to reflect as closely as possible

the month(s) and day(s) upon which SNF acceptance would occur in that year. Id. at 5463 (Art. IV.C).

The term "DOE facility" in the proposed Standard Contract referred to a facility for disposal, in a permanent repository, of the SNF and/or HLW. Id. at 5462 (Art. I.11). The proposed rule provided that written comments had to be submitted by March 7, 1983. Id. at 5458.

As with the NWPA, the proposed Standard Contract did not contain any obligation upon DOE's part to accept SNF at a particular or minimum steady-state rate. Likewise, the proposed Standard Contract did not include a qualitative standard requiring DOE to accept SNF at a rate that would "avoid additions of on-site storage capacity after [January 31, 1998] and [that would] reduce the backlog of SNF and thus avoid delays in the decommissioning of nuclear power plants at the end of their useful life [sic]." See Pl. Br. 14.

B. Public Comments[4]

Domestic nuclear utilities – including GPC and APC – and their industry representatives were very involved in the drafting of the Standard Contract and its terms. Indeed, DOE received numerous comments in response to the proposed rule. See DX 5.001-5.080. One of the issues that pervaded the comments made by utility and industry representatives concerned the rate at

[4] Plaintiffs contend that DOE received "preliminary comments" from industry before publishing the proposed Standard Contract in the Federal Register. Pl. Br. 25. This characterization of industry's input to the Standard Contract is inaccurate. Before DOE published the proposed Standard Contract, it met with several industry groups to receive their feedback on the contents of the Standard Contract and received several proposed drafts of the Standard Contract. DX 7, 12, 14-17 & 19. Representatives of Southern Nuclear attended these meetings. DX 15. All of this evidence belies plaintiffs' contention regarding the limited input of industry and supports the Government's showing that the Standard Contract was developed with the full input and advice of the nuclear utility industry.

which DOE would be obligated, by contract, to accept SNF from the contract holders. A number of the comments recognized that the Standard Contract did not establish a specific rate at which DOE must accept SNF, and sought to have such a rate included. APC and GPC submitted almost identical comments regarding the spent fuel receipt rate:

> The draft contract recognizes that the annual capacity of the DOE disposal facilities may not be adequate to handle the level of deliveries of spent fuel desired by the holders of such fuel. In this regard, it is important that the annual receipt rate of the disposal facility being designed be commensurate with the quantities of spent nuclear fuel being generated annually and also the need to reduce the back-log of spent fuel as expeditiously as possible. Consistent with Section 302(a)(5) of the Act, the contract should express the intent of DOE to take title to spent nuclear fuel as expeditiously as practicable upon the request of the generator or owner.

DX 5.081 at 8 (ARC0010680) (GPC's comments) (emphasis added); see DX 5.028 at 8 (ARC0010281) (APC's comments). At trial, Mr. Hunt agreed that this paragraph reflected APC's request that DOE "establish a rate of acceptance that [would] be higher than the annual generation rate so that it will reduce the backlog of spent fuel that already exists." Tr. 567:22-568:2. Neither GPC nor APC requested the inclusion of language tying DOE's performance obligation to the construction of additional at-reactor storage and timely decommissioning. See id.

Similarly, the Edison Electric Institute ("EEI"), an association of investor-owned utilities, and the Utility Nuclear Waste Management Group ("UNWMG"), a consortium of 43 utilities with specific interests relating to nuclear waste management, expressly recognized that "the contract may not be the appropriate place to commit DOE to a specific, numerical receiving

rate."[5] DX 5.034, Attachment at ARC0010334. However, EEI and UNWMG requested that a term be added to the Standard Contract that would require DOE to "design its facilities with the capacity to receive SNF/HLW at a rate commensurate with the amount of SNF/HLW then being generated together with the accumulated backlog of SNF/HLW." See DX 5.034 **(**ARC0010334). Specifically, EEI and UNWMG suggested the inclusion of the following language, intended to add an obligation upon DOE beyond that imposed by the proposed rule:

> WHEREAS, DOE recognizes that its ability to take delivery of spent nuclear fuel and/or high-level radioactive waste must be commensurate with the amount of such fuel and waste then being generated together with the amount of such fuel and waste previously generated, and consistent with its obligation to take title to such fuel and waste as expeditiously as practicable upon the request of the owner or generator of such fuel and waste.

Id. at ARC0010335. Both GPC and APC participated in formulating EEI's comments upon the proposed contract (Tr. 559:2-10 (Hunt)), and both adopted EEI's comments in their entirety. See DX 5.028 at 1 (ARC0010274); DX 5.081 at 1 (ARC0010673). Southern Company Services, which also submitted comments upon the Standard Contract, likewise adopted EEI's comments. Tr. 564:7-18 (Hunt); DX 5.027 at 1-5 (ARC0010269-ARC0010273).

Other utilities submitted similar comments seeking firm commitments regarding the rate of DOE performance. For instance, Tennessee Valley Authority ("TVA") submitted a comment, stating that "a commitment to do no more than start accepting deliveries by 1998 is empty and meaningless without setting forth some reasonable minimum rate of acceptance which

[5] GPC and APC were members of both EEI and UNWMG. Tr. 557:17-19 (Hunt), Tr. 560:2-15 (Hunt); Tr. 124:2-11 (Long) ("virtually all utilities belong to" EEI). Currently, the plaintiffs are members of the Nuclear Energy Institute – or NEI – that replaced EEI. Tr. 125:2-22 (Long). NEI focuses "industry efforts . . . to come up with positions that impact public policy." Tr. 125:16-22 (Long).

corresponds to the purposes of the Act." DX 5.063 at 5 (ARC0010537). TVA recognized that, "[o]f course, under the priority ranking system in the draft contract, it would be difficult at the time contracts are executed to give each Purchaser assurances of delivery acceptance at any specific rate," but suggested that "[t]his could, however, be done on an industry wide basis." Id. TVA suggested that DOE add a contract provision to provide that "DOE shall start accepting delivery of SNF or HLW not later than January 31, 1998, at not less than the annual rate [at which] SNF and/or HLW is then being produced from civilian nuclear power plants covered by contracts . . . ." Id.

DOE also received comments seeking a commitment for DOE to accept SNF at the rates set forth in the Mission Plan. For instance, Florida Power & Light Company, expressly stated that DOE should create a mandatory obligation that would require DOE to accept SNF and HLW at the rates identified in the Mission Plan, once that plan was approved by Congress:

> The [NWPA] specifically requires the Department of Energy to prepare a Mission Plan detailing a schedule for the construction of repositories and their capacities (Section 301). It is proposed that once this Mission Plan has been approved by Congress (18 months after the enactment of the [NWPA]), it becomes the standard by which contract performance by the DOE is judged. It is suggested that Article V B (3) be modified to include the statement:
>
> > "Should the DOE fail to meet the schedule and capacities detailed in the approved 1984 DOE Mission Plan, because of Force Majeure or other causes, DOE shall, to the extent permitted by the [NWPA], as it may be amended from time to time, bear the reasonable and necessary incremental costs of storage or alternative disposal incurred by the Purchaser."

DX 5.043, attachment 1 at 1 (ARC0010439). Ultimately, 32 utilities adopted EEI's comments and at least four utilities specifically requested the inclusion of a qualitative standard tied to the

generation rate and reduction of the backlog. See generally DX 5.001-5.081; see also DX 14 at SMUD0011720 (same); DX 22 at GPE0010323 (same).[6]

EEI also suggested that "[t]he definition of 'DOE Facility' (Article I.11) should be broadened to include destinations other than the repository," such as an MRS. DX. 5.034, Attachment A at 4 (ARC0010336). EEI stated that "[t]he contract does not recognize the possibility that DOE might send SNF/HLW to an intermediate location (such as a monitored retrievable storage facility) before it goes to a repository" and that, "[t]o accommodate this, the definition of 'DOE Facility' should be broadened." DX 5.034, Attachment A at 5 (ARC0010337); see also DX 5.014 (ARC0010180) (change to contract language "would implicitly recognize DOE's option to reprocess SNF or to utilize Monitored Retrievable Storage prior to permanent disposal"); DX 5.069 (ARC0010625) ("[t]his change would recognize the possibility of DOE shipping SNF/HLW to an intermediate storage facility such as a monitored retrievable storage facility").

[6] DOE also received comments that would require a permanent repository be in place by January 31, 1998, or, in the alternative, that DOE obligate itself to accept SNF, beginning no later than January 31, 1998, at a rate commensurate with that which would be expected if a repository were operational by January 31, 1998. DX 5.017 at ARC0010216. EEI and UNWMG requested that DOE modify the proposed Standard Contract to read that "[t]he services to be provided by DOE under this contract shall commence on a schedule consistent with the commencement of disposal services [i.e., in a repository] not later than January 31, 1998 . . . ." DX 5.034 at ARC0010342-43. Others requested an express contractual provision tying the repository to a January 31, 1998 date. DX 5.036 at ARC0010414.

Finally, and among other proposed modifications,[7] certain utility and industry representatives requested the inclusion of a provision that allowed purchasers to exchange approved DCSs. EEI noted that, while Article IV.B of the proposed contract "allows the Purchaser to 'change the specific assemblies to be delivered so long as the SNF meets the acceptance criteria of the contract,'" the provision should be made "more explicit" to allow "exchanges among and within utilities." DX 5.034 at ADM002.0292. EEI requested inclusion of the following paragraph:

> E. Exchanges
>
> Purchaser shall have the right to determine which SNF and/or HLW is delivered to DOE, provided that Purchaser complies with the requirements of Article V.A.2(b) as to such SNF and/or HLW. Purchaser shall have the right to exchange approved delivery commitment schedules with parties to other contracts with DOE for disposal of SNF and/or HLW, provided that DOE shall have the right to approve such exchanges, based upon the feasibility of necessary transportation arrangements, which approval shall not be unreasonably withheld.

Id. at ADM002.0293; see also DX 5.012 at ADM002.0109 (comments of NSP); DX 5.015 at ADM002.00133 (comments of Consumers Power Co.); DX 5.018 at ADM002.00173 (comments of Gulf States Utilities); and, DX 5.033 at ADM002.0264 (comments of Portland General Electric).

[7] The nuclear industry also "discouraged" the inclusion of the priority provision for shutdown reactors in the contract. See DX 5.034 at ADM0020307 (in comments upon proposed rule, EEI stated that it did not support priority to shutdown reactors and recommended that the provision be deleted).

C. The Final Rule

On April 18, 1983, DOE issued the Standard Contract as a final rule. 48 Fed. Reg. 16590 (April 18, 1983). The final rule, as promulgated, made several important modifications to the Standard Contract set forth in the proposed rule. First, and in response to the comments from the industry, the Standard Contract eliminated any requirement for DOE to begin SNF "disposal" in a permanent repository by January 31, 1998. Id. Instead, the final Standard Contract only required DOE to begin SNF acceptance by January 31, 1998, after the commencement of "facility" operations:

> This contract applies to the delivery by Purchaser to DOE of SNF and/or HLW of domestic origin from civilian nuclear power reactors, acceptance of title by DOE to such SNF and/or HLW, subsequent transportation and, with respect to such material, establishes the fees to be paid by the Purchaser for the services to be rendered hereunder by DOE. The SNF and/or HLW shall be specified in a delivery commitment schedule as provided in Article V below. The services to be provided by DOE under this contract shall begin, after commencement of facility operations, not later than January 31, 1998 and shall continue until such time as all SNF and/or HLW from the civilian nuclear power reactors specified in Appendix A, annexed hereto and made a part hereof, has been disposed of.

10 C.F.R. § 961.11, Art. II (emphasis added). The "facility" was re-defined to encompass either a permanent repository to be constructed pursuant to the NWPA or such other facility to which SNF might be shipped by DOE prior to its transportation to a permanent repository. Id. § 961.11, Art. I.10; see also 48 Fed. Reg. 16590, 16591 (Apr. 18, 1983).

With respect to the order of SNF acceptance, the Standard Contract retained the proposed rule's intention to provide SNF acceptance priority among contract holders upon an "oldest fuel first" basis, 10 C.F.R. § 961.11, Art. VI.B.1, and, like the proposed rule, provided for DOE's

issuance of an acceptance priority ranking beginning April 1, 1991. 10 C.F.R. § 961.11, Art. IV.B.5.a. However, DOE adopted EEI's proposed term allowing for exchanges among contract holders, with modification allowing DOE, in its sole discretion, to approve or reject proposed exchanges.[8] 10 C.F.R. § 961.11, Art. V.E

With respect to the rate of SNF acceptance, DOE did not adopt the suggestion of EEI and many of the utilities to incorporate into the contract a requirement that DOE accept SNF at a rate equal to the annual generation rate plus some additional amount to reduce the accumulated backlog. Tr. 572:25-573:11 (Hunt) (language does not appear in Standard Contract). DOE determined it could not include this requirement because of the number of uncertainties concerning the acceptance of SNF by DOE in 1998. Yankee Atomic Transcript, August 2, 2004, 3621:20-3622:4 (Mr. Robert Morgan, the first Director of the Office of Civilian Radioactive Waste Management testified: "I felt that the Nuclear Waste Policy Act requirements were extremely difficult because of the licensing, potential litigation, technical issues, stakeholder issues, that it was going to be difficult to meet the '98 date. And that I felt that it would be inappropriate and not required by the [A]ct to have a rate of acceptance in the contract."); 3626:9-3627:13 (rejection of request by utilities in comments during rulemaking); Tennessee Valley Authority Transcript, July 14, 2005, 2198:15-2199:3; 2209:14-20 (DOE's rejection of EEI's request for whereas clause).[9] Instead, as Mr. Morgan testified, the contract provided that

[8] DOE also did not accept EEI's suggestion that the priority provision for shutdown reactors be removed from the contract. 48 Fed. Reg. at 16592.

[9] By agreement of the parties, and in light of Mr. Morgan's age and state of residency, the Government designated testimony from Mr. Morgan in lieu of calling him as a live witness. The testimony of Mr. Morgan cited in the Government's brief is part of the record of this case. Defendant's Testimony Designations, filed October 17, 2005. The Government also designated

the acceptance rate would be developed later. Yankee Transcript, 3657:8-12 (Standard Contract provides that "there would be a process that would be an acceptance rate that would be negotiated with DOE at a later point in time"); Tennessee Valley Authority Transcript, 2221:18-2222:2 (acceptance rate to be determined at a later date). Because of these perceived uncertainties, DOE added an amendments clause to the final Standard Contract, which provides:

> The provisions of this contract have been developed in the light of uncertainties necessarily attendant upon long-term contracts. Accordingly, at the request of either DOE or Purchaser, the parties will negotiate and, to the extent mutually agreed, amend this contract as the parties may deem to be necessary or proper to reflect their respective interests; provided, however, that any such amendment shall be consistent with the DOE final rule published in the Federal Register on April 18, 1983 entitled, "Standard Contract for Disposal of SNF and/or HLW", as the same may be amended from time to time.

Art. XV (Amendments) (emphasis in original); 48 Fed. Reg. at 16595 ("This clause was added to expressly recognize that DOE or the Purchaser may wish to amend the contract in the future to more accurately or equitably reflect their respective interests).

The utilities acknowledged that DOE rejected their request regarding the inclusion of a qualitative description of the acceptance rate in both internal memoranda and correspondence with DOE. For example, TVA noted that its request regarding the acceptance rate term had been rejected:

> DOE did not accept TVA's suggestion that DOE should start accepting delivery of SNF and HLW in 1998 at a rate not less than that which they are being produced by the civilian nuclear power industry as a whole. The final contract does obligate DOE to issue, not later than July 1, 1987, an annual capacity report for

---

portions of the testimony of Mr. Ronald Milner from the trial in Yankee Atomic Electric Co. v. United States, Fed. Cl. No. 98-126C.

> planning purposes and, beginning April 1, 1991, annual capacity priority rankings (the oldest SNF and HLW having priority) for receipt by the DOE repository. DOE is also obligated to provide annual reports giving the waste disposal programs' plans and cost projections.

DX 32, Attachment 2 at 3 (TV1471) (TVA memorandum, dated May 24, 1983); see DX 37 at 1 (Yankee Atomic memorandum, dated January 20, 1984). Likewise, in a letter to Robert Morgan, EEI complained that the Standard Contract as promulgated lacked "standards or milestones for DOE's performance . . . ." DX 34, Attachment 1 at 1 (SN011049).

DOE likewise did not adopt Florida Power & Light Company's request that DOE add a contract clause obligating DOE to accept SNF and/or HLW under "the schedule and capacities detailed in the approved 1984 DOE Mission Plan . . . ." DX 5.043, attachment 1 at 1 (ARC00010439). Apparently, the utilities contemplated renewing this request in a rulemaking petition concerning the Standard Contract. DX 36 at 2 (YDK045589) (Yankee Atomic memorandum, dated October 19, 1983).

The final Standard Contract included a "Disputes" clause, the purpose of which was to provide a mandatory administrative mechanism for the resolution of contract disputes arising under the contract:

> Except as otherwise provided in this contract, any dispute concerning a question of fact arising under this contract which is not disposed of by agreement shall be decided by the Contracting Officer, who shall reduce his decision to writing and mail or otherwise furnish a copy thereof to the Purchaser. The decision of the Contracting Officer shall be final and conclusive unless within ninety (90) days from the date of receipt of such copy, the Purchaser mails or otherwise furnishes to the Contracting Officer a written appeal addressed to the DOE Board of Contract Appeals (Board). . . .

10 C.F.R. § 961.11, Art. XVI.A (emphasis added).

Finally, the final Standard Contract contained an integration clause, precluding reliance upon any representation, promise, or condition not expressly incorporated into the contract:

> This contract, which consists of Articles I through XXII and Appendices A through G, annexed hereto and made a part hereof, contains the entire agreement between the parties with respect to the subject matter hereof. Any representation, promise, or condition not incorporated in this contract shall not be binding on either party. No course of dealing or usage of trade or course of performance shall be relevant to explain or supplement any provision contained in this contract.

10 C.F.R. § 961.11, Art. XXII.

## III. PLAINTIFFS' EXECUTION OF THEIR STANDARD CONTRACTS

On June 10, 1983, GPC executed three Standard Contracts with DOE. One contract covered the SNF generated at plant Vogtle (DX 1), and two contracts covered the SNF generated at Units 1 and 2 of plant Hatch. DX 2 and 3. On June 13, 1983, APC executed one Standard Contract with DOE, covering the SNF generated at plant Farley. DX 4. All of these Standard Contracts contained the same terms and conditions as the final rule promulgated by DOE on April 14, 1983. See DX 1-4.

## IV. ISSUANCE OF THE MISSION PLAN AND ITS AMENDMENT

### A. The Documents That Set Forth DOE's Early Program Plans

In June 1985, DOE issued the Mission Plan, in accordance with the requirements of 42 U.S.C. § 10221 (1982), which was to "provide an informational basis sufficient to permit informed decisions to be made in carrying out the repository program and the research, development, and demonstration programs required under this chapter." 42 U.S.C. § 10221 (1982). The Mission Plan contained waste acceptance schedules to fulfill the requirement of the NWPA to project how long the repositories to be constructed would be in operation before they

were closed for long-term monitoring. Yankee Atomic Transcript, 4723:9-22 (Milner). In these schedules, DOE projected for informational purposes that an initial permanent repository would begin operations in 1998 and that a second permanent repository would commence operations in 2006. DX 44 at 25 (HQR0031129) ("Assumptions About Geologic Repositories, A. Number of Repositories, Two"); id. at 26 ("Table 2-2 shows a schedule that is based on the current estimated emplacement capacities of the two planned geologic repositories, one of which is currently authorized"); Yankee Atomic Transcript, 4724:9-12 (Milner: DOE assumed construction of two repositories at time the Mission Plan was issued). With two operational repositories, the schedules in the Mission Plan show a steady-state rate of 6,000 MTU, reached in 2012. DX 44 at 26-27 (HQR0031130-HQR0031131); Tr. 1749:14-1750:4 (Kouts).[10] Significantly, these schedules were constructed based upon projected annual generation rates of approximately 3,000 MTU in 1998 and increasing in the future and upon the total capacity limitation for each repository of 70,000 MTU. DX 44 at 26-27 (HQR0031130-HQR0031131); Trebules Dep., Apr. 17, 2002, 101:3-12. These schedules also projected that DOE would not begin to work off the backlog of accumulated fuel (or exceed the generation rate) until the second repository came on-line in 2006. DX 44 at 26-27 (HQR0031130-HQR0031131); Trebules Dep., Apr. 17, 2002, 98:15-99:1; Tr. 1750:21-1751:16 (Kouts).

The Mission Plan noted that these schedules were "only an approximation of how the system may operate and is subject to considerable variation. The DOE will further define and specify the system acceptance parameters as the program progresses." DX 44 at 29

---

[10] Plaintiffs incorrectly describe the steady-state rate shown on these schedules as 3,000 MTU. Pl. Br. 34.

(HQR0031133); Trebules Dep., Apr. 17, 2002, 113:18-116:14. The Mission Plan further advised that,

> Under the terms of the contracts for disposal services that have been signed between the DOE and the utilities, an annual capacity report with projected annual receiving capacities and rankings will be issued by the DOE beginning in 1987. In 1991, the DOE will begin to publish firm waste-acceptance schedules for individual reactors, including shipment allocations.

DX 44 at 29 (HQR0031133); Yankee Atomic Transcript, 4725:13-4726:2 (Milner: "firm waste acceptance schedules" meant delivery commitment schedules); Trebules Dep., Apr. 17, 2002, 147:1-148:21 (Trebules: "I think [the ACR and APR] were going to be negotiated with the utilities and those would become the specific schedules that the government would try to meet in terms of accepting spent fuel.").

DOE issued two drafts of the Mission Plan, in December 1983 and April 1984. PX 35 and 37. In the 1983 draft Mission Plan, DOE described its "program strategy," including the provision of waste acceptance schedules. DOE described the rates upon which these schedules were built as follows:

> While the Department's acceptance rate during the initial five years is set to prevent, in the aggregate, the need for utilities to provide additional on-site storage after 1998, it is possible that an individual utility may face a need for expanded storage due to the timing of its shipment allocation.

PX 35 at 2-2. This language does not appear in the second draft of the Mission Plan, issued in April 1984, or in the final Mission Plan, issued in 1985.[11] Compare PX 35 and 37 and DX 44.

---

[11] Plaintiffs noted the changes to the drafts of the Mission Plan when Southern Nuclear wrote to complain that DOE had removed the language regarding the strategy to ensure that preclude the need for additional at-reactor strategy in the aggregate. PX 267.

Nevertheless, the 1983 draft Mission Plan stated, like the final Mission Plan, that the proposed waste acceptance schedule was subject to revision and that firm waste acceptance schedules for the utilities would not be developed until 1991, pursuant to the terms of the Standard Contract:

> This Waste Acceptance Schedule will serve as a planning base which will be updated annually in response to the latest projections of nuclear power growth. The schedule will eventually be further developed to show not only the aggregate acceptance schedule, but also an acceptance priority ranking by utility and fuel element. Under the terms of the utility contracts for disposal services, an annual capacity report with projected annual receiving capacities and rankings will be issued by the Department for planning purposes, beginning in 1987.
>
> The disposal contracts with the utilities specify that priority will be given to the oldest spent fuel or high-level wastes. In 1991, DOE will begin publishing firm individual utility acceptance schedules in accordance with the contracts, including shipment allocations.

PX 35, at 2-2. This draft Mission Plan also noted that, "[i]f by this date it is known that the first repository will not be available by January 31, 1998, then the Department will request Congressional authorization to construct an MRS facility to be in operation by January 31, 1998." Id. at 2-7. The "planning approach" to pursue the construction of a repository or, in the alternative, an MRS was "designed to ensure that all utilities will be able to establish firm planning schedules for the disposition of their radioactive wastes . . . ." Id. at 2-1. The "firm planning schedules" referred to in this sentence were the acceptance schedules or delivery commitment schedules to be developed pursuant to the mechanism in the Standard Contract. Morgan Dep., Mar. 21, 2002, 151:23-152:1 (Morgan: "firm schedule" in the 1983 draft Mission Plan meant an "acceptance schedule"); Lawrence Dep., May 21, 2002, 311:10-315:18 (Lawrence: "firm planning schedule" defined as the waste acceptance schedule to be developed pursuant to the mechanism in the contract); Rosselli Dep., Apr. 15, 2002, 136:7-23 and 137:14-

18 (Rosselli, the author of the 1983 draft Mission Plan, defined "firm schedule" as "the delivery commitment schedules." )

In the 1987 Mission Plan Amendment, which DOE submitted to Congress in June 1987, DOE recommended deferral of the date contemplated for operation of the first repository from 1998 to 2003, with the second repository becoming operational by 2023. It explained that this recommendation was based upon experience gained in the program, a budget decrease for fiscal year 1987, and budget uncertainty for fiscal year 1988. The Mission Plan also noted that DOE could nonetheless start accepting waste in 1998 at an MRS facility.[12] DX 63 at 6 (HQR0031634) and 11 (HQR0031639).

Further, in the 1987 Mission Plan Amendment, DOE stated that, "[l]ike the schedule in the 1985 Mission Plan, the schedule presented here is only an approximation of how the system may operate and is subject to considerable variation." DX 63 at 60 (HQR0031687). In that schedule, DOE projected that it would begin acceptance in 1998 at an MRS and at the first repository in 2003 and that it would not reach a steady-state rate of 3,000 MTU until 2008. Id. at 61 (HQR0031687). The 1987 Mission Plan Amendment also reiterated that firm acceptance schedules would be established through the mechanism set forth in the Standard Contract:

> Under the terms of the contract that has been signed between the DOE and the owners and generators of spent fuel and high-level waste, an annual capacity report with projected annual receiving capacities and rankings will be issued by the DOE for planning purposes beginning in 1987. In 1991, the DOE is required to begin publishing annual acceptance priority rankings for spent-fuel receipt by the DOE. Beginning January 1, 1992, the utilities are to submit to the DOE for approval delivery commitment schedules

[12] The ability to start accepting waste in 1998 at an MRS facility was dependent upon congressional authorization. See 42 U.S.C. § 10161(b)-(c) (1982).

> based on these rankings. These schedules will form the basis for final delivery schedules to be submitted by the utilities not less than 12 months before the actual delivery date.

DX 63 at 60 (HQR0031687).

In response to this proposed schedule in the draft Mission Plan Amendment, EEI submitted comments complaining that this schedule represented a "significant change" from the Mission Plan:

> <u>Spent Fuel Acceptance Rate</u>. A significant change between the Mission Plan and the [Draft Mission Plan Amendment] occurs in the magnitude, time of, and the rate at which DOE will accept spent fuel. Not only is the start of spent fuel acceptance delayed, but the maximum rate drops from 6000 MTU/year to 3000 MTU/year. In the 1985 Mission Plan, DOE began accepting spent fuel in 1996 at 400 MTU, increasing to 1800 MTU in 1997 and 3000 in 1998. In 2012, when the second repository was scheduled to reach its design receiving rate, the total spent fuel acceptance rate rose to 6000 MTU/year. (See Mission Plan, Table 2-3.) The [Draft Mission Plan Amendment] on the other hand, shows no spent fuel accepted in 1996 or 1997, the first acceptance in 1998 at 1200 MTU, and the rate of 3000 MTU once the first repository reaches its design receiving rate in 2008. The much lower acceptance rate now proposed will require greater at-reactor inventories and will adversely impact the ability to dispose of spent fuel from reactors being decommissioned.

DX 63 at 417 (HQR0032042). In the same letter, EEI urged DOE to continue to pursue the development of the MRS to meet the January 31, 1998 date. <u>Id.</u> at 414 (HQR0032039 ("Now, the MRS is more important to NWPA implementation, because <u>it is the only feasible way</u> that DOE can meet its 1998 statutory and contractual obligation.") (emphasis added).

B. <u>Testimony About DOE's Obligation And Early Program Plans</u>

In the statement of facts in their post-trial brief, plaintiffs discuss the testimony of 11 individuals that plaintiffs designated as substantive evidence, pursuant to Fed. R. Evid. 801(d)(2)

and RCFC 32, as support for their contentions regarding DOE's obligations pursuant to the Standard Contract.[13] Pl. Br. 35-37. There are several problems with plaintiffs' proposed facts. First, the only testimony that the Court could properly consider, at best, is that of Messrs. Morgan, Lawrence and Rosselli because these are the only individuals who were at DOE during the period of contract formation. Second, a close examination of the testimony that plaintiffs cite and other testimony counter-designated for these individuals simply establishes, at best, that the very earliest program schedules were developed with the objective of precluding the need for at-reactor storage for utilities after January 31, 1998. As explained above, this goal was identified in the 1983 draft Mission Plan as a "strategy," which changed as the program developed. None of the testimony cited by the plaintiffs establishes that Messrs. Morgan, Lawrence, and Rosselli or anyone else at DOE understood that the intent of the NWPA was to establish a program that would preclude the need for at-reactor storage or work off the backlog of SNF to allow timely

---

[13] The testimony cited is replete with objections upon which the Court must rule before the Court considers its substance. Fed. R. Evid. 106. Further, the testimony of Messrs. Cole, Lawrence, and McDuffie cannot be considered at all because these individuals were not Federal employees at the time of their depositions (Messrs. Cole and McDuffie were never Federal employees). Accordingly, the testimony of these individuals cannot be considered the admissions of a party opponent, pursuant to Fed. R. Evid. 801(d)(2). Long Island Savings Bank v. United States, 63 Fed. Cl. 157, 165 (2004) (Court analyzed admission of deposition testimony pursuant to RCFC 32(a) because individual was not an employee of the Federal Government at the time of his deposition); Globe Savings Bank v. United States, 61 Fed. Cl. 91 (2004) (Federal employment at the time of testimony must be established if testimony is to be admitted as admission of party opponent, pursuant to Fed. R. Evid. 801(d)(2)); Young v. James Green Mgt., Inc., 327 F.3d 616, 622-23 (7th Cir. 2003) (statements made by former employees of party, who were not employed by party at time of statement, cannot be party admissions under Fed. R. Evid. 801(d)(2)(D)); Shapiro, Lifschitz, & Schram, P.C. v. Hazard, 90 F. Supp. 2d 15, 18 n.3 (D.D.C. 2000) ("affidavit does not qualify under the party admission exception in Fed. R. Evid. 801(d)(2)(D) because O'Riordan is a former employee"); Robertson v. National R.R. Passenger Corp., No. 98-1397, 1999 WL 280407, at *1 (E.D. La. May 3, 1999) ("statement issued by a former employee after the employment ceases, is inadmissible under Rule 801(d)(2)(D)").

decommissioning or that DOE had this intent when it entered the Standard Contracts with APC and GPC.

Putting aside the fact that Mr. Morgan cannot properly testify as to the "intent" of the NWPA,[14] Mr. Morgan did not testify that the intent of the NWPA was to avoid having utilities provide on-site storage after 1998. Pl. Br. 35. Instead, Mr. Morgan testified that this "strategy" was one that he developed, Morgan Dep. Mar. 21, 2002, 43:15-17, and that Congress did not, in fact, provide any guidance on this issue. Id. at 59:19-60:4 (Q: "[W]hat was source of your plan to -- beginning in 1998 utilities will not have to provide any additional storage facilities? Why did you say that? A: Because I thought it made sense. And this is one of the things that was not defined by Congress in the conference report, . . . "); Morgan Dep., Mar. 21, 2002, 154:20-156:15 (draft Mission Plan set forth a goal of matching the discharge rate by 2000 or 2001); Yankee Atomic Transcript, 3695:6-15 (performing at a rate that would preclude utilities from adding additional storage after 1998 was a program goal identified in the draft Mission Plan).

Mr. Morgan also testified at his deposition that DOE's goals, as stated in the 1983 draft Mission Plan, did not exist when DOE drafted the Standard Contract. Specifically, Mr. Morgan testified in response to questions from plaintiffs' counsel:

> Q: Was eliminating the need for utilities to add storage facilities on site beginning in 1998 DOE's purpose in drafting the contract the way it drafted it?

[14] Plaintiffs, in footnote 13, attempt to disparage Mr. Morgan's testimony at his deposition, claiming that, early in his deposition, Mr. Morgan testified that he knew the intent of the NWPA and that it was to preclude additional at-reactor storage. However, in the same pages that plaintiffs cite, Mr. Morgan testified, in part, "I don't think I can state what the intent of Congress was." Morgan Deposition, Mar. 21, 2002, 44:21-22.

A: There was no mention of rate in the contract, no acceptance rate.

And again, I'll say that it was an optimistic schedule presented in the mission plan.

Morgan Dep., March 21, 2002, 60:5-13. Mr. Morgan, when asked again about the goal to preclude additional at-reactor storage, stated:

Q: Was that plan [to preclude at-reactor storage], as expressed in that paragraph you just referred to, DOE's purpose in drafting the standard contract the way it drafted it?

[objection omitted]

A: No. This was a mission plan. The contract was sent out months before that, before we were even working on schedules. The contract was required to be in place, what, some 60, 90 days after enactment? I don't know the date, but there is a requirement in there.

That was too early to tell what we were doing. In other words, the contract had no rate in it.

Morgan Dep., March 21, 2002, 62:1-15; Yankee Atomic Transcript, 3695:16-25 (had not identified program goal at the time signed contracts with the utilities).

During his testimony at trial in Yankee Atomic and TVA, Mr. Morgan reiterated this fact regarding the inability to agree to an acceptance rate because:

> The Nuclear Waste Policy Act was a series of requirements that I felt were extremely difficult to meet. There were many technical unknowns, what would be the licensing requirements from the NRC, what would be the characterization requirements of a repository, and that there was the potential intervention by some of the stakeholders. But I felt that there was a potential that Congress may change the law which, in effect, they did at a later point in time. So I felt it was absolutely impossible or incomprehensible that I would agree to an acceptance rate with all these unknowns. I felt that that would be just absolutely inappropriate.

TVA Transcript, 2198:9-2199:3. Mr. Morgan similarly testified that DOE could not commit to the qualitative rate advocated by EEI and others:

> Q: Mr. Morgan, did DOE consider this request by EEI for a qualitative description of the rate of acceptance to be included in the contract?
>
> A: We considered it and rejected it.
>
> Q: And why was it rejected?
>
> A: Because of the uncertainties of the program that I mentioned earlier, and it was impossible for me to commit to a given rate with the unknowns that we were facing. The Nuclear Waste Policy Act did not include an acceptance rate, and so we were well within what we felt was the law that was passed by Congress.

TVA Transcript, 2209:9-20. As Mr. Morgan explained during his deposition as well as his trial testimony, the contract contained a mechanism for the development of the schedule for waste acceptance which was to be developed later when some of the uncertainties were resolved and DOE had identified a repository:

> Q: I believe you said in your prior deposition sessions in March that it was your understanding that the contracts, these contracts that we're talking about contained a mechanism for developing a schedule.
>
> A: Yes.
>
> * * *
>
> Q: What mechanism is that? How does that mechanism work?
>
> A: When the schedules of a repository were identified, that then one had the capability of making commitments [for the] receipt of fuel. That's what the process was.
>
> * * *

> But that was in the future because we had no repository identified, the type of media, had any idea of the licensing requirements. And it was the uncertainties.

Morgan Dep., June 25, 2002, 131:17-132:16 and 144:9-19 (Q: "[T]his process could not kick in, this scheduling process, until such time as a repository had been developed? A: Until the repository had been identified. And that was in the '92 framework. . . . And it would be at that point in time that you would start dealing with the process."); TVA Transcript, 2221:18-2222:2 ("[I]t was something like 1991, that by that time, we felt we would have information available to make some commitments, whether it be at the repository or at the monitored retrievable storage facility."); Yankee Atomic Transcript, 3657:8-15 (contract defined process for establishing schedule).

Similarly, Mr. Lawrence's testimony[15] at his deposition does not support plaintiffs' contention that DOE understood the NWPA to require that DOE accept fuel at a rate sufficient to preclude the need for additional at-reactor storage after 1998. Instead, Mr. Lawrence testified that the NWPA did not contain this requirement. Lawrence Dep., May 21, 2002, 336:8-11) ("there is no provision in the Act requiring the Department to ensure that additional storage space is not required by the utilities after 1998."). Mr. Lawrence further testified, on the same pages that plaintiffs cite, that the draft Mission Plan which identified this goal was:

> a planning basis, it's what we originally set out with the intent -- with the hopes of doing. We may find out during the course of technical work and design that it's not possible to achieve that. So this is just a planning basis.

---

[15] As noted above, the Court should not admit the testimony that the plaintiffs designated for Mr. Lawrence because Mr. Lawrence was not a Federal employee at the time of his deposition. Accordingly, Mr. Lawrence's deposition testimony cannot be considered to be the admissions of a party opponent. Fed. R. Evid. 801(d)(2).

Lawrence Dep., May 20, 2002, 188:23-189:3; Lawrence Dep., May 21, 2002, 315:10-11 ("we were in no position in 1983 or '84 to commit to a schedule"); Lawrence Dep., May 21, 2002, 294:13-295:5 (draft Mission Plan, issued in April 1984, was a "planning document" and that "in terms of acceptance rate, we would not be able to firm that up until we had designs and more information in place and anticipated that would be – and I believe that the contract indicated – that would be something that would be done later in the process."); Lawrence Dep. May 20, 2002, 126:6-23 and 184:3-22 (DOE would not be able to make "reasonable commitments or commitments" until 1991). Finally, plaintiffs' quotation of Mr. Lawrence's testimony regarding the acceptance rates necessary to preclude the need for additional at-reactor storage is truncated and, therefore, misleading. Mr. Lawrence testified that, "[i]f we met that objective, and the ramp-up and acceptance rates were as anticipated and the – the spent fuel storage arising at the utilities were as projected, it would preclude the need for additional storage." Lawrence Dep., May 21, 2002, 304:22-305:1. The objective to which Mr. Lawrence's testimony refers was to have "a repository selected, constructed licensed and in operation by January 31, 1998." Lawrence Dep., May 21, 2002, 304:7-10.

Finally, the testimony of Mr. Rosselli that plaintiffs cite is also taken out of context and does not support plaintiffs' contentions. Mr. Rosselli, who was the author of the draft Mission Plan upon which plaintiffs rely, explained that the identification of the plan to "preclude the at-reactor storage after January 31, 1998" was provided as "a planning basis." Rosselli Dep., April 15, 2002, 138:1-4. Moreover, the plaintiffs have also taken their quotation of Mr. Rosselli's testimony out of context. Mr. Rosselli was explaining the possible perceived benefit of the exchange provision in the Standard Contract, not that DOE had an obligation to preclude the

need for additional at-reactor storage for the utilities. Rosselli Dep., April 15, 2002, 17-141:5. Mr. Rosselli, like Messrs. Morgan and Lawrence, testified that the Government was not in a position to establish an acceptance rate when the contracts were signed:

> Because at the point in time of drafting of this particular document [April 1983], the Government wasn't in position to contemplate or set any type of receipt or acceptance rate.
>
> Q: Why do you say that?
>
> A: At this particular point in time, there wasn't a repository site that was selected. The facilities, you know, that would be needed to support the repository, you know, weren't designed or built. It was just too early. There were a lot of technical issues, you know, still on the table that had to be resolved and worked through.

Rosselli Dep., Apr. 15, 2002, 71:4-16; Rosselli Dep., Apr. 15, 2002, 94:1-5 ("Having a repository available on January 1st, 1998 [sic] was only one step having to do with delivery of [SNF]. You had to have a rank ordering. You had to . . . develop a delivery commitment schedule.").

The remaining testimony that the plaintiffs cite, at best, only confirms that DOE's ability to preclude the need for utilities to add additional at-reactor storage after January 31, 1998, was only an early goal or objective of the program, not a legal requirement. For example, Mr. Trebules testified that "the objective of reaching waste acceptance rates that would preclude the utilities from having to provide additional on-site storage" was a "planning target." Trebules Dep., Apr. 17, 2002, 52:19-22. However, Mr. Trebules also testified that the schedules set forth in the final 1985 Mission Plan did not meet this objective, were based upon an expected generation rate of 3,000 MTU from utilities, and did not allow DOE to begin to work off the backlog of accumulated spent fuel until the second repository became operational. Id., 53:1-21.

Mr. Trebules further noted that DOE would not meet this "objective" until DOE was accepting 3,000 MTU, the projected generation rate at the time the final Mission Plan was issued and that this objective was viewed "in the aggregate," not based upon individual utilities' requirements. Trebules Dep., Apr. 18, 2002, 381:15-382:14. As noted above, the language contained in the 1983 draft Mission Plan upon which the plaintiffs rely was not included in the April 1984 draft Mission Plan or the 1985 final Mission Plan. Compare PX 35 and PX 37 and DX 44.

The plaintiffs also provide citations that are totally taken out of context or are unsupported. For example, Mr. Rusche did not testify that there was a strategy of preventing additional on-site storage by the time he arrived to be the Director of OCRWM. Rusche Dep., May 16, 2002, 158:10-162:21. In fact, Mr. Rusche apparently believed that such a "strategy" would create a "completely unreasonable expectation." Id., 159:1-2. Further, Mr. Rusche did not testify that the goal of precluding at-reactor storage was "consistent" with the NWPA. Rusche Dep., May 16, 2002, 170:16-173:25. Instead, his testimony was that the date, January 31, 1998 was "consistent" with the Act. Id., 172:3-6. Mr. Rusche pointed out that the statement in the 1983 draft Mission Plan, about which he was being asked, preceded his arrival, and he did not recall seeing the statement before his deposition. Rusche Dep., May 16, 2002, 177:2-5. Mr. Milner's testimony, which plaintiffs cite, concerns one of the goals and objectives set forth in the final 1985 Mission Plan relating to the orderly operation of nuclear plants. Milner Dep., May 1, 2002, 85:1-24. Similarly, the testimony of Mr. Lake Barrett to which plaintiffs cite concerns a policy memo by the Office of Management and Budget ("OMB") in 1995 discussing the need to address the fact that DOE's performance will be delayed. Barrett Deposition, May 8, 2002, 1045:1-10 and 1064-1065.

Similarly, none of the testimony that plaintiffs cite establishes that DOE's obligation eventually to accept all SNF generated by the Standard Contract holders, including the fuel generated before 1998 ("backlog"), Art. IV.B.1, requires the application of any specific acceptance rate. Pl. Br. 37-39. For example, Mr. Barrett did not testify that the NWPA required DOE to "reduce the backlog of SNF and remove SNF from reactor sites to avoid interference with normal decommissioning." Pl. Br. 37. Instead, Mr. Barrett described his understanding of the purpose of the NWPA to be only that "the federal government to take the materials from the high-level waste and spent fuel sites into federal custody." Barrett Dep., Apr. 22, 2002, 52:19-22; Apr. 23, 2002, 475:11-17 (Barrett: "the basis tenets in the act was that the federal government was to be responsible for the waste and take the waste off . . . for all contract holders, be they operating, be they shut down, to fulfill the federal responsibilities under the act."). Moreover, Mr. Barrett understood that the NWPA did not contain any acceptance rate. Id., 121:17-21.[16] The cited testimony of Mr. Lawrence is also unsupported. Plaintiffs contend that Mr. Lawrence "acknowledged that DOE's objective was to prevent shutdowns and reduce

[16] Plaintiffs also cite to Mr. Barrett's testimony regarding his supposition regarding the basis for the "five year old cooled fuel" provision of the Standard Contract. Pl. Br. 38 (citing Barrett Dep., Apr. 23, 2002, 475:1-8). However, as made clear in the testimony cited, Mr. Barrett did not know for certain that "timely decommissioning" was the goal of including this provision. Id. ("So I think that's what the basis for the five years was."). Because Mr. Barrett was not at DOE at the time of contract formation, Barrett Dep., Apr. 22, 2002, 38:14-15, and was not involved in any contract formation activities, Barrett Dep., Apr. 26, 2002, 742:14-743:1, Plaintiffs have failed to establish the necessary foundation for this testimony as well as much of Mr. Barrett's suppositions about the "intent" of the NWPA and the Standard Contract. Similarly, Mr. Barrett's testimony regarding the 3,000 MTU steady-state rate lacks foundation. As Mr. Barrett explained, "[the 3,000 MTU receipt rate] was established before my arrival or personal participation in establishing that number." Barrett Dep., Apr. 22, 2002, 149:5-12. These problems are among the Government's objections to much of the testimony that the plaintiffs have designated.

the backlog of accumulated fuel." Pl. Br. 38 (citing Lawrence Dep. 142). Mr. Lawrence actually testified: "Ultimately, over time, our objective was to accept waste at a rate that would avoid shutdowns and be able to eventually work off the backlog. But over what period of time that was and under what rate, we were in no position to commit to at that particular point in time." Lawrence Dep., May 20, 2002, 142:4-9. Mr. Pollog defined "timely decommissioning" at trial, but he also explained that DOE's capacity in any given year will be finite, so that any emphasis upon timely decommissioning for one utility will be at the expense of acceptance for another utility. Tr. 1925:5-1926:4 (Pollog). Finally, Mr. Zabransky's testimony regarding what he believed to be a "reasonable" acceptance rate does not identify a time period over which the backlog was to be reduced. Pl. Br. 39. None of the testimony cited establishes that DOE had a contractual obligation, or understood that it had a contractual obligation, (1) to preclude the need for additional at-reactor storage after 1998, or (2) to accept SNF at a rate sufficient to allow "timely decommissioning."

V. THE 1987 AMENDMENTS TO THE NUCLEAR WASTE POLICY ACT

On December 22, 1987, after DOE submitted the 1987 Mission Plan Amendment, Congress amended the NWPA "to redirect the program for the management and disposal of spent nuclear fuel and high-level radioactive waste under the [NWPA]." S. Rep. No. 100-152, at 1 (Sept. 1, 1987). The Senate Committee on Energy and Natural Resources reported, in considering legislation to amend the NWPA, that "[t]he schedules included in the NWPA have proven to be overly ambitious" and that "[t]his has been largely due to the need to provide additional time for completion of necessary technical work and additional time for public participation." Id. at 5. The committee reported that, "[i]n the four and a half years since

passage of the NWPA, it has become clear that the program laid out in the Act will take longer to complete than was anticipated and that completion will be at much greater cost." Id. It further reported that, "[i]n addition to cost and schedule considerations, a number of other circumstances have changed since passage of the NWPA," including that, "as we approach major decision points in the nuclear waste program, there will be great potential for political opposition . . . ." Id.

The 1987 amendments to the NWPA directed DOE to characterize a single site, at Yucca Mountain in Nevada, for development of a single permanent repository and to terminate activities at all other sites. 42 U.S.C. § 10172(a). The 1987 amendments also authorized the Secretary to site, construct, and operate one, but only one, MRS facility. 42 U.S.C. § 10162(b). However, the 1987 amendments provided that "construction of [the MRS] facility may not begin until the Commission has issued a license for the construction of a repository under section 115(d)." 42 U.S.C. § 10168(d)(1). Finally, it also provided that "the quantity of [SNF] at the site of such facility at any one time may not exceed 10,000 metric tons of heavy metal until a repository under this Act first accepts [SNF]." Id. § 10168(d)(3).[17]

## VI. PLANNED ACCEPTANCE AT AN MRS FACILITY UNTIL 2010

### A. Program Reassessment And 1991 Draft Mission Plan Amendment

In November 1989, the Secretary of Energy submitted a report to Congress regarding DOE's reassessment of the program. In this report, DOE stated that it would be unable to begin

---

[17] The 1987 amendments to the NWPA also established the Office of the Nuclear Waste Negotiator. 42 U.S.C. § 10242(a). That office was to seek to enter into negotiations with states and Indian tribes to "attempt to reach a proposed agreement" with them through which a state or Indian tribe "would agree to host a repository or [MRS] facility with such State or reservation." Id. § 10243(a). The authorization for that office expired in 1994. Id. § 10250.

operations at a repository until 2010, because there was insufficient time to perform the scientific investigation necessary. PX 67 at ix-x (YMP0020191). However, DOE also stated that it planned "to work with Congress to modify the current linkages between the repository and the MRS facility and to embark on an aggressive program to develop an integrated MRS facility for spent fuel." Id. DOE further advised that, "if the linkages [were] modified, it [was] likely that waste acceptance at an MRS facility could begin by 1998 or soon thereafter." Id. As a result of the 1989 Reassessment, DOE did not plan to begin repository operations until 2010 and planned to begin performance at an MRS in 1998. Yankee Atomic Transcript, 4730:2-18 (Milner).

In September 1991, DOE issued another Draft Mission Plan amendment, which provided further details upon the "action plan" set forth in the Secretary's 1989 Reassessment. DX 94 at HQR0030799 ("[1989 Reassessment] stated that further details on the Secretary's action plan would be provided in a revised Mission Plan."). In accordance with the 1989 Reassessment, the 1991 Draft Mission Plan Amendment reaffirmed DOE's plans to begin performance in 1998 at an MRS:

> To achieve the objective of timely and adequate waste acceptance, we plan to develop an MRS facility that is to start waste acceptance in 1998. To make this possible, the President's legislative package for the National Energy Strategy includes a provision to repeal the schedule linkages established in the Nuclear Waste Policy Amendments of 1987 (Amendments Act). This could also be achieved by congressional enactment of a negotiated siting agreement reached through the efforts of the Nuclear Waste Negotiator.

DX 94 at 18 (HQR0030825). The schedule set forth in the 1991 Mission Plan Amendment showed acceptance by DOE up to the 10,000 MTU limit on the MRS until the repository began operations in 2010. DX 94 at 205-206.

B. DOE's Efforts To Site And Plans To Perform At An MRS

With the issuance of the 1989 Reassessment, DOE planned to commence performance at an MRS beginning in 1998. Tr. 1767:6-12 (Kouts); Barrett Dep., Apr. 22, 2002, 47:19-48:4 (Barrett: "the MRS was our primary means to remove fuel by 1998."). To site an MRS, DOE worked with the Office of the Nuclear Waste Negotiator. DOE expected that, as part of an agreement with a volunteer host, the statutory linkages between the construction and operation of an MRS and the construction of the repository would be removed. Tr. 1759:11-1760:2 and 1771:7-13 (Kouts); Yankee Atomic Transcript, 4768:12-4769:1 (Milner); Barrett Dep., Apr. 22, 2002, 249:10-19 (Barrett: "Because if we had a volunteer, in my judgment, those linkages would have been modified by Congress if it was acceptable to the volunteer host."); Barrett Dep., Apr. 23, 2002, 432:11-17 (same). DOE did not plan to seek to remove the capacity limitations to avoid raising renewed concerns that the MRS would become a "de facto" repository. Tr. 1772:10-21 (Kouts: "the [D]epartment's position since the submission of the MRS proposal in 1987 was that you had to have a limitation on the MRS facility in order to make it acceptable to the local government and to a state governor that the facility would not be permanent . . .."); Barrett Dep., Apr. 23, 2002, 464:6-465:7 (Barrett: "We did not make it an issue to remove all elements like the metric tonnage limits as well as the time linkages, because the thing that was most important to us was that we start moving materials of reasonable quantity, of which 10,000 metric tons was a reasonable quantity, as soon as we could with '98."). The efforts to site an MRS continued until 1994 when the term of the second Nuclear Waste Negotiator expired and Congress refused to fund grants to the various Native American groups

that had expressed interest in hosting the MRS. Tr. 1773:22-1774:2 (Kouts); Barrett Dep., Apr. 22, 2002, 242:16-245:15; Barrett Dep., Apr. 23, 2002, 444:3-8.

Because of the limitations upon the total amount of fuel that could be accepted at the MRS prior to the commencement of repository operations, DOE planned to accept SNF at the rates set forth in the 1991 Annual Capacity Report, which we discuss below.

## VII. DOE'S ISSUANCE OF ANNUAL CAPACITY REPORTS

### A. The 1987 Through 1990 Annual Capacity Reports

Beginning in 1987, in compliance with the NWPA and the language of the Standard Contract, DOE issued an "Annual Capacity Report." 10 C.F.R. § 961.11, Art. IV.B.5. As each of these ACRs expressly stated, "[a]s specified in the Contract, the ACR is for planning purposes only and thus is not contractually binding on either DOE or the Purchasers." DX 62 at 2 (HQR0012713), DX 71 at 1 (HQR0012617), DX 87 at 2 (HQR0012494) ("projections in this initial report are based on current plans and best available information; they are not contractually binding"). Further, each of the ACRs from 1987 through 1990 contained the following, or substantially similar, language:

> Beginning in 1991, the ACR acceptance ranking will be converted into an Annual Priority Ranking for receipt of SNF/HLW. In 1992, based on this priority ranking, the Purchasers will submit to DOE for approval, Delivery Commitment Schedules identifying the SNF/HLW that Purchasers propose to deliver to the DOE waste management system (WMS). Once approved, these schedules will become the basis for Final Delivery Schedules to be submitted by the Purchasers not less than 12 months before the date of DOE's anticipated acceptance of title to the SNF/HLW and subsequent transport to a DOE facility.

DX 62 at 2 (HQR0012713), DX 71 at 2 (HQR0012618), DX 87 at 2 (HQR0012494).

Additionally, the 1987 ACR warned contract holders that the waste acceptance schedule was uncertain and presumed both a repository and an MRS in 1998. DX 62 at HQR0012714-15. Similarly, the 1988 ACR contained the admonitions by DOE, warning contract holders of delays in the availability of a repository. Specifically, DOE warned:

> [U]nder current conditions, operations of and waste acceptance at a DOE facility probably cannot begin in 1998. The delay in the repository schedule, first noted in the <u>OCRWM Mission Plan Amendment</u> published in June 1987 and the conditions imposed on the siting and construction of an MRS facility by the Nuclear Waste Policy Amendments Act of 1987 (Amendments Act) make it unlikely that DOE will be able to start accepting SNF significantly before 2003. As recognized in the draft Mission Plan Amendment, earlier waste acceptance would require additional Congressional action or an acceleration of the system development schedule by some other means. Under current conditions, the owners and generators of SNF will continue to be responsible for storing their spent fuel until acceptance by DOE.
>
> * * *
>
> The Amendments Act directs that "the quantity of spent nuclear fuel or high-level radioactive waste at the site of such a [MRS] facility at any one time may not exceed 10,000 metric tons of heavy metal until a repository under this act first accepts spent nuclear fuel or solidified high-level radioactive waste . . ." Should the start of repository operations be delayed for any reason, waste acceptance at the MRS is to be limited to 10,000 MTU.

DX 71 at HQR0012620-23 (footnotes omitted).

Prior to the issuance of the 1990 ACR, DOE prepared the "Reassessment of the Civilian Radioactive Waste Management Program," discussed in the previous section. PX 67. As a result of the reassessment detailed in this report, DOE determined that the repository would not open until 2010, but that the MRS should open by 1998. <u>Id.</u>; Yankee Atomic Transcript 4730:11-18 (Milner). The 1990 ACR contained "upper bounding" and "lower bounding" schedule projections for SNF acceptance by DOE. For purposes of simplicity, the "upper

bounding" projection contained a shorter ramp-up, a 3,000 MTU per year receipt rate, and 24,000 MTU total acceptance for the first 10 years of Waste Management System operation. DX 87 at HQR0012497-99. The "lower bounding" projection contained a lower receipt rate and longer ramp-up (400, 600, 875 MTU per year), and a 7,375 MTU total acceptance for the first 10 years of WMS operation. Id. The 1990 ACR contained the following admonitions:

> The two waste acceptance schedule projections used in this ACR are representative of the bounding cases for a WMS configuration authorized by the Nuclear Waste Policy Amendments Act of 1987 (Amendments Act), which includes an MRS facility. The upper bounding case is representative of the receipt rate of a WMS that is not restricted by MRS storage capacity limits of 10,000 MTU before repository operations and a maximum of 15,000 MTU at any time as imposed by the Amendments Act. This case is also not restricted by the MRS site selection and construction schedule linkages with the repository as imposed by the Amendments Act. The lower bounding case represents a receipt rate that would be in compliance with the Amendments Act restrictions on storage limits at an MRS before a repository starts operation. However, this case assumes removal of the schedule linkages with the repository imposed by the Amendments Act.

DX 87 at HQR0012496 (emphasis added). As with the earlier ACRs, the 1990 ACR expressly represented that the information in the 1990 ACR was "not contractually binding on either DOE or the Purchasers." DX 87 at HQR0012494.[18] In a memorandum to Dr. John Bartlett, Director,

---

[18] Each of the ACRs issued between 1987 and 1990 also requested written comments from the Purchasers regarding the content of the ACRs. See DX 62 at HQR0012714; DX 71 at HQR0012619; DX 87 at HQR0012495. The 1988 and 1990 ACRs contained a section for DOE responses to the comments submitted by the Purchasers. DX 71 at HQR0012627-31; DX 87 at HQR0012509. Moreover, DOE also met with industry representatives to obtain "consensus positions" upon various issues related to the Standard Contract, through a process which came to be known as the "ACR Issue Resolution Process." DX 150. Mr. Milner communicated to Dr. Bartlett in 1991 that "the 1991 ACR includes an update on the progress of the cooperative interactions between [DOE] and Contract holders to address issues of mutual concern arising from implementation of the contract." DX 98 at EDB0011765.

OCRWM, dated December 21, 1990, Ronald A. Milner, then Associate Director for Storage and Transportation, informed Dr. Bartlett that the 1990 ACR was for planning purposes only and would be replaced "by a contractually binding annual acceptance priority ranking report" in April 1991. DX 88 at EDB0011518.

B. The 1991 Annual Capacity Report[19]

In December 1991, DOE issued its "Annual Capacity Report" for that year, DOE-RW-331P. DX 97 at 1-2 (HQR0012362-HQR0012363). The 1991 ACR was significant because it was the last ACR that would be issued prior to the contract holders' submission of DCSs beginning January 1, 1992. See 10 C.F.R. § 961.11, Art. V.B.1. In that regard, the 1991 ACR provided that, "[b]eginning in January 1992, the Purchasers may submit Delivery Commitment Schedules (DCS) to DOE identifying the range of SNF that the Purchasers propose to deliver to the Federal Waste Management System (FWMS) beginning sixty-three months thereafter." DX 97 at 2 (HQR0012363). It also stated that "[t]he Purchasers' allocations for each delivery year are presented in Tables A.1 through A.10 in Appendix A, and should be used as the basis for submitting DCSs." DX 97 at 2 (HQR0012363). See DX 97 at 7 (HQR0012368) ("[t]hese allocations are the basis for DCS submittals"); Tr. 1864:24-1865:2 (Pollog: purpose of the 1991 was "to provide purchasers the allocations they will need to fill out their delivery commitment schedules.").

The 1991 ACR contained the following table of acceptance rates:

---

[19] Prior to the issuance of the 1991 ACR, DOE decided to issue an ACR in 1991, rather than a document titled, "Annual Acceptance Priority Ranking." This decision was discussed with Standard Contract holders. DX 98; Yankee Atomic Transcript, 4738:9-25 (Milner). The 1991 ACR was to be used in conjunction with the 1991 APR to provide the individual allocations for the utilities that were the basis of the expected DCS submissions. Yankee Atomic Transcript, 4740:1-4741:10 (Milner)

TABLE 2.1

Projected Waste Acceptance Rates for Spent Nuclear Fuel

| Year | | SNF (MTU) |
|---|---|---|
| 1998 | | 400 |
| 1999 | | 600 |
| 2000 | | 900 |
| 2001 | | 900 |
| 2002 | | 900 |
| 2003 | | 900 |
| 2004 | | 900 |
| 2005 | | 900 |
| 2006 | | 900 |
| 2007 | | 900 |
| 2008 | | 900 |
| | TOTAL | 8,200 |

DX 97 at 5 (HQR0012366). Based upon these rates, DOE identified the allocations available to each Purchaser in each year based upon the ranking ordering of fuel discharged by all the utilities based upon the dates of discharge. DX 97 at 9 (HQR0012370) (Table 3.1 Summary Of Purchasers' Annual Allocations (MTU)); Tr. 1871:4-1872:15 (Pollog). These allocations were created with the knowledge that no permanent repository would be available by January 31, 1998. Id. at 4 (HQR0012365). Thus, as DOE explained, "the waste acceptance projections used in this ACR are representative of a FWMS [Federal Waste Management System] configuration authorized by the NWPA, which includes a Monitored Retrievable Storage (MRS) facility." Id. In particular, they "are consistent with the 10,000 MTU storage capacity limit contained in the NWPA for an MRS facility before a repository starts operation." Id.; Tr. 1865:10-19 (Pollog: waste acceptance rates in 1991 ACR intended to comply with 10,000 MTU capacity statutory limitation on an MRS). DOE noted, however, that the schedule assumed that the schedule linkages between the MRS construction and repository construction authorization would be

broken. Id.

In a memorandum dated December 20, 1991, Ronald A. Milner, Associate Director for Storage and Transportation, stated in a memorandum to John Bartlett, Director, Office of Civilian Radioactive Waste Management, as follows:

> The 1991 ACR assumes that FWMS [Federal Waste Management System] operations commence in 1998 and the system configuration is that authorized by the Nuclear Waste Policy Amendments Act of 1987, specifically a Monitored Retrievable Storage facility with a 10,000 MTU storage limit prior to repository operations.
>
> The 1991 ACR differs from previously published ACRs for two reasons. First, while the information in the ACR has traditionally been used for planning purposes only, the allocations in the 1991 ACR will also serve as the basis for submission of Delivery Commitment Schedules (DCS) by the Contract holders. These DCSs, which will provide planning information for waste acceptance activities, may be submitted to the Department as early as January 1, 1992.

DX 98; Yankee Atomic Transcript, 4737:13-4738:8 (Milner: when the 1991 ACR was issued, DOE believed that an MRS could be sited to allow DOE to begin waste acceptance by 1991).

The utility industry recognized the importance of the 1991 ACR in the determination of delivery commitments for performance beginning in 1998. See, e.g., DX 99 at 2 and 3 (SN169910) (UWASTE memorandum explaining that the ACR and APR "are necessary to properly complete the DCS forms."); DX 100 at 2 (SN170373) (same); DX 66 at 8 (YDK038298) (UNWMG memorandum describing the 1991 ACR as "contractually binding"); Tr. 1952:16-1953:25 (Zabransky: discussing his understanding of importance of 1991 ACR when in the utility industry)

C. The 1992 Through 1994 Annual Capacity Reports

The 1992 ACR, which was issued in May 1993, contained the same acceptance rates as the 1991 ACR. DX 121 at 4 (HQR 0012324). The 1992 ACR also provided that, "[d]uring the first ten years following projected commencement of the Civilian Radioactive Waste Management System (CRWMS) operation, the total quantity of SNF that could be accepted is projected to be 8,200 MTU." DX 121 at v (HQR 0012319). It stated that "[t]his is consistent with the storage capacity licensing conditions imposed on an MRS facility by the NWPA." Id. The ACR also stated that, "[a]s specified in the Standard Contract, the ACR is for planning purposes only and, thus, is not contractually binding on DOE or the Purchasers." DX 121 at 1-2 (HQR0012321-22).

In March 1995, DOE issued the combined 1994 Acceptance Priority Ranking & Annual Capacity Report, to "establish[] the order in which the Department allocates the projected acceptance capacity for commercial [SNF]" and to "appl[y] projected nominal acceptance rates for the system to the priority ranking in the APR, resulting in individual allocations for the owners and generators expressed in metric tons per uranium (MTU)." PX 13 at 1. The 1994 ACR contained substantially similar SNF acceptance rates as the 1991 and 1992 ACRs, identifying a projected nominal waste acceptance rate of 8,200 for the first 10 years of SNF acceptance:

Table 1. Projected Nominal Waste Acceptance Rates for Spent Nuclear Fuel

| Year | SNF (MTU) |
|---|---|
| Year 1 | 400 |
| Year 2 | 600 |
| Year 3 | 900 |

| | |
|---|---|
| Year 4 | 900 |
| Year 5 | 900 |
| Year 6 | 900 |
| Year 7 | 900 |
| Year 8 | 900 |
| Year 9 | 900 |
| Year 10 | 900 |
| TOTAL | 8,200 |

PX 13 at 4. See DX 97 at 5 (HQR0012366), DX 121 at 4 (HQR0012324). The 1994 ACR also contained the following statement:

> The ACR (see Appendix B) applies a 10-year projected nominal waste acceptance rate to the APR, resulting in individual capacity allocations. In the previous ACR, the projected nominal acceptance rate was based on the assumption of SNF acceptance beginning in 1998 at a Monitored Retrievable Storage facility prior to repository operations. Due to the uncertainty associated with the date of commencement of operation of the waste management system, the annual nominal waste acceptance rates are presented by year(s) of operation of the system rather than by specific calendar year(s). The projected nominal acceptance rates also reflect the capacity limit imposed by the Act on such a storage facility prior to repository operations. These projected nominal waste acceptance rates are presented in Table 1. The Department will continue to process DCS submittals on an annual basis.

PX 13 at 3-4 (emphasis added); Tr. 1969:13-1970:12 (Zabransky: language added because of uncertainty regarding the first year of operations). The 1994 ACR also provided that, "[a]s specified in the Standard Contract, the ACR is for planning purposes only and, thus, is not contractually binding on either DOE or the Purchasers." PX 13 at 1. However, it also provided that "[t]hese capacity allocations, as listed in the ACR, form the basis for the Purchasers' submittal of Delivery Commitment Schedules (DCS)." Id.

## VIII. INDUSTRY SUBMISSION OF DELIVERY COMMITMENT SCHEDULES

By letter dated March 4, 1992, the DOE contracting officer issued a letter to plaintiffs and other utilities, along with the instructions for the submission of delivery commitment schedules. DX 102. The contracting officer stated that "[t]he allocations in the 1991 Annual Capacity Report (ACR) should be the basis for the DCS submittals." Id. The accompanying instructions provided that purchasers could "begin submitting to the Department of Energy (DOE) Delivery Commitment Schedules (DCS) that identify all spent nuclear fuel (SNF) the Purchasers plan to deliver to DOE beginning 63 months thereafter." Id. The instructions stated that "[t]he DCS provides the Purchasers with the opportunity to inform DOE of their plans for utilizing their allocations of projected Federal waste management system (FWMS) acceptance capacity." Id. They further provided that, "[f]or each allocation listed in the 1991 ACR (or subsequent ACRs, as appropriate), a Purchaser must submit at least one DCS for that allocation at least 63 months prior to the date that the allocation occurs (e.g., if a Purchaser has an allocation in 1998, a DCS must be submitted for that allocation by September 30, 1992)." Id. Failure to submit a DCS against an allocation set forth in the ACR would have been considered a waiver by the utility of that allocation. Slater Dep., June 13, 2002, 150:19-24.

The DCS instructions were developed with the full participation of the nuclear industry. Slater Dep., Apr. 22, 1999, 258:19-259:24; Tr. 1954:1-1955:15, 1957:8-1958:17 (Zabransky: meetings between DOE and utilities to develop instructions and discuss DCS process); see, e.g., DX 91 at 3 (SN169940) (UWASTE memorandum advising members that DOE had issued the draft DCS instructions and that the Standard Contract Task Force would meet to develop comments); DX 92 (Minutes of Standard Contract Task Force meeting, during which members

met with DOE to discuss and provide comments upon the draft DCS instructions); DX 96 at 3 (SN169920) (UWASTE memorandum advising members that Standard Contract Task Force had provided comments to DOE upon another draft of the DCS instructions); see DX 80 (Minutes of High-Level Waste/Spent Fuel Storage Working Group Meeting stating that, "[b]y 1/1/92, each utility is required to submit a DCS to DOE" and that the task force would be "following this closely"). After the instructions were issued, utilities met with DOE again to discuss the instructions. DX 103.

Recognizing the need to submit DCSs to claim allocations, many utilities submitted timely DCSs that DOE approved by DOE. For example, in 1992, Wisconsin Electric Power Company ("WEPCO") submitted DCSs for all of its allocations in the first ten years of SNF acceptance. Tr. 1943:22-1944:6 (Zabransky). WEPCO submitted these DCSs for approval, believing that they "represented a commitment." Tr. 1944:7-12 (Zabransky). Eight other utilities also submitted, in 1992, DCSs for all of their allocations in the first ten years of SNF acceptance. Tr. 1966:7-12 (Zabransky); see also DX 337 at SN119650 (summary document reflecting all DCS submissions from utilities for the first 10 years of acceptance under 1991 ACR rate of acceptance). Moreover, every utility with an allocation in 1998 and 1999, with the exception of one utility, submitted a DCS for that allocation. Id. DOE approved all of those DCSs. Every utility with an allocation in 2000, with the exception of two utilities, submitted a DCS that DOE approved. Id.

In the statement of facts, the plaintiffs assert that the DCSs were for "planning purposes only," relying in part upon the testimony of Ms. Nancy Slater and the DCS instructions. Pl. Br. 57. Ms. Slater, in her deposition, testified that the DCSs, "in my personal opinion, they were for

planning purposes only." Slater Dep., June 13, 2002, 98:9-10. However, Ms. Slater also testified that the failure to submit a DCS against an allocation would be considered a waiver of that allocation, Slater Dep., June 13, 2002, 150:19-24, and that the DCSs would be most useful to the planning for transportation, for which Ms. Slater had no responsibility. Id., 149:17-150:1. Finally, Ms. Slater testified as to her understanding of the role of DCSs:

> My understanding of the role of the DCSs, if we had begun to accept in 1998, is that those individuals who had submitted DCSs and had them approved for year 1, which the question you are posing would be 1998, those would be the utilities that I would expect to receive FDSs from, and they would be the utilities that would deliver in that year.

Id. 152:17-24.[20]

The plaintiffs also cite to paragraph 7(c) of the DCS instructions and claims that this provision states that the DCSs are not binding. Pl. Br. 57. Paragraph 7(c) provides as follows:

> The annual acceptance rates in the 1991 ACR provide an approximation of the [Federal Waste Management System] capacity and are for planning purposes. The process described herein assumes that the FWMS will be able to accept the Purchasers' SNF beginning in 1998 according to the acceptance rate reflected in the 1991 ACR. In the event that such circumstances change, all DCSs previously approved by DOE may need to be reevaluated by DOE and the Purchasers.

DX 102 at SN134697 (emphasis added). This provision allows both parties to renegotiate the approved DCSs if circumstances change and conditions warrant. Pollog Dep., Apr. 11, 2002,

---

[20] Plaintiffs also cite to the testimony of Mr. Alan Brownstein, in support of their contention that the DCSs were for planning purposes only. As Mr. Brownstein explained at his deposition, "in my mind, the January 31, 1998 date . . . was always a conditional requirement, and it was conditioned clearly both on the law and the contract, on the commencement of the facility operations." Brownstein Dep., Apr. 9, 2002, 116:7-18. This view was rejected by the United States Court of Appeals for the District of Columbia Circuit in Indiana Michigan Power Co. v. United States, 88 F.3d 1272 (D.C. Cir. 1996).

62:19-63:63:18. However, the ability for the parties to make bilateral modifications to a DCS does not change the nature of those DCSs as a commitment by the Purchaser to deliver, and DOE to accept the amount of fuel covered by an approved DCS for a given year. Id., 33:15-19.

In a memorandum dated August 26, 1992 from Mr. Fennell to Mr. Cocherell, the two individuals responsible for administering the Standard Contracts for APC and GPC, plaintiffs accurately described the mechanism for defining DOE's delivery obligations in accordance with the DCS process:

> Under the spent fuel disposal contracts, submittal of a Delivery Commitment Schedule (DCS) form to DOE for pickup of spent fuel is required 63 months prior to the year of the fuel pickup. The Annual Capacity Report, last issued in December 1991, provides the basis for determining the expected delivery schedule which in turn provides the timing of the DCS form submittal. The first DCS forms submittal due date is September 30, 1992, for the 1998 initial year of spent fuel pickup specified under the spent fuel contracts. The first Southern Electric System submittal would be required by September, 1995 for a 2001 projected DOE pickup from Plant Hatch.

DX 110; DX 99 at 2 (SN169910) (UWASTE memorandum stating the same understanding); see also DX 105 at 3 (SN172054) (Mr. Fennell's report upon DCS process and recommendation to submit plaintiffs' DCS forms by September 30, 1992). In a memorandum dated November 12, 1991, Mr. Fennell explained that none of plaintiffs' fuel was scheduled for acceptance in 1998. DX 95 at 2 (SN172239).

By letter dated October 21, 1996, Mr. Cocherell submitted two DCSs for delivery of 0.8 and 4.5 MTU of SNF in years 2001 and 2002, respectively, from plant Hatch. DX 198. In his letter, Mr. Cocherell acknowledged that the DCS for 2001 did not comport with the contract requirement to submit the DCS 63 months in advance of the requested acceptance. Id. Mr.

Cocherell also noted that "[t]he attached [DCS] meets the notice obligations under the spent fuel disposal services Contracts but does not indicate Southern Nuclear's acceptance of the removal rates contained in the current ACR. Southern Nuclear believes the ACR rates are too low." Id. This statement is the only evidence in the record that plaintiffs disputed their allocations in the ACR. In response to the submissions for plant Hatch, DOE, by letter dated March 13, 1997, stated that it was "not able at this time to approve your DCS submittal" and, "[c]onsequently, the Department hereby waives until further notice the contract requirement that you provide a revised schedule within 30 days." DX 203.

## IX. THE TOTAL SYSTEM LIFE CYCLE COST REPORTS AND FEE ADEQUACY REPORTS ARE BASED UPON THE THEN-CURRENT TECHNICAL BASELINE FOR THE PROGRAM

The fee paid by utilities, 1 mil per kilowatt hour, was determined by Congress in enacting the NWPA. 42 U.S.C. § 10222(a)(2). Pursuant to the NWPA, DOE is required annually to assess whether the fees collected pursuant to statute are adequate to fund all of the efforts necessary to implement the NWPA. 42 U.S.C. § 10222(a)(4). The Secretary is to advise Congress if the fee is found to be inadequate, and Congress is entitled to consider a fee adjustment. Id. To date, the fee has never been adjusted.

To determine whether the fee is adequate, DOE first prepares a Total System Life Cycle Cost report, in which it projects the total cost of the program. Tr. 1778:24-1779:25 (Kouts). This total system cost projection is based upon the projected number of years that the program is estimated to operate, projected transportation requirements, projected interest rates, and other factors. Tr. 1780:19-1781:14 (Kouts); see, e.g., PX 16 and 27. The current program plans, including acceptance rate projections, type and location of receiving facilities, and the scope of

the transportation program, are the basis for the total cost estimate. Tr. 1780:19-1781:18 (Kouts); Yankee Atomic Transcript, 4727:20-22 (Milner: the basis for the assumptions are the current program planning bases); DX 330 at 2 ("It must be recognized that the waste management system is continually evolving. The TSLCC estimates represent snapshots in time which incorporated all available and appropriate information on program activities up to a specific point in time in order to develop a comprehensive set of estimates for the system.").

A review of the TSLCCs that DOE has issued over the life of the program show that, contrary to the plaintiffs' contentions, Pl. Br. 44-45, there are no TSLCCs in which DOE has assumed the operation of a single repository at a steady state rate of 3,000 MTU beginning operation in 1998, the scenario that the plaintiffs ask the Court to assume for the purpose of assessing damages. For example, in the TSLCC published in April 1985, DOE assumed a two-repository system, with the first repository beginning operations in 1998 and the second beginning operations in 2006. PX 17 at 2-3. In its Preliminary Estimates of the Total-System Life Cycle Cost For The Restructured Program: An Addendum to the May 1989 Analysis of the Total Life Cycle Cost for the Civilian Radioactive Waste Management Program, December 1990, ("1990 PETSLCC"), DOE utilized a schedule that was explicitly based upon acceptance starting at an MRS. DX 330. The first ten years are identical to the ACR schedule, with the exception of the second year of acceptance, where the 1990 PETSLCC contemplates that 400 MTU rather than 600 MTU would be accepted. Id. This schedule further shows what DOE anticipated the transition from a repository to an MRS would look like. Id. In year eleven and year twelve of acceptance, 900 MTU would be accepted. In years thirteen through seventeen, 1800 MTU would be accepted. Only in year eighteen would the system accept 3000 MTU. Id.

In the September 1995 TSLCC, cited by the plaintiffs, DOE assumed operations of a single repository beginning in 2010 and ramping up to 3,000 MTU rate by 2014. PX 23 at 8.

Significantly, although DOE's program baseline has changed in terms of number and type of facility and projected rate of acceptance, the total estimated life cycle cost has not changed dramatically over the course of the program. Tr. 1788:15-1789:18 (Kouts: "not seeing a wide variation in the overall cost of the program, given the different scenarios being run."). Moreover, the changes in acceptance rate assumptions have a minor effect upon total program cost. Tr. 1789:19-1790:20. Because these estimates have not changed over time, DOE has never recommended any change to the fee that the utilities pay pursuant to the NWPA. Tr. 1790:21-24 (Kouts).[21]

## X. ADDITIONAL FACTS AFFECTING THE PLAINTIFFS' CLAIM

### A. Plaintiffs Historically Have Operated Their Facilities With A Single Full Core Reserve In Their Wet Pools

Historically, each of plaintiffs' nuclear plants have operated with a single full core reserve in their wet pools.[22] Tr. 193:14-194:4 (Long); Tr. 477:6-23 (Hunt); Tr. 624:6-8 (Hunt) (plant Farley maintains reserve of 157 assemblies). While there is no regulatory requirement for plaintiffs to maintain full core reserve[23] (Tr. 150:16-24 (Long)), plaintiffs' management requires

[21] The fact that the cost estimates have not changed, although the acceptance rate assumptions have changed, would defeat any argument that plaintiffs may make concerning the fact they are "paying for a 3,000 MTU acceptance rate."

[22] As set forth in the plaintiffs' brief, plants Hatch and Vogtle each have two wet pools that are connected. Pl. Br. 21. Plaintiffs have treated the two pools at each plant as a single pool. Id.; Tr. 134:11-15 (Long) (discussing plants Hatch and Vogtle: "you can think of those two spent fuel pools as basically shared between each one of those reactors.").

[23] Operating nuclear utilities impinge on full core reserve when necessary. For example, the Columbia generating station has encroached upon single full core reserve in the past and is

that their plant managers maintain full core reserve.[24] Tr. 150:22-24 (Long); Tr. 407:24-408:5 (Cocherell); Tr. 1158:13-17 (Bland); Tr. 1364:22-1365:8 (McCallum). At trial, plaintiffs' fact witnesses described the maintenance of single full core reserve as one of the plaintiffs' "fundamental" operating criteria. Tr. 162:11-163:1, 165:20-25, 200:21-201:6, 220:6-21 (Long); Tr. 1158:13-1159:15 (Bland); see also Tr. 1701:20-1702:4 (Metcalfe). For example, David Bland, the plant Hatch dry storage project manager from 1997-2000, testified that he received guidance from management that single core offload was a "major consideration" and:

> [Y]ou shall not allow single-core offload capability to disappear. We need that to ensure availability of these assets to make electricity.

Tr. 1162:12-1163:8, 1168:8-11 (Bland); PX-238 at SN201329; DX-208 at SN201261.

While Southern Nuclear's employees testified to their present desire to recover two full core reserves at plant Hatch, the documents admitted at trial support the conclusion that a single core reserve both is consistent with historic practices and appropriate to impose as a basis for awarding damages here. For example, in a February 18, 1992, memorandum concerning "Hatch Spent Fuel Storage Planning," Richard Fennell[25] noted that "[t]he one full core reserve has been established at Hatch since the late 1970's [sic]." DX 101 at SN068280 (emphasis added). Mr. Fennell continued, noting that "[t]his is not to say that the reserve policy should not be reviewed, but does say that revision of that policy should be carefully considered." Id. at SN06280-81.

---

close to exceeding that capacity again. Tr. 686:9-17 (Supko); 1252:5-10 (Bland).

[24] The concept of full core reserve also appears in testimony and documents as full core offload or full core discharge capability.

[25] Mr. Fennell reported to Mr. Cocherell during this time period. Tr. 349:24-350:4 (Cocherell).

However, Mr. Fennell recognized that any decision to increase the minimum reserve also would advance in time plant Hatch's need for additional storage at a cost of approximately $1.5 million (assuming that the ISFSI only would cost $10 million).[26] Id.

Similarly, in the "Hatch Spent Fuel Storage Capacity Expansion Strategy" documents prepared from the late 1980s to the early 1990s, which updated management concerning SNF-related storage issues (see Tr. 410:5-22, 412:15-20, 413:18-414:2, 414:25-415:22 (Cocherell)), single full core reserve was referenced as the relevant capacity for SNF storage planning. See, e.g., DX 115 at SN067822 (December 1992); DX 119 at SN065686 (April 1993). For example, in a December 1992 Update, Mr. Fennell wrote:

> This report references spent fuel storage planning milestones on the basis of maintaining two full core reserve capacity, one core for each unit. Two full core reserve has not been used in financial and strategic planning reports for Plant Hatch, since Hatch has a transfer canal connecting the two spent fuel pools. Also, although simultaneous Hatch unit shutdown certainly can occur, simultaneous unit maintenance with both cores offloaded has not typically been considered a credible event for contingency planning. In short, plant major [sic] maintenance efforts would focus on one unit at a time, with or without the cooperation of a forced outage event.

DX 115 at SN067822 (emphasis added). See also DX-119 at SN065686. Tr. 408:6-12, 409:22-410:22, 411:6-17, 413:3-8, 413:18-414:19 (Cocherell). Likewise, the November 1992 Update recognized that the single full core reserve "has classically been used as the milestone of concern

[26] Plaintiffs assert that the Hatch ISFSI allegedly cost in excess of $37.5 million to design, license, and construct. Pl. Br. 76. Larry Johnson identified at least $9.5 million in costs attributable to the three Hi-STAR casks initially placed upon that ISFSI. Tr. 2308:24-2309:21 (Johnson). Applying these figures and the low five-percent interest rate assumed by Mr. Fennell in his analysis would result in a cost increase of nearly $6 million to advance the ISFSI construction and loading from 2000 to 1997 to support two full core reserves (($37.5M x 1.05 x 1.05 x 1.05) - 37.5M = 5.9M).

relative to scheduling additional spent fuel storage capacity." PX 251 at SN067909. That update, and others, also recognized that a two full core reserve planning basis would increase costs to Southern Nuclear at plant Hatch and that, based upon the cost reductions associated with single full core reserve, "schedule slippage . . . based on a single shared core reserve is viewed as a desirable option." Id.; see also Tr. 414:20-415:8; 415:17-22 (Cocherell)

Other historic documents from the plaintiffs support a finding that GPC and Southern Nuclear historically maintained a single full core reserve at plants Hatch and Vogtle:

- A May 4, 1992 memo from Mr. Fennell noted that "the maintenance of the single full core offload capability is still the official planning basis for Hatch, and so the potential loss of the two full core offload capability . . . while not optimum, should be acceptable." DX 106 at SN068218 (emphasis added).

- PowerPoint presentations made to management tracked the dates for the loss of single core reserve and pool capacity at plaintiffs' three facilities. See DX 312; DX 324; Tr. 420:24-422:15 (Cocherell); see also DX 79 at SN054426-27 (Executive Summary, Nuclear Fuel Supply, tracking single core reserve at plants Hatch and Vogtle).

- In a white paper concerning plant Hatch's "spent fuel storage strategy," the author noted the loss of both dual and single core offload, but noted that, "[s]ince the loss of single-core off-load capability will occur within a short time, a strategy that will resolve the spent fuel storage issue should be implemented to assure the future operation of Plant Hatch." DX 180 at SN083719 (emphasis added). Indeed, that analysis continued, finding that the "major concern with the Federal and utility-sponsored repositories is the lack of assurance these facilities will be operational or accepting fuel prior to the loss of Plant Hatch's single-core off-load capability." Id. at SN083720 (emphasis added). The white paper concluded that the cask loading schedule should be established so as to "assure single-core off-load capacity is available for the Fall 2000 outage." Id. at SN083722.

- In its November 1989 nuclear fuel supply report for plant Hatch, Southern Nuclear indicated that Plant Hatch would exceed single full core reserve before 2003 and tied responses to any DOE failure to commence SNF acceptance to the loss of single full core reserve. DX-79 at SN054425-26 (plant Hatch), SN054427 (tracking single full core reserve for plant Vogtle); see also Tr. 194:14-195:3, 196:1-11, 197:1-7 (Long).

- In a 1992 position paper for Southern Nuclear's Washington Government Affairs Office, GPC provided information regarding spent fuel storage and projections for Plants Hatch and Vogtle based upon single core reserve. DX 104 at SN152410-SN152412.

- In a presentation to the Nuclear Regulatory Commission ("NRC") made by David Bland, Southern Nuclear addresses the loss of single core offload as one of four "[m]ajor considerations." PX-238 at SN201329. See also Tr. 198:9-199:6, 199:12-16, 200:5-18, 200:21-201:6 (Long); Tr. 1143:5-9, 1152:15-1153:9, 1162:12-1163:8, 1168:8-11, 1223:1-23 (Bland).

- In a letter to the NRC, Lewis Sumner, Vice President, Hatch Project Support, informed the NRC that "Plant Hatch must have the capability to begin loading the DCSS [dry cask storage system] by June 2000, to avoid the loss of single-core off load capability." DX 217 at SN201339.

- Numerous other documents that pre-date this litigation track the loss of single full core reserve for all three facilities as the date by which additional capacity must be obtained or offsite shipments must be commenced. See DX 27 at SN048365 (attachment to memorandum from Bruce Hunt, dated April 6, 1983); DX 313 at SN043109 (attachment to memorandum from Louis Long, dated August 26, 1985); DX 38 at SN019278 (attachment to memorandum to Bruce Hunt, dated April 11, 1984); DX 42 at SN043121 (attachment to memorandum from Bruce Hunt, dated March 20, 1985); DX 27 at SN048365 (attachment to memorandum from Bruce Hunt, dated April 6, 1983); PX 363 at SN076504 (email dated June 5, 2000, to numerous recipients characterizing the deferral of the loss of single full core reserve at plant Hatch as "an important achievement"); DX 204 at SN073306-3307 ("Spent Fuel Storage Profile" containing Mr. Fennell's handwriting (Tr. 419:12-17 (Cocherell)), identifying full core discharge capability as a "minimum of one full core, or 560 spaces to serve both units" at plant Hatch); DX 316 at SN018362 (document reflecting questions and answers for executives citing single core reserve).

- GPC has maintained a single full core reserve as the standard at plant Vogtle. For example, in 1990, GPC agreed that, for calculating plant Vogtle's decommissioning costs, TLG Services should assume single full core offload capability during the operating life of the plant. Tr. 416:4-417:21(Cocherell); DX-86 at SN182342.

The trial testimony likewise supports GPC's historic policy relating to the maintenance of single full core reserve. See Tr. 626:1-12, 627:12-24 (Hunt); Tr. 220:6-21 (Long); Tr. 407:24-408:5 (Cocherell); Tr. 1502:4-12, 1701:20-1702:4 (Metcalfe).

In addition to the evidence supporting GPC's historic reserve policies, GPC's conduct in implementing dry storage at plant Hatch belies the existence of a two full core reserve policy. Indeed, GPC failed to initiate its spent fuel storage project at plant Hatch in time to maintain a two full core reserve. See Tr. 154:19-155:21, 158:5-11, 193:23-194:4 (Long); Tr. 346:1-16 (Cocherell); Tr. 980:22-981:3 (Wade); Tr. 1152:15-1153:7, 1156:25-1159:15 (Bland). Instead, the single bathtub rack that was installed in the plant Hatch spent fuel pool extended single core reserve by one year, from 2000 to 2001. Tr. 158:5-11 (Long); Tr. 258:23-259:5 (Cocherell).[27] Even after adding the bathtub rack to the Hatch spent fuel pool, GPC measured the capability of storing spent fuel in the pool by the loss of single core off-load capability and not two core off-load capability.[28] Tr. 258:23-17, 345:14-22 (Cocherell); PX 363 at SN076504.

Plaintiffs' litigation position for a prospective need for a two full core reserve at plants Hatch and Vogtle is based upon the possibility of highly unlikely events that have not previously been used for contingency planning purposes. In fact, the possibility of simultaneous unit shutdown at plant Hatch "has not typically been considered a credible event for contingency planning." DX 115 at SN067822. Witnesses at trial were in accord, testifying that the need for dual core offload was considered unlikely. Tr. 408:6-12, 409:22-410:22, 411:6-17, 413:3-8,

---

[27] Plaintiffs could have, from a technical perspective, installed the second bathtub rack in the Hatch spent fuel pool. Tr. 158:12-15 (Long).

[28] GPC stores a second storage rack at plant Hatch that was not installed in the spent fuel pool but that could be placed into the pool if plant Hatch impinges upon full core reserve. Tr. 202:8-23 (Long). Installing that second storage rack would allow plant Hatch to maintain single core reserve for an additional year. Id. GPC ultimately did not install the second bathtub rack in the Plant Hatch spent fuel pool because, with cask loading, GPC could maintain single core reserve without the additional rack. Tr. 159:24-160:10 (Long). However, plaintiffs' claim assumes that the second rack would have been installed in the plant Hatch wet pool in the "but for" world to maintain single core reserve through 2002. Tr. 1490:9-14 (Metcalfe).

413:18-414:19 (Cocherell); Tr. 145:1-6, 145:23-146:2, 147:2-3 (Long) (two full core offload is rare and has a low probability of occurring). Mr. Bland noted that the maintenance of two full core reserve at all times is unnecessary because it is impossible to predict when or if emergency situations will arise. Tr. 1251:4-1252:13 (Bland).[29] Moreover, as set forth in several planning updates, in the event of simultaneous unit maintenance, "plant major [sic] maintenance efforts would focus on one unit at a time, with or without the cooperation of a forced outage event." DX 115 at SN067822. That is, regardless of pool reserve, only one unit would be repaired at a time.[30]

Finally, plaintiffs' experts and their causation theory support the conclusion that Southern Nuclear's historic policy of single full core reserve is appropriate for assessing damages in this case. Eileen Supko, plaintiffs' expert upon the nuclear industry and upon the alleged "reasonable" rate of acceptance by DOE, assumes the maintenance of one full core reserve across the industry – whether in a connected pool (such as plant Hatch) or in an individual pool (such as plant Farley). Tr. 683:22-684:4; 776:19-777:20 (Supko). The assumption of a single core reserve drives Ms. Supko's conclusions concerning unmet

[29] By maintaining single core reserve, if both cores have to be offloaded for repair, once the first core is repaired, it can be placed back in operation while the second core is offloaded and repaired. Tr. 150:1-4 (Long). In emergency situations, leaving fuel in the reactor is safe. Tr. 1251:4-1252:13 (Bland).

[30] Plaintiffs also have asserted that, in the event that they are required to unexpectedly switch cask vendors, they would need additional capacity to obtain delivery of a new cask. However, Mr. Wade testified that single core offload "would take about three years to use up . . . [a]bout that amount of time is what we estimate to qualify and select and test a cask from a new vendor." Tr. 956:20-24 (Wade). So, single full core reserve would account for that unproven and highly unlikely contingency. In any event, plaintiffs never established that they engaged in contingency planning assuming the possible demise of Holtec.

acceptance needs under various acceptance rates. Tr. 779:3-8 (Supko). However, if the full core reserve assumption is increased to match plaintiffs' assumption for the purposes of measuring damages across all of industry, such an assumption would result in additional at-reactor storage needs that would not be met by the rate that Ms. Supko has selected as "reasonable." See Tr. 779:11-22 (Supko).

Plaintiffs' damages expert, Kenneth Metcalfe, constructed his fuel management model – created for use in the spent fuel cases generally – upon the assumption that all utilities seek to maintain a single full core reserve. Tr. 1693:14-1694:8 (Metcalfe) (based upon his experience in the nuclear industry, nuclear utilities generally maintain a single full core reserve per pool). As a result, the formulas underlying Mr. Metcalfe's fuel management model assume single core reserve capacity for the plant Hatch and Vogtle pools in both the "but for" and actual worlds. Tr. 1602:13-19, 1605:16-21, 1608:12-1612:14, 1621:12-18 (Metcalfe). However, while the single core reserve assumption was allowed to operate in Mr. Metcalfe's "but for" fuel management model, he overwrote those formulas in the actual world model and replaced them with hard-coded loading schedules for plants Hatch and Vogtle. Tr. 1490:24-1491:19, 1492:15-19, 1498:8-1499:19, 1637:21-1638:1 (Metcalfe). Indeed, while overwriting the code in his fuel management model to eliminate the one full core reserve assumption, Mr. Metcalfe fully was aware that Ms. Supko – a purported expert in the nuclear industry and admitted advocate for nuclear power producers (Tr. 787:22-788:3 (Supko)) – assumed a single full core reserve in every pool in the nation for her analysis. Tr. 1646:1-4 (Metcalfe).[31]

[31] In other spent fuel cases, Mr. Metcalfe has been directed to assume different reserve capacities that operated to improve the litigation positions of the plaintiffs. In SNF litigation involving Indiana Michigan Power Company, Mr. Metcalfe oversaw the preparation of the

The effect of Mr. Metcalfe's decision to overwrite his Excel formulas in his actual world fuel management is significant. In the "but for" world, and with the addition of two "bathtub" racks, plant Hatch would have operated inside of two full core reserves from 1998 through 2002. Thereafter, plant Hatch would move above and below two full core reserve through 2008. Tr. 1622:19-1623:8 (Metcalfe). In Mr. Metcalfe's "but for" model for Plant Vogtle, Plant Vogtle would operate inside of two full core reserve from 2005 to 2009, assuming timely DOE acceptance at the plaintiffs' litigation rate. Tr. 1635:7-1637:9 (Metcalfe). However, Mr. Metcalfe used his one full core reserve assumption in his "but for" model, and all three plants stayed above full core reserve. Tr. 1623:9-1624:21 (Metcalfe). Mr. Metcalfe recognized that, if it was "imperative" for plaintiffs to obtain a two full core reserve in the "but for world" as it claims in the actual world, the costs associated with that additional reserve would come at plaintiffs' expense. Tr. 1634:1-10 (Metcalfe).

---

expert report in that case, which assumed two full core reserves plus a reload for each reactor in the actual world, where there was a shared pool. Tr. 1639:3-1640:6 (Metcalfe). This assumption resulted in moving up the date by which dry storage was required. However, this Court rejected the factual basis underlying this full core reserve argument as "not credible" and "artificial." Indiana Michigan Power Co. v. United States, 60 Fed. Cl. 639, 655 (2004), aff'd, 422 F.3d 1369 (Fed. Cir. 2005). In contrast, in the Wisconsin Electric Power Company ("WEPCO") litigation, Mr. Metcalfe assumed no full core capacity in the actual world, which permitted that plaintiff to argue that they would not have needed to construct dry cask storage in the "but for" world. Tr. 1638:16-1640:25; 1641:13-1646:25 (Metcalfe). In reality, WEPCO loaded casks to an ISFSI in 1995 in order to maintain single full core reserve in the connected pool. Tr. 1644:23-1645:6 (Metcalfe).

### B. The Government's Expert Witnesses Offered Significant Testimony Relevant To Determining The Quantum Of Plaintiffs' Damages

#### 1. The Testimony Of The Government's Accounting And Damages Expert, R. Larry Johnson

Mr. Johnson, of Veris Consulting ("Veris"), offered testimony concerning the results of Veris' financial audit of the plaintiffs' damages claim. Mr. Johnson has nearly 38 years of experience in accounting, is a Certified Public Accountant, and has testified in more than 75 cases as an expert witness. Tr. 2178:18-2182:10 (Johnson) (practicing accountant since 1968); Tr. 2185:22-2186:14 (Johnson) (testified in 7-8 trials and a similar number of arbitration proceedings). Indeed, Mr. Johnson now has been certified as an expert witness in two SNF trials. Tr. 2186:23-2187:11, 2195:25-2196:12 (Johnson). Mr. Johnson's calculation of damages reflected his opinions, as an damages and accounting expert, as to which costs claimed by plaintiffs were non-incremental, not reasonable, or not supported by adequate documentation or detail. Tr. 2212:25-2214:10 (Johnson). Mr. Johnson also monetized the opinions of Dr. Jonathan Neuberger concerning the number of casks that plaintiffs would have needed to load in the "but for" world assuming the 1991 ACR rate of acceptance, as well as the number of casks that plaintiffs needed to load to maintain single core reserve at plant Hatch in the actual world. Tr. 2323:6-2326:1 (Johnson). Mr. Johnson's opinions, and the calculations that result, are discussed below.

### 2. The Testimony Of The Government's Economics and Modeling Expert, Dr. Jonathan Neuberger

Dr. Neuberger is a PhD economist with Economists Incorporated,[32] and has provided economic analysis and expert testimony in more than 50 cases in the last seven or eight years. Tr. 2020:21-24 (Neuberger). Dr. Neuberger also was certified as an expert witness by Judge Hodges in the Indiana Michigan litigation and was certified by this Court as an expert in economics and economic damages. Tr. 2021:7-2022:1 (Neuberger).

Dr. Neuberger offered three primary opinions relevant to the measure of plaintiffs' damages. First, Dr. Neuberger offered expert testimony concerning the damages model offered by the plaintiffs' expert witness, Mr. Metcalfe. Specifically, Dr. Neuberger – an expert in damages modeling – criticized Mr. Metcalfe's application of different full core reserve assumptions in the "but for" world and actual world in his fuel management model, which resulted in significant additional costs to the Government. Dr. Neuberger opined that, in modeling their "but for" and actual worlds using different assumptions, the plaintiffs created an unlevel playing field that worked to increase plaintiffs' asserted damages. Tr. 2060:23-2061:13 (Neuberger). A correct damages analysis would have established consistent assumptions in the "but for" and actual worlds in order to isolate the effect of the breach. Tr. 2065:9-24 (Neuberger). By altering the full core reserve assumptions, Mr. Metcalfe decreased costs to the plaintiffs in the "but for" world and increased damages allegedly resulting from DOE's partial breach of contract.

[32] Economists Incorporated is a economics consulting firm that specializes in economic analysis in the context of litigation.

Second, and related to his first opinion, Dr. Neuberger ran Mr. Metcalfe's fuel management model applying the single full core reserve assumptions in both the "but for" and actual worlds – as the model was designed to operate – to re-calculate the number of casks that plant Hatch needed to load in the actual world to maintain the single core reserve that they assume is appropriate in the "but for" world. Dr. Neuberger also ran the DOE allocations model to determine the acceptance allocations that the plaintiffs would have received had DOE performed, beginning in 1998, under a 900 MTU rate of acceptance. Contrary to the repeated assertions in the plaintiffs' brief, Dr. Neuberger offered no technical opinion concerning the proper full core reserve at the plaintiffs' facilities.[33] Tr. 2040:25-2041:5 (Neuberger). Instead, Dr. Neuberger simply modeled the results of Mr. Metcalfe's fuel management model assuming a uniform single core reserve in both the "but for" and actual worlds.[34]

Finally, Dr. Neuberger offered an expert opinion, based upon his significant experience and training in economics, concerning the plaintiffs' claim for more than $28 million in prejudgement interest (characterized as "cost of capital" in the plaintiffs' brief). Specifically, and as will be discussed in more detail below, Dr. Neuberger opined that the "cost of capital" calculation performed by Mr. Metcalfe that was used to inflate the plaintiffs' past costs to

---

[33] The Government's case concerning full core reserve is based in no part upon the testimony of Dr. Neuberger. Instead, and contrary to the repeated assertions in the plaintiffs' brief, the Government's case concerning full core reserve is based upon historic company documents, the testimony of the plaintiffs' fact witnesses, and the testimony and modeling underlying the plaintiffs' expert opinions. We offered no expert upon full core reserve because the Government's case could be – and, indeed, was – made without such expert testimony.

[34] Dr. Neuberger also modeled the effect of a two full core reserve assumption in the "but for" world using Mr. Metcalfe's fuel management model. Tr. 2062:1-5 (Neuberger).

present value is, from an economics perspective, akin to adding prejudgment interest to the claim. Tr. 2042:21-2043:3 (Neuberger).

3. Summary Of The Work Performed By Plaintiffs' Damages Expert, Kenneth Metcalfe

In contrast to the detailed audit work performed by Mr. Johnson, Mr. Metcalfe accepted the plaintiffs' assertions concerning their damages claim with little or no analysis. Of the approximately 37 binders that were served upon the Government in connection with Mr. Metcalfe's expert report, all but three reflected the work product of plaintiffs' personnel and not that of Mr. Metcalfe. Tr. 1580:23-1595:18 (Metcalfe). While Mr. Metcalfe generally was responsible for three binders (Binder A (summary damages model), Binder B (fuel management binder), and Binder E (escalation)), Binder A simply summarized the underlying cost binders – for which plaintiffs' personnel provided the inputs – and reflected the present value of future damages, Binder B largely consisted of work product from Ms. Supko and plaintiffs' historic discharges (Tr. 1582:4-17 (Metcalfe)), and Binder E related to future damages that no longer were at issue at the time of trial. Tr. 1585:24-1586:9 (Metcalfe). Moreover, with respect to Binder B, Mr. Metcalfe's work product, reflected in the formulas contained in Excel spreadsheets, had been overwritten to reflect plaintiffs' position concerning its cask loading operations. Tr. 1606:25-1607:13 (Metcalfe).

Mr. Metcalfe failed to review any work orders from Williams Companies ("Williams") or Southern Company Services ("SCS") – even though the scope of work performed by these entities is contained within those work orders. Tr. 1655:5-15 (Metcalfe); Tr. 2205:10-13 (Johnson). As a result, Mr. Metcalfe's damages opinion failed to include substantial amounts relating to plaintiffs' avoided "but for" costs for activities, such as the crane rail modifications

and railroad repair and maintenance, that the plaintiffs conceded should not have been included in damages. See Tr. 2232:5-10 (Johnson) (discussing plaintiffs' omission of certain costs that would have been incurred in the "but for" world related to the overhead crane).

C. The Application Of The Terms Of The Standard Contract And Plaintiffs' Full Core Reserve Policies Reduce Plaintiffs' Asserted Damages

1. In The "But For" World, And Under A 900 MTU Rate Of Acceptance, Plants Hatch And Vogtle Both Required Additional On-Site SNF Storage After January 31, 1998

Applying the 900 MTU rate of acceptance set forth in the 1991 ACR to the SNF storage needs of plants Hatch and Vogtle leads to the conclusion that, in the "but for" world, plant Hatch needed to construct and load a dry storage facility and that plant Vogtle needed to add the Maine Yankee racks to its Unit 1 wet pool. Dr. Neuberger ran the DOE allocations model for SNF acceptance slots under the 900 MTU acceptance rate through 2009 and applied those results to the Kenrich fuel management model to determine what additional capacity plaintiffs' facilities would have needed had DOE begun performance in 1998 under this rate. Dr. Neuberger testified that, assuming the maintenance of a single full core reserve, GPC would have been required to construct a dry storage facility at plant Hatch for the storage of six dry storage casks through December 31, 2004, or 14 dry storage casks through December 31, 2009. Tr. 2073:5-19 (Neuberger). Mr. Johnson monetized the costs associated with these six casks and removed those would-have-been costs from damages. Tr. 2325:8-2326:1 (Johnson). Specifically, Mr. Johnson deducted the cask costs and the ISFSI construction costs related to those six casks from

damages. Tr. 2327:5-12 (Johnson). Mr. Johnson concluded that removing the six casks and the associated costs from damages requires an adjustment to damages totaling $19,268,476.[35]

Likewise, at plant Vogtle, based upon the acceptance rate of 900 MTUs and a single full core reserve, Dr. Neuberger concluded that GPC would have been required to add capacity for 352 assemblies prior to first acceptance from DOE, resulting in the purchase and installation of the Maine Yankee racks that were installed by GPC in 1998. Tr. 2073:8-2075:9 (Neuberger); Tr. 167:20-168:6 (Long). Removing the costs associated with the Maine Yankee rack installation from damages requires an adjustment to damages totaling $2,597,745. Tr. 2331:7-15 (Johnson).

Interestingly, the need for additional dry storage capacity at plant Hatch, assuming timely DOE performance, is not solely based upon Dr. Neuberger's calculations using the DOE model. Instead, such a need was expressly recognized by plaintiffs during early planning stages for alternative storage facilities at plant Hatch. See, e.g., DX 158 at 2, 9; DX 154 at 2. In the final recommendation to Southern Nuclear management, the Hatch Spent Fuel Storage Task Force concluded, in September 1994, that:

> MYTH: The Department of Energy accepting responsibility for spent fuel storage in 1998 will solve Hatch concerns.
>
> ***FACT: The DOE pick-up schedule is estimated to match the Hatch discharge rate only after 14 years of operation or about 2013.***

DX 158 at 2 (SN065606) (emphasis in original); see also DX 154 (same). The Task Force concluded that the "Minimum Storage Requirement" of 1,276 assemblies assumed "DOE pick-

[35] In the "but for" world, assuming the 900 MTU acceptance rate, plant Hatch would be required to load an additional eight casks to the ISFSI between 2005 and 2010. Tr. 2073:16-19 (Neuberger). If those casks were considered in damages, Mr. Johnson concluded that an additional $5,006,399 would need to be removed from damages. Tr. 2329:19-2330:1 (Johnson).

up operational in 1998." Id. at 9 (SN065613).[36] Interestingly, in assessing the potential availability of a private MRS, the Task Force assumed that the Hatch pick-up schedule for the private MRS would be "bounded by the DOE pick-up assumptions of starting in year 1998 and starting in year 2010." Id. at 19 (SN065623). As a result, the Task Force impliedly recognized the need for additional on-site storage even if a private MRS facility, such as PFS, was operational by 1998.

2. Applying A Single Full Core Reserve Assumption To Plaintiffs' Damages Claim Demonstrates That Plant Hatch Has Loaded An Unreasonable Number Of Casks To Its ISFSI

In addition to the casks that would have been loaded to the ISFSI had DOE performed at the 900 MTU rate of acceptance, applying the single core reserve policy that historically has existed at plant Hatch and that is assumed to exist by the plaintiffs and their experts to limit plaintiffs' costs in the "but for" world, requires a finding that the plant Hatch has loaded an unreasonable and excessive number of casks to its ISFSI. As Dr. Neuberger testified, allowing Mr. Metcalfe's fuel management model to operate as designed in the "but for" world to maintain a single full core reserve requires a finding that an additional 13 casks have been loaded than needed to maintain single core reserve. Tr. 2365:2-21 (Johnson). This number reflects two facts. First, the evidence at trial demonstrated that, even without installing the second bathtub rack into the plant Hatch wet pool, plant Hatch did not need to load the three Hi-STAR casks in 2000 to maintain single full core reserve. Tr. 1000:9-15 (Wade).[37] In fact, Mr. Wade testified

[36] That figure is higher than the number of assemblies that Dr. Neuberger calculated would have been needed to load to dry storage in the "but for" world.

[37] Facts relating to the decision to load Hi-STAR, and the effect upon damages, will be addressed below.

that full core reserve never would have been lost had plant Hatch simply loaded the four Hi-STORM casks that ultimately were loaded in Summer 2001 (prior to the 2001 discharges). Tr. 346:1-16 (Cocherell). Moreover, and contrary to the assumptions underlying the Government's pretrial brief upon this issue, the second bathtub rack did not need to be installed for plaintiffs to take credit for the additional space that the rack would have provided. Instead, the fact that the rack is on-site and could be placed in the pool is sufficient to provide the operational flexibility, from a planning perspective, that the rack would provide if physically installed in the pool. Tr. 343:12-344:1 (Cocherell); Tr. 1688:22-1689:2 (Metcalfe). As a result, the credit to the Government, provided in plaintiffs' claim, for the cost of the second bathtub rack that the plaintiffs assert would have been installed in the "but for" world is proper as the rack was not needed to maintain full core reserve in the actual world through 2001. However, if the Court found that the installation of the second rack was proper – and in addition to removing the three Hi-STAR casks from damages – an additional three casks could be removed from damages.[38] Second, the plaintiffs have loaded 10 Hi-STORM casks that were not needed to maintain single core reserve. Instead, these casks were loaded ultimately to reach a dual core offload reserve. Tr. 954:10-24 (Wade); Tr. 1157:8-24 (Bland).

The effect of the additional 13 casks upon damages is significant. Mr. Johnson determined that a total of $17,230,533 must be removed from the claim that is associated with these 13 casks. Tr. 2309:6-14, 2305:3-14, 2365:22-2366:25 (Johnson).

---

[38] Based upon the evidence at trial that the three Hi-STAR casks were not needed to maintain single full core reserve without the installation of the second bathtub rack, the Government did not increase the number of casks to be removed from the claim. Instead, it assumed that the second bathtub rack would not have been installed and allowed the offset provided by the plaintiffs for that installation in the "but for" world to pass through as a credit to damages. Tr. 1528:9-15 (Metcalfe).

### 3. Of The $17,230,533 Related To Plaintiffs' Decision To Exceed One Full Core Reserve In The Actual World, At Least $9,533,518 Is Related To The Decision To Load Hi-STAR Casks In 2000

As of December 31, 2004, Plant Hatch had loaded 22 casks to its ISFSI. Tr. 1016:2-4 (Wade). Nineteen of the casks were Holtec Hi-STORM casks. Tr. 1499:1-6 (Metcalfe). Hi-STORM casks are storage-only, concrete overpacks in which a multi-purpose canister ("MPC"), loaded with SNF, is placed. Tr. 891:12-14 (Wade). The Hi-STORM is not licensed for transportation of SNF. Tr. 894:4-7 (Wade). Holtec obtained the license for Hi-STORM casks in June 2000. Tr. 180:5-17, Tr. 184:11-14-17 (Long). Hi-STORM casks cost approximately $620,000 per cask. PX 414 at SNC002615; Tr. 2329:6-2330:1 (Johnson). The first four Hi-STORM casks were loaded at plant Hatch in June 2001, prior to the September 2001 discharge from Unit 2 into the Hatch spent fuel pool. Tr. 983:12-19 (Wade).[39] In connection with the loading of the Hi-STORM casks, the plaintiffs were required to make significant expenditures associated with equipment, plant modifications, and NRC dry runs. Tr. 1118:21-1119:3 (Wade).

In 2000, prior to loading any Hi-STORM casks, the plaintiffs purchased and loaded three Holtec Hi-STAR casks at plant Hatch. Tr. 982:21-24 (Wade). Hi-STAR casks are dual-purpose casks that are licensed both for the storage and transportation of SNF. Tr. 1177:22-23 (Wade).

---

[39] Plaintiffs allege that, even with the additional racks, had the Hi-STAR cask loading not taken place in 2000, plant Hatch would have fallen below full core reserve "with the next scheduled discharge due in early 2001." Pl. Br. 94. This statement factually is wrong. As a matter of fact, the 2001 discharge occurred in September of that year – clearly not "early 2001" as characterized in plaintiffs' brief. Tr. 983:12-19 (Wade). Moreover, plaintiffs fail to point out that four Hi-STORM casks were loaded in the Summer of 2001, prior to the 2001 discharge. Plaintiffs also assert – without citation to the record – that the additional bathtub rack and the Hi-STAR cask loading in 2000 allowed GPC to maintain full core reserve through 2000 at Plant Hatch. Pl. Br. 94. That assertion likewise is false, as the testimony of plaintiffs' "experienced personnel" demonstrated that they did not need to load any casks in 2000 to maintain full core reserve at plant Hatch. Tr. 1000:9-15 (Wade).

The Hi-STAR casks utilize the identical MPC that is used in connection with the Hi-STORM overpack. Tr. 894:15-19 (Wade). However, the Hi-STAR casks cost approximately $1.15 million per cask. Tr. 2294:10-22 (Johnson) (cost of three Hi-STAR casks total $3.45 million). Although they both utilize the same MPC technology, the manner in which the MPC is placed into the two casks differs significantly. Tr. 1106:15-19 (Wade). The MPC is placed into the Hi-STORM casks inside the reactor building through the use of Hi-TRAC transfer cask which itself is loaded in the wet pool. Tr. 907:9-21 (Wade). The Hi-STORM cask then is transported in an upright position out to the ISFSI where it is offloaded and placed upon the ISFSI. In contrast, the MPC is loaded directly into the Hi-STAR cask in the wet pool. Tr. 1202:17-1203:3 (Wade). Thereafter, the Hi-STAR casks are transferred out of the fuel building to the ISFSI in a horizontal position and are up-ended upon an up-ender pad at the ISFSI and moved in place upon the ISFSI. Tr. 1237:4-14 (Bland).

As a result of these differences, and though certain modifications and equipment may be used for both systems, the Hi-STAR requires different equipment and modifications than are needed to load Hi-STORM casks, Tr. 891:8-11 (Wade), including different handling equipment and additional engineering. Tr. 891:16-21 (Wade). More specifically, the Hi-STAR-specific costs total $9,533,518 and include: (i) cask procurement costs ($3,458,904) (Tr. 2294:19-2295:9 (Johnson));[40] (ii) SCS Hi-STAR-specific engineering work ($50,362) (Tr. 2277:24-2278:5

---

[40] Support for the monetization of each of these activities, where not referenced above, may be found in the transcript as follows: (iii) Tr. 2278:14-25; (iv) Tr. 2268:14-24; (v) Tr. 2279:11-2280:2; (vi) Tr. 2283:22-2284:8; (vii) Tr. 2301:1-16; (viii) Tr. 2284:21-2285:2; (ix) Tr. 2285:8-17; (x) Tr. 2287:1-8; (xi) Tr. 2287:21-2288:7; (xii) Tr. 2281:15-2282:1; (xiii) Tr. 2286:6-18; (xiv) Tr. 2280:3-10; (xv) Tr. 2281:3-10; (xvii) Tr. 2296:3-11; (xviii) Tr. 2296:22-2297:11; (xix) Tr. 2297:17-25; and (xx) Tr. 2301:25-2302:14. Where factual support for the identification of an activity as related to Hi-STAR, we rely upon the testimony of plaintiffs' personnel cited herein.

(Johnson)); (iii) Williams labor related to Hi-STAR ($135,696) (Tr. 1010:3-6 (Bland; Tr. 992:23-993:9 (Wade)); (iv) construction of HI-STAR upender pad ($803,404) (Tr. 1235:24-1236:1 (Bland)); (v) gantry crane rails for upender pad ($105,697) (Tr. 1094:10-18 (Wade); see also DX 308); (vi) Holtec NRC demonstration costs ($1,125,407) (Tr. 1104:6-1106:19 (Wade)); (vii) NRC demonstration costs ($606,897) (id.); (viii) leased rail cars for Hi-STAR loading ($108,645) (Tr. 1092:24-1093:20 (Wade)); (ix) 900 Gantry Crane used for loading ($80,752) (Tr. 1094:10-18 (Wade); see also DX 239); (x) Hi-STAR closure materials ($161,784) (Tr. 1246:23-1249:12 (Bland)); (xi) leased Manatowak crane for loading campaign ($682,887) (Tr. 1095:24-1096:9 (Wade); see also DX 256); (xii) Hi-STAR cask cradle cancellation charges ($168,240) (Tr. 1097:6-1098:1 (Wade)); (xiii) cancellation charges due to transition in lifting equipment from Hi-STAR to Hi-STORM operations ($30,606) (Tr. 1099:15-1100:11 (Wade)); (xiv) Hi-STAR cask cradle ($225,983) (Tr. 1097:6-1098:1 (Wade)); (xv) metal plates used to test Hi-STAR cask cradle ($99,732) Tr. 1244:19-1245:17 (Bland)); (xvi) Holtec engineering analyses related to the HI-STAR system ($57,583) (Tr. 2295:10-2296:2 (Johnson)); (xvii) cradle drop analysis for Hi-STAR system ($125,000) (Tr. 1097:6-1098:1 (Wade)); (xviii) leased rail car to transport Hi-STAR casks to the plant site ($87,500) Tr. 2296:22-2297:16; (PX 422 at SNC004649); (xix) Williams labor for maintenance of Hi-STAR casks ($15,713) (Tr. 1246:4-22 (Bland)); (xx) Holtec delay charges related to loading campaign ($280,000) (Tr. 1103:14-1104:5 (Wade)); (xxi) materials related to loading ($50,491) (Tr. 2304:20-2305:2 (Johnson); (xxii) Williams labor relating to loading ($477,172) (Tr. 2303:23-2304:5 (Johnson)); and (xxiii) other contract labor related to loading ($595,063) (Tr. 2304:6-19 (Johnson)).[41]

---

[41] Citations to the testimony of company witnesses and documents supports findings for each activity that the costs were related solely to the Hi-STAR system. To the extent that they

Additionally, plaintiffs' witnesses acknowledged that SCS invoices totaling $5,083,728 included work related to the Hi-STAR up-ender pad (Tr. 1234:6-14 (Bland)) – a pad that is not used to load the Hi-STORM.[42] While Mr. Bland was able to identify the three years during which work was performed upon the up-ender pad (Tr. 1233:13-1235:8 (Bland)), neither he nor any other witness could segregate the amounts in the SCS invoices for those three years that related to the Hi-STAR up-ender pad from those related to the actual ISFSI. Tr. 1239:6-17, 1240:13-19 (Bland). Based upon plaintiffs' failure to identify the non-incremental Hi-STAR-related components of the SCS engineering work, Mr. Johnson removed all of these costs from damages. Tr. 2276:9-25 (Johnson).[43]

The decision to load the three Hi-STAR casks in 2000 – more than a year in advance of the loss of full core reserve – came at a significant cost. Indeed, even without the embedded SCS engineering costs associated with the up-ender pad, the decision to load the three casks in 2000 cost Southern Nuclear more than $9.5 million. Based upon the testimony of Mr. Johnson and Dr. Neuberger, as well as other evidence presented at trial, these costs should be removed from damages.

---

are not reflected in the fact witness testimony, the costs are contained in Mr. Johnson's testimony, cited above.

[42] Plant Farley utilizes the Hi-STORM cask with the Hi-TRAC transfer cask, but did not construct an up-ender pad to accept delivery of the Hi-TRAC at the reactor site. Tr. 1402:3-12 (McCallum).

[43] Under the 900 MTU rate of acceptance, the SCS invoices that contain embedded Hi-STAR up-ender pad costs are eliminated from the claim based upon plaintiffs' need to load 14 casks to the ISFSI. Tr. 2327:5-12 (Johnson).

D. Implementing A Two Full Core Reserve Policy Requires Additional Storage At Plants Hatch And Vogtle In The "But For" World Regardless Of The Rate Of Acceptance Applied To Plaintiffs' Claim

To the extent that this Court applies a two full core reserve policy at plants Hatch and Vogtle, the evidence demonstrated that each of these plants would have been required to add storage in the "but for" world in the form of dry storage at plant Hatch, regardless of the rate applied to plaintiffs' claims. See Tr. 2061:17-2062:19 (Neuberger) (Hatch). Specifically, if this Court were to apply the 3,000 MTU rate and plaintiffs' asserted two full core reserve policy, GPC would need to load eight casks to the ISFSI at plant Hatch. Tr. 2063:8-21 (Neuberger). At plant Vogtle, the plaintiffs would have needed space in the wet pool under the 1991 ACR acceptance scenario. Tr. 2074:4-2075:9 (Neuberger). With respect to plant Farley, if the Court finds that APC was required to maintain a single full core reserve plus a reload of fresh fuel for each wet pool as set forth in plaintiffs' brief – a position not advocated by the Government – APC would require dry storage at plant Farley if DOE had begun performance in 1998 at the 1991 ACR rate because it would have impinged upon full core reserve. Tr. 2075:15-24 (Neuberger).

E. Plaintiffs' Damages Require Further Adjustment To Reflect Actual Costs Incurred As A Result Of DOE's Partial Breach

In addition to the adjustments related to the cask loading activities described above, adjustments to plaintiffs' damages claim are required based upon the analysis that Mr. Johnson performed and by the evidence adduced at trial. In analyzing the plaintiffs' damages claim, Mr. Johnson and his staff undertook an extensive audit of the plaintiffs' claims and of the supporting documentation. Tr. 2196:25-2199:23 (Johnson). The purpose of the audit and analysis was to determine whether costs were incurred from an accounting perspective and, if incurred, whether

the costs were incremental. Tr. 2197:18-2198:11, 2205:14-2206:17 (Johnson). During the audit, Mr. Johnson and his staff reviewed the thousands of documents produced by the plaintiffs in connection with their initial disclosures and requested thousands of additional supporting financial records. Tr. 2196:25-2199:23 (Johnson). The information that Mr. Johnson requested included employee time records, contracts, purchase orders, and invoices for damages-related activities. Tr. 2198:21 - 2199:14 (Johnson).

Additionally, and because of the significant costs in the claim related to Williams and SCS, Veris also sought SCS work orders and Williams Maintenance Work Orders ("MWOs") to determine whether costs charged by these two contractors properly flowed through to damages. Tr. 2204:18-20, 2198:21-2199:14 (Johnson). The work orders and MWOs were significant because no other supporting documentation contained descriptions of the work being performed by these two contractors. Tr. 2198:21-2201:12 (Johnson). Because both Williams and SCS are involved in continuing work at the facilities that is unrelated to DOE's partial breach, the work orders and MWOs allowed Veris to determine whether particular costs were incurred and the activities to which those costs related. Tr. 2199:24-2200:16 (Johnson). Based upon the testimony of plaintiffs' witnesses, and plaintiffs' own damages claim, by identifying the activities performed by Williams and SCS, the Government was able to determine whether the plaintiffs improperly included in damages non-incremental costs. Tr. 2203:12-2208:2, 2228:9-24 (Johnson). As a result of Veris' detailed analysis of these work orders, over $795,000 of Williams' costs were found to be related to work upon the plant Hatch overhead crane, which the plaintiffs conceded was work that would have been performed to support DOE cask loading activities. Tr. 2228:5-2234:11 (Johnson).

Mr. Metcalfe, in preparing his expert report, failed to review any SCS or Williams work orders, relying instead upon the accounting system maintained by plaintiffs. Tr. 1655:5-15, 1657:8-13 (Metcalfe); Tr. 2205:10-13 (Johnson). As a result, Mr. Metcalfe failed to identify these non-incremental activities and costs and allowed these non-incremental costs to pass through to damages. Tr. 2210:20-2211:21 (Johnson).

Based upon the audit of the plaintiffs' claim, Mr. Johnson concluded that the Kenrich asserted damages should be reduced to $16,707,846 for all three plants, assuming acceptance under a 900 MTU rate through 2004. Mr. Johnson made adjustments in four categories: (i) elements non-incremental; (ii) elements not reasonable; (iii) elements not supported by adequate details or documentation; and (iv) prejudgment interest.[44] Tr. 2213:3-2214:10 (Johnson). Plaintiffs' damages were adjusted as follows:

[44] The prejudgement interest originally totaled $28,888,897. Tr. 2308:16-23 (Johnson). Plaintiffs' brief now asserts prejudgement interest totaling almost $25 million. Pl. Br. 16. This adjustment will be addressed separately below.

**Southern Nuclear**
**Adjusted Damages**
**All Plants**

| | Plant Hatch | Plant Farley | Plant Vogtle | Total |
|---|---|---|---|---|
| Kenrich Asserted Damages through 12/31/04 | $ 77,008,917 | $ 21,355,367 | $ 8,716,094 | $ 107,080,378 |
| Adjustments | | | | |
| Elements Non-Incremental | 7,260,466 | 821,103 | (15,710) | 8,065,859 |
| Elements Not Reasonable | 25,647,059 | 2,824,979 | 2,822,224 | 31,294,262 |
| Elements Not Supported by Adequate Details or Documentation | 123,519 | 32,215 | 101,560 | 257,294 |
| Pre-judgment Interest | 21,633,033 | 4,045,589 | 3,210,275 | 28,888,897 |
| Adjustments to Reflect 900 MTU Rate Non-breach World Adjustments | 19,268,476 | - | 2,597,745 | 21,866,221 |
| **Asserted Damages as Adjusted** | $ 3,076,364 | $ 13,631,481 | $ - | $ 16,707,845 |

### 1. Plaintiffs Failed To Establish That Internal Labor Charges Were Incremental To DOE's Partial Breach

Plaintiffs staffed the dry storage projects at plants Hatch and Farley with internal management resources. Tr. 168:21-25 (Long). Likewise, cask loading operations and ISFSI O&M was handled by plaintiffs internally. Tr. 169:3-5 (Long). Plaintiffs relied upon contractors for certain "design activities" and to construct the facilities. Tr. 168:25-169:3 (Long). When plaintiffs staffed the management of the dry storage projects, they utilized their own project management personnel. Tr. 169:17-19 (Long). Management personnel generally are salaried employees. Tr. 1021:12-15 (Wade). For the operations portion of the project, plaintiffs utilized employees from their maintenance departments. Tr. 169:19-21 (Long). Maintenance employees are unionized and compensated upon an hourly basis. Tr. 1020:24-1021:7 (Wade).

Had these employees not been needed to work on the dry storage projects, they would have been working to resolve maintenance backlogs. Tr. 170:13-15 (Long).[1] Maintenance activities are prioritized by the plaintiffs. Tr. 171:3-9 (Long). High priority maintenance activities are completed immediately, either through the authorization of overtime, through additional shifts, or through the retention of contractors. Id. Plaintiffs could not identify any overtime that was charged to maintenance projects as a result of the work performed on the dry

[1] The maintenance departments have backlogs of activities that they are working on to try and work down to get fixed so that the plant runs as it is supposed to." Tr. 170:18-21 (Long). Mr. Wade could not identify any maintenance activity that was delayed as a result of the diverted effort to dry storage that affected the operations of their nuclear facilities. Tr. 1138:21-1139:5 (Wade). While Mr. McCallum identified activities that competed for the same resources and stated that contractors were brought in to complete certain security-related work (Tr. 1389:21-1391:9 (McCallum), plaintiffs never introduced evidence of any costs that actually were incurred related to these activities (either costs for the contractor labor or costs resulting from delay).

storage projects. Tr. 1138:25-1139:5 (Wade). For lower priority activities, a backlog is allowed to build up and, when the dry storage-related activities are completed, employees "could go back to work on" those low priority activities. Tr. 171:10-15 (Long).[2]

The plaintiffs staffed their projects so as to accommodate other work being performed by their employees at the three facilities. For example, loading campaigns were structured to avoid conflicts with outages and to allow work to be performed during a standard work week. Indeed, at plant Hatch, more than 150 employees are trained to assist in loading activities. Tr. 1018:21-1019:3 (Wade). Ultimately, people are assigned to the activity based upon availability. Tr. 1022:13-1023:3 (Wade). Mr. Johnson noted that, every year, more than 50 percent of the employees charging time to the ISFSI project charged less than $5,000 per year. Tr. 2260:9-13 (Johnson).

Plaintiffs were unable to identify a single employee who was terminated following the completion of the plant Hatch dry storage project. Tr. 203:10-13 (Long). Likewise, and although the figures would be available to plaintiffs (Tr. 203:17-204:3 (Long)), plaintiffs were unable to identify any delays that occurred to other projects as a result of the diversion of work to the dry storage projects. Tr. 203:14-22 (Long). Instead, all of the plaintiffs' "evidence" concerning the incrementality of plaintiffs' internal labor consists of conclusory statements by plaintiffs' personnel that were unsupported by any actual evidence of additional cost. See Tr. 203:3-204:3 (Long); Tr. 1134:12-1139:5 (Wade). Since Mr. Johnson allowed overtime identified by the plaintiffs to pass through to damages as well as expenses for contractor

---

[2] Interestingly, GPC's average number of employees on-site actually has decreased over time despite the partial breach, from approximately 1200 when it was first formed to approximately 800 today. Tr. 172:3-8 (Long).

personnel allegedly hired as a result of damages related projects to pass through to damages (Tr. 2258:1-9 (Johnson)), plaintiffs' failure to produce tangible evidence is telling.[3]

Mr. Johnson and Veris identified damages and offsets in the plaintiffs' claim netting out to $6,466,016 relating to internal labor.[4] That figure includes overheads included, by plaintiffs, in damages. Tr. 2261:8-23 (Johnson). Based upon plaintiffs' failure to establish that they incurred any incremental costs relating to employee salaries or time, Mr. Johnson removed from damages all internal labor costs and offsets identified by the plaintiffs in their claim, with the exception of identified overtime charges. Tr. 2258:1-9 (Johnson). Specifically, Mr. Johnson removed $11,103,900 from damages and accounted for the plaintiffs' offsets by placing $4,637,884 back into the claim.[5]

---

[3] This type of information was requested by Veris during the audit process. Where support was provided, the costs were allowed to pass through to damages, subject to causation findings of the Court.

[4] The $6,466,016 is comprised of a net internal labor adjustment at plant Farley of $821,103 (Tr. 2311:14-25 (Johnson)), a net internal labor adjustment at plant Vogtle of negative $15,710 (which increases damages) (Tr. 2317:20-2318:8 (Johnson)), and net adjustments at plant Hatch in the following categories: ISFSI internal labor ($1,779,286) (Tr. 2256:15-19 (Johnson)); ISFSI internal labor OH ($750,731) (Tr. 2261:8-23 (Johnson)); ISFSI overheads ($1,789,112) (Tr. 2261:24-2262:9 (Johnson)); dry cask internal labor ($674,430) (Tr. 2264:3-20 (Johnson)); dry cask internal OH ($467,216) (id.); dry cask overheads ($436,653) (id.); dry cask Sept.-Dec. costs ($29,638) (id.); loading internal labor ($856,085) (Tr. 2265:18-2266:10 (Johnson)); loading internal labor OH ($434,503) (id.); loading Sep.-Dec. costs ($212,536) (id.); loading pool to ISFSI - Initial ($357,985) (id.); and loading pool to ISFSI - Annual ($406,820) (id.).

[5] Mr. Johnson was required to "put the offsets back into the claim" in order to avoid an inconsistent application of his conclusions. Had Mr. Johnson simply deducted from the claim the internal labor costs, without a corresponding addition for the internal labor offsets, the result – which would inure to the benefit of the Government – would not properly reflect plaintiffs' harm.

2. In Addition To Adjustments Related To Cask Loading And Internal Labor, Plaintiffs' Alleged Damages Associated With Plant Hatch Require Further Adjustment

Based upon his audit of the plaintiffs' damages at Plant Hatch, Mr. Johnson determined that a total of $7,260,466 should be removed from the claim because the costs were not incremental to the breach. Tr. 2218:18-20 (Johnson); see also Johnson Demonstrative at 6-7. Specifically, those adjustments were made in the following four categories: (i) ISFSI licensing, engineering, and construction; (ii) dry casks; (iii) loading to ISFSI and other ISFSI operations and maintenance; and (iv) handling DOE containers. Tr. 2218:21-2219:12, 2262:25-2263:24, 2264:21-25, 2266:22-25 (Johnson). Of the total $7.2 million adjustment, $5,660,623 related to internal labor adjustments discussed above.

The non-incremental adjustments remaining after accounting for internal labor total $1,599,843. Prior to trial, and in recognition of the accuracy of certain adjustments made by Mr. Johnson, the plaintiffs withdrew $570,000 of these costs. Tr. 1476:22-1478:7 (Metcalfe). These adjustments included costs associated with the following items and activities: (i) overhead crane study; (ii) biometric security system; (iii) railroad maintenance and spur installation; (iv) railroad refurbishment; (v) railroad repair and construction; (vi) repair of overhead crane rails; and, (vii) two way radios. Id. In connection with their expert reports, plaintiffs identified at least $73,831 associated with the rail alignment were not properly included in damages because, in the "but for" world, they would also have been incurred to load casks to DOE. Tr. 1029:19-25 (Wade); PX 734 at KRG00022 (M8). However, the plaintiffs failed to remove all of the costs associated with this activity. Tr. 1052-1054 (Wade). Mr. Johnson identified an additional $916,556 associated with the crane rail alignment. See, e.g., DX 234 at SNC003382 (crane

runway survey); DX 235 at SNC002952 (same); DX 244 at SNC003153 (overhead crane repairs); DX 245-246 (same). As detailed above, at the beginning of trial, the plaintiffs removed an additional $56,000 associated with the rail alignment and repair of the Unit 1 & 2 overhead crane rails. Tr. 1477:6-7 (Metcalfe). However, these additional trial adjustments still failed to remove all costs associated with the crane rail modifications. The evidence demonstrated that an additional $860,566 needs to be removed from damages to account for all costs associated with the crane rail modifications.[6] Tr. 2228:5-24 ($795,442), 2233:4-2235:23 ($121,124, $56,000) (Johnson).

Plaintiffs also removed at trial $385,000 associated with railroad repair and construction upon the grounds that those costs would have been incurred in the but for world. Tr. 1477:5-6 (Metcalfe). As with the crane rail modifications, the plaintiffs had eliminated from damages, in connection with their expert report, certain of these costs but failed to account for all costs. However, an additional $56,626 must be removed from damages to account for all of the costs associated with railroad repair and construction.[7]

---

[6] The plaintiffs conceded $56,000 for costs associated with "Repair of Overhead Crane Rails." Veris determined the appropriate adjustment for this activity is $916,566. The appropriate adjustment is composed of two amounts. First, it includes an amount of $121,124 related to three invoices from Birmingham Crane & Hoist: $83,384 (SNC003150), $21,840 (SNC003151), and $15,900 (SNC003153). These invoices and the corresponding purchase orders contain such descriptions as "runway repair, rail alignment and repair Unit 1 & 2 reactor building overhead crane rails." Second, Williams Power maintenance work orders also contain descriptions relating to "crane rails and load testing of lift equipment." These maintenance work orders total $795,442. Therefore, $121,124 plus 795,442 less $56,000 of costs conceded by the plaintiffs produce the additional adjustment of $860,556.

[7] The plaintiffs conceded $385,000 for costs associated with "Railroad Repair and Construction." Veris determined the appropriate adjustment for this activity is $441,626. A D.R. Davies Contractor invoice (SNC003148) and corresponding purchase order (SNC003332) confirm the amount of $441,626 for "labor materials, equipment and supervision to rehabilitation

In addition to the adjustments related to railroad repair and construction, adjustments are needed to account for $64,976 that was incurred by plaintiffs for work performed by SCS for "inspection of the rail line" at plant Hatch. Since inspection would have been needed in the "but for" world to deliver SNF to DOE, these costs should be removed from damages.[8]

With respect to elements of the claim deemed not reasonable – and outside of adjustments relating to plaintiffs' excessive cask loading (and use of Hi-STAR) and plaintiffs' membership in PFS – an additional $50,000 for standby time for contract welding personnel between loading campaigns. Tr. 1114:9-24 (Wade); Tr. 2302:15-25 (Johnson). This amount is for time spent by contract welders not working on activities at the plant. Tr. 1114:25-1115:3 (Wade). Plaintiffs agreed at trial to remove $152,000 for a second rail car engine that the Government determined was unreasonable. Tr. 1477:18-19 (Metcalfe).

Plaintiffs agreed at trial that $129,000 must be removed from the claim for plant Hatch because the costs were not supported by adequate details or documentation. Tr. 1477:16-21. The lack of documentation supporting these costs was determined through the audit of the plaintiffs' claims conducted by Mr. Johnson and Veris. Tr. 2306:12-17, 2307:9-16 (Johnson). Mr. Metcalfe included all of these amounts in plaintiffs' damages claim.[9] Tr. 1477:16-21 (Metcalfe).

---

of the lead track to plant Hatch." The difference between the plaintiffs conceded amount of $385,000 and the $441,626 produces the additional adjustment required of $56,626.

[8] The SCS work order (H182BF) related to "inspections of the rail line to keep it available for use." PX 444 at SNC002686.

[9] The adjustment for pre-judgment interest is discussed below.

### 3. Other Than The Adjustment Associated With The Maine Yankee Racks At Plant Vogtle, The Remaining Adjustments At Plants Farley And Vogtle Largely Are Associated With PFS, Prejudgment Interest, and Internal Labor Charges

Based upon his analysis, Mr. Johnson adjusted plant Farley's damages from $21,355,367 asserted by plaintiffs to $13,631,481. Of the $7,723,886 adjustment, $4,045,589 relates to prejudgment interest (Tr. 2315:25-2316:11 (Johnson)), $2,822,224 relates to PFS (Tr. 2314:19-2315:4 (Johnson)), and $821,103 relates to internal labor adjustments. Tr. 2311:14-25 (Johnson). Similarly, at plant Vogtle, Mr. Johnson's adjustments totaling $6,118,349 are comprised of $3,210,275 (Tr. 2321:3-10 (Johnson)) related to prejudgment interest, $2,822,224 related to PFS (Tr. 2318:25-2319:10 (Johnson)), and an increase of $15,710 related to internal labor charges. Tr. 2350:1-8 (Johnson).

However, certain additional adjustments are required. For example, Mr. Johnson removed a charge for $101,560 that was unsupported. Indeed, that charge, which Mr. Metcalfe flowed through to damages, reflected a handwritten note from an individual at Kenrich that stated "support for this journal transaction could not be located." (SNOC006464). Plaintiffs withdrew this charge at the beginning of trial. Tr. 1478:3-7 (Metcalfe). Additionally, Mr. Johnson eliminated a duplicative rental charge for equipment purchased by plant Hatch and rented by plant Farley for $2,755. Tr. 2314:5-13 (Johnson). As with the "query ack report" charge, plaintiffs removed this amount from damages at the start of trial. Tr. 1477:22-25 (Metcalfe).

## XI. PLAINTIFFS' INVESTMENT IN PRIVATE FUEL STORAGE

Since 1995, Southern Nuclear has contributed nearly $8.5 million to Private Fuel Storage, LLC ("PFS"). Tr. 385 (Cocherell); PX 715 at J-178. Approximately $4.4 million of

that total was contributed after loading activities to the ISFSI at plant Hatch had begun. Tr. 385-386 (Cocherell); PX 715 at J-178. Southern Nuclear's last payment to PFS, which it was not contractually obligated to make, totaled $1.5 million and was not made until December 2004. Tr. 386-388 (Cocherell). After that payment, Southern Nuclear stopped making financial contributions to PFS. Tr. 385 (Cocherell); PX 715 at J-178. In December, 2005, Southern Nuclear withdrew from PFS. DX 338.

Southern Nuclear's PFS investment was a speculative investment in a venture with no real chance of resolving the plaintiffs' asserted spent nuclear fuel storage situation. Mr. Cocherell testified that he believed that the PFS project was speculative from the very beginning. Tr. 396:3-398:3 (Cocherell). In fact, when Southern Nuclear was considering whether to participate in PFS, Mr. Cocherell raised concerns about whether the facility ever would be licensed and he expressed his opinion to senior management that Southern Nuclear should not participate. Tr. 388:8-18 (Cocherell). Mr. Cocherell – who was Southern Nuclear's representative upon the PFS Board of Managers (Tr. 339:17-23 (Cocherell)) – acknowledged that substantial hurdles to the successful completion of PFS were present from the beginning of the project. Tr. 388:25-393:1 (Cocherell). These hurdles included opposition from the State of Utah, potential opposition from the states along the transportation routes to the PFS facility, and concerns as to whether PFS could obtain sufficient financing for the construction of the PFS facility, estimated to exceed $100,000,000. Id.; DX 161, DX 162. At the time of trial – which was after PFS obtained its license from the NRC but before Southern Nuclear withdrew from the effort – Mr. Cocherell could not predict whether a PFS facility will ever be constructed. Tr. 393:5-8 (Cocherell).

In addition to its speculative nature, Southern Nuclear knew when it began the venture that PFS could not resolve APC's and GPC's spent nuclear fuel storage dilemma and that, even if constructed, SNF storage at a PFS facility would be more expensive than on-site dry storage. Tr. 207:10-208:24 (Long). Moreover, in a September 1994 presentation to management, the Hatch Spent Fuel Task Force reported that "[a] private MRS could be implemented, but the date for commercial operation and pick-up is not certain." DX 158 at 19 (SN065623). Ultimately, the Task Force recommendation involved the pursuit of "MPC interim dry cask storage with re-rack as a fall back position." DX 158 at 33 (SN065637). The Task Force's 1994 recommendation contains no reference to PFS or other off-site storage alternative. See DX 158 at 33-39 (SN065637-43).

Thereafter, in March, 1996, Southern Nuclear predicted that it would lose single full core offload capability by 2000. Tr. 212-13 (Long); DX 180. At that time, the projected startup date for PFS was 2002 – two years too late for plant Hatch. DX 180. Southern Nuclear therefore concluded that on-site storage, as opposed to offsite storage in the proposed PFS facility, was the only solution to the Hatch plant's storage problem. Tr. 212-214; DX 180 ("Thus, on-site storage is the only option that assures storage space will be available when needed."). Mr. Long agreed, testifying that, as of March 1996, "it was apparent that the only solution to Hatch's storage problem was on-site dry storage." Tr. 214:7-11 (Long). In April 1996, Southern Nuclear acknowledged that negotiations for a PFS facility had been suspended, further underscoring the conclusion that PFS would not solve Hatch's storage problem. Tr. 214:21-215:21 (Long); DX 182. Mr. Cocherell acknowledged that, in 1996, PFS was not used as a possible scenario in

plaintiffs' decommissioning studies because the plaintiffs could not rely upon PFS as an alternative. Tr. 397:14-23 (Cocherell).[10]

Thereafter, in 1998, plaintiffs recognized that "Southern Nuclear is also part of a joint utility effort to develop a private fuel storage facility for operation as early as the year 2002, not in time to address Hatch storage requirements by the year 2000." DX 223. Despite these conclusions, Southern Nuclear continued to make contributions to PFS until as late as 2004 and has included these contributions in its damages claim in this case. Tr. 215:15-21 (Long). Financial analyses from the 1990s demonstrate reflect the conclusion that onsite dry storage is a cheaper alternative than storage at PFS. DX 143; Tr. 206-209 (Long). Mr. Long admitted, that as long as it was cheaper to store SNF on-site, Southern Nuclear would not choose to store its fuel at PFS. Tr. 208:17-19, 209:20-25 (Long).

Southern Nuclear's witnesses testified that the primary reason that Southern Nuclear joined PFS was as an insurance policy. Tr. 186:19-187:4, 204:16-19 (Long); Tr. 395:24-396:2 (Cocherell). As Mr. Long testified, Southern Nuclear was aware of a situation faced by another utility, Northern States Power Company ("NSP"), where the State of Minnesota through legislation placed restrictions upon the number of casks that NSP could include in its dry storage facility. Tr. 186:19-187:12. However, neither Alabama nor Georgia ever passed legislation like that passed in Minnesota, restricting the number of casks. Tr. 188:4-13, 205:3-8 (Long). Mr. Long further acknowledged that Southern Nuclear faces different political considerations in Alabama and Georgia than those faced by NSP in Minnesota. Tr. 205:22-206:5 (Long). Indeed,

[10] In fact, PFS never has been applied in any decommissioning study that has been performed for plaintiffs' facilities. Tr. 397:6-23 (Cocherell).

at the time of trial, Mr. Long testified that Southern Nuclear no longer had any interest in PFS, Tr. 206:6-11 (Long), a fact that was confirmed after trial when Southern Nuclear officially withdrew from PFS. DX 338.

Most significantly, the September 1994 Task Force presentation to Southern Nuclear management (Tr. 1739:2-1740:8 (Reynolds), Tr. 1740:9-1741:12 (Fennell)), contained a legal analysis from Troutman Sanders, Southern Nuclear's legal counsel, concerning the viability of on-site dry storage. Troutman Sanders concluded that "[s]pent nuclear fuel from either Hatch or Vogtle may be stored at either facility as long as the facility is operating." DX 158 at 32 (SN065636). This statement is particularly significant given that Mr. Long admitted that, had the plaintiffs known that they would be allowed to put as many casks as they needed on an ISFSI, they would not have considered PFS. Tr. 209:20-210:1 (Long).

In addition to serving as Southern Nuclear's unused insurance policy, PFS was a speculative opportunity for profit. Southern Nuclear's witnesses agreed that, as an investor in PFS, Southern Nuclear would be entitled to a share in any profits earned. Tr. 211:5-17 (Long); Tr. 397-98 (Cocherell); DX 143, DX 145, DX 162. Finally, the plaintiffs presented no evidence at trial the either GPC or APC made payments for PFS – either directly to PFS or as a reimbursement to Southern Nuclear. In their damages claim, the $8.5 million simply is divided into thirds, each of which are allocated to the plaintiffs' three facilities. Tr. 385:15-20 (Cocherell); Tr. 1531:6-1532:22 (Metcalfe).

## XII. PLAINTIFFS' ASSERTED COST OF CAPITAL CONSTITUTES PRE-JUDGMENT INTEREST AND, IN ANY EVENT, WAS NOT A COST INCURRED BY ANY OF THE NAMED PLAINTIFFS IN THIS CASE

Several central facts were adduced at trial that are relevant to the consideration of plaintiffs' claim for nearly $25 million in "cost of capital" expenses. See Pl. Br. 16. First, this expense is computed as interest on past damages. Based upon his expertise in economics, Dr. Neuberger testified that the plaintiffs' assertion of a "cost of capital" expense was the economic equivalent of prejudgment interest. Tr. 2042:21-2043:3 (Neuberger). Indeed, Mr. Metcalfe, plaintiffs' damages expert, acknowledged that the purpose of the "cost of capital" was to make the plaintiffs whole by providing them with the time value of money between the date of injury and the date of judgment, Tr. 1674:3-21 (Metcalfe), the same purpose for which prejudgment interest is awarded. Tr. 1673:24-1674:21 (Metcalfe).

Second, the evidence shows that the plaintiffs themselves never actually incurred a "cost of capital" in connection with breach-related projects. The plaintiffs presented no testimony that money was borrowed for breach-related projects or was raised through offerings of bonds or other securities by the plaintiffs. Tr. 2087:24-2088:21 (Neuberger). Other than conclusory statements concerning opportunity costs, there is no evidence of an actual cost of capital expense being incurred. In contrast, the evidence at trial demonstrates that Southern Company – and not these three plaintiffs – is the entity that would have incurred any "cost of capital" expense in connection with these projects. Tr. 1677:22-1678:4 (Metcalfe). None of the three plaintiffs here actually raise capital. Tr. 1686:4-23 (Metcalfe). Instead, they all are funded by their parent company, Southern Company. Tr. 1686:4-23 (Metcalfe). The documents from which the cost of capital for each of the three facilities was derived for this litigation were upon Southern

Company letterhead, not the letterhead of any of the three plaintiffs. PX 668; Tr. 1678:14-1679:11 (Metcalfe). Additionally, the after-tax cost of capital used by Mr. Metcalfe was calculated by him in connection with this litigation and was not a figure that was available in plaintiffs' documents prior to this case. Tr. 1583:17-1584:1 (Metcalfe). Southern Company, the entity that actually would have incurred cost of capital expenses (if any such expenses actually were incurred), is not a plaintiff in this litigation and, like Southern Nuclear, was not a signatory to the Standard Contract. See DX 1-4; Amended And Supplemental Complaint, filed October 11, 2005.

## ARGUMENT[11]

### I. SOUTHERN NUCLEAR OPERATING COMPANY IS NOT A PROPER PARTY PLAINTIFF IN THIS CASE

As an initial matter, the Court should dismiss Southern Nuclear Operating Company as a party plaintiff in this case. By motion dated December 21, 2001, the Government filed a motion to dismiss Southern Nuclear from this litigation, given that it is not a party to any of the Standard Contracts at issue in this case and lacks privity of contract with the United States. In response to the Government's motion, the plaintiffs asserted that Southern Nuclear "has not asserted any claim, cause of action or damages separate and apart from those asserted by APC and GPC" and that it "has not asserted any right to recovery in its own right." Southern Nuclear Response Brief, at 2 (Jan. 23, 2002). Nevertheless, Southern Nuclear argued in its January 23, 2002

---

[11] Plaintiffs assert that the Federal Circuit has found that this Court has jurisdiction over plaintiffs' partial breach claim. Pl. Br. 4. While the Government does not dispute this contention, we note that issues relating to the basis and scope of this Court's jurisdiction in the SNF cases is currently upon appeal before the Federal Circuit. PSEG Nuclear, L.L.C. v. United States, 05-5162 (Fed. Cir. filed Aug. 5, 2005).

response brief that it possessed standing to pursue this action as the "agent and attorney-in-fact" of the actual Standard Contract holders, APC and GPC, a position which it alleged that it had obtained through operating agreements between Southern Nuclear, APC, and GPC.

The Court properly rejected Southern Nuclear's arguments and recognized that it could not render judgment in Southern Nuclear's favor in this case:

> The court lacks jurisdiction to consider or resolve any issues between APC, GPC, and [Southern Nuclear] concerning their operating agreements. Absent contractual privity between [Southern Nuclear] and the United States, no judgment can be rendered in favor of [Southern Nuclear].

Order, at 4 (Apr. 7, 2004). Nevertheless, the Court allowed Southern Nuclear to continue to participate as a plaintiff in this case because Southern Nuclear's "voluntary participation in this litigation could facilitate discovery and trial proceedings." Id.

Although the plaintiffs previously represented that Southern Nuclear was not presenting any damages claims upon its own behalf in this litigation, the evidence at trial indicated that, as we will discuss below, some of the claimed damages – particularly those associated with Southern Nuclear's investment in PFS – were incurred by Southern Nuclear and not APC or GPC. Because Southern Nuclear lacks privity of contract with the Government, and in accordance with the legal arguments discussed in the briefing upon the Government's December 21, 2001 motion to dismiss and the Court's April 7, 2004 order, the Court should dismiss Southern Nuclear from this litigation for lack of jurisdiction.

## II. PLAINTIFFS BEAR THE BURDEN OF ESTABLISHING ALL ELEMENTS OF THEIR CLAIM, INCLUDING LIABILITY, CAUSATION, FORESEEABILITY, AND REASONABLE CERTAINTY

### A. Plaintiffs Have The Burden Of Proving All Elements Of Their Case

"To recover for breach of contract, a party must allege and establish: (1) a valid contract between the parties, (2) an obligation or duty arising out of the contract, (3) a breach of that duty, and (4) damages caused by the breach." San Carlos Irrig. & Drainage Dist. v. United States, 877 F.2d 957, 959 (Fed. Cir. 1989). As the United States Court of Appeals for the Federal Circuit recently recognized, the mere fact of DOE's breach of the Standard Contract does not "perforce" make all of a utility's costs "to store its SNF recompensable: [a plaintiff] must prove foreseeability, causation, and reasonableness," Indiana Michigan Power Co. v. United States, 422 F.3d 1369, 1376 (Fed. Cir. 2005), and it must prove these three elements "by a preponderance of the evidence." Alaska Pulp Corp. v. United States, 59 Fed. Cl. 400, 413-14 (2004). According to the precedent of this circuit, plaintiffs bear the burden of introducing clear proof that they were injured as a direct result of DOE's delay in accepting their SNF. Myerle v. United States, 33 Ct. Cl. 1, 27 (1897). Further, the "measure of damages to be applied in the particular case is irrelevant until the claimant has established the fact of losses that were the natural and proximate result of the breach of contract." Willems Indus., Inc. v. United States, 155 Ct. Cl. 360, 376, 295 F.2d 822, 831 (1961). "Absent tangible proof of damages, [a party] may not recover for an alleged injury." Roseburg Lumber Co. v. Madigan, 978 F.2d 660, 667 (Fed. Cir. 1992).

The parties agree that "[t]he remedy for breach of contract is damages sufficient to place the injured party in as a good a position as it would have been had the breaching party fully

performed." Pl. Br. 111 (citing Indiana Michigan, 422 F.3d at 1373). Conversely, "the non-breaching party should not be placed in a better position through the award of damages than if there had been no breach." Bluebonnet Sav. Bank, F.S.B. v. United States, 339 F.3d 1341, 1344-45 (Fed. Cir. 2003) (citing White v. Delta Constr. Int'l, Inc., 285 F.3d 1040, 1043 (Fed. Cir. 2002) ("the non-breaching party 'should on no account get more than would have accrued if the contract had been performed.'")). Although "the effort is made to put the injured party in as good a position as that in which he would have been put by full performance of the contract," that effort must be "at the least cost to the defendant and without charging him with harms that he had no sufficient reason to foresee when he made the contract." Northern Helex Co. v. United States, 207 Ct. Cl. 862, 875, 524 F.2d 707, 713 (1975) (emphasis added) (quoting Restatement of Contracts § 329 cmt. e), cert. denied, 429 U.S. 866 (1976).

## B. Plaintiffs' Burden Includes Their Obligation To Establish A Reasonable "But For" World Against Which To Measure Whether DOE's Delay "Caused" Them To Incur Incremental Costs

The plaintiffs are required to establish that, "but for" the breach of contract, the asserted harm would not have been suffered. Fawick Corp. v. United States, 149 Ct. Cl. 623, 637 (1960); see San Carlos Irrigation & Drainage Dist. v. United States, 111 F.3d 1557, 1563 (Fed. Cir. 1997) ("[a] plaintiff must show that but for the breach, the damages alleged would not have been suffered" (emphasis added)). The plaintiffs also are required to introduce clear proof that they were injured as a direct result of DOE's partial breach. Myerle, 33 Ct. Cl. at 27 (1897); Quiman, S.A. de C.V. v. United States, 39 Fed. Cl. 171, 183 (1997), aff'd, 178 F.3d 1313 (Fed. Cir. 1999). "For a damage to be direct there must appear no intervening incident . . . ; the cause must produce the effect inevitably and naturally, not possibly nor even probably." Ramsey v. United

States, 121 Ct. Cl. 426, 434, 101 F. Supp. 353, 357 (1951). "There must not be two steps between cause and damage." Myerle, 33 Ct. Cl. at 27.

In their post-trial brief, plaintiffs assert that causation is established if it shows that the breach is a "substantial factor" in its increased costs. Pl. Br. 111 (citing Tennessee Valley Authority v. United States, 69 Fed. Cl. 515 (2006)). However, the Federal Circuit has rejected the idea that the "substantial factor" test somehow differs in substance from the "but for" test that the Court has historically required for establishing causation, clarifying that the "but for" test, not the "substantial factor" test, is still the required burden for a plaintiff to prove causation. California Federal Bank v. United States, 395 F.3d 1363, 1367-68 (Fed. Cir. 2005). Further, the "substantial factor" test finds its roots in tort law. W. Keeton, et al., Prosser and Keaton on the Law of Torts 266-68 (5th ed. 1984). The well-established contract law test for causation in contract cases before this Court is whether the claimed damages were "attributable solely to," J.D. Hedin Constr. Co. v. United States, 197 Ct. Cl. 782, 808, 456 F.2d 1315, 1330 (1972), and, thus, "directly related" to the breach. Wells Fargo Bank v. United States, 88 F.3d 1012, 1022 (Fed. Cir. 1996); see Southern Pac. Co. v. Darnell-Taenzer Lumber Co., 245 U.S. 531, 533-34 (1918) ("[t]he general tendency of the law, in regard to damages at least, is not to go beyond the first step").[12]

---

[12] Plaintiffs' suggestion that the Court should apply a lesser standard conflicts with this Court's precedent. Even in tort cases, the substantial factor test has not "replaced the need for *each* liable defendant to be a but-for *and* substantial contributor to the indivisible injury," Menne v. Celotex Corp., 861 F.2d 1453, 1461 (10th Cir. 1988), and the courts have made clear that, when the claimed damages could have resulted from multiple factors, the plaintiff "must establish that the breach alone would have been sufficient" to cause the claimed damage and that it would not have occurred "but for" the breach. Point Productions A.G. v. Sony Music Entertainment, Inc., 215 F. Supp. 2d 336, 344 (S.D.N.Y. 2002). The United States Court of Appeals for the Federal Circuit requires application of both tests, even in the tort context.

Further, to prove causation, plaintiffs must establish the "but for" world so that the Court can identify whether plaintiffs' claimed damages are, in fact, incremental to DOE's partial breach. A plaintiff cannot recover as damages from the government any costs that it would have incurred regardless of DOE's breach of contract. See Bluebonnet Sav. Bank, 339 F.3d at 1345 ("[t]o derive the proper amount for the damages award, the costs resulting from the breach must be reduced by the costs, if any, that the plaintiffs would have experienced absent a breach"). Generally, a plaintiff must establish a plausible "but-for world" as part of its causation analysis. Bluebonnet Sav. Bank, FSB v. United States, 67 Fed. Cl. 231, 238-39 (2005); see Coast Fed. Bank, FSB v. United States, 48 Fed. Cl. 402, 403 n.25 (2000) (plaintiffs bear burden of propounding realistic "but for" scenario); Glendale Fed. Bank, FSB v. United States, 239 F.3d 1374, 1380 (Fed. Cir. 2001) (plaintiffs bear burden of demonstrating "what might have been . . . ."). Without establishing that "but for" world, plaintiffs leave the Court with no mechanism by which to determine whether their claimed costs were incremental to the Government's partial breach.

### C. Plaintiffs Have The Burden Of Demonstrating That Their Claimed Damages Were Foreseeable

Plaintiffs also must establish that their damages were foreseeable. Indiana Michigan, 422 F.3d at 1376. Foreseeability is measured based upon what the parties contemplated at the time of contract formation, rather than from the date of breach. See Northern Helex, 207 Ct. Cl. 682,

---

Shyface v. Secretary of Health and Human Servs., 165 F.3d 1344, 1352 (Fed. Cir. 1999). Thus, the "substantial factor" test may only be applied in place of a "but for" test if doing so would "generally yield identical results." Abbott Labs. v. Brennan, 952 F.2d 1346, 1352-53 (Fed. Cir. 1992). Indeed, the Court in Columbia First Bank v. United States, 60 Fed. Cl. 97 (2004), determined that, under the "substantial factor" test, the plaintiff must still prove that the "breaching provisions directly and primarily caused the . . . damages it seeks." Id. at 105.

524 F.2d at 714; Bohac v. Department of Agric., 239 F.3d 1334, 1340 (Fed. Cir. 2001); Prudential Ins. Co. v. United States, 801 F.2d 1295, 1300 (Fed. Cir. 1986) (affirming trial court's finding of no foreseeability when plaintiff landlord claimed damages for losses of leased property in excess of what Government leased from plaintiff in Government tenant holdover of lease). As part of the foreseeability determination, plaintiffs must demonstrate that both the magnitude and type of damages were foreseeable at the time of contract formation. See Landmark Land Co. v. United States, 256 F.3d 1365, 1378 (Fed. Cir. 2001) (affirming trial court's denial of damages because the magnitude of damages was not foreseeable); Wells Fargo, 88 F.3d at 1024-25 (rejecting remote and conjectural damages claim because type of damages were not foreseeable at time of contract formation). "The mere circumstance that some loss was foreseeable, or even that some loss of the same general kind was foreseeable, will not suffice if the loss that actually occurred was not foreseeable." Restatement (Second) of Contracts § 351, cmt. a (cited in Landmark Land, 256 F.3d at 1378).

## D. Plaintiffs Must Prove Their Damages With Reasonable Certainty

Plaintiffs also have the burden of establishing "reasonable certainty" as to each item within their damages claims. Wells Fargo, 88 F.3d at 1023; see Restatement (Second) of Contracts § 352 cmt. a ("[a] party cannot recover damages for breach of a contract for loss beyond the amount that the evidence permits to be established with reasonable certainty"). To support its claim, plaintiffs must provide appropriate documentary or other support from its records to establish its damages claims. See Roseburg Lumber, 978 F.2d at 667 (plaintiff must provide adequate support for claimed costs). A contractor's failure to present any documentary support for its assertions that it incurred costs, precluding the Government from verifying that

the costs were incurred and the reasons for their incurrence, precludes any recovery of those costs. Barrow Utils. & Elec. Co. v. United States, 20 Cl. Ct. 113, 121 (1990). Without proper records, plaintiffs cannot meet their burden of establishing reasonable certainty.

E. After Establishing The Legal And Factual Predicates To Damages, Plaintiffs Must Demonstrate That Their Action Mitigated Those Damages

If plaintiffs satisfy their burden of proving causation, foreseeability, and reasonable certainty for any of their claimed damages, the general rule in any damages claim is that "a party cannot recover damages for loss that he could have avoided by reasonable efforts." Robinson v. United States, 305 F.3d 1330, 1333 (Fed. Cir. 2002) (quoting Restatement (Second) of Contracts § 350, cmt. b) (emphasis in original). Under Indiana Michigan, plaintiffs were obligated to begin mitigating any alleged damages in May 1994. Indiana Michigan, 422 F.3d at 1375. Plaintiffs also must attempt to mitigate any potential damages "at the least cost to the defendant." LaSalle Talman Bank, F.S.B. v. United States, 45 Fed. Cl. 64, 111 (1999) (quoting Northern Helex, 207 Ct. Cl. 862, 524 F.2d at 713), rev'd on other grounds, 317 F.3d 1363 (Fed. Cir. 2003). The least-cost principle "precludes rewarding a plaintiff for undertaking a form of mitigation that is considerably more costly than other available means of mitigation." Id. To determine whether an attempt at mitigation was appropriate, courts consider whether a reasonable person, in light of the known facts and circumstances, would have taken steps to avoid certain damages. Koby v. United States, 54 Fed. Cl. 493, 497 (2002).

## II. PLAINTIFFS HAVE FAILED TO ESTABLISH THAT, IN THE "BUT FOR" WORLD, DOE WAS CONTRACTUALLY OR STATUTORILY OBLIGATED TO ACCEPT SNF AT AN ANNUAL RATE OF 3,000 MTU

### A. The Plaintiffs Have Failed To Establish That DOE Was Obligated To Accept SNF At A Rate Sufficient To Preclude The Need For Additional At-Reactor Storage And To Allow "Timely Decommissioning"

#### 1. The Plaintiffs Have Failed To Identify Any Language In Either The NWPA Or The Standard Contract That Requires DOE To Satisfy The Plaintiffs' Proposed Two-Part Obligation

As the foundation for the "but for" world that they are required to establish to allow the Court to evaluate causation, the plaintiffs assert that the NWPA and the Standard Contract obligate DOE to accept SNF from contract holders in a manner that (1) "was sufficient to avoid the need for additional at-reactor storage after January 31, 1998," and (2) would "reduce the backlog of SNF so that [plaintiffs'] nuclear plants could decommission in a timely manner." Pl. Br. 127; see Pl. Br. 8. The plaintiffs define the requirement of "timely decommissioning" as allowing decommissioning to be completed within five years of a utility's shutdown. Tr. 554:25-555:12 (Hunt). Based upon the application of this alleged contractual obligation, the plaintiffs conclude that DOE was obligated to accept SNF beginning in 1998 at an annual rate of 3,000 MTU, after a short five-year "ramp-up" period. See Pl. Br. 72.

Amazingly, in asserting that the NWPA obligates DOE to satisfy this requirement, the plaintiffs do not cite to the single most important piece of evidence in interpreting any statute: the actual language of the statute itself. See Pl. Br. 23. The only evidence that they cite to support their contention that the NWPA imposes this obligation is the deposition designations of several witnesses. Pl. Br. 23. Yet, oral testimony is inadmissible to assist in interpreting the proper meaning of a statute. See, e.g., National Sch. of Aeronautics, Inc. v. United States, 135

Ct. Cl. 343, 142 F. Supp. 933, 938 (1956) ("A legislature speaks through statutes, and, in cases where the statutes require interpretation, through committee reports and debates. No member of a legislature, outside the legislature, is empowered to speak with authority for the body"); Department of Energy v. Westland, 565 F.2d 685, 690-91 (C.C.P.A. 1977) (rejecting testimony of former congressman concerning proper interpretation of statute because "no member of the legislature is empowered to speak for that body");[13] Gardner & North Roofing & Siding Corp. v. Board of Governors of the Fed. Reserve Sys., 464 F.2d 838, 842 (D.C. Cir. 1972) (rejecting letter from congressman written one year after passage of legislation, which was not part of legislative history and therefore could not be considered in determining the intent of the legislature); United States Steel Corp. v. United States, 618 F. Supp. 496, 500 n.5 (C.I.T. 1985) ("post enactment statements, even those by the authors of the legislation, cannot be considered by the court, because the statements cannot demonstrate intent at the time of passage"). Further, the deposition designations that the plaintiffs cite, even if admissible upon this point, do not actually support the proposition that the NWPA created this alleged two-part requirement. See, e.g., Morgan Dep., March 21, 2002, 198:1-7 (objective was to begin waste acceptance from utilities in January 1998); Barrett Dep., Apr. 23, 2002, 475:11-16 ("one of the basic tenets in the act was that the federal Government was to be responsible for the waste and take the waste off so it should – for all contract holders, be they operating, be they shut down, to fulfill the federal responsibilities under the act."). Most importantly, the supposed two-part requirement that the plaintiffs propose is wholly unsupported by the statutory purposes that Congress expressly

[13] Decisions of the Court of Customs and Patent Appeals "are binding precedent on this Court." BMW Mfg. Corp. v. United States, 241 F.3d 1357, 1362 n.3 (Fed. Cir. 2001).

identified in the NWPA itself, which generally relate to the health and safety of the public and to ensuring that commercial nuclear utilities, rather than taxpayers, fund the entirety of the nuclear waste disposal program. 42 U.S.C. § 10131. None of the identified statutory purposes in any way relates to or requires the "protection of the finances of commercial nuclear utilities." See id.

Similarly, although the plaintiffs allege that the Standard Contract contains the two-part requirement that they have identified, they again do not and cannot cite to any language in the contract itself that purports to create any such obligation. "Contract interpretation begins with the plain language of the agreement." Foley Co. v. United States, 11 F.3d 1032, 1034 (Fed. Cir. 1993). Yet, the plaintiffs' entire argument regarding the rate of acceptance rests upon extra-contractual evidence that post-dates the formation of the Standard Contract, devoid of any reference to actual language in the contract itself. As a matter of law, the Court cannot properly create an obligation that does not exist in the contract itself and then find a party in breach of the "obligation" to which the party had never agreed in the first place. As this Court recently recognized in this case, "[n]one of the demanded terms is found in the contract; and it is clear that the parties shared no meeting of the minds regarding those terms, as was made clear to all during contract negotiations." Florida Power & Light Co. v. United States, 64 Fed. Cl. 37, 48 n.12 (2005), interlocutory appeal pending sub nom. PSEG Nuclear, L.L.C. v. United States, No. 05-5162 (Fed. Cir. filed Aug. 5, 2005).

2. The Plaintiffs Failed To Establish That, In Light Of The Contract's Integration Clause, The Contract Is Not Fully Integrated

In fact, because the Standard Contract contains an integration clause, which expressly provides that the written language in the Standard Contract "contains the entire agreement between the parties with respect to the subject matter hereof," 10 C.F.R. § 961.11, Art. XXII(A),

the plaintiffs' attempt to incorporate extra-contractual requirements into the Standard Contract is particularly inappropriate. The contract further provides that "[a]ny representation, promise, or condition not incorporated in this contract shall not be binding on either party" and that "[n]o course of dealing or usage of trade or course of performance shall be relevant to explain or supplement any provision contained in this contract." Id. The plaintiffs' interpretation of the Standard Contract, which reads into the agreement alleged program hopes and goals over a 20-year period, completely eradicates the integration clause from the contract. However, "an integration clause 'conclusively establishes that the integration is total unless (a) the document is obviously incomplete or (b) the merger clause was included as a result of fraud or mistake or any other reason to set aside the contract.'" Barron Bancshares, Inc. v. United States, 366 F.3d 1360, 1375 (Fed. Cir. 2003) (quoting Rumsfeld v. Freedom N.Y., Inc., 329 F.3d 1320, 1329 (Fed. Cir. 2003)); see Southern California Fed. Sav. & Loan Ass'n v. United States, 422 F.3d 1319, 1330 (Fed. Cir. 2005) ("the plain language of the Sole Benefit clause and the Entire Agreement [integration] clause evidence the parties' intent to limit the scope of the Assistance Agreement to its specified terms"). The integration clause "prohibits the use of external evidence to add to or modify the terms of a written agreement." Southern California, 422 F.3d at 1330 (interpreting Barron Bancshares, 366 F.3d at 1375). Although "parol evidence 'must be admissible on the issue of the extent to which a written agreement is integrated, for . . . the writing cannot prove its own integration,'" McAbee Constr, Inc. v. United States, 97 F.3d 1431, 1434 (Fed. Cir. 1996) (quoting Sylvania Elec. Prods., Inc. v. United States, 198 Ct. Cl. 106, 458 F.2d 994, 1006 (1972)), the fact that the Standard Contract contains an integration clause makes plaintiffs' burden of establishing a lack of integration "extremely heavy." Id.

The "parol evidence" that the plaintiffs have submitted to the Court does not speak to whether the agreement is fully integrated, but, instead, merely attempts to supplement the terms of the contract. With regard to whether the contract itself is fully integrated, the plaintiffs failed to present any evidence at trial. As a result, they have not met their burden of proving that the Standard Contract is not fully integrated and, therefore, they cannot rely upon extra-contractual evidence of the parties' alleged contractual intentions.

Further, any review of parol evidence upon the issue of whether the Standard Contract is completely integrated – the only evidence of which was presented by the Government – plainly establishes its full integration. The basic terms of the Standard Contract were developed through notice-and-comment rulemaking. 48 Fed. Reg. 5458, 5458 (Feb. 4, 1983) (Notice of Proposed Rulemaking); 48 Fed. Reg. 16,590, 16,597 (Apr. 18, 1983) (Final Rule).[14] As we previously discussed in detail in our statement of facts, several utilities requested that DOE include in the Standard Contract a two-part obligation that differs somewhat from the obligation that the

---

[14] Because the terms of the Standard Contract were developed through notice-and-comment rulemaking, it is appropriate to interpret them in the same manner that the Court would interpret regulations, including review and reliance upon the history of the rulemaking. As DOE represented in its preamble to the proposed rule, "DOE determined that it would be most appropriate to develop this proposed standard contract through rulemaking because this process present[ed] the best opportunity for interested persons, particularly the affected parties, to participate in developing the standard contract which [would] be used in DOE's nuclear waste disposal activities." 48 Fed. Reg. 5458, 5458 (Feb. 4, 1983). "Although DOE recognize[d] that some situations may require special contractual provisions, DOE intend[ed] to develop and use, to the maximum extent practicable, a standard contract to specify the rights and duties of the parties." Id.; see 48 Fed. Reg. 16,590, 16,597 (Apr. 18, 1983) (Final Rule) (rejecting comments of several commenters that terms of Standard Contract "not be part of the rule itself"). Contract terms that are developed pursuant to notice-and-comment rulemaking and incorporated into an individual contract are interpreted in accordance with the rules applicable to interpreting regulations. See, e.g., Santa Fe Engineers, Inc. v. United States, 801 F.2d 379, 381 (Fed. Cir. 1986); Honeywell, Inc. v. United States, 228 Ct. Cl. 591, 596, 661 F.2d 182, 186 (1981).

plaintiffs here now propose: an obligation to accept SNF beginning in 1998 at a rate sufficient to accept the amount of SNF being annually generated at that time plus some of the "backlog" of previously generated SNF. As we previously discussed, and as evidenced by the comments in the administrative record of the rulemaking and the testimony of Mr. Morgan, DOE specifically refused to create any such obligation upon its part when developing the Standard Contract terms. Instead, DOE included in the Standard Contract a mechanism by which the SNF acceptance rate would be developed in the future, through the issuance of ACRs and APRs and through the submission and approval of DCSs and FDSs. This evidence plainly establishes that the acceptance rate is not "missing" from the Standard Contract and that the contract is not "incomplete." To the contrary, the acceptance rate issue was fully contemplated by the parties, and the parties were fully aware of the completeness of the terms relating to rate in the Standard Contract.

To the extent that the Court considers any other parol evidence, the internal documents from various utilities from 1983 and 1984, soon after the Standard Contract was executed, demonstrate that DOE had not obligated itself in the contract to satisfy a minimum performance rate. See, e.g, DX 32, attachment 2 at 3 (TV1471); DX 37 at 1.[15] Moreover, in correspondence with DOE soon after the publication of the final rule, but prior to the execution of the Standard

[15] Although resort to parol evidence is neither necessary nor appropriate in interpreting an unambiguous contract, to the extent that parol evidence is deemed relevant or admissible in interpreting the terms of the Standard Contract, the standardized nature of the contract at issue here requires interpretation of its terms in a uniform manner as applied to all contract holders, not simply plaintiffs, "without regard to [a particular contract holder's individual] knowledge or understanding of the standard terms of the writing." Restatement (Second) of Contracts § 211 (1981). Accordingly, to the extent that parol evidence is admissible here, review of other contract holders' understandings of the contract requirements is as relevant as a review of plaintiffs' individual understandings.

Contract by individual utilities, the utilities complained about the fact that DOE had not included any additional performance obligations in the contract. See DX 31 at 1-2. In interpreting the requirements of a contract, the behavior of parties before the "advent of controversy" is often more revealing than the contract language alone. Omni Corp. v. United States, 41 Fed. Cl. 585, 591 (1998). "A principle of contract interpretation is that the contract must be interpreted in accordance with the parties' understanding as shown by their conduct before the controversy." Julius Goldman's Egg City v. United States, 697 F.2d 1051, 1058 (Fed. Cir. 1983), cert. denied, 464 U.S. 814 (1983). Clearly, the industry's "understanding" that DOE had some minimum acceptance rate obligation was created after disputes about timely SNF acceptance began. The contemporaneous evidence should preclude any reading of plaintiffs' two-part test into the Standard Contract.

3. Even If The Court Considered Parol Evidence To Seek To Interpret The Contract's Terms, The Plaintiffs Have Failed To Identify Any Contemporaneous Evidence Supporting Their Argument

In any event, the specific two-part obligation that the plaintiffs here seek to impose into the Standard Contract – eliminating the need for additional at-reactor storage and providing for timely decommissioning – is not found in any documents contemporaneous to contract formation. First, as Mr. Morgan discussed at trial and as evidenced by the Standard Contract itself, DOE specifically and intentionally excluded the creation of any contractual obligations to meet any pre-determined minimum acceptance rate or minimum qualitative standards because it could not know, in 1983, the scope and extent of the technical and other obstacles that it would face in attempting to develop an operational repository. Yankee Atomic Transcript, August 2, 2004, 3621:20-3622:4 and 3626:9-3627:13; TVA Transcript, July 14, 2005, 2198:15-2199:3 and

2209:9-20. This Court should not impose a term upon DOE in connection with litigation that DOE expressly rejected as a contract obligation during contract formation.

Further, as we previously discussed in our statement of facts, some utilities requested that DOE include a provision requiring DOE to accept SNF each year at the annual SNF generation rate plus some "backlog" – a request that DOE rejected. However, the plaintiffs have not identified any contemporaneous documentary evidence to support the two-part requirement that they now propose. Even assuming that the Court considered parol evidence, the absence of any contemporaneous documentation supporting the specific two-part obligation that the plaintiffs have proposed renders it unsupportable.

Specifically, the qualitative two-part test that the plaintiffs seek to impose upon DOE finds no support in the Administrative Record. In fact, none of the 81 comments contained in that record contain a request that DOE include in the contract a two-part test tied to at-reactor storage and timely decommissioning.[16] The plaintiffs assert that both APC and GPC requested that DOE commit to accepting SNF "at a rate that eliminated the need to expand SNF storage at Southern Nuclear's plants after 1998." Pl. Br. 127 (citing PX 46 and PX 47). However, the plaintiffs' citation to these two letter omits any pinpoint cite for that statement. The absence of specificity is because, upon review, neither letter contains any reference to the "elimination of at-reactor storage." See DX 5.028 at 8-9 (ADM002.0226-27) (Clayton letter to DOE (PX 47)) (references generation rate and backlog); DX 5.081 at 8 (ADM002.0625) (Beckham letter to

---

[16] As described above, several commenters, including these plaintiffs, requested a rate that was tied to the SNF generation rate and to working off the backlog. See, e.g., DX 5.063 at 5 (ARC0010537), DX 5.013 (ARC0010169), DX 5.017 at 5 (ARC0010216), DX 5.0028 at 8 (ARC0010281), DX 5.033 at 1 (ARC0010316), DX 5.066 (ARC0010568), DX 5.081 at 8 (ARC0010680).

DOE (PX 46)) (same). Plaintiffs' failure to request such a term, at the time of contract formation, belies their contention that such a term should be judicially imposed today. Clearly, in 1983, the plaintiffs did not believe such a provision was required; otherwise, they surely would have requested it.

The plaintiffs' failure to request the term that they now ask this Court to impose is significant, since the qualitative test actually requested by the plaintiffs during contracting fundamentally is different from the two-part obligation that the plaintiffs seek to impose upon DOE in this litigation. As an example, assuming the current generation rate of 2,000 MTUs, a rate of 2,100 MTUs per year would satisfy the qualitative test referenced by several utilities in the Administrative Record that is tied to the generation rate and backlog. However, as demonstrated at trial, the far higher steady-state rate of 3,000 MTUs, with a fast ramp-up, fails to satisfy the two-part obligation tied to at-reactor storage and timely decommissioning. Notwithstanding DOE's rejection of any qualitative two-part obligation tied to the rate of acceptance, this Court should not impose upon DOE a qualitative two-part obligation that the plaintiffs – and every other commenter – failed to request during contract formation.

The only "evidence" to which the plaintiffs have cited as indicative of DOE's alleged agreement to obligate itself to meet a qualitative standard for rate hinges upon the second recital of the Standard Contract, which provides as follows:

> Whereas, the DOE has the responsibility, following commencement of operation of a repository, to take title to the spent nuclear fuel or high-level radioactive waste involved as expeditiously as practicable upon the request of the generator or owner of such waste or spent nuclear fuel.

DX 1, 2, 3 and 4; see Pl. Br. 26. At trial, Mr. Hunt – plaintiffs' only contract formation witness – acknowledged that the language concerning at-reactor storage and timely decommissioning does not appear either in the Standard Contract or the NWPA, yet he pointed to this clause as support for DOE's alleged performance obligation. Tr. 464:14-466:24, 563:2-11 (Hunt). Plaintiffs assert that, because they requested that this language be included in conjunction with the request for the inclusion of a qualitative measurement of performance tied to the generation rate and a reduction of the backlog, the inclusion of "as expeditiously as possible" language evidences a meeting of the minds regarding this obligation. Pl. Br. 24-25 (referring to DX 5.028 and 5.081 (comments of APC and GPC upon proposed Standard Contract)). As a matter of fact and law, this recital does not support the two-part obligation that the plaintiffs advocate here and cannot be read to impose a requirement upon DOE to perform at an acceptance rate that would meet the proposed two-part obligation.

As a matter of law, plaintiffs' reliance upon a "Whereas clause" is misplaced. This Court has found that, while "recitals may be read in conjunction with the operative portions of a contract in order to ascertain the intention of the parties[,] . . . they cannot create any right beyond those arising from the operative terms of the document." Blackstone Consulting Inc. v. United States, 65 Fed. Cl. 463, 470 (2005) (quoting KMS Fusion, Inc. v. United States, 36 Fed. Cl. 68, 77 (1996), aff'd 108 F.3d 1393 (Fed. Cir. 1997), & Grynberg v. Federal Energy Regulatory Comm'n, 71 F.3d 413, 416 (D.C. Cir. 1995)). The recital in the Standard Contract, without more, does not evidence a meeting of the minds regarding the requirement to accept at a rate that would preclude the need to add storage capacity after 1998 or to allow

decommissioning within five years of shutdown. It also does not support the conclusion that DOE was obligated to perform at annual acceptance rate of 3,000 MTU.[17]

As a matter of fact, plaintiffs' attempt to impose a performance obligation upon DOE through the "Whereas" clause likewise fails. First, the plaintiffs never explained at trial how, through the inclusion of the "Whereas" clause, DOE obligated itself to a two-part obligation that had not even been proposed by the utilities at the time of contract formation. Second, the language "as expeditiously as practicable" does not rise to the level of the objective or qualitative two-part obligation that plaintiffs seek to impose upon DOE in this litigation or, even, the test tied to the generation rate and backlog plaintiffs requested at the time of contracting. The language "as expeditiously as practicable" is not amenable to any objective measure of performance. "As expeditiously as practicable" means "as quickly as possible" in the circumstances, and nothing more. Third, the inclusion of the recital in the Standard Contract was not the victory for the utilities that the plaintiffs suggest. That language was not invented by the utilities; rather, it appears in the text of the NWPA and its inclusion is consistent with the NWPA. Tr. 562:21-22 (Hunt); see 42 U.S.C. § 10222(a)(5)(A). Fourth, and importantly, the recital conditions the "as expeditiously as practicable" language upon the commencement of operation of a repository. Since the D.C. Circuit has held that acceptance at a repository was not a required element of performance by 1998, Indiana Michigan Power Co. v. Department of

---

[17] Plaintiffs' assertion that the phrase "as expeditiously as practicable" obligates DOE to accept SNF under a particular, measurable standard is disingenuous. In addition to this request – which, incidentally, appears in the NWPA , 42 U.S.C. § 10222(a)(5)(A) – the plaintiffs requested express language in the contract reflecting a qualitative obligation tied to the generation rate and backlog of SNF. If the language "as expeditiously as practicable" was sufficient to obligate DOE, plaintiffs have failed to explain why they requested, during contract formation, the inclusion of the additional, qualitative language.

Energy, 88 F.3d 1272, 1276 (D.C. Cir. 1996), the conditioned recital, as a matter of fact, is unavailing. Given that DOE was not obligated to have a repository available by January 31, 1998, the plaintiffs cannot rely upon the language of the "Whereas" clause to establish an obligation to accept SNF "as expeditiously as possible" beginning in 1998. The plaintiffs simply have failed to establish that DOE obligated itself to meet any two-part test, and, in particular, that DOE obligated itself to a two-part test that did not exist at the time of contract formation.

B. Plaintiffs Cannot Rely Upon Program Planning Documents To Establish The Government's Obligation To Accept SNF At An Annual Rate Of 3,000 MTU

1. As A Factual Matter, The Documents Upon Which The Plaintiffs Rely To Demonstrate DOE's Intent To Accept SNF At A 3,000 MTU Rate Relate To Acceptance At A Repository

Since they are unable to demonstrate that the Standard Contract requires that DOE accept at a 3,000 MTU[18] rate that is tied to a qualitative standard, plaintiffs assert that the 3,000 MTU rate somehow is mandatory because it has appeared in numerous DOE planning documents. See, e.g., Pl. Br. 30-34. However, the documents upon which plaintiffs rely to evidence DOE's eventual "intent" annually to accept 3,000 MTUs of SNF generally depend upon the existence of an operational repository. Yet, the Standard Contract does not require DOE to begin SNF acceptance at a repository. To the contrary, the language of the Standard Contract explicitly contemplates that DOE may accept SNF either at a repository or at "such other facility(ies) to which [SNF] and/or [HLW] may be shipped by DOE prior to its transportation to a disposal facility." 10 C.F.R. § 961.11, Art. I.10. In fact, between the proposed rule and the final rule, the

---

[18] As will be discussed below, the 3,000 MTU rate advocated by the plaintiffs is a "breach rate" under the qualitative two-part obligation that the plaintiffs seek to impose upon DOE in this litigation.

definition of the type of "facility" to which DOE could deliver SNF was expanded expressly to state, "in accordance with the [NWPA], that there may be an interim storage facility (or facilities) which DOE may utilize prior to emplacement in a repository." 48 Fed. Reg. 16590, 16591 (Apr. 18, 1983). Pursuant to the rationale of the United States Court of Appeals for the District of Columbia Circuit in Indiana Michigan Power Co. v. Department of Energy, 88 F.3d 1272 (D.C. Cir. 1996), DOE was not obligated to have an operational repository by January 31, 1998, precluding any argument that DOE was somehow obligated to accept SNF at rates that it had anticipated for SNF acceptance at a repository. Because DOE was entitled to accept SNF at a facility other than a repository, plaintiffs' reliance upon planning documents relating to SNF acceptance at a repository is meaningless.

Moreover, the planning documents upon which plaintiffs rely uniformly and expressly indicate that they are "not contractually binding," that they do not establish acceptance rates that create mandatory obligations, and that they were only for planning purposes. See, e.g., DX 44 at HQR0031133 (in 1985 Mission Plan, DOE expressly represented that "[i]t should be emphasized that this schedule is only an approximation of how the system may operate and is subject to considerable variation," that "DOE will further define and specify the system acceptance parameters as the program progresses," and that "[i]n 1991, the DOE will begin to publish firm waste-acceptance schedules for individual reactors, including shipment allocations."). Each Annual Capacity Report issued between 1987 and 1990 expressly advised contract holders that, in 1991, but not before, DOE would begin publishing firm individual utility acceptance schedules in accordance with the contracts, including shipment allocations. Although plaintiffs appear to rely in part upon the 1985 Mission Plan and its drafts to establish DOE's "intent" to

accept SNF at a 3,000 annual rate, several commenters, prior to the promulgation of the final Standard Contract, had requested that DOE add a contract provision obligating itself to accept SNF at whatever rates were identified in the Mission Plan. See DX 5.043, Attachment 1 at 1 (ARC0010439). However, as previously discussed, DOE intentionally declined to create any such obligation.[19]

The Mission Plan, and other documents, also do not reflect the rate or the program advocated by the plaintiffs here. In the early to mid-1980s, DOE was projecting significantly higher annual discharge rates than ultimately were realized. As a result, the DOE program documents envisioned a two repository system, with the potential for an operational MRS, that ultimately would accept in excess of 6,000 MTUs per year. Tr. 1748:5-1750:4 (Kouts); Tr. 607:16-609:2 (Hunt). Based upon the projections of discharges at that time, and under the two repository scheme, it would have taken six years for DOE simply to meet the generation rate and begin working off the backlog. Tr. 693:20-694:10 (Supko). Plaintiffs' reliance upon the 1983 draft Mission Plan is misplaced for several reasons. As with the other mission plans cited in plaintiffs' brief, the 1983 draft is predicated upon a two-repository system and an expected

---

[19] Importantly, the 1985 Mission Plan upon which plaintiffs rely was created pursuant to a statutory requirement for submission to Congress. 42 U.S.C. § 10221(b)(3). After DOE submitted the 1985 Mission Plan and a 1987 Mission Plan Amendment to Congress, Congress enacted the 1987 amendments to the NWPA, presumably after considering DOE's Mission Plan submissions and evaluating the state of DOE's program. As it was entitled to do, Congress significantly modified the scope of the program at that time, limiting DOE's focus for development of a repository to one site, Yucca Mountain, and establishing linkages between a Monitored Retrievable Storage ("MRS") facility and a repository. 42 U.S.C. §§ 10133, 10161-69. Plaintiffs' reliance upon documents prepared for Congress that relate to possible circumstances and scenarios that could have existed prior to congressional review of and action upon those pre-amendment planning documents does not support its argument that DOE has somehow obligated itself to accept SNF at a 3,000 MTU rate, regardless of whether a repository is available.

annual discharge rate exceeding 4,000 MTUs. The draft Mission Plan also contains the language that it is for planning purposes only. Further, and most significantly, the draft Mission Plan is a draft document that was circulated to contract holders for comment. PX 37 (letter to recipients); Tr. 463:11-464:5; 593:24-594:18 (Hunt). Ultimately, in the published Mission Plan, the language concerning “additional at-reactor storage” – upon which plaintiffs’ case is predicated – was not included by DOE.

Finally, plaintiffs rely upon various Total System Life Cycle Cost reports and Fee Adequacy studies that DOE has prepared throughout the program. Plaintiffs assert that these studies demonstrate that the utilities paid for a 3,000 MTU rate of acceptance. The plaintiffs, once again, reach this conclusion by selectively referencing the text of these documents and ignoring statements that contradict their assertions.

The purpose of the fee adequacy studies (although required by the NWPA) and total system life cycle cost analyses is solely to determine whether the fees paid into the Nuclear Waste Fund are sufficient to pay for the costs of the entire program. Contrary to plaintiffs’ assertion, these reports do not establish that the Government has charged the utilities fees based upon a 3,000 MTU acceptance rate. Instead, the acceptance rate is one of many assumptions necessary to determine the total cost of the program. The acceptance rate is used to determine the length of time that the DOE acceptance facilities will need to operate. The TSLCC reports incorporate the program assumptions, including acceptance rate, as they exist at the time that they are prepared. For example, in the early studies cited by plaintiffs, DOE planned to perform at two repositories, with a cumulative acceptance rate of 6,000, not the 3,000 MTU rate upon which plaintiffs rely. PX 27 at 11 (PNL0202528) and PX 16 at 2-4 (PNL0201505). In the later

studies cited by plaintiffs, DOE planned to perform at a repository beginning in 2010. PX 24 at 13-15 and PX 25 at 1-3. Interestingly, plaintiffs do not cite to the 1990 PETSLCC, which shows performance at an MRS at a steady-state rate of 900 MTU until a repository opens with no ramp-up to 3,000 until 2015. DX 330 at A-1 to A-3.

Significantly, whether assuming a single repository, two repositories, or an MRS followed by a repository, the underlying projections for the total cost of the program did not materially change. Likewise, the fee that the utilities have paid has not changed with changes in the program. Tr. 620:1-10 (Hunt). Indeed, the rate of acceptance is, perhaps, the least significant cost component of the program. Instead, the plaintiffs' fees are intended to pay for the facility design, licensing, and construction costs; the costs associated with transportation of SNF; the costs of ultimately emplacing that SNF into a repository; and more than 10,000 years of storage and monitoring. Tr. 353:1-354:2 (Cocherell). Plaintiffs wish to focus this Court's attention upon the first five years of acceptance and to ignore the last 10,000 when analyzing the TSLCC documents. However, these documents cannot – and should not – be parsed to support the discrete litigation theory in the manner that the plaintiffs seek here.

2. As A Legal Matter, Program Documents Expressing An Agency's Hopes And Goals Do Not Somehow Become Contract Obligations, Absent An Express Modification Of The Contract

The plaintiffs' use of select citations from DOE program documents is nothing more than cherry-picking, and they can identify no language by which DOE somehow agreed or even suggested that the acceptance rates in its planning documents were contractually binding or constituted anything other than DOE's hopes and goals for its program. In National By-Products, Inc. v. United States, 186 Ct. Cl. 546, 405 F.2d 1256 (1969), the Court of Claims

recognized that, "[b]efore a representation can be contractually binding, it must be in the form of a promise or undertaking . . . and not a mere statement of intention, opinion, or prediction." Id. at 558-59, 405 F.2d at 1263. In a dispute involving whether the Government had contractually agreed that it would build a right-bank levee, the Court in National By-Products determined that, although the Government's representative had represented during contract negotiations "that in its then view the right-bank dike would eventually come into being," such "a representation, without more, would not indicate the Government's commitment to build it, or its guarantee that it would be built." Id. at 570-71, 405 F.2d at 1270. "Rather, the representation would simply mirror the Government's current belief, opinion or prediction, even its fervent hope that this would occur," which could not constitute a contractual obligation upon the Government's part. Id. at 571, 405 F.2d at 1270; see id. at 570, 575, 405 F.2d at 1269, 1272 ("we attribute the Corps' activity in later acting as a catalyst for local action to provide right-bank protection to its public-minded concern with the problem . . . and not to any feeling of *contractual* liability" (italics in original)); see Commercial Metals Co. v. United States, 176 Ct. Cl. 343, 349 (1966) ("the Railroad's historical practice – which has not been incorporated in any written pronouncement for the information of the public – could not modify the plain language of the sales contract between the plaintiff and the Railroad . . . ."); Branhill Realty Co. v. Montgomery Ward & Co., 60 F.2d 922, 923 (2d Cir. 1932) (although parties discussed lessee's use of leased premises as chain store, lessee "did not bind itself so to do" in the contract, so that lessee "might, at its option, use them either for a chain store or for any lawful purpose"). Because DOE has never obligated itself to satisfy a 3,000 MTU acceptance rate, the Court cannot incorporate such a requirement into the Standard Contract.

Finally, the plaintiffs contend that the "900 MTU rate accomplishes none of the requirements that the parties to the Contracts understood to be the obligation of the Government." Pl. Br. 107. This contention is astounding given the fundamental "requirement" of the NWPA and the Standard Contract: namely, that DOE begin accepting SNF by January 31, 1998. As of 1987 and, certainly, no later than 1989, the only manner in which DOE would have been able to fulfill its commencement date requirement that, unlike the alleged obligations advanced by the plaintiffs here, actually are expressly included in the Standard Contract and NWPA would have been to commence acceptance and temporary disposal at an MRS. Had the Government begun acceptance under the 900 MTU rate in January 1998, the primary and express requirement of beginning SNF acceptance would have been fulfilled, leaving plaintiffs, such as these, to decide whether to commence litigation to argue that the rate constituted a breach of obligations not articulated either in the Standard Contract or the NWPA. In fact, the Federal Circuit, in Indiana Michigan, tied the plaintiff's obligation to mitigate to the time period in which DOE affirmatively stated that performance beginning in 1998 was not possible. The Indiana Michigan Court did not select 1987, 1989, or even 1991, as dates by which the utilities' duty to mitigate commenced, although, in each of these years, DOE stated that performance by 1998 was possible at an MRS with a 10,000 MTU aggregate limit.

### C. Plaintiffs' Argument That The NWPA And The Standard Contract Require DOE Meet A Qualitative Two-Part Obligation Fails To Account For The Significant Changes In The Industry Over The Course Of The DOE Program

Plaintiffs' alleged requirements concerning the rate and schedule of SNF acceptance would impose upon DOE a indefinite and ever-changing performance obligation. Under plaintiffs' theory, DOE has a fixed obligation to accept SNF at a 3,000 MTU rate of acceptance

that allegedly is tied to a two-part qualitative test. However, utilities are entitled to make operating and management decisions that radically change the amount of SNF generated and, necessarily, result in fluid performance requirements for DOE. Simply put, plaintiffs would require that DOE develop, design and operate a program assuming a moving target of "at-reactor storage" and "timely decommissioning" driven solely by the temporal operating decisions of the utilities.

In fact, the uncertainty concerning utility operating and management decision by 1998 is precisely why DOE could not commit to a two-part obligation or particular rate of SNF acceptance. Mr. Morgan explained that the reason that DOE expressly rejected the inclusion of a specific acceptance rate into the Standard Contract was because, based upon "the uncertainties and the optimistic schedule that we were looking at, we felt it was inappropriate to commit to a rate at this time in the contract." Def. Counter-Designation of R. Morgan, at Tr. 57:20-23, Tr. 203:16-19 (3/21-22/02). At trial, Mr. Pollog discussed these uncertainties, as well as the dramatic changes in the industry concerning SNF discharges from 1983 through 1998. For example, when the Standard Contract was signed in 1983, DOE projected 140,000 MTUs of SNF generated in the history of nuclear power. Tr. 1892:5-8 (Pollog). However, by the early 1990s, as a result of nuclear power plant shutdowns, the amount of SNF DOE projected dropped to 83,000 MTUs. Tr. 1892:8-11 (Pollog). Currently, as a result of license extensions, DOE projects that 130,000 MTUs of SNF will be generated. Tr. 1892:12-25 (Pollog). Yet, under the plaintiffs' theory, regardless of the generation rate, DOE was statutorily and contractually obligated to accept SNF at such a rate that precludes additional at-reactor storage after 1998,

reduces the backlog of SNF and allows for decommissioning of reactors within five years of shutdown.[20]

Further, the annual discharge rate has dropped by one-third since 1983. In 1983, the projected annual discharge rate for SNF was approximately 3,000 MTUs. Tr. 1893:3-6 (Pollog). Today, the annual discharge rate is approximately 2,000 MTU. Tr. 1893:7-10 (Pollog). The reason for this significant decrease in the SNF generation rate is that utilities are burning the fuel that they have in their reactors for a longer period of time than they had previously, in an attempt to get more energy out of the fuel. Tr. 1893:11-19 (Pollog). Of course, had the annual discharge rate remained at 3,000 MTUs, as projected in the 1980s, a 3,000 MTU annual rate of acceptance would not have come close to meeting plaintiffs' asserted two-part obligation (in fact, it would not even meet the obligation that they actually requested during the development of the contract terms, that DOE accept SNF at a rate equal to the generation rate and that works off the backlog).

In addition, other industry factors have changed – in many cases significantly – over the course of the DOE SNF acceptance program. Significantly, Mr. Pollog explained that the decisions that utilities have made could affect the accuracy of DOE's projections concerning the size of the SNF acceptance program. Tr. 1887:12-14 (Pollog). For example, Mr. Pollog explained that, in the early 1980s, three nuclear power plants had shut down prematurely. Tr.

---

[20] As discussed in more detail below, the plaintiffs' own expert, Eileen Supko, assumed a DOE program that accepts 90,000 MTUs over the course of the program, resulting in 690 MTUs of additional at-reactor storage after 1998 and nine years of average post shut-down storage time. Tr. 845:14-21 (Supko). Yet, had DOE's original projections (made at the time of contract formation) been realized, a 3,000 MTU rate would have resulted in significantly more at-reactor storage after 1998 and an even longer average post-shutdown time.

1889:12-17 (Pollog); Pollog Dem. 1. However, since then, 11 additional nuclear power plants have shut down prematurely. Tr. 1889:12-17 (Pollog); Pollog Dem 1. Of course, under the plaintiffs' purported test, DOE was contractually obligated to accept all of the SNF from these shutdown reactors in the first year, despite the oldest-fuel-first provision in the Standard Contract, to facilitate "timely" decommissioning within five years of the utility's shutdown.

Another significant change over the course of the DOE program is the number of licenses extensions sought by commercial nuclear utilities. In the early 1980s, license extensions were not even a consideration. Tr.1889:18-25 (Pollog); Pollog Dem. 1. However, today, 49 utilities have either sought or received a license extension, resulting in 20 more years of SNF generation for these utilities. Tr.1889:22-25; Tr.1891:6-8 (Pollog); Pollog Dem. 1. As more utilities obtain license extensions, the amount of SNF that utilities ultimately will generate increases. Again, plaintiffs' theory ties DOE's present and future obligations to the actions and decisions of utilities that significantly affect the amount of SNF that ultimately will be generated.

Further, in the early 1980s, capacity factors, which represent the efficiency of a nuclear power plant, averaged approximately 50-to-60 percent. Tr.1888:12-21 (Pollog); Pollog Dem. 1. However, today, the average capacity factors are at 90 percent. Tr.1888:12-21 (Pollog); Pollog Dem. 1. Similarly, the amount of enrichment, which is the amount of uranium-235 present in nuclear fuel, was 2.5 percent in the early 1980s, whereas today it has almost doubled to 4-to-5 percent. Tr.1881:17-21; 1888:22-1889:3 (Pollog); Pollog Dem. 1. Mr. Pollog also explained that, although in the early 1980s, the amount of burn-up, which is a measurement of the how much energy a fuel has produced over a period of time, was approximately 30,000-megawatt days per MTU, today that number is closer to 50,000-megawatt days per MTU. Tr.1881:22-

1882:4; 1889:6-11 (Pollog). In other words, utilities are becoming more efficient and, consequently, producing more SNF than anticipated at the time of contract formation in 1983.

Finally, in a September 24, 1993 letter from Mr. Cocherell to Mike Alissi of EEI, that addressed the allocation of MPCs upon an OFF or NEED basis, Mr. Cocherell noted:

> We have, however, concluded that verifying the true extent of storage needs of NEED utilities will be formidable. The definition of need will vary from utility to utility. Therefore, we see little option to the OFF priority allocation scheme for multipurpose containers.

DX 127 at SN029392. Based upon the effect of industry decisions upon DOE's alleged obligations – as well as the fact that utilities may have different ideas concerning the manner in which to measure DOE's performance – it is illogical to impose upon DOE a contractual obligation that is tied to a two-part requirement under which performance can change based upon utility-specific opinions and operating decisions.

D. The 3,000 MTU Rate Of Acceptance That The Plaintiffs Advocate Does Not Satisfy The Two-Part, Qualitative Obligation Upon Which The Plaintiffs Rely To Justify That Rate

As set forth above, the plaintiffs bear the burden of establishing a plausible "but for world" as part of their causation analysis. Bluebonnet Sav. Bank, FSB v. United States, 67 Fed. Cl. 231, 238-39 (2005). The "but for" world is significant because "[t]o derive the proper amount for the damages award the costs resulting from the breach must be reduced by the costs, if any that the plaintiffs would have experienced absent a breach." Bluebonnet Sav. Bank, 339 F.3d at 1345 (emphasis added). The "but for" world that the plaintiffs attempted to establish at trial fatally is flawed.

Plaintiffs assert that, "[h]ad DOE performed that the 3,000 MTU acceptance rate . . . it would have accomplished the dual purposes of the NWPA and the Contracts, eliminating the need for additional storage plus removing the backlog of SNF in time to avoid impact on timely decomissioning." Pl. Br. 120. Plaintiffs' statement is contradicted by the evidence, including the testimony of Ms. Supko, one of plaintiffs' expert witnesses. Indeed, if this Court were to agree that the plaintiffs' proposed two-part test is a contractual obligation of DOE, it could not use that test to justify reliance upon the 3,000 MTU steady-state rate of acceptance in plaintiffs' "but for" world.

As discussed in detail below, had DOE performed beginning in 1998 using a 3,000 MTU rate of acceptance, numerous operating utilities would still have been obligated to construct additional at-reactor storage – an express breach of the alleged two-part obligation under the Standard Contract that the plaintiffs are promoting.[21] Indeed, the plaintiffs acknowledged this reality in a 1988 memorandum from Mr. Hunt to Charles Head of OCRWM. In that memorandum, Mr. Hunt wrote that "[b]oth APC and GPC realize that other utilities may be physically unable to expand their spent fuel capacity and could require alternative means such as

[21] Plaintiffs' brief internally is inconsistent. Plaintiffs assert that the 3,000 MTU rate would have satisfied the two-part qualitative obligation that they have requested. Pl. Br. 126. However, they also state that the 3,000 MTU rate "essentially" eliminated the need for additional storage. Pl. Br. 130. Of course, "essentially eliminate" does not equal "would eliminate." Moreover, plaintiffs creatively change the language that they use in discussing their two-part obligation to fit their litigation argument. For example, in response to this Court's question, "[W]hat rate of acceptance by DOE would have been necessary to avoid additional on-site storage at APC or GPC," the plaintiffs respond that the 3,000 MTU rate "would have avoided the need for additional dry storage facilities." Pl. Br. 125 (emphasis added). In response to those types of questions, and despite the clear feelings of plaintiffs' personnel that the rack additions at plant Hatch after 1998 constituted a breach of contract, the plaintiffs subtly qualify their responses to achieve the intended result: that is, the imposition of a rate of acceptance that does not fulfill the asserted two-part contractual obligation.

dry cask storage even if DOE could provide storage beginning in 1998." DX 75 at SN120964. Consistent with that memorandum, the plaintiffs' damages claim assumes that, in the"but for" world, and assuming DOE performance under their proposed rate of acceptance, plant Hatch would have added capacity in its wet pool after 1998. Plaintiffs' only contract formation witness, Mr. Hunt, testified at trial that he believed that the at-reactor storage added in the plant Hatch wet pool (the costs of which were assumed to have been incurred in the "but for" world in plaintiffs' claim) – and for which the Government is not being charged – constituted a breach of DOE's performance obligations and should have been unnecessary in the "but for" world. Tr. 630:14-631:6 (Hunt).

Shutdown utilities likewise would not be able to decommission within five years of shutdown. Instead, the average time SNF would remain on-site after shutdown in the plaintiffs' alleged "but for" world would have been nine years (with many prematurely shutdown reactors having SNF on-site for even longer periods of time). Tr. 827:22-828:11, 836:19-837:14 (Supko). While the plaintiffs' attorneys and experts – for the purposes of this litigation – have stated a willingness to accept additional at-reactor storage obligations in their "but for" world, this Court should be cautious in implementing a qualitative standard and rate in the "but for" world that, for many utilities, would constitute a material breach of that alleged contractual obligation. In short, plaintiffs' theory of DOE's contractual obligation and rate are inconsistent with a "but for" or non-breach world. As a result, plaintiffs have failed to establish a realistic "but for" world from which to measure their damages.

## III. THE COURT SHOULD REJECT EILEEN SUPKO'S OPINIONS CONCERNING THE "REASONABLENESS" OF A PARTICULAR RATE OF ACCEPTANCE

### A. Ms. Supko's Opinions

In support of their contention that a 3,000 MTU rate of acceptance is required under both the Nuclear Waste Policy Act and the Standard Contract, the plaintiffs presented at trial the testimony of Eileen Supko, an admitted advocate for the nuclear industry. Tr.787:22-788:3 (Supko).[22] Ms. Supko offered two opinions in this case. First, Ms. Supko opined that a 3,000 MTU steady-state rate of acceptance was "reasonable" because it would meet the requirements of the Standard Contract, "as they were described to [her] by counsel." Tr.658:23-659:1 (Supko).

Ms. Supko testified that her methodology consisted of reviewing various program documents that DOE had published over the years and "performing an analysis using my model of a range of acceptance rates that I found in historical documents using my SPNTFUEL Model." Tr.660:1-13 (Supko).[23] In determining the "reasonableness" of a particular rate of acceptance, Ms. Supko explained that she measured different rates of acceptance based upon how they compared to three different criteria: "the amount of additional spent nuclear fuel storage that would be required after 1998," the "number of years of post shut down spent nuclear fuel storage that would be required," and "the extent to which the steady state acceptance capacity . . . would be fully utilized over the life of the program. Tr. 677:14-678:6 (Supko)

---

[22] Ms. Supko claimed at trial that "all the nuclear operating companies in this country are clients of my company." Tr. 825:9-10 (Supko)

[23] Ms. Supko did not create the SPNTFUEL computer model that she used in this case to determine APC's and GPC's acceptance rights. Tr. 740:4-5 (Supko).

(hereinafter referred to as plaintiffs' "primary requirements"). Ms. Supko modeled four different rate "scenarios," including a 3,000 MTU steady-state rate (Scenario 1), a 900 MTU steady-state rate (Scenario 2), a 900 MTU rate of acceptance that ramped up to 3,000 MTU by 2015 (Scenario 3), and a 6,000 MTU steady-state rate of acceptance (Scenario 4). Tr. 673:13-677:13 (Supko). Ms. Supko ultimately opined that a 3,000 MTU steady-state rate of acceptance, after a brief ramp-up, constitutes a "reasonable" rate of acceptance because it would have satisfied the criteria that "were provided by counsel." Tr. 694:16-21 (Supko).

Second, Ms. Supko calculated APC's and GPC's acceptance rights under a 3,000 MTU rate of SNF acceptance. Tr. 659:1-4 (Supko). With respect to the methodology that she used to reach this second opinion, Ms. Supko used DOE's historical discharges through 2002 contained in certain DOE forms called "RW-859s," and then reviewed future projected discharges that the plaintiffs provided to Ms. Supko in connection with this case. Tr. 660:14-661:2 (Supko)

As discussed below, Ms. Supko's opinions are not relevant to any issue in this case, are not based upon a reliable or testable methodology, and conflict with the plaintiffs' theory of DOE's contractual obligations under the Standard Contract.[24]

[24] Notably, the Court in Indiana Michigan Power Co. v. United States, 60 Fed. Cl. 639 (2004), aff'd, 422 F.3d 1369 (Fed. Cir. 2005), rejected Ms. Supko's opinions concerning a prediction as to when DOE would open a repository, concluding that "[s]he did not present a 'methodology' that could be used by experts in such a field." Id. at 647. Similarly, in Sacramento Municipal Utility District v. United States, 70 Fed. Cl. 332 (2006), Ms. Supko offered the same opinion concerning the "reasonableness" of the 3,000 MTU rate of acceptance that she offered in this case. The Court did not qualify Ms. Supko as an expert and, instead, concluded that "the evidence presented on the acceptance rate under the terms of the Standard Contract [is] highly speculative, therefore, the court declines to make any determination of the acceptance rate based on this record." SMUD, 70 Fed. Cl. at 375 n.40.

B. The Court Should Reject Ms. Supko's Opinions Because They Are Neither Relevant Nor Reliable

1. Ms. Supko's Opinions Are Not Relevant To Any Issue In This Case

The Federal Circuit has explained that, under the Supreme Court's decision in Daubert v. Merrill Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), the Court has an obligation to screen expert testimony for both relevance and reliability. Seaboard Lumber Co. v. United States, 308 F.3d 1283, 1301 (Fed. Cir. 2002). The standard articulated by the Supreme Court in Daubert must be met even in non-jury cases such as this one. Seaboard Lumber Co., 308 F.3d at 1302. The burden of demonstrating Ms. Supko's satisfaction of the Daubert standards lies squarely upon the plaintiffs. Daubert, 509 U.S. at 592 n.10 (citation omitted); Rink v. Cheminova, Inc., 400 F.3d 1286, 1292 (11th Cir. 2005). As discussed below, the plaintiffs have failed to meets their burden of demonstrating that Ms. Supko's expert testimony meets the Daubert standards.

With respect to the first prong of the Daubert inquiry, Ms. Supko's testimony is not relevant to any issue in this case. Under Federal Rule of Evidence 702, as well as Daubert and its progeny, the Court may only admit expert testimony that is relevant to determine a fact in issue. Rink, 400 F.3d at 1291; see Needleman v. John Hancock Life Ins. Co., No. 03-1955, 2006 WL 842370, at *10 (N.D. Tex. Mar. 31, 2006) (holding that expert testimony was not relevant to resolution of issues in case).

As discussed above, the sole issue before the Court concerning the determination of the appropriate rate of SNF acceptance is to identify what the Standard Contract requires. Ms. Supko concedes that she is not offering any opinions concerning this central issue. Tr. 788:14-17, Tr. 788:18-21, Tr. 790:12-791:2 (Supko) (admitting that she is not offering an opinion as to

what rate of acceptance is required by the Standard Contract or the NWPA). Indeed, Ms. Supko admits that a 3,000 MTU rate of acceptance is not contained in either the Standard Contract or the NWPA. Tr. 788:22-25 (Supko). Ms. Supko also had no involvement in the formation of the Standard Contract or the NWPA. Tr. 789:5-7, 791:3-5 (Supko).

Ms. Supko is not offering an opinion regarding the intent of DOE's spent fuel program or how DOE would have performed in the "but for" world. Tr.790:1-3; Tr.791:24-792:3 (Supko). In fact, Ms. Supko is not offering an opinion in this case that DOE would have performed at a 3,000 MTU steady-state rate of acceptance in the "but for" world. Tr.792:4-8 (Supko). Further, Ms. Supko is not offering an opinion that DOE had to satisfy the "primary requirements" identified by counsel for Southern Nuclear in the "but for" world. Tr.793:6-9 (Supko).[25] Simply put, Ms. Supko is offering an opinion as to what she believes is "reasonable," without reference to the Government's contractual obligations. Because Ms. Supko's opinion fails to address any issue in this case, Ms. Supko's opinions are of no assistance to the Court in determining what the Government's contractual obligations are concerning the rate and schedule of acceptance of SNF from commercial nuclear utilities. Consequently, Ms. Supko's opinions fail to satisfy the first part of the Daubert test.

2. Ms. Supko's Opinions Should Be Afforded Little, If Any, Weight Because They Are Not Reliable

Because Ms. Supko has not employed any scientific or readily testable methodology in determining what would be a "reasonable" rate of acceptance under the Standard Contract, her

[25] Ms. Supko admitted that the NWPA does not contain any reference to the two "primary requirements" against which counsel for Southern Nuclear asked her to model various acceptance rates. Tr. 791:14-19 (Supko).

opinions lack any indicia of reliability. Possessing requisite credentials is insufficient to render expert testimony admissible. See Kumho Tire Co. v. Carmichael, 526 U.S. 137, 153 (1999) (affirming trial court's exclusion of expert and noting that, despite the trial court's acceptance of expert's qualifications, the expert lacked a reliable methodology); Fuesting v. Zimmer, Inc., 421 F.3d 528, 535 (7th Cir. 2005). Rather, the Federal Circuit has explained that the trial court must ensure that the expert testimony is reliable. Microstrategy Inc. v. Business Objects, S.A., 429 F.3d 1344, 1355 (Fed. Cir. 2005) (affirming trial court's exclusion of expert witness that used flawed methodology in reaching conclusions). Consequently, to accept Ms. Supko's opinion in this case, the Court must first determine whether Ms. Supko's opinions are reliable.

The Court in Daubert set forth the following, non-exclusive list of factors for lower courts to consider to determine whether an expert's opinion is reliable: (1) whether the scientific theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the theory's known or potential rate of error when applied; and (4) whether the theory has been "generally accepted" in the scientific community. Daubert, 509 U.S. at 593-94. At bottom, "[a]n expert must offer good reason to think that his approach produces an accurate estimate using professional methods, and this estimate must be testable. Someone else using the same data and methods must be able to replicate the result." Zenith Electronics Corp. v. WH-TV Broadcasting Corp., 395 F.3d 416, 419 (7th Cir.), cert. denied, 125 S. Ct. 2978 (2005). Ms. Supko's opinions fail to satisfy any of these criteria.

First, Ms. Supko's methodology concerning the "reasonableness" of a rate of acceptance is simply a determination of whether a particular rate of acceptance satisfies the two "primary requirements" identified by counsel, Tr.737:10-13 (Supko), and, consequently, is not subject to

any type of scientific testing. Whether any particular rate of acceptance is "reasonable" is a subjective judgement call made by Ms. Supko. It is not possible to test such a theory, because it is not science.[26] Indeed, Ms. Supko essentially conceded as much at trial. Although Ms. Supko utilizes the annual discharge rate as a benchmark for determining the reasonableness of the amount of additional at-reactor storage after 1998, Ms. Supko has not endeavored to determine how far above that annual discharge rate the amount of additional at-reactor storage number could be and still be deemed reasonable. Tr.808:15-24 (Supko). Any such determination would necessarily be based upon nothing more than a subjective judgment incapable of scientific testing. Courts have not hesitated to exclude proposed expert testimony based upon subjective judgments or "intuition" such as the testimony offered by Ms. Supko in this case. See Zenith Electronics, 395 F.3d at 418-19 (affirming exclusion of expert economist that based conclusions solely upon "expertise" without an articulation of testable methodology); Brown v. Wal-Mart Stores, Inc., 402 F. Supp. 2d 303, 309 (D. Maine 2005) (rejecting expert opinion that "merely places an expert sheen on common sense," without employing any testable methodology).

Second, Ms. Supko acknowledged at trial that she has never subjected her methodology concerning the reasonableness of a particular rate of acceptance to peer review. Tr.735:1-736:8 (Supko). Although publication, which is an element of peer review, is not a "sin qua non of admissibility," it may suggest "good science." Oddi v. Ford Motor Co., 234 F.3d 136, 145 (3d Cir. 2000); see Zaremba v. General Motors Corp., 360 F.3d 355, 358 (2d Cir. 2004) (affirming

[26] Indeed, Ms. Supko admitted at trial that, were the Court to reject the two "primary requirements" upon which she modeled various acceptance rates, she would need to utilize new assumptions against which to measure various rates. Tr.739:5-9 (Supko). However, Ms. Supko was unable to identify any alternative evaluative criteria that could be used to evaluate the "reasonableness" of various DOE acceptance rates. Tr.739:10-21 (Supko).

trial court's exclusion of expert where expert had not subjected methodology to peer review or publication); Fuesting, 421 F.3d at 537 (affirming trial court's exclusion of expert witness based, in part, upon lack of peer review of opinion or methodology offered by expert). The lack of peer review or publication highlights the fact that Ms. Supko's opinion concerning the "reasonableness" of a particular rate of acceptance is nothing more than a subjective judgment that is incapable of testing.

Third, counsel for the plaintiffs propounded no testimony that Ms. Supko's methodology is one that is "generally accepted" in the relevant scientific community. "Widespread acceptance can be an important factor in ruling particular evidence admissible, and a known technique which has been able to attract only minimal support with the community may properly be viewed with skepticism." Oddi, 234 F.3d at 145 (quoting Daubert, 509 U.S. at 594); see Zaremba, 360 F.3d at 358 (affirming trial court's exclusion of expert where party tendering expert failed to demonstrate that expert's opinion or methodology was generally accepted). In this case, the plaintiffs, which bear the burden of proof, adduced absolutely no evidence that Ms. Supko's methodology in determining the "reasonableness" of a particular rate of acceptance possesses widespread acceptance in the relevant community.

Finally, and perhaps most significantly, with respect to the rate of error in Ms. Supko's methodology, Ms. Supko, as she conceded at trial, has continuously revised her analysis based upon previous significant errors in her model. Although Ms. Supko has, to date, authored expert reports on behalf of 10 plaintiffs in spent nuclear fuel cases, Tr.742:22-24 (Supko), the numbers, or outputs, from Ms. Supko's model in each of these reports have changed – and, in many instances, changed significantly. These changes, which were made after recognition that her

model was producing flawed results, call into question the reliability of her overall conclusions in this case.

For example, although Ms. Supko has offered the same opinion concerning the reasonableness of a 3,000 MTU steady-state rate in virtually every report that she has authored to date, the amount of additional at-reactor storage that she calculates has changed dramatically over the course of her reports. Tr.743:1-744:6 (Supko). For example, in Ms. Supko's expert report in Commonwealth Edison Co. v. United States, No. 98-621C (Fed. Cl.), Ms. Supko concluded that there would be 1,600 MTUs of additional at-reactor storage under a 3,000 MTU steady-state rate. Tr.744:14-19 (Supko). In Ms. Supko's next expert report in Sacramento Municipal Utility District v. United States, 98-488C (Fed. Cl.), however, Ms. Supko concluded that there would be 600 MTUs of additional at-reactor storage under a 3,000 MTU steady-state rate. Tr.744:20-24 (Supko). Ms. Supko admitted at trial that the reason for this 1,000 MTU decrease in her calculation of additional storage requirements was her failure to consider linking a utility that had dry storage in 1998 with that utility's wet pool. Tr.744:25-745:4 (Supko).

Significantly, Ms. Supko admitted at trial that she committed an error in her calculation in this case and had underestimated the amount of additional at-reactor storage under a 3,000 MTU steady-state rate of acceptance by 430 MTUs. Tr.745:14-19 (Supko). Ms. Supko initially concluded in this case that there would be 600 MTUs of additional at-reactor storage under a 3,000 MTU steady-state rate of acceptance. However, Ms. Supko conceded that, in a report she subsequently authored for another SNF client in South Carolina Electric & Gas Co. v. United States, No. 04-101C (Fed. Cl.), she calculated 1,030 MTUs of additional at-reactor storage under a 3,000 MTU steady-state rate. Tr.745:14-19 (Supko). Ms. Supko explained at trial that the

reason that she has increased her calculation of the amount of additional at-reactor storage by 430 MTUs after the issuance of her report in this case was because she had "underestimated the requirements at the eight sites that had dry storage prior to 1998. I underestimated their requirements post-1998 because of the way that I linked things in the model." Tr.746:2-747:7 (Supko). Tellingly, and despite these drastic changes in the amount of additional at-reactor storage that Ms. Supko has calculated, Ms. Supko has never modified her opinion concerning the reasonableness of a 3,000 MTU steady-state rate of acceptance. Tr.748:21-749:4 (Supko). Indeed, Ms. Supko conceded that the numbers which she has calculated regarding additional at-reactor storage may change yet again in the future as she receives updated information from utilities which she represents as clients. Tr.756:3-9 (Supko). Yet, this tremendous variance in at-reactor storage – from a high of 1,600 MTU to a low of 600 MTU – calls into serious question the reliability of the results of Ms. Supko's analysis in this case.

### C. The Court Should Disregard Ms. Supko's Opinions Because Her Model Lacks Evidentiary Support

In determining whether a hypothetical model such as the one offered by Ms. Supko provides a sufficient basis for an award of damages, the law commands that a plaintiff establish a realistic and complete "but for" world. See Ericsson, Inc. v. Harris Corp., 352 F.3d 1369, 1379-80 (Fed. Cir. 2003) (patentee seeking lost profits for infringement must account for the effects of "hypothetically increased price" in but for world); Dolphin Tours, Inc. v. Pacifico Creative Serv., Inc., 773 F.3d 1506, 1512 (9th Cir. 1985) ("[i]n projecting free market profits, antitrust plaintiffs are not entitled to assume favorable aspects of an anticompetitive market"); Restatement (Second) of Contracts § 347(c); cf. Bluebonnet, 339 F.3d at 1345-46. Where, as here, the plaintiffs attempt to prove that they have suffered damages using a "computer [model] of the

hypothetical 'but for'" world premised upon a number of critical assumptions, the "failure to establish the reasonableness of these assumptions is fatal" to the damage claim. Southern Pac. Communications Co. v. AT&T, 556 F. Supp. 2d 825, 1076 (D.D.C. 1982); see Bluebonnet Sav. Bank, F.S.B. v. United States, 266 F.3d 1348, 1358 (Fed. Cir. 2001); LaSalle Talman Bank, F.S.B. v. United States, 45 Fed. Cl. 64, 93-95 (1999), aff'd in part, rev'd in part, 317 F.3d 1363 (Fed. Cir. 2003); Kidder, Peabody & Co. v. IAG Int'l Acceptance Group N.V., 28 F. Supp. 2d 126, 134 (S.D.N.Y. 1998). The plaintiffs' damages model may not be based upon mere speculation or hypotheticals. Home Sav. of Am. v. United States, 57 Fed. Cl. 694, 727 (2003), aff'd in part, rev'd in part, 399 F.3d 1341 (Fed. Cir. 2005) (citing Franklin Fed. Sav. Bank v. United States, 55 Fed. Cl. 108 (2003); Willems Indust., Inc. v. United States, 155 Ct. Cl. 360, 295 F.2d 822 (1961)).

This Court has repeatedly rejected expert models that lack evidentiary foundation, on the grounds that such models are improperly speculative. In Castle v. United States, 48 Fed. Cl. 187 (2000), aff'd in part, rev'd in part and remanded in part, 301 F.3d 1328 (2002), this Court rejected the expert's model because it was based upon assumptions that were contrary to facts in the record, holding that "[a] claim whose basic structural components lack such factual foundation is simply speculation." Id. at 206. Likewise, in Fifth Third Bank v. United States, 55 Fed. Cl. 223 (2003), the Court rejected plaintiff's damages model, explaining that:

> Plaintiff's model ignores the presence of competitors similarly unfettered by the breaching provisions of FIRREA. But the most outstanding flaw is the assumption that the But-for-Bank would, even if it could, engage in the same type of activities without identifying any specific investments or opportunities, and that these activities would produce the same results (discounted to be conservative) as the actual business activities in which plaintiff engaged. The court agrees with defendant that this deficiency

renders plaintiff's model speculative as a matter of fact and law.

Id. at 241; accord Southern Nat'l Corp. v. United States, 57 Fed. Cl. 294, 305 (2003); see also Glendale Fed. Bank, FSB v. United States, 43 Fed. Cl. 390, 399 (1999), aff'd in part, vacated in part, remanded on other grounds, 239 F.3d 1374 (Fed. Cir. 2001) ("The court believes that plaintiff's lost profits model suffers from serious defects, which undercut the basis for using it as a credible model for ascertaining lost profits . . . ."); Suess v. United States, 52 Fed. Cl. 221, 228 (2002) (rejecting damages model as "premised on unrealistic assumptions").

In this case, Ms. Supko's hypothetical model of the "but for" world is not based upon actual facts, but, rather, is based upon industry-wide assumptions that, in many instances, bear no relation to the but for world. For example, despite Ms. Supko's concession that the determination of a full core operating reserve is utility specific, Ms. Supko has not endeavored to apply any individual utility's operating reserve policy in her industry-wide acceptance rights model. Tr.776:7-8; Tr.778:10-14 (Supko). Rather, regardless of what an individual utility's operating reserve policy actually is, and despite the fact that Ms. Supko has endeavored to model what reasonable acceptance would have looked like in the "but for" world, Ms. Supko has simply assumed one full core reserve per pool for each utility. Tr.777:17-20 (Supko). Ms. Supko admitted that, had she increased her full core reserve assumption beyond one full core, it could potentially increase the amount of additional at-reactor storage that she has calculated. Tr.779:11-17; Tr.780:17-25 (Supko).

Another uniform assumption that Ms. Supko has made in her model is the use of license extensions. Tr.781:13-25 (Supko). Although they both purport to be both "but for" analyses, Ms. Supko has made entirely inconsistent assumptions between her industry-wide model and her

Southern Nuclear acceptance rights model. Tr.783:22-784:6 (Supko). For example, Ms. Supko has assumed that, for purposes of her industry-wide model, no utility seeks a license extension. Tr.782:18-21 (Supko). Yet, for purposes of modeling the plaintiffs' acceptance rights in this case, Ms. Supko assumes that the plaintiffs seek and obtain license extensions for their plants. Tr.782:22-25 (Supko).[27]

Had Ms. Supko assumed license extensions on an industry-wide basis, it would have had a significant effect upon her opinions in this case. Ms. Supko testified that, if she assumed license extensions in her industry-wide acceptance model, the amount of average post-shutdown storage time would decrease in Scenarios 1, 3, and 4 and would increase in Scenario 2. Tr.784:9-21 (Supko). The reason for the decrease in the average post-shutdown storage time if Ms. Supko assumed license extensions is because that would give DOE 20 more years to work off the backlog of SNF generated by utilities. Tr.785:6-10 (Supko). Ms. Supko stated that, if she had assumed license extensions in her industry-wide model, the amount of average post-shutdown storage time with respect to Scenario 3 would decrease from 16.5 years to approximately 12 or 13 years. Tr.785:1-5 (Supko). Ms. Supko also explained that, under a 3,000 MTU rate of acceptance, which she claims is "reasonable," the range of average post-shutdown storage is "approximately 12 or 14 years for operating nuclear power plants." Tr.689:25-690:2 (Supko).

Ms. Supko admitted at trial that, despite the fact that she is endeavoring to model a "but

---

[27] Ms. Supko had not endeavored to model whether, in 1998, a particular utility would have sought a license extension. Tr.782:12-17 (Supko). Indeed, Ms. Supko testified that it "would have been difficult to determine in 1998" whether a particular utility would have sought and received a license extension. Tr.782:16-17 (Supko).

for" acceptance scenario, as she represents more utilities in the SNF litigation, it is possible that she will continue to change her model to reflect those utilities' pool capacities, future projected discharges, and other utility-specific information. Tr.756:3-757:13 (Supko). This admission simply highlights the malleability inherent in her model and its lack of a relationship to the "but for" world. Consequently, the Court should reject Ms. Supko's conclusions because they fail to properly account for the "but for" world. See Guillory v. Domtar Indus. Inc., 95 F.3d 1320, 1330 (5th Cir. 1996) (limiting expert testimony because it was not "sufficiently grounded in scientific methodology or the facts as presented in the testimony of other witnesses").

D. Ms. Supko's Model Inconsistently Mixes Information From The "But For" And Actual Worlds

Although Ms. Supko is purporting to model the "but for" world, she inconsistently – and inexplicably – mixes information from the "but for" and actual worlds. First, Ms. Supko's model does not consistently assume pre-1998 pool capacity, despite the fact that she is endeavoring to model a "but-for" acceptance rate scenario. Tr.751:1-7; Tr.753:14-17 (Supko). Instead, Ms. Supko's model utilizes certain pool capacities that were modified after 1998 in determining what the additional at-reactor storage requirements would have been in a world in which DOE began acceptance in 1998. Tr.751:18-22; Tr.755:6-10 (Supko). Indeed, Ms. Supko has included both GPC's post-1998 rack addition at plant Hatch, as well as the second bathtub rack for plant Hatch in her "but for" model. Tr.751:23-752:1; Tr. 753:3-6 (Supko).[28] Similarly, Ms. Supko utilizes South Carolina Electric & Gas's 2002 rerack of its spent fuel pool in her model for purposes of modeling DOE performance beginning in 1998. Tr.751:23-752:5

[28] Ms. Supko acknowledged at trial that Plant Hatch had never installed the second bathtub rack. Tr. 753:7-9 (Supko).

(Supko). Ms. Supko admitted that she is using post-1998 pool capacity modifications for "about a dozen" plants. Tr.755:10-14 (Supko). When asked why she used post-1998 actual additional storage for purposes of determining what the "but for" world would have looked like in 1998, Ms. Supko candidly admitted that she did not "go back and try to see what the world looked like for every pool in 1998. That would have required my going back into the Nuclear Regulatory Commission's docket for every nuclear power plant and looking at license amendments." Tr.752:21-25 (Supko). Yet that is precisely the type of analytical rigor expected from an expert. Ms. Supko's failure properly to model the "but for" world simply reflects a flaw in her overall analysis and calls into question her overall opinions in this case.

In fact, Ms. Supko's inclusion of the GPC racks has a significant effect upon the results of her model in this case. Ms. Supko admitted at trial that, had she removed the second bathtub rack that was never installed at plant Hatch from her model, her model would have calculated GPC having additional storage requirements after 1998, even under the 3,000 MTU steady-state rate of acceptance. Tr.754:17-755:1 (Supko). Ms. Supko acknowledged that the amount of additional at-reactor storage which GPC would have had to add in the "but for" world under a 3,000 MTU steady-state rate would have been even larger had she removed the first additional rack at plant Hatch from her computer model. Tr.755:2-5 (Supko).[29] Simply put, Ms. Supko has no methodology in terms of her inputs concerning storage capacity and, instead, is simply

---

[29] In SMUD, No. 98-488C (Fed. Cl.), for example, Ms. Supko concluded that, under Scenario 2 (i.e., the 900 MTU steady-state rate), the amount of additional at-reactor storage would be 12,100 MTUs. Tr. 750:9-13 (Supko). Yet, in this case, Ms. Supko assumed that there would be 12,600 MTUs of additional at-reactor storage under Scenario 2. Tr. 750:14-20 (Supko). Ms. Supko explained at trial that the reason for this 500 MTU increase in at-reactor storage was that she had updated the information regarding "what Southern Nuclear believed they would have done had DOE begun acceptance in '98." Tr. 750:14-20 (Supko).

making a subjective judgment in terms of when she includes post-1998 pool capacity for her "but for" analysis, deciding when that information "is important to the analysis." Tr.757:9-13 (Supko).

Second, although Ms. Supko is endeavoring to determine what "reasonable" industry-wide acceptance would have looked like had DOE begun accepting SNF beginning in 1998, Ms. Supko is utilizing the 1998 RW-859s, which includes information submitted by utilities to DOE after January 31, 1998. Tr.762:9-14 ;Tr.763:15-18; Tr.764:7-15 (Supko). RW-859s are forms that DOE collects from commercial utilities, pursuant to the Standard Contract, that contain information from utilities such as historical discharges of SNF, the characteristics of the SNF, the initial enrichment of the SNF, and projected future discharges. Tr.1880:10-1881:16 (Pollog); 661:6-15 (Supko). Notably, utilities submitted RW-859 forms during the 1990 and 1991 time frame, which was during the time when DOE issued the 1991 Annual Capacity Report. Tr.762:19-24 (Supko). The RW-859 forms during the 1990/1991 time frame reflected cumulative projected discharges of 86,000 MTU. Tr.762:25-763:4 (Supko). Currently, the cumulative projected discharges are approximately 90,000 MTU – a difference of 4,000 MTU, or two years' worth of annual cumulative industry SNF discharges. Tr.763:5-7, Tr.830:18-22 (Supko).[30]

[30] Although damages in this case are limited to those incurred through December 1, 2004, and the plaintiffs' projected future discharges are not relevant for the purposes of establishing damages, it is notable that Ms. Supko's model treats such future projected discharges inconsistently in different cases. Tr. 764:20-23 (Supko) (admitting that her use of utility future projected discharges have changed in the various expert reports that she has authored). Ms. Supko admitted that she does not utilize any particular methodology in deciding when to use RW-859 information to determine future projected discharges, but, rather, that the source used for future projected discharge information depends upon discussions that she has with that client. Tr.768:15-769:18 (Supko). Indeed, rather than articulate a sound methodology

E. Even If The Court Were To Accept Counsel's Assertion Concerning The Two "Primary Requirements," A 3,000 MTU Rate Of Acceptance Does Not Satisfy These Two Requirements Under Ms. Supko's Model

Even if the Court were to accept the extra-contractual "two-part obligation" that Ms. Supko applies in this case, the outputs of her model do not satisfy that alleged obligation. Indeed, Ms. Supko's analysis demonstrates that, even with the fast ramp-up rates assumed by her model, a 3,000 MTU steady-state rate of acceptance beginning in the fifth year of the DOE program violates the plaintiffs' proffered views of both the NWPA and the Standard Contract, because the rate results in additional at-reactor storage after 1998 and would require more than five years' time to decommission nuclear utility sites. Indeed, under the plaintiffs' theory of DOE's contractual obligations, Ms. Supko's modeling establishes that performance by DOE under the 3,000 MTU rate of acceptance would constitute a breach of the Standard Contract with respect to numerous contract holders, including GPC.

The plaintiffs claimed throughout trial, as well as throughout their post-trial brief, that both the NWPA and the Standard Contract required DOE to accept SNF at a rate that would "accomplish the parties' intent to avoid additional at-reactor storage after January 31, 1998, and remove the backlog of SNF at a reasonable pace" to allow for "timely decommissioning," which the plaintiffs and Ms. Supko suggest is five years after reactor shut-down. Pl. Br. 8, 30; Tr.827:3-15 (Supko); Tr. 465:3-466:24 (Hunt). Ms. Supko's conclusion in this case -- that under a 3,000 MTU rate of acceptance, there would be 690 MTUs of additional at-reactor storage and

---

for her inputs and assumptions, Ms. Supko explained that her decision to use future projected discharge information from the client rather than the information contained in the RW-859 forms turns on "how . . . it affect[s] their damages case." Tr.769:15-18 (Supko). Clearly, Ms. Supko's selection of future projected discharges is yet another example of her lack of any sound, scientific methodology.

nine years of average post shutdown storage time, Tr.704-06 (Supko) -- plainly violates the "requirements" of the NWPA and the Standard Contract as the plaintiffs have articulated them. Indeed, Ms. Supko testified that, under Scenario 1 (the 3,000 MTU rate), approximately 12 utilities would have to add additional at-reactor storage after 1998. Tr.820:19-23 (Supko).[31]

In apparent recognition that the 3,000 MTU rate of acceptance violates the plaintiffs' proposed "primary requirements," Ms. Supko has modified these "requirements" in an attempt to make the 3,000 appear more "reasonable."[32] Specifically, Ms. Supko has inserted the qualifier

---

[31] Of the approximately 12 utilities that Ms. Supko identified as requiring additional at-reactor storage after 1998 even under a 3,000 MTU steady-state rate of acceptance, four of those utilities had over 100 MTUs of additional at-reactor storage. Tr.823:19-24 (Supko). For example, Palo Verde Number 1 had 184.9 MTUs of additional at-reactor storage even under Ms. Supko's 3,000 MTU steady-state rate of acceptance. Tr.823:25-824:5 (Supko).

[32] Ms. Supko explained at trial that she was not offering an independent opinion concerning the two "primary requirements," but, rather, relied upon counsel for the identification of the two "primary requirements." Tr.793:15-21 (Supko). Ms. Supko also stated that she is not relying upon any DOE documents or testimony to support the two "primary requirements" identified by counsel. Tr.802:22-803:8 (Supko). Indeed, Ms. Supko testified that the reason she did not offer an independent opinion concerning the two "primary requirements" is that she believes that may be a legal issue. Tr.800:5-9 (Supko).

Ms. Supko explained that the first SNF case in which counsel identified the two "primary requirements" was counsel for the plaintiff in Commonwealth Edison. Tr.794:13-17 (Supko). Ms. Supko testified that counsel for Commonwealth Edison identified the two "primary requirements" through proposed findings of fact and discussions with counsel. Tr.794:18-21 (Supko). Specifically, Ms. Supko relied upon Commonwealth Edison's proposed finding of fact 68 for the identification of the two "primary requirements." Tr.795:24-796:6 (Supko). Notably, with respect to the first purported "primary requirement" -- the prevention of additional at-reactor storage after 1998 -- Commonwealth Edison's proposed finding of fact number 68 does not contain the word "generally." Tr.796:12-15 (Supko). Furthermore, with respect to the second "primary requirement" -- decommissioning -- Commonwealth Edison's proposed finding of fact number 68 does not contain any reference to "timely" decommissioning. Tr.796:16-18 (Supko).

Further, although Ms. Supko testified at trial that she relied upon certain DOE documents to "confirm" her understanding of the intent of the program, Tr.801:13-20 (Supko), of the 16

"generally" into the phrase "no at-reactor storage after 1998." Absent the qualifier "generally" that Ms. Supko added to the first "primary requirement," Ms. Supko's 3,000 MTU rate would violate the first primary requirement, as it would require at least 690 MTUs of additional at-reactor storage after 1998.[33] Furthermore, in an attempt to make the amount of at-reactor storage after 1998 appear smaller, Ms. Supko has deliberately excluded all SNF generated by reactors that shut down prior to 1998. Ms. Supko stated that there was approximately 3,000-to-4,000 MTUs in storage at shutdown utilities as of 1998, Tr.816:13-19 (Supko), including, among others, Sacramento Municipal Utility District, Yankee Atomic, and Trojan. Tr. 816:20-817:1 (Supko). Had Ms. Supko included the SNF contained at shutdown utilities after 1998 in her calculation of additional at-reactor storage, her number under Scenario 1 (the 3,000 MTU steady-state rate) could be as high as 4,600 MTU. Tr. 817:16-21 (Supko). Such a result would

---

documents upon which Ms. Supko relies for her conclusion concerning the "reasonableness" of the 3,000 MTU rate of acceptance, six of those documents presume a two repository system and a 6,000 MTU rate of acceptance, PX 16-18, 35, 37 & 38, three presume performance at a repository rather than an MRS, PX 5 (withdrawn), 23 & 42, and the remaining seven are program documents that DOE published in 1998 or later, which plainly do not constitute DOE's plans for performance in the "but for" world. PX 14, 24, 25, 98, 180, 629 & 631. Ms. Supko's selective reliance upon DOE program documents to "confirm" her opinion do no such thing and, rather, illustrate the significant flaws in her analysis and opinions in this case.

[33] In their post-trial brief, the plaintiffs try to reconcile this inconsistency by claiming that Ms. Supko offered alternatives to dry storage that utilities would have pursued had DOE begun industry-wide performance by 1998. Pl. Br. 70. First, although Ms. Supko offered hypothetical examples of what a utility that had additional storage requirements after 1998 could do, she offered no evidence as to what utilities would do to accommodate their additional storage needs. Second, although Ms. Supko claimed that a utility with post-1998 storage needs could rerack its wet pool, she also stated that she considers a utility's post-1998 rerack to constitute additional at-reactor storage. Tr.818:19-24 (Supko). Therefore, even by Ms. Supko's standards, which are plainly inconsistent with the ones that the plaintiffs are pressing in this case, a 3,000 MTU rate of acceptance cannot avoid the need for utilities to add additional at-reactor storage after 1998.

violate both "primary requirements" that Ms. Supko models and that the plaintiffs claim are required by both the NWPA and the Standard Contract.

Similarly, the nine years average that Ms. Supko estimates that it would take to decommission a facility under a 3,000 MTU rate of acceptance would violate the second "requirement" that DOE accept SNF at a rate sufficient to work off the backlog and to allow decommissioning within five years of a plant shutdown.[34] Simply put, if the plaintiffs are correct that the NWPA and the Standard Contract require a rate of acceptance that precludes all additional at-reactor storage after 1998 and allows for decommissioning within five years of shutdown, Ms. Supko's analysis demonstrates that a 3,000 MTU rate of acceptance violates these requirements.

Additionally, although Ms. Supko rejects the 900 MTU rate of acceptance contained in the 1991 ACR (a contractually required document) because performance at an MRS was linked to DOE obtaining a construction permit for a permanent Federal repository, Ms. Supko's analysis runs into an identical statutory constraint. Ms. Supko's industry-wide model assumes that DOE's waste acceptance program will accept 90,000 MTUs of SNF over the life of the program. Tr.845:14-18 (Supko). However, Ms. Supko conceded at trial that the 1987 Amendments to the Nuclear Waste Policy Act limited DOE's acceptance to a single repository with a 70,000 MTU limit. Tr.845:22-846:16 (Supko). In other words, in Ms. Supko's "but for"

[34] As Mr. Pollog testified at trial, when DOE entered into Standard Contracts with APC and GPC in 1983, DOE projected that, by 2000, annual utility discharges would be 3,000 MTU per year. Tr. 1893:3-8 (Pollog). If DOE was statutorily and contractually obligated to satisfy the two-part obligation that the plaintiffs claim, DOE would have had to accept at a rate greater than 3,000 MTU per year to work off the backlog, as the discharge rate by utilities would equal that acceptance rate.

rate scenario, she has projected that DOE will accept 20,000 MTU more than DOE was statutorily authorized to accept in 1998. Tr.846:20-24 (Supko).[35]

Ms. Supko explained that Congress would have to act to either increase the limits under the 1987 Amendments to the Nuclear Waste Policy Act or authorize a second repository. Tr.847:10-15 (Supko). Yet, Ms. Supko rejects DOE's performance through an MRS for precisely the same reasons: that congressional action would have been required to modify the statutory linkages between the construction authorization for a permanent Federal repository and the construction of an MRS. Tr.842:18-23 (Supko).

Further, even with the qualifications that Ms. Supko adds to the plaintiffs' "primary requirements," Ms. Supko's analysis reflects that a rate of acceptance lower than 3,000 MTU per year could satisfy these "requirements." First, with respect to the first prong of her test – the amount of additional at-reactor storage after 1998 – Ms. Supko explained that one of the benchmarks she utilizes to determine whether the amount of additional at-reactor storage after 1998 is reasonable is how that number compares to the annual cumulative discharge rates of commercial reactors. Tr.807:3-14 (Supko). Notably, Ms. Supko admitted at trial that a 2,000 MTU rate of acceptance would generally keep pace with the annual discharge rate. Tr.831:3-12

[35] Further, Ms. Supko's assumption that the program, in the but for world, would generate 90,000 MTU of SNF is inconsistent with the testimony by Mr. Pollog on this issue. Mr. Pollog testified that, in the early 1980s, DOE expected the total amount of SNF generated to be approximately 140,000 MTUs. Tr.1892:4-8 (Pollog). However, because certain utilities prematurely shut down their power plants, by the early 1990s, that number decreased to approximately 83,000 MTUs. Tr.1892:8-11 (Pollog). Currently, as a result of license extensions, DOE projects that the total amount of SNF generated will be approximately 130,000 MTU. Tr.1892:12-23 (Pollog). If Ms. Supko assumed that the cumulative generation of SNF totaled 130,000-140,000 MTU, presumably a much higher annual rate than 3,000 MTU would be needed to satisfy the "two part obligation" that Ms. Supko applies in this case.

(Supko). Further, Ms. Supko testified that the amount of additional at-reactor storage after 1998 could be as high as 1,999 MTU and still satisfy the first "primary requirement" identified by counsel. Tr.809:17-22 (Supko).[36] Indeed, although Ms. Supko testified that the amount of additional at-reactor storage number would decrease if certain contract provisions such as "exchanges" were utilized by utilities, Ms. Supko did not endeavor to model how the additional at-reactor storage number would decrease had exchanges been utilized. Tr.811:6-813:9 (Supko).

Similarly, although Ms. Supko claimed that the amount of additional at-reactor storage number could be even lower depending upon individual utilities' decisions such as full core reserve policies and how they manage pool capacities and their wet racks, Ms. Supko admitted that she did not endeavor to model how that number would be affected had utilities made such decisions. Tr.813:10-20 (Supko).[37] For example, Ms. Supko acknowledged that she did not

---

[36] The amount of "reasonable" additional at-reactor storage could potentially be even higher under Ms. Supko's analysis because, although Ms. Supko utilizes the annual discharge rate as a benchmark for determining the "reasonableness" of the amount of additional at-reactor storage after 1998, she has not endeavored to determine how far above that annual discharge rate the amount of additional at-reactor storage number could be and still be deemed reasonable. Tr.808:15-24 (Supko).

[37] Similarly, although Ms. Supko has performed a "sensitivity" analysis in which she models intra-utility exchanges of acceptances rights (i.e., trading of acceptance rights between common owners), she admitted that the decision to engage in intra-utility trades is very company-specific. Tr.849:18-21 (Supko). However, Ms. Supko conceded that she did not have discussions with the co-owners of the plaintiffs' plants regarding their willingness to engage in trades with each other and did not model inter-utility rights. Tr. 665:9-14; Tr.852:12-16 (Supko).

Although Ms. Supko opined that the amount of additional at-reactor storage may decrease if utilities utilized the plus/minus 20 percent provision of the Standard Contract, she admitted that she did not analyze how the 20 percent provision would work on a specific utility-by-utility basis. Tr.665:9-14; Tr.854:13-16 (Supko). Indeed, Ms. Supko did not offer an opinion in this case as to the effect of the plus/minus 20 percent provision on any particular utility. Tr.854:17-20 (Supko). Further, Ms. Supko admitted that utilities could also request that DOE

know whether the total amount of additional at-reactor storage under Scenario 3 (900-to-3000) could go from 4,980 to 2,000 MTU if all of the flexibilities Ms. Supko claimed could occur did in fact occur. Tr.814:1-13 (Supko). Ms. Supko simply did not endeavor to model such a scenario for Scenario 3. Tr.815:6-14 (Supko). Ms. Supko also admitted that, had she assumed license extensions in her utility-wide analysis, under Scenario 3, the amount of average post-shutdown time would decrease from 16.5 years to approximately 12 years, a period of time she deemed "reasonable" under the 3,000 MTU. Tr. 814:24-815:5; 689:25-690:2 (concluding that post-shutdown storage time under 3,000 rate ranged from 5-to-14 years) (Supko).

Ms. Supko agreed that her Scenario 3 (900-to-3000) represents a monitored retrievable storage system beginning acceptance in 1998, with a Federal repository beginning acceptance beginning in 2010. Tr.842:9-14 (Supko). Notably, Ms. Supko conceded that Scenario 3 is one that DOE had used for planning purposes for a number of years. Tr.842:15-18; Tr.845:1-6 (Supko). Indeed, in the early-to-mid 1990s, Ms. Supko modeled what is now Scenario 3 for private clients. Tr.845:7-11 (Supko). It only is in the context of supporting a damages claim that Ms. Supko now takes the position that the rate of acceptance associated with the MRS is unreasonable.

In short, Ms. Supko's opinions are irrelevant to any issue in this case, lack any indicia of reliability, and are entirely inconsistent with the plaintiffs' purported understanding of DOE's obligations under the NWPA and the Standard Contract. Indeed, even accepting the standards

---

accept 20 percent less fuel under the plus/minus 20 percent provision of the Standard Contract. Tr.856:20-25 (Supko). In any event, DOE had the right to deny a utility's request to increase its SNF acceptance by 20 percent during the final delivery schedule submission and approval process. 10 C.F.R. § 961.11, Art. V.B & C.

articulated by Ms. Supko, a rate less than 3,000 MTU would plainly satisfy the artificial and extra-contractual obligations that she utilized. The Court should reject Ms. Supko's opinions in this case.

## IV. ANY DAMAGES IN THIS CASE SHOULD NOT BE MEASURED AGAINST ANY ACCEPTANCE RATE GREATER THAN THAT TO WHICH DOE ACKNOWLEDGED IT WAS WILLING TO COMMIT

### A. Contrary To The Plaintiffs' Representations, The Standard Contract Is Not "Missing" An Acceptance Rate Term

The plaintiffs assert that "it is clear that an acceptance rate term is missing from [the plaintiffs'] Contracts with DOE." Pl. Br. 122. Its argument completely ignores the rulemaking process by which the Standard Contract was drafted, as well as the language of the contract itself. In appropriate circumstances, if a term of a contract "which is essential to a determination of [the parties'] rights and duties" has been omitted from a contract, and the contract is otherwise sufficiently definite to be enforceable, "a term which is reasonable in the circumstances [may be] supplied by the court." Restatement (Second) of Contracts § 204 (1981); see David Nassif Assocs. v. United States, 214 Ct. Cl. 407, 423, 557 F.2d 249, 258 (1977) ("[n]ormally, the task of supplying a missing, but essential, term (for an agreement otherwise sufficiently specific to be enforceable) is the function of the court"). However, an "omission" occurs where "[t]he parties to an agreement . . . entirely fail to foresee the situation which later arises and gives rise to a dispute" or where "they . . . have expectations but fail to manifest them either because the expectation rests on an assumption which is unconscious or only partly conscious, or because the situation seems to be unimportant or unlikely, or because discussion of it might be unpleasant or might produce delay or impasse." Restatement (Second) of Contracts § 204 cmt. b. To define the missing term, the Court must consider what "the parties would have agreed upon at the time

of their initial . . . negotiations . . . ." David Nassif, 214 Ct. Cl. at 376, 644 F.2d at 7; see Restatement (Second) of Contracts § 204 cmt. d ("[s]ometimes it is said that the search is for the term the parties would have agreed to if the question had been brought to their attention" when negotiating the contract).

Here, it is plain that the parties did not fail to foresee the issue of an acceptance rate. Rather, the parties' consideration of this issue is clearly set forth in the administrative record of the rulemaking process that was used to develop the Standard Contract. As we previously discussed in detail, APC, GPC, and other utilities explicitly requested that DOE add a provision to the Standard Contract that would obligate DOE to accept SNF at a rate that satisfied certain requirements. DOE, however, intentionally declined to do so because there were too many uncertainties in the program to allow it to make such a commitment. See, e.g., Morgan Depo. Designation Tr. 2198:15-2199:3. Indeed, in May 1983, one of the utilities acknowledged this result of the parties' negotiations, stating that "DOE did not accept TVA's suggestion that DOE should start accepting SNF and HLW in 1998 at a rate not less than that which they are being produced by the civilian nuclear power industry as a whole." DX 32, attachment 2 at 3 (TV1471).

Instead, as this Court found in another SNF case, the Standard Contract "establishes a definite and detailed procedure that the parties agreed to employ to determine the applicable rate of acceptance." TVA v. United States, 60 Fed. Cl. 665, 671 (2004); see id. at 665 ("The Standard Contract did not establish a specific rate or schedule for the collection of SNF. Rather, it established a process by which a rate would be established for each utility."). Specifically, the Standard Contract created, in essence, a two-phase process for developing the rate of acceptance. First, the Standard Contract's schedule terms seek to obtain the agreement of the parties to a

specific schedule for the acceptance of an individual contract holder's SNF and HLW. Pursuant to the terms of the Standard Contract, DOE was to issue, beginning not later than July 1, 1987, "an annual capacity report [("ACR")] for planning purposes," identifying "projected annual receiving capacity" at any DOE facilities and annual acceptance ranking for acceptance of contract holders' SNF and/or HLW for the first 10 years "following the projected commencement of operation of the initial DOE facility." 10 C.F.R. § 961.11, Art. IV.B.5(b). Subsequently, beginning on April 1, 1991, DOE was to issue "an annual acceptance priority ranking" ("APR") for receipt of the contract holders' SNF, "based on the age of SNF and/or HLW as calculated from [its] date of discharge." Id., Art. IV.B.5(a).

Second, the contract holder, "[a]fter DOE has issued its proposed acceptance priority ranking" on April 1, 1991, and no earlier than January 1, 1992, would submit a delivery commitment schedule ("DCS") identifying "all SNF and/or HLW the [contract holder] wishes to deliver to DOE beginning sixty-three (63) months thereafter," for DOE's approval or disapproval. 10 C.F.R. § 961.11, Art. V.B.1 (emphasis added). If DOE approves the DCS, the parties have effectively agreed and defined the amount of SNF that DOE will accept from that contract holder 63 months later. Id. If DOE disapproves the first DCS submission, the contract holder is entitled to make a second DCS submission, again for DOE's approval or disapproval. Id. If DOE approves the second DCS submission, the parties have, as stated above, effectively defined the amount of SNF that DOE will accept from that contract holder 63 months later. Id. If DOE disapproves the second submission, DOE responds with its own proposed schedule, which the contract holder may accept or, alternatively, may attempt to negotiate with DOE. Id., Art. V.B.2. The contract holder may then submit its dispute to the contracting officer for a decision, and the contracting officer's final decision upon the DCS "shall be final and

conclusive" until, within 90 days, the contract holder appeals to the Energy Board of Contract Appeals. Id., Art. XVI.A; see McDonnell Douglas Corp., ASBCA No. 26747, 83-1 BCA ¶ 16,377, at 81,421 (1983) (boards of contract appeals "[h]istorically and traditionally" assumed jurisdiction over non-monetary "disputes as to the interpretation of contract provisions and determination of the rights and obligations of the parties under the provisions of the contract"). The EBCA's review of DOE's discretionary decision would not be de novo, but, instead, the "contracting officer's discretionary authority [could] be overturned only by a showing that it was arbitrary, capricious or otherwise an abuse of discretion." Rapid City Indian Health Advisory Bd. of Directors, ASBCA No. 26641, 83-1 BCA ¶ 16,311, at 81,084 (1983); see United States Fidelity & Guaranty Co. v. United States, 230 Ct. Cl. 355, 365-70, 676 F.2d 622, 628-31 (1982); Fraas Surgical Mfg. Co. v. United States, 215 Ct. Cl. 820, 828-29, 571 F.2d 34, 39 (1978).[38]

Because of the detailed schedule terms in the Standard Contract, the acceptance rate is not an unintentionally "missing" term, but, instead, was to be established in the future through an arrangement similar to an "agreement to agree," wherein the parties agreed that, in the future, DOE would identify the amounts of SNF that it anticipates being able to accept, each contract holder would identify the SNF that it wants to deliver, and DOE would evaluate the contract holder's request. That is, the parties agreed that, in the future, they would attempt to agree to

---

[38] As one of the boards of contract appeals has explained, where a challenge to an agency's decision under a contract "tests the validity of the Contracting Officer's exercise of his judgment and discretion in a matter which by the terms of the contract itself is made discretionary with him," and the board is "reviewing a contractually-provided judgmental decision of the Contracting Officer," the board's review is limited to whether the contracting officer's discretionary decision was in bad faith, was unreasonable, or was arbitrary or capricious. Thomas W. Yoder Co., VABCA No. 997, 74-1 BCA ¶ 10,424, at 49,250-51 (1974). Were the board to engage in a de novo review of the discretionary decision, it would infringe upon the contracting officer's "legal right to exercise his discretion." Id.

definitize a specific acceptance schedule. "[I]f an essential element is reserved for the future agreement of both parties, as a general rule it can give rise to no legal obligation until such future agreement." 1 R. Lord, Williston on Contracts § 4:26, at 585 (4th ed. 1990).

Based upon the evidence in this case, the Court cannot identify a rate that the "parties would have agreed upon at the time of their initial . . . negotiations," as established in Nassif, where the parties specifically considered but refused to agree upon a rate and, instead, agreed to defer that issue until a later date through an "agreement to agree." The plaintiffs' request that the Court view the acceptance rate as "missing" from this contract and that the Court apply the rules applicable to "missing" terms is unsupportable.

## B. Absent Agreement By The Parties Upon The Rate Of Acceptance, The Court Must Ensure That The Plaintiffs Do Not Obtain Greater Rights Through Litigation Than They Would Have Under The Contract

Because the Standard Contract's schedule terms ultimately provide DOE, to the extent that the parties cannot agree upon specific SNF acceptance commitments, with the option of selecting one of numerous potential acceptance scenarios, subject to review by the EBCA for abuse of discretion, the schedule terms act as a form of "alternative contract." "An alternative contract is one in which a party promises to render some one of two or more alternative performances [any] one of which is mutually agreed upon as the bargained-for equivalent given in exchange for the return performance by the other party." 11 A. Corbin, Corbin on Contracts § 1079, at 394 (interim ed. 1979); see Restatement of Contracts § 344 cmt. a, at 565 (1932) ("[a]n alternative contract is one wherein A promises B some one of two or more alternative performances"). "A promise of one of several alternative performances will give the choice of alternatives, unless the contrary is stated, to the person who is to render the performance." 11 W. Jaeger, Williston on Contracts § 1407, at 592 (3d ed. 1968); see 11 A. Corbin, supra, § 1079,

at 394 ("[t]he choice among these alternatives, the power of election, is usually given to the promisor"). In such circumstances, "he has power to discharge his contractual duty by performing either alternative." 11 A. Corbin, supra, § 1079, at 394; see Restatement of Contracts § 344 cmt. a, at 565 (1932) ("[t]he option may be given to A, in which case he has power to discharge his duty by performing either alternative").

If the promisor breaches its obligations under the alternative contract, the measure of damages is not an amount that the promisee or the Court determines is most attractive or most reasonable of the possible alternative methods of performance that the promisor could have elected, but instead is the "least valuable," or least costly to the promisor, of the possible alternative performances:

> The damages to which the promisee would be entitled in case of breach of such a promise would be based on the least valuable of the alternative performances. . . . A promise to give any one of a thousand specified things as the promisor may choose, though it cannot be enforced specifically, is not too indefinite to have a clear meaning, and the promisee's damages would be the value of the least valuable of the one thousand things. The same is true of a promise to perform whenever within a specified period of time the promisor may choose.

1 R. Lord, supra, § 4:24, at 557-58 (emphasis added). The Restatement of Contracts succinctly defines this rule as follows:

> The damages for breach of an alternative contract are determined in accordance with that one of the alternatives that is chosen by the party having an election, or, in case of breach without an election, in accordance with the alternative that will result in the smallest recovery.

Restatement of Contracts § 344, at 565 (1932) (emphasis added); see Koby v. United States, 53 Fed. Cl. 493, 501 (2002) ("general rule is that, unless the contract specifically preserved the right of election for the promisee, 'in the case of breach without an election (of alternatives),

[damages] (shall be) in accordance with the alternative that will result in the smallest recovery'" (quoting In the Matter of Community Med. Ctr., 623 F.2d 864, 867-68 (3d Cir. 1980)) (brackets and parentheses in original); Branhill Realty Co. v. Montgomery Ward & Co., 60 F.2d 922, 923 (2d Cir. 1932) ("[w]here a promisor has agreed to alternative performances, in case of breach without an election, the damages are measured by the alternative that will result in the smallest recovery"); 11 W. Jaeger, supra, § 1407, at 593 (where "no choice has been made" between the various alterative methods of performance, "either expressly by the promisor or automatically by the terms of the contract or by law, the measure of damages . . . is the value of the alternative least onerous to the defendant" (emphasis added)); see also White v. Delta Constr. Int'l, Inc., 285 F.3d 1040, 1043 (Fed. Cir. 2002) ("damages for breach of contract shall place the wronged party in as good a position," but not a better position, "as it would have been in, had the breaching party fully performed its obligation" (emphasis added)).[39]

"The *ratio dicendi* for this rule is that the court may not place the promisee in a better position than had the contract been performed – it presumes that the promisor had bargained for the flexibility of the alternatives and, therefore, should be liable for no more than the least expensive alternative he could have chosen." Koby, 53 Fed. Cl. at 501; see Liberty Bank v. Talman Home Mortgage Corp., 877 F.2d 400, 407 n.10 (5th Cir. 1989) ("[t]he rationale for this rule is simply: the promisor is held liable only for the cost of the least expensive alternative he

[39] "An inconsistent and, it seems, erroneous rule has been laid down in a few cases which hold that if the promisor fails to make an election the promisee thereupon has the option." 11 W. Jaeger, supra, § 1407, at 594. However, this minority view is incorrect. Id.; see Community Med. Cntr., 623 F.2d at 868 (explaining that minority view "has garnered scholarly approval in only one situation – where the contract itself contains language granting the promisee the right to elect remedies"). Any grant of election of remedies to the utility plaintiffs would eliminate the discretion that the Standard Contract grants to DOE.

could have chosen 'as a recognition of the flexibility which had been bargained for by the party in breach'").

C. The Court Must Ensure That It Does Not Create A Contract For The Parties To Which They Had Not Mutually Agreed

A court cannot make contracts for the parties. To be valid and enforceable, "a contract must have both consideration to ensure mutuality of obligation . . . and sufficient definiteness so as to 'provide a basis for determining the existence of a breach and for giving an appropriate remedy.'" Ridge Runner Forestry v. Veneman, 28 F.3d 1058, 1061 (Fed. Cir. 2002) (citations omitted). If an agreement is missing one or more essential terms, an agreement to agree on those terms is unenforceable because it lacks mutuality of intent and sufficient definiteness to determine the rights and liabilities of the parties. See Modern Sys. Tech. Corp. v. United States, 979 F.2d 200, 204 (Fed. Cir. 1992); Bel Pre Health Care Center, Inc. v. United States, 24 Cl. Ct. 495, 496 (1991), aff'd, 980 F.2d 745 (Fed. Cir. 1992) (table); Transamerica Equip. Leasing Corp. v. Union Bank, 426 F.2d 273, 274 (9th Cir. 1970). "Courts refuse to enforce agreements that contain indefinite promises or terms they deem essential because judicial clarification of the uncertainty entails great danger of creating intentions and expectations that the parties themselves never entertained." Neeley v. Bankers Trust Co. of Tex., 757 F.2d 621, 628-29 (5th Cir. 1985); see Mays v. Trump Indiana, Inc., 255 F.3d 351, 357-58 (7th Cir. 2001); Shann v. Dunk, 84 F.3d 73, 78-81 (2d Cir. 1996) ("[w]e believe the issue of Shann's liability for the deferred payments was of such importance that, if the district court finds the parties failed to agree on it, the court would be required to void the contract for absence of an essential term").

As indicated in the Court of Claims' decision in Nassif, and as previously mentioned, certain terms of a contract that are "essential" to it in some respects may, in certain

circumstances, be identified by the Court, which must consider what "the parties would have agreed upon at the time of their initial . . . negotiations . . . ." David Nassif, 214 Ct. Cl. at 376, 644 F.2d at 7. However, at a certain point, the missing term becomes so essential to the formation of the contract that the Court, if it supplies the missing term itself, creates a contract to which the parties had never agreed. In Nassif, even though the cafeteria that the plaintiff was to build may have been an "essential" part of the contract, it was not the central part of the contract, which, instead, was a 20-year lease of floor space in an office building. Here, the allegedly "missing" term that the plaintiff seeks to have the Court impose into the Standard Contract is one of the central aspects of the Standard Contract and will have an extraordinary effect upon the damages that the plaintiffs could recover from the Government here. Depending upon the rate and schedule of SNF acceptance that the Court imposes into the Standard Contract, the damages in all of the pending SNF cases could vary from a very small amount of damages to, as alleged by all of the SNF plaintiffs, billions of dollars. This enormous variance in the effect of the acceptance schedule term upon the parties' rights, obligations, and damages cannot be said to be minor and, in fact, is one of the most essential terms of the Standard Contract.

D. In This Case, Damages Must Not Be Measured Against Any Rate Of Acceptance Greater Than That Identified In The 1991 ACR

In several of the other SNF cases that have proceeded before this Court, the contract holder plaintiffs had submitted DCSs to DOE, and DOE had approved those DCSs, definitizing at least some of the acceptance dates for the acceptance of those contract holders' SNF in the "but for" world. In those cases, contract holders submitted DCSs to DOE in accordance with the rates identified in the 1991 ACR, and DOE approved those submissions. By agreeing upon a schedule for the acceptance of some of the SNF in those DCSs, the Government and the contract

holder committed to accepting, and delivering, a particular amount of SNF during a particular period of time. In those cases, the approved DCSs represent the parties' agreement, pursuant to the terms of the Standard Contract, regarding the schedule upon which DOE was obligated to accept that contract holder's SNF through a period of time.

This case does not involve any DCSs that were approved by DOE. Nevertheless, DOE and the utilities acted in accordance with the schedule provisions of the Standard Contract to develop a schedule for waste acceptance beginning in 1998. The evidence shows that the rates of SNF acceptance identified in the 1991 ACR were predicated upon the requirements of the 1987 NWPA amendments, which precluded DOE from accepting more than 10,000 MTUs of SNF for storage at a Monitored Retrievable Storage ("MRS") facility prior to the operation of a Federal repository. 42 U.S.C. § 10168(d)(1). When developing the 1991 ACR, and anticipating operation of a repository in 2010, DOE divided the 10,000 MTU acceptance limitation across the 12-year period from 1998 (when it anticipated that MRS operations would begin) to 2010. DOE then drafted, with the assistance of the utilities, the instructions for the submission of DCSs. See, e.g., DX 91, 92, 99, 105 and 110.

After the instructions were issued, numerous utilities submitted DCSs that were then approved by DOE. In fact, by letter dated October 21, 1996, GPC submitted two DCSs for plant Hatch complaining about the allocations set forth in the accompanying ACR. DX 198. DOE responded, however, by informing GPC that it could neither approve nor disapprove its DCSs at that time, given that DOE no longer anticipated that it would be able to begin SNF acceptance in 1998. Although the Standard Contract provided for an appeal, GPC did not pursue any appeal.

Although plaintiffs ask the Court to impose into the Standard Contract an obligation for DOE to accept 3,000 MTUs of SNF every year soon after 1998, DOE has never agreed – either

at the time of contract formation or at any time thereafter – to commit itself to accept contract holder SNF at such a rate, and the plaintiffs submitted no evidence at trial that DOE would even have considered binding itself contractually to such an obligation. At best, DOE announced in 1991 that it was willing to enter into commitments to accept SNF at the rates identified in the 1991 ACR through the first 10 years of SNF acceptance beginning in 1998. Although the plaintiffs here do not have any approved DCSs, and although APC has never even submitted any DCSs to DOE, the Court in TVA determined that DOE's announcement in 1997 that it would suspend approving or disapproving DCSs in the amounts identified in the 1991 ACR constituted a sufficient breach of the duty of good faith and fair dealing to permit the plaintiff in that case to rely upon the 1991 ACR allocations for the purpose of measuring causation and damages in that case. Tennessee Valley Auth. v. United States, 60 Fed. Cl. 665, 672-73 (2004). Although we do not agree with the Court's characterization of DOE's conduct, we agree that DOE had essentially announced its willingness to commit to the 1991 ACR rates.

The 1991 ACR represents, at best, the outside parameter of that to which DOE was willing to agree to definitize the acceptance rates in the Standard Contract for the first 10 years of the SNF acceptance program. Further, as previously discussed, DOE consistently represented over time that the 1991 ACR would be the document in which it would identify the acceptance schedule that it would be willing and able to satisfy in making SNF acceptance commitments to the contract holders. Significantly, the plaintiffs presented no evidence at trial that the issuance of the 1991 ACR was in bad faith.

To the extent that the Court attempts to incorporate any greater rate into the Standard Contract, or to the extent that it found that there was no schedule mechanism in the contract, it would be creating a contract term to which DOE never agreed. As previously discussed, the

Court must be certain not to make a contract between the parties that did not otherwise exist. Further, it cannot impose liability upon DOE for failing to satisfy obligations to which it never consented. To the extent that the Court dismisses the schedule mechanism from the contract and ignores the 1991 ACR, the Court is left with no viable method by which to assess damages arising from DOE's delay. Given that the Standard Contract does not contain parameters that identify the required minimum rate of performance that DOE must satisfy each year after 1998, but, instead, leave that determination to further negotiation and agreement, the Court has no guidelines by which to define a "reasonable" rate. Further, given that DOE specifically rejected the utilities' request that DOE obligate itself to meet any two-part qualitative obligation, the Court cannot now find pursuant to Nassif that DOE "would have" agreed to be bound to a rate founded upon an obligation it expressly disclaimed and rejected at the time of contract formation. In these circumstances, to the extent that the Court rejects the schedule provisions of the contract, it must find that the contract is simply too indefinite to enforce and, to the extent that the plaintiffs cannot establish a viable "but for" world, the plaintiffs cannot establish causation in this case.

E. Some Of The Decisions Issued Since The Government Filed Its Motion Regarding The Spent Nuclear Fuel Acceptance Rate Incorrectly Analyze The Standard Contract Schedule Provisions

Plaintiffs rely upon the Court's decisions in Commonwealth Edison Co. v. United States, 56 Fed. Cl. 652 (2003), and Indiana Michigan Power Co. v. United States, 57 Fed. Cl. 88 (2003), in support of their rate argument.[40] Pl. Br. 121. Specifically, the plaintiffs argue that this Court

[40] The Court's decision in Indiana Michigan upon the Government's motion for summary judgment regarding the rate of acceptance was not necessary to the appeal to the Federal Circuit. The Federal Circuit dismissed the Government's cross-appeal of the decision, stating that the "trial court's rate calculation determination was not necessary to the judgment."

must supply a reasonable acceptance rate term in connection with this litigation. Id. In Commonwealth Edison, this Court rejected the Government's arguments, at least for purposes of summary judgment, that the schedule provisions contained in the Standard Contract provide the mechanism for determining the SNF acceptance schedule. Yet, this Court did not explain the manner in which SNF acceptance would, or will, work absent reference to that schedule mechanism. Finding that the DCS process did not limit the contract holder's damages or limit its right to the acceptance of larger amounts of SNF than identified in those DCSs, the Court found that the DCS process was only "non-binding and preliminary." Id. at 663. However, without the DCS process, the Standard Contract contains no requirement that the contract holder notify DOE of the amount of SNF it wants DOE to take in any particular year (either in advance or upon the day that acceptance is desired); no notice of the location, date, or time for that acceptance within a particular year; and no notice of the characteristics of the SNF that will need to be accepted at that time or the size of the cask that DOE will have to procure to transport the SNF. If the DCSs were not binding, uncertainty surrounding the exchanges of approved DCSs – a theory that underlies Ms. Supko's model to reduce the amount of additional at-reactor storage – would be compounded.

In Indiana Michigan, this Court stated that its "obligation is to provide a rate of [SNF] acceptance that the Department of Energy would have employed in absence of the breach." 57 Fed. Cl. at 100 (emphasis added). With all due respect, that focuses upon the wrong question. The issue presented requires a determination of the rate of SNF acceptance pursuant that DOE was contractually obligated to satisfy in the "but for" world. DOE cannot be held financially

---

Indiana Michigan Power Co. v. United States, 04-5139 (Fed. Cir. Oct. 13, 2004) (unpublished opinion).

responsible in damages for a failure to take actions that it might have elected voluntarily to perform, even though it was not required to do so. The only damages that the Court can properly award are those based upon DOE's breach of its obligation to perform actions that it was contractually obligated to perform. Accordingly, the Court's finding in Indiana Michigan that "[n]othing in the record supports the collection rate that defendant would use – 900 metric tons per year," id. at 98, is not only factually incorrect, but also irrelevant to the identification of the rate at which DOE was contractually obligated to accept SNF.

If the Court's decisions in Commonwealth Edison and Indiana Michigan eliminate the existing schedule terms from the Standard Contract, the Court is left with no mechanism in the Standard Contract for determining the quantity of SNF that DOE would have accepted, when DOE would have accepted that SNF, and from which utility the SNF would have been accepted had DOE begun timely performance. Further, given that the plaintiffs and the other utilities still expect performance upon the Standard Contract, DOE also is left with no mechanism for determining when, how, or where DOE will accept SNF and/or HLW in the future. The Standard Contract does not contain a specific rate of acceptance because of the uncertainties that existed at the time of contract formation in a program that was to be implemented 15 years later. Instead, the contract contains a mechanism for determining the rate of acceptance at a later time, as the program, and its capacity limitations, are further defined. This mechanism was implemented in 1991 and worked until 1995, when DOE finally announced that it could not meet the 1998 acceptance date at the MRS. Going forward, DOE will use the mechanism that generated the 1991 ACR and subsequent DCS submission and approval process to define the rate of acceptance in the future.

To the extent that the Court disagrees with our demonstration that the schedule provisions of the Standard Contract, the approved DCSs, and the commitments that DOE announced it was willing to make through the 1991 ACR identify the parties' obligations in this case, the Court cannot merely impose its own view of a reasonable schedule term. A rejection of the our position would effectively render the Standard Contract too indefinite to enforce. See Massengill v. Guardian Mgt. Co., 19 F.3d 196, 202 (5th Cir. 1994) ("When a writing does not show the parties' agreement on a minor contract term, the reviewing court may supply a reasonable interpretation. . . . *But essential contract terms may not be supplied by a court*. 'If any essential term is left unresolved, there is simply no contract and no obligation on the parties.'" (emphasis added; citation omitted; applying Mississippi law)); see also Coyle's Pest Control, Inc. v. Cuomo, 154 F.3d 1302, 1306 (Fed. Cir. 1998) (refusing to read "reasonable" term into contract, court found contract unenforceable as indefinite quantity contract because it lacked minimum quantity term).[41]

The Standard Contract provides a mechanism for establishing the SNF acceptance schedule, including the rate of SNF acceptance. The evidence at trial showed that the parties followed that mechanism for a significant period of time. As a result, a schedule exists that the Court should view as the contractual "schedule" for purposes of assessing damages. Absent the

---

[41] It is true that the appellate court has found that a contract term which allows for future negotiation "impliedly places an obligation on the parties to negotiate in good faith," Aviation Contractor Employees, Inc. v. United States, 945 F.2d 1568, 1572 (Fed. Cir. 1991), and that, where the contract and applicable regulations provide guidelines for negotiations of future agreements, the Court may "determine whether or not the government negotiated according to the contract." City of Tacoma, Dep't of Public Utilities v. United States, 31 F.3d 1130, 1132 (Fed. Cir. 1994). However, that review does not provide the Court with the ability to create a contract for the parties where the "missing" terms are so essential to the central purpose of the contract that the absence of the terms renders the contract too indefinite to enforce.

Court's reliance upon that prior schedule, we cannot identify any basis upon which the Court could justify its imposition of its own schedule into this contract.

V. PLAINTIFFS HAVE NOT ESTABLISHED THE NECESSARY CAUSAL LINK BETWEEN ALL OF THEIR CLAIMED STORAGE CONSTRUCTION COSTS AND DOE'S DELAY IN BEGINNING SNF ACCEPTANCE

Plaintiffs cannot recover their alleged damages if they have failed to establish that they would not have incurred these construction costs had DOE timely begun SNF acceptance. See Bluebonnet, 339 F.3d at 1344-45 (citing White, 285 F.3d at 1043). To the contrary, "the non-breaching party 'should on no account get more than would have accrued if the contract had been performed.'" White, 285 F.3d at 1043 (quoting DPJ Co. v. FDIC, 30 F.3d 247, 250 (1st Cir.1994)).

In their brief, plaintiffs contend that the costs incurred to date to construct dry storage facilities at plant Hatch and plant Farley and install additional racks in the spent fuel pool at plant Vogtle all result from DOE's failure to begin timely performance upon their Standard Contracts for these facilities. See Pl. Br. 76-79. Yet, this contention is based upon the unsupportable claim that DOE was obligated to perform at a 3,000 MTU annual acceptance rate after a five-year ramp-up period. If the Court finds that the Government was entitled to accept the amounts of SNF at a lesser rate, such as those set forth in the 1991 ACR, plaintiffs' claim for the costs of the installation of additional storage facility at plant Hatch significantly is reduced, and the costs for the rerack at plant Vogtle are eliminated.[42] Plaintiffs' claim for the costs of additional storage at plant Farley remains unaffected by rate, provided that the Court finds that

[42] Likewise, applying a 3,000 rate and assuming a two full core reserve policy at plants Hatch and Vogtle would result in plaintiffs incurring additional storage costs at both plants in the "but for" world.

plaintiffs' policy is to maintain only one full core reserve in each plant Farley wet pool.[43] The evidence offered at trial demonstrated that, regardless of DOE's delay in beginning SNF acceptance from the nuclear industry, plaintiffs would have been required to construct a dry storage facility at plant Hatch and would have needed additional racks at plant Vogtle. Plaintiffs' alleged damages must be reduced consistent with these "but for" world realities.

## VI. PLAINTIFFS FAILED TO ESTABLISH THAT THE COSTS THEY ALLEGEDLY INCURRED FOR INTERNAL LABOR, OVERHEAD, AND ENGINEERING SUPERVISION WERE INCREMENTAL TO DOE'S BREACH

As part of their claim, plaintiffs have included all internal labor costs that were billed to any allegedly damages-related project, such as the plant Hatch and Farley ISFSIs and the plant Vogtle rerack. These costs were added to the claim without regard to the job duties of the employees performing the tasks, to the scheduling of the tasks, or to the amount of time spent by each employee upon a damages-related project. Instead, any time that was billed to a project was charged to the damages claim as well. "It is settled . . . that a contractor is not entitled to recover 'expenses which would properly have been incurred regardless of the [breach].'" Boyajian v. United States, 423 F.2d 1231, 1236 (Ct. Cl. 1970) (quoting Saddler v. United States, 287 F.2d 411, 415 (Ct. Cl. 1961)). Rather, plaintiffs may only recover for labor performed by their employees to the extent that they can show that these labor costs represent an incremental cost. See Wilner v. United States, 23 Cl. Ct. 241, 258, 262-63 (1991) (allowing recovery for hours that would not have been worked but for the delay).

---

[43] If the Court accepts plaintiffs' contention that they maintain a single full core reserve plus a reload for each of plant Farley's wet pools, on-site dry storage would have been required in the "but for" world under a 900 MTU rate. Accordingly, the claimed dry storage costs could not be incremental to DOE's delay.

Consistent with this principle, salaries or wages generally may represent an incremental cost or damage under two circumstances. First, an employer may recover where the employer actually pays his employee because of the breach. In this regard, the United States Court of Appeals for the Eighth Circuit has refused to award such damages to a corporate employer where there was no evidence that its employee "requested payment, that payment was made, or that the parties intended such a payment to be made" for the additional time he had worked because of the breach. Wilson v. Marquette Elecs., Inc., 630 F.2d 575, 586 (8th Cir. 1980) (rejecting claim that $40,000 in "lost time" for employee labor was recoverable because no showing that company lost any money because of time employee was forced to spend on project); see also AES Tech. Sys., Inc. v. Coherent Radiation, 583 F.2d 933, 943 (7th Cir. 1978) (plaintiff not entitled to damages where breach did not "prohibit . . . employees from working on other projects"). Second, courts have generally sustained recovery for employees' lost time only where the plaintiff has foregone other contractual opportunities. Thus, recovery is only available where "salary and other overhead items allocated as a bookkeeping matter to a broken contract would in fact have been recovered in a substitute contract." Autotrol Corp. v. Cont'l Water Sys. Corp, 918 F.2d 689, 693 (7th Cir. 1990) (Posner J.); see 22 Am. Jur. 2d *Damages* § 416 (2004); accord S.W. Eng'g Co. v. Cajun Elec. Power Coop., 915 F.2d 972, 978-979 (5th Cir. 1990); Willred Co. v. Westmoreland Metal Mfg. Co., 200 F. Supp. 59, 66 (E.D. Pa. 1961). It is a question for the fact-finder to determine whether such a contract reasonably could have been acquired. Autotrol, 918 F.2d at 693. Here, this type of damage award is wholly inappropriate because plaintiffs cannot demonstrate any alternative, profitable responsibilities to which they could have allocated their employees but for the Government's breach. Cf. id. (noting that

"[t]here was testimony that Autotrol's controls division was consistently overbooked with new projects and had a consistent record of profitability. . . .").[44]

In two recently decided SNF cases, this Court has held that a plaintiff may not recover internal labor costs where plaintiff has failed to demonstrate that those costs constituted a loss directly tied to the delay in the Government's acceptance of SNF under the Standard Contract. In Sacramento Municipal Utility District v. United States, 70 Fed. Cl. 332 (2006), the Court recently denied the plaintiff's claim that all of its indirect labor costs, regardless of whether the plaintiff could establish that they constituted an incremental cost to the plaintiff, constituted damages:

> The evidence in this case, however, fails to establish that SMUD would have reduced the Rancho Seco personnel or reassigned these employees to other responsibilities, but for the labor requirements of the"dual-purpose" dry storage project-particularly since SMUD also was engaged during this time in executing the incremental decommissioning of the Rancho Seco site.
>
> *　　*　　*
>
> Accordingly, the court has determined that SMUD may not recover any internal labor costs claimed, except for the costs incurred for the 16 employees to the extent they worked on any portion of the dry storage project.

---

[44] The cases that plaintiffs cite in their post-trial brief do not change this analysis. As an initial matter, two of the cases cited in support for their conclusion that labor costs are recoverable are not contract cases. Pl. Br. 153 (citing Freeport Sulphur Co. v. The S/S Hermosa, 526 F.2d 300 (5th Cir. 1976) (tort claim based upon vessel collision with dock); United States v. The John R. Williams, 144 F.2d 451 (2d Cir. 1944) (admiralty claim based upon negligence of party for damage to submarine telephone cable). Further, in Convoy Co. v. Sperry Rand Corp., 672 F.2d 781 (9th Cir. 1982), the United States Court of Appeals for the Ninth Circuit expressly noted that the district court found that the plaintiff had lost the benefit of its supervisors' services as a direct result of the breach. Id. at 785-86 (see Pl. Br. 152). The court in Dunn Appraisal Co. v. Honeywell Information Sys. Inc., 687 F.2d 877 (6th Cir. 1982), reached a similar conclusion. Id. at 884 (relying upon Convoy and holding that the breach deprived the plaintiff of the salary employee's services) (see Pl. Br. 153).

Id. at 376. Similarly, in Tennessee Valley Authority v. United States, 69 Fed. Cl. 515 (2006), the Court disallowed the recovery of an SNF plaintiff's internal labor costs where the plaintiff failed to meet its burden of demonstrating that the use of this labor constituted a loss to the plaintiff:

> Nonetheless, TVA's proofs respecting its internal charge-backs for salaried staff at Sequoyah and Browns Ferry leave much to be desired. TVA did not provide detailed hours and amounts per employee in its ledger reports. TVA's proofs also do not indicate the actual services provided by most of the pertinent salaried staff at the two facilities, nor does the evidence disclose the extent to which most of the employees were committed to the dry storage projects. By contrast, TVA did make an appropriate showing respecting the work of Messrs. Davis, Edwards, Chapman, and Symonds, and Ms. Border. The court accordingly concludes that charge-backs for these individuals are recoverable by TVA but that the remaining charge-backs are not.

Id. at 540. Both SMUD and TVA reflect the principle that, to recover internal labor costs, a plaintiff has the burden to establish that its use of internal labor constitutes a loss to the plaintiff.

At trial, the Government demonstrated that the plaintiffs' damages claim misstates the incrementality of these personnel and overhead charges. The Government presented testimony which demonstrates that the plaintiffs planned work upon damages-related projects around other work needed at their facilities so as not to interfere with regular activities and to draw upon the existing workforce during slower periods of time. Tr. 1021:25-1024:3 (Wade). Employees generally were assigned to work upon damages-related projects based upon their availability. Id. Plaintiffs structured activities, such as loading campaigns, in an effort to avoid paying overtime or incurring otherwise unnecessary contractor expenses. Id. Plaintiffs also were unable to identify any material number of employees that was retained solely because of the work upon damages-related projects nor identify employees who were terminated at the completion of work

upon these projects. Tr. 203:10-13 (Long); Tr. 1017:17-23 (Wade). Additionally, plaintiffs introduced no evidence concerning the work that would have been performed by these employees had they not been engaged in the damages-related projects or contractors that were added to the facility to account for the diversion of resources to damages-related activities. See id. Plaintiffs' failure is demonstrative of their inability to establish incrementality and is not surprising given that, between 1999 and 2003, between 38 percent and 92 percent of the employees charging time to damages related activities charged less than $5,000 of their total annual compensation as an incremental cost in any particular year. DX 327 at 10; Tr. 2260:9-13 (Johnson) (majority of employees charged less than $5,000 per year). These costs are not incremental simply because plaintiffs so assert. Instead, plaintiffs bear the burden of establishing incrementality for each of the costs asserted in damages.[45] Since the plaintiffs failed to meet that burden, all labor costs that were unsupported in connection with the audit should be removed from damages.

Finally, in removing all utility personnel costs from plaintiffs' claim, with the exception of overtime charges established during the audit, Mr. Johnson also accounted for several million dollars in utility labor that had been included by plaintiffs as offsets to that claim. Tr. 2267:1-17 (Johnson). If the Court allows plaintiffs to recover the time spent by utility personnel, the costs

[45] Plaintiffs' brief incorrectly simplifies the Government's position upon the utility personnel and overhead costs. Pl. Br. 109. Our position is not that, as a matter of law, these costs are not recoverable. Rather, had the plaintiffs established that employees were retained based upon work being performed upon incremental projects, that overtime was paid in connection with those projects, or that contractors were retained to supplement staff based upon work upon those projects, such costs likely would be recoverable. However, instead of establishing that specific employees were incremental, the plaintiffs relied upon conclusory and unsupported statements concerning the asserted incremental nature of their internal labor as a whole. Plaintiffs' litigation strategy, however, failed to meet their burden of proof.

related to the time that would have been spent by utility personnel in the "but for" world must be included to reduce plaintiffs' damages.

## VII. THIS COURT SHOULD ADJUST AN ADDITIONAL $5,006,399 ASSOCIATED WITH CASKS THAT WOULD HAVE BEEN LOADED TO THE PLANT HATCH ISFSI AFTER 2004

While the Federal Circuit's decision in Indiana Michigan limits the ability of the plaintiffs to recover damages through December 31, 2004, in this litigation, the Government presented evidence that, in the "but for" world, plant Hatch would have loaded an additional eight casks to its ISFSI from 2005-2010 at a cost to plaintiffs of $5,006,399. Thereafter, no additional casks would need to be offloaded to the ISFSI. In this case, it is appropriate to reduce plaintiffs' damages by this amount. Unlike Indiana Michigan, which is premised upon a plaintiff's ability to return to the Court to seek future incurred costs based upon future partial breaches, the parties will be litigating the "but for" world only once. In this case, the Court's decisions concerning such things as the rate of acceptance and full core reserve will likely be binding upon the parties in future cases. As a result, all of the consequences of the "but for" world should be credited to the Government in this case.

Additionally, there is no risk of speculation here – another factor raised by Indiana Michigan. Instead, this Court will be determining a fixed "but for" world. From that fixed world, the costs associated with DOE performance that the plaintiffs would have incurred also are fixed. As a result, it is proper to credit the Government with those costs in this litigation. To the extent that the Court determines that a recognition of costs that plaintiffs would have incurred after 2004 is improper, the Court should make a finding that, in its fixed "but for" world, the plaintiffs would have loaded eight casks after 2004 and that the amounts associated

with those cask loads have not been credited to the Government in this case, but, rather, should be credited in future litigation.

## VIII. EVEN IF THIS COURT FINDS THAT DOE WAS OBLIGATED TO PERFORM AT A 3,000 MTU RATE OF ACCEPTANCE, THE PLAINTIFFS' DAMAGES SIGNIFICANTLY ARE OVERSTATED

Even if the Court applies a 3,000 MTU rate of acceptance as a contractual obligation upon DOE, through the imposition of the plaintiffs' proposed two-part requirement, significant adjustments to the plaintiffs' damages are required. To account for a 3,000 MTU rate, and using the 900 MTU rate as the baseline for any adjustments, the Court should return to the claim, from the adjustments identified above, certain additional costs. Specifically for Plant Hatch, the $19,268,476 that was deducted by Mr. Johnson for ISFSI construction costs and for the costs associated with the six casks that Dr. Neuberger testified would have needed to have been loaded in the "but for" world assuming a 900 MTU rate, would need to be added back into the claim. Tr. 2327:5-12 (Johnson). Additionally, Mr. Johnson deducted $2,597,745 related to re-racking efforts and plant Vogtle to reflect Dr. Neuberger's opinion that this re-racking would have been needed assuming a 900 MTU rate of acceptance. Tr. 2331:7-15 (Johnson). These costs would also need to be added to adjusted damages to arrive at adjusted damages assuming a 3,000 MTU rate of acceptance. These additions to damages bring the total adjusted damages from $16,707,846 under the 900 MTU rate of acceptance to no more than $38,574,066, assuming a 3,000 MTU rate of acceptance. Tr. 2347:12-16 (Johnson).

## IX. PLAINTIFFS CANNOT RELY UPON DIFFERENT FULL CORE RESERVE POLICIES IN THE "BUT FOR" AND ACTUAL WORLDS IN ESTABLISHING CAUSATION FOR THE INCREMENTAL NATURE OF DRY STORAGE COSTS

### A. Plaintiffs' Damages Claim And The Evidence Adduced At Trial Supports A Finding That Plaintiffs' Historic Operating Reserve Of Single Core Offload Is Appropriate In Determining Damages

Although the plaintiffs recognize that they cannot recover costs here that they would have incurred absent DOE's delay, Pl. Br. 112, they then measure the incremental nature of costs by comparing the amount of SNF in their wet pool today versus the amount that would have been in their wet pool had DOE performed at a 3,000 MTU rate. Pl. Br. 137. Plaintiffs then conclude that, even today, they are not in "as good a position" as had DOE performed. Id. at 137-38. However, in making this comparison, the plaintiffs have inexplicably relied on different full core reserve policies in the "but for" and actual worlds.

At trial, the Government presented substantial evidence that the plaintiffs historically operated the plants Hatch and Vogtle wet pools with a single full core reserve and used that operating reserve for planning purposes. For example, and among the numerous statements discussed above, on February 18, 1992, Richard Fennell noted that "[t]he one full core reserve has been established at Hatch since the late 1970's [sic]." DX 101 at SN068280. Indeed, outside of statements made during this litigation, not a single Southern Nuclear or GPC document suggests that plants Hatch and Vogtle must, as a matter of operational safety or efficiency, modify their operational or planning positions to maintain dual full core reserve. Instead, the plaintiffs repeatedly recognized the operational and safety requirement of single core reserve. When the costs of maintaining an additional reserve would have been borne by the plaintiffs – costs that were recognized in planning documents and by plaintiffs' damages expert –

they followed their historic single full core reserve policies. However, now that they seek reimbursement for all of their storage costs, plaintiffs have modified their policies to expand full core reserve, increasing the costs sought from the Government.

Plaintiffs' historic documents show that they understand the concept of mitigating costs when it inures to their benefit. Mr. Fennell noted in February 1992 that any decision to increase the minimum reserve also would advance in time plant Hatch's need for additional storage at a cost of approximately $1.5 million (assuming that the ISFSI only would cost $10 million). DX 101 at SN068280-81. They should not be allowed to alter their historic management policies here simply because the Government is being asked to foot the bill for those alterations. Ultimately, to the extent that the plaintiffs now wish to maintain a higher reserve, they must do so at their expense. The Government only should be obligated to pay for the space for which the plaintiffs were willing to pay prior to the partial breach of contract and that they are required to undertake in the actual world.

In fact, other than the statements of plaintiffs' employees at trial that plaintiffs desire to reach a two full core reserve in the pools, there is no evidence that plaintiffs actually have an official policy concerning full core reserve for plants Hatch and Vogtle upon which the Court may rely to find the existence of a two full core reserve at those facilities. In contrast, the evidence at trial – in particular, the evidence created by plaintiffs outside of this litigation – articulates a single full core reserve policy or tracks the loss of single full core reserve in the Hatch and Vogtle wet pools. See, e.g., DX 38, DX 101, DX 104, DX 312, DX 313, DX 324.

Plaintiffs' entire argument hinges upon the occurrence of speculative events in the future, such as dual unit shutdown and maintenance, which were deemed too speculative to form the basis for contingency planning in the past. At trial, evidence was presented that:

> Two full core reserve has not been used in financial and strategic planning reports for Plant Hatch, since Hatch has a transfer canal connecting the two spent fuel pools. Also, although simultaneous Hatch unit shutdown certainly can occur, simultaneous unit maintenance with both cores offloaded has not typically been considered a credible event for contingency planning. In short, plant major [sic] maintenance efforts would focus on one unit at a time, with or without the cooperation of a forced outage event.

DX 115 at SN067822 (emphasis added). The testimony, cited above, is in accord. If contingency planning prior to the breach did not consider simultaneous unit shutdown to be a credible event, this Court should not allow the plaintiffs, at the Government's expense, to expand their reserve margin to account for non-credible events, particularly when they have not been required to do so by the Nuclear Regulatory Commission ("NRC") or any other independent oversight body.

Moreover, the plaintiffs' damages theory concerning full core reserve is predicated upon a risk free "but for" world in which no uncertainty regarding DOE's performance exists. The problems of such an assumption are obvious:

> By modeling a 'but for' company whose investment decisions are determined . . . with perfect knowledge of future demand and future costs rather than on any business plan that [plaintiff] actually adopted, [plaintiff's] hypothetical model avoids any element of management fallibility. The 'but for' company never makes mistakes in planning or building its [business]. To permit damages to be awarded on the basis of such an idealized business plan would open . . . defendants to virtually unlimited damage claims based upon whatever after-the-fact scheme plaintiffs, or their lawyers and economists might conjure up. Such conjectures about what plaintiffs might have thought of doing at an earlier time provide no meaningful measure of damages actually suffered by plaintiffs.

Southern Pac. Communications Co. v. AT&T, 556 F. Supp. 2d 825, 1083 (D.D.C. 1982) (citations omitted; emphasis added), aff'd, 740 F.2d 1011 (D.C. Cir. 1984). "The model merely

represents an after-the-fact conjecture about what [plaintiffs] might have considered doing in the 'but for' world created by [plaintiffs'] economists and computer experts." Id. at 1083. By assuming that the plaintiffs would not have been required to consider any uncertainty and risk in the "but for" world – particularly given the events that we know took place in that world in 2001 – the plaintiffs' "but for" model provides the Court no insight into what the "but for" world would have looked like. Indeed, at trial, we demonstrated that, had DOE commenced performance in 1998 under plaintiffs' acceptance rate, but had acceptance been interrupted from 2001-2002, plant Hatch's selection of a single core offload in the "but for" world would have resulted in it shutting down for lack of space in the wet pool. If the plaintiffs were willing to accept the uncertainty surrounding DOE's acceptance, in a first-of-a-kind program, at the fastest published rate for a repository, and maintain only one full core reserve, that margin clearly is reasonable in a world in which the plaintiffs consistently have loaded and consistently plan to load casks to dry storage upon a yearly basis.

By their argument, plaintiffs seek to impose costs upon the Federal Government for the maintenance of reserve capacity that plaintiffs contend they would not have maintained in the "but for" world in which the costs associated with the maintenance of a larger reserve would have been borne solely by plaintiffs. Costs that plaintiffs would not have been willing to incur in the "but for" world, but that they allegedly want to but are not obligated to incur now, should not be imposed upon the Government here. This Court, based upon the evidence and upon plaintiffs' underlying damages theory, should find that a single full core reserve is appropriate at plants Hatch and Vogtle. To the extent that this Court finds a two full core reserve policy is

appropriate – consistent with plaintiffs' post-trial brief – it should apply that policy consistently in both the actual and "but for" worlds.[46]

The plaintiffs' effort to increase damages based upon an unadopted "new" full core reserve policy is not is basically the same as the plaintiff in Indiana Michigan Power Co. v. United States, 60 Fed. Cl. 639 (2004), aff'd, 422 F.3d 1369 (Fed. Cir. 2005), attempted. In that case, the plaintiff asserted that, in the actual world, its full core reserve policy would require the maintenance of 554 spaces in the wet pool (which, like plant Hatch, was shared by two reactors) – that is, two full core reserves and space for two "reloads" – even though it had not formally adopted this position as official company policy. Id. at 654. However, the evidence at trial demonstrated that, historically, the plaintiff sought to maintain a single full core reserve of 193 spaces in the wet pool. Id. As here, plaintiff's damages hinged upon the increased full core reserve; that is, the timing of necessary SNF offloads to the ISFSI directly was tied to the amount of reserve maintained in the wet pool. Id. By arguing for a higher reserve in the actual world than traditionally had been maintained, and that, as a matter of safety and regulation, was unnecessary, plaintiff increased its damages. Id. In rejecting the plaintiff's litigation position

[46] Plaintiffs assert that the Government improperly has removed the cost of the second bathtub rack from its damages analysis and, as a result, has understated damages by $419,000. Pl. Br. 146. Plaintiffs' assertion is based upon pre-trial assumptions that turned out to be incorrect. Specifically, the Government understood that the second bathtub rack needed to be installed to maintain single core reserve through 2001, if the three Hi-STAR casks had not been loaded in 2000. That understanding was in error. At trial, the evidence demonstrated that, even without the installation of the second bathtub rack or the loading of three Hi-STAR casks in 2000, plant Hatch would have maintained full core reserve through Fall 2001. Ultimately, the four Hi-STORM casks were loaded in 2001 in advance of the loss of full core reserve. As a result, the Court should not adjust damages – by removing the "but for" offset provided by plaintiffs in their claim – to account for the installation of the second bathtub rack in the actual world. However, if the Court desires to do so, it should eliminate all costs associated with the four Hi-STORM casks loaded in 2001, as the second bathtub rack would have extended full core reserve through 2002.

concerning the full core reserve, the Court held that "[p]laintiff's claimed need for a dry storage facility and most of its other future costs depend on a number that seems artificial to us, and in any event one that has not been 'formalized.'" Id. at 655. This Court should reach a similar conclusion regarding the plaintiffs' litigation-inspired full core reserve.

B. The Government's Case Concerning Full Core Reserve Is Based Upon The Testimony Of Plaintiffs' Personnel And Historic Operating Documents

Throughout their brief, the plaintiffs repeatedly call into question the Government's case concerning full core reserve upon the grounds that we "offered no testimony of any person with nuclear plant operating or management experience – or nuclear experience of any kind – on what constitutes a reasonable operating reserve for a nuclear power plant." Pl. Br. 141. Likewise, the plaintiffs repeatedly assert that our case is premised upon the opinions of Dr. Neuberger, who "was not qualified to render an opinion as to the reasonableness" of operational reserves. Pl. Br. 141. The plaintiffs' articulation of the alleged limitations in the Government's case fundamentally misstates the nature of the evidence upon which we rely to assert that, in awarding damages, the Court should be guided by the single core reserve policies of plants Hatch and Vogtle.

First, the Government did not offer any affirmative expert or fact witness upon the issue of full core reserve because we appropriately relied upon the substantial evidence concerning the historic reserve policies at plants Hatch and Vogtle elicited from the plaintiffs' "experienced" personnel during cross-examination and from plaintiffs' planning and contingency documents. To find the existence of an appropriate operating reserve of one full core, this Court need look no further than the same "experienced" personnel who, following the initiation of litigation against the Government, determined that prudent operating reserves should be expanded going forward

at full cost to the United States. The Court also could look to the opinions of Ms. Supko and Mr. Metcalfe as support for the proposition that a prudent operating reserve used by utilities with connected wet pools (such as plant Hatch) is single core reserve.[47]

Second, Dr. Neuberger testified as an expert in modeling economic damages. He was not offered to critique the plaintiffs' operating reserve policy. Rather, he was offered to criticize the plaintiffs' use, through Mr. Metcalfe, of "but for" and actual world models that relied upon materially different assumptions. Dr. Neuberger concluded that, if single core reserve was appropriate in the "but for" world, as a matter of proper damages modeling, the same reserve should be applied in the model of the actual world. Dr. Neuberger then ran the single core reserve assumption in the plaintiffs' damages model – as the model was intended to run before the code was overwritten by plaintiffs' expert – to reach a conclusion as to the number of casks that would have been needed in the actual world to maintain single core offload reserve.

Third, plaintiffs' comparison of the trial court's decision in Indiana Michigan Power Co. v. United States, 60 Fed. Cl. 639, 654-55 (2004), aff'd 422 F.3d 1369 (Fed. Cir. 2005), concerning full core reserve with the plaintiffs' reserve policies is misplaced. The Indiana Michigan decision actually is consistent with the Government's position here. As in this case, the Government argued for the imposition, by the Court, of reserve policies that had been in place since the 1980s, instead of the litigation position articulated by plaintiffs engineers. To suggest, as the plaintiffs do here, that their dual core reserve policy pre-dates this litigation is

---

[47] If the Court were to impose a dual core offload reserve upon the Government in determining plaintiffs' damages, it would be appropriate to implement that policy in the "but for" world as well. In that event, plant Hatch would have loaded eight casks to dry storage and plant Vogtle would have added the Maine Yankee racks in the "but for" world, assuming plaintiffs' rate of acceptance. Tr. 2063:5-21 (Neuberger).

unsupported. Indeed, even after the institution of this litigation, the plaintiffs maintained only a single core reserve and assume such a reserve in the "but for" world as well. As in Indiana Michigan, this Court should hold plaintiffs to the same operational policies that existed prior to the breach.

C. To Award Damages Related To APC For Plant Farley At A 900 MTU Rate Of Acceptance, The Court Must Implement A Fungible Single Full Core Reserve Policy Per Pool At That Facility

In our expert reports, we acknowledge that plant Farley would not have had to construct additional on-site storage under either plaintiffs' 3,000 MTU rate or the 900 MTU rate set forth in the 1991 ACR. However, to award damages under the 900 MTU rate as set forth in the Government's expert reports, this Court must find that APC would have maintained at plant Farley a single full core reserve and that it would have been willing briefly to encroach upon that reserve to avoid constructing dry storage. As set forth in the Government's expert reports, at a 900 MTU rate, plant Farley's two wet pools each are within the single full core reserve plus a re-load for a total of six years at Farley 1 and two years at Farley 2 through 2009, and in both 2007 and 2009, Farley Unit 1 must operate inside a single full core reserve. To the extent that the Court accepts plaintiffs' contentions concerning the full core reserve policy at plant Farley and imposes a single full core reserve plus one reload per pool, APC would have been required to load at least three casks in order to maintain that reserve. In that event, damages would need to be reduced to account for the additional costs that plaintiffs would have incurred to maintain that reserve in the "but for" world.

## X. SOUTHERN NUCLEAR'S INVESTMENT IN PRIVATE FUEL STORAGE IS NOT RECOVERABLE

### A. Plaintiffs Failed To Establish that GPC or APC Paid Any Money In Connection With PFS

The plaintiffs have requested that the Court allow them to recover costs that Southern Nuclear invested in PFS. However, we have located no evidence, either in the record or elsewhere, that either GPC or APC paid any money to PFS. We have also located no evidence that either entity reimbursed or was required to reimburse Southern Nuclear for those expenses. Instead, the evidence shows that Southern Nuclear paid the amounts to PFS.

As previously discussed, no evidence was introduced that demonstrated that Southern Nuclear executed, or is a party to, any Standard Contract with the Government, and Southern Nuclear lacks standing to pursue any damages in this litigation. See Order, at 3-4 (Apr. 7, 2004). Given Southern Nuclear's lack of standing and the absence of any evidence that these costs were incurred by GPC or APC, they should be denied.[48]

### B. Even If GPC Or APC Had Been Responsible For PFS Costs, They Were Not Foreseeable And Did Not Constitute Reasonable Mitigation

As a matter of law, the Federal Circuit's Indiana Michigan decision precludes recovery of Southern Nuclear's contributions in PFS. The issue of the recoverability of amounts paid to PFS squarely was address by the Federal Circuit. In finding that PFS-related costs were not

---

[48] The evidence that Southern Nuclear paid all amounts to PFS is supported by the manner in which plaintiffs' expert divided the PFS expenses between the utilities. The one-third division of the $8.5 million in costs arose out of this litigation, based upon the conclusion that it was appropriate to allocate the costs equally among the three facilities, as opposed to over the two major owners of those facilities (with GPC having 2/3 of the cost allocated to its facilities and APC having 1/3 allocated to plant Farley). This allocation appears necessary because there is no evidence in the record that either GPC or APC paid any amounts to Southern Nuclear for PFS.

recoverable, the Federal Circuit did not simply uphold the trial court's findings of fact. Instead, the Federal Circuit held:

> The credited evidence also showed that the utility's investment in the private storage facility was speculative and that the high cost of the venture was unforeseeable. * * * While DOE should have foreseen that its breach would force Indiana Michigan to find alternate storage for its SNF, it is not liable for such a speculative venture and unforeseeable costs.

Indiana Michigan, 422 F.3d 1369, 1376 (Fed. Cir. 2005). It is worth noting that Southern Nuclear's investment in PFS here exceeds the amounts paid by Indiana Michigan, which were found to be unforeseeable, by $1.3 million. Since foreseeability is measured from the perspective of the defendant, Indiana Michigan, 422 F.3d at 1376, and given that Indiana Michigan's contract with DOE is materially identical to the contracts at issue here, Indiana Michigan is dispositive of Southern Nuclear's claim for $8.5 million in PFS costs.

Outside of the dispositive precedent precluding recovery for PFS, plaintiffs have failed to prove that, at the time of contracting, PFS was a foreseeable consequence of any breach. The purpose of the NWPA and Standard Contract was, ultimately, to transfer ownership of SNF stored on-site at individual utilities to the Federal Government for transportation to and storage at a Government facility. While it may have been foreseeable that, in the event the Government failed to begin timely acceptance, utilities may have needed to increase on-site storage, it certainly was not foreseeable that a small group of utilities would seek off-site alternatives. Moreover, the documents cited by the plaintiffs in support of foreseeability are inapposite. Pl. Br. 119. The 1983 draft Mission Plan contains no reference to the possibility of a privately-funded off-site storage facility in the event of a DOE delay and the citation to PX 68 references a

document that was created six years after contracting. As a result, these documents do not establish foreseeability as of the time of contracting in the early 1980s.

Further, Southern Nuclear's investments in PFS did not constitute reasonable mitigation. The plaintiffs assert that the Government "offered no witness . . . to testify as to whether Southern nuclear [sic] plant management's decision to pursue PFS as an option in the event of difficulty in implementing dry storage was unreasonable mitigation." Pl. Br. 103.[49] Plaintiffs' assertions of evidentiary failures of the Government wholly misrepresent the trial record. Indeed, the Government presented substantial evidence that PFS was not reasonable mitigation during cross-examination of the plaintiffs' personnel. Additionally, the Government introduced numerous internal company documents that contradict the plaintiffs' theory concerning the reasonableness of PFS. While the plaintiffs clearly do not agree, cross-examination and admitted exhibits constitute evidence and belie their litigation theory here.

During cross-examination and with admitted exhibits, the Government established several critical facts that contradict any assertion that PFS constituted reasonable mitigation. The evidence at trial demonstrated that Southern Nuclear's contributions to PFS began in 1995 and continued through 2004. Plaintiffs' post-trial brief incredibly and falsely asserts that, "[w]hen it became obvious that the PFS facility would not be available in time for use by Southern, it ceased its investments." Pl. Br. 109. At trial, the evidence demonstrates that the

---

[49] In the face of the factual evidence concerning PFS that was elicited by the Government, presented above, plaintiffs make the bold assertion that the Government "has not produced one word of testimony that Southern's investment was unreasonable." Pl. Br. 110. While such an absolute statement may appear to plaintiffs as strong legal advocacy, a statement that fundamentally ignores the substantial record in this case is of little assistance to this Court. Indeed, plaintiffs' brief is rife with unequivocal and, unfortunately for the plaintiffs, unsupported statements such as this one.

plaintiffs knew as early as 1995 that PFS would not be licensed and constructed in time to alleviate plant Hatch's storage needs. Indeed, plaintiffs made contributions after beginning loading to the ISFSI at plant Hatch with a final $1.5 million contribution in 2004 after loading 22 casks to the ISFSI at plant Hatch, after constructing the ISFSI at plant Farley, and after performing the rack addition at plant Vogtle.

Plaintiffs' assertion that they needed an insurance policy in the event of political opposition to dry storage is belied by the results of a 1994 study for management – before a single contribution was made by plaintiffs to PFS – in which the plaintiffs' attorneys and the Task Force studying storage expansion options concluded that plaintiffs would have no problems storing SNF on-site throughout operations.[50] Indeed, in 1994, the Hatch Spent Fuel Task force noted the possibility of PFS but recommended that plant Hatch pursue dry storage. Indeed, the PFS option is not reflected in the final recommendation of the Task Force, as an "insurance policy" or otherwise.

In addition, there is substantial evidence that PFS was unreasonably speculative. Indeed, Mr. Cocherell testified that, when plaintiffs were considering PFS, he opposed it because he believed that the plaintiffs should deal with their own storage problems. Indeed, Mr. Cocherell raised concerns about whether the facility ever would be licensed, and he expressed his opinion to senior management that plaintiffs should not participate. Mr. Cocherell also acknowledged that substantial hurdles to the successful completion of PFS were present from the beginning of the project. These hurdles included opposition from the State of Utah, potential opposition from

[50] Plaintiffs assert that they did not know what "political obstacles [they] would face" in constructing dry storage. Pl. Br. 109. This statement plainly is contradicted by the September 1994 Task Force report.

the states along the transportation routes to the PFS facility, and concerns as to whether PFS could obtain sufficient financing for the construction of the PFS facility (estimated to exceed $100,000,000. At the time of trial – which was after PFS obtained its license from the NRC but before Southern Nuclear withdrew from the effort – Mr. Cocherell still could not predict whether a PFS facility will ever be constructed.

The evidence also demonstrates that, even if PFS had become operational in time to relieve plaintiffs' on-site storage needs, PFS was substantially more expensive than on-site dry storage upon a per kilogram basis. While the plaintiffs contend in their post-trial brief that they did not know "whether the centralized, multi-user facility such as PFS might be more economically than on-site storage," that contention blatantly is false. Instead, documents pre-dating the plaintiffs' first contributions to PFS concluded that off-site storage at a PFS facility would be more expensive than on-site storage. This conclusion is supported by Mr. Long, who testified that, as long as dry storage was allowed in Georgia and Alabama, plaintiffs would have no interest in PFS. If plaintiffs actually believed that PFS might have been cheaper, Mr. Long's unequivocal statement makes no sense. Similarly, Mr. Long admitted that, as long as it was cheaper to store SNF onsite, Southern Nuclear would not choose to store fuel at PFS. The evidence demonstrate that PFS would not have constituted reasonable mitigation even if constructed.

Investment in PFS, known to be the more expensive, less desirable, and ultimately unused alternative, cannot be considered reasonable mitigation. The Court of Appeals for the Federal Circuit held in Indiana Michigan, "[w]hile DOE should have foreseen that its breach would force Indiana Michigan to find alternative storage for its SNF, it is not liable for such a speculative venture and unforeseeable costs." Indiana Michigan, 422 F.3d at 1376. Here, too, it

is clear that Southern Nuclear's investment in PFS was a wholly speculative venture, unlikely to resolve the plaintiffs' spent fuel storage dilemma, and not attributable to DOE's partial breach of the Standard Contract. Thus, the investment should be rejected as part of its damages claim.

## XI. PLAINTIFFS' CANNOT RECOVER THEIR CLAIM FOR THE COST OF CAPITAL GROSS-UP OF PAST COSTS AS A MATTER OF LAW OR FACT

Plaintiffs have improperly included nearly $29 million in their damages claim associated with the alleged application of a "cost of capital" to increase their past costs so as to account for the time value of money. Plaintiffs' claims for a "cost of capital" gross-up of their past costs fails as a matter of law and fact.

First, interest upon a claim against the United States is precluded under 28 U.S.C. § 2516(a) unless permitted pursuant to a contract or Act of Congress, a fact that plaintiffs acknowledge. See Pl. Br. 162. Plaintiffs attempt to circumvent the well-established rule precluding the recovery of prejudgment interest by contending that the cost of capital gross-up for its past costs does not represent interest "on a claim," which they concede would be barred, but, rather, constitutes interest as a component of a claim. Pl. Br. 53-54. As the United States Supreme Court explained in Library of Congress v. Shaw, 478 U.S. 310 (1986), "'the force of the no-interest rule cannot be avoided simply by devising a new name for an old institution: '[T]he character or nature of 'interest' cannot be changed by calling it 'damages,' 'loss,' 'earned increment,' 'just compensation,' 'discount,' 'offset,' or 'penalty,' or any other term, because it is still interest and the no-interest rule applies to it.'" England v. Contel Advanced Systems, Inc., 384 F.3d 1372, 1379 (Fed. Cir. 2004) (citing Shaw, 478 U.S. at 321). Importantly, the Supreme Court has identified the underlying purpose behind prejudgment interest, which is to make the injured party whole. Monessen Southwestern Railway Co. v. Morgan, 486 U.S. 330, 345 (1988)

(Blackmun, J., concurring in part, dissenting in part) (stating that Supreme Court repeatedly has repeatedly "authorized prejudgment interest for economic injury when the purpose of the overall award is to make the plaintiff whole"). Here, plaintiffs' attempt to recover this cost of capital gross-up plainly is, according to their own expert, an attempt to "make themselves whole" based upon the time value of money and, therefore, constitutes interest upon a claim, rather than a distinct element of their damages claim. Moreover, as Dr. Neuberger testified at trial, from an economics perspective, plaintiffs' claim for the cost of capital gross-up upon their past damages claim is the equivalent in all material respects to a claim for prejudgment interest.

In other words, contrary to plaintiffs' litigation-inspired argument, plaintiffs' expert agrees that the purpose of the cost of capital is simply a "more direct and appropriate" way of effectuating the purpose of prejudgment interest. Tr. 1674:3-1675:19 (Metcalfe). Further, this Court has unequivocally rejected claims for the replacement cost of capital because such claims are simply disguised claims for prejudgment interest. See Columbia First Bank v. United States, 54 Fed. Cl. 693, 699-700 (2002) (rejecting plaintiff's claim for $4.4 million to "compensat[e] the plaintiff for the lost use of the money for the intervening period" because such cost violated ban upon prejudgment interest).

Plaintiffs' reliance upon several Winstar cases for the proposition that the recovery of the borrowed cost of capital is recoverable is misplaced. Pl. Br. 162. There is no evidence in the record that the plaintiffs borrowed monies to finance their past damages and, therefore, incurred out-of-pocket financing costs paid to third parties. Rather, the evidence demonstrates that the plaintiffs simply utilized their own funds to pay for their past costs. As a result, plaintiffs merely are claiming an economic cost associated with the financing of past costs. However, as this Court recently explained, "in Winstar cases, plaintiffs cannot recover damages under a cost

replacement capital theory for costs they did not actually incur." Standard Federal Bank v. United States, 62 Fed. Cl. 265, 292 (2004). This is precisely what plaintiffs are attempting to do in claiming as a damage their cost of capital gross-up in this case. As a matter of law, plaintiffs are not entitled to recover the cost of capital incurred upon the dry storage project.[51]

Finally, plaintiffs' reliance upon the Court's decision in TVA v. United States, 69 Fed. Cl. 515 (2006), is misplaced. Pl. Br. 164. While we disagree with the Court's conclusion that AFUDC is recoverable as a matter of law,[52] the plaintiffs here are not seeking AFUDC, which is

---

[51] In the Indiana Michigan litigation, the trial court rejected plaintiff's gross-up of its past costs based upon the principles articulated in Shaw. It is worth noting that the individuals responsible for preparing the plaintiff's claim in Indiana Michigan are, with one exception, those responsible for preparing plaintiffs' claim here.

[52] In awarding damages in TVA, the trial court refused to exclude a category of costs referred to as "Allowance for Funds Used During Construction" ("AFUDC"). AFUDC is a pro-rated share of the average monthly interest rate that TVA has been charged on all of the long- and short-term debt that it has issued to finance capital expenditures and operating costs for all of its corporate divisions or organizations. As a general matter, "[i]nterest paid on bank loans made because of financial stringency resulting from a breach by the [g]overnment of a contract between it and the borrower is not recoverable as an item of damage." J.D. Hedin Constr. Co. v. United States, 456 F.2d 1315, 1330 (1972). Nevertheless, the Federal Circuit has more recently held that, "[a]lthough interest on equity capital is not recoverable, a contractor may recover interest actually paid on funds borrowed because of the government's delay in payments and used on the delayed contract." Wickham Contracting Co. v. Fischer, 12 F.3d 1574, 1582 (Fed. Cir. 1994) (emphasis added). To recover such interest costs, "changed work either must be directly traced to a specific loan or a necessity for increased borrowing must be shown to have been required by extra work or delay caused by the government." Gevyn Constr. Corp. v. United States, 827 F.2d 752, 754 (Fed. Cir. 1987) (emphasis added). "In the latter situation, the allowance of interest depend[s] upon a specific showing that the course of borrowing was affected by the change in question, i.e., that apart from the normal borrowing pattern, there was a necessity to borrow specifically due to the change in question." Singer Co. Librascope Div. v. United States, 568 F.2d 695, 718 (Ct. Cl. 1977); see Framlau Corp. v. United States, 568 F.2d 687, 694 (Ct. Cl. 1977) (to recover interest on borrowings necessitated by changed work, plaintiff must "prove what part, if any, of its large borrowings were attributable to compensable changes" and that it was "forced to borrow to perform the changed work"). In TVA, the trial court erred by allowing TVA to recover AFUDC without requiring TVA to show a match between capital expenditures and specific debt instruments. Here, the plaintiffs have not even alleged that they actually paid interest on loans obtained to finance their ISFSI projects.

a creature of regulated industry. Here, the plaintiffs are seeking to recover a cost of capital that was added by their damages expert in connection with this litigation, and not an AFUDC that was used to earn a return on funds used during the construction of their ISFSIs. Moreover, unlike an AFUDC, the plaintiffs applied the cost of capital to all of their damages components, including those components that are not, as a matter of accounting, capitalized. Plaintiffs' reliance upon decisions involving AFUDC are not applicable to the calculations underlying their claim for nearly $30 million in prejudgment interest.

As a matter of fact, the plaintiffs' claims for their "cost of capital" also fails. At trial, the evidence demonstrated that none of these three plaintiffs raises capital. As a result, none of these three plaintiffs incurs a cost of capital in connection with the raising of capital. Instead, these plaintiffs are funded by a parent company, Southern Company, which is responsible for raising capital. Indeed, plaintiffs applied a cost of capital applicable to Southern Company, and not to these plaintiffs. Notwithstanding plaintiffs' failure to prove that any capital was raised by the Southern Company for these SNF storage-related projects, to the extent any cost of capital has been incurred, Southern Company has incurred those costs. However, Southern Company is not in privity with the Government – as it is not a party to the Standard Contract – and, further, is not a plaintiff in this case. Even if the plaintiffs could recover their cost of capital as a matter of law (which they cannot), they have failed to establish that they suffered any damages related to the cost of capital that they apply in this litigation.

## CONCLUSION

For the reasons outlined above, the Government respectfully requests that the Court enter judgment in the Government's favor.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/Harold D. Lester, Jr.
HAROLD D. LESTER, JR.
Assistant Director

OF COUNSEL:

STEPHEN FINN
JOSHUA E. GARDNER
HEIDE L. HERRMANN
MARIAN E. SULLIVAN
Trial Attorneys
Commercial Litigation Branch
Civil Division
Department of Justice
Washington, D.C. 20530

s/John C. Ekman
JOHN C. EKMAN
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington D.C. 20530
Tele: (202) 353-0897
Fax: (202) 307-2503

May 24, 2006

Attorneys for Defendant

CERTIFICATE OF FILING

I hereby certify that on this 24th day of May, 2006, a copy of foregoing "DEFENDANT'S POST-TRIAL BRIEF" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ John C. Ekman