**No. 98-614C**
**(Senior Judge Merow)**

---

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**SOUTHERN NUCLEAR OPERATING COMPANY,**
**ALABAMA POWER COMPANY AND GEORGIA POWER COMPANY,**

**Plaintiffs,**

**v.**

**THE UNITED STATES,**

**Defendant.**

---

# PLAINTIFFS' REPLY BRIEF

---

**M. Stanford Blanton**
**BALCH & BINGHAM LLP**
**1710 Sixth Avenue North**
**Birmingham, AL 35203**
**Telephone: (205) 226-3417**
**Facsimile: (205) 226-8798**

**Of Counsel:**

**Ed R. Haden**
**K. C. Hairston**
**BALCH & BINGHAM LLP**
**1710 Sixth Avenue North**
**Birmingham, AL 35203**
**Telephone: (205) 251-8100**
**Facsimile: (205) 226-8798**

**Ronald A. Schechter**
**Jeffrey L. Handwerker**
**Matthew M. Shultz**
**ARNOLD & PORTER LLP**
**555 Twelfth Street, N.W.**
**Washington, D.C. 20004-1202**
**Telephone: (202) 942-5000**
**Facsimile: (202) 942-5999**

**June 16, 2006**

**TABLE OF CONTENTS**


TABLE OF AUTHORITIES ..... iii

SUMMARY OF THE ARGUMENT ..... 2

ARGUMENT ..... 8

I. DOE's 3000 MTU Annual Acceptance Rate Is a Reasonable Rate That Fulfills DOE's Contractual Obligations. ..... 8

A. The Nuclear Waste Policy Act, the Standard Contract, and the Government's Partial Breach. ..... 8

B. Eileen Supko's Expert Opinions. ..... 15

II. The Number of Casks Southern Loaded at Plant Hatch was Based on a Reasonable Operating Reserve. ..... 24

A. Southern's Documents Tracked, and Southern Actually Used, the Minimum 1 FCR to Determine When and Whether to Build an ISFSI and the 2 FCR for Maintaining Long-Term Operational Efficiency. ..... 27

1. Southern's Documents Tracked 1 FCR and 2 FCR and Southern's Nuclear Engineers and Managers Explained the Use of the 1 FCR and 2 FCR Operating Reserves. ..... 27

2. Southern's Facts are Markedly Different from those in *Indiana Michigan*. ..... 35

B. Southern's 1 FCR Minimum Operating Reserve is Consistent in Both the Actual and Non-Breach Cases and its 2 FCR Long-Term Operating Reserve is More Conservative than the Non-Breach Case. ..... 37

1. Southern Consistently Used the 1 FCR Minimum Operational Reserve in the Breach and Non-Breach Cases to Determine When to Build an ISFSI. ..... 37

2. Contract Law Does Not Require Southern's Actual Long-Term Reserve Target to be Identical to the Operating Reserve in the Non-Breach Case. ..... 40

C. Southern's Use of the 1 FCR Operating Reserve to Determine When and Whether to Build an ISFSI in the Breach Case was Reasonable. ..... 41

1. Southern's Use of the 1 FCR Minimum to Determine Whether to Build an ISFSI in the Non-Breach Case was Reasonable. ..... 42

2. The Government's Cited Law Does Not Support its Argument in this Case. ..... 43

III. Southern's Purchase of the HI-STAR Casks Was Reasonable When the Decision was Made in 1999. .......... 45

IV. Southern's Internal Labor, Engineering, and Supervision Costs were Incremental Because they Deprived Southern of Other Work its Employees Would Have Performed Had DOE Not Breached. .......... 50

V. Southern's Private Fuel Storage Costs Were Foreseeable and Reasonable. .......... 53

A. A PFS Facility was Reasonably Foreseeable to DOE. .......... 54

B. Southern's Decommissioning Studies and 1994 Strategy Report Support the Reasonableness of Southern's Payments to PFS. .......... 57

VI. The Miscellaneous Cost Items Were Reasonable. .......... 59

VII. The Cost of Capital Adjustment is a Separate Recoverable Element of Damages, Not Prejudgment Interest. .......... 60

CONCLUSION .......... 62

CERTIFICATE OF SERVICE .......... 64

# TABLE OF AUTHORITIES

## CASES

*Alaska Pulp Corp. v. United States*, 59 Fed. Cl. 400 (2004) .......... 36

*Autotrol Corp. v. Continental Water Systems Corp.*, 918 F.2d 689 (7th Cir. 1990).......... 5, 50, 51

*Boston Edison Co. v. United States*, 64 Fed. Cl. 167 (2005) .......... 14

*Citizens Federal Bank v. United States*, 66 Fed. Cl. 179 (2005), *appeal dismissed*, 2006 U.S. App. LEXIS 8099 (Fed. Cir. Mar. 23, 2006) .......... 49

*Commonwealth Edison Co. v. United States*, 56 Fed. Cl. 652 (2003) .......... passim

*Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) .......... 19

*First Hartford Corp. Pension Plan & Trust v. United States*, 194 F.3d 1279 (Fed. Cir. 1999).......... 1

*First Nationwide Bank v. United States*, 56 Fed. Cl. 438 (Fed. Cl. 2003), *aff'd* 431 F.3d 1342 (Fed. Cir. 2005) .......... 46, 47

*In re Application for Certificate of Need for Indep. Spent Fuel Storage Installation* (ISFSI), 501 N.W.2d 638 (Minn. Ct. App. 1993), *review denied*, 1993 Minn. LEXIS 477 (Minn. July 15, 1993).......... 56

*In re Northern States Power Co.*, 604 N.W.2d 386 (Minn. Ct. App. 2000) .......... 29, 56

*Indiana Michigan Power Co. v. Dep't of Energy*, 88 F.3d 1272 (D.C. Cir. 1996).......... 9, 10

*Indiana Michigan Power Co. v. United States*, 57 Fed. Cl. 88 (2003) .......... passim

*Indiana Michigan Power Co. v. United States*, 60 Fed. Cl. 639 (2004), *aff'd*, 422 F.3d 1369 (Fed. Cir. 2005) .......... passim

*Indiana Michigan*, 422 F.3d 1369 (Fed. Cir. 2005).......... 25, 26, 40

*Maine Yankee Atomic Power Co. v. United States*, 225 F.3d 1336 (Fed. Cir. 2000) .......... 9, 10

*New York State Energy Research & Dev. Auth. v. Nuclear Fuel Serv., Inc.*, 666 F.2d 787 (2d Cir. 1981).......... 56

*Northern States Power Co. v. United States Dep't of Energy*, 128 F.3d 754 (D.C. Cir. 1997), *cert. denied*, 525 U.S. 1016 (1998) .......... 8, 10

*Park Village Apartments v. United States*, 32 Fed. Cl. 441 (1994) .......... 19

*Sacramento Municipal Utility District v. United States*, 63 Fed. Cl. 495 (2005) .......... 13, 14

*Sacramento Municipal Utility District v. United States*, 70 Fed. Cl. 332 (2006) .......... passim

*Southern Pacific Communications Co. v. AT&T*, 556 F. Supp. 825 (D.D.C. 1982), *aff'd*, 740 F.2d 980 (D.C. Cir. 1984), *cert. denied*, 470 U.S. 1005 (1985) .......... 43, 44, 48

*System Fuels, Inc. v. United States*, 66 Fed. Cl. 722 (2005) .......... 13, 14

*Tennessee Valley Auth. v. United States*, 69 Fed. Cl. 515 (2006). .......... passim

*Westfed Holdings, Inc. v. United States*, 52 Fed. Cl. 135 (2002), *aff'd in relevant part and rev'd in part*, 407 F.3d 1352 (Fed. Cir. 2005) ............................................................ 7, 60

*Yankee Atomic Electric Co. v. United States*, No. 98-126C (Fed. Cl. June 26, 2003)............ passim

**STATUTES**

Nuclear Waste Policy Act of 1982, *as amended*, Pub. L. 97-425, 96 Stat. 2201 (codified at 42 U.S.C. §§ 10101-10270)........................................................................ passim

42 U.S.C. § 10131 ............................................................................................................... 9

42 U.S.C. § 10155 ......................................................................................................... 55, 56

42 U.S.C. § 10222 ............................................................................................................... 9

**LEGISLATIVE HISTORY**

H.R. Rep. 97-491 (1982), *as reprinted in* 1982 U.S.C.C.A.N. 3792 ............................................ 55

**OTHER AUTHORITIES**

E. Allan Farnsworth, *Contracts* § 12.12 ......................................................................... 49

Oliver Wendell Holmes, *The Common Law* 1 (1881) ................................................................. 40

*Restatement (Second) of Contracts* § 350 .................................................................... 40, 41

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **Southern Nuclear Operating Company, Inc.,**<br>**Alabama Power Company,**<br>**and Georgia Power Company**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**THE UNITED STATES,**<br><br>**Defendant.** | **)**<br>**)**<br>**)**<br>**)**<br>**)**<br>**)**<br>**)**<br>**)**<br>**)**<br>**)**<br>**)** | **No. 98-614C**<br>**(Senior Judge Merow)** |

**PLAINTIFFS' REPLY BRIEF**

Plaintiffs Alabama Power Company ("APC"), Georgia Power Company ("GPC"), and Southern Nuclear Operating Company, Inc., ("SNC")[1] (collectively, "Southern") file this Reply to the Government's Post-Trial Brief.

[1] The Government argues that SNC should be dismissed because it is not a party to the contracts with DOE (the "Contracts"). (Def.'s Post-Trial Br. 92-93.) While not a party to the Contracts, SNC is a proper party to this lawsuit because the Operating Agreements with APC and GPC designate SNC as their "attorney-in-fact and agent" and SNC has administered the Contracts with DOE on this basis. (Trial Tr. vol. 1, 120, 123, 125-26, Oct. 17, 2005) (Long Test.) [Hereinafter "Tr."]; (PX 806 §§ 2.1, 2.11 (GPC Nuclear Operating Agreement)); PX 807 § 2.01(b) (APC Nuclear Operating Agreement)). Where a person or entity acts on behalf of a corporation that is a party to a contract, that person or entity is a proper party to a breach of contract action in this Court. *See First Hartford Corp. Pension Plan & Trust v. United States*, 194 F.3d 1279 (Fed. Cir. 1999). SNC, APC, and GPC incorporate Plaintiffs' Response to the Government's Motion to Dismiss Southern Nuclear Operating Company as a Plaintiff for Lack of Subject Matter Jurisdiction (Jan. 24, 2002, Dkt. 119). Because APC and GPC bear the costs claimed as damages in this action, damages should be awarded to APC and GPC only.

## SUMMARY OF THE ARGUMENT

The Government makes several arguments in an attempt to reduce Southern's damages, each of which fail for the reasons set forth below:

The Government's Argument that the 3000 MTU Annual Rate is Improper Fails Because that is DOE's Own Published Rate, the 900 MTU Rate Was Based on a Statutorily-Barred MRS, and Ms. Supko's Relevant and Reasonable Expert Opinion Demonstrated that the 3000 MTU Annual Rate Is Reasonable – [$21,866,220] – This Court has held that an acceptance rate term is missing from the Standard Contract and that the Court therefore must supply a reasonable acceptance rate term. The Government argues that its liability should be limited to the obligation to accept 900 Metric Tons Uranium ("MTUs") of spent nuclear fuel ("SNF") per year and limited by the Standard Contract's Delivery Commitment Schedule ("DCS") process. This Court has repeatedly rejected these arguments because the 900 MTU rate was based on a Monitored Retrievable Storage ("MRS") facility that the Department of Energy ("DOE") was barred by statute from constructing and the DCS process was not contractually binding and, in any event, never completed.

Presumably because the officials in charge of DOE's radioactive waste program testified that a 3000 MTU annual acceptance rate was reasonable, the Government offers no evidence that its proposed 900 MTU rate is reasonable. Instead, the Government focuses its rate argument on unfounded criticism of the methodology underlying Ms. Eileen Supko's opinion that the 3000 MTU rate is reasonable. Ms. Supko was clearly qualified to offer her expert opinion based on her education and experience; indeed, the Nuclear Regulatory Commission ("NRC") has relied on her work. Her opinion on the rate is relevant because it determines how much SNF DOE was obligated to remove. Her opinion was reliable because its methodology was the same as the methodology she uses on her consulting work and DOE's own Lake Barrett and Christopher

Kouts agreed with its results. Southern introduced additional evidence that demonstrated that a 3000 MTU steady state rate was reasonable – such a rate was consistent with the purpose and intent of the Nuclear Waste Policy Act of 1982 ("NWPA" or "Act") and the Standard Contract, as well as the intent of the parties to the Contract to prevent additional on-site storage after January 1998, to reduce the SNF backlog at a reasonable pace, and to allow for orderly decommissioning of the reactors. The Court should adopt this rate in determining Southern's damages

The Government's Argument that Southern's Cask Loading Schedule is Based on an Unreasonable Operating Reserve Fails Because Southern's Operating Reserve is More Conservative than it Would Have Been Had DOE Performed, is Supported by Numerous Documents, and is Supported by the Testimony of Southern's Nuclear Engineers and Managers – [$7,697,015] – The Government argues that Southern loaded an excessive amount of casks from the Plant Hatch reactor pool. The Government argues that Southern should be limited to the number of casks needed to maintain only one full core reserve ("FCR") for both of Plant Hatch's reactors and contends that its position is supported by Southern internal documents that tracked when the Plant Hatch pool would lose 1 FCR. The Government's argument improperly collapses two different decisions. First, Southern determined when to build the ISFSI to avoid shutting down the plant using a minimum of 1 FCR. Second, Southern determined that it was reasonable to recover space sufficient to discharge the core of each of its reactors – which equates to 2 FCRs - as a long-term operating position. Consistent with its documents that track both 1 FCR and 2 FCRs, Southern's nuclear engineers and managers testified that it is reasonable for Plant Hatch to maintain a 2 FCR in the long-term for operational efficiency, but they would temporarily

accept a reduction in the operating reserve down to 1 FCR to determine when to build an ISFSI. It is undisputed that Southern actually built the ISFSI at Plant Hatch when its operating reserve was only 1 FCR. It is also undisputed that while Southern's actual cask loading schedule is designed to recover dual core offload capability – or 2 FCR – in the future, it did not place Southern in as good a position – with as much usable reactor pool space – on December 31, 2004, as it would have enjoyed had DOE performed at the 3000 MTU rate.

The Government's Argument that Southern's Decision to Purchase Three HI-STAR Casks and Related Equipment was Unreasonable Fails Because it is Based on Hindsight, Would have Required Southern to Wait to the Last Minute to Load Casks, and Assumes Away the Fact that the HI-STORM Casks Were Not Licensed for Use – [$14,919,855] – The Government contends that because the less expensive HI-STORM was licensed in June 2000, Southern could have waited until then to order casks and make the other arrangements necessary for cask loading by September 2001 when the 1 FCR would be lost. The Government's argument is based on second guessing of decisions using 20/20 hindsight. Because of the long lead time for cask fabrication, cask licensing, and ISFSI construction, Southern's management made the decision to order casks in early 1999 when it was still "uncertain" when and if the HI-STORMs would be licensed. First, it would be unreasonable to require Southern to wait until the last minute before it lost its minimum operating reserve to load its first casks – a first of its kind operation at a boiling water reactor. Second, even had Southern waited until 2001 to load casks, the cask selection would have been made at a time (1999) when the HI-STORM casks were not yet licensed and the HI-STAR casks were far ahead of the HI-STORM casks in the licensing process. Finally, the three HI-STAR casks that were purchased provided Southern with valuable

operational flexibility to transport spent fuel to other sites or to centralized storage facilities, a valuable commodity given Southern's understandable lack of confidence in the Government's performance of its responsibilities.

The Government's Argument that Southern's Internal Labor, Engineering, and Supervision were Not Incremental Fails Because the SNF Work Deprived Southern of a Reduction in its Backlogged Plant Maintenance Projects and Because the Use of Southern's Own Personnel was Less Expensive than the Use of Outside Contractors – [$6,466,016] – The Government asserts that under *Autotrol Corp. v. Continental Water Systems Corp.*, 918 F.2d 689 (7th Cir. 1990) (Posner, J.), Southern's use of internal labor, engineering, and supervision was not incremental because Southern would have paid its employees anyway and Southern did not show that its employees worked overtime. *Autotrol*, 918 F.2d at 692-93, however, states that the Government's argued-for incremental "analysis is superficial" and that the correct test is whether the breach deprived the non-breaching party (*i.e.*, Southern) of valuable services of its own employees. Southern established that the SNF work prevented its employees from reducing maintenance backlogs. Moreover, Southern established that using its own employees to load SNF casks was 50% less expensive than using outside contractors.

The Government's Arguments that Southern's Payments to PFS Were Unforeseeable and Unreasonable Fail Because the Head of DOE's SNF Program and the NWPA Expressly Recognized Private Off-Site Storage in 1982-83 and Southern's Documents Recognize that PFS Could be Implemented – [$8,466,672] – The Government argues that Southern's $8.5 million of payments to PFS were not foreseeable in 1983 when DOE signed the Contracts and were not

reasonable because a 1994 report stated that SNF could be stored on-site as long as the plant was operating. To the contrary, it was clearly foreseeable in 1983 that utilities might resort to off-site storage without Government performance of its obligations under the contract. Robert Morgan, DOE's director of the SNF storage program, recognized off-site storage as an option when he stated in 1983: "During the first year of operation of the repository in 1998, we should be receiving fuel at a rate so that **no utility would have to add any further storage facilities** either on site or **at another location**." (PX 53 (Robert Morgan, Proceedings of the 1983 Radioactive Waste Management Program, December 12-15, 1983: Program Overview), at 11 (Feb. 1984)) (emphases added). Similarly, the NWPA recognizes that off-site SNF storage was a possibility for utilities that had exhausted on-site storage capacity. NWPA § 135(h) (codified at 42 U.S.C. § 10155(h)).

The Government's argument that the payments to PFS were not reasonable because the 1994 Hatch Spent Fuel Storage Task Force Report noted that spent nuclear fuel could be stored on-site for the life of plant assumes that Southern could only recover for PFS if it was the only legal alternative to Southern for dealing with the hardship imposed by the Government's disregard of its contractual obligations. The premise of the Government's argument is simply wrong. The report in question simply stated a correct proposition of law, that Southern has unfortunately been required to apply since the Government has so completely ignored its obligations. Moreover, the report in question also noted that the situation could become "political" and that "[a] private MRS could be implemented," (DX 158 (1994 Report) at 19, SN065623,)) – a fact the Government conveniently omits from its discussion. Finally, DOE stated in 2002 that "DOE recognizes interim storage at the Private Fuel Storage Facility in Utah

to be a reasonably foreseeable future action…," (PX 817 (DOE, Environmental Impact Statement) at vol. III § 9.1).

The Government's Argument that Southern's Cost of Capital was Prejudgment Interest (*i.e.*, a Fixed Interest Rate Applied to Costs Incurred) Fails Because Southern Incurred a Separate Cost of Obtaining Debt and Equity Capital at Fluctuating Rates to Fund SNF Storage Projects and Such Cost is Recognized by FERC – [$28,423,972] – The Government argues that Southern's cost of capital is merely re-labeled prejudgment interest that cannot be recovered. Southern's damages expert, Mr. Metcalfe, however, explained that prejudgment interest is not a cost incurred by the plaintiff, but is an arbitrarily selected fixed rate imposed upon all costs that were incurred (including financing costs) regardless of the actual cost of capital of the plaintiff. Southern's cost of capital, however, is a real cost, based on APC's and GPC's respective weighted average costs of debt and equity capital, that it incurred to obtain the real money that was spent on its SNF projects. "[T]he distinction between interest as an element of damages and interest on a claim is well-recognized." *Westfed Holdings, Inc. v. United States*, 52 Fed. Cl. 135, 163 (2002) (internal quotations omitted), *aff'd in relevant part and rev'd in part*, 407 F.3d 1352 (Fed. Cir. 2005). Federal Energy Regulatory Commission ("FERC") accounting principles recognize that utilities actually do incur a cost of capital Allowance for Funds Used During Construction ("AFUDC").

## ARGUMENT

Southern seeks damages for costs it has reasonably incurred to store SNF. Southern has calculated its past damages based on DOE's published rate of SNF acceptance and the reasonable decisions of Southern's experienced and successful team of nuclear engineers and managers. The Government challenges its own published acceptance rate based on previously rejected legal theories, and it challenges the experienced judgment of Southern's nuclear engineers and managers based on 20/20 hindsight, as opposed to the opinion of its own nuclear expert whom it withdrew from trial.

### I. DOE's 3000 MTU Annual Acceptance Rate Is a Reasonable Rate That Fulfills DOE's Contractual Obligations.

#### A. The Nuclear Waste Policy Act, the Standard Contract, and the Government's Partial Breach.

The Government's post-trial brief recycles the same arguments that it repeatedly has raised, and that numerous courts repeatedly have rejected, regarding the meaning and intent of the NWPA and the Standard Contract, as well as the Government's partial breach of that Contract. (Def.'s Post-Trial Br. 100-161.) Southern's opening brief addressed in detail virtually all of the Government's arguments. Given the extensive record in this case, as well as the Court's familiarity with the issues, Southern will not repeat its arguments here. Instead, Southern will summarize the **existing case law**, including the law of this case, that demonstrates the error of the Government's positions.

Congress enacted the NWPA to address "the 'national problem' posed by the accumulation of spent nuclear fuel and radioactive waste produced by various domestic sources." *Northern States Power Co. v. United States Dep't of Energy*, 128 F.3d 754, 756 (D.C. Cir. 1997), *cert. denied*, 525 U.S. 1016 (1998). In the NWPA, Congress recognized that the federal

government bore the responsibility for permanently disposing of radioactive waste to protect the public health, the public safety, and the environment. *See* 42 U.S.C. §§ 10131(a)(4), (b)(2); *Maine Yankee Atomic Power Co. v. United States*, 225 F.3d 1336, 1337 (Fed. Cir. 2000); *Indiana Michigan Power Co. v. United States*, 57 Fed. Cl. 88, 90 (2003). The NWPA imposed two duties on DOE triggered by different conditions and at different times. One, in return for the payment of fees by the utilities, DOE was to dispose of SNF beginning no later than January 31, 1998. 42 U.S.C. § 10222(a)(5)(B); *Indiana Michigan Power Co. v. Dep't of Energy*, 88 F.3d 1272, 1276 (D.C. Cir. 1996). Two, DOE was to take title to SNF following the start of repository operations and upon the request of a utility. 42 U.S.C. § 10222(a)(5)(A); *Indiana Michigan*, 88 F.3d at 1276. *See also Indiana Michigan*, 57 Fed. Cl. at 91 n.9.

The NWPA obligated the DOE to start disposing of nuclear utilities' SNF no later than January 31, 1998. *Indiana Michigan*, 88 F.3d at 1277.[2] Further, Congress provided that the generators and owners of nuclear waste should bear the costs of the waste's disposal. *See* 42 U.S.C. §§ 10131(a)(4), (b)(2); *Maine Yankee*, 225 F.3d at 1337; *Indiana Michigan*, 57 Fed. Cl. at 90. Therefore, in return for the DOE's obligation to start disposing of SNF no later than January 31, 1998, nuclear utilities have reciprocal obligations to pay the fees established by the Act. *Indiana Michigan*, 88 F.3d at 1277.

To accomplish the goals of the NWPA, the Act further authorized the DOE to enter into the Standard Contracts with utilities for the disposal of SNF. *Maine Yankee*, 225 F.3d at 1337.

[2] Moreover, in holding that Maine Yankee Atomic Power Company's claims against the Government were ripe, this Court found that DOE had an obligation "to begin accepting, transporting, and disposing of Maine Yankee's SNF 'not later than January 31, 1998.'" *Maine Yankee Atomic Power Co. v. United States*, 42 Fed. Cl. 582, 583 (1998). *But see Sacramento Mun. Util. Dist. v. United States*, 70 Fed. Cl. 332, 339 (2006) ("The Standard Contract did not specify a date that DOE would accept a particular utility's SNF and HLW."). In addition, DOE was obligated to continue collecting SNF once it began collecting in 1998. *See Indiana Michigan*, 57 Fed. Cl. at 97.

By prohibiting the issuance of licenses to a utility that has not entered into a Standard Contract, the NWPA effectively made these contracts mandatory for the utilities. *Id.*

In two separate opinions, the United States Court of Appeals for the District of Columbia Circuit held that the Government had an unconditional obligation under the Act and the Standard Contracts to commence removal of SNF no later than January 31, 1998 and that the Government could not rely on its failure to construct a repository as an excuse for its non-performance. *See Northern States*, 128 F.3d at 760; *Indiana Michigan*, 88 F.3d at 1276-77. Thus, the Government cannot invoke the provision in the Standard Contract's unavoidable delay clause related to acts of the Government in its sovereign or contractual capacity. *Northern States*, 128 F.3d at 760.

In *Maine Yankee*, 255 F.3d at 1342, the United States Court of Appeals for the Federal Circuit held that the DOE's failure to begin acceptance of SNF by January 31, 1998 was a partial breach of contract that extended to all utilities. The Federal Circuit also held that the avoidable delays clause of the Standard Contract applied only to the types of delays that "routinely" arise after performance under the contract has begun and not to the delay of "a critical and central obligation of the contract" – to begin SNF acceptance by January 31, 1998. *Id.* at 1341. In light of the rulings in *Maine Yankee*, 225 F.3d 1336, and *Northern States*, 224 F.3d 1361, this Court granted Southern's motion for summary judgment on the issue of the Government's contractual liability. Apr. 7, 2004 Order, Dkt. No. 234 at 4-5.

This Court has held that an acceptance rate term is missing from the Standard Contract. *Indiana Michigan*, 57 Fed. Cl. at 96; *Commonwealth Edison Co. v. United States*, 56 Fed. Cl. 652, 662 (2003); *see Yankee Atomic Electric Co. v. United States*, No. 98-126C, slip op. at 2 (Fed. Cl. June 26, 2003) (adopting Judge Hewitt's opinion in Commonwealth Edison to the extent applicable); *Southern Nuclear Operating Co. v. United States*, No. 98-614, Apr. 7, 2004

Order, at 6 (same). Accordingly, Judge Hewitt, Judge Hodges, and Your Honor have held that the Court must supply a reasonable acceptance rate term. *Indiana Michigan*, 57 Fed. Cl. at 96; *Commonwealth Edison*, 56 Fed. Cl. at 662; *see Yankee Atomic*, No. 98-126C, slip op. at 2; *Southern Nuclear*, No. 98-1614, No. 98-614, Apr. 7, 2004 Order, at 6. In reaching these conclusions, the Judges of this Court, including Your Honor, have repeatedly rejected precisely the arguments the Government raises again in this case.

The Government argues that the acceptance rate supplied by the Court should be 900 MTUs per year or one based on the Standard Contract's DCS process. *See, e.g.*, (Def.'s Post-Trial Br. 43-44, 44-46, 47-48, 49-53, 105, 156-57.) However, courts have consistently rejected both of these arguments.

In denying the Government's partial summary judgment motions, Judge Hewitt, Judge Hodges, and Your Honor ruled that, as a matter of law, the 900 MTU per year acceptance rate contained in the 1991, 1992, and 1995 Annual Capacity Reports ("ACRs") is not a reasonable and appropriate acceptance rate on which to base the utilities' damages. *See Commonwealth Edison*, 56 Fed. Cl. at 666-67; *Indiana Michigan*, 57 Fed. Cl. at 97-100; *Yankee Atomic*, No. 98-126C, slip op. at 2. The Government's 900 MTU per year acceptance rate is based on limits that the 1987 Amendments to the NWPA imposed on a MRS facility. *See Indiana Michigan*, 57 Fed. Cl. at 100; *Commonwealth Edison*, 56 Fed. Cl. at 666; *see also Tennessee Valley Auth. v. United States*, 69 Fed. Cl. 515, 520 (2006).[3] Because DOE was never authorized to build an MRS facility and because it was illegal under the 1987 Amendments to the NWPA to store SNF at an

---

[3] An MRS was limited to a total capacity of 10,000 MTUs of SNF. The 900 MTU per year rate was derived by dividing the 10,000 MTU capacity by 12 years, the expected number of years from the beginning of MRS operations to the opening of the permanent repository, and applying a ramp-up of 400 MTUs and 600 MTUs for the first two years. *Commonwealth Edison*, 56 Fed. Cl. at 666 & n.12; *see also* (Def.'s Post-Trial Br. 155.)

MRS before a permanent repository was licensed, the *Indiana Michigan* and *Commonwealth Edison* courts rejected the Government's position that its damages should be limited based on an acceptance rate derived from the operation of an MRS facility. *See Indiana Michigan*, 57 Fed. Cl. at 100; *Commonwealth Edison*, 56 Fed. Cl. at 666. Judge Hewitt concluded:

> The court does not agree with defendant that it is entitled to limit its damages based upon an optional disposal method of which it did not avail itself. The 10,000 MTU limitation applied only to a MRS until a permanent repository began accepting SNF; the 1987 Amendments did not apply this limitation to DOE's obligation to dispose of SNF under the Standard Contract beginning January 31, 1998.

*Commonwealth Edison*, 56 Fed. Cl. at 666. Moreover, Judge Hodges concluded that the 900 MTU per year acceptance rate was artificially low and unsupported by the record in that case. *Indiana Michigan*, 57 Fed. Cl. at 98. Finally, it bears noting that Judge Lettow in *TVA*, 69 Fed. Cl. at 521, found that the DOE had abandoned plans for an MRS by 1995, but failed to reflect this change in an ACR or APR until 2004.

In its Post-Trial Brief, the Government criticizes Southern for not citing to the DOE's Preliminary Estimates of the Total-System Life Cycle Cost for the Restructured Program (Dec. 1990) (DX 330) ("1990 PETSLCC"), "which shows performance at an MRS at a steady-state rate of 900 MTU until a repository opens with no ramp-up to 3000 until 2015." (Def.'s Post-Trial Br. 115.) However, Judge Lettow in *TVA*, 69 Fed. Cl. at 531, rejected the Government's argument that the 1990 PETSLCC showed the acceptance rates that would have applied in the non-breach case. Specifically, Judge Lettow found that the 1990 PETSLCC was based upon a "mistaken assumption" never authorized by Congress – modification of the linkages between the repository and an MRS facility. *Id.* Judge Letow's reasoning is equally applicable to this case.

Judge Hewitt in *Commonwealth Edison* rejected the Government's argument that the DCS process described in the Standard Contract should define the amount of SNF that the

Government was required to accept in the non-breach case. Judge Hewitt held that the DCS process was a planning tool and that it did not create any binding obligation on either the Government or the utilities. *See Commonwealth Edison*, 56 Fed. Cl. at 663, 665-66. Judge Hewitt stated, "[i]n these circumstances, plaintiff's submission and defendant's acceptance of the proposed DCSs did not create a contractually binding obligation for either party." *Id.* at 666 (citations omitted). Furthermore, Judge Hewitt concluded that even if the process defined in the Standard Contract could create a binding obligation, the third step in the process – the submission and approval of final delivery schedules – was never completed. *Id.*

Other Judges on this Court, including Your Honor, have agreed with Judge Hewitt that the DCS process did not create any obligation between the Government and the utilities nor did it alter the Government's obligations under the Standard Contract. In *Indiana Michigan*, 57 Fed. Cl. at 98, Judge Hodges concluded "[t]he Contract does not use [ACRs] and [DCSs] to determine an Acceptance Rate. The [DOE] did not consider these forms to be binding. . . . The Contract contemplated that DOE would use these reports for planning purposes only. The [ACRs] disclaimed any other purpose, specifically stating that they were not binding on either party." (Footnotes and citations omitted.) In *System Fuels, Inc. v. United States*, 66 Fed. Cl. 722, 731 (2005), Judge Braden held that as a matter of law the DOE could not amend the Standard Contract through the DCS process without separate consideration. Judge Braden further found that "[t]here is absolutely no evidence in the record that the ACR and DCSs were binding on either party nor were they intended to create a separate contract between the parties." *Id.* at 732. In *Sacramento Municipal Utility District* [*SMUD*] *v. United States*, 63 Fed. Cl. 495 (2005), Judge Braden similarly ruled that "the DCSs imposed no legal obligation on either party to the DOE Standard Contract" and that "[t]he record contains no evidence that separate

consideration was offered by the Government to support an independent contract modifying the DOE Standard Contract." *Id.* at 505. *See also Yankee Atomic Electric Co. v. United States*, No. 98-126C, slip op. at 2 (Fed. Cl. June 26, 2003) (adopting Judge Hewitt's opinion in *Commonwealth Edison* to the extent applicable); *Southern Nuclear Operating Co. v. United States*, Apr. 7, 2004 Order, at 6 (same).

Courts have also found that the DOE's use of the 1991 ACR to govern the initial DCS process reflects DOE's effort to manipulate the acceptance rate to limit its liability in the spent fuel litigation in violation of its duty of good faith and fair dealing. *See Boston Edison Co. v. United States*, 64 Fed. Cl. 167, 186-87 (2005) (concluding that the utility plaintiff has alleged facts regarding DOE's planning process that "if proved, would make out a viable claim for relief under these implied covenants [of good faith and fair dealing]"); *Commonwealth Edison*, 56 Fed. Cl. at 665 ("The court agrees that DOE's use of the 1991 ACR to limit the amount of SNF requested by the utilities in their DCS submissions may be a breach of good faith and fair dealing"). *But see System Fuels*, 66 Fed. Cl. at 735 (dismissing claim for breach of good faith and fair dealing relating to DCS and ACR process).

Finally, the Government argues in this case that the Standard Contract should be interpreted as a regulation. (Def.'s Post-Trial Br. 104 n.14.) However, Judge Hewitt in *Commonwealth Edison*, 56 Fed. Cl. at 661-62, found that the Government's arguments, which were substantially the same as those advanced in its Post-Trial Brief here, did not "'follow logically from the text' nor [were] reasonably reflective of the intent of the parties." (Citations omitted.) Accordingly, Judge Hewitt refused to defer to the Government's positions, even under the more deferential interpretation standards applied to regulations. *See id.* at 662.

As noted above, this Court, in its April 7, 2004 Order, adopted Judge Hewitt's reasoning in *Commonwealth Edison*, 56 Fed. Cl. 652, on the rate acceptance issue, but left final resolution of the acceptance rate issue for trial. (Apr. 7, 2004 Order, at 6.) The time is ripe for the Court to again reject the Government's arguments regarding a reasonable acceptance rate and to accept the rate that Southern presented at trial.[4]

**B. Eileen Supko's Expert Opinions.**

Southern presented the expert testimony of Eileen Supko, whom the Court accepted as an expert in a variety of areas, including nuclear engineering, DOE's nuclear waste management program, and modeling of SNF acceptance rights.[5] (Tr. 878-81) (Supko Test.) Ms. Supko provided expert testimony regarding the reasonable acceptance rate in the non-breach world.[6]

In reaching her expert opinion, Ms. Supko used the same research tools and methodology that she uses in performing similar analyses for non-litigation purposes. She relied upon the SPNTFUEL Model, which she has used in her work for the nuclear industry and upon which the Nuclear Regulatory Commission has relied in a recent proceeding. (Tr. 657-58) (Supko Test.)

[4] The Government also argues that several deposition designations should not be considered. (Def.'s Post-Trial Br. 28 n.13.) As previously explained by Southern, the Government agreed to the deposition designations in open court. *See* Plaintiffs' Response to Defendant's Objection to Plaintiffs' Designations of Deposition and Trial Testimony, Dkt. No. 332 (Mar. 27, 2006). Southern incorporates herein by reference its previous response.

[5] The Government describes Ms. Supko as an "advocate for the nuclear industry," (Def.'s Post-Trial Br. 124), but ignores the fact that DOE itself recognized Ms. Supko's expertise by nominating her for one of the two consultancies she has served with the International Atomic Energy Agency. (Tr. 654-65) (Supko Test.) Ms. Supko also provided consulting services for the government of Ontario, Canada. (*Id.* at 656.)

[6] Ms. Supko also identified the quantities of SNF that DOE would have accepted from Southern's plants in the non-breach world through 2004, under the acceptance rate identified in her first opinion. (Tr. 710-12) (Supko Test.); PX 624 (Supko Report) at 38-40.) The Government's Post-Trial Brief does not challenge Ms. Supko's testimony in this area.

She identified key factors that she deemed relevant in determining a reasonable acceptance rate – factors that she has used in her work for nuclear utilities unrelated to the SNF litigation[7] – and she analyzed four acceptance rate scenarios, which largely were derived from various DOE documents.[8] (PX 624 at 11-13, 27-28; (Tr. 673-77) (Supko Test.)). One of these scenarios – Scenario 2, with a steady state acceptance rate of 900 MTUs per year – was the acceptance rate that the Government insists the Court must apply in this case. (Def.'s Post-Trial Br. 156-57.)[9]

As a result of her analysis, Ms. Supko concluded that the only scenario that presented a reasonable acceptance rate was Scenario 1, which involved a steady-state annual acceptance rate of 3000 MTUs after a five-year ramp up. (Tr. 690, 694) (Supko Test.) This scenario required the nuclear industry as a whole to accommodate an additional 1030 MTUs of storage, which Ms.

[7] These factors were: (1) The amount of additional spent fuel storage that utilities would have had to add had DOE begun acceptance of SNF in 1998, as the Standard Contract required; (2) The number of years after each plant is shut down for decommissioning that SNF remains on site prior to acceptance by DOE; and (3) The extent to which DOE would use the annual steady-state acceptance capacity over the life of the waste management program. (PX 624 (Supko Report) at 12-13; (Tr. 677-78) (Supko Test.))

[8] One of the scenarios, which involved a higher acceptance rate, was included to show "the effect of a higher acceptance rate scenario . . . on a utility's spent nuclear fuel storage requirements." (Tr. 677) (Supko Test.)

[9] The Government suggests that the court in *TVA*, accepted its position that it is only bound to perform at the 900 MTU per year acceptance rate. *See* (Def.'s Post-Trial Br. 156.) The Government simply is wrong. TVA accepted the reduced 900 MTU per year acceptance rate for the purposes of its damages claim, but the Government argued that it was not bound to accept TVA's SNF because TVA had no approved DCSs. *TVA*, 60 Fed. Cl. at 671. Contrary to the Government's suggestion, what the court actually held was that the DOE could not use the lack of a repository as an excuse for failing to act on TVA's DCS submissions. *Id.* at 673. The *TVA* court made it clear that "[i]n light of the parties' concurrence on [the acceptance rate], the Court accepts **only for the purposes of this case** that the DCS process creates a binding 'benchmark' for addressing breaches of the Standard Contract." *Id.* at 671 n.7 (emphasis added); *see also TVA*, 69 Fed. Cl. at 530 ("Both parties accept the aggregate rates of SNF acceptance that DOE provided for the first ten years of DOE SNF acceptance in the ACR for 1994 as issued in March 1995."). In addition, the Court in *TVA* expressly rejected the Government's argument that "3,000 MTU/year is not an appropriate long-term steady-state disposal rate," because this argument "does not comport with the long-term acceptance rates listed in nearly all of DOE's planning documents." (*Id.*)

Supko concluded could have been accommodated without having to build additional dry storage facilities. In addition, Scenario 1 would have required utilities to store fuel after shutdown for an average of nine years, and would have allowed the waste management system to operate at maximum capacity for 28 years, both of which Ms. Supko concluded were reasonable periods of time. (*Id.* at 689.) In contrast, the rate scenario that the Government asks the Court to adopt – a 900 MTU rate – would require the industry to store more than 13,000 MTUs of SNF, and would have required a utility, on average, to store SNF for 64 years after it shut down – longer than its license period. And, the waste management program would have to operate for more than a century under the Government's preferred scenario. (*Id.* 690-94.)

The Government presented no testimony to rebut Ms. Supko's expert opinions. In fact, DOE officials testified that they agreed with Ms. Supko's conclusion that a 3000 MTU rate was reasonable. As the former Acting Director of the program said, the 3000 MTU rate was chosen

> as **a proper balance** . . . . If you make the number too high, then you have—you would quickly work off the backlog, and then you would have a lot of idle capacity. If it was too low, you would have reactors needing to put in dry storage, and 3,000, based on an early 1980s, seemed like a reasonable number to use.

(Barrett Dep. 1332-33, May 10, 2002) (PDD 5) (emphasis added); *see also* (Tr. at 1844, 1857) (Kouts Test.) (testifying that 3000 MTU per year acceptance rate was reasonable).

Without a nuclear industry expert witness of its own, the Government attempts to impugn the integrity of Ms. Supko and to paint her SNF modeling and expert opinions as unreliable or inconsistent and contradictory. As discussed below, the Government's criticisms are misplaced and in some cases simply wrong.

The Government begins by criticizing Ms. Supko based on her participation in two other SNF cases: *Indiana Michigan Power Co. v. United States* and *Sacramento Municipal Utility District* [*SMUD*] *v. United States*. (Def.'s Post-Trial Br. 125 n.24.) The Government suggests

that none of Ms. Supko's opinions are based on a reliable or testable methodology because her opinions on when the DOE would begin repository operations were rejected by the Court in *Indiana Michigan Power Co. v. United States*, 60 Fed. Cl. 639, 647 (2004), *aff'd*, 422 F.3d 1369 (Fed. Cir. 2005). (Def.'s Post-Trial Br. 125 n.24.) However, in that case, the Government stipulated to Ms. Supko's expertise except to the extent that she would be testifying as to when a repository would open, and the Court subsequently accepted Ms. Supko's expertise in the following fields: "spent nuclear fuel storage and licensing, rate of acceptance, and 'DOE's Yucca Mountain schedule.'" *Indiana Michigan*, 60 Fed. Cl. at 646. Although the *Indiana Michigan* court did reject Ms. Supko's opinion that repository operations would begin by 2015 or later, when DOE during trial still claimed it would open Yucca Mountain in 2010, subsequent events have proven Ms. Supko's opinion correct. (Tr. 859-861) (Supko Test.)

The Government also relies on the fact that Ms. Supko was not qualified as an expert in the *SMUD* case and that in a footnote the *SMUD* court declined to make a determination on the SNF acceptance rate to suggest that Ms. Supko's opinions in this case are irrelevant or unreliable. (Def.'s Post-Trial Br. 125 n.24) (citing *SMUD*, 70 Fed. Cl. at 375 n.40). The Government reads too much into the *SMUD* court's actions on the acceptance rate. First, the *SMUD* court never directly addressed Ms. Supko's qualifications as an expert, and concluded that it did not need to determine an acceptance rate to award SMUD substantial amounts of damages. The Government can only speculate that footnote 40 was meant to reject Ms. Supko's opinion on the acceptance rate. Moreover, the Court's determination regarding the costs at issue in the section where footnote 40 appears relates to whether SMUD would have been able to move up in the SNF acceptance queue such that all of its SNF would have been removed by

2003 – the Court's analysis does not address the underlying acceptance rate issue. *See SMUD*, 70 Fed. Cl. at 374-75.

The Government next argues that Ms. Supko's expert opinions should be rejected under the standards established in *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). (Def.'s Post-Trial Br. 126-32.) The Government criticizes Ms. Supko's expert testimony as irrelevant because she is offering an opinion only on the reasonableness of the 3000 MTU per year acceptance rate and is not offering any opinions on what the Standard Contract requires or how the DOE would have actually performed had it not breached its contracts with Southern. (Def.'s Post-Trial Br. 126-27.) As discussed above, Judges on the Court of Federal Claims, including Your Honor, have held that an acceptance rate term is missing from the Standard Contract and that it is the court's duty to supply a <u>reasonable</u> acceptance rate term. *See Indiana Michigan*, 57 Fed. Cl. at 96; *Commonwealth Edison*, 56 Fed. Cl. at 662; *Yankee Atomic*, No. 98-126C, slip op. at 2. Ms. Supko's expert testimony obviously is relevant to this key issue.

The Government then turns to *Daubert*'s indicia of reliability. The Government's initial attack is that Ms. Supko's opinions are unreliable because they are "subjective judgments or 'intuition.'" (Def.'s Post-Trial Br. 129.) The Government's attack is misplaced. Expert witnesses are expected to exercise their expert judgment when rendering opinions. *See Park Village Apartments v. United States*, 32 Fed. Cl. 441, 449 (1994) ("An expert's 'judgment' is often based to some extent on 'impressions' which can be characterized as more 'art' than 'science.' Here, each expert relied on his or her own expert judgment when selecting comparable units and adjusting the rents of these comparable units to account for differing conditions."). Thus, this attack misses the mark in that it fails to recognize that reliable expert opinions are not always easily characterized as "science" as the Government contends.

The Government also argues that Ms. Supko's methodology has not been subject to publication or peer review and is not "'generally accepted' in the relevant scientific community." (Def.'s Post-Trial Br. 130.) The SNF analyses and projections that form the bases of Ms. Supko's opinions in this case were performed using the SPNTFUEL computer model that Energy Resources International, Inc. ("ERI") developed in the early 1990s. *See* (Tr. 656) (Supko Test.) This model was developed for the purpose of assisting ERI's clients in planning their SNF needs. (*Id.* at 657.) For example, Ms. Supko has used the SPNTFUEL model to project SNF discharge and acceptance rates that her clients have used in filing decommissioning cost estimates with the NRC, to assist utilities in planning their dry storage needs, and to support a cost/benefit analysis submitted to the NRC in connection with the PFS's environmental impact statement. (*Id.* at 657-58.) The NRC relied on this cost/benefit analysis work in producing the environmental impact statement for the PFS facility. (*Id.* at 658.) The Government ignores these facts, which demonstrate that the SPNTFUEL model and Ms. Supko's expertise are relied on and trusted by colleagues working in the nuclear power industry, including the NRC.

The Government further argues that Ms. Supko's expert opinions are somehow unreliable because Ms. Supko has modified the SPNTFUEL model over time and that the model has consequently produced varying results on the amount of additional at-reactor storage required in the non-breach case.[10] (Def.'s Post-Trial Br. 130-32.) First, predicting events in the non-breach case necessarily involves making judgments about what would have happened had the Government not partially breached the contract. The Government cannot rely to its advantage on the fact that its partial breach has caused uncertainty in how it would have disposed of SNF had

[10] *I.e.*, had DOE begun acceptance at a 3000 MTU per year rate in 1998.

it lived up to its obligations. Furthermore, the Government could rightly criticize Ms. Supko had she not updated her model when new information affecting the model came to light.

Second, the variance in the amount of additional at-reactor storage represents, at most, a change of approximately 1000 MTUs over the approximately forty year designed life of the waste management program, (Tr. at 672) (SupkoTest.), and of the approximately 90,000 to 130,000 MTUs of SNF expected to be generated by reactor plants currently in operation, (*id.* at 763); (Def.'s Post-Trial Br. 143 n.35). Thus, this variance over the life of the waste management program cannot reasonably be considered "significant[]," "dramatic[]," "drastic," or "tremendous" as the Government has described it. (Def.'s Post-Trial Br. 130-32.)

With respect to the increase from 600 MTUs to 1030 MTUs of additional at-reactor storage required under the 3000 MTU per year acceptance rate scenario (Scenario 1), the Government argues that this change should have caused Ms. Supko to conclude that this scenario was unreasonable. (Def.'s Post-Trial Br. 131-32.) However, Ms. Supko testified that even with this change, there remains a clear distinction between the reasonableness of Scenario 1 and Scenarios 2 and 3.[11] (Tr. 747-48) (Supko Test.) Furthermore, the Government fails to understand that the change in the SPNTFUEL model that prompted this increase in storage requirements will also affect the additional at-reactor storage requirements of all other acceptance rate scenarios, and do not affect Ms. Supko's conclusion. (*Id.* at 680-82.) Thus, contrary to the Government's suggestion, there is no reason to believe that this storage requirement increase should affect Ms. Supko's conclusion on the reasonableness of the 3000 MTU per year scenario.

---

[11] Scenario 2 is the 900 MTU per year steady-state acceptance rate scenario. Scenario 3 is the 900 MTU per year acceptance rate scenario with a ramp-up to a 3000 MTU per year rate in 2015.

Next, the Government argues that, in her initial analysis, Ms. Supko improperly presumed that no nuclear utility would seek a license extension for its facilities. (Def.'s Post-Trial Br. 134-135.) However, in response to the Government's having raised this issue during deposition, Ms. Supko performed an analysis that presumed that utilities obtained license extensions, which confirmed her conclusion that the 3000 MTU acceptance rate was reasonable. (Tr. 785) (Supko Test.)

The Government also argues that Ms. Supko inconsistently "mixes" information from the but-for and actual cases in two respects: pool capacities and SNF discharges. (Def.'s Post-Trial Br. 136-38.) With respect to pool capacities, the Government criticizes Ms. Supko for not "consistently assum[ing] pre-1998 pool capacity." (*Id.* at 136.) This criticism is misplaced. First, the Government mischaracterizes Ms. Supko's testimony. Ms. Supko testified that she decided whether to include post-1998 storage modifications depending on whether such an addition would be appropriate in the non-breach world; for example, where a utility would have made the modification had the DOE not breached the contract. *See* (Tr. 750, 756-57) (Supko Test.) Second, post-1998 pool capacity changed for only 12 plants out of the 122 plants with SNF – less than 1%. (*Id.* at 755.) Ms. Supko testified that the inclusion of these modifications would not affect her conclusions. (*Id.* at 751-52, 755.)

With respect to SNF discharges, the Government criticizes Ms. Supko for using post-January 31, 1998 SNF discharge information as contained in the 1998 RW-859s, instead of RW-859s during the 1990-1991 time frame. (Def.'s Post-Trial Brief 138.) Again, the Government's criticism is misplaced. As Ms. Supko explained at trial, the evolution and improvement of reactor operations would have continued independently of whether the DOE performed in 1998. *See* (Tr. 763-64) (Supko Test.) Utilities would have upgraded reactor

power, improved capacity factors, increased burn-up rates, and changed other factors that affect SNF discharges in the but-for and actual cases. *See id.* Therefore, it is entirely appropriate and reasonable for Ms. Supko to use the 1998 RW-859 discharge information.

After criticizing Ms. Supko's opinions for taking into account changes that occurred after 1998 in calculating the amount of additional at-reactor storage required, the Government inexplicably argues that she should have included SNF stored at shutdown reactors prior to 1998. *See* (Def.'s Post-Trial Br. 141.) The Government accuses her of "deliberately exclud[ing]" this amount of SNF "in an attempt to make the amount of at-reactor storage after 1998 appear smaller." (*Id.*) This is nonsense. The record is clear that one of the goals of the NWPA and the Standard Contract, and the intent of the parties, was to eliminate the need for <u>additional</u> at-reactor storage <u>after</u> January 31, 1998. This additional at-reactor storage was caused by the Government's partial breach of contract. Pre-1998 at-reactor storage simply is not relevant.

Finally, the Government simultaneously criticizes Ms. Supko for assuming that reactor plants will generate too much and too little SNF. *See* (Def.'s Post-Trial Br. 142-43 & n.35.) First, the Government makes the point that Ms. Supko has projected that utilities will generate 20,000 MTUs more SNF than the NWPA's 70,000 MTU limit for a permanent repository. (*Id.* at 142-43.) Next, in a footnote to the same sentence, the Government argues that a 3000 MTU per year acceptance rate must be too low because DOE now projects that the total amount of SNF generated will be 130,000 MTUs, 40,000 MTUs greater than Ms. Supko's assumption. (*Id.* at 143 n.35.) The simple answer is that the Standard Contract does not contain a limit on the amount of SNF that the DOE can accept—by contract, DOE has bound itself to accept all SNF, regardless of any statutory limit. *See* (PX 2 (Standard Contract) art. II.))

Despite the various concerns expressed regarding Ms. Supko's expert opinions, the Government cannot escape the reality that her conclusions, as well as her logic, are the same as Lake Barrett's and Christopher Kouts's. The criteria Ms. Supko used to evaluate the reasonableness of the different acceptance rate scenarios, referred to by the Government as the Southern's "primary requirements," (Def.'s Post-Trial Br. 124-25), are consistent with the factors Mr. Barrett used in his deposition testimony. *See* (Barrett Dep. 1332-33, May 10, 2002). As noted earlier, based on these factors, Mr. Barrett, a former Deputy Director of the waste management program, concluded that "3,000. . . seemed like a reasonable number to use." (*Id.* at 1333.) Furthermore, elsewhere in his deposition, Mr. Barrett testified again that a 3000 MTU per year acceptance was a reasonable acceptance rate. (*Id.* at 1370-71.) Similarly, at trial, Mr. Kouts testified that a 3000 MTU per year rate was reasonable. (Tr. 1844, 1857) (Kouts Test.)

Moreover, on much the same evidence as presented in this case, Judge Hodges in *Indiana Michigan* found that if DOE had begun acceptance of SNF on January 31, 1998 as required by the Standard Contract, DOE would have performed at a rate of 3000 MTU per year. *Indiana Michigan*, 57 Fed. Cl. at 99-100; *see also TVA*, 69 Fed. Cl. at 530-33.

## II. The Number of Casks Southern Loaded at Plant Hatch was Based on a Reasonable Operating Reserve.

The Government contends that Southern has unreasonably mitigated its damages by loading too many casks with SNF at Plant Hatch. (Def.'s Post-Trial Br. 55-56.) The Government bases this argument on the contention that Southern's nuclear engineers and managers implemented too large an operating reserve in the reactor pool. (*Id.* at 56.) The larger the operating reserve, the more casks that have to be loaded with SNF from the reactor pool and the more damages that are incurred. The Government argues that Southern should have loaded

only 9 casks, containing a total of 612 assemblies, as that would have maintained a maximum operating reserve of 1 FCR – 560 assemblies. (Def.'s Post-Trial Br. 70-71.) Southern contends that its actual loading of 22 casks, containing a total of 1496 assemblies, was reasonable in light of its long-term target operating reserve of 2 FCRs – 1120 assemblies. (Pls.' Post-Trial Br. 80.) The difference between 1 FCR and 2 FCR at Plant Hatch is significant because the Plant Hatch pool serves two reactors, meaning that both reactors could not discharge their cores if the reserve is limited to 1 FCR. The difference in damages is $7,697,015.

Under the law of contracts, of course, the measure of damages is not the amount of damages sufficient to provide 1 or 2 FCRs, but "damages sufficient to place the injured party in as good a position as it would have been had the breaching party fully performed." *Indiana Michigan*, 422 F.3d 1369, 1373 (Fed. Cir. 2005) (internal quotations omitted). Both damages experts agree that had DOE performed at the 3000 MTU rate, DOE would have removed more SNF assemblies from Plant Hatch's pool than Southern has actually loaded into dry storage during the same period of time, and, as a result, Southern would have enjoyed an even larger operating reserve as of December 31, 2004, than it actually had. Dr. Neuberger, the Government's economist, testified that had DOE performed, the SNF inventory at Plant Hatch would have been lower – and the usable pool space would have been larger – than it actually was on December 31, 2004:

> Q. What is the end-of-the-year **inventory** in the Hatch pool for **2004**, assuming the government had performed?
>
> A. Going across that column or that row to column J or, similarly, column R., the number there is 4,627 [assemblies of SNF].
>
> Q. All right, sir. **<u>4,627</u>** [SNF assemblies in the pool] **if the government performed**, correct?
>
> A. **Correct.**

Q. Now, under the **actual** scenario, **using the numbers of casks that Hatch actually loaded what's the end-of-the-year number for 2004** under this scenario?

. . . .

A. Right, **4,795**.

Q. Okay. So in other words, **there would be more space in the Hatch pool if the government had performed using these DOE allocations than using the actual loading that Plant Hatch did**?

A. As of the end of 2004, **yes**.

(Tr. 2117-18) (Neuberger Test.) (emphases added). *See* (*Id.* at 2123, 2141, 2144-45); (Tr. 1522) (Metcalfe Test.)

Without addressing the fact that Southern's 2 FCR cask loading schedule would not place Southern "in as good a position as it would have been had the breaching party [DOE] fully performed," *Indiana Michigan*, 422 F.3d at 1373, the Government asserts that Southern's cask loading schedule constitutes unreasonable mitigation. The Government presented no expert testimony on what a reasonable cask loading schedule for Plant Hatch would have been, but instead relies on 20/20 hindsight and second-guessing about policy and mischaracterization of Southern's dry storage planning documents in an attempt to justify its claim of unreasonable mitigation. The Government, in essence, argues that Southern loaded an excessive number of casks at Plant Hatch because: (1) a number of Southern's internal documents track 1 FCR as the minimum operating reserve; (2) Southern has loaded casks based on a target of 2 FCR in the actual scenario, but used a 1 FCR as the threshold for adding dry storage in the breach and non-breach cases; and (3) a 1 FCR minimum operating reserve is unreasonable in the non-breach case because it could leave Plant Hatch without adequate reserves in the event of a DOE performance interruption. (Def.'s Post-Trial Br. 169-76.)

### A. Southern's Documents Tracked, and Southern Actually Used, the Minimum 1 FCR to Determine When and Whether to Build an ISFSI and the 2 FCR for Maintaining Long-Term Operational Efficiency.

#### 1. Southern's Documents Tracked 1 FCR and 2 FCR and Southern's Nuclear Engineers and Managers Explained the Use of the 1 FCR and 2 FCR Operating Reserves.

The Government's argument that Southern's documents contradict the testimony of Southern's nuclear engineers and managers regarding the appropriate size of operating reserves at Plant Hatch improperly collapses two different decisions: (i) when to build the ISFSI to avoid shutting down the plant; and (ii) what level of operating reserve is reasonable to maintain after the ISFSI is built for efficient long-term operations. Beginning in the 1990s, Southern tracked when SNF discharges would reduce the operating reserve down to 1 FCR for the entire pool for more than a short period of time because prior to reaching this point Southern would have to complete construction of an operational ISFSI on which to load SNF casks to avoid shutting down Plant Hatch. While the NRC does not specify the size of operating reserves, Southern adopted a policy that a minimum short-term operating reserve of 1 FCR should be maintained to ensure reliable reactor operations (*i.e.*, a reserve sufficient to allow the safe unloading of one reactor for maintenance or repair). (Tr. 145 (Long Test.); Tr. 1158 (Bland Test.)) Constructing a $26 million ISFSI for the first time in Southern's history to avoid shutting down the plant was a substantial economic event that Southern tracked in its financial statements and engineering reports. (DX 106 (Hatch Spent Fuel Expansion Bids of Projection) (May 4, 1992).) The timing of such an investment was a product of various factors, including the relative probability of having to unload one reactor during the period of time before the second core reserve could be recovered versus the lower probability of needing to unload both cores during the same period of time. Based on its management's assessment of that risk, Southern did not use a 2 FCR operating reserve in the 1990s to plan when to build its ISFSI. Instead, Southern used the 1 FCR

minimum to determine when its first-in-industry project of constructing an ISFSI for boiling water reactors should be completed and when casks, NRC loading demonstrations, and labor scheduling should take place.[12]

Once the ISFSI was constructed and the $26 million was spent, Southern had to make a different decision – what level of operating reserve was reasonable on long-term basis for operational efficiency. Southern's management concluded that it was reasonable to operate on a temporary basis at the bare minimum level of 1 FCR operating reserve; an analysis that is far different when the consideration is whether to operate at the minimum level over the long term.[13] As with the initial construction decision, the probability of needing dual core offload capability over the long term, which is greater than needing it over the short term, was a key factor in this decision. This is especially true given the age of Plant Hatch's reactors now versus the early 1990s. Southern's managers balanced the costs of paying earlier, rather than later, for casks and loading against the value of additional useable pool space to absorb the risks that SNF could build up from labor shortages, cask defects or delays, an NRC ordered shut down of both now older reactors, and other risks, and they concluded that a long-term operating reserve target of 2

[12] The Government also argues that Southern's 2 FCR long-term operating reserve is contradicted by Southern's accounting expert's original spreadsheet that tracked when a pool would lose 1 FCR capacity. (Def.'s Post-Trial Br. 62, 175.) Southern, however, did not determine its operating reserve capacity based on the opinion of its accounting expert or the formulae in his spreadsheet. (Tr. 1499) (Metcalfe Test.) Instead, Southern determined what a reasonable long-term operating reserve target for its nuclear reactor pool was based on the opinions of its experienced nuclear engineers and managers. (*Id.*) Similarly, the Government argues that Southern's SNF removal rate expert, Ms. Supko, contradicted the Hatch shared pool 2 FCR target by using 1 FCR in her model. (Def.'s Post-Trial Br. 61-62). However, Ms. Supko explained that her model measured industry-wide removal rates and was never intended to measure plant specific operating reserves. (Tr. 776-81) (Supko Test.)

[13] Had Southern's nuclear engineers and managers based their operating reserve decisions on the possibility of recovering damages in this lawsuit, as suggested by the Government, they could have ignored the costs of litigation, the unavailability of pre-judgment interest, and the uncertainties of recovery and selected the same operating reserve target that DOE's performance at the 3000 MTU rate would have provided (*i.e.*, 3 or 4 FCRs and increasing).

FCRs was the most reasonable and prudent operating practice to maintain the economic viability of Plant Hatch. (Tr. 147 (Long Test.); (Tr. 956-57 (Wade Test.)).[14]

Contrary to the Government's implication that all of Southern's planning documents rely on 1 FCR for all purposes, a number of Southern's documents recognize the difference between the minimum operating reserve (*i.e.*, 1 FCR) and the optimum long-term operating reserve (*i.e.*, 2 FCRs), the loss of 1 FCR to the need for a completed ISFSI, and track the loss of 2 FCRs:

- "The concept of maintaining an **<u>optimum</u> reserve** storage capacity, **as opposed to** maintaining **<u>minimum</u> full core reserve** is indeed a concept used in the industry. Unfortunately the experience has been that **the desired optimum reserve is exceeded prior to initial operation of the new storage facility** . . . The one full core reserve has been established at Hatch since the late 1970's. This is not to say that the reserve policy should not be revised, but does say that revision of that policy should be carefully considered. . . . Factors other than maintenance and refueling operations efficiency must be considered prior to proposing that **<u>two full cores</u>** plus a reload be adopted as the planning **<u>minimum</u>** reserve." (DX 101) (Hatch Spent Fuel Storage Memorandum) (Feb. 18, 1992) (emphases added).

- "ISFSI is ready by January, 1998. This date corresponds to slightly more than **two full core reserves** offload capacity remaining. . . In the event that no other pool expansion analyses dollars can be spent before 1994, some slippage for the 1998 ISFSI schedule may result. If the 1994 pool storage studies again show no more room available in the [Hatch] pool, then maintenance of the **two full core reserve** capability **may need to be sacrificed**. However, **<u>construction of the ISFSI</u>** can still be done **prior to 2001**, in time to **maintain more than <u>one full core</u>** offload capability. It is noted that **maintenance of the single full core capability is still the official planning basis for Hatch**, and so the potential **loss of the two full core** offload capability to allow pool expansion studies in 1994,

[14] Southern is not alone in selecting a 2 FCR operating reserve target. *See, e.g.*, *In re Northern States Power Co.*, 604 N.W.2d 386, 388 & n.1 (Minn. Ct. App. 2000) (upholding public service commission's decision that, among other things, required the nuclear utility to maintain a 2 FCR reserve for a pool that served two nuclear reactors – "A condition to the approval was that NSP establish cooling pool storage space for a full core off-load, which entailed **the ability to store the 121 fuel assemblies from each of Prairie Island's two reactors** – for a total of 242 assemblies . . . . A full core off-load is the process of removing **all the fuel assemblies from the two nuclear reactor cores at Prairie Island**, and then placing the assemblies into the storage pool. The off-load would be necessary when, for example, NSP wanted to work on the reactors") (emphases added).

**while <u>not</u> <u>optimum</u> should be acceptable**." (DX 106 (Hatch Spent Fuel Expansion Budget Projection) (May 04, 1992)) (emphases added).

- "Plant Hatch is projected to lose single core reserve capacity by the year 2001. Pool capacity is exceeded by the fall of 2003. **There may potentially be a desire to plan based on maintaining a <u>2 full core reserve</u> capacity**, barely exceeded by the fall of 1998. . . . A storage expansion schedule is submitted here . . . that **plan** [sic] to reserve **two full core reserves**, one for each pool. . . . It has been suggested that a more limiting criteria of **two full core reserves** (Spring, 1998) be used for scheduling purposes." (PX 251 (Hatch Spent Fuel Storage Planning Strategy Update) (Nov. 11, 1992)) (emphases added).

- The same report that stated that a dual-core offload "has not typically been considered a credible event for contingency planning," also stated: "Plant Hatch will lose **<u>two full core reserve</u>** by the fall of 1998," and stated: **"Hatch spent fuel storage capacity <u>planning</u> will be <u>based on</u> maintaining a <u>two full core reserve</u> for the purposes of this report**. The spent fuel capacity expansion schedule **slippage to a schedule based on a single shared core reserve** is viewed as a desirable option in view of the cost advantage." (DX 115 (Hatch Spent Fuel Storage Planning Strategy Update) SN067822, SN067824 (Dec. 31, 1992)) (emphasis added).

- "[T]he Hatch units will lose the ability to discharge **<u>two full core loads</u>** simultaneously in 1998 and will lose the ability to discharge one core load of fuel in 2000. . . . The spent fuel pool rack capacity additions should **maintain two-unit full-core discharge capability** until at least early 2000." (PX 275 (Spent Fuel Storage & Disposal) (Mar. 15, 1995)) (emphases added).

- "Based on present discharge rates, there will be insufficient spent fuel storage space in the pools to support the spring 2001 refueling outage. Prior to that time **<u>double core off load capability</u>** will have been lost **by 1998** and **<u>single core off load capability</u>** lost **by the fall outage 2000**." (PX 281 (Spent Fuel Storage Strategy) (Apr. 27, 1996)) (emphases added).

- "Based on projected Plant Hatch spent fuel discharges to current on-site storage, Plant Hatch will maintain **full-core discharge capability** into the year 2000. Simultaneous **<u>two-unit full-core discharge capability</u>** will not be possible after 1998. The capacity of the spent fuel pools would be exceeded with discharges scheduled to occur in 2003. Because of DOE's continuing delays or the lack of a feasible alternative off-site storage option, Hatch intends to add dry casks storage capacity by as early as 1999." (PX 789 (Strategic Plan update – Spent Fuel Capacity) (April 23, 1997)) (emphases added).

- Slide showing:

  "<u>Status of Edwin I. Hatch Nuclear Plant</u>

. . .

* Loss of **<u>2 Unit Full Core Reserve</u>** – Fall 1998

* Loss of **Single Unit Full Core Reserve** – Fall 2000" (DX 208 (Summary of September 4, 1997, Meeting Between Nuclear Regulatory Commission Staff and Southern Nuclear) (Attached Power Point Slide) (Sept. 11, 1997)) (emphases added.)

- Slide showing:

  "Hatch Pool Capacity . . .

  - Capability Loss

    - **<u>dual core off-load</u>** – fall '98

    - <u>single core off-load</u> – fall '00

    - pool full – spring '03 . . ."

  (PX 293 (Spent Fuel Options) (Nov. 11, 1997)) (emphasis added).

The testimony presented by Southern was consistent with its documents and its actions. Mr. David Bland, who was responsible for the initial construction of the Plant Hatch ISFSI, explained the timing of the construction of the ISFSI as follows: "[A]t a bare **minimum**, you want to be able to **remove the fuel from one reactor** so that at least you could work on one at any given time. . . . [T]o the extent that we somehow could work our way around that problem with a partial offload, that raises new issues with regard to the safety of actually performing the work in the reactor core." (Tr. 158-59) (Bland Test.) (emphases added). Similarly, Mr. Long, Southern's vice president in charge of the SNF operations at Plant Hatch, explained: "You **always want** the capability to be able to **off load that core**, fix your machine and get – put fuel back in and get going again." (Tr. 145) (Long Test.) (emphases added). Thus, in September 1997, Southern told the NRC that Southern "need[ed] to begin cask loading by the end of 1999 or early 2000" prior to the time it would experience the "Loss of Single Unit Full Core Reserve –

Fall 2000." (DX 208) (Summary of September 4, 1997, Meeting Between Nuclear Regulatory Commission Staff and Southern Nuclear) (Attached Power Point Slide) at SN201254, SN201260 (Sept. 11, 1997). Southern **actually constructed the ISFSI** and **began loading casks in June 2000**, thus maintaining the 1 FCR operating reserve for the entire pool, but not the 2 FCR. Thus, Southern's actions match both its planning documents and the testimony in this case.

The question of how many SNF assemblies to load onto an already constructed ISFSI, especially at an operating nuclear power plant, is a different question than when to construct the ISFSI in the first place. Based on the long-term risk of needing dual core offload capability, Southern's management decided to load a sufficient number of casks to gradually recover a 2 FCR operating reserve. The logic of Southern's decision is buttressed by objective fact, not opinion. First, because both units at Plant Hatch utilize the same reactor model, an NRC directive, or other requirement, to inspect or conduct work on the particular reactor design installed at Plant Hatch could require the offloading of the reactor core from both units. While the 1992 memorandum relied upon by the Government indicated that a dual core offload necessitated by a maintenance event was not considered a "credible event" at that time, Mr. Long testified in 2005 that "as time goes on, the industry is finding things that are unexpected. There is a possibility that some issue might be found that a TVA Browns Ferry reactor, that Nuclear Regulatory could say, hey, look, this thing could be a generic problem facing all BWRs [boiling water reactors] of that vintage, like our Plant Hatch, you all need to go fix this thing." (Tr. 146) (Long Test.) Mr. Long further explained:

> **[I]t is a risk management kind of decision that you make. Not all decisions are black and white**. There is a probability of having to off-load one core at a time. There is less probability to have to off-load two simultaneously.
>
> But as our plants grow older, get older, I think that probability increases, and, therefore, we made a short-term judgment that we can live with something

> happening and us being able to kind of manage through that problem by doing this, and this, but we would really like to have dual core off-load capability.

(Tr. 148-49) (Long Test.) (emphasis added).

Because the electricity generated by one of Southern's nuclear reactors is more cost efficient and requires the use of fewer air quality emissions credits, (Tr. 139) (Long Test.), Mr. Long explained that a single dual-core off load is quicker and, in the current electricity generation environment, more financially sound than using two staggered single-core off loads:

> Q. [I]f you don't have that [2 FCR] now, what would you have to do if you need to shut down both reactors at the same time and remove the cores?
>
> A. What I would have to do is off-load one core, fix the problem and that unit, and reload that core and then go to the next unit, off-load that core and fix that unit. And then, you know, that's just **time and money, just takes additional time to do that.**

(Tr. 149) (Long Test.) (emphasis added).

Second, a long-term 2 FCR operating reserve reduces the risk that contingencies in the extensive dry cask loading process will impact operational reliability. A problem with any of the number of factors that go into a casks loading campaign (*e.g.*, late arrival of or defect in casks, the unavailability of internal or contract labor, the malfunctioning of cranes, the malfunctioning of helium evaporators, the late arrival of or defect in canisters, stop-work order from the NRC) could result in a delayed loading of SNF from the pool to the ISFSI. (Tr. 956-57 (Wade Test.); Tr. 1163 (Bland Test.)) Mr. Wade, a Southern engineer who has managed SNF loading campaigns at Plant Hatch, explained why the 2 FCR operating reserve is important for the long-term:

> A single core off-load would take about three years to use up during normal refueling operations. About that amount of time is what we estimate to qualify and select and test a cask from a new vendor.
>
> So the **second full core off-load**, not only does it give us the capability to off-load both reactors at the same time, it also gives us some margin for some

> contingency in case Holtec goes out of business or if they are required – or if they can't supply casks to us any longer.
>
> . . . .
>
> [To change cask vendors], you would have to redo the entire operational evaluation. You would have to do a **licensing evaluation**, go through **planning**. You would have to go through **evaluation of the building**, **of the structure**. You would have to do [an] . . . **evaluation of the concrete pads at the ISFSI** itself. Particularly the ISFSI is designed for a single cask vendor's casks. So all of those evaluations would have to be redone as a prerequisite to being able to load a cask from another vendor.

(Tr. 956-57) (Wade Test.) (emphases added.)[15]

Again, Southern's decision to pursue a target of 2 FCRs at Plant Hatch is neither hypothetical nor without cost to Southern. Southern has demonstrated its belief that the decision is correct by actually pursuing it and by expending its own resources to implement it without any guarantee that the funds would be recovered from the Government and with certain knowledge that any recovery obtained would take years of expensive litigation. Under the circumstances, Southern's management's actions speak louder than the Government's counsel's words. Indeed, the Government offered no witness with any nuclear engineering or management experience to testify that the 2 FCR long-term operating reserve is unreasonable or that 1 FCR is a reasonable long-term operating reserve.

[15] The Government argues that a change in cask vendors is unlikely and that, in any event, 1 FCR could be used in the event that Southern had to change cask vendors because the 1 FCR minimum would last for three years of regular SNF discharges. (Def.'s Post-Trial Br. 61, n.30). Southern's nuclear engineers, however, testified that nuclear utilities have been forced to change vendors or to examine such a change because several cask vendors have had quality and financial problems. (Tr. 956 (Wade Test.); Tr. 1166-67 (Bland Test.)) Moreover, if Southern starts with 1 FCR and then has a three-year period of SNF discharges from both reactors with no cask loading, it would not maintain the 1 FCR minimum operating reserve that the Government concedes is reasonable in the actual case.

### 2. Southern's Facts are Markedly Different from those in *Indiana Michigan.*

The Government argues that *Indiana Michigan*, 60 Fed. Cl. at 654-55, supports its contention that without a formalized policy, Southern cannot recover damages for loading up to the 2 FCR level and that such a reserve should be deemed a "litigation reserve." (Def.'s Post-Trial Br. 175-76.) The Government's arguments ignore the actual facts and cannot withstand a careful comparison of the evidence in the *Indiana Michigan* trial with the evidence presented at this trial.

In *Indiana Michigan*, 60 Fed. Cl. at 654 and note 27, "Mr. Abbott [the Government's nuclear industry expert] testified for the Government that . . . no evidence supports the need for a policy of 554 spaces in reserve [2.9 FCR]," and "Dr. Neuberger characterized Indiana Michigan's 554-assembly reserve as "'unrealistically' high." In this case, the Government withdrew Mr. Ed Johnson, its only nuclear industry expert, and Dr. Neuberger, its economics expert, disclaimed any expertise as to the appropriate size for Southern's operating reserve. (Tr. 2033-34) (Neuberger Test.)

In *Indiana Michigan*, 60 Fed. Cl. at 655, "Mr. Malin [the utility's engineer] testified that he would recommend setting a 554 [2.9 FCR] . . . reserve at some point in the future. Mr. Malin testified at his November 2003 deposition that the appropriate reserve was 470 assemblies." In this case, Southern's nuclear managers and engineers, Messrs. Long, Bland, and Wade testified without contradiction that a 2 FCR operating reserve was reasonable for long-term operational efficiency. (Tr. 148-49 (Long Test.), Tr. 956-57 (Wade Test.), Tr. 1166-67 (Bland Test.)

In *Indiana Michigan*, 60 Fed. Cl. at 654, the utility used a hypothetical 554-assembly (*i.e.*, 2.9 FCR) operating reserve to "project[] that it will begin removing fuel from its storage pool and placing it in dry storage in 2009-2010" – in the future. In this case, Southern is

claiming damages for the past costs of an ISFSI that it has already built, casks it has already purchased and loaded, and money that it has already spent. While Indiana Michigan bore the burden of proving that its future damages were certain, *Alaska Pulp Corp. v. United States*, 59 Fed. Cl. 400, 413-14 (2004), the Government bears the burden of proving that Southern's actual mitigation damages (*i.e.*, restoring part of the usable pool space that DOE's performance would have provided) are unreasonable, *TVA*, 69 Fed. Cl. at 523.

In *Indiana Michigan*, 60 Fed. Cl. at 655, one of Indiana Michigan's engineers testified that he "established a full core reserve of 554 in January 2004" – the year of Indiana Michigan's trial. In this case, Southern's documents demonstrate that it tracked a 2 FCR operating reserve since 1992, six years before the filing of its Complaint. (DX 106 (Hatch Spent Fuel Expansion Budget Projection) (May 4, 1992).)

Because Indiana Michigan had not built an ISFSI, purchased casks, or spent all of the millions it claimed in damages, the Court had to look elsewhere for evidence that such a damages amount would some day be incurred. *Indiana Michigan*, 60 Fed. Cl. at 654-55. In light of contradictory testimony of Indiana Michigan's engineers about a future project, the Court looked for a written policy or plan stating that Indiana Michigan would in fact build an ISFSI at any time in the future in order to preserve a 554-assembly [2.9 FCR] operating reserve and found none. *Id.* at 655. Because Southern has already built its ISFSI, purchased and loaded casks, and spent the $26 million it claims in damages for the ISFSI, its conduct of gradually recovering a 2 FCR reserve is not a "litigation-inspired" policy, but an actual operating fact.

While "litigation inspired" policies are certainly a fair characterization of the Government's cynical efforts to avoid responsibility under the NWPA and the Contracts (*e.g.*, the 900 MTU rate), it is empty rhetoric to characterize Southern's expenditure of millions of

dollars of its own money that way. The Government's use of creative adjectives not only rings hollow, it illustrates the absence of real evidence supporting the Government's position.

### B. Southern's 1 FCR Minimum Operating Reserve is Consistent in Both the Actual and Non-Breach Cases and its 2 FCR Long-Term Operating Reserve is More Conservative than the Non-Breach Case.

#### 1. Southern Consistently Used the 1 FCR Minimum Operational Reserve in the Breach and Non-Breach Cases to Determine When to Build an ISFSI.

The Government argues that Southern uses a 2 FCR operating reserve in the actual case and only a 1 FCR in the non-breach case and that this alleged inconsistency compels the reduction of Southern's damages. (Def.'s Post-Trial Br. 175.) As with the Government's other attacks on Southern's claim, this assertion is baseless. Southern's engineers used the 1 FCR minimum operating reserve consistently in both the breach and non-breach cases for determining when to build the ISFSI at Plant Hatch. In the actual case, Southern's engineers installed one bathtub rack in 2000 to expand the capacity of the shared pool and to aid in retaining 1 FCR from 2000 to 2001. (Tr. 158 (Long Test.); Tr. 960 (Wade Test.)) Because DOE was not expected to begin removing SNF before 2010 (*i.e.*, long after Plant Hatch would have had to shut down because its reactor pool would have filled up with SNF), Southern's engineers concluded that they would have to build the ISFSI in any event. The Government's expert agreed that in the actual/breach case, even though the shared pool lost a 2 FCR operating reserve in 1999, Southern did not complete construction of the ISFSI in 1999. Instead, Southern completed construction of the ISFSI in 2000 when the operating reserve was only slightly above 1 FCR, not 2 FCRs. Dr. Neuberger testified:

> Q. . . . [I]f we look back on the actual scenario for Plant Hatch, number 38, under Exhibit 3, now, you would agree with me, wouldn't you, doctor, assuming that three casks were actually loaded in the year 2000 at Plant

Hatch, that **Plant Hatch did not have two full core reserves after those casks were loaded in 2000**?

A Well, I could do the math, but it looks like **it does not**, yes.

Q I mean, I can help you. It would be 4958 [assemblies in the pool] for the two full core reserves under this approach.

A Okay.

Q So **they didn't have two full core reserves in 2000**?

A **That's correct**. In my simulation of the model, using two full core reserve had some different timing in when those casks would have been loaded to maintain that reserve, and I believe there were two casks loaded, if not in 2000, maybe the year before, in order to get there.

. . . .

JUDGE MEROW: Does the bathtub have any impact on these?

THE WITNESS: This assumes no second bathtub rack, so if you had the bathtub rack, the – the number in column K, one full core reserve capacity, would be 167 higher.

. . . .

Q [W]hat **they actually did was they didn't load enough casks to get to two full core reserve in 2000 or in 2001 or in 2002, correct**?

A **That's correct**.

(Tr. 2112-15) (Neuberger Test.) (emphases added).[16] Dr. Neuberger's own testimony refutes his contention that Southern used a 2 FCR operating reserve in the actual/breach case for all purposes.

---

[16] (PX 594 (Neuberger Report) Ex. 3 – Fuel Mgmt. Model – Actual Scenario – Hatch SNF Inventory Table.) The spreadsheet assumes a standard timing of discharges and cask loadings that differs from the actual variable timing of discharges and cask loadings during each year. The actual SNF inventory in the pool, and thus the actual operating reserve, will vary during the year depending on when discharges and cask loadings actually occur. Looking at the actual cask loadings, Mr. Wade explained:

A. [A]t the end of the summer of 2000 just prior to the fall 2000 refueling … we had just loaded casks and were just below the dual core offload line.

In the non-breach case, Southern's engineers again said that they would have used the 1 FCR, instead of the 2 FCR, operating reserve to determine when to build the ISFSI. In the non-breach case, Southern's engineers testified that by installing the second bathtub rack for $419,000, they could have avoided losing the 1 FCR operating reserve until 2002 – the year that DOE would have begun removing SNF from Plant Hatch had it performed at the 3000 MTU annual rate. (Tr. 161-62 (Long Test.); Tr. 962 (Wade Test.))[17] Thus, in both the breach and non-breach cases, Southern consistently used the 1 FCR, not the 2 FCR, for the decision of whether and when to build an ISFSI.

Southern did not measure its damages using 2 FCR in the actual case and 1 FCR in the breach case. Instead, it used 1 FCR in both cases to determine when and if it had to build the ISFSI. Southern's non-breach costs for casks and loading are based on its actual costs that have been incurred and on the actual number of casks loaded. Those costs reflect Southern's decision to recover 2 FCR long-term operating reserve target. It is inaccurate and misleading to say that Southern "used" any particular reserve to calculate the numbers of casks loaded in its damages model. The damages are based on Southern's actual loading campaigns, not a theoretical model. The evidence presented in this case that Southern's loading campaign was reasonable is undisputed. If the Government had evidence that it was not a reasonable operating practice for Southern to load as many casks as it did, it would have surely presented that evidence.

---

Q. So you were above single core but below dual core?

A. That's correct.

(Tr. 959) (Wade Test.)

[17] *See* (PX 594 (Neuberger Report) Ex. 3 – Fuel Mgmt. Model – But-For Scenario – Hatch SNF Inventory Table.)

### 2. Contract Law Does Not Require Southern's Actual Long-Term Reserve Target to be Identical to the Operating Reserve in the Non-Breach Case.

Dr. Neuberger opined that "discrepancies," or inconsistencies, between the breach and non-breach cases were inappropriate in measuring of contract damages, (Tr. 2039-41) (Neuberger Test.) Contract law, however, does not require perfect consistency between the breach and non-breach cases. As pointed out in Southern's opening Post-Trial Brief, (Pls.' Post-Trial Br. 142-43), and not responded to by the Government, section 350 of the *Restatement* (*Second*) *of Contracts* provides: "If *discrepancies* between the transactions [*i.e.*, contracted-for transaction and breach-mitigating transaction] can be adequately compensated for in damages, the alternative transaction is regarded as a substitute and such damages [*i.e.*, reasonable costs of mitigation] are awarded." *Id.* at cmt. e (emphasis added). *See Indiana Michigan*, 422 F.3d at 1375 (applying *Restatement* (*Second*) *of Contracts* § 350 in spent nuclear fuel case). Thus, while Dr. Neuberger's abstract logic is superficially appealing, it fails to recognize that "[t]he life of the law has not been logic: it has been experience." Oliver Wendell Holmes, *The Common Law* 1 (1881). Indeed, the Government's expert conceded as much:

> Q But you would agree with me that a rational person, from an economics perspective, that a rational person, when confronted with two drastically different situations, might manage his business in two different ways?
>
> A I'll acknowledge that, yes.

(Tr. 2121) (Neuberger Test.) [18]

---

[18] Dr. Neuberger further conceded:

> Q. … I think you agree, probably without qualification, that if the installation of that second bathtub rack allowed Southern Nuclear to avoid a dry cask storage facility at all at Plant Hatch, that would be a rational, economically rational thing to do?
>
> A. It certainly may be from an operational standpoint.

Experience has demonstrated that it is reasonable to allow the non-breaching party to mitigate damages with a substitute transaction that is not identical to the contracted-for transaction, but is reasonable. *Compare Restatement* § 350, illus. 5 (allowing damages for identical substitute transaction), *with id.* at illus. 12 (allowing damages for different substitute transaction with additional costs); *see TVA*, 69 Fed. Cl. at 532 ("**Given the proportionately large cost of building and operating dry storage facilities**, TVA would have had **several options available in the but-for scenario to** deal with its spent fuel while still **avoiding dry storage**. These options included encroachment on full core reserve, increasing TVA's allotments with DOE, exchanging allotments with other utilities, cask-pit storage, and transshipment of SNF to other plants.") (Emphases added.)

The consistency required is not between the contracted-for and substitute transactions, but between the reasonableness of the non-breaching party's actions in the face of the circumstances in the contracted-for and breach cases that may well be different. If the circumstances in the scenarios differ such that a reasonable man would take different actions in each case, the *Restatement* allows him to so act and to so recover.

### C. Southern's Use of the 1 FCR Operating Reserve to Determine When and Whether to Build an ISFSI in the Breach Case was Reasonable.

After arguing that 1 FCR is the only reasonable operating reserve in the actual case, the Government then argues that use of 1 FCR in the non-breach case is unreasonable because it assumes perfect (*i.e.*, uninterrupted) performance by DOE. (Def.'s Post-Trial Br. 171-72.) This argument also fails.

---

(Tr. 2134) (Neuberger Test.) Dr. Neuberger simply had no expertise with which to assess the reasonableness of Southern Nuclear's operating decisions. (*Id.* at 2033-34.)

**1. Southern's Use of the 1 FCR Minimum to Determine Whether to Build an ISFSI in the Non-Breach Case was Reasonable.**

Southern determined whether and when to build an ISFSI in the breach and non-breach cases based on the decision that it would maintain at least a 1 FCR operating reserve in the Plant Hatch pool. Thus, Southern's 1 FCR operating reserve would be sufficient in the non-breach case as the decision point for when to build an ISFSI.[19]

Had DOE performed beginning in 1998, the pace of DOE's cask loading schedule under DOE's published acceptance rate and published APR would have allowed Southern to reach and maintain an operating reserve of almost 2 FCRs by 2004 and increasing thereafter in the non-breach case. (Tr. 959) (Wade Test.) Thus, it would be reasonable for Southern to use the same standard that it used in the actual case – to not lose a 1 FCR – in the non-breach case for determining whether and when to build an ISFSI.

Without the benefit of any evidence to support its argument, the Government also suggests that 1 FCR would be insufficient in the non-breach case because a temporary interruption in SNF loadings triggered by a terrorist attack, such as 9/11, might occur. (Def.'s Post-Trial Br. 172.) Assuming that the Government's speculation that a terrorist incident would disrupt cask loading for any material period, the argument still fails to compel a different policy than that implemented by Southern. To have any appreciable impact in the non-breach case, an interruption in SNF loading caused by a terrorist attack would have had to occur in the months in 2002 before DOE picked up casks, when the lowest operating reserve would have been reached, and continue for an extended period of time. *See* (Tr. 989-90) (Wade Test.) After that time period, at the 3000 MTU rate, DOE would have removed SNF at a pace sufficient to cause the

[19] In lieu of arguing that the second bathtub rack should not have been installed in the actual case, the Government now agrees with Southern that it is due the $419,000 credit for installation of the second bathtub rack. (Def.'s Post-Trial Br. 71.)

operating reserve to reach and surpass 2 FCRs and provide sufficient buffer for terrorist events or acts of God. (PX 594 (Neuberger Report) Ex. 3 – Fuel Mgmt. Model – But-For Scenario – Hatch SNF Inventory Table.) The Government presented no witness to testify about the consequences of such an event on DOE's cask loading schedule, or concerning the reasonableness of building a ISFSI in order to guard against the impact of such a speculative event during a temporary window of exposure.[20]

### 2. The Government's Cited Law Does Not Support its Argument in this Case.

In any event, the Government cites *Southern Pacific Communications Co. v. AT&T*, 556 F. Supp. 825 (D.D.C. 1982), *aff'd*, 740 F.2d 980 (D.C. Cir. 1984), *cert. denied*, 470 U.S. 1005 (1985), for the proposition that Southern's non-breach case is unreasonable because it assumes perfect performance by DOE with no risk. The case involves an antitrust claim by a telephone company against AT&T before the break-up of the latter. To compute its damages, the plaintiff telephone company had its experts create a hypothetical company based on assumptions about the company's market share, profit margins, and capital investments, including the assumption that the company would purchase the exact amount of capacity needed to serve customer demand in each market with no over- or underinvestment. *Id*. at 1078-83. Rejecting the hypothetical model company as implausible, the district court stated:

[20] Moreover, had DOE performed beginning in 1998, it would have had four years of successful SNF removal experience before arriving at Plant Hatch in 2002. Southern would have benefited by those four years of nation-wide experience of DOE and other nuclear utilities in cask procurement, NRC loading demonstrations, and cask loading. But for a speculative terrorist incident, Southern would have had some confidence that DOE would indeed perform again in the fifth year – 2002 – as it would have done in the first four years.

> **<u>SPCC acknowledged at trial that its computer model of the hypothetical 'but for' company was not based on any business plan that SPCC actually adopted or even considered in the real world</u>**. . . . The model merely represents an after-the-fact conjecture about what [plaintiffs] **might have considered** doing in the 'but for' world **created by** [plaintiffs'] **economists and computer experts**.
>
> . . . .
>
> By modeling a 'but for' company **whose investment decisions are determined ... with perfect knowledge of future demand and future costs** rather than on any business plan that [plaintiff] actually adopted **<u>or considered in the real world</u>**, [plaintiff's] **hypothetical model avoids any element of management fallibility**. **The 'but for' company never makes mistakes in planning or building its [business**]. To permit damages to be awarded on the basis of such an idealized business plan would open **<u>antitrust</u>** defendants to virtually unlimited damage claims based upon whatever **after-the-fact scheme plaintiffs, or their lawyers and economists might conjure up**. Such conjectures about what plaintiffs might have thought of doing at an earlier time provide no meaningful measure of damages actually suffered by plaintiffs.

(Def.'s Post-Trial Br. 171-72) (quoting *Southern Pac.*, 556 F. Supp. 2d at 1083) (underline emphases for text of opinion omitted from Government's brief).

Unlike *Southern Pacific*, 556 F. Supp. 2d at 1083, Southern's non-breach case did not involve a "hypothetical 'but for' company," but an already existing company – Southern – operating an already existing facility – Plant Hatch. Southern's "but for" world – its non-breach case – was not "created by [Southern's] economists and computer experts," *id.*, but by Southern's nuclear engineers and nuclear managers who actually operate nuclear plants, reactor pools, and SNF storage facilities. Southern's non-breach case was not based on "perfect" "investment decisions," *id.*, for hypothetical infrastructure to meet hypothetical demand, but on the real capacity of the existing infrastructure – its reactor pool –, the undisputed demand for storage space – the actual SNF inventory and the actual rate of SNF discharge –, the Government's published SNF acceptance rate, and the Government's published APR (*i.e.*, when and how much SNF would be removed from Plant Hatch). Finally, Southern's operating reserve

policy of not falling below 1 FCR before building an ISFSI and maintaining at least a 2 FCR reserve for long-term operations was not based on a "business plan" or policy that Southern never "actually adopted or considered in the real world," but on the business practice that Southern actually implemented at Plant Hatch and that is in place today.[21]

## III. Southern's Purchase of the HI-STAR Casks Was Reasonable When the Decision was Made in 1999.

The Government has argued[22] that Southern acted unreasonably in loading the HI-STAR casks in June of 2000 because Plant Hatch did not lose its 1 FCR operating reserve until September of 2001. Because the less expensive HI-STORM casks became available in June of 2000, the Government contends that Southern should have waited until June of 2000 to purchase and load the less expensive HI-STORM casks at a lower cost. (Def.'s Post-Trial Br. 72-75.)[23]

---

[21] Pursuant to the Federal Circuit's opinion in *Indiana Michigan*, 422 F.3d 1369 (Fed. Cir. 2005), and the parties' representations, this Court ordered that the "scope of the trial proceedings in this matter will comprise damages evidence up to and including December 31, 2004." (Order Sept. 16, 2005, Dkt. No. 304.) Thus, the Government's contention that the Court should consider $5 million of offsets to damages for costs savings projected to be realized from 2005-2010 (Def.'s Post-Trial Br. 167), while postponing recognition of damages Southern will incur during those same years, is not well taken. Just as a plaintiff cannot recover a future damages claim for a present partial breach "[b]ecause of its highly speculative nature," *Indiana Michigan*, 422 F.3d at 1376, a defendant cannot recover speculative offsets against such damages until the damages are claimed in a subsequent action.

[22] While the Government did not include a HI-STAR argument in the Argument Section of its Post-Trial Brief, it did make the HI-STAR assertion in the Facts Section of its brief at pages 72-75.

[23] The Government charges:

> Plaintiffs allege that, even with the additional racks, had the Hi-STAR cask loading not taken place in 2000, plant Hatch would have fallen below full core reserve "with the next scheduled discharge due in early 2001." Pl. Br. 94. This statement factually is wrong. As a matter of fact, the 2001 discharge occurred in September of that year – clearly not "early 2001" as characterized in plaintiffs' brief. Tr. 983:12-19 (Wade). **Moreover, plaintiffs fail to point out that four**

The three HI-STAR casks were more expensive than the subsequently available HI-STORM casks and required additional equipment and plant modifications to load. The issue is whether Southern acted reasonably in mitigating its damages by spending $14,919,855[24] on the HI-STAR casks and related equipment.

---

> **Hi-STORM casks were loaded in the Summer of 2001, prior to the 2001 discharge**.

(Def.'s Post-Trial Br. 72 n.39) (emphasis added). Southern's actual statement was:

> As Southern had **never undertaken the long lead-time and complex task of** the engineering, licensing and **construction of an ISFSI**, and the execution of a SNF cask loading campaign, Plant Hatch's management targeted mid- to late 2000 for the commencement of operation of the Plant Hatch facility. . . .
>
> Even with the additional racks, which were licensed by NRC in March of 2000 and installed in the Plant Hatch pool thereafter, had the performance of cask loading and **the ISFSI storing campaign** not been successfully implemented in late 2000, the operating reserve at Plant Hatch would have fallen below the minimum of 1 FCR, with the next scheduled discharge due in **early 2001**. (Tr. 1180) (Bland Test.)

(Pls.' Post-Trial Br. 94.) The reason that Southern did not "point out that the four HI-STORM casks were loaded in the Summer of 2001," was that Southern was explaining that the decision of when to load casks for the first time had to be made in 1999 because first-time loading included several long lead time projects, such as fabrication of casks, licensing of casks, and the "construction of an ISFI." (Pls.' Br. 94); (Tr. 1180-83) (Bland Test.) Without the construction of the ISFSI, no casks – HI-STAR or HI-STORM – could have been loaded in 2000 or 2001. The SNF inventory would have risen from 5423 assemblies at the end of 2000 to 5607 assemblies after the 2001 discharge – leaving an operating reserve of 471 assemblies – "below the minimum of 1 FCR" (*i.e.*, 560 assemblies). *See* (PX 594 (Neuberger Report) Ex. 3 – Fuel Mgmt. Model – Actual Scenario – Hatch SNF Inventory Table)) Southern agrees, however, that the actual loading date of the four HI-STORM casks occurred in September of 2001, which is mid- to late 2001.

[24] The Government contends that the $5,083,728 of the Southern Company Services ("SCS") invoices should be disallowed because neither Mr. Bland "nor any other witness" could identify what portion of the costs were related to the ISFSI as opposed to the HI-STAR upender pad. (Def.'s Post-Trial Br. 75.) "[T]he breaching party [*i.e.*, the Government] has the burden of proof on a failure to mitigate [properly] defense." *First Nationwide Bank v. United States*, 56 Fed. Cl. 438, 444 (Fed. Cl. 2003), *aff'd* 431 F.3d 1342 (Fed. Cir. 2005). The Government's accounting expert, Mr. Johnson, reduced damages for these costs because the upender pad design was

Southern, however, did not have the luxury of making the cask purchase decision in 2000. As David Bland explained:

> We've got to build these pieces of equipment that can take as much as a year to do. We've got to construct the facilities on which they're doing it, which again can take as much as a year to do. We have to – before we can do either of those, we have to produce the designs under which we'll do that work, which takes from six months – six to nine months to do.
>
> ….
>
> **You can't take a four to six year job and do it in 32 months and do it in a – what might be called a logical sequence.** You have to assume some things.

(Tr. 1180-83, 84) (Bland Test.) (emphasis added). When Southern was making the decision to build the ISFSI and to order casks in 1998 and early 1999, it was scheduled to lose the minimum 1 FCR operating reserve in its shared pool in 2000 because the bathtub racks had not yet been licensed by the NRC for installation in the pool.[25] (Tr. 1187-88) (Bland Test.) ("Q. . . . [A]m I

---

included in the work order for the ISFSI engineering and based on his understanding that the upender design work was done between 1998 and 2000. (Tr. 2373-74) (Johnson Test.). At trial, however, the testimony of Mr. Bland that only a few hours of engineering time in 1999 went into designing the upender pad was undisputed. (Tr. 1242-1243) (Bland Test.) Mr. Bland also testified without dispute that SCS simply took the design for the entire ISFSI and scaled it down for the upender pad. (*Id.* 1259.) Mr. Johnson was unaware of this trial testimony at the time he decided to disallow the cost and could not identify evidence that the work on the upender was done in 1998 or 2000. (Tr. 2390) (Johnson Test.) Moreover, Mr. Johnson conceded that his adjustment for the upender pad amounted to 77% of the entire engineering cost of the Hatch ISFSI, while the area of the upender pad was only approximately 7% as large as the total area of the ISFSI. (*Id.* at 2388-92). Mr. Johnson conceded that the testimony provided by Mr. Bland was "inconsistent" with his position to disallow 77% of the total engineering costs for the Hatch ISFSI on account of the upender pad and to exclude over $5 million from Southern's claim. (*Id.*)

[25] The Government also charges:

> Plaintiffs also assert – without citation to the record – that the **<u>additional bathtub rack</u> and <u>the Hi-STAR cask loading</u>** in 2000 allowed GPC to maintain full core reserve through 2000 at Plant Hatch. Pl. Br. 94. **That assertion likewise is false**, as the testimony of plaintiffs' "experienced personnel" demonstrated that they did not need to load any casks in 2000 to maintain full core reserve at plant Hatch. Tr. 1000:9-15 (Wade).

(Def.'s Post-Trial Br. 72 n.39) (emphases added). The cited testimony of Mr. Wade is:

correct that in early '99, you had to make your final decision between HI-STAR and HI-STORM? A. Yes. Q. Had the license work for the two bathtub racks been completed? A. No, it had not."); *id.* at 1222-26 (Bland Test.) ("Plant Hatch must have the capability to begin loading the DCSS by June 2000 to avoid the loss of single-core offload capability."). At the time the decision had to be made regarding the which line of casks to purchase, Southern's management was confronted with the following circumstances: (1) the HI-STAR cask was a "dual purpose cask[]" that could be used to "both store and ship" SNF (DOE had not yet disapproved transportation casks) (Tr. 175-76 (Long Test.)); (2) the HI-STAR cask had substantially progressed through the licensing process and Southern "had gotten the NRC to agree that it was safe" (Tr. 1182) (Bland Test.); (3) Southern "was uncertain about the licensing of the HI-STORM and when it might be granted," (Tr. 184) (Long Test.), as the licensing of the HI-STORM "still had technical issues . . . it was still indeterminate when it would be available . . . ," (Tr. 1183-84) (Bland Test.), and "it could be three years before you get a final answer," (*id.* at 1183.) Faced with these circumstances in 1998 and early 1999, Southern's experienced nuclear engineers and nuclear plant managers made the reasonable decision to purchase the HI-STAR

---

Q. Again, so the HI-STARs hadn't been loaded in 2000 in this case?

A. In this particular case, yes.

Q. And even though those weren't loaded, you are still above one full core reserve going into the 2001 outage, right?

A. That is right.

(Tr. 1000) (Wade Test.) The SNF inventory in 2000 after the discharge and without loading the HI-STARS was of 5423 assemblies. (PX 594 (Neuberger Report) Ex. 3 – Fuel Mgmt. Model – Actual Scenario – Hatch SNF Inventory Table.)) Had the 167 assembly bathtub rack not been added to the Hatch pool, the capacity of that pool would have been 5911 assemblies. The operating reserve would have fallen to 488 assemblies (5911 capacity – 5423 inventory) or 72 assemblies below 1 FCR (*i.e.*, 560 assemblies).

casks. Even if they had put the decision off for a year to early 2000, the HI-STORMs would not have been licensed, the HI-STAR casks would have been licensed, and the HI-STAR casks would have been the safer choice.

After the NRC licensed the bathtub racks for installation in early 2000, (Tr. 1188) (Bland Test.), allowing an expansion of pool capacity to maintain the 1 FCR minimum until 2001, and after the NRC licensed the HI-STORM in May to June, 2000 (Tr. 184) (Long Test.), the Government's 20/20 hindsight leads it to argue that Southern could have waited until June of 2000 and ordered the HI-STORM casks instead of the HI-STAR casks. This ignores the undisputed testimony that the only reason the HI-STORMs became available in 2000 is that Southern's licensing work on behalf of the HI-STARs also benefited the HI-STORMs. (Tr. 1178-80) (Bland Test.) The Government's argument, based on 20/20 hindsight, is that the only reasonable course of action for Southern was to wait until the last possible minute to decide what casks to order and expose Plant Hatch to the risk that the HI-STORM casks would not be available in time.

This Court has stated, however, that "a party that takes steps that seemed reasonable at the time will not be judged by hindsight." *Citizens Federal Bank v. United States*, 66 Fed. Cl. 179, 185 (2005) (quoting E. Allan Farnsworth, *Contracts* § 12.12), *appeal dismissed*, 2006 U.S. App. LEXIS 8099 (Fed. Cir. Mar. 23, 2006); *see id.* ("[T]his court has repeatedly rejected attempts by the Government to come in years after the fact and claim that the nonbreaching parties failed to mitigate properly. . . . [i]t is not the task of the court to second guess the judgment of a skilled team of managers with a history of successful institutional management.") (internal quotations omitted). The Government has not borne its burden to show that Southern's

experienced and successful team of nuclear engineers and managers acted unreasonably in mitigating its damages by purchasing three HI-STAR casks and related equipment.

## IV. Southern's Internal Labor, Engineering, and Supervision Costs were Incremental Because they Deprived Southern of Other Work its Employees Would Have Performed Had DOE Not Breached.

The Government contends that Southern's use of its own employees on SNF projects, at a cost of $6,466,016, was not incremental. (Def.'s Post-Trial Br. 162-67.) Specifically, the Government argues that Southern did not show that its internal labor, engineering, and supervision costs for SNF projects were incremental absent a showing that such employees were hired for an SNF project and fired thereafter, worked overtime on such projects, or were supplemented with contract employees. (*Id.* at 166 n.45.) The Government relies on *Autotrol Corp. v. Control Water Systems Corp.*, 918 F.2d 689 (7th Cir. 1990) (Posner, J.), *Sacramento Municipal Utility District* [*SMUD*] *v. United States*, 70 Fed. Cl. 332 (2006) , and *TVA*, 69 Fed. Cl. 515. (Def.'s Post-Trial Br. 163-66.)

In *Autotrol*, 918 F.2d at 692-93, Judge Posner writing for the court, discussed the incremental damages theory that the Government argues for here and rejected it in favor of the standard damages test relied upon by Southern. The court set forth the defendant's argument that the salary of an engineer was not incremental to the breach, and then rejected it:

> It is more difficult to see how any part of the salary of the engineer in our illustration is a variable cost of the contract. His salary would presumably have been paid, for a time anyway, whether or not he worked on the electrodiarese project or, for that matter, on some substitute project. . . .
>
> **But this analysis is superficial. . . . If the contract had never been signed, the engineer would have had more time to devote to some other project of Autotrol's.**

*Id.* (emphasis added).

The court also noted that "[t]here was testimony that Autotrol's controls division was consistently overbooked with new projects and had a consistent record of profitability" and thus there were other projects that the engineer could have worked on for his employer that was not going out of business. *Id.* at 693. As in *Autotrol*, Southern presented testimony that its nuclear plants were consistently backlogged with maintenance projects, the performance of which allows each plant to continue to run and to earn a profit. Mr. Long testified: "[I]f the people are off working on dry cask storage, they are not working on the backlog of maintenance activities that we – that they are normally charged to do," and "they would be working on maintenance backlogs that we have." (Tr. 170) (Long Test.) Mr. Wade also confirmed that there was "other plant maintenance work that could have been done," had Southern's employees not been working on SNF storage projects. (Tr. 1128) (Wade Test.) Mr. Tom McCallum, Project Manager for Southern Nuclear, testified that Southern's use of its own employees on SNF storage projects meant that "there's work that gets deferred – gets sent outside of the company, or the backlog . . . ." (Tr. 1287) (McCallum Test.) In addition to regular maintenance project delays, projects such as the design and construction of tornado barriers and security enhancements had to be outsourced to contractors because in-house personnel were working on SNF projects. (*Id.* at 1389-91.) Instead of hiring or retaining otherwise idle personnel, Mr. Long testified that "[w]hen we first formed Southern Nuclear, we had people on the site that averaged 11 to 1200 people on the site. Now, we're down to the 800s . . . ." (*Id.* at 172.)

In *SMUD*, 70 Fed. Cl. at 376, Judge Braden denied claims for internal labor on an SNF project where SMUD was "engaged during this time in the incremental decommissioning of the Rancho Seco site." Unlike *SMUD*, Southern was not engaged in the decommissioning, or shutting down, of any of its nuclear plants. Instead, Southern nuclear managers and engineers

testified that with constant work demands on its employees' time, they would have reassigned them to complete backlogged plant maintenance projects but for the SNF storage projects that had to complete because of DOE's breach. (Tr. 170 (Long Test.); Tr. 1287 (McCallum Test.).)[26]

In *TVA*, 69 Fed. Cl. at 540, Judge Lettow disallowed that portion of internal labor for which "TVA did not provide **detailed hours and amounts per employee in its ledger reports**," and for which "TVA's proofs also do not indicate the **actual services provided** by most of the pertinent salaried staff at the two facilities, nor does the evidence disclose the **extent to which most of the employees were committed to the dry storage projects**." (Emphases added.) Judge Lettow, however, allowed the claim for internal labor damages where "TVA did make an appropriate showing." *Id.*[27] After Southern provided detailed hours and amounts per employee, gave information on the actual services provided, and gave information on the extent to which the employees were committed to SNF projects, the Government stipulated that such amounts were adequately supported. (Tr. 6.)

Southern also established that compared to hiring outside contractors, "the internal labor costs were . . . cheaper" – approximately fifty percent cheaper for ongoing SNF cask loading campaigns. (*Id*. at 1125-28) (Wade Test.)

---

[26] In *SMUD*, 70 Fed. Cl. at 376, the Court recognized: "The fact that an injured party has used internal resources to mitigate a breach does not foreclose the injured party from recovering such costs. *See Tennessee Valley Auth.*, 69 Fed. Cl. at 539 ('That TVA used its own internal resources to support its mitigation is not fatal to its claim for damages in mitigating a breach of contract.')." The *SMUD* Court's application of that test is unclear.

[27] In *TVA*, 69 Fed. Cl. at 540, this Court rejected the Government's arbitrary proposed rule that employees who spent less than "50%" of their time on SNF storage projects during a year have all SNF cost allocations disallowed, stating "use of a '50%' criterion as a surrogate [for whether an employee was precluded from other work] is not supportable." Similarly, in this case, the Government suggests an arbitrary $5,000 or less disallowance test that lacks any basis in law. (Def.'s Post-Trial Br. 166.)

**V. Southern's Private Fuel Storage Costs Were Foreseeable and Reasonable.**

The Government contends that Southern's payment of $8.5 million to fund an off-site storage facility PFS was unreasonable.[28] (Def.'s Post-Trial Br. 177-82.) The Government argues that the PFS costs should be disallowed because: (1) Southern's payments for a PFS facility was not foreseeable to DOE; and (2) the damages were not reasonable because the decommissioning studies for Plant Hatch did not reduce the amount of SNF to be disposed of for any SNF shipments to a PFS facility and because Southern's 1994 Task Force Report stated that

[28] The Government contends, after the record at trial has closed, that there is no record evidence that APC or GPC ever paid SNC for the PFS expenses. (Def.'s Post-Trial Br. 177.) This challenge is not a reasonableness, certainty, or incremental challenge, but a challenge to Southern's support that such amounts were incurred by APC and GPC. At trial, however, the Government stipulated:

> MR. BLANTON: . . . But other than that [certain maintenance work orders for Plants Hatch and Farley] I think **everthing** else in this – **in the claim as expressed by the Kenric[h] group, is supported from a books and records standpoint**. Is that right?
>
> MR. EKMAN: **That's correct**.

(Tr. 4-6.) In any event, the record does contain the PFS workpapers that support Mr. Metcalfe's damages report and those workpapers include the following footnote: "Per DeWade Pittman (Southern Nuclear Operating Company Business Planning Manager), costs associated with private fuel storage are to be allocated evenly among its three plants." (PX 715 (Metcalfe Expert Report Workpapers) at KRG 00230 n.2.) The record also contains the operating agreements between SNC and GPC and between SNC and APC that state in pertinent part: "GPC shall pay to Southern Nuclear [SNC] the costs incurred by Southern Nuclear in providing Nuclear Operating Services for Each Plant." (PX 806 (GPC Nuclear Operating Agreement) § 5.1); "Nuclear Operating Services," in turn, is defined to include "Fuel Services" that include "all activities relating to procurement . . . and disposal of . . . nuclear fuel . . . and waste products." (*Id.* at §§ 1.19, 1.7). *See* (PX 807 (APC Nuclear Operating Agreement) § 4.01, 4.03, & Art. I, p.2.) *See also* (PX 427 (Accounting Report) SNC 007649) (stating that the PFS costs were recorded to "Location 00950"); (PX 396 (List of Location Numbers) at 1, 2 n. (a)) ("All cost recorded in location 00950 will be allocated to Farley, Hatch and Vogtle."). Much like its post-trial attempt to avoid deposition designations to which it agreed at trial, *see* (Response to Plaintiff's Designations of Deposition and Trial Transcripts, Dtk. No. 325 (March 16, 2006), the Government's belated argument as to sufficiency of the support for the PFS costs to which it stipulated at trial lack merit and are refuted by the Government's on-the-record commitments at trial.

the SNF could be stored at Plant Hatch as long as the plant was operating. (Def.'s Post-Trial Br. 178.)

**A. A PFS Facility was Reasonably Foreseeable to DOE.**

The Government argues that "[a]s a matter of law, the Federal Circuit's *Indiana Michigan* decision precludes recovery of Southern Nuclear's contributions in PFS" because such contributions were "unforeseeable" as they were not mentioned in DOE's 1983 Mission Plan. (Def.'s Post-Trial Br. 177-78.) The Federal Circuit's decision, however, only held that Judge Hodges's finding of fact on foreseeability was not clearly erroneous based on the evidence and arguments in that record.[29] In contrast, the following facts proved by Southern were not argued

[29] Indiana Michigan's post-trial brief did not argue the foreseeability of PFS. *See Indiana Michigan v. United States*, No. 98-486, Dkt. No. 275 p.12-14 (Apr. 1, 2004). Indiana Michigan's foreseeability argument on PFS in its opening brief to the Federal Circuit was:

> The CFC also stated that DOE could not foresee that utilities would engage in such an expensive storage option. *Indiana Michigan*, 60 Fed. Cl. at 659. The CFC noted, however, the Government's recognition that DOE should have foreseen that its breach of the Standard Contract would cause Indiana Michigan to run out of space in its spent fuel pool and that Indiana Michigan would likely have to incur the expenses of building and operating a dry storage facility. *Id.* at 652. PFS was simply another dry storage alternative that, at least in 1994, had the potential of being more cost-effective for a nuclear utility than constructing its own dry storage facility on-site. DOE cannot argue, therefore, that it could not have foreseen that Indiana Michigan would explore more cost-effective alternatives to on-site dry storage in 1994 due to DOE's announcement that it would not accept SNF by the 1998 Standard Contract deadline. The fact that PFS was delayed by NRC licensing does not alter the fact that it appeared to be a reasonable and potentially cost effective option for storing SNF at the time Indiana Michigan joined PFS.

Brief of Appellant, 2004 WL 3335282 at *48 (Fed.Cir.).

Indiana Michigan's foreseeability argument for PFS in its reply brief to the Federal Circuit was:

> Similarly, Indiana Michigan has designed and will soon build an SNF dry storage facility on-site at the Cook plant; construction is scheduled to begin early next

in *Indiana Michigan*, and support the foreseeability to DOE in 1983 that utilities would pursue an off-site SNF storage option:

- Robert Morgan, DOE's director of the SNF storage program, stated in 1983: "During the first year of operation of the repository in 1998, we should be receiving fuel at a rate so that **no utility would have to add any further storage facilities** either on site or **at another location**." (Emphasis added) (PX 53 (Robert Morgan, Proceedings of the 1983 Radioactive Waste Management Program, December 12-15, 1983: Program Overview), at 11 (Feb. 1984)) (emphases added).

- Because private ISFSIs were a real possibility, the NWPA addressed them by cautioning that the Act's provisions governing Federal Interim Storage ("FIS") and an MRS, did not require utilities to utilize a private, off-site ISFSI: "[N]othing in this Act shall be construed to encourage, authorize, or require the **private** or Federal use, purchase, lease, or other **acquisition of any storage facility located away from the site of any civilian nuclear power reactor** and not owned on the date of the enactment of the Act." NWPA § 135(h) (codified at 42 U.S.C. § 10155(h) (emphases added). If such facilities were not foreseeable, there would have been no need for this provision.

- The NWPA itself provided for a Government-operated temporary off-site storage facility – an MRS – for utilities to use as a "back-up" if the permanent repository was delayed. NWPA § 141, 42 U.S.C. § 10161; H.R. Rep. 97-491, pt. 1, at 44 (1982), *as reprinted in* 1982 U.S.C.C.A.N. 3792, 3810 hereinafter ["NWPA Report"] ("MRS AS **BACK-UP** FOR REPOSITORY PROGRAM") (emphasis added).

- The NWPA also established the FIS program for the temporary off-site storage of SNF. NWPA § 135(a)(1)(A), 42 U.S.C. § 10155(a)(1)(A). In fact, DOE submitted two reports to Congress on the substantial cost of such an off-site temporary SNF storage facility in July 1983 — within a month of signing the Contracts with APC and GPC. (PX 200, 1988 Federal Interim Storage Fee Study, at 1-1, SNC055112) (listing July 1983 DOE reports).

---

> year. Indiana Michigan is building the dry storage facility because it reasonably believes, and the record supports, that DOE will not begin to accept SNF under the Standard Contract until at least 2010 and most likely not until 2015, at the earliest. These costs were foreseeable and were or will be incurred by Indiana Michigan as a direct and proximate result of DOE's failure to accept SNF between 1998 and at least 2015.

Reply Brief, 2005 WL 1178141 at *3-*4.

- DOE was also aware, when it signed the Contracts, that nuclear utilities had attempted private solutions to SNF storage problems by working with a reprocessing plant located off-site from their nuclear plants. *See* NWPA Report at 28, *as reprinted in* 1982 U.S.C.C.A.N. at 3794 ("A lasting result of the events of the 1970's has been a continuing tendency on the part of nuclear utilities to seek resolution of the nuclear waste management problem through the initiation of spent fuel reprocessing in the United States.")

- DOE worked with private utilities on alternative storage techniques, including a cooperative program to conduct unlicensed storage operations at an off-site location with utility supplied fuel and casks. *Id.* at 44, *as reprinted in* 1982 U.S.C.C.A.N. at 3805.

- Prior to 1983, DOE knew that private companies operated off-site low-level radioactive waste storage facilities. *See, e.g.*, 46 Fed. Reg. 38081, 38089 - 38090 (July 24, 1981) (authorizing private companies to obtain licenses to operate a low level radioactive waste disposal facilities by providing in § 61.3 that a "person" have an NRC license to operate under and defining in § 61.2 a "person" to include any "corporation, partnership, firm, association, trust, estate, public or private institution"); *New York State Energy Research & Dev. Auth. v. Nuclear Fuel Serv., Inc.*, 666 F.2d 787 (2d Cir. 1981) (reviewing attempt by state agency to transfer possession of low level radioactive waste burial facility from private company to DOE).

- DOE was also aware that intense political resistance greatly impacted the location and operation of SNF disposal alternatives. The legislative history to the NWPA recounts the "rejection of a site for the [SNF storage] facility in Lyons, **Kansas** in 1971 after an intense **political attack** …," a **public referendum** in **California** prohibit the construction of a new nuclear power plants in the state until a solution to the waste disposal problem is demonstrated, and a "site in **Michigan**, where **political uproar** quickly brought the program to defeat …." NWPA Report at 27, *as reprinted in* 1982 U.S.C.C.A.N. at 3793 (emphases added).[30]

[30] In *In re Northern States Power Co.*, 604 N.W.2d 386, 388 (Minn. Ct. App. 2000), the court recounted a similar political action:

> In August 1992, the commission approved NSP's request, although modifying the requested number of casks from NSP's requested 48 to 17. . . .
>
> As part of its limited certificate of need order approving NSP's plan to store waste in the 17 casks, the commission determined that state legislative approval of dry cask storage was unnecessary. This court disagreed, concluding that Minnesota's Radioactive Waste Management Act prohibited the dry cask storage absent legislative approval. *In re Application for Certificate of Need for Indep. Spent Fuel Storage Installation (ISFSI)*, 501 N.W.2d 638, 648 (Minn. App. 1993), *review denied*[, 1993 Minn. LEXIS 477] (Minn. July 15, 1993).

- And DOE was aware that the NWPA anticipated future political issues with SNF storage as it required hearings in the vicinity of a potential SNF disposal site, allowed a State to veto a site, and provided that such a veto could be overridden only by a joint resolution of Congress. *See* NWPA § 111 (a)(6) ("The Congress finds that—State and public participation in the planning and development or repositories is essential in order to promote public confidence in the safety of disposal of such waste and spent fuel") (codified at 42 U.S.C. § 1013(a)(6)); NWPA § 112(b)(2) ("Before nominating any site the Secretary shall hold public hearings in the vicinity of such site"), 42 U.S.C. § 10132(b)(2); NWPA § 116(b)(2) ("Governor or legislature of the State may disapprove the site designation") (codified at 42 U.S.C. § 10136(b)(2)); NWPA § 115 (c) ("such site shall be disapproved unless . . . Congress passes a resolution . . . approving such site") (codified at 42 U.S.C. § 10135(c)).

Thus, it was reasonably foreseeable to DOE that if it failed to provide SNF storage to Southern, Southern would seek an off-site private SNF storage solution.

**B. Southern's Decommissioning Studies and 1994 Strategy Report Support the Reasonableness of Southern's Payments to PFS.**

The Government next argues that PFS payments were unreasonable in addition to Southern's on-site storage facilities based on two types of documents. The Government contends that Southern's decision not take shipments of PFS into account in its decommissioning studies means that Southern believed a PFS facility was unrealistic. (Def.'s Post-Trial Br. 88-89.) Of course, PFS, like an MRS, is only a temporary off-site storage facility, not a permanent disposal facility.[31] (Tr. 427) (Cocherell Test.) ("[W]e would potentially ship, have the ability to

---

In response to ISFSI, the legislature passed legislation approving of the 17 dry casks. *See* Minn. Stat. §§ 116C.77, 771 (1994).

The political issues in Kansas, California, Michigan, and Minnesota also support the reasonableness of Southern's decision to invest a relatively small amount in a back-up SNF storage facility in case political pressure in Georgia or Alabama prevented or limited cost-effective storage on site.

[31] It is the height of irony that the Government would argue that PFS, which has been licensed by NRC, is speculative and unforeseeable while at the same time relying on the mythical MRS,

ship to that facility for about a 20‑year period and then someone would have to pick it up and take it away or **it would have to go back to the [plant] site.")** Because any SNF that Southern has shipped to a PFS facility would come back to Southern's plant sites unless a federal repository was completed, reduction of the SNF from plant decommissioning costs would be a calculation error.[32]

Similarly, the Government contends that Southern's position that the PFS costs were reasonable "is belied" by a 1994 Hatch Spent Fuel Storage Task Force Report (the "1994 Task Force Report") that included a statement by a law firm that SNF could be stored on site "as long as the facility is operating." (Def.'s Post-Trial Br. 90, 180) (citing DX 158.) This bullet point simply stated the then-current Georgia law. The Report also included the following additional bullet points by the law firm:

- "Georgia has a **moratorium on disposal** of radioactive waste"
- "Georgia Department of Natural Resources has previously concluded that the adequacy of **interim storage systems** for high-level waste is '**questionable**'"
- "**If issue becomes political**, past actions indicate that Georgia PSC would examine the prudence of the technological choice."

---

which was never sited, never the subject of a license application, and barred by statute, as the basis for its acceptance rate argument.

[32] The Government also states that Southern "incredibly and falsely" asserted that "[w]hen it became obvious that the PFS facility would not be available in time for use by Southern, it ceased its investments." (Def.'s Post-Trial Br. 179.) The Government assumes that the only relevant time was prior to the completion of the ISFSI at Plant Hatch in 2000, as opposed to the time when Southern had conducted the successful operation of ISFSI's in both Georgia and Alabama without negative political, regulatory, or legislative action. As Southern readily acknowledged in its brief: "Plant Hatch would have needed the PFS alternative to be ready in 2000 to avoid building a PFS. Nonetheless, had the State of Georgia banned the storage of SNF at Plant Hatch or taxed it to the extent that such storage was not cost effective, PFS provided an alternative storage site to which SNF storage at a Plant Hatch ISFSI could be moved. . . . Southern's nuclear plant managers made [a] reasonable decision[] . . . to stop making payments after the completion and successful operation of ISFSIs in Alabama and Georgia." (Pls.' Post-Trial Br. 160-61.)

(DX 158 (1994 Task Force Report) at 32, SN065636) (emphases added). In addition to noting that storing SNF on site in Georgia could become political, the 1994 Task Force Report also stated that **"[a] private MRS could be implemented**, but the date for commercial operations and pick-up is not certain." (*Id.* at 19, SN065623) (emphases added). While a private MRS, or PFS, was not the least costly option, it was a back-up option that "**could be implemented**." (*Id.*) (emphasis added).

Moreover, PFS continued to be reasonable as the following facts show:

- NRC continued accepting licensing submittals for the PFS facility. (Tr. 186) (Long Test.); Tr. 339-40 (Cochrell Test.); (PX 817 (DOE, Final E.I.S.) at vol. III § 9.1 (Feb. 2002)).

- DOE stated: "**DOE recognizes** interim storage at the **Private Fuel Storage Facility** in Utah to be a **reasonably foreseeable future action** …." (PX 817 (DOE, Final E.I.S.) at vol. III § 9.1 (Feb. 2002)) (emphases added).

- NRC approved the license for PFS in 2005. (Tr. 339-40) (Cocherell Test.)

Unlike *Indiana Michigan*, the evidence produced in this trial and argued by Southern demonstrates that that PFS was foreseeable and Southern's relatively small investment therein was reasonable.

## VI. The Miscellaneous Cost Items Were Reasonable.

The Government mentions standby welding time in the Fact Section of its brief, but does not challenge standby welding time or the cost of the work platform in the Argument Section of its brief. (Def.'s Post-Trial Br. 85.) Southern relies on its opening brief on these issues. (Pls.' Post-Trial Br. 161-62.)

## VII. The Cost of Capital Adjustment is a Separate Recoverable Element of Damages, Not Prejudgment Interest.

The Government argues that the $29 million that Southern claims for cost of capital is simply re-labeled pre-judgment interest computed on Southern Company parent letterhead for which no direct borrowing took place. (Def.'s Post-Trial Br. 91, 182.) Southern's damages expert, Mr. Metcalfe, explained that prejudgment interest is not a cost incurred by the plaintiff, but is an arbitrarily selected fixed rate imposed upon all costs that were incurred (including financing costs) regardless of the actual cost of capital of the plaintiff. Southern's cost of capital, however, is a real cost of obtaining the real money that Southern spent on its real SNF projects. *See* (Tr. 2084) (Neuberger Test.); (Tr. 1550-51) (Metcalfe Test.) "[T]he distinction between interest as an element of damages and interest on a claim is well-recognized." *Westfed Holdings, Inc. v. United States*, 52 Fed. Cl. 135, 163 (2002) (internal quotations omitted), *aff'd in relevant part*, 407 F.3d 1352 (Fed. Cir. 2005).

Further, the separate costs of capital for APC and GPC were computed using the differing fluctuating weighted average costs of capital for those companies and the co-owners of Plants Hatch and Vogtle. (Tr. 1547-48, 1584-86) (Metcalfe Test.) While the Southern Company parent corporation's letterhead appeared on the weighted average cost of capital schedules, that is because the Southern Company's finance department computed the differing costs of capital incurred each year by APC and GPC. (PX 668 (KRG Cost of Capital Workpapers), SNOC 01633); (Tr. 1547-48, 1584-86) (Metcalfe Test.)

In *TVA*, 69 Fed. Cl. at 542, this Court held that there is no requirement that a specific borrowing be traced back to a specific SNF expenditure. Instead, capital is raised and funded to SNC which is then reimbursed by APC and GPC.[33]

Finally, the Government argues that this Court's holding in *TVA*, 69 Fed. Cl. at 542-43, that Allowance for Funds Used During Construction ("AFUDC"), or construction period interest, was allowable is inapposite because Southern is not claiming AFUDC. (Def.'s Post-Trial Br. 185.) Mr. Metcalfe explained that under FERC accounting principles the cost of capital, without a specific borrowing for a specific project, is routinely recorded and recovered by utilities, including Southern and TVA. (Tr. 1543-1552) (Metcalfe Test.) Unlike a utility that recovers in its rate base the cost of capital on construction projects over time and on operating expenses annually, a plaintiff in a breach of contract action can recover all damages incurred in the construction period and after that period for operations. *See TVA*, 69 Fed. Cl. 542-43. Accordingly, Mr. Metcalfe computed the entire cost of capital and backed out the AFUDC that had already been recorded on the books to prevent double counting. (Tr. 1543-44) (Metcalfe Test.) Thus, the net cost of capital claimed by Southern is the accurate cost of funding the construction of the SNF facilities and the operations made necessary by DOE's breach.

---

[33] The Government argues that there is no evidence that "the three plaintiffs" incurred any cost of capital because the Southern Company parent corporation actually raises the capital and funds them. (Def.'s Post-Trial Br. 185.) While it true the capital is raised by the Southern Company parent, the Southern Company actually funds SNC with this capital. (Tr. 1686) (Metcalfe Test.) Pursuant to the Operating Agreements that GPC and APC, respectively, have with SNC, GPC and APC reimburse SNC for all costs, including SNF project costs to ensure that each operating company stands on its own. *See* (PX 806 (GPC Nuclear Operating Agreement) §§ 5.1,1.19, 1.7); (PX 807 (APC Nuclear Operating Agreement) § 4.01, 4.03, & Art. I, p.2.)

## CONCLUSION

Southern respectfully asks this Court to enter findings of fact and to make conclusions of law consistent with its briefs and enter judgment awarding Southern $101,900,000 in damages.

Respectfully submitted,

Dated: June 16, 2006

s/ M. Stanford Blanton
M. Stanford Blanton
BALCH & BINGHAM LLP
1710 Sixth Avenue North
Birmingham, AL 35203
Telephone: (205) 226-3417
Facsimile: (205) 226-8798

*COUNSEL OF RECORD FOR PLAINTIFFS*

**Of Counsel:**

Ed R. Haden
K. C. Hairston
BALCH & BINGHAM LLP
1710 Sixth Avenue North
Birmingham, AL 35203
Telephone: (205) 251-8100
Facsimile: (205) 226-8798

Ronald A. Schechter
Jeffrey L. Handwerker
Matthew M. Shultz
ARNOLD & PORTER LLP
555 Twelfth Street, N.W.
Washington, D.C. 20004-1202
Telephone: (202) 942-5000
Facsimile: (202) 942-5999

**CERTIFICATE OF SERVICE**

I hereby certify that on this 16th day of June, 2006, a copy of the foregoing "PLAINTIFFS' REPLY BRIEF" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ M. Stanford Blanton