**No. 98-614C**
**(Senior Judge Merow)**

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**(Electronically Filed on August 10, 2006)**

---

**SOUTHERN NUCLEAR OPERATING COMPANY,**
**ALABAMA POWER COMPANY, AND GEORGIA POWER COMPANY,**

**Plaintiffs,**

**v.**

**THE UNITED STATES,**

**Defendant.**

---

# PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION FOR RECONSIDERATION

---

**M. Stanford Blanton**
**BALCH & BINGHAM LLP**
**1710 Sixth Avenue North**
**Birmingham, AL 35203-2015**
**Telephone: (205) 226-3417**
**Facsimile: (205) 226-8798**

***Of Counsel*:**

**Ed R. Haden**
**K. C. Hairston**
**BALCH & BINGHAM LLP**
**1710 Sixth Avenue North**
**Birmingham, AL 35203-2015**
**Telephone: (205) 251-8100**
**Facsimile: (205) 226-8798**

**Ronald A. Schechter**
**Jeffrey L. Handwerker**
**Matthew M. Shultz**
**ARNOLD & PORTER LLP**
**555 Twelfth Street, N.W.**
**Washington, D.C. 20004-1202**
**Telephone: (202) 942-5000**
**Facsimile: (202) 942-5999**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .......... ii

ARGUMENT .......... 1

I. The Court's Findings Regarding Mitigation Are Supported By Record Evidence And Are Clearly Correct. .......... 2

A. The Government's Argument Regarding Dry Storage at Plant Hatch Is Based On a Misquotation of the Court's Opinion. .......... 3

B. The Government's Argument Ignores Substantial Evidence Relied Upon by the Court in Finding That Temporary Shortfalls In SNF Removal Could Be Accommodated Without Dry Storage. .......... 5

II. This Court Correctly Based Damages Upon A Reasonable Rate Of SNF Acceptance. .......... 8

A. Because the Standard Contract Contained No Rate, this Court Supplied a Reasonable Rate. .......... 8

B. The Court Properly Placed the Burden of Proof on the Government to Establish That Plaintiffs' Mitigation Was Unreasonable. .......... 9

C. The Court's Offset of the Second Bathtub Rack Does Not Conflict With Its Holding Regarding The Basis For Plaintiffs' Damages. .......... 14

CONCLUSION .......... 15

CERTIFICATE OF SERVICE .......... 17

# TABLE OF AUTHORITIES

## CASES

*Caroline Hunt Trust Estate v. United States*, 65 Fed. Cl. 271, 317 (2005*), aff'd in part, rev'd in part on other grounds and remanded*, 470 F.3d 1044 (Fed. Cir. 2006), *reh'g en banc denied*, (Mar. 19, 2007)........................................................................................ 12

*Commonwealth Edison Co. v. United States*, 56 Fed. Cl. 652 (2003)............................................ 8

*David Nassif Assocs. v. United States*, 557 F.2d 249 (Ct. Cl. 1977)............................................. 8

*Energy Capital Corp. v. United States*, 302 F.3d 1314 (Fed.Cir. 2002) ...................................... 10

*First Nationwide Bank v. United States*, 56 Fed. Cl. 438 (Fed. Cl. 2003) ............................. 11, 14

*Fru-Con Constr. Corp. v. United States*, 44 Fed. Cl. 298 (Ct. Cl. 1999) ...................................... 1

*Indiana Michigan Power Co. v. United States*, 422 F.3d 1369 (Fed. Cir. 2005).................9, 10, 11

*LaSalle Talman Bank v. United States*, 317 F.3d 1363 (Fed. Cir. 2003) ............................... 12, 13

*Lisbon Contractors, Inc. v. United States*, 828 F.2d 759 (Fed. Cir. 1987).................................. 12

*Pacific Gas & Electric Co. v. United States*, 73 Fed. Cl. 333 (2006) ........................................... 8

*Robinson v. United States*, 305 F.3d 1330 (Fed. Cir. 2002) ....................................................... 11

*Sacramento Mun. Util. Dist. v. United States*, 70 Fed. Cl. 332 (2006) ....................................... 11

*San Carlos Irrigation & Drainage Dist. v. United States*, 111 F.3d 1557 (Fed.Cir. 1997) ..... 10, 12

*Tennessee Valley Authority v. United States*, 69 Fed. Cl. 515 (2006)...................................... 6, 11

*Yankee Atomic Elec. Co. v. United States*, 73 Fed. Cl. 249 (2006)............................................. 11

## OTHER AUTHORITIES

11 *Corbin on Contracts* § 1039, p. 316 (2005 ed.) .................................................................. 11

*Restatement (Second) of Contracts* § 204 (1981)............................................................... 8

*Restatement (Second) of Contracts* § 347 (1981)............................................................... 10

*Restatement (Second) of Contracts* § 350 ........................................................................ 11

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**(Electronically Filed on August 10, 2007)**

| | | |
|---|---|---|
| **SOUTHERN NUCLEAR OPERATING COMPANY, ALABAMA POWER COMPANY, AND GEORGIA POWER COMPANY,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**THE UNITED STATES,**<br><br>**Defendant.** | ) | **No. 98-614C**<br>**(Senior Judge Merow)** |

**PLAINTIFFS' RESPONSE TO**
**<u>DEFENDANT'S MOTION FOR RECONSIDERATION</u>**

Plaintiffs Alabama Power Company ("APC"), Georgia Power Company ("GPC"), and Southern Nuclear Operating Company, Inc. (collectively, "Southern") respectfully submit this Response to the Defendant's Motion for Reconsideration. The Government's Motion misquotes this Court's July 9, 2007 opinion, takes portions of the opinion out of context, and omits evidence supporting the findings of fact. Plainly and properly read, the opinion's conclusions of law are consistent with controlling precedent and its findings of fact are supported by the record. Because the Court's opinion is correct, the Government's Motion for Reconsideration should be denied.

## <u>ARGUMENT</u>

"Th[e] showing, under RCFC 59, must be based upon manifest error of law, or mistake of fact, and is not intended to give an unhappy litigant an additional chance to sway the court." *Fru-Con Constr. Corp. v. United States*, 44 Fed. Cl. 298, 300 (Ct. Cl. 1999). "To sustain its

burden, the movant must show: (1) that an intervening change in the controlling law has occurred; (2) that previously unavailable evidence is now available; or (3) that the motion is necessary to prevent manifest injustice." *Id.* at 301. Because the Government argues no intervening change in law or new evidence and fails to show any manifest injustice, its Motion should be denied.

## I. The Court's Findings Regarding Mitigation Are Supported By Record Evidence And Are Clearly Correct.

The Government's arguments regarding the accuracy of the Court's damages calculations under the 900 MTU rate are largely academic because the Court expressly rejected the 900 MTU rate contained in the 1991 Annual Capacity Report ("ACR") as a reasonable basis upon which to calculate damages. After noting that the Department of Energy ("DOE") abandoned the Delivery Commitment Schedule ("DCS") process and the Nuclear Waste Policy Act barred construction of a Monitored Retrievable Storage facility ("MRS") upon which DOE based the 900 MTU rate, the Court stated: "[D]efendant's reliance on the 1991 ACRs unravels." Slip Op. at 30. "The contingent and conditional 1991 ACR was discussed previously and the court declines to find that DOE would have performed at that level. Indeed DOE could not have performed at that level without Congressional action." *Id.* at 52. "Neither windfall nor a nonbreach world is measured by contingent, litigation-driven and subsequently-abandoned [1991 ACR] rates." *Id.* at 53. Instead, this Court found: "The record evidence demonstrates that a reasonable annual removal rate in most circumstances would fall between the 2000 MTU annual industry SNF discharge as the floor and the annual 3000 MTU design capacity of the planned repository as the ceiling." Slip Op. 56 n.38.

Notwithstanding this Court's rejection of the 900 MTU rate argument, the Government's Motion argues that this Court's July 9, 2007 opinion erroneously concluded (1) that GPC would have tolerated a loss of one full core reserve ("FCR") at Plant Hatch for several years under the 900 MTU acceptance rate contained in the 1991 ACR and (2) that installation of the second bathtub rack alone would have provided sufficient storage at Plant Hatch under the 900 MTU rate. The Government's arguments fail because they misquote and distort the relevant passages of the Court's opinion and omit substantial evidence that the Court cited in support of its findings of fact.

**A. The Government's Argument Regarding Dry Storage at Plant Hatch Is Based On a Misquotation of the Court's Opinion.**

First, the Government argues that the Court erred in concluding that under the 1991 ACR rates (*i.e.*, a ramp-up to 900 MTUs per year), GPC would not have required dry storage at Plant Hatch because, according to the Government, those rates would have resulted in less than one FCR at Plant Hatch and that there is no evidence that GPC would have operated Plant Hatch at less than one FCR. (Gov. Mot. 3.) The Government attempts to set up a "straw man" argument by asserting that the following quotation appears in the Court's opinion and then arguing that the quotation is not supported by evidence:

> "[r]ather than build expensive dry storage, any loss of FCR would have been tolerated because DOE's continuing performance in the nonbreach world would have restored FCR in a relatively short time under the 1991 ACR rates." Slip Op. at 41.

(Gov. Mot. 3) (emphasis added).

The underlined words in the purported quotation, however, do not appear in this Court's opinion. Instead, this Court, while concluding that dry storage would not have been built had DOE performed, actually stated:

> The court concludes that the decision to build the ISFSI at Plant Hatch was caused in substantial part by DOE's delay, and that but for the partial breach – in the nonbreach world, plaintiff would not have built it. In this regard, the court credits Mr. Long's testimony that the dry storage decisions would not have been made if DOE's commencement of performance had not been delayed. If DOE had timely commenced performance, a second bathtub rack would have been installed to accommodate discharges for the relatively short time until DOE's accepted SNF from this plant. The cost of the second bathtub rack was deducted from damages. Rather than build expensive dry storage, any loss of FCR would have been tolerated because DOE's continuing performance in the nonbreach world would have restored FCR in a relatively short time. The court credits Mr. Long's testimony:
>
> > This whole business of ISFSI and having to store these casks out in rods, or out in the yard is not part of our core business. It is something we're being made to have to do because [DOE] did not come and pick up our fuel and we would not be in that business but for that. And if there was a choice where I didn't have to build an ISFSI and I had to put in, you know, a second set of racks for a while, in the unit 1 pool, I probably would have selected to do that rather than go out and build this thing out there.
>
> (Tr. 160-61(Long).) Upon consideration of the testimony and evidence, the court concludes defendant did not establish the decision to acquire the three HI-STARs was unreasonable. The decisions at Plant Hatch in this regard were foreseeable, substantially caused by DOE's partial breaches, were reasonable, and the costs were established with reasonable certainty.

Slip Op. at 41-42 (emphasis added).

The 900 MTU rate from the 1991 ACR was neither expressly stated nor implied in the above portion of the opinion. Mr. Long, whose testimony the Court credits, testified that DOE should have operated under the 3000 MTU rate. (Tr. 22.) This Court rejected the "litigation-driven" 900 MTU rate as a matter of fact and that rate was not a necessary basis for its finding that GPC would not have constructed dry storage facilities at Plant Hatch had the Government performed. Slip Op. at 30, 53, 56.

### B. The Government's Argument Ignores Substantial Evidence Relied Upon by the Court in Finding That Temporary Shortfalls In SNF Removal Could Be Accommodated Without Dry Storage.

Notwithstanding the forgoing, the Court found that Southern had multiple options available to it to avoid dry storage even if the Court had performed at the "contingent, litigation-driven, and subsequently-abandoned" 900 MTU rate. *See* Slip Op. at 53. The Government argues that the Court's offset to damages relative to the second bathtub rack is inconsistent "with the Court's finding that the second bathtub rack would have provided sufficient storage space under the lower acceptance rates contained in the 1991 ACR." (Gov. Mot. 3.) The Government asserts the following quotation from this Court's opinion as the basis for its contention:

> Even at the rates under the December 1991 ACR, absent DOE's announced failure to commence performance during the time frame relevant here, storage shortages would likely have been accommodated. The court credits testimony and evidence that these plants would not have built dry storage, but plaintiff would have installed a second bathtub rack (at Plant Hatch) and/or would have lived with, or tolerated, less than FCR for a time pending pickups from DOE.

(Gov. Mot. 2) (quoting Slip. Op. at 56).

This argument mischaracterizes this Court's opinion by omitting the Court's recitation of a number of options available to utilities to avoid building dry storage facilities and the Court's citation to the testimony supporting such options. When read in context, the Court's analysis makes clear that the Court did not find that the installation of the second bathtub rack alone would have foreclosed the need for dry storage facilities under a 900 MTU rate. Instead, the Court credited the testimony of several witnesses to the effect that multiple options existed for dealing with temporary delays in performance by the Government and that the decision to construct expensive dry cask storage depended upon multiple factors:

> Nuclear waste management options included "increas[ing] fuel burnups" or possibly lengthening fuel discharge cycles. (Tr. 684 (Supko).) Additional or temporary racks or part of the FCR discharge capability could be utilized. (Tr. 689 (Supko).) Use of the twenty-percent increase option available under the

> Standard Contract would increase pickup allocations, another way to avoid constructing dry storage. (PX 624 at 17; Tr. 665, 812-13.) [Ms. Eileen Supko] presumed only those utilities that needed to increase their allocations by twenty percent to avoid building dry storage, would do so. (Tr. 856 (Supko).) Inter-company exchanges of allocations under the Standard Contract with DOE's consent, could be used to avoid dry storage. (PX 624 at 17.)
>
> [T]he court concurs with the logic expressed in *Tennessee Valley Authority v. United States*, that "[g]iven the proportionately large cost of building and operating dry storage facilities, TVA would have had several options available in the but-for scenario to deal with its spent fuel while still avoiding dry storage." 69 Fed. Cl. at 532.
>
> Regardless of whether the burden is on the plaintiffs to establish lack of windfall, or on the defendant to prove windfall, the court credits witness testimony that the reracking at Plant Vogtle and the dry storage at Plants Hatch and Farley would not have occurred if DOE had been performing at any reasonable rate. 38/ <u>Even at the rates under the December 1991 ACR, absent DOE's announced failure to commence performance during the time frame relevant here, storage shortages would likely have been accommodated</u>. The court credits testimony and evidence that these plants would not have built dry storage, but plaintiff would have installed a second bathtub rack (at Plant Hatch) and/or would have lived with, or tolerated, less than FCR for a time pending pickups from DOE. Decisions to build dry storage were made after monitoring DOE's preparation for performance; planning and financing, then equivocation; denial of contractual responsibility absent a repository; and announced delays in commencement of performance. Furthermore, there is no chance for a windfall in that defendant did not establish that DOE will perform such that the storage costs awarded here would have been incurred under any scenario that would not be unreasonable.
>
> . . . .
>
> 38/ The record evidence demonstrates that a reasonable annual removal rate in most circumstances would fall between the 2000 MTU annual industry SNF discharge as the floor and the annual 3000 MTU design capacity of the planned repository as the ceiling.

Slip Op. 55-56 (emphasis added) (some footnotes omitted). *See also* (Tr. 684-90 (Supko) (discussing risk management at nuclear plants and explaining that expensive dry storage could be avoided in a number of ways)); (Tr. 139, 160-62 (Long) (discussing economics of nuclear plant management and stating, "it is a risk management kind of decision that you make. Not all decisions are black and white")); (Tr. 1160-67 (Bland) (discussing impact of length of DOE's

delay on choice of options to avoid dry storage and stating, “if you tell me that I’m going to need to be on this boat for the next six hours, I’m going to create probably a raft, because I don’t have a lot of time and I’m not going to be on it that long. If you tell me I’m going to live on this boat for the next six years, if I could afford it, I’m going to build a very large yacht, because I have to live on it”)).

The Court’s reference to the 1991 ACR rates simply emphasizes the reasonableness of the Court’s finding that Southern would “likely” have pursued a number of options to avoid constructing expensive dry storage had DOE ever shown any indication of performing its obligations. The Court credited the unchallenged testimony of the Plaintiffs’ witnesses that a nuclear utility, faced with a temporary shortfall in spent fuel acceptance could and likely would have employed a number techniques, including the installation of additional or temporary racks in the SNF pool, increasing shipments of SNF by twenty percent, increasing fuel burnups, lengthening fuel discharge cycles, and engaging in inter- or intra-company exchanges of acceptance allocations in order to avoid constructing expensive, permanent dry storage. Southern presented substantial evidence supporting this finding. (Tr. 684-90 (Supko); Tr. 139, 160-62 (Long); Tr. 116-67 (Bland)). In contrast, the Government presented no evidence regarding the unavailability of these alternatives and its assertion that performance at a 900 MTU rate would have impinged on one FCR for three years, Gov. Mot. 3, ignores the impact of most if not all of these alternatives.

Quoted accurately and read in context, the Court’s opinion is supported by the evidence. [1]

[1] The Government also asserts that this Court erred in stating “that, at the time of the 1983 draft Mission Plan, ‘approximately 2000 MTU of SNF were being produced annually on a utility-wide basis,’” Slip Op. at 22 (citing testimony of Tom Pollog, at Tr. 1894), because in 1983 the rate of discharge was approximately 3000 MTUs industry-wide and that later dropped to approximately 2000 MTUs. (Gov. Mot. 12 n.4). This argument is incorrect because the Court stated:

## II. This Court Correctly Based Damages Upon A Reasonable Rate Of SNF Acceptance.

### A. Because the Standard Contract Contained No Rate, this Court Supplied a Reasonable Rate.

The Government asserts that this Court erred by stating that the inquiry regarding the appropriate rate of SNF acceptance "is not minimum contract performance, but what DOE would have done." (Gov. Mot. 4) (quoting Slip Op. at 53). This argument fails because the Standard Contract's omission of a contract term for the rate of SNF acceptance required the trial court to supply a reasonable term, not a minimum one. *See David Nassif Assocs. v. United States*, 557 F.2d 249, 258 (Ct. Cl. 1977) ("[T]he task of supplying a missing, but essential, term for an agreement otherwise sufficiently specific to be enforceable is the function of the court."); *Commonwealth Edison Co. v. United States*, 56 Fed. Cl. 652, 662 (2003) (same); *see generally Restatement* (*Second*) *of Contracts* § 204 (1981) (stating that the court supplies "a term which is reasonable in the circumstances").[2]

---

> "[N]o utility will have to provide additional storage capacity after January 31, 1998. Subsequently, the acceptance rate will be equal to or greater than the actual discharge rate of spent fuel each year." (Id. at 2-1.) At that time, approximately 2000 MTU of SNF were being produced annually on a utility-wide basis. (Tr. 1894 (Pollog).)

Slip Op. at 22. "At that time" refers to 1998, not 1983.

[2] Moreover, the Government's argument that the Court should look at what the contract requires as opposed to what the parties would have done appears to contradict Judge Hewitt's opinion in *Pacific Gas & Electric Co. v. United States*, 73 Fed. Cl. 333 (2006), that the Government is currently attempting to have affirmed on appeal, No. 2007-5046 (Fed. Cir. docketed Jan. 24, 2007). *See id.* at 399 ("The court does not hold that either the 1991 ACR/APR or PG&E's approved DCSs constituted contractually binding obligations for either party. . . . Nevertheless, the parties understood that the ACR/APR and DCS/FDS scheme was the process under the express terms of the Standard Contract by which a firm acceptance rate and delivery scheduled would be determined, and the parties substantially carried out this process before DOE's breach. . . . Moreover, had DOE performed according to the terms of the Standard Contract by beginning to accept utilities' spent fuel on January 31, 1998, **it appears more likely than not that it would have performed** using an MRS facility and in accordance with the allocations, acceptance rates, and DCSs it had considered and approved.") (Emphasis added.)

This Court properly rejected the Government's proposed 1991 ACR rates for determining the non-breach world, stating: "Neither windfall nor a nonbreach world is measured by contingent, litigation-driven and subsequently abandoned rates." Slip. Op. at 53. After reviewing the documentary evidence and evaluating the testimony of the witnesses, this Court found: "The record evidence demonstrates that a reasonable annual removal rate in most circumstances would fall between the 2000 MTU annual industry SNF discharge as the floor and the annual 3000 MTU design capacity of the planned repository as the ceiling." Slip Op. at 56 n.38.

The Government's argument here is mere semantics. There was no legal error in finding a reasonable rate, as opposed to a minimum one, to supply for the omitted term in the Standard Contracts.

### B. The Court Properly Placed the Burden of Proof on the Government to Establish That Plaintiffs' Mitigation Was Unreasonable.

The Government contends that this Court erred by placing the burden of proof on the Government to show that the "but for" world -- the position Southern would have been in had DOE performed. (Gov. Mot. 9.) The Government insists that this Court's placing the burden of proof conflicts with the Federal Circuit's opinion in *Indiana Michigan Power Co. v. United States*, 422 F.3d 1369, 1372-73 (Fed. Cir. 2005). (Gov. Mot. 9.) This argument fails because the Court accurately quoted and faithfully applied the general rules set forth in *Indiana Michigan* and correctly applied general contract law regarding the burden of proving that mitigation expenses are unreasonable.

In *Indiana Michigan*, 422 F.3d at 1373, 1375, the Federal Circuit explained the general burden of proof in a breach of contract case as follows:

> The remedy for breach of contract is damages sufficient to place the injured party in as good a position as it would have been had the breaching party fully performed. *San Carlos Irrigation & Drainage Dist. v. United States*, 111 F.3d 1557, 1562 (Fed.Cir. 1997). "[T]he general principle is that all losses, however described, are recoverable." *Restatement (Second) of Contracts* § 347 cmt. c (1981). Damages for a breach of contract are recoverable where: (1) the damages were reasonably foreseeable by the breaching party at the time of contracting; (2) the breach is a substantial causal factor in the damages; and (3) the damages are shown with reasonable certainty. *Energy Capital Corp. v. United States*, 302 F.3d 1314, 1320 (Fed.Cir. 2002). While the amount of damages need not be "ascertainable with absolute exactness or mathematical precision[,]" recovery for speculative damages is precluded. *San Carlos Irrigation & Drainage Dist.*, 111 F.3d at 1563 (citation omitted).
>
> . . . .
>
> Section 350, comment b of the Restatement of Contracts advises that "[o]nce a party has reason to know that performance by the other party will not be forthcoming, . . . he is expected to take such affirmative steps as are appropriate in the circumstances to avoid loss by making substitute arrangements or otherwise." Indiana Michigan is "not precluded from recovery ... to the extent that [it] has made reasonable but unsuccessful efforts to avoid loss." *Id.* § 350(2).

This Court quoted the above passages from *Indiana Michigan*. *See* Slip Op. at 8, 9, 15, 12. This Court's application of these general principles in its opinion did not conflict with the Federal Circuit's decision in *Indiana Michigan*.

In *Indiana Michigan*, 422 F.3d at 1376, however, the plaintiff failed to prove that DOE's breach of the Standard Contract was a substantial factor in causing its expenditures because its expenditures were made independent of DOE's breach. *Id.* ("[Indiana Michigan] authorized the expenditure for its reracking projects in 1989, in the normal course of business, six years before the 1994 Notice of Inquiry announced DOE's inability to begin timely SNF collection."). In contrast, this Court found based on ample record evidence that Southern's construction of dry storage facilities was foreseeable (DOE knew that utilities would have to store SNF somewhere if a repository was not built), certain (Southern presented detailed accounting records of its actual expenditures to which the Government largely agreed), and caused by DOE's breach of

the Standard Contracts (to avoid shutting down its nuclear plants Southern built dry storage facilities to serve as a substitute for DOE's performance). Accordingly, this case presents a question not before the Federal Circuit in *Indiana Michigan*: Once the plaintiff proves foreseeability, causation, and certainty, which party has the burden of proving whether mitigation expenses were reasonable or unreasonable?

This Court answered as follows:

> Once plaintiff has established, to a reasonable certainty, its expenditures were the foreseeable result of, and caused by, DOE's partial breach, the burden shifts to defendant to prove that such damages "could have [been] avoided by reasonable efforts." *Pacific Gas & Elec.*, 73 Fed. Cl. at 406 (alteration in original) (citing *Indiana Michigan*, 422 F.3d at 1375 (quoting *Robinson v. United States*, 305 F.3d 1330, 1333 (Fed. Cir. 2002) (quoting *Restatement* (*Second*) *of Contracts* § 350 cmt. b)). *See also Yankee Atomic* [*Elec. Co.*], 73 Fed. Cl. [249,] 264 [(2006)] ("Defendant has the burden of showing that plaintiffs' mitigation efforts were unreasonable."); *Sacramento Mun. Util.*[*Dist. v. United States*], 70 Fed. Cl. [332,] 367 [(2006)]; *Tennessee Valley Auth.*, 69 Fed. Cl. at 528.

Slip Op. at 49. *See First Nationwide Bank v. United States*, 56 Fed. Cl. 438, 444 (Fed. Cl. 2003) ("[T]he breaching party [*i.e.*, the Government] has the burden of proof on a failure to mitigate [properly] defense."); 11 *Corbin on Contracts* § 1039, p. 316 (2005 ed.) ("The burden of proving that losses could have been avoided by reasonable effort and expense must always be borne by the party who has broken the contract."); *Tennessee Valley Auth. v. United States*, 69 Fed. Cl. 515, 523 (2006) ("[T]he government bears the burden of showing that TVA's mitigation efforts were unreasonable.").

The legal issue posed by the Government is when does causation, for which the non-breaching party bears the burden of proof, end and when does mitigation, for which the breaching party bears the burden of showing unreasonableness, begin. The Government's position that the non-breaching party must prove the "but for" scenario with such specificity that any questions regarding the non-breaching party's conduct are eliminated is not consistent with

the law of the Federal Circuit. *See San Carlos Irrigation*, 111 F.3d at 1563 ("[T]he amount of damages need not be 'ascertainable with absolute exactness or mathematical precision.'").

The Court correctly found that the entire dry storage facilities at Plants Hatch and Farley and the extensive re-racking at Plant Vogtle were mitigation, or substitutes for DOE's promised performance. Slip Op. at 3 ("Rather than allow their spent fuel pools to completely fill with SNF, which would result in shutting down their reactors, replacing that source of electricity at a much higher cost, plaintiffs decided to incur the relatively lesser expense of additional on-site storage."). Southern's claimed expenses were incurred to avoid the costs and lost profits that would have arisen had Southern shut down its nuclear plants. *Id*.

Once Southern had established foreseeability, certainty, and causation for these mitigating expenditures, the burden shifted to the Government to show that any of these expenditures were unreasonable (*i.e.*, that Southern would receive a windfall or that some offset to damages was appropriate). Slip Op. at 51 (citing *Lisbon Contractors, Inc. v. United States*, 828 F.2d 759, 769 (Fed. Cir. 1987) ("The burden was on the government to prove [the claimed offset]."); *Caroline Hunt Trust Estate v. United States*, 65 Fed. Cl. 271, 317 (2005*), aff'd in part, rev'd in part on other grounds and remanded*, 470 F.3d 1044 (Fed. Cir. 2006)*, reh'g en banc denied*, (Mar. 19, 2007) ("While plaintiff has the burden of proving its damages, the government has the burden of proving any offsets . . . .")). The Government bore the burden of attempting to prove what its own hypothetical performance would have been had it not breached the Standard Contract. *Id.* at 48 ("[W]hen damages are hard to estimate, the burden of imprecision does not fall on the innocent party.") (quoting *LaSalle Talman Bank v. United States*, 317 F.3d 1363, 1374 (Fed. Cir. 2003)). The Government's assertion of unreasonableness regarding Southern's expenditures based on the discredited 900 MTU rate failed to carry that burden. Slip Op. at 53

("The court finds on this record that the contingent rates of acceptance in the 1991 ACR did not fulfill DOE's contractual duties to commence performance, were not an accurate indicator of how DOE would have performed, and that defendant did not meet its burden in this regard.").[3]

Moreover, even if Southern bore the burden of proving that their expenditures were caused with such specificity that each and every dollar spent must have been reasonable and resulted in no windfall, Southern's evidence more than bore that burden. Southern presented overwhelming evidence that a 3000 MTU acceptance rate was reasonable and met the intent of the parties at the time of contracting. *See* Slip Op. at 21-32. Conversely, the evidence regarding the 900 MTU rate established without dispute that the rate was based on an abandoned DCS process and a statutorily-barred MRS. *Id.* at 53 ("Neither windfall nor a nonbreach world is measured by contingent, litigation-driven and subsequently-abandoned rates."). Accordingly, this Court prudently recognized that based on the evidence in this case: "Regardless of whether the burden is on the plaintiffs to establish lack of windfall, or on the defendant to prove windfall, the court credits witness testimony that the reracking at Plant Vogtle and the dry storage at Plants Hatch and Farley would not have occurred if DOE had been performing at any reasonable rate." Slip Op. at 56.[4]

---

[3] The Government argues against this Court's analogy to reliance damages, stating that Southern seeks expectancy damages and should bear the burden of proving the "but for" scenario. (Gov. Mot. 6-9.) The Court was simply placing the burden of proof on the party who had the greater ability to prove how DOE would have performed and who was guilty of the breach -- the Government. Slip Op. at 50-51. *See LaSalle Talman Bank*, 317 F.3d at 1374 ("[W]hen damages are hard to estimate, the burden of imprecision does not fall on the innocent party.").

[4] The Government poses a hypothetical that attempts to analogize this case to one seeking lost profits on a sale of a plant (Gov. Mot. 9), but the hypothetical is based on a false assumption. This hypothetical is erroneous because it assumes that a necessary ingredient in proving the "but for" sales price must be evidence of the rate of SNF acceptance absent DOE's breach. This assumption is false as a plaintiff-seller could, for example, bear its burden of proving what the sales price of a nuclear plant would have been absent a breach by presenting evidence of comparable sales of non-nuclear generating capacity in the same area, comparable sales of

**C. The Court's Offset of the Second Bathtub Rack Does Not Conflict With Its Holding Regarding The Basis For Plaintiffs' Damages.**

Finally, the Government contends:

> To the extent that the Court held that Government was obligated to accept SNF in such a manner as to preclude all additional at-reactor storage after 1998, recognition of the need for the second bathtub rack after 1998, which plaintiffs conceded constitutes additional at-reactor storage after 1998, Tr. 630:14-21 (Hunt); Tr. 818:12-820:18 (Supko), conflicts with that obligation. Indeed, as Ms. Supko's analysis demonstrated, the rate would have to be significantly greater than 3,000 MTU to preclude all additional at-reactor storage after 1998. Slip Op. at 54 (indicating that, even under a 6,000 MTU acceptance rate, Ms. Supko's analysis indicates post-1998 storage requirements).

Gov. Mot. 11-12 (emphasis added).

This contention misstates the Court's holding. The Court noted that Ms. Supko's model calculated the effect of alternative acceptance rates on what she concluded were program goals of (1) minimizing the need for additional SNF storage either at the reactor site or elsewhere; and (2) reducing the backlog of inventory of SNF that had accumulated at reactor sites to allow timely decommissioning." Slip Op. at 55. The Court stated: "Whether aspirational objectives, goals or contractual requirements, the court relies on these statements [i.e., prevention of post-1998 additional at-reactor storage and a reasonable reduction in backlog] for foreseeability as

---

nuclear generating capacity prior to the breach, etc. If the defendant believed plaintiff's evidence overstated the sales price because it ignored the rate of acceptance under the contract, the defendant would have to come forward with evidence of the acceptance rate and show how it would impact the "but for" sales price. Similarly, once the selling plaintiff bears its burden of showing that the construction of dry storage facilities was foreseeable, certain, and caused by the defendant's breach, the burden shifts to the defendant to show that the acceptance rate under the contract renders any such mitigation expenditures unreasonable. *See First Nationwide Ba*nk, 56 Fed. Cl. at 444 ("[T]he breaching party has the burden of proof on a failure to mitigate [properly] defense."). Thus, the Government's hypothetical is no more than a red herring and does not call into question the Court's logic in allocating the burden of proof.

well as what would have been reasonable or unreasonable performance by DOE . . . ." (Slip Op. at 10.)[5]

In short, Southern did not argue and the Court did not hold that DOE's performance had to be perfect, only reasonable.

**CONCLUSION**

The Government's Motion should be denied.

[5] Ms. Supko's analysis did not indicate that a DOE acceptance rate of 6,000 MTUs would have required additional at-reactor, expensive dry storage facilities. She concluded that the only scenario that presented a reasonable acceptance rate of 3000 MTUs after a five-year ramp up. (Tr. 690, 694) (Supko Test.) This scenario required the nuclear industry as a whole to accommodate an additional 1030 MTUs of storage, which Ms. Supko concluded could have been accommodated without having to build additional dry storage facilities by using additional or temporary racks, increasing fuel burnups, lengthening fuel discharge cycles, using intra- and inter-company swaps, or utilizing the Standard Contract's option to increase SNF acceptance by twenty percent. (Tr. 684, 689, 665, 812-13, PX 624 at 17, 856.)

Respectfully submitted,

Dated: August 10, 2007

s/ M. Stanford Blanton

M. Stanford Blanton
BALCH & BINGHAM LLP
1710 Sixth Avenue North
Birmingham, AL 35203-2015
Telephone: (205) 226-3417
Facsimile: (205) 226-8798

*COUNSEL OF RECORD FOR PLAINTIFFS*

***Of Counsel*:**

Ed R. Haden
K. C. Hairston
BALCH & BINGHAM LLP
1710 Sixth Avenue North
Birmingham, AL 35203-2015
Telephone: (205) 251-8100
Facsimile: (205) 226-8798

Ronald A. Schechter
Jeffrey L. Handwerker
Matthew M. Shultz
ARNOLD & PORTER LLP
555 Twelfth Street, N.W.
Washington, D.C. 20004-1202
Telephone: (202) 942-5000
Facsimile: (202) 942-5999

**CERTIFICATE OF SERVICE**

I hereby certify that on this 10th day of August, 2007, a copy of the foregoing "PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION FOR RECONSIDERATION" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ M. Stanford Blanton