# In the United States Court of Federal Claims

No. 98-614C
(Filed November 1, 2007)

******************************
SOUTHERN NUCLEAR OPERATING COMPANY, ALABAMA POWER COMPANY, GEORGIA POWER COMPANY,

Plaintiffs,

v.

THE UNITED STATES,

Defendant.
******************************

Motion for Partial Reconsideration.

*M. Stanford Blanton*, Birmingham, AL, for plaintiffs. *Ed R. Haden*, *K. C. Hairston*, *Ronald A. Schechter, Jeffrey L. Handwerker, Matthew M. Shultz,* of counsel.

*Marian E. Sullivan*, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant, with whom were *Peter D. Keisler*, Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Harold D. Lester, Jr.*, Assistant Director. *Stephen Finn*, *Joshua E. Gardner*, and *Alan J. Lo Re*, Trial Attorneys. *Jane K. Taylor*, Office of General Counsel, United States Department of Energy, Washington, D.C., of counsel.

## ORDER ON MOTION FOR PARTIAL RECONSIDERATION

**Merow**, *Senior Judge*

Defendant timely moved for reconsideration of discrete segments of the Opinion reported in this matter at 77 Fed. Cl. 396 (2007). Plaintiffs have filed a

Response.[1/] After careful analysis of the parties' submissions, for the following reasons it is concluded that defendant has not shown any viable basis for reconsideration.

**A. Standards for reconsideration**

By a timely motion, a party may request the court amend its findings and judgment. RCFC 52(b). "[R]econsideration may be granted . . . for any of the reasons established by the rules of common law or equity applicable as between private parties in the courts of the United States." RCFC 59(a)(1). The court may take additional testimony, amend or make new findings of fact and conclusions of law, or direct the entry of a new judgment. *Id.*

Reconsideration is within the court's discretion. *Yuba Natural Res., Inc. v. United States*, 904 F.2d 1577, 1583 (Fed. Cir. 1990). "Motions for reconsideration must be supported 'by a showing of extraordinary circumstances which justify relief.'" *Caldwell v. United States*, 391 F.3d 1226, 1235 (Fed. Cir. 2004), citing *Fru-Con Constr. Corp. v. United States*, 44 Fed. Cl. 298, 300 (1999), *aff'd*, 250 F.3d 762 (Fed. Cir. 2000) (Table). To prevail, the moving party must meet the "exacting standard of identifying 'a manifest error of law or mistake of fact.'" *Browning Ferris Indus., Inc. v. United States*, 2007 WL 1412087, at *1 (Fed. Cl. May 10, 2007) (citing *Pacific Gas & Elec. Co. v. United States*, 58 Fed. Cl. 1, 2 (2003)). To establish manifest legal or factual error, the moving party must demonstrate: "(1) that an intervening change in the controlling law has occurred; (2) that previously unavailable evidence is now available; or (3) that the motion is necessary to prevent manifest injustice." *Stockton E. Water Dist. v. United States*, 76 Fed. Cl. 497, 499 (2007) (citing *Bishop v. United States*, 26 Cl. Ct. 281, 286 (1992)). *See First Fed. Lincoln Bank v. United States*, 60 Fed. Cl. 501, 502 (2004).

In the end, reconsideration of even part of a final judgment is extraordinary relief, not an opportunity for a dissatisfied party to repeat arguments previously rejected. "[M]otions for reconsideration are not intended to allow a party to reassert arguments that the Court has already considered." *Browning Ferris Indus.*, 2007 WL

---

[1/] Defendant subsequently filed a motion to correct a quotation in its Motion for Reconsideration which plaintiffs noted was erroneous. Defendant's motion to correct the quotation is **GRANTED**.

1412087, at *1 (citations omitted). Also, RCFC 59 "is not intended to give an unhappy litigant an additional chance to sway the court." *Fru-Con Constr.*, 44 Fed. Cl. at 300. Reconsideration is not an opportunity to make arguments that could have been raised earlier but were not. *Browning Ferris Indus.*, 2007 WL 1412087, at *1. *See also Four Rivers Inv., Inc. v. United States*, __ Fed. Cl.__, __, 2007 WL 2989138, at *3 (Oct. 4, 2007); *Shirlington Limousine & Transp., Inc. v. United States*, 78 Fed. Cl. 27, 29 (2007).

**B. Background summary**

In June of 1983, the parties signed a Standard Contract under which the Department of Energy ("DOE") was to accept, transport and dispose of plaintiffs' spent nuclear fuel ("SNF"), commencing performance not later than January 31, 1998. DOE's failure to do so remains a partial breach of contract. Following a five-week trial on damages, extensive briefing and oral argument, the court issued its Opinion, a portion of which is subject to defendant's reconsideration motion.

In its Opinion, the court made extensive findings and conclusions which are not here fully repeated. The mitigation damages awarded were "sufficient to place [plaintiffs] in as good a position as [they] would have been had [DOE] fully performed." *Indiana Michigan Power Co. v. United States*, 422 F.3d 1369, 1373 (Fed. Cir. 2005).

As instructed by *Indiana Michigan,* the court determined that, in the main: (1) plaintiffs' mitigation efforts of building dry storage facilities for their spent nuclear fuel ("SNF") because they were running out of room in their existing wet pools were reasonably foreseeable by DOE at the time of contracting; (2) DOE's admitted delays and apprehension about the viability of DOE's projections were a substantial causal factor in the mitigation decisions and the reasonable expenses thereof; and (3) the expenses were established with reasonable certainty. But for DOE's delay, these expenditures would not have been incurred if DOE had performed at any reasonable rate, regardless of whether the burden was on plaintiffs or defendant to prove what would have happened if there had been no partial breach.

At (1) the time the mitigation decisions were made; (2) in 1998 when DOE was required to commence performance; (3) at the time the expenses were incurred; (4) at the time of trial; (5) at the time of the court's Opinion; and (6) at the date of this

reconsideration proceeding, plaintiffs will not be better off by the award of mitigation expenses than if DOE performed at the levels it planned at any of those times. While the 1991 Annual Capacity Report ("ACR") rates advocated by DOE cannot be held to comprise the performance contemplated by the contracting parties in the absence of a partial breach, even at those restrictive rates, the utilities through fuel management techniques, swaps, inter- or intra-company exchanges, use of the twenty percent increase option under the Standard Contract, and other measures, could have avoided dry storage if there had been confidence in DOE's commencement and continuance of performance. Offsets for expenses plaintiffs avoided because of DOE's partial breach were applied. Within its jurisdictional constraints, the relief awarded by the court attempted to make plaintiffs whole, not better.

**C. Acceptance rate**

With the foregoing background, defendant requests reconsideration of the court's decision not to find a specific rate at which DOE would have performed starting January 31, 1998.[2/] Defendant argues that without determining the scope of DOE's contractual obligations, it is impossible to determine what, if any, damages plaintiffs suffered.

Both parties asked the court to adopt a specific rate. In its post-trial brief, defendant urged the court to adopt the acceptance rates in the 1991 ACR as the bounds of DOE's contractual obligation. (Def.'s Br. 146-61.) The court did not adopt defendant's position. *Southern Nuclear*, 77 Fed. Cl. at 436 ("The court does not accept either defendant's proffered 1991 ACR rate or the 3000 MTU (metric ton of uranium) rate advocated by plaintiffs."). Accordingly, as it was previously briefed and argued, the court's rejection of that rate may not comprise a proper subject of reconsideration. Nevertheless, upon analysis, defendant has not established any reason for reconsideration. The court's mitigation analysis – causation, foreseeability and reasonable certainty – and examination of what costs would have been incurred in the nonbreach world as well as possible windfall, considered the various rates discussed both prior, and subsequent, to the signing of the Standard Contract. The court concluded that, regardless of which party had the burden, the reracking at Plant Vogtle and dry storage at Plants Hatch and Farley would not have been undertaken

---

[2/] "The Court Did Not Address The Rate At Which DOE Was Contractually Obligated To Accept SNF." (Mot. for Recons. 4.)

if DOE had timely performed at any reasonable rate, or alternatively, even at the rate in the 1991 ACR, which was not considered to have relevance.

The Federal Circuit has held that the Standard Contract is enforceable and breached, implicitly determining that no express acceptance rate is required for contract viability. *Indiana Michigan*, 422 F.3d at 1372, 1375; *Maine Yankee Atomic Power v. United States*, 225 F.3d 1336, 1342 (Fed. Cir. 2000). Other spent nuclear fuel cases in this court have awarded mitigation damages without determining a specific rate at which DOE would have commenced performance in 1998. *System Fuels, Inc. v. United States*, __ Fed. Cl.__, __, 2007 WL 3033659, at *19 n.20 (Oct. 16, 2007) (declining to analyze causation based on constrained rates for stand-alone Monitored Retrieval Storage ("MRS") or to find a precise acceptance rate); *System Fuels, Inc. v. United States*, __ Fed. Cl.__, __, 2007 WL 2989008, *22 (Oct. 11, 2007) (analyzing reasonable foreseeability, substantial causation, reasonable certainty in amount of damages and offsets, without finding a specific acceptance rate); *Northern States Power Co. v. United States*, 78 Fed. Cl. 449, 462 n.12 (2007) (noting that the "Standard Contract did not specify a rate for the acceptance of spent fuel by DOE . . . although defendant urges us to resolve this acceptance rate issue now, we do not need to do so[.]"); *Sacramento Mun. Util. Dist. v. United States*, 70 Fed. Cl. 332, 375 n.40 (2006) ("The court finds that the evidence presented on the acceptance rate under the terms of the Standard Contract to be highly speculative, therefore, the court declines to make any determination of the acceptance rate based on this record."); *Yankee Atomic Elec. Co. v. United States*, 73 Fed. Cl. 249, 268 (2006) ("Regardless of [the acceptance] rate, these plaintiffs are faced with at least a twelve-year delay in commencement of performance. With due regard to the long lead time required for these mitigation decisions, the evidence establishes that the mitigating decisions and resulting expenditures were commercially reasonable, and substantially caused by DOE's impending partial breach(es) and delay(s)." (citation omitted)). *Cf. Tennessee Valley Auth. v. United States*, 69 Fed. Cl. 515, 531 (2006) (accepting the parties' stipulation applying the 1991 ACR rates for the first ten years of contract performance and finding an annual rate of 3000 MTU would apply thereafter) and *Pacific Gas & Elec. Co. v. United States*, 73 Fed. Cl. 333, 399-400 (2006) (noting there was no evidence that DOE's commencement of performance at the 1991 ACR rates would have been a breach).

The court rejected DOE's dissemination of the 1991 ACR rates as a static benchmark for determining plaintiffs' damages in the way defendant urged. After

reviewing the documentary evidence and witness testimony, the court concluded that a reasonable annual removal rate in most circumstances would fall between the 2000 MTU annual industry SNF discharge as the floor and the annual 3000 MTU design capacity of the planned repository as the ceiling. *Southern Nuclear Operating Co.*, 77 Fed. Cl. at 439 n.38. The evidence shows that DOE has consistently used the design annual capacity of the planned repository as the steady state removal rate (after appropriate ramp-up) to be allocated to utilities on an oldest fuel first basis.

The Standard Contract, signed fifteen years before performance was to begin, does not contain an express rate of performance; instead, it has a process through which a rate would develop. DOE would compile an industry-wide ranking of SNF by date of discharge from the reactor. A utility with the "coolest" fuel (SNF that had been discharged from the reactor the longest) would be first in line for DOE's pickup for that amount of fuel, with the next oldest being next in line. This queue included fuel discharged from reactors as far back as the late 1960s and early 1970s. This Annual Priority Ranking, "APR," published roughly annually by DOE, remained relatively unchanged except for the addition of "new" fuel discharged. The amount of fuel DOE accepted would determine the speed of working off the backlog in the queue. Annual amounts were to be determined by DOE in Annual Capacity Reports ("ACRs"). The age of then-existing SNF inventory was known and the "capacity" of the future repository was part of the design process. Rates were driven by this capacity. Purchasers' individual allocations would be determined by a confluence of the APR and the ACR. Allocation of the full repository capacity on an annual basis was contemplated. This is illustrated by defendant's position that granting any priority to a utility above its queue allocation would serve to deprive others in the same amount. It is not without relevance that the significant document is entitled a "capacity" report.

The annual capacity of a repository cited in public planning documents was 3000 MTU after a ramp-up. After the signing of the Standard Contracts, DOE recognized significant slips in the repository schedule and determined the only way performance could commence by January 31, 1998 was at a MRS. Unable to commence performance as originally contemplated, DOE attempted to mitigate the impact of the delay. DOE lacked authorization to construct a MRS, and sought amendment of the National Waste Policy Act ("NWPA") to do so. In its proposal to Congress, to avoid objections that the MRS could in effect become a repository, DOE limited its capacity to a total of 15,000 MTU (for political not for technical reasons)

until a repository came on line. This was anticipated to require five years at which time transshipments to the repository from the MRS would begin. Congress granted DOE's request, in part, in that 1987 Amendments to the NWPA permitted a MRS, but limited the total amount of SNF it could accept to only 10,000 MTU until a repository started accepting fuel, when the limit would be increased to 15,000 MTU.

The July 9, 2007 Opinion cited some of the various capacity and acceptance rates noted in program documents. Of course, as DOE has not commenced performance, the rate or rates that either could have satisfied DOE's contractual obligations, or at which DOE would have performed, starting on or before January 31, 1998, are largely academic. The court did not find the restricted 1991 ACR rates, which departed from the capacity of a repository, were reasonable, nor that they would have satisfied DOE's contractual responsibilities had performance timely commenced, which is the underlying concern of defendant's reconsideration request. The 1991 ACR rate was premised on the artificially-limited capacity of a stand-alone MRS which was clearly not the facility contemplated by the parties when contracting, or the facility required to carry out the SNF "disposal" obligation assumed by DOE and reflected in the fee the utilities have paid pursuant to the contract.

Moreover, DOE's proffer of the 1991 ACR was specifically contingent on congressional amendment to the NWPA to remove conditions precedent to operation of a MRS, the only way DOE could commence performance by January 31, 1998. DOE could not site the MRS until the Secretary of Energy recommended a location for the permanent repository. Secondly, construction of a MRS could not begin until construction authorization for a repository had been granted. Construction authorization was not on the near horizon, which effectively precluded any MRS in time for contract performance to begin and which has yet to occur. Also, a MRS site had to be located and approved. For all these reasons, the 1991 ACR rates were not given credence as the performance DOE would have provided in the absence of the breaching delays.

**D. Burden of proof of the nonbreach world and expenses that would have been incurred therein**

Defendant argues again that plaintiffs have the burden of establishing what DOE would have done in the nonbreach world – that is, to establish that these

mitigation efforts would not have been made if there had been no delay(s).[3/] In addition to the court's determinations on foreseeability, causation and reasonable certainty, in the alternative, the court addressed, without accepting, defendant's characterization of concomitant elements of recovery – that the mitigation expenses were incremental – or would not have been incurred if DOE had timely commenced performance. Even if this additional element was necessary (and the court found it was not), even if timely performance at the 1991 ACR rates was possible (and the court found it was not – but required congressional amendment to the NWPA which never occurred); and even if performance at the 1991 ACR rates would have satisfied DOE's contract obligation (and the court made no such finding), the court found that nevertheless, the dry storage and other mitigation expenses would not have been incurred. Accordingly, assuming defendant were correct and plaintiffs have the burden of establishing the nonbreach world, that burden was met "[r]egardless of whether the burden is on the plaintiffs to establish lack of windfall, or on the defendant to prove windfall, the court credits witness testimony that the reracking at Plant Vogtle and the dry storage at Plants Hatch and Farley would not have occurred if DOE had been performing at any reasonable rate." *Southern Nuclear*, 77 Fed. Cl. at 439.

**E. Findings about what Plant Hatch would have done in the nonbreach world**

Defendant also argues there is no evidentiary support for the court's conclusion that dry storage would not have been built at Plant Hatch in the nonbreach world, a finding that includes the possibility that Plant Hatch may have had to impinge on full core reserve ("FCR").

Defendant advocated the limited 1991 ACR/MRS rates as the government's nonbreach world performance. The court rejected those rates as contingent, with artificially constrained capacity limitations – a proffer of substituted performance.[4/] However, the court found, in the alternative, contingencies aside, even at the rates in the 1991 ACR, the dry storage expenditures awarded would not have been incurred.

---

[3/] "Plaintiffs' Burden Includes Their Obligation To Establish A Reasonable 'But For' World Against Which To Measure Whether DOE's Delay 'Caused' Them To Incur Incremental Costs." (Def.'s Post-Trial Br. 95-97.)

[4/] Post-contracting constraints imposed by Congress do not alter contract rights. *United States v. Winstar*, 518 U.S. 839, 885 (1996) (plurality).

While evidence and testimony supporting this conclusion is cited in the opinion, applying the numbers given in the record (not adjusted by fuel management techniques, swaps, purchases, exchanges, increase in DOE allocations, etc.) supports this finding.

The following chart illustrates projected discharges at Plant Hatch starting in 1998. A bathtub rack installed in 2000 increased the number of assemblies that could be stored in the wet pool from 5,910 to 6,078. With the addition of a second set of racks that were purchased but not installed in 2000, but could have been in the nonbreach world, the pool capacity could have been increased to 6,245.[5/]

| year | initial # of assemblies in pool (PX594 Ex.3) | assemblies added to pool (PX594 Ex.3) | DOE assembly picked-up 1991 ACR (PX8) | total assemblies in pool (minus pick-up) | available pool space (capacity* minus total assemblies) |
|---|---|---|---|---|---|
| 1998 | 4,663 | 192 | 0 | 4,855 | 1,055 |
| 1999 | 4,855 | 192 | 0 | 5,047 | 863 |
| 2000 | 5,047 | 376 | 0 | 5,423 | 822 |
| 2001 | 5,423 | 184 | 4 | 5,603 | 642 |
| 2002 | 5,603 | 224 | 24 | 5,803 | 442 |
| 2003 | 5,803 | 232 | 0 | 6,035 | 210 |
| 2004 | 6,035 | 228 | 188 | 6,075 | 170 |
| 2005 | 6,075 | 240 | 0 | 6,315 | (70) |
| 2006 | 6,315 | 240 | 304 | 6,251 | (6) |
| 2007 | 6,251 | 240 | 84 | 6,407 | (162) |

*** 1998-1999 capacity = 5,910 2000-2007 capacity = 6,245**

The projected number of assemblies in excess of the capacity of the pool would have been 70 in 2005, 6 in 2006 and 162 in 2007. For perspective, these amounts are less than three percent of the total of the more than 6000 assemblies in the pool.

Furthermore, if one were to construct a hypothetical non-breach DOE performance involving use of a MRS, one would have to assume compliance with the existing statutory framework including linkages as opposed to the 1991 ACR which assumed the linkages could be removed by legislation. There is no viable evidence to support the elimination of these statutory requirements. In *Systems Fuels*, 2007

[5/] (Pls.' Post Tr. Br. 86-87 (citing trial evidence); Tr. 43, 45, 1628.)

WL 303359, at *8, it is noted that "In 1995 President Clinton stated he would veto proposed legislation removing the linkages between a permanent repository and an interim storage facility." In order to enable any timely performance employing a MRS it must be assumed that a repository would have been licensed by 1998. Assuming a five-year construction schedule, the repository would then come on line to receive shipments from the MRS by 2003. DOE projected that the repository, operating in conjunction with a MRS, would have accepted from the MRS: 400 MTU in 2003; 400 MTU in 2004; 400 MTU in 2005; 900 MTU in 2006; 1800 MTU in 2007; and increased amounts thereafter. (DX 63 at HQR0031688.)

With a repository operational in conjunction with a MRS it would no longer be required, or make sense, to limit acceptance at the MRS to the minimal amounts in the 1991 ACR. The MRS would no longer be constrained by the 10,000 MTU capacity limitation and could store up to 15,000 MTU. DOE could revert to its planned performance in this circumstance. Accordingly, the following illustrates the Plant Hatch pool space using acceptance at a MRS at the rates in DX 63 supported by transshipments after 2003 to the repository for disposal as planned by DOE. These numbers are unadjusted by the twenty percent increase options, swaps, exchanges or sales, or any of the fuel management techniques described at trial.

| year | initial # of assemblies in pool (PX594 Ex.3) | assemblies added to pool (PX594 Ex.3) | DOE pick-up (DX63) | total assemblies in pool (minus pick-up) | available pool space (capacity* minus total assemblies) |
|---|---|---|---|---|---|
| 1998 | 4,663 | 192 | 0 | 4,855 | 1,055 |
| 1999 | 4,855 | 192 | 0 | 5,047 | 863 |
| 2000 | 5,047 | 376 | 28 | 5,395 | 850 |
| 2001 | 5,395 | 184 | 188 | 5,391 | 854 |
| 2002 | 5,391 | 224 | 0 | 5,615 | 630 |
| 2003 | 5,615 | 232 | 388 | 5,459 | 786 |
| 2004 | 5,459 | 228 | 489 | 5,198 | 1,047 |
| 2005 | 5,198 | 240 | 619 | 4,819 | 1,426 |
| 2006 | 4,819 | 240 | 564 | 4,495 | 1,750 |
| 2007 | 4,495 | 240 | 184 | 4,551 | 1,694 |

*** 1998-1999 capacity = 5,910 2000-2007 capacity = 6,245**

Furthermore, the annual capacity of a MRS without the contingencies or capacity limitation would result in considerably more room in the pool. (PX 7 –

upper bounding rates of 1200 MTU in 1998, 1200 MTU in 1999, 2000 MTU in 2000, 2000 MTU in 2001, 2700 MTU in 2002, and 3000 MTU steady state from 2003-2007).

The court credits, and credited, testimony that with the sufficient lead time in the nonbreach world, and with fuel management, burnup adjustments, swaps, increase in pickups etc, given the enormous expense and effort to build an ISFSI (Independent Spent Fuel Storage Installation) for a relatively small amount of SNF, dry storage would not have been built at Plant Hatch. If nonbreach performance were to involve use of a MRS in conjunction with a repository, Plant Hatch had sufficient pool space to obviate any need for dry storage.

**F. Alleged factual inconsistencies**

If there had been confidence in DOE timely commencing performance, plaintiff Georgia Power had admitted it would have installed a second bathtub rack at Plant Hatch to increase wet storage, and agreed that the costs of a second bathtub rack, holding 167 assemblies, be deducted from any damages as avoided costs that would have been incurred in the nonbreach world. (Pls.' Post-Trial Br. 88-89.) While the court did not adopt plaintiffs' position that DOE would perform at 3000 MTU annually in the nonbreach world, the court, nevertheless applied this offset, a finding to which plaintiffs did not and do not object.

Defendant interprets the court as finding that a second bathtub rack would be required in the nonbreach world where DOE performs at a steady-state acceptance rate ranging from 2000 to 3000 MTU. Assuming the accuracy of this interpretation, defendant then points to the court's reasoning that the second bathtub rack would have provided sufficient storage space under the lower 1991 ACR rates as inconsistent. *See* 77 Fed. Cl. at 439.

However, the finding does not indicate that the installation of the second bathtub rack alone would have foreclosed the need for dry storage under the 1991 ACR rates. The court credited witness testimony that there were several options for dealing with possible storage shortages as follows:

> From her spent fuel management expertise, Ms. Supko [] described alternatives utilities had for dealing with small quantities of

SNF to avoid building expensive dry storage facilities for a small quantity of SNF, if DOE had performed and there was industry confidence in continued performance. "[T]here are a wide range of things that could have been done, had they believed performance was going to occur." (Tr. 689 (Supko).) Nuclear waste management options included "increas[ing] fuel burnups" or possibly lengthening fuel discharge cycles. (Tr. 684 (Supko).) Additional or temporary racks or part of the FCR discharge capability could be utilized. (Tr. 689.) Use of the twenty-percent increase option available under the Standard Contract would increase pickup allocations, another way to avoid constructing dry storage. (PX 624 at 17; Tr. 665, 812-13.) She presumed only those utilities that needed to increase their allocations by twenty percent to avoid building dry storage, would do so. (Tr. 856 (Supko).) Inter-company exchanges of allocations under the Standard Contract with DOE's consent, could be used to avoid dry storage. (PX 624 at 17.)

[T]he court concurs with the logic expressed in *Tennessee Valley Authority v. United States*, that "[g]iven the proportionately large cost of building and operating dry storage facilities, TVA would have had several options available in the but-for scenario to deal with its spent fuel while still avoiding dry storage." 69 Fed. Cl. at 532.

Regardless of whether the burden is on the plaintiffs to establish lack of windfall, or on the defendant to prove windfall, the court credits witness testimony that the reracking at Plant Vogtle and the dry storage at Plants Hatch and Farley would not have occurred if DOE had been performing at any reasonable rate.[38/] Even at the rates under the December 1991 ACR, absent DOE's announced failure to commence performance during the time frame relevant here, storage shortages would likely have been accommodated. The court credits testimony and evidence that these plants would not have built dry storage, but plaintiff would have installed a second bathtub rack (at Plant Hatch) and/or would have lived with, or tolerated, less than FCR for a time pending pickups from DOE. Decisions to build dry storage were made after monitoring DOE's preparation for performance; planning and financing, then equivocation; denial of contractual responsibility absent a

> repository; and announced delays in commencement of performance. Furthermore, there is no chance for a windfall in that defendant did not establish that DOE will perform such that the storage costs awarded here would have been incurred under any scenario that would not be unreasonable.
>
> > [38/] The record evidence demonstrates that a reasonable annual removal rate in most circumstances would fall between the 2000 MTU annual industry SNF discharge as the floor and the annual 3000 design capacity of the planned repository as the ceiling.

77 Fed. Cl. at 438-39, some footnotes omitted. No factual inconsistency has been shown.

**G. Defendant's argument that the court should not have analyzed what DOE would have done; rather what was the least amount of SNF that DOE could have picked up without breaching the contract**

Defendant also complains of the court's statement that the "inquiry is not minimum contract performance but what DOE would have done." What DOE was planning and publishing at various points in time, was cited for foreseeability, causation and for other purposes. DOE's plans were certainly relevant on determining what were foreseeable consequences if DOE did not timely perform. DOE's evolving plans were certainly relevant on determining what caused plaintiffs' growing apprehension and conclusion of significant delay. What DOE is currently advocating is certainly relevant on the court's findings of no windfall as the dry storage expenditures would have had to be made if DOE commences performance in 2017, its current optimistic prediction. That statement, and any answer, however, did not determine or constrain mitigation damages. This phrase is in a section of the opinion following the court's rejection of the contingent, litigation-driven and subsequently abandoned 1991 ACR based on the artificially-constrained capacity of a stand-alone MRS. The comment, in context, is as follows:

> *La Salle Talman v. United States*, 462 F.3d 1331, 1336 (Fed. Cir. 2006) held the trial court did not err in rejecting as deductions from damages the cost-avoidances proffered by the government if there had been no breach, because they were "not an accurate indicator" of how the nonbreaching party would have behaved had there been no breach.

> In this regard, assuming inquiry into the nonbreach world is appropriate on this record, inquiry is not minimum contract performance, but what DOE would have done. The court finds on this record that the contingent rates of acceptance in the 1991 ACR did not fulfill DOE's contractual duties to commence performance, were not an accurate indicator of how DOE would have performed, and that defendant did not meet its burden in this regard.

77 Fed. Cl. at 437.

The court neither concluded nor considered whether the acceptance rates in the 1991 ACR would or would not have fulfilled DOE's contractual obligations for the first ten years of the program. The court did find that the contingent, artificially-constrained 1991 ACR at that time was not an accurate benchmark from which to determine costs that would have been incurred in that hypothetical scenario.

Under defendant's thinking, deductions from recovery for costs that would have been incurred if there had been no breach, would be determined not from what would have happened, but what could have happened if DOE had performed not at the capacity levels planned, expected levels, but at some bare minimum. DOE did not advocate at trial, after trial or in its request for reconsideration, what a bare minimum contract performance would be in the context of the overall SNF disposal obligation involved.

**F. Alleged inconsistent findings**

As defendant notes, the court acknowledged the testimony of Mr. Bland that his "mandate" was to preserve FCR. That testimony, cited by the court as support for findings on long-range planning, is not inconsistent with the court's later finding that, for a relatively short-time, through fuel-management techniques, possible inter- or intra-company swaps (or purchases) of allocations, dry storage would not have been constructed. If there had been confidence in DOE's commencement of performance, dry storage would not have been built.

The court did not find DOE was obligated to accept SNF in such amounts as to preclude all additional at-reactor storage after 1998 – so defendant's objection that the court's recognition of the need for the second bathtub rack after 1998 (which

plaintiffs concede, so was not a point of contention) does not "conflict with that obligation." Accordingly, defendant's objections that it could never meet performance obligations of elimination of all at-reactor storage for plaintiffs or industry as a whole and elimination of all post-1998 storage requirements at any of the touted rates, does not warrant reconsideration of any cited portion of the court's opinion.

**H. Difference between expectancy, reliance damages and the burden of proof**

Finding further fault with the court's reasoning on allocating the burden of proving the nonbreach world, defendant concludes the court placed that burden on defendant. In the Opinion, the court did refer to case authority concerning foreseeable costs incurred in reliance on a contract, in which the breaching or repudiating party has the burden of establishing expenses that would have been incurred if the contract had been performed – in the nonbreach world. Defendant states that, while the breaching party has the burden of establishing the costs that would have been incurred in the nonbreach world in the context of claims for reliance or restitution, "the opposite is true when a plaintiff is claiming expectation damages." Expectancy damages are "the benefits the nonbreaching party expected to receive in the absence of a breach." *Calif. Fed. Bank v. United States*, 395 F.3d 1263, 1267 (Fed. Cir. 2005). Defendant adds:

> There is no dispute that, in this case, the plaintiffs are making a claim for expectation damages. Indeed, plaintiffs have not incurred any costs "in reliance" upon contract performance, but, rather, are claiming that, as a result of non-performance, they have had to expend costs they otherwise would not have had to expend. Consequently, the analogy to reliance damages is misplaced and is unsupported by the law.

(Def.'s Mot. for Recons. 6.)

In order to place plaintiffs in as good a position as they would have been had DOE fully performed, plaintiffs met their burden of establishing the mitigation costs awarded were reasonably foreseeable to DOE at the time of contracting; DOE's partial breach was a substantial causal factor in the damages and the damages were established with reasonable certainty.

Defendant illustrates its argument by reference to a suit seeking pre-sale increased storage costs from DOE's delay as well as reduced profits from a subsequent sale of its plant (the plant sold for less than it otherwise would have because of continuing storage needs and other consequences from the breach). "[U]nder the Court's ruling in this case, the plaintiff would have the burden of proving the 'but for' world for its lost profits theory, while the Government would have the burden of proving that same 'but for' world in connection with the plaintiff's increased storage costs claim. Such a result demonstrates precisely why drawing a distinction between different types of expectation damages is not simply unsupported by the law, but unsupported by logic." (Def.'s Mot. for Recons. 10.)

Again, as the court's findings on whether or not the expenses would have been incurred in the nonbreach world were the same regardless of which party had the burden of proof, defendant's claimed error is academic. The impact of DOE's partial breaches on the market for commercial nuclear reactors and the parties' burdens in this regard may well not be the same as those involved in the mitigation efforts reflected in the instant litigation. There is no logical inconsistency.

**CONCLUSION**

The Motion for Reconsideration does not raise a manifest error of law or fact. There being no other grounds for reconsideration stated, it is **ORDERED** that the Motion for Reconsideration is **DENIED.**

s/ James F. Merow
James F. Merow
Senior Judge